**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CAREISMATIC BRANDS, LLC, *et al.*, | Case No. 24-10561 (VFP) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF KENT PERCY, CHIEF RESTRUCTURING OFFICER OF CAREISMATIC BRANDS, LLC IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Kent Percy, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer ("CRO") of Careismatic Brands, LLC, and certain of its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company" or "Careismatic").   I have served as Chief Restructuring Officer since January 2, 2024.  In the month before becoming CRO of Careismatic, I advised the Company in my capacity as a Partner & Managing Director of AlixPartners, LLC (together with its affiliates, "AlixPartners"), which the Company retained in December 2023 as financial advisor to assist in the Company's restructuring efforts and to evaluate certain strategic alternatives.  In both that capacity and as Chief Restructuring Officer of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/careismatic.   The location of Debtor Careismatic Brands, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is:  1119 Colorado Avenue, Santa Monica, California 90401.

2.     I have over 25 years of corporate restructuring experience, including over 20 years in the AlixPartners restructuring practice, and have served at AlixPartners as a Partner & Managing Director since January 2018.  Prior to joining AlixPartners, I was a Vice President of the venture capital firm MC Capital, where I managed the investment of early-stage capital of startup companies.  Before that, I spent three years in the Business Recovery Services group at PricewaterhouseCoopers LLP.

3.     Over the past 25 years, I have specialized in the retail, media, and entertainment industries, advising senior management and directors of major companies to devise and implement turnaround and restructuring strategies in out-of-court transactions, chapter 11 restructurings, and foreign insolvency proceedings.  I have been involved in numerous large and complex restructurings, including:  Bed Bath & Beyond; CTI Foods; Caesars Entertainment Operating Company; Borden Dairy; Eastman Kodak Company; Advantage Rent A Car; Toys "R" Us; Comverse Technology, Inc.; Dana Incorporated; Gymboree Group, Inc.; FairPoint Communications, Inc.; Milacron, Inc.; think3, Inc.; and Nebraska Book Company.  I am a Certified Insolvency & Restructuring Advisor and a Certified Public Accountant.  I received a Bachelor of Arts in Economics from the University of Texas at Austin and earned a Master of Business Administration from the Goizueta Business School at Emory University.

4.     On January 22, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of New Jersey (the "Court").  To minimize the adverse effects on their business, the Debtors have filed certain motions and pleadings seeking various types of typical "first day" relief (collectively, the "First Day Motions").  The facts set forth in each First Day Motion are incorporated herein by reference.

5.      I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith. I am familiar with the contents of each First Day Motion and believe that the relief requested therein is necessary for the Debtors to transition smoothly into chapter 11 and to continue operating as a going concern.

6.      The statements set forth in this Declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and third-party advisors. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

## Background

7.      Careismatic is the leading designer, marketer, and distributor of medical apparel, footwear, and accessories. Founded in 1995 in Chatsworth, California, Careismatic has grown from operating a single flagship brand, Cherokee Medical Uniforms ("Cherokee"), to a portfolio of seventeen brands. The Company offers value to its stakeholders through its spectrum of medical apparel and workwear and omnichannel distribution capabilities across the globe. Careismatic is the market leader in the $3 billion domestic medical scrubs industry, with dominant positions in the wholesale and online marketplace segments.

8.      Careismatic's mission is simple:  support those who care for others by providing a wide choice of products, technologies, and brands focused on the caregiver. Through its commitment to this mission, Careismatic's portfolio of brands and products have become

emblematic of patient care. As its business has expanded over the years, Careismatic has continued to support caretakers and healthcare workers in delivering high-quality patient care in approximately 65 countries around the world.

9.      Careismatic's commitment to caregivers was particularly visible during the COVID-19 pandemic, when the Company redoubled its efforts to stand by and support frontline workers. The COVID-19 pandemic highlighted Careismatic's mission—finding new ways to elevate healthcare professionals by providing high-quality apparel and personal protective equipment—and how this mission remains central to the Company's growth. The pandemic led to sharp increases in medical apparel demand, validating the Company's investments into new brands, technologies, and manufacturing capacity. This confluence of factors led to record-setting revenue for Careismatic in both 2020 and 2021, with revenue growing to $687 million in 2021 (approximately 38% greater than the $498 million in revenue posted in 2019).

| REVENUE | | | | |
|---------|---------|---------|---------|---------|
| 2019 | 2020 | 2021 | 2022 | 2023E |
| $498 million | $635 million | $687 million | $627 million | $559 million |

10.      Despite this success, operational and financial factors have stressed the Company's financial condition over the last two years, and ultimately necessitated this restructuring. While Careismatic expanded capacity to meet market demand in 2020 and 2021, demand has normalized to its historical trendline in 2022 and 2023. Macroeconomic issues, including a rapid and dramatic rise in interest rates, persistent supply chain disruptions, rising material costs, and a challenging labor market exacerbated significantly weaker industry-wide demand.

11.     Careismatic has also faced pressure from increased competition and a shift in consumer purchasing preferences.  Careismatic has traditionally led the wholesale medical apparel market, distributing its products primarily through a mix of national and regional retailers, and to wholesale purchasers.  In the aggregate, these brick-and-mortar retailers comprised approximately 60% of Careismatic's revenue in 2022.  As consumer preferences continue to shift online, Careismatic realized the need to change, bringing in new management to accelerate its transition to online marketplace and direct-to-consumer ("DTC") offerings, and has invested in the build-out of its DTC platform.  While DTC and online marketplace sales can offer significantly higher gross margins, the Company must continue to make significant investments in its fulfillment and digital capabilities as the shift to online accelerates.  Furthermore, the shift in consumer preferences has created opportunities for new competitors, as entrants have flooded the online market to capture a portion of the total available market.  While Careismatic anticipates significant growth and improved net margins from its burgeoning DTC and online marketplace segments over the next five years, the Company remains in a trough period as it restructures its legacy business and online businesses.

12.     In addition to market headwinds and the challenges posed by rapidly shifting consumer preferences, the lingering effect of Careismatic's legacy business model—including a lack of integration amongst acquired brands (leading to internal inefficiencies and redundancies), poor inventory forecasting and controls (further exacerbated by COVID-19 supply chain disruptions), and material ongoing litigation—has proved distracting and burdensome to the Company.  The ongoing costs incurred in remedying these issues, and related material obligations related to the Company's legacy business model, pose additional and unsustainable liquidity challenges to Careismatic.

13.    In an effort to address the significant headwinds and liquidity challenges facing the Company following the COVID-19 pandemic, in October 2022, investment vehicles managed or advised by Partners Group (USA) Inc. or its affiliates (collectively, the "Sponsor"), provided the Company with a much-needed infusion of capital in the form of the approximately $30 million unsecured Sponsor PIK Notes.[2]  In addition to the Sponsor PIK Notes, beginning in late 2023, an affiliate of the Sponsor, party to that certain Services Agreement with the Company, dated as of January 6, 2021 (the "Services Agreement"), determined in effort to help preserve the Company's liquidity, it would defer reimbursement of certain expenses to which it is entitled under the Services Agreement, and defer and accrue the management fees due and owing pursuant to the Services Agreement, resulting in additional liquidity for the Company.  Despite the Sponsor's material contributions and concessions, however, the market challenges and legacy obligations facing the Company persisted and have required additional action and contingency planning.

14.    Over the last eighteen months, the Company has also undergone a major operational restructuring, replacing the vast majority of its executive team, as the Company works to reduce its cost structure and execute on its long-term roadmap for omnichannel growth.  The Company has also sought to rework its facilities and warehousing footprint and capture savings through new third-party logistics providers.  The first phase of this transformation strategy, focused on getting "back to basics," seeks to reduce expenditures and increase operational efficiencies, while focusing on providing a best-in-class customer experience.

---

[2]    The Sponsor PIK Notes were approved by the Company after the board of directors of CBI Parent, L.P. and Careismatic Brands, Inc. were informed of the Sponsor PIK Notes' terms, the Company's liquidity situation, and the availability of alternative financing from other sources.

15. The Company also recognized that, despite these operational measures, it would be necessary to engage with certain of its secured lenders to deleverage its capital structure. In September 2023, the Company retained PJT Partners LP ("PJT"), as investment banker, and Kirkland & Ellis LLP ("K&E," and together with PJT and AlixPartners, the "Advisors"), as legal counsel, in connection with a potential liability management transaction to be effectuated out-of-court or by other means. Despite some early interest from such discussions, the Company faced ongoing declines to available liquidity because of continued underperformance, prompting necessary discussions around an in-court path. As a result, in December 2023, the Company retained AlixPartners as financial advisor to assist with exploring strategic alternatives, planning for potential in-court proceedings, and managing the Company's liquidity.

16. In addition to retaining the Advisors, Debtors CBI Parent, L.P. ("CBI Parent") and CBI Intermediate, Inc. ("CBI Intermediate") each appointed additional independent directors to evaluate all restructuring options: Harvey Tepner was appointed to the board of CBI Parent and Roger Meltzer to the board of CBI Intermediate. Messrs. Tepner and Meltzer each serve as the sole member of the transaction committees (the "Transaction Committees") established by CBI Parent and CBI Intermediate, respectively. In addition to evaluating the Company's restructuring alternatives, the Transaction Committees are charged with, among other things, investigating claims or causes of action CBI Parent and CBI Intermediate and/or their estates might have against certain insiders and affiliates, which investigations have commenced prepetition and remain ongoing as of the date hereof.

17. Over the past two months, the Company, with the assistance of the Advisors, and the support and cooperation of the Sponsor, engaged in detailed turnaround discussions and hard-fought negotiations with (i) an ad hoc group holding approximately 73% of the First Lien

Loans and approximately 21% of the Second Lien Term Loans (each as defined herein) (the "First Lien Ad Hoc Group"), represented by Milbank LLP ("Milbank"), as legal counsel, and Houlihan Lokey Capital, Inc. ("Houlihan"), as financial advisor, and (ii) an ad hoc group holding 3% of the First Lien Loans and 50% of the Second Lien Term Loans (the "Cross-Holder Group"), represented by King & Spalding LLP ("King & Spalding").  Since November, the Debtors have worked with the First Lien Ad Hoc Group on the terms of a go-forward restructuring, and, beginning in mid-January, the Debtors also engaged the Cross-Holder Group to further build consensus.  On January 22, 2024, after extensive, arm's-length negotiations, the Debtors entered into the Restructuring Support Agreement (the "Restructuring Support Agreement" or "RSA"), attached hereto as **Exhibit C**, with the First Lien Ad Hoc Group, the Cross-Holder Group, and the Sponsor (together, the "RSA Parties").  The deal reflected in the Restructuring Support Agreement charts a clear and value-maximizing path forward for the Company during these chapter 11 cases and beyond.

18.    Indeed, as discussed in greater detail below, the Restructuring Support Agreement contemplates, among other things:  (i) a value-maximizing restructuring transaction via "prearranged" chapter 11 cases through either a standalone recapitalization or sale to a third-party; (ii) debtor-in-possession financing ("DIP Financing") to fund costs throughout these chapter 11 cases; (iii) deleveraging of the Company's balance sheet through a debt-for-equity exchange of the First Lien Loans and warrants issued in satisfaction of the Second Lien Secured Claims (as defined in the Restructuring Support Agreement); (iv) mutual releases between the Company and the RSA Parties;[3] and (v) exit financing sufficient to fund the Debtors' go-forward business

---

[3]    Pursuant to the Restructuring Support Agreement, the mutual releases are subject to the outcome of the Transaction Committees' investigations into the releases to be provided in connection with the Restructuring Transactions (as defined herein).  The Restructuring Support Agreement is itself contingent on the Plan (as

post-emergence.  With the Restructuring Support Agreement in hand, the Debtors will promptly

file, prosecute, and confirm a chapter 11 plan of reorganization (the "Plan") and expeditiously

emerge from bankruptcy well-positioned to remain the leader of the medical apparel market.

<div align="center">*        *        *        *        *</div>

19.    To better familiarize the Court with the Debtors, their business, and the

circumstances leading to these chapter 11 cases, this Declaration is organized into four sections

as follows:

- **Part I** provides an overview of the Debtors' corporate history and business operations;
- **Part II** describes the Debtors' prepetition corporate and capital structure;
- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;
- **Part IV** describes the RSA, DIP Financing, and the path forward in chapter 11; and
- **Part V** describes relief requested and the facts supporting each First Day Motion.

**I.    Careismatic's Corporate History and Business Operations.**

**A.    Corporate History.**

20.    Established in 1995 in Chatsworth, California, the Company (at the time, operating

under the name Strategic Partners), purchased Cherokee, one of the most popular brands of

"scrubs," out of bankruptcy, becoming the Company's first and flagship brand.

---

defined below) including the releases contemplated in the Restructuring Support Agreement and the Plan
becoming effective.



21.    Over time, the Company has expanded to become a portfolio of reliable brands, offering a wide array of medical apparel, footwear, and accessories across distribution channels. The Company's initial growth is attributable to their innovative design and licensing partnerships. The Company began entering into licensing agreements with brands such as Disney and Marvel to create themed scrubs designed for pediatric use.  As one of the first companies to put cartoon characters on medical scrubs, the Company's partnerships with Disney, Marvel, and others  created a new market segment.  In 2009, the Company extended this strategy further by entering into a licensing agreement to sell its medical apparel under the Dickies brand—one of the most trusted brands in workwear.

22.    During this period, the Company also solidified its position as the premier player in the medical apparel wholesale market.  Working with its national retailer clients, the Company became one of the first medical apparel companies to invest online by building out the retailers' web stores, which were designed for the Company to receive and fulfill customer orders without

the retailer needing to hold Careismatic's inventory.  These growth strategies worked:  by 2010, the Company had over 500 employees and dozens of retailer clients.

23.    After over 20 years of sustained growth, the Company, recognizing a shift in the medical apparel marketplace, looked to enter its next stage of growth by building out its online marketplace presence (*e.g.*, Amazon) and DTC offerings.  In 2016, under new leadership, the Company invested heavily in its online presence to keep up with its competitors.  These investments also marked an evolution of the Company's image from a wholesale supplier to a more dynamic business serving both large retailer clients and end customers (*i.e.*, healthcare workers).

24.    More recently, the Company has conducted a rebranding to Careismatic Brands in 2020 and was acquired by funds managed by Partners Group—its current Sponsor—in 2021.  More importantly, during the subsequent period, Careismatic's brand acquisition and development strategies have evolved.  Instead of entering licensing agreements with non-medical brands to emboss on Careismatic's apparel, Careismatic acquired brands to adapt to shifting customer expectations.  The Company also built a broad portfolio that could provide scale to its distribution platform and leverage the Company's technology, manufacturing capabilities, and network to serve diverse customer needs.

25.    Today, the Company's portfolio of brands includes Cherokee, Classroom Uniforms, AllHeart, Infinity, Med Couture, Scrubstar, Heartsoul Scrubs, Silverts Adaptive Apparel, Healing Hands Scrubs, Medelita, and BALA Footwear.  These brands account for approximately 88% of the Company's revenues.  Below is a timeline of the Company's key acquisitions:



- **Classroom Uniforms**.  One of the first brands acquired by Careismatic, Classroom Uniforms, along with its sister brand Real School, has been a leader in the school uniform space since 1995.

- **AllHeart**.  Acquired in 2018, AllHeart is an online store for medical apparel, footwear, accessories, and medical devices.  AllHeart sells a wide range of brands under its own labels (*AllHeart, AllHeart Basics, and AllHeart Luxe Supreme*), other Careismatic brands, and other market-leading brands.

   

- **Healing Hands Scrubs**.  Healing Hands is a medical apparel company founded by Bansi Lakhani, who was inspired to create the company after he received care from dedicated and caring nurses following a heart attack.  Based in New Jersey, Healing Hands offers premium scrubs for both men and women.

- **Infinity**.  Infinity is an imprint of Cherokee that sells scrubs and footwear, adapted to meet the needs of people working in demanding clinical environments.



- **Scrubstar.**  Offered exclusively through Walmart and Walmart.com, Scrubstar offers high-quality, comfortable medical apparel at unbeatable prices.

- **Medelita**.  Founded in 2008, Medelita is known for high-end, tailored medical apparel designs crafted from cutting-edge performance fabrics.




- **Med Couture**.  A premium medical apparel brand for women, Med Couture is sold through a number of brick-and-mortar and online retailers (including AllHeart.com and Amazon).  Med Couture also offers the Rothwear line of medical apparel for men.



- **Heartsoul Scrubs**.  A fierce, feminine, far-from-ordinary medical apparel brand for women with a huge and loyal following.  Offered online and at retailers nationwide.

- **Silverts Adaptive Apparel**.  For over 90 years, Silverts has been providing reliable adaptive apparel and footwear to fit a range of needs.



- **BALA Footwear.**  Founded in 2020 in Portland, Oregon, by former Nike executives Brian Lockard and John Eberle and former Under Armor executive Caprice Neely, BALA seeks to achieve comfort for its medical professional customers by leveraging features prevalent in athletic footwear.

**B.    Business Operations.**

26.    Headquartered in Santa Monica, California, Careismatic employs approximately 800 full-time U.S. employees, and generated approximately $559 million of revenue in 2023. Through its portfolio of brands and distribution platform, including its one million square foot distribution facility in Texas, Careismatic serves every type of customer, at every price point, through all distribution channels.  Careismatic's platform can be broadly segmented into (i) wholesale, (ii) Walmart, (iii) DTC, and (iv) online marketplace.

### a.    Wholesale.

27.    The Company's wholesale business (both U.S. and international) remains its largest segment and it continues to dominate the market—making up over 50% of the U.S. wholesale market and one of the largest players globally.

28.    Domestically, the Company's wholesale business contributes 46% of net sales of the Company.  Careismatic has over 2,300 wholesale customers, comprised of national and regional retailers, independent stores, institutional purchasers (*e.g.*, hospitals, medical offices, patient care facilities), and independent websites.  Medical scrubs make up approximately 90% of revenues from U.S. Wholesale customers.  Key customers include national medical apparel retailers such as Uniform Advantage, Scrubs and Beyond, Uniform Destination, and Uniform Factory Outlet.

29.    The Company's international wholesale business constitutes 9% of net sales.  The Company's international wholesale customers span approximately 65 countries with its largest international markets being in Latin America, Canada, Europe, and the Middle East.  The Company continues to prioritize the growth of its international business both through a dedicated international sales team and partnering with third-party logistics providers to better serve customers globally.

### b.    Walmart.

30.    The Company first began selling to Walmart in 1997.  Today, the Company sells two brands through Walmart:   (i) Scrubstar, a Walmart private label brand available in approximately 3,900 stores and online; and (ii) Genuine Dickies, a premium scrubs brands launched in 2022 (available in approximately 305 stores and online).  The Company is uniquely able to meet Walmart's service level, pricing requirements, and geographic footprint.  In addition, the Company offers Walmart store-specific analytics, which allow its stores to optimize sales and

inventory productivity.  While competitors have unsuccessfully attempted to become the primary
supplier for Walmart, the Company has maintained pole position by delivering on consumer
requirements, product quality, and service level requirements needed to serve Walmart at scale.

### c.    Direct-to-Consumer.

31.    Recognizing changing consumer preferences, the Company has continued to invest
in its DTC business.  The Company believes that its DTC business will become a core source of
growth in the years to come and a major driver of gross margin expansion.  The Company's DTC
strategy is focused on its single multi-site single check out portal (the "MSSC Portal"), which will
allow the Company to efficiently scale its DTC business, enable the Company to fully capture
retail economics, and reduce customer acquisition costs.  The Company continues to work on
integrating its brands to the MSSC Portal while simultaneously modernizing its Careismatic
Rewards Program for a better retail user experience.  In the future, the Company looks to leverage
its DTC capabilities and expects significant margin expansion over the next five years.

### d.    Online Marketplace.

32.    Complementing the Company's direct-to-consumer segment, Careismatic began
selling its products on Amazon and Walmart Marketplace in 2019.  The Company's Online
Marketplace is its fastest-growing segment, having grown 33% annually since 2019 and
accounting for 16% of the Company's net sales today.  The Company has an approximate 50%
market share on Amazon.  In addition to being the fastest growing segment, Online Marketplace
sales have the highest gross margins (over 60%), which the Company expects to continue to
improve driven by product assortment optimization and pricing management.

### C.    Recent Events.

33.    Since 2021, the medical apparel industry has faced a variety of challenges,
including a reversion to the mean demand following the pandemic, which indirectly created a spike

in demand for the Company's products.  COVID-19 also accelerated the average consumer's shift to purchasing online, which has had an outsized benefit to apparel companies already focused on online distribution.  The shift to online sales has invited new competition to the space, which has squeezed longtime industry players, such as Careismatic, out of otherwise available market share.  Finally, recent shifts in technology companies' restrictions on targeted advertising has created severe disruption for ecommerce brands and markets.

34.    The Company has been proactively addressing these challenges since 2021.  In response to the COVID-19 supply chain disruption, the Company reduced its cash conversion cycle (*i.e.*, the number of days it takes the Company to convert inventory into cash from sales) by nearly half.  Careismatic has also continuously worked to integrate its recently-acquired business lines to realize scale and eliminate redundancies.  The Company also focused on a more efficient spend on advertising investments.  Finally, and perhaps most importantly, new management has focused its efforts on (i) rebuilding customer relationships, (ii) improving margins through streamlined costs and optimized pricing, and (iii) transitioning from its legacy operational model to utilizing third parties to realize savings and reduce mandatory capital expenditures.

## II.    The Debtors' Organizational and Capital Structure.

### A.    Careismatic's Organizational Structure.

35.    An overview of Careismatic's current organizational structure, in simplified form, is reflected below.  A comprehensive organization chart is attached hereto as **Exhibit B**.



\* Careismatic Brands Asia Limited (Hong Kong), Careismatic Brands do Brasil (Brazil), Careismatic Brands Europe Limited (UK), Careismatic Brands NL B.V. (Netherlands), De Soto Technologies Private Limited (India), Silvert's Holdings, Ltd. (British Columbia)

**B.      Careismatic's Prepetition Capital Structure.**

36.      As of the Petition Date, Careismatic has approximately $832.9 million in total outstanding funded debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Amount Outstanding** |
| **First Lien Term Loans** | January 2026 | $590 million |
| **First Lien Revolving Loans** | January 2028 | $100 million |
| **Second Lien Term Loans** | January 2029 | $110 million |
| **Unsecured PIK Note** | October 2025 | $32.9 million |
| **Total Outstanding Funded Debt:** | | **$832.9 million** |

*a.      Prepetition ABL Facility.*

37.      Pursuant to that Credit and Security Agreement dated March 9, 2023 (as amended, restated, supplemented, or modified from time to time prior to, and in effect immediately before the Petition Date, the "ABL Facility") by and among Careismatic Receivables LLC, a Delaware limited liability company, as borrower, Careismatic Brands, LLC, a California limited liability company, as Pennsylvania corporation, as the servicer, administrator, and collector of the receivables, GLAS USA LLC, as administrative agent, GLAS Americas LLC, as collateral agent, KKR Credit Advisors (US) LLC, as structuring advisor, and the lenders party thereto from time to time, the Debtors have access to an asset-based revolving credit facility in an aggregate principal amount of $30 million.  The ABL Facility was set to mature on March 9, 2025.  On January 18, 2024, the Debtors determined to pay off the ABL Facility in the ordinary course of business.

*b.      First Lien Credit Agreement.*

38.      The Debtors are obligors under that certain First Lien Credit Agreement, dated as of January 6, 2021 (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of

January 28, 2021, and as amended by Amendment No. 2 to the First Lien Credit Agreement, dated as of June 8, 2023, the "First Lien Credit Agreement"), by and among CBI Intermediate, Inc., a Delaware corporation, as holdings, CBI Buyer, Inc., a Delaware corporation, as the Merger Sub or the Initial Borrower, New Trojan Parent, Inc., a Delaware corporation, as successor to Merger Sub and the Borrower, the lenders from time to time party thereto (the "First Lien Lenders"), UBS AG, Stamford Branch, as administrative agent and collateral agent.    As of the Petition Date, an aggregate balance of approximately $690 million, including accrued and unpaid interest in outstanding loans under the First Lien Credit Agreement, consisting of approximately: (i) $590 million outstanding of first lien term loans, which carry an interest rate of Adjusted Term SOFR plus 3.25% per annum, and mature on January 1, 2028 (together, the "First Lien Term Loans"); and (ii) $100 million of outstanding of first lien revolving loans, which carry an interest rate of Adjusted Term SOFR plus 3.75% (which may be decreased to 3.50% or 3.25% upon meeting certain deleveraging benchmarks), and mature on January 1, 2026 (the "First Lien Revolving Loans," and together with the First Lien Term Loans, the "First Lien Loans").    The First Lien Loans are secured by a first priority lien on substantially all of the Debtors' assets.

### c.    *Second Lien Credit Agreement.*

39.    On January 6, 2023, Debtor New Trojan Parent, Inc., a Delaware, LLC, as borrower, CBI Intermediate, Inc., a Delaware Corporation, as holdings, the lenders party thereto from time to time (the "Second Lien Lenders"), and UBS AG, Stamford Branch, as administrative and collateral agent entered into that certain Second Lien Credit Agreement (as amended by Amendment No. 1 to the Second Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the Second Lien Credit Agreement, dated as of June 8, 2023, the "Second Lien Credit Agreement").    As of the Petition Date, the aggregate balance of the term loans provided under the Second Lien Credit Agreement are approximately $110 million,

including accrued and unpaid interest (the "Second Lien Term Loans"). The Second Lien Term Loans carry an interest rate of Adjusted Term SOFR plus 7.25% and matures on January 1, 2029. The Second Lien Term Loans are secured by a second priority lien on substantially all of the Debtors' assets.

40.     The relative rights and priorities of the First Lien Lenders and the Second Lien Lenders in respect of priority are set forth in that certain Junior Lien Intercreditor Agreement, dated as of January 6, 2021, between UBS AG Stamford Branch, in its capacity both as collateral agent under the First Lien Credit Agreement and collateral agent under the Second Lien Credit Agreement.

### d.     Sponsor PIK Notes.

41.     On October 17, 2022, Careismatic Brands, LLC, a Delaware, LLC, as borrower, and the Sponsor, entered into a series of unsecured intercompany notes (collectively, the "Sponsor PIK Notes"). As of the Petition Date, the outstanding principal amount on account of the Sponsor PIK Notes was $32.9 million, including accrued and unpaid interest. The Sponsor PIK Notes bear an interest rate equal to 8% per annum, payable in kind. The Sponsor PIK Notes have a maturity date of the earliest of:  (i) October 17, 2025; (ii) the date of the consummation of a Change of Control (as defined in the Sponsor PIK Notes); and (iii) the date of the consummation of a Qualifying IPO (as defined in the Sponsor PIK Notes).

## III.   Events Leading to These Chapter 11 Cases.

### A.     Challenges Facing the Debtors' Business.

42.     At a critical time during its operational transformation, the Company presently faces a set of unanticipated challenges and a constrained liquidity position. *First*, the Company is confronting a decline in demand as a result of the post-COVID-19 market-wide downturn in the medical apparel industry. *Second*, the Company is facing challenges posed by a higher interest

rate environment and persistent supply chain disruptions. **Third**, the Debtors hold one-time legacy obligations in connection with the resolution of certain litigation and compensation to former employees and advisors. **Fourth**, the Debtors' current capital structure is overleveraged given the downward cash flow forecasts. Taken together, these factors have resulted in a significantly diminished operational and financial outlook for the Debtors. Simply put, without a comprehensive restructuring of their balance sheet, the Debtors will be unable to continue as a going concern.

43.     **Softening Demand.** The COVID-19 pandemic caused a spike in market-wide demand for medical apparel in the United States and globally. To keep up with demand, Careismatic ramped up production, expanding its production capacity to meet customer needs. While the Company expects demand to return to levels consistent with historical growth rates, demand remains temporarily depressed as the market normalizes following all-time highs during 2020 and 2021. Today, aggregate demand is approximately 65% of 2020 and 2021 demand. Careismatic's cash position has been challenged as demand returns to its historical growth-rate more slowly than anticipated. Despite this, the Company firmly believes this is a trough period and not an indicator of future performance, as revenue growth is expected to return in the near term as demand for medical apparel rebounds to its historical growth rates.

44.     **Increased Costs.** Like many businesses, Careismatic's business has not been immune to the consequences of markedly higher interest rates, persistent inflation, and macroeconomic headwinds that have reverberated through the economy. Beginning in 2021, rising interest rates, supply chain delays and the cost of materials, labor, and fuel, led to increased costs and reduced margins across Careismatic's portfolio. In 2021, the Company's interest

expense increased to $42 million—over 82% greater than prior to the COVID-19 pandemic.[4]  In 2023, the Company's interest expense rose to an estimated $64 million—approximately 42% greater than 2022 and 178% greater than 2019.  This has impacted profit margins.

45.    ***Ongoing Litigation***.    The Company is involved in certain ongoing material litigation.  Some of the costs associated with these litigation matters are largely liquidated, and others continue to develop.  For either category, absent a comprehensive financial restructuring, the outcomes of such material litigation, including the cost of settlement, would constitute a significant decrease in liquidity that would alter the Company's ability to meet ordinary course obligations.

46.    ***Balance Sheet and Liquidity Constraints***.    Due to the above-mentioned factors, the Company has experienced significant financial performance deterioration and liquidity constraints.  In 2023, the Company's estimated EBITDA dropped to $42 million (approximately 41% less than 2022 EBITDA), with estimated EBITDA falling to $3 million in the fourth quarter. Today, the Debtors have approximately $12.4 million in remaining liquidity.  Accordingly, absent a comprehensive financial restructuring, it is highly unlikely that the Debtors would be able to continue to operate and meet their obligations as they become due.

**B.    Proactive Approach to Address Financial and Operational Issues.**

*a.    Operational Changes.*

47.    In response to growing liquidity issues, the Company, under new management, has taken steps to implement its "back to basics" plan by reducing expenditures, increasing operational efficiencies, and improving margins.  The Company has focused efforts across four major areas.

---

4    Interest expense excludes interest income from the sale of certain interest rate swaps and mark-to-market gains on interest rate swaps retained.

*First*, Careismatic continues to implement channel diversification strategies to reach both wholesale and retail customers.  With the latter, Careismatic is refining its DTC model to increase brand exposure and create a streamlined online shopping experience.  As it grows its DTC market share, the Company expects to realize greater profits by capturing full retail economics.

48.    *Second*, the Company is restructuring its brand profile to more clearly align to customer needs.  To do so, Careismatic has taken its well-known brands and retooled them to target specific customer segments.  *Third*, the Company has continued to integrate recently acquired brands by conducting a top-to-bottom evaluation of its enterprise to reduce redundancies and drive operating inefficiencies.   This has lowered previous modules' costs by consolidating cross-platform brand work groups.  *Finally*, the Debtors have restructured their real estate footprint by consolidating facility locations and engaging third-party logistics providers where doing so would reduce costs (in particular, in operations in Canada and Europe).  These operating initiatives have had and will continue to have a significant positive impact on the Company's free cash, through reduced operating costs and improved margins.

### b.    *Enhanced Corporate Governance.*

49.    In connection with its contingency planning efforts and in consultation with its Advisors, the Company reviewed its existing corporate governance infrastructure.  The Company determined that it was in the best interests of the Company and its stakeholders to establish two Transaction Committees and to appoint one experienced independent and disinterested director to each:  (i) Harvey Tepner to the board of CBI Parent and (ii) Roger Meltzer to the board of CBI Intermediate.  Messrs. Tepner and Meltzer are the sole members of the respective Transaction Committees and have full delegation of authority to make decisions related to the restructuring.  On December 29, 2023, CBI Intermediate retained McDonald Hopkins LLC as independent counsel, and on January 8, 2024, CBI Parent retained Kobre & Kim LLP as independent counsel.

23

The Transaction Committees of CBI Parent and CBI Intermediate, with the assistance of their respective counsel, are (i) actively investigating potential claims or causes of action CBI Parent and CBI Intermediate, respectively, and/or their respective estates may hold against certain insiders, affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions (as defined herein).

### C.    Risk Management Phase.

50.    In the months leading up to these chapter 11 cases, the Company and its Advisors, with the support of the Sponsor, spent significant time exploring strategic alternatives.  As part of these efforts, the Company retained PJT, AlixPartners, and K&E, and with their assistance engaged the Company's existing stakeholders, including the First Lien Ad Hoc Group.  Unfortunately, the Company's cash position further deteriorated in the final months of 2023 and no actionable proposal materialized, reducing the possibility of a successful liability management transaction.  As a result, in December 2023, the Company and its Advisors began preparing for the increasing necessity of a chapter 11 filing.

## IV.    The RSA, Debtor-in-Possession Financing, and the Path Forward in Chapter 11.[5]

### a.    *Restructuring Negotiations.*

51.    In November 2023, with the assistance of K&E, PJT, and AlixPartners, the Company engaged with the First Lien Ad Hoc Group, represented by Milbank and Houlihan, and the Sponsor regarding an in-court restructuring.  When the Cross-Holder Group, represented by King & Spalding, indicated an interest in participating in the restructuring in mid-January 2024,

---

[5]    Capitalized terms used but not defined in this section shall have the meanings set forth in the Restructuring Support Agreement or the DIP Credit Agreement (as defined in the DIP Motion), as applicable.

the Debtors, with the support of the First Lien Ad Hoc Group and the Sponsor, engaged the Cross-Holder Group to build consensus prior to commencing these chapter 11 cases. As a result of these discussions and those held with other stakeholders, the Company believed that a comprehensive financial restructuring was needed to provide a long-term solution to the Company's capital structure and liquidity needs. Following a month of hard-fought, arm's-length negotiations between the Debtors, with the support and cooperation of the Sponsor, the First Lien Ad Hoc Group, and the Cross-Holder Group, the Debtors and the RSA Parties reached an agreement to effectuate certain restructuring transactions pursuant to a chapter 11 plan of reorganization (the "Restructuring Transactions"), executing the Restructuring Support Agreement on January 22, 2024.

>    ***b.***    ***Entry into the RSA.***

52.    Under the Restructuring Support Agreement, the Debtors, the Sponsor, the First Lien Ad Hoc Group, and the Cross-Holder Group agreed, subject to the terms and conditions thereof, to support a recapitalization transaction to significantly restructure the Debtors' balance sheet. The transactions contemplated by the Restructuring Support Agreement and related documentation will allow the Debtors to successfully emerge from chapter 11 with a rightsized balance sheet and poised to capitalize on their operational initiatives. The Restructuring Support Agreement contemplates the following key terms, among others:

- DIP Financing, in the form of (i) a $125 million new-money super-senior secured delayed draw debtor-in-possession financing facility (the "DIP Facility"), with $50 million available on an interim basis and $75 million available upon a final basis, and (ii) access to the prepetition secured lenders' cash collateral (the "Cash Collateral");

- the First Lien Lenders, in full and final satisfaction of their secured claims, will receive (i) in the event a recapitalization transaction is effectuated, 100% of the new equity in the reorganized Company (the "New Common Stock"), or (ii) in the event of a sale transaction, the sale proceeds;

- the Second Lien Lenders, on account of their secured claims, will receive 5-year warrants to purchase up to 8.5% of the New Common Stock with a strike price set at $818 million;

- mutual releases between the Company, the First Lien Ad Hoc Group, the Cross-Holder Group, the DIP Lenders, the Sponsor, the respective administrative and collateral agents under the First Lien Credit Agreement, the Second Lien Credit Agreement, and the DIP Credit Agreement; and

- stabilization for the Debtors' post-emergence business through exit financing.

53.     I believe that the deleveraging and liquidity-enhancing Restructuring Transactions set forth in the RSA represent the most-value maximizing path forward.  The Debtors commenced these chapter 11 cases to effectuate the Restructuring Transactions and gain access to the DIP Facility.   The Debtors are committed to consummating the comprehensive recapitalization transaction embodied in the Restructuring Support Agreement and emerging with a stronger balance sheet and the financial flexibility to continue serving their customers.  The Company and the RSA Parties believe it is imperative that the Debtors move through their chapter 11 process as efficiently as possible to minimize the administrative cost of these cases and the burden on the Company's operations.  To that end, the Debtors propose to proceed with these chapter 11 cases along the following timeline:

- no later than five calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than 30 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- no later than 30 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order that, among other things, approves (i) bidding procedures, (ii) the form and manner of notice of auction(s), (iii) the procedures for assumption and assignment of certain executory contracts and unexpired leases, and (iv) the date for auction(s), if necessary;

- no later than 45 calendar dates after the Petition Date, the Debtors shall have filed a Disclosure Statement and Plan;

- no later than 90 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the adequacy of the Disclosure Statement; and

- no later than 120 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

### c. *Proposed DIP Financing.*

54.     In connection with the execution of the RSA, the Debtors, with the assistance of PJT, AlixPartners, and K&E, reached an agreement with the First Lien Ad Hoc Group and Cross-Holder Group regarding the financing that would be necessary to fund these chapter 11 cases.  Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion") filed contemporaneously herewith, the Debtors seek authorization from the Court to enter into the $125 million DIP Facility.[6]

55.     As of the Petition Date, the Debtors only have $12.4 million in cash on hand, which is insufficient to support operations during the first days of these chapter 11 cases.  If approved on an interim basis, the DIP Facility will provide the Debtors with access to $50 million of new liquidity for use during these chapter 11 cases.  The DIP Facility is the culmination of rigorous, arm's-length negotiations between the Debtors and the First Lien Ad Hoc Group and Cross-Holder Group, is the best, and, in fact, the only DIP financing proposal currently available to the Debtors after concerted efforts undertaken by PJT to obtain additional DIP financing proposals, and

---

[6]   A description of the terms of the DIP Facility and the facts and circumstances leading to entry into the DIP Facility can be found in the *Declaration of Joshua Abramson in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, filed contemporaneously herewith.

provides the Debtors with crucial liquidity at the outset of these chapter 11 cases, allowing the Debtors and their advisors to focus on facilitating the consummation of the proposed restructuring transactions in the Restructuring Support Agreement and exiting chapter 11 expeditiously.

      **1.**      **Need for DIP Financing.**

56.     Absent the liquidity infusion to be provided by the DIP Facility, the Debtors would experience significant business disruption, would need to meaningfully curtail their operations, and would face a number of other value-destructive consequences.  Cash on hand and expected inflows are not expected to be sufficient to fund operations as a going concern in the near term or for the duration of these chapter 11 cases.

57.     In connection with the search for viable postpetition financing, AlixPartners, assisted by the Debtors, their management, and the other Advisors, prepared projected cash forecasts for the Debtors' business during these chapter 11 cases.  These forecasts took into account anticipated cash receipts and disbursements during the projected period and considered a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the underlying business.

58.     As of the Petition Date, substantially all of the Debtors' cash is encumbered, which means that the Debtors require immediate access to Cash Collateral to operate their enterprise and continue paying debts as they come due.  Prior to the Petition Date, the Debtors, in consultation with the Advisors, reviewed and analyzed their projected cash needs and prepared projections (as updated from time to time in accordance with the terms of the DIP Facility, the "Budget") of postpetition cash needs for the Debtors' business in the initial thirteen weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or

disbursed during this period, and, along with the longer-term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases. Based on my discussion with other members of the Debtors' management team and the Advisors regarding the needs of the business, I believe that the Budget, including its projections, provide an accurate reflection of the Debtors' likely funding requirements over the next thirteen weeks, and are reasonable and appropriate under the circumstances.

59.     Based on these projections and the Budget, the proposed DIP Facility provides the Debtors with sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to proceed expeditiously toward a value-maximizing resolution.  The DIP Facility will provide the Debtors with the necessary liquidity to fund their business operations during these chapter 11 cases and maintain relationships with their customers, vendors, suppliers, and employees.  Based on extensive discussions with the Debtors and their relevant Advisors, I understand that the proposed DIP Facility is the best and, in fact, only financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases.  Accordingly, in my professional opinion, the relief requested in the DIP Motion, filed substantially contemporaneously herewith, is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates, and should be approved by this Court.

**2.     The DIP Sizing Process.**

60.     The Debtors, with the assistance of their Advisors, determined that they will require approximately $125 million to fund these chapter 11 cases.  That amount was derived from a baseline cash-flow projection that the Debtors' management team and Advisors developed from an analysis of the Debtors' receipts and disbursements and informed by the Debtors' revised business plan forecast, as adjusted for:  (i) an anticipated contraction in vendor and customer receivables due to delayed payments and/or loss of sales while in chapter 11; (ii) the likely need

to satisfy prepetition foreign vendor obligations; and (iii) other chapter 11-related adjustments, including payment of professional fees, certain customary first day relief, and other related costs.

### 3.    The Debtors' Proposed Use of Cash Collateral.

61.    Pursuant to the DIP Motion, the Debtors also seek the continued use of Cash Collateral to provide sufficient liquidity for their operations during these chapter 11 cases. Substantially all of the Debtors' cash represents Cash Collateral, and accordingly, the Debtors will not be able to meet their near-term liquidity needs without access to Cash Collateral. The Debtors rely on the Cash Collateral generated from their operations to, among other things, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers. At the outset of these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll and contractual obligations, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases. Absent access to the Cash Collateral, the Debtors would face a value-destructive interruption to their business operations and severe limitations on their ability to implement the restructuring transactions contemplated by the Restructuring Support Agreement.

## V.    Evidentiary Basis for Relief Requested in the First Day Motions.

62.    The Debtors have filed First Day Motions seeking various relief to stabilize the Debtors' business operations, ensure a "smooth landing," and facilitate the efficient administration of these chapter 11 cases. A description of the relief requested in—and the facts supporting each First Day Motion—is set forth in **Exhibit A**.

63.     I have consulted with the Debtors' Advisors regarding each of the First Day Motions.  The relief requested is necessary and in the best interests of the Debtors' estates, and it will allow the Debtors to operate with minimal disruption and maximize value during these chapter 11 cases.  The Debtors have tailored their requests for immediate relief where the failure to receive such relief would cause immediate and irreparable harm to the estates.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 22, 2024

/s/ Kent Percy
Name:  Kent Percy
Title:   Chief Restructuring Officer

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions**[1]

---

[1]    Capitalized terms used but not defined herein have the meaning ascribed to them in the applicable First Day Motion.

I.   **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.   Pursuant to the Joint Administration Motion, the Debtors seek entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.   Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.   Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.   The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

II.   **Debtors' Motion For Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "<u>Case Management Motion</u>").**

2.   Pursuant to the Case Management Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to designate these chapter 11 cases as complex cases, (b) approving and implementing certain notice, case management, and administrative procedures as described in <u>Exhibit 1</u> to the Case Management Order (collectively, the "<u>Case Management Procedures</u>"); and (c) granting related relief.

3.   There are thousands of creditors and parties in interest in these chapter 11 cases. Notice of all pleadings and other papers filed in these cases to each of these parties would be extremely burdensome and costly to the Debtors' estates.   The costs of photocopying, postage, and other expenses associated with such large mailings would be excessive and practically prohibitive. The relief sought in the Case Management Motion is tailored to address such concerns while

simultaneously ensuring timely notification to those parties actively participating in this case or those parties whose rights are directly affected by a given matter.

4.      The Case Management Procedures will facilitate service of Court Filings and orders in a manner that will maximize the efficiency and orderly administration of these chapter 11 cases, while at the same time ensuring that appropriate notice is provided.

### III.  Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief (the "DRC Retention Application").

5.      Pursuant to the DRC Retention Application, the Debtors seek entry of an order authorizing, but not directing, the Debtors to appoint Donlin, Recano & Company, Inc. ("DRC") as the claims and noticing agent (the "Claims and Noticing Agent") in the Debtors' chapter 11 cases effective as of the Petition Date.  As the Claims and Noticing Agent, DRC will assume full responsibility for the distribution of notices and the processing of claims and relieve the Clerk of the administrative burden of processing an overwhelming number of claims.

6.      Prior to selecting DRC as their Claims and Noticing Agent, the Debtors solicited and reviewed engagement proposals from two other Court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, based on all engagement proposals obtained and reviewed, DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

### IV.  Debtors' Motion Seeking Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) 2015.3 Reports, and (II) Granting Related Relief (the "SOFAs and Schedules Extension Motion").

7.      Pursuant to the SOFAs and Schedules Extension Motion, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors will file (i) their Schedules and Statements by 36 days for a total of 50 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown, and (ii) their initial reports of

financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in rule 2015.3 of the Federal Rules of Bankruptcy Procedure, to and including the later of (x) 30 days after the 341 Meeting and (y) March 11, 2024, 50 days from the Petition Date; and (b) granting related relief.

8.      The ordinary operation of the Debtors' business requires the Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare their Schedules and Statements, the Debtors must compile information from those books and records, and from documents relating to the claims of their thousands of creditors, and the Debtors' many assets and contracts.  Collecting the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their advisors.  This information is extensive and located in numerous places throughout the Debtors' organization.  Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term.

9.      The Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, but resources are strained.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist with stabilizing business operations during the initial postpetition period, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the time period required by the Bankruptcy Rules.

**V.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (C) Redact Certain Personally Identifiable Information, and (II) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

10.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors in lieu of filing separate creditor lists for each Debtor, (ii) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (iii) redact certain personally identifiable information; and (b) granting related relief.

11.    ***Consolidated Creditor Matrix***.    Allowing the Debtors to prepare and maintain a Consolidated Creditor Matrix in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these chapter 11 cases where there are hundreds of creditors and parties in interest.    Converting the Debtors' computerized information to a format compatible with the matrix requirements, as well as the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

12.    ***Consolidated List of the 30 Largest Unsecured Creditors***.    The exercise of compiling separate top creditor lists for each individual Debtor could consume an excessive amount of the Debtors', and their advisors', limited time and resources.    Furthermore, because the top creditor lists for each individual Debtor overlap, the Debtors submit that filing separate lists for each Debtor would be of limited utility.

13.    ***Redact Certain Personally Identifiable Information***.    The Debtors seek authority to redact certain personally identifiable information from any paper filed or to be filed with the

4

Court in these chapter 11 cases, including the Creditor Matrix and Schedules and Statements, because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking.  The Debtors propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other filings redacted pursuant to the proposed order to (a) the Court, (b) the U.S. Trustee, (c) counsel to any official committee appointed in these chapter 11 cases, (d) the Proposed Claims and Noticing Agent, and (e) any party in interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases.

**VI.**   **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Debtor Bank Accounts, Business Forms, and Books and Records, and (D) Continue Intercompany Transactions and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

14.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to (i) continue using the Cash Management System, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Debtor Bank Accounts, Business Forms, and Books and Records, and (iv) continue Intercompany Transactions and funding consistent with the Debtors' historical practices; and (b) granting related relief.

15.    In the ordinary course of business, Careismatic operates a complex Cash Management System.  Careismatic uses the Cash Management System to collect, transfer, and disburse funds, and to facilitate cash monitoring, forecasting, and reporting.  Careismatic's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions.  Careismatic's accounting department regularly reconciles Careismatic's books and records to ensure that all transfers are accounted for properly.

16.    The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to Careismatic to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  Careismatic estimates that its cash receipt collections averaged approximately $40.1 million per month in the twelve months prior to the Petition Date.  In addition, Careismatic estimates that total disbursements to third parties averaged approximately $35.8 million per month in the twelve months prior to the Petition Date.

17.    As of the Petition Date, Careismatic's Cash Management System is composed of 63 Bank Accounts.  Of the Bank Accounts, 45 are Debtor Bank Accounts while the remaining 18 are owned and controlled by non-Debtor affiliates.  Of the Debtor Bank Accounts, two are maintained in Canada and 43 are maintained in the U.S.  The U.S. Bank Accounts are maintained by ten Debtor entities and six non-Debtor entities and are held at eleven different financial institutions.

18.    The Debtors' primary Cash Management Bank is JPM.  In total, the Debtor Bank Accounts include:  (a) eighteen accounts maintained at JPM; (b) fourteen accounts maintained at U.S. Bank; (c) six accounts maintained at Wells Fargo; (d) two accounts maintained at Scotiabank; and (e) three accounts maintained at East West Bank.  The Debtor Bank Accounts consist of (a) eight Depository Accounts, (b) one Payroll Account, (c) seven Disbursement Accounts, and (d) five Depository and Disbursement Accounts; (e) two Debtor Foreign Bank Accounts; (f) he Settlement Funds Account; (g) the Primary Concentration Account; and (h) the Primary Disbursement Account.

19.    The Debtors' revenues are largely received through eight of the Debtors' Depository Accounts maintained at JPM.  On a weekly basis, funds are manually transferred from

depository accounts under the Company's historical cash management framework held at U.S. Bank and East West Bank to a number of JPM Depository Accounts by way of wire transfer and/or electronic fund transfer, while Scotiabank funds are repatriated monthly through the same process. Those funds are then automatically swept from the applicable JPM Depository Account into the primary concentration account ending in 3512 held at JPM (the "Primary Concentration Account"). Generally, funds are then disbursed directly from the Primary Concentration Account or transferred from the Primary Concentration Account to the other Debtor Bank Accounts on an as-needed basis to support the Debtors' operations.

20.      The Debtor Foreign Bank Accounts and Non-Debtor Foreign Bank Accounts that are maintained at banks headquartered in Canada, China, the United Kingdom, the Netherlands, and India are used to fund Careismatic's international operations. Certain of the foreign based non-Debtor affiliates are cash positive and maintain their own operations without the need for regular additional funding, including their locations in Europe. This cash is then used to fund each foreign based non-Debtor affiliate's business operations, as applicable. Conversely, excess cash generated from the business operations of the foreign-based Debtor and non-Debtor affiliates is also occasionally repatriated back to the depository account ending in 3561 from the applicable Debtor Foreign Bank Accounts or Non-Debtor Foreign Bank Accounts to help fund domestic business operations. The Debtors also make monthly ordinary course transfers from the Primary Disbursement Account to the applicable Non-Debtor Foreign Bank Accounts of the India and China affiliates to fund ongoing operations. These transfers are an integral part of Careismatic's Cash Management System and allow Careismatic to support its global operations when necessary.

21. The Debtors' cash on hand is largely comprised of proceeds from the Debtors' ongoing business operations. As of the Petition Date, the aggregate balance of funds held in the Debtor Bank Accounts is approximately $23 million.

22. All but one of the banks where the Debtor Bank Accounts are maintained are Authorized Depositories or foreign affiliates of Authorized Depositories under the U.S. Trustee Guidelines. Likewise, all but two of the Debtor Bank Accounts are insured by the FDIC. The remaining Debtor Bank Accounts are the Debtor Foreign Bank Accounts at Scotiabank. The average balance of the accounts is $322,000. Scotiabank is a well-capitalized, financially stable, and reputable institution that is not an Authorized Depository solely because of its location in Canada, and not because of any risk in holding funds there. Relocating the Debtor Foreign Bank Accounts to U.S.-only accounts could have potentially significant tax or regulatory impacts.

23. ***Business Forms and Books and Records***. As part of the Cash Management System, the Debtors use a variety of Business Forms in the ordinary course of business. The Debtors also maintain Books and Records to document their financial results and a wide array of operating information.

24. ***Bank Accounts and Fees***. In the ordinary course of business, the Debtors incur Bank Fees in connection with maintenance of the Cash Management System. The Debtors incur approximately $13,000 in the aggregate in Bank Fees each month under the Cash Management System to maintain the Debtor Bank Accounts. The Debtors estimate that they owe approximately $13,000 total in prepetition Bank Fees as of the Petition Date.

25. ***M&R Attachment Account***. In March 2023, M&R initiated arbitration against Careismatic Brands, LLC in the Superior Court of California, seeking to recover alleged legal fees owed following M&R's representation of Debtor Careismatic Brands, LLC (f/k/a Careismatic

Brands, Inc.) in certain litigation matters.  Following the entry of a non-binding arbitration award

(the "Non-Binding Award") on account of the Disputed Amount, M&R sought a writ of attachment

against the Debtors' available cash in the amount of the Non-Binding Award.

26.    On January 2, 2024, Careismatic Brands, LLC and M&R entered into a stipulation

(the "Stipulation") whereby the Debtors agreed to the entry of a right to attach order on a

segregated *account* containing the Disputed Amount (the " M&R Attachment Account"), which

would provide M&R with an attachment lien (the "Attachment Lien") encumbering the Disputed

Amount pursuant to section 481.010 *et seq.* of the California Code of Civil Procedure ("CCP").

Following entry of the Interim Order, the Debtors intend to return the Disputed Amount to the

Primary Concentration account and wind down the M&R Attachment Account.

27.    ***Wells Fargo Purchase Facility***.   In the ordinary course of business, certain

customer receipts that are subject to an account purchase arrangement with Wells Fargo flow into

the Walmart USA Receipts Account (the "Wells Fargo Purchase Facility").   The Debtors sell

certain receivables arising from sales of inventory to Wal-Mart Stores, Inc.'s US-based retail

business ("Walmart") (each, an "Account," and collectively, the "Accounts") in exchange for cash

pursuant to that certain Receivables Purchase Agreement dated as of February 16, 2016 by and

among certain of the Debtors and Wells Fargo (as may be amended, modified, or restated from

time to time, the "Receivables Purchase Agreement").    Under the Receivables Purchase

Agreement, after Wells Fargo receives a confirmation notice from Walmart with respect to the

receivables owing from Walmart, the Debtors are deemed to automatically offer to sell to Wells

Fargo all of the Debtor's rights in and to any or all of the receivables identified Walmart's

confirmation notice.  Wells Fargo may then, in its discretion, approve such request, and thereafter

deposits the purchase price into the Walmart USA Receipts Account approximately fourteen

business days after such offer.  In exchange for accelerating cash receipts on account of the Walmart receivables, Wells Fargo receives 0.85% fee on all such receivables.

28.    ***Credit Card Program***.  As part of the Credit Card Program, the Debtors provide approximately 40 employees with Credit Cards issued by JPM and First National Bank, as applicable, to pay for approved business travel and other miscellaneous operational expenses incurred by employees in the ordinary course of business.  Expenses incurred on the Credit Cards are billed directly to the Debtors and do not pass through the applicable employee's personal financial accounts.  The Debtors estimate that they incur approximately $500,000 in the aggregate on account of the Credit Card Program on a monthly basis.  The Debtors incur a *de minimis* amount each month under the Cash Management System to maintain the Credit Card Program.  The Debtors estimate that they owe approximately $190,000 in prepetition obligations related to the Credit Card Program as of the Petition Date.

29.    ***Intercompany Transactions***.  Careismatic operates as a global enterprise, and thus, in the ordinary course of business, the Debtors maintain and engage in Intercompany Transactions with each other and their non-Debtor affiliates, resulting in Intercompany Balances.  The Debtors generally account for and record all Intercompany Transactions and Intercompany Balances in their centralized accounting system, the results of which are recorded on the Debtors' balance sheets and regularly reconciled.

**VII.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "<u>NOL Motion</u>").**

30.    Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain Procedures related to certain issuances or transfers of, or declarations of worthlessness with respect to Common Stock; (b) directing that any issuance, purchase, sale, other

transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

31.     The Debtors currently estimate that, as of December 31, 2023, they had approximately $10 million of U.S. federal NOLs, no capital loss carryovers, approximately $100 million of 163(j) Carryforwards, "net unrealized built-in losses," and certain other Tax Attributes.[2]  The Debtors may generate additional Tax Attributes in the current tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset U.S. federal taxable income or U.S. federal tax liability in future years.  In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.

**VIII.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

32.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) negotiate, remit, and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to, including, or following the Petition Date), without regard to whether such obligations accrued or arose before or after the Petition Date, and (ii) undertake the Tax Planning Activities; and (b) granting related relief.

---

[2]     Amounts are estimates and are subject to change.  The Tax Attributes include certain amounts that are subject to limitations on their utilization as a result of a prior "ownership change" under section 382 of the IRC and state and local Tax Attributes of approximately $120 million in the aggregate.

33.     In the ordinary course of business, the Debtors collect, withhold, and incur income and franchise taxes, sales and use taxes, foreign taxes, customs and import duties, property taxes, and other governmental and regulatory taxes, penalties, interests, assessments, and fees (collectively, "Taxes and Fees").   The Debtors pay or remit, as applicable, Taxes and Fees to various Authorities on a periodic basis (monthly, quarterly, semi-annually, or annually, as applicable) depending on the nature and incurrence of the particular Taxes and Fees and as required by applicable laws and regulations.  The Debtors generally pay and remit Taxes and Fees via wire transfers, checks, through each Authority's online portals, or by a third-party servicer.  In some cases, the Debtors forward payments to landlords or contract counterparties and/or customers withhold taxes from the Debtors' invoice payments.  Those parties then remit the taxes directly to the Authorities.  From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes and Fees.  The Debtors generally use these credits in the ordinary course of business to offset against future Taxes and Fees or cause the amount of such credits to be refunded to the Debtors.

34.     The Debtors pay certain sales and use taxes, property taxes, and regulatory and other Taxes and Fees in the ordinary course of business with the assistance of Moss Adams, LLP ("Moss Adams"), Vertex, Inc. ("Vertex"), and Avalara, Inc. ("Avalara") (collectively, the "Tax Consulting Firms").  Moss Adams facilitates the calculation of the Debtors' taxes owed and logistics of payment.  The Debtors either remit payment directly to the applicable Authorities via ACH or wire transfer, or utilize Vertex to satisfy sales and use taxes across the United States via automatic debit.  The Debtors utilize Avalara to track and assess sales and use taxes to assure compliance with the various taxing regimes to which they are subject.  As of the Petition Date, the

Debtors estimate that they owe the Tax Consulting Firms approximately $10,000 on account of the services as the Debtors' tax administrators.

35.    The Debtors are subject to, or may become subject to, routine audit investigations on account of tax returns and/or tax obligations in respect of prior years (each, an "Audit," and collectively, the "Audits") during these chapter 11 cases.  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "Assessments").  The Debtors typically remit Regulatory and Other Taxes and Fees to the relevant Authorities on a monthly, quarterly, or annual basis, depending on the applicable Authority.  These payments are paid directly through online accounts with the specific taxing Authority.  In 2023, the Debtors remitted approximately $35,000 in Regulatory and Other Taxes and Fees to the applicable Authorities.

36.    In addition, the Debtors are back filing business licenses with the City of Santa Monica ("Santa Monica") for the Debtors' business operations over the past four years, but is in dispute with Santa Monica over the Debtors' classification as an operating headquarters or a wholesaler.  Ultimately, depending on the Debtor's classification, this back filing may give rise to a $400,000 obligation to Santa Monica (the "Back Filing Obligations").  The Debtors have engaged Ernst & Young LLP ("EY") to contest this reclassification—as such, the liability is contingent and is not expected to materialize, if ever, until three months following the Petition Date.  As of the Petition Date, the Debtors estimate that they owe EY approximately $20,000 on account of services in connection with the Back Filing Obligations.

37.    Any failure by the Debtors to pay Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to):  (a) Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these

13

chapter 11 cases; (b) Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in certain instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would distract those key individuals from their duties related to the Debtors' restructuring.  Taxes and Fees not timely paid as required by law may result in fines and penalties, the accrual of interest, or both.  In addition, nonpayment of Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  Lastly, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

38.     The Debtors estimate that approximately $3.2 million in Taxes and Fees is outstanding as of the Petition Date.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due in Interim Period |
|---|---|---|---|
| Income and Franchise Taxes | Income and franchise taxes incurred in the ordinary course of business based on the jurisdictions in which the Debtors do business, generally payable on an annual basis. | $315,000 | $0 |
| Sales and Use Taxes | Taxes on goods and services sold or used, assessed based on the value of such goods and services, generally payable on a monthly, quarterly, or annual basis. | $300,000 | $250,000 |
| Foreign Taxes | Taxes due to Authorities in foreign jurisdictions, including foreign corporate income taxes, value added taxes, foreign regulatory fees, and business rate taxes. | $400,000 | $400,000 |
| Customs and Import Duties | The Debtors remit taxes to Authorities imposed for importing goods from outside the United States. | $2 million | $2.5 million |

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due in Interim Period |
|---|---|---|---|
| Property Taxes | Taxes related to real and personal property holdings, generally payable on an annual or semi-annual basis. | $175,000 | $100,000 |
| Regulatory and Other Taxes and Fees | Taxes and Fees related to compliance with regulatory requirements, including periodic licensing, permitting, reporting, business licensing, and similar requirements, generally payable on a monthly, quarterly, or annual basis, depending on the specific Taxes and Fees. | $5,000 | $5,000 |
| **Total** | | $3,195,000 | $3,255,000 |

**IX.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief (the "Insurance Motion").**

39.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) maintain insurance and surety coverage under the Insurance Policies and the Surety Bonds (as applicable) entered into prepetition and pay related prepetition obligations in the ordinary course of business and (ii) renew, supplement, modify, or purchase insurance and surety coverage in the ordinary course of business on a postpetition basis, and (b) granting related relief.

40.    ***The Insurance Policies and Related Payment Obligations.***  In the ordinary course of business, the Debtors maintain approximately 32 Insurance Policies administered by various third-party insurance carriers (collectively, the "Insurance Carriers").  Generally, the Insurance Policies fall into the following categories:  casualty; property; executive risk; cargo; and cyber. The Insurance Policies provide coverage for, among other things, the Debtors' general liability; umbrella liability; property liability; employee benefits liability; cargo liability; crime liability;

directors' and officers' liability; product liability; travel; terrorism; cybersecurity; and workers'

compensation.  The Debtors maintain similar types of insurance for its international operations,

including general liability, automobile liability, property liability, and a special contingency risk

policy.  The Debtors have selected policy specifications and insured limits that they believe to be

appropriate given the relative risk of loss, the cost of the coverage, and industry practice.  In the

opinion of the Debtors' management, the Debtors maintain adequate insurance with limits and

coverages that they believe to be commercially reasonable.

41.     The Insurance Policies are essential to the ongoing operation of the Debtors'

business.  The Debtors' ability to maintain the Insurance Policies, to renew, supplement, and

modify the same as needed, and to enter into new insurance policies as needed in the ordinary

course of business, is essential to preserving the value of the Debtors' businesses, operations, and

assets.  Moreover, in many instances, insurance coverage is required by statutes, rules, regulations,

and contracts that govern the Debtors' commercial activities, including the requirements of the

U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11

case.

42.     ***Premium Payments.***  The Insurance Policies generally are one year in length and

renew annually, principally in April and July.  The aggregate annual premium obligations

associated with the Insurance Policies (the "Premiums") is approximately $2,200,000, plus

applicable taxes and surcharges.  As of the Petition Date, the Debtors owe approximately $100,000

with respect to the Premiums.

43.     ***Deductible Fees.***  Pursuant to certain of the Insurance Policies, the Debtors are

required to pay various deductibles (the "Insurance Deductible(s)"), depending upon the type of

claim and Insurance Policy involved.  Under such Insurance Policies, the Insurance Carriers may

pay claimants and then invoice the Debtors for any Insurance Deductible.  In such situations, the

Insurance Carriers may have prepetition claims against the Debtors.  The Debtors risk losing their

Insurance Policies if they fail to make their Insurance Deductible payments, which would not only

greatly increase the risk related to the Debtors' operations but may cause them to violate state laws

requiring them to have such policies.  As of the Petition Date, the Debtors estimate that there are

approximately $51,000 in accrued but unpaid amounts due and owing pursuant to the Deductibles.

44.     ***The Debtors' Surety Bond Program.***  In the ordinary course of business, the

Debtors provide surety bonds (the "Surety Bonds") to certain third parties, often government

customs agencies, to secure the Debtors' payment or performance of certain obligations.

45.     When a party that transacts with the Debtors requests a bond and the Debtors

determine that they have better operational uses for cash and do not wish to provide the cash and

cash equivalents necessary to satisfy such request, they may pursue a surety bond.  In such

situations, sureties provide, upfront, the full amount of the requested cash and cash equivalents to

the requesting party on behalf of the Debtors, in exchange for a fee from the Debtors and an amount

of collateral to secure the bond issuance on the Debtors' behalf.  The issuance of a surety bond

shifts the risk of the Debtors' nonperformance or nonpayment from an obligee to a surety.

46.     To continue their business operations during these chapter 11 cases, the Debtors

must maintain the Surety Bond Program, including paying bond premiums and related fees as they

come due, providing the Sureties with collateral, and acquiring additional bonding capacity as

needed in the ordinary course of business, and executing other agreements, as appropriate, in

connection with the Surety Bond Program.

47.     The Debtors currently maintain four Surety Bonds.  As of the Petition Date, the

Debtors do not owe any amounts on account of the Surety Bond Program.

48.     ***Insurance Brokers.***  The Debtors retain the services of insurance brokers to help manage their portfolios of risk.  The Debtors obtain their Insurance Policies and Surety Bonds through Willis Towners Watson, Marsh McLennan, Wilson M. Beck Insurance Services (Victoria), Tom Gould Customs Consulting, and USI (the "Brokers").  The Brokers, among other things:  (a) assist the Debtors in obtaining comprehensive insurance and surety coverage for their operations in a cost-effective manner; (b) advise the Debtors on the negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and rates; and (c) provide ongoing support throughout the applicable policy periods for the Insurance Policies.  In exchange for these services, the Debtors pay the Broker Fees.  The Broker Fees are generally included in the Premiums that the Debtors pay in the ordinary course of business.  As of the Petition Date, the Debtors believe that they owe $45,000 to the Brokers on account of the Broker Fees.

X.      **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(B)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief (the "Trade Claims Motion").**

49.     Pursuant to the Trade Claims Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of (i) Critical Vendor Claims, (ii) Foreign Vendor Claims, (iii) 503(b)(9) Claims, and (iv) Lien Claims; (b) granting administrative expense priority to all undisputed obligations on account of goods ordered by the Debtors prior to the Petition Date that will not be delivered until after the Petition Date and authorizing the Debtors to satisfy such obligations in the ordinary course of business; and (c) granting related relief.

50.     To effectuate their business model and ensure the uninterrupted provision of services to their customers, the Debtors rely on goods and services provided by over 1,400 vendors,

including an array of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants.

In order to protect their business (and, ultimately, customers) on a postpetition basis, the Debtors

request authorization to pay certain outstanding prepetition claims of the Trade Claimants. The

following table summarizes the categories of claims that the Debtors request authority to pay.

| Category | Description of Services Provided | Requested Relief on an Interim Basis | Requested Relief on a Final Basis |
|---|---|---|---|
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business. | $1.8 million | $3 million |
| Foreign Vendors | Foreign vendors that provided raw material, merchandise, and manufacturing services. | $15 million | $25 million |
| 503(b)(9) Claimants | Suppliers that provided goods to the Debtors that were received within twenty days before the Petition Date. | $1.2 million | $2 million |
| Lien Claimants | Suppliers of goods or services utilized by or provided to the Debtors that may assert mechanic's, possessory, or other similar liens. | $3.6 million | $6 million |
| **Total amount of Trade Claims:** | | **$21.6 million** | **$36 million** |

51. ***Critical Vendor Claims.*** The Debtors have identified, and will continue to identify,

a narrow subset of vendors and service providers that are critical to preserving the value of the

Debtors' estates and ensuring a seamless transition into chapter 11 (the "Critical Vendors"). This

subset of vendors includes merchandise vendors, software providers, marketing services providers,

and major brand partnerships. The Debtors' business relies on continuing access to, and

relationships with, the Critical Vendors, and, in many instances, the Debtors could not operate

their physical infrastructure without access to the goods and services provided by the Critical

Vendors. The Critical Vendors are so essential to the Debtors' business that the lack of any of

their particular goods or services, even for a short duration, could significantly disrupt the Debtors'

operations and cause irreparable harm to the Debtors' businesses, goodwill, and market share.

19

52.     The Debtors, with the assistance of their advisors, reviewed their books and records, consulted operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices.  In doing so, the Debtors were able to identify only those vendors that are critical to the continued and uninterrupted operation of the Debtors' business and the loss of which could materially harm their business, by, among other things, shrinking their market share, reducing their enterprise value, and ultimately impairing the Debtors' ability to reorganize to the detriment of the Debtors, their stakeholders, and the Debtors' vendors.  In identifying vendors critical to their business, the Debtors examined each of their vendor relationships with, among other things, the following criteria in mind:

- whether certain specifications or contract requirements directly or indirectly prevent the Debtors from obtaining goods or services from alternative sources;

- the location and nationality of the vendor;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and

- whether failure to pay a particular vendor could cause an inability to properly service the Debtors' customers and result in substantial revenue loss.

53.    In addition to these factors, the Debtors and their advisors examined the health of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

54.    Among the Critical Vendors are major brands (the "Brands") that have entered into certain licensing agreements (the "License Agreements") with the Debtors that provide terms by which the Debtors are permitted to sell Brand-themed apparel.  Approximately twelve percent of the Debtors' revenue can be attributed to Brand-themed apparel.  The License Agreements generally require the Debtors to make periodic royalty payments, typically based on a percentage of the Debtors' gross receipts, in exchange for the right to sell Brand-themed apparel over a specified time period.  Crucially, nothing in the License Agreements requires the Brands to continue go forward licensing after the expiration of their term.  If the Brands are not timely paid pursuant to the existing License Agreements, they may be reluctant to license future intellectual property to the Debtors, endangering the Debtors' ability to generate revenue, and irrevocably damaging the Debtors' valuable market share.  The License Agreements form an integral part of the Debtors' business, and if access to the Brand intellectual property use was disrupted, even for a limited time, the Debtors' estate would suffer irreparable harm.

55.    ***Foreign Vendor Claims.***  An additional critical component of the Debtors' supply chain involves transacting with certain foreign vendors (collectively, the "Foreign Vendors").  The Foreign Vendors provide among other things, critical goods and services, consisting mostly of raw material, merchandise, and manufacturing services.  As of the Petition Date, the Debtors estimate that there is approximately $25 million in aggregate amount outstanding on account of prepetition goods provided and/or services rendered by the Debtors' Foreign Vendors

(the "Foreign Vendor Claims").  The Debtors believe there is a significant and material risk that a Foreign Vendor may stop providing services to the Debtors on a timely basis and/or to completely sever its business relationship with the Debtors.  Short of severing their relations with the Debtors, nonpayment of certain Foreign Vendor Claims may also cause Foreign Vendors to take other harmful actions, including refusing to supply goods or services, which would be to the detriment of the Debtors' customers.  Providing uninterrupted services for the Debtors' customers is critical to the Debtors' businesses and cash flows, and the Debtors can ill afford any delays or interruptions of this nature.

56.    ***503(b)(9) Claims.***  The Debtors may have received good from various vendors within the twenty-day period immediately preceding the Petition Date (the "503(b)(9) Claimants"), thereby giving rise to prepetition claims of the 503(b)(9) Claimants (the "503(b)(9) Claims").  The Debtors receive inventory, goods, and other materials from their vendors on a rolling basis to satisfy their customers' demands.  The vast majority of the 503(b)(9) Claimants are also Critical Vendors, Foreign Vendors, or Lien Claimants.  The Debtors' relationships with these vendors, and with many of the other 503(b)(9) Claimants, are not governed by long-term contracts or supply agreements.  Rather, the Debtors obtain inventory, goods, or other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Debtors do not pay the 503(b)(9) Claims.  Such refusal would negatively affect the Debtors' estates, as the Debtors' business is dependent on the steady flow of inventory, goods, and other materials.  The Debtors also believe that certain 503(b)(9) Claimants could demand payment in cash on delivery—further exacerbating the Debtors' liquidity.

57.    ***Lien Claims.***  The Debtors routinely transact business with a number of third parties who may assert various statutory liens (the "Lien Claimants"), including mechanics' liens, against

the Debtors and their property if the Debtors fail to pay for the services rendered.  The Lien

Claimants primarily consist of shipping and warehouse vendors.  In the ordinary course of

business, the Debtors incur obligations (the "Lien Claims") to the Lien Claimants for the

distribution, receipt, and delivery of the Debtors' goods.  To maintain their operations and

efficiently transport products, the Debtors employ a network that utilizes the services of the Lien

Claimants.  The Debtors' business depends on both the uninterrupted flow of inventory through

their supply chain and distribution network.  This supply and distribution network is critical to the

Debtors' timely delivery of products to their retail partners and end consumers.  The supply chain

depends on services provided by, among others, shipping providers (including ocean, rail, freight

forwarding, and trucking services) and third-party warehouses where products are stored until

utilized to fulfill retail partners or direct e-commerce orders.  For example, in many instances, after

leaving overseas factories, the Debtors' products are sent to a port before sailing on freight vessels

to designated receiving ports in the United States.  The Debtors occasionally depend on air freight

carriers in the transportation of overseas and domestically sourced products.  The Debtors'

shipping providers transport merchandise:  (a) from the overseas facility to port facilities;

(b) between facilities for the reassignment of goods; (c) to the facilities of the Debtors' customers;

and (d) directly to customers as part of the Debtors' expansion into end-consumer interaction.

Under the laws of most states, these servicers or carriers will, in certain circumstances, have a lien

on the goods in their possession that secures the charges or expenses incurred in connection with

the transportation of goods or the supply of labor.

58.    The value of the assets in the possession of the Lien Claimants generally exceeds

the value of their respective prepetition claims.  The refusal of Lien Claimants to deliver or return

the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations

and could potentially cost the Debtors a substantial amount of revenue and future business.  The

Debtors' ability to maintain access to materials, goods, equipment, and installation services is

critical to the continued viability of the Debtors' business operations.

59.     ***Outstanding Orders.***  Prior to the Petition Date and in the ordinary course of

business, the Debtors may have ordered goods that will not be delivered until after the Petition

Date (the "Outstanding Orders").  In the mistaken belief that they would be general unsecured

creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or

transport such goods (or may recall such shipments) with respect to such Outstanding Orders

unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the

Debtors' ongoing business operations and requiring the Debtors to expend substantial time and

effort in issuing such substitute orders.

**XI.     Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors'
Proposed Adequate Assurance of Payment for Future Utility Services,
(II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services,
(III) Approving the Debtors' Proposed Procedures for Resolving Adequate
Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").**

60.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders:

(a) approving the Debtors' proposed adequate assurance of payment for future utility services;

(b) approving the Debtors' proposed procedures for resolving requests for adequate assurance;

(c) prohibiting utility providers from altering, refusing, or discontinuing services; and (d) granting

related relief.

61.     In connection with the operation of their business and management of their

properties, the Debtors obtain electricity, natural gas, water and sewage, waste management,

chemical disposal, telecommunications, and other similar services (collectively,

the "Utility Services") from a number of utility providers or brokers (collectively,

the "Utility Providers").  On average, the Debtors pay approximately $118,800 each month for Utility Services.

62.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these chapter 11 cases.  Specifically, the Debtors must maintain their Utility Services to properly serve their customers' needs.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations and safety procedures would be disrupted, and such disruption would adversely affect customer goodwill and employee relations, which, in turn, would jeopardize the Debtors' reorganization efforts.

**XII.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

63.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay all prepetition wages, salaries, commissions, other compensation, and Reimbursable Expenses on account of the Compensation and Benefits in the ordinary course of business and (ii) continue to administer the Compensation and Benefits in the ordinary course of business, including payment of prepetition obligations related thereto; and (b) granting related relief.

64.    The Debtors seek authority to pay the following aggregate prepetition amounts on account of the Compensation and Benefits:

| Relief Sought | Approximate Estimated Amount[3] |
|---|---|
| *Compensation and Withholding Obligations* | $6,798,000 |
|    Wage Obligations | $1,700,000 |
|    Withholding Obligations | $190,000 |
|    Payroll Processing | $35,000 |
|    Reimbursable Expenses | $230,000 |
|    Paid Leave Benefits | $3,800,000 |
|    Non-Insider Severance Program | $800,000 |
|    Non-Employee Director Compensation | $43,000 |
|    Stipend Program | $0 |
| *Retirement Planes* | $640,000 |
| *Workers' Compensation Program* | $19,000 |
| *Employee Health and Welfare Coverage and Benefits* | $470,000 |
| **TOTAL** | $7,927,000 |

65.     As of the Petition Date, the Debtors currently employ approximately 816 individuals (the "Employees"), nearly all of whom are full-time, across six primary locations. Approximately 312 Employees earn a salary, and approximately 504 Employees are paid on an hourly basis. Some Employees have been hired to work on a regular, ongoing basis for an indefinite time period (the "Regular Employees"), and other Employees have been hired to work on a temporary basis for a specific time period (the "Temporary Employees"). All of the Debtors' Employees work in the United States.

66.     The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with respect to the Debtors' core business segments, or who have developed relationships with vendors that are essential to the Debtors' business. These individuals are not easily replaced. Without the continued, uninterrupted services of the Employees, the Debtors' business operations will come to a halt, materially impairing the administration of the Debtors' estates. In addition to the Regular

---

[3]     Such amounts are the estimated approximate amounts outstanding on account of accrued but unpaid prepetition obligations as of the Petition Date.

Employees, the Debtors' workforce also includes approximately 56 independent contractors (the "Independent Contractors") and 63 Temporary Employees, who perform necessary selling, marketing, accounting and finance, and other operational activities for the Debtors. The Debtors' Independent Contractors and Temporary Employees are sourced regularly from various staffing agencies.

67.     The vast majority of the Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses. These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health insurance and other benefits during these chapter 11 cases.

68.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Compensation and Benefits, including, among other things, Wage Obligations, Withholding Obligations, the Unpaid Payroll Processing Fees and other administrative costs, Reimbursable Expenses, Health and Welfare Coverage and Benefits, the Workers' Compensation Program, the 401(k) Plan (including the 401(k) Matching Contributions), Paid Leave Benefits, the Non-Insider Severance Program, the Stipend Program, the Non-Employee Director Compensation, and certain other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion (collectively, the "Compensation and Benefits").

69.     As of the Petition Date, the Debtors believe that they owe certain Non-Insider Severance Benefits (as defined below) in excess of the statutory cap of $15,150 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code to certain Employees, but not on account of any Wage Obligations or other obligations. The Debtors seek authority to pay any amounts above the cap solely pursuant to the Final Order.

70.     The Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases.  The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.  Such Employees may then elect to seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.

71.     Employees will be exposed to significant financial difficulties if the Debtors are not able to pay the Compensation and Benefits in the ordinary course.  Further, the Debtors' ability to continue providing benefits in the ordinary course is critical to maintaining Employee morale and will minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

**XIII.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer and Partner Programs and (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

72.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to (i) maintain and administer their Customer Programs and (ii) honor certain prepetition obligations related thereto, and (b) granting related relief.

73.     Prior to the Petition Date, in the ordinary course of the Debtors' business and as is customary in their industry, the Debtors offered and engaged in certain customer and other

programs and practices. These programs include the following: (a) wholesale customer policies and practices, including markdown allowances, chargebacks, returns, and co-op advertising; (b) customer gift certificate programs; (c) loyalty programs; (d) returns, refunds, and exchanges; and (e) warranty programs related to the Debtors' products (collectively, the "Customer and Partner Programs").

74.     To effectuate a smooth transition into chapter 11, the Debtors must maintain customer loyalty and goodwill by continuing to honor their obligations under the Customer and Partner Programs. The Debtors operate in highly competitive businesses and must regularly provide both existing and potential customers with programs similar to (or better than) those offered by their competitors. The Debtors have implemented each of the Customer and Partner Programs in the ordinary course of their businesses as a means to maintain positive, productive, and profitable relationships with their customers that ultimately promote customer satisfaction, encourage new purchases, and ensure that the Debtors remain competitive.

75.     Failure to continue the Customer and Partner Programs, or failure by the Debtors to meet their obligations under such programs, would damage the Debtors' standing with their current and potential customers at this critical time in their operations. The success and viability of the Debtors' businesses, and ultimately the Debtors' ability to maximize the value of their assets, is dependent upon the continued patronage and loyalty of their customers. Any delay in honoring obligations to customers and third parties on account of the Customer and Partner Programs would severely and irreparably impair customer relations and drive away valuable customers, thereby harming the Debtors' efforts to maximize the value of their assets to the benefit of all interested parties.

76.     A description of the Debtors' prepetition Customer and Partner Program obligations are set forth below.  The Debtors estimate that, of the prepetition obligations under the Customer and Partner Programs, approximately $4.6 million constitutes accrued credits, adjustments, discounts, or other similar obligations owing to their customers, $100,000 of which entail the expenditure of the Debtors' cash.

**<u>Exhibit B</u>**

**Organization Chart**



CBI Parent, L.P. (Delaware)
CBI Midco, Inc. (Delaware)
CBI Intermediate, Inc. (Delaware)
New Trojan Parent, Inc. (Delaware)
Trojan Holdco, Inc. (Delaware)
Trojan Buyer, Inc. (Delaware)
Strategic Partners Acquisition Corp. (Delaware)
Strategic Partners Corp. (Delaware)
Strategic Partners Midco, LLC (Delaware)
Careismatic Group Inc. (Delaware)
Careismatic Group II Inc. (Delaware)
Krazy Kat Sportswear LLC (New Jersey)
Careismatic Brands, LLC (California)
Careismatic Receivables LLC (Delaware)
Med Couture, LLC (Texas)
Silverts Adaptive, LLC (California)
AllHearts, LLC (Delaware)
Marketplace Impact, LLC (Delaware)
Careismatic Brands Europe Limited (UK)
Strategic General Partners, LLC (California)
Pacoima Limited, LLC (California)
Careismatic Brands Asia Limited (Hong Kong)
De Soto Technologies Private Limited (India)
Medelita, LLC (California)
Silvert's Holdings, Ltd. (British Columbia)
Careismatic, LLC (California)
Careismatic Brands NL B.V. (Netherlands)
99%
1%
Strategic Distribution, L.P. (Texas)
Careismatic Brands do Brasil (Brazil)
Legend
Debtor
Limited Partnership
Non-Debtor
Corporation / LLC

## **Exhibit C**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and incorporating all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of January 22, 2024 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Careismatic Brands, LLC, a company incorporated under the Laws of California ("**Careismatic**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold approximately 73% of the First Lien Claims and approximately 20% of the Second Lien Claims that (i) are members of the First Lien Ad Hoc Group that have executed and delivered counterpart signature pages to this Agreement on the date hereof (such entities, the "**First Lien Initial Consenting Creditors**") or (ii) have executed and delivered a Joinder or Transfer Agreement to counsel to the Company Parties (such entities the "**First Lien Joining Consenting Creditors**," and together with the First Lien Initial Consenting Creditors, the "**First Lien Consenting Creditors**");

    iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold 3% of First Lien Claims and 50% of Second Lien Claims that are members of the Cross-Holder Ad Hoc Group that have executed and delivered counterpart signature pages to this Agreement on the date hereof (such entities, the "**Cross-Holder Creditors**," and together with the First Lien Consenting Creditors, the "**Consenting Creditors**"); and

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

iv.     Partners Group (USA) Inc. or its affiliates that hold Company Claims/Interests (each solely in their capacity as such, collectively, the "**Sponsor**" and, together with the other entities in clause (ii) and clause (iii), the "**Consenting Stakeholders**").

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**") and the debtor-in-possession financing credit agreement attached as **Exhibit C** hereto (the "**DIP Credit Agreement**") and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.**     *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**Acceptable Alternative Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the First Lien Credit Agreement or Second Lien Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to the Restructuring Transactions.

"**Backstop Commitment**" has the meaning set forth in the Restructuring Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court that, among other things, approves (i) bidding procedures, (ii) the form and manner of notice of auction(s), (iii) the procedures for assumption and assignment of certain executory contracts and unexpired leases, and (iv) the date for auction(s), if necessary.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Careismatic**" has the meaning set forth in the preamble of this Agreement.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (ii) the right to object to or otherwise contest Claims or interests; (iii) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against a Company Party, including the First Lien Claims, Second Lien Claims, or Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Hearing**" means a hearing before the Bankruptcy Court to consider confirmation of the Plan and approval of this Agreement, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Creditor Fees and Expenses**" means (i) the First Lien Consenting Creditor Fees and Expenses and (ii) the Cross-Holder Creditor Fees and Expenses.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Cross-Holder Creditors**" means that certain ad hoc group of holders of First Lien Claims and Second Lien Claims represented by King & Spalding LLP, as counsel.

"**Cross-Holder Creditor Fees and Expenses**" means all reasonable and documented fees and expenses (whether incurred at any point prior to or after the commencement of the Chapter 11 Cases) incurred by the Cross-Holder Ad Hoc Group, and any advisors thereto in connection with the formulation, development, negotiation, documentation or implementation of this Agreement, the Restructuring Term Sheet, the Restructuring Transactions contemplated thereby or hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, including the fees and expenses of King & Spalding LLP, as counsel to the Cross-Holder Ad Hoc Group; *provided*, that the Cross-Holder Creditor Fees and Expenses shall not be paid in an amount greater than $250,000 in the aggregate.

"**Debtors**" means the Company Parties from and after the commencement of the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means Jefferies Finance LLC and its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement by and among the Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Orders**" has the meaning set forth in the Restructuring Term Sheet.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Financing Arrangements**" has the meaning set forth in the Restructuring Term Sheet.

"**Exit Term Loan Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Ad Hoc Group**" means that certain ad hoc group of holders of First Lien Claims represented by Milbank LLP and Gibbons P.C., as counsel, and Houlihan Lokey Capital, Inc., as investment banker.

"**First Lien Claims**" means any Claim on account of the First Lien Loans.

"**First Lien Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**First Lien Consenting Creditor Fees and Expenses**" means all reasonable and documented fees and expenses (whether incurred at any point prior to or after the commencement of the Chapter 11 Cases) incurred by the First Lien Ad Hoc Group and any advisors thereto in connection with the formulation, development, negotiation, documentation or implementation of this Agreement, the Restructuring Term Sheet, the Restructuring Transactions contemplated thereby or hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, including the fees and expenses of: (i) Milbank LLP and Gibbons P.C., as counsel to the First Lien Ad Hoc Group, and any regulatory counsel or other advisors retained by the First Lien Ad Hoc Group; (ii) Houlihan Lokey, as investment banker to the First Lien Ad Hoc Group; and (iii) St. Onge Company, as third-party logistics advisor to the First Lien Ad Hoc Group.

"**First Lien Credit Agreement**" means that certain agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as borrower, CBI Intermediate, Inc., a Delaware corporation, as holdings, the lenders party thereto from time to time, the issuing banks thereto from time to time, the Swing Line Lender party thereto from time to time, and UBS AG, Stamford Branch, as administrative agent and collateral agent.

"**_First Lien Initial Consenting Creditors_**" has the meaning set forth in the preamble to this Agreement.

"**_First Lien Joining Consenting Creditors_**" has the meaning set forth in the preamble to this Agreement.

"**_First Lien Loans_**" means loans outstanding under the First Lien Credit Agreement.

"**_Governing Body_**" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity.

"**_Governmental Authority_**" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization (other than the Bankruptcy Court).

"**_Interests_**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any CBI Parent, L.P., and puts, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of CBI Parent, L.P. (in each case whether or not arising under or in connection with any employment agreement).

"**_Interim DIP Order_**" has the meaning set forth in the Restructuring Term Sheet.

"**_Joinder_**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

"**_Joining Consenting Creditors_**" has the meaning set forth in the preamble to this Agreement.

"**_Law_**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**_Milestones_**" means the case milestones set forth in Section 3.02.

"**_Parties_**" has the meaning set forth in the preamble to this Agreement.

"**_Permitted Transferee_**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**_Petition Date_**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**_PJT_**" means PJT Partners LP.

"**PJT Agreement**" means that certain engagement letter, dated January 19, 2024, by and among PJT, Kirkland and Ellis LLP, and Careismatic Brands, LLC.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code to be consistent in all respects with this Agreement and otherwise reasonably acceptable to the Required Consenting First Lien Lenders.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Prepetition Credit Agreements**" means the First Lien Credit Agreement and the Second Lien Credit Agreement.

"**Qualified Marketmaker**" means an Entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Recapitalization**" has the meaning set forth in the Restructuring Term Sheet.

"**Reorganized Debtors**" means, from and after the Effective Date, the Debtors (together with any applicable newly-formed entity formed to implement the Plan).

"**Required Consenting Creditors**" means the Required Consenting First Lien Lenders and the Cross-Holder Creditors.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, First Lien Initial Consenting Creditors holding at least 50.01% of the aggregate outstanding principal amount of First Lien Loans that are held by the First Lien Initial Consenting Creditors.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement. For the avoidance of doubt, "Restructuring Transactions" include both the Sale Transaction and the Recapitalization.

"**Rules**" means Rule 501(a)(1), (2), (3), (7), and (8) of the Securities Act.

"**Sale Transaction**" has the meaning set forth in the Restructuring Term Sheet.

"**Second Lien Claims**" means any Claim on account of the Second Lien Loans.

"**Second Lien Credit Agreement**" means that certain agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party

thereto from time to time, and UBS AG, Stamford Branch, as administrative agent and collateral agent.

"**Second Lien Loans**" means loans outstanding under the Second Lien Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement).

"**Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Termination Event**" means the occurrence of a termination event arising under Section 11.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

9

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.      *Effectiveness of this Agreement*.**   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)      holders of at least two-thirds of the aggregate outstanding principal amount of First Lien Loans shall have executed and delivered counterpart signature pages of this Agreement;

(c)      the Cross-Holder Creditors shall have executed and delivered counterpart signature pages of this Agreement;

(d)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred; and

(e)      the Company Parties shall have paid in full in cash all invoiced, then outstanding, accrued, and unpaid Consenting Creditor Fees and Expenses; *provided* that such invoices are received by the Company Parties by January 17, 2024;

**Section 3.      *Bankruptcy Process; Milestones*.**

3.01.   <u>Definitive Documents</u>.

(a)      The Definitive Documents governing the Restructuring Transactions shall include the following:  (i) the Plan and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto; (ii) the Plan Supplement and the documents contained therein; (iii) the Confirmation Order; (iv) the Disclosure Statement; (v) the order of the Bankruptcy Court

approving the Disclosure Statement and the other Solicitation Materials; (vi) the First Day Pleadings and all orders sought pursuant thereto; (vii) all motions, orders, filings, documents, and agreements related to either the Recapitalization or the Sale Transaction, as applicable, including the Disclosure Statement motion and any documentation relating to solicitation of the Plan; (viii) such other documents (including any related motions, orders, agreements, instruments, schedules, or exhibits) that are reasonably desired or necessary to consummate and document the transactions contemplated by this Agreement, the Restructuring Term Sheet, and the Plan; (ix) the DIP Documents and the DIP Orders; (x) such documents, motions or orders reasonably desired or necessary to consummate and document the Exit Financing Arrangements; (xi) such documentation with respect to warrants issued on account of Second Lien Secured Claims, which shall include terms consistent with the terms and conditions set forth on **Exhibit B** attached hereto (the "**Warrants Documents**"); (xii) any agreement with respect to any new proposed key employee retention or incentive program, or other similar program, plan, or agreement; and (xiii) any shareholder agreement, organizational documents, evidence of equity interests (including share certificates or other mutually agreed evidence of equity interests to be issued in accordance with the Restructuring Transactions), or other governance documents for the Reorganized Debtors.

(b)    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to good faith negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions (and any Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date) shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12, or shall otherwise be in form and substance reasonably acceptable to (i) the Company Parties; (ii) the Required Consenting First Lien Lenders; (iii) the Cross-Holder Creditors (x) solely with respect to provisions of those documents governing the treatment of Second Lien Claims and (y) solely to the extent such documents are modified, amended, or supplemented such that the rights of the Cross-Holder Creditors are disproportionately and negatively affected with respect to any and all rights granted to the Cross-Holder Creditors, each in their capacity as a Backstop Party; and (iv) the Sponsor, solely with respect to provisions thereof that materially and adversely affect the rights of the Sponsor (if any).

3.02.   _Milestones_.   The Company shall implement the Restructuring Transactions in accordance with the following Milestones, as applicable, unless extended or waived in writing by the Required Consenting First Lien Lenders (which may be by electronic mail between applicable counsel):

(a)    _Entry of Interim DIP Order_.  As soon as practicable, but in no event later than the date that is five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(b)    _Entry of Final DIP Order_.  As soon as practicable, but in no event later than the date that is thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

(c)     Entry of Bidding Procedures Order.  As soon as practicable, but in no event later than the date that is thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order.

(d)     Filing of Plan and Disclosure Statement.  As soon as practicable, but in no event later than the date that is forty-five (45) calendar days after the Petition Date, the Company Parties shall have filed a Plan and Disclosure Statement, in each case in form and substance acceptable to the Required Consenting First Lien Lenders.

(e)     Entry of Disclosure Statement Order.  As soon as practicable, but in no event later than the date that is ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order.

(f)     Entry of Confirmation Order.  As soon as practicable, but in no event later than the date that is one hundred and twenty (120) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

**Section 4.**     *Commitments of the Consenting Stakeholders.*

4.01.   General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of all of its Company Claims/Interests to:

(i)     support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)     use commercially reasonable efforts to support the Company Parties' efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b);

(iv)     not direct (or cause to be directed) any Agent to take any action inconsistent with such Consenting Stakeholder's obligations under this Agreement or the Plan and, if any applicable Agent takes any action inconsistent with such Consenting Stakeholder's obligations under this Agreement or the Plan, such Consenting Stakeholder shall use its commercially reasonable efforts to direct such Agent to cease, withdraw, and refrain from taking any such action; *provided* that in no instance shall any Consenting Creditor be required to provide an indemnity to any Agent, as applicable, in connection with such efforts;

(v)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement and otherwise reasonably acceptable to the Required Consenting First Lien Lenders to which it is required to be

a party, and solely with respect to the Warrants Documents, in form and substance reasonably acceptable to the Cross-Holder Creditors and the Required Consenting First Lien Lenders and consistent in all respects with the Restructuring Term Sheet and otherwise; and

(vi)     not object to or otherwise seek to hinder the Company Parties' payment to PJT of the fees and expenses set forth in the PJT Agreement.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)     During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will use commercially reasonable efforts to support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement; *provided, however*, that no Consenting Creditor shall be obligated to waive any condition to the consummation of any part of the Restructuring Transactions.

**Section 5.    *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)    be construed to impair the rights of any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and do not delay, interfere with, or impede the Restructuring Transactions;

(b)    limit or impair the ability of a Consenting Creditor to purchase, transfer, or enter into any transactions regarding Company Claims/Interests, subject to Section 8 hereof;

(c)    except as expressly provided herein, constitute a waiver under, or amendment of, the Prepetition Credit Agreements or otherwise limit or impair any right or remedy of any Consenting Creditor under the Prepetition Credit Agreements, or any other applicable agreement, instrument, or document that gives rise to a Consenting Creditor's Company Claims/Interests;

(d)    constitute a waiver under, or amendment of, the affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(e)    impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(f)    prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement (including the Restructuring Term Sheet);

(g)    require any Consenting Creditor to (i) incur any financial or other liability other than as expressly described in this Agreement, (ii) indemnify or otherwise incur any liability to the Sponsor or any Agent, (iii) take, or refrain from taking, any action where to do so would breach (A) any law or regulation or (B) any order or direction of any relevant court or Governmental Authority, or (iv) fail to comply with any antitrust or regulatory obligations as they may reasonably determine;

(h)    prevent any Consenting Creditor from (i) defending against or responding to any pleading filed with the Bankruptcy Court or any other court seeking to challenge the validity,

enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of its Company Claims/Interests or any liens or collateral securing its Company Claims/Interests or (ii) taking or directing any action relating to the maintenance, protection, or preservation of any collateral; or

(i)      prevent any Consenting Creditor from enforcing or exercising any rights, remedies, conditions, consents, or approval requirements under any of the Definitive Documents.

**Section 6.      *Commitments of the Company Parties*.**

6.01.    <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties shall direct their subsidiaries to:

(a)      support, act in good faith, and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      to the extent any legal, financial, or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)      use commercially reasonable efforts to obtain promptly any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)      (i) provide counsel for the Consenting Creditors a reasonable opportunity (no less than three (3) Business  Days in advance of filing or such shorter period as may be necessary in light of exigent circumstances) to review draft copies of all First Day Pleadings, (ii) provide counsel for the Consenting Creditors a reasonable opportunity (no less than seven (7) Business Days in advance of filing or such shorter period as may be necessary in light of exigent circumstances) to review draft copies of all Definitive Documents that the Company Parties intend to file with the Bankruptcy Court, and (iii) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Stakeholders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable;

(g)      negotiate in good faith with the Consenting Creditors and each of their respective advisors regarding the preparation and execution of the Definitive Documents and the implementation of the Restructuring Transactions;

(h)      inform counsel to the First Lien Ad Hoc Group and counsel to the Cross-Holder Ad Hoc Group in writing (email being sufficient) as soon as reasonably practicable after becoming aware of (i) any matter or circumstance which they know to be a material impediment to the

implementation or consummation of the Restructuring Transactions, (ii) any notice of any commencement of any material involuntary insolvency proceedings or material legal suit, investigation, or enforcement action from or by any person in respect of any Company Party, (iii) any material breach of any of the terms, conditions, representations, warranties or covenants set forth in this Agreement (including a breach by any Company Party), or (iv) the occurrence of a Termination Event;

(i)　　　if any Company Party receives an Alternative Restructuring Proposal in the form of a term sheet or other written offer or proposal, the Company Parties shall (i) inform counsel to each of the Consenting Creditors in writing (email being sufficient) within twenty-four (24) hours of receiving such proposal, with such notice to include the material terms thereof (including the identity of the person(s) or Entity(s) involved) and the action taken or proposed to be taken by the Company Parties in response thereto, (ii) provide counsel to each of the Consenting Creditors, upon reasonable request, with regular updates as to the status and progress of such Alternative Restructuring Proposal, and (iii) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Consenting Creditors relating to such Alternative Restructuring Proposal; *provided* that this paragraph shall not apply to any and all bids received by the Company Parties and their advisors in connection with the Sale Transaction if the Consenting Creditors are participating in the Sale Transaction via a Credit Bid (as defined in the Restructuring Term Sheet); and

(j)　　　provide the Consenting Creditors with any information reasonably requested regarding the Company Parties and reasonable access to management and advisors of the Company Parties for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs.

6.02.　　<u>Negative Commitments</u>.　Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)　　　object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)　　　take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)　　　modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all respects;

(d)　　　file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(e)　　　without the prior written consent of the Required Consenting First Lien Lenders (which consent shall not be unreasonably withheld), (i) (x) reject or enter into any material agreement or amendment or (y) grant any material consent or waiver relating thereto, (ii) settle or agree to the amount, priority, or treatment of any claim or liability, or (iii) enter into, adopt or

amend any employment or compensation-related agreement or collective bargaining agreement outside of the ordinary course of business, except as contemplated by this Agreement; or

(f)    file a motion seeking approval of, or otherwise affirmatively support, encourage, pursue, or participate in, any alternative Exit Term Loan Facility that is not an Acceptable Alternative Exit Facility, nor encourage any other person or Entity in any efforts related to the foregoing.

**Section 7.    *Additional Provisions Regarding Company Parties' Commitments*.**

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or its Governing Body, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.  If a Company Party determines to take any action or refrain from taking any action with respect to the Restructuring Transactions in reliance on this Section 7.01, such Company Party shall promptly (in any event within two (2) Business Days of such determination) provide written notice of such determination to counsel of each of the Consenting Creditors.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to  (i) consider, respond to, and facilitate Alternative Restructuring Proposals, (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity, (iii) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals, and (iv) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

7.03.    Nothing in this Agreement shall (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions, or (ii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.    *Transfer of Interests and Securities*.**

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

17

(a)      in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Stakeholder; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided, however*, that (i) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (ii) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a Permitted Transferee under Section 8.01; and (ii) the Transfer otherwise is permitted under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any Claims and interests in favor of a bank or broker-dealer holding custody of such Claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims and interests.

**Section 9.**    ***Representations and Warranties of Consenting Stakeholders***.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Agreement Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 10.**    ***Mutual Representations, Warranties, and Covenants***.  Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Agreement Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate the

Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements, and has not participated in any discussions in furtherance of any such agreements or arrangements, that have not been disclosed to all Parties to this Agreement with either (i) the other Parties to this Agreement or (ii) any third party that is not Party to this Agreement where such restructuring or similar agreements or arrangements are related to the Restructuring Transactions contemplated by this Agreement.

## Section 11.    *Termination Events*.

11.01.    <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated by the Required Consenting First Lien Lenders; and, solely with respect to the Cross-Holder Creditors, by the Cross-Holder Creditors; and, solely with respect to the Sponsor, by the Sponsor, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by one or more of the Company Parties of any provision set forth in this Agreement (including the commitments in Section 6 and/or Section 7) that remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)    the Bankruptcy Court enters an order denying confirmation of the Plan on a final basis;

(d)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the

20

Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) rejecting this Agreement, (iv) terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan), or (v) dismissing any of the Chapter 11 Cases;

(e)     the Company Parties fail to pay any Consenting Creditor Fees and Expenses in accordance with this Agreement;

(f)     any of the Company Parties consummate an Alternative Restructuring Transaction that prevents the consummation of the Restructuring Transactions;

(g)     any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, or (iii) shall have been withdrawn;

(h)     in the case of a Definitive Document that is an order, including the Confirmation Order or the DIP Orders, such order shall have been stayed, reversed, vacated, or adversely modified;

(i)     the termination of the DIP Facility or the acceleration of any obligations thereunder or the termination of the Company's authorization for the Company to use cash collateral;

(j)     prior to the Petition Date, any Company Party (i) voluntarily commences any case or files any petition seeking winding up, dissolution, liquidation, administration, moratorium, receivership or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement or (ii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets;

(k)     the failure of the Company Parties to adhere to the Milestones set forth in Section 3.02; and

(l)     solely for the Sponsor, by the Sponsor, (i) upon the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order of the Bankruptcy Court, granting standing to any person other than a Company Party the right to prosecute or settle potential Claims or Causes of Action against the Sponsor or (ii) upon a modification of the release and exculpation provisions of the Plan that materially and adversely affects the interests of the Sponsor.

11.02. <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

21

(b)     the Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (i) the Required Consenting Creditors, (ii) the Sponsor, and (iii) each Company Party.

11.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Effective Date.

11.05.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; *provided* <u>however</u>, that, notwithstanding the foregoing or anything else to the contrary in this or any other document or agreement, in no event shall such termination relieve any Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the Termination Date as to such Party or (ii) any obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided, however*, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (i) any right of any Company Party or the ability of

22

any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (ii) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by (i) each Company Party and the Required Consenting First Lien Lenders; (ii) solely with respect to any modification, amendment, waiver or supplement of the Cross-Holder Ad Hoc Group's (A) Cross-Holder Creditor Fees and Expenses, (B) releases, or (C) Second Lien Claim treatment, the Cross-Holder Creditors; and (iii) solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of the Sponsor, the Sponsor.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**    *Miscellaneous*

13.01.    <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.    <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto (together with any exhibits, annexes, or schedules thereto), including the Restructuring Term Sheet, is expressly incorporated herein and made a part

of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern; *provided* that this Agreement shall govern in the event of any inconsistency between Restructuring Term Sheet and this Agreement (or any other exhibits, annexes, and schedules hereto).

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company

Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)  if to a Company Party, to:

Careismatic Brands, LLC
1119 Colorado Avenue,
Santa Monica, California 90401
Attention:  Sid Lakhani, Chief Executive Officer; Sean Bogue, Chief Financial Officer
E-mail address: slakhani@careismatic.com; sbogue@careismatic.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua Sussberg
E-mail address:  jsussberg@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Chad J. Husnick
E-mail address:  chusnick@kirkland.com

(b)  if to a First Lien Consenting Creditor, to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Evan R. Fleck; Nelly Almeida
E-mail address:  efleck@milbank.com; nalmeida@milbank.com

(c)  if to the Second Lien Consenting Creditor, to:

25

King & Spalding LLP
1185 6th Avenue
New York, NY 10036
Attention:  Peter Montoni; Matt Warren
E-mail address:  pmontoni@kslaw.com; mwarren@kslaw.com

(d)    if to the Sponsor, to:

Partners Group (USA) Inc.
1114 Avenue of the Americas, 37th Floor
New York, NY 10036
Attention:  Philip Wolf
E-mail address:  philip.wolf@partnersgroup.com

with copies to:

Ropes & Gray LLP
1211 6th Ave,
New York, NY 10036
Attention:  Gregg Galardi
E-mail address:  gregg.galardi@ropesgray.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any

such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19.  <u>Fees and Expenses</u>.  Pursuant to the DIP Orders, the Company Parties shall pay in full in cash all Consenting Creditor Fees and Expenses within five (5) business days of the Company's receipt of a statement setting forth such expenses.  The Plan, the Confirmation Order, the DIP Orders, and/or other Definitive Documents shall contain appropriate provisions to give effect to the obligations provided for in this Section 13.19.  Any amendment or modification to any engagement letter of any financial advisor, to the extent giving rise to a claim to reimbursement or payment from any Company Party, shall require the prior written consent of the First Lien Ad Hoc Group or the Cross-Holder Ad Hoc Group, as applicable.  To the extent there is any inconsistency between the terms of the DIP Orders and this Section 13.19, the terms of the DIP Orders shall control.

13.20.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13, any defined terms used in any of the foregoing Sections (solely to the extent used therein) and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

13.21.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.01(a), Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting First Lien Lenders, or the Cross-Holder Creditors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including

electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature pages omitted.*]

## EXHIBIT A

### Company Parties

1. AllHearts, LLC
2. Careismatic Group II Inc.
3. Careismatic Group Inc.
4. Careismatic, LLC
5. CBI Intermediate, Inc.
6. CBI Midco, Inc.
7. CBI Parent, L.P.
8. Krazy Kat Sportswear LLC
9. Marketplace Impact, LLC
10. Med Couture, LLC
11. Medelita, LLC
12. New Trojan Parent, Inc.
13. Pacoima Limited, LLC
14. Silverts Adaptive, LLC
15. Strategic Distribution, L.P.
16. Strategic General Partners, LLC
17. Strategic Partners Acquisition Corp.
18. Strategic Partners Corp.
19. Strategic Partners Midco, LLC
20. Trojan Buyer, Inc.
21. Trojan Holdco, Inc.

## <u>EXHIBIT B</u>

**Restructuring Term Sheet**

*Execution Version*

**Careismatic Brands, LLC, *et al.***
**RESTRUCTURING TERM SHEET**

This restructuring term sheet (including all exhibits and schedules hereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") sets forth the principal terms and conditions of a proposed restructuring of Careismatic Brands LLC and certain of its direct and indirect affiliates and subsidiaries.  This Restructuring Term Sheet does not address all terms, conditions, or other provisions that would be required in connection with the restructuring or that will be set forth in the Definitive Documents, which are subject to agreement in accordance with the restructuring support agreement to which this Restructuring Term Sheet is attached (including all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**").  Capitalized terms used and not defined in this Restructuring Term Sheet shall have their respective meanings as defined in **Exhibit B** hereof or the Restructuring Support Agreement, as applicable.

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAW.  NOTHING IN THIS RESTRUCTURING TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE AND WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF EACH PARTY HERETO.**

**UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THE RESTRUCTURING TERM SHEET IS INCONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT WITH RESPECT TO SUCH PROVISION SHALL CONTROL.**

| Overview | |
|---|---|
| **Debtors** | The Entities that are listed on **Exhibit A** to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "**Debtor**" and, collectively, the "**Debtors**"). |
| **Restructuring Implementation** | The Restructuring Transactions will be implemented pursuant to confirmation of a prearranged chapter 11 plan implementing the terms and conditions set forth in this Restructuring Term Sheet (the "**Plan**") and in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**" and such cases, the "**Chapter 11 Cases**," and the date of the commencement of the Chapter 11 Cases, the "**Petition Date**"). |
| | The Plan will be structured such that the Debtors may pursue: |
| |     a)    a sale of the equity of the Reorganized Debtors or substantially all assets of the Debtors to the highest or otherwise best bidder |

| Overview |
|---|

|  | | through a Successful Bid that is <u>not</u> a Credit Bid (as defined below) (the "**Sale Transaction**") following a sale and marketing process to be conducted pursuant to the Bidding Procedures (the "**Sale Process**"); <u>or</u> |
|---|---|---|
|  | b) | in the event a Sale Process yields no Third-Party Bid that is a Successful Bid, providing for the equitization of 100% of the Allowed First Lien Claims (as defined below), subject to dilution from the (x) MIP Equity, (y) the DIP Premiums (as defined in **Exhibit C** hereto), subject to the DIP Premium Conversion Election Option (each as defined below) (the "**Recapitalization**"). In the event where the Successful Bid is the Credit Bid, the Debtors shall pursue confirmation of a Plan via the Recapitalization. |

In the event of a Sale Transaction, the sale proceeds (the "**Sale Proceeds**") provided by the winning bidder shall be distributed in accordance with this Restructuring Term Sheet and the Plan.

All Holders of First Lien Claims and DIP Claims shall be permitted to credit bid such Claims in connection with a Sale Process, with the structure of such credit bid to be discussed and agreed between the Debtors and the requisite Holders of the First Lien Claims and /or DIP Claims, as applicable (any such credit bid, the "**Credit Bid**").

A Sale Transaction or the Recapitalization (the "**Restructuring Transactions**") will be subject to the Definitive Documents, the terms of the Restructuring Support Agreement, and the consent rights set forth therein.

The Restructuring Transactions will be supported by (a) the undersigned Holders of First Lien Claims and Second Lien Claims, represented by Milbank LLP and Houlihan Lokey Capital, Inc. as of the date hereof, (the "**First Lien Initial Consenting Creditors**"),[1] (b) the undersigned Holders of First Lien Claims and Second Lien Claims represented by King & Spalding LLP as of the date hereof (the "**Cross-Holder Creditors**" and, in its capacity as an ad hoc group, the "**Cross-Holder Ad Hoc Group**, together, with the First Lien Consenting Creditors, the "**Consenting Creditors**"), (c) the Sponsor, and (d) the Debtors, in each case on the terms set forth herein.

The "**Effective Date**" will be the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Restructuring Support Agreement and the Plan has been substantially consummated.

From and after the Effective Date, the Debtors (together with any applicable newly-formed entity formed to implement the Plan) shall be referred to herein

---

[1]    In its capacity as an ad hoc committee, First Lien Consenting Creditors (as defined in the Restructuring Support Agreement) represented by Milbank LLP and Houlihan Lokey Capital, Inc. (the "<u>First Lien Ad Hoc Group</u>").

| Overview | |
|---|---|
| | as the "**Reorganized Debtors**" and Careismatic Brands, LLC shall be referred to herein as "**Reorganized CBI**," in each case subject to modification in the event that the Plan is structured in such a way that results in a particular Debtors being "left behind" or otherwise wound down in connection with the Plan. |
| **DIP Facility, DIP Lenders, Backstop Commitments and Backstop Parties** | The Debtors shall seek authority to obtain debtor-in-possession financing (the "**DIP Facility**") on the terms and conditions set forth in the DIP Credit Agreement, attached hereto as **Exhibit A** (the "**DIP Credit Agreement**" and the lenders thereunder, the "**Initial DIP Lenders**").<br><br>Certain Holders of First Lien Claims that comprise the First Lien Initial Consenting Creditors and the Cross-Holder Creditors shall backstop 100% of the DIP Facility pursuant to the DIP Credit Agreement (the "**Backstop Commitment**" and those First Lien Initial Consenting Creditors and Cross-Holder Creditors, the "**Backstop Parties**").<br><br>The DIP Facility in the aggregate amount of $125 million, consisting of (i) $50 million of which shall be funded upon the entry of an interim order by the Bankruptcy Court approving the DIP Facility (the "**Interim DIP Order**"), and (ii) $75 million of which shall be funded upon the entry of a final order by the Bankruptcy Court approving the DIP Facility (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**") (the loans under the DIP Facility, the "**DIP Commitments**"), in each case on the terms and conditions set forth in the DIP Credit Agreement and DIP Orders.  The DIP Orders shall provide for the Debtors' consensual use of cash collateral (the "**Cash Collateral**") of the prepetition secured parties and approval of (i) each of the DIP fees and DIP Premiums referenced in **Exhibit C** (collectively, the "**DIP Fees and Premiums**") and (ii) the DIP Premium Conversion Election Option (as defined below). |
| **DIP Facility Subscription Process** | Participation in the DIP Facility shall be offered ratably to all Holders of First Lien Claims, on the following terms: (a) 15% of the DIP Commitments (as defined below) allocated on a *pro rata* basis to the Backstop Parties; and (b) the remaining 85% of the DIP Commitments allocated on a *pro rata* basis to all Holders of First Lien Claims ("**Existing First Lien Lenders**") (such process, the "**DIP Facility Subscription**").<br><br>On or after the date of entry of the Interim DIP Order, the Company Parties will request that the First Lien Agent post the Restructuring Support Agreement (inclusive of all exhibits) and a posting memo in respect of the syndication of the DIP Commitments to the First Lien Agent's website maintained for the Existing First Lien Lenders, which posting will provide blank signature pages to the Restructuring Support Agreement and the DIP Credit Agreement. Existing First Lien Lenders may subscribe for the DIP Commitments (or designate an affiliate to subscribe for the DIP Commitments) by delivering signature pages to the Restructuring Support Agreement and the DIP Credit Agreement in accordance with the instructions set forth in the posting memo (by 5:00 p.m. prevailing Eastern Time on February 6, 2024, the ("**Subscription Deadline**"). |

| Overview | |
|---|---|
| | The record date for determining the right to subscribe, and the *pro rata* allocation of the DIP Facility Subscription, for DIP Commitments shall be January 17, 2024 (giving pro-forma effect to trades or assignments of First Lien Loan Claims that have not yet closed); *provided*, *however*, that the right to subscribe, and *pro rata* allocation of such subscription, shall transfer with the First Lien Claims to the extent of any trade or assignment of such First Lien Claims (in accordance with the requirements of the Restructuring Support Agreement, if applicable) made after entry of the Interim DIP Order and before the Subscription Deadline.   The Existing First Lien Lenders that elect to subscribe to the DIP Commitments (collectively, with the Initial DIP Lenders, the "**DIP Lenders**") shall be entitled to fund their *pro rata* share of 85% of the DIP Commitments, as set forth above. |
| **DIP Facility Maturity Date** | The earliest to occur of (i) the date falling nine months after entry by the Bankruptcy Court of the Interim DIP Order; (ii) the Effective Date, and (iii) the date of termination of the DIP Commitments and acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default under the DIP Facility (subject to any applicable cure or noticing periods set forth in the DIP Orders). |
| **Uses of Proceeds** | The use of the DIP Commitments will be set forth in the DIP Credit Agreement and will be subject, among other things, to the Budget (including Permitted Variances (as defined therein)). <br><br> No portion of the Debtors' Cash Collateral (as defined in the Bankruptcy Code), the proceeds of the DIP Facility, the Collateral (as defined in the DIP Credit Agreement), or the Carve-Out (as defined therein) may be used: <br><br> (a)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders; <br><br> (b)    to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Lenders or the First Lien Lenders (as defined below), or their respective rights and remedies under DIP Documents, the DIP Orders, or the applicable Prepetition Loan Documents (as defined in the DIP Credit Agreement); or (ii) any other action which, with the giving of notice or passing of time, would result in an "Event of Default" (as defined in the DIP Credit Agreement); <br><br> (c)    for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (other than permitted adequate protection payments pursuant to the DIP Orders); <br><br> (d)    unless the Exit Conversion (as defined herein) takes place, to make any distribution under a plan of reorganization that does not provide for the indefeasible payment of the DIP Commitments in full in Cash (including all DIP Fees and Premiums); or |

| Overview |
|---|
| | (e) except as may be permitted by the Budget, to make any payment in settlement of any Claim, action, or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Administrative Agent acting at the direction of the Requisite Lenders (each as defined in the DIP Credit Agreement). |
| **Claims and Interests to be Addressed** | Outstanding indebtedness of the Debtors, equity Interests, and Intercompany Interests in the Debtors that will be restructured or otherwise addressed pursuant to the Restructuring Transactions include:<br><br>(i) indebtedness under that certain First Lien Credit Agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, the issuing banks thereto from time to time, the Swing Line Lender party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent (the "**First Lien Agent**" and such agreement, the "**First Lien Credit Agreement**"), comprised of revolving credit facility loans in an aggregate estimated principal amount outstanding of approximately $100 million, plus applicable interest, fees, costs, expenses, and premiums (the Claims in respect thereof, the "**First Lien RCF Claims**");<br><br>(ii) indebtedness under that certain First Lien Credit Agreement, comprised of term loans in an aggregate estimated principal amount outstanding of approximately $590 million, plus applicable interest, fees, costs, expenses, and premiums (the Claims in respect thereof, together with the First Lien RCF Claims, the "**First Lien Claims**," and the Holders thereof, the "**First Lien Lenders**");<br><br>(iii) obligations arising under that certain Master Equipment Lease Agreement dated July 25, 2023, as amended from time to time, by and among Wingspire Equipment Finance LLC, as Lessor, and Careismatic Brands, LLC, as Lessee, in an aggregate estimated principal amount outstanding of approximately $2.9 million (the Claims in respect thereof, the "**Equipment Financing Claims**,");<br><br>(iv) indebtedness under that certain Second Lien Credit Agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent, comprised of term loans in |

| Overview | |
|---|---|
| | an aggregate estimated principal amount outstanding of approximately $110 million, plus applicable interest, fees, costs, and expenses (the claims in respect thereof, the "**Second Lien Claims**"); |
| | (v) unsecured intercompany notes under various agreements from certain limited partners of CBI Parent, L.P. (the "**Sponsor Loan Agreement**" and the Claims in respect thereof, the "**Sponsor Loan Claims**"), each dated as of October 17, 2022, between those Entities listed on **Schedule 1**, attached hereto, as co-issuer and Careismatic Brands, Inc. (n/k/a Careismatic Brands, LLC), a Delaware corporation, as Borrower, in the outstanding principal amount of $32.9 million;[2] |
| | (vi) Intercompany Claims and Intercompany Interests; and |
| | (vii) Interests (as defined in the Restructuring Support Agreement). |
| **Cash Collateral; DIP Facility** | The Restructuring Transactions shall be funded through: (i) the consensual use of Cash Collateral and the DIP Facility; and (ii) in the case of the Recapitalization, the Exit Financing Arrangement (as defined below).<br><br>The terms of the DIP Facility are set forth in the DIP Credit Agreement attached hereto as **Exhibit A**.<br><br>Notwithstanding anything herein to the contrary, the DIP Documents shall provide that, subject to entry of the Final DIP Order, each Holder of a DIP Claim shall be entitled to elect, at its sole discretion, to convert the DIP Premiums earned in connection with the DIP Facility into New Common Stock at a 40% discount to plan enterprise value; *provided, that* in the event that: (i) the Debtors' restructuring is consummated through either (a) a Sale Transaction (via a Third-Party Bid) or (b) a plan of reorganization that, in the case of each (a) and (b), provides for the payment in full, in Cash, of the First Lien Claims and the DIP Claims on the effective date of any such plan or the closing of any such Sale Transaction (as applicable); or (ii) an Acceptable Alternative Exit Facility (as defined below) is approved and becomes effective, such election will fall away (the election option, the "**DIP Premium Conversion Election Option**"). |
| **Exit Financing Arrangement** | On the Effective Date, in the event of the Recapitalization, the Reorganized Debtors shall enter into the following exit financing (the "**Exit Financing Arrangement**"):<br><br>(i) the DIP Commitments shall be converted into exit financing loans of the Reorganized Debtors (the "**Exit Conversion**") having the economic |

---

[2] **Schedule 1** provides the principal amounts totaling $30 million. The remaining $2.9 million constitutes accrued and unpaid interest.

| Overview | |
|---|---|
| | terms set forth below and otherwise in form and substance acceptable to the Required DIP Lenders (as defined in the Credit Agreement) (the "**Exit Term Loan Facility**" and the lenders thereto, the "**Exit Term Loan Lenders**"). |
| | a. *Interest Rate*: (i) SOFR + 7.00% paid monthly in Cash <u>or</u> (ii) at the Debtors' sole discretion, solely for the first year following entry into the Exit Term Loan Facility, SOFR + 2.50% in Cash plus 6.50% PIK. |
| | b. *Default Interest Rate*: SOFR + 9.00% paid monthly in Cash. |
| | c. *Maturity*: The date falling five years after the Effective Date. |
| | d. *Other*: Usual and customary covenants and call protection. |
| | In the event of a Recapitalization, the Debtors may seek an alternative to the Exit Term Loan Facility to present to the First Lien Ad Hoc Group for approval; provided that any such facility shall be on terms and conditions acceptable to the Required Consenting First Lien Lenders in their sole discretion (any such facility, an "**Acceptable Alternative Exit Facility**"). |
| **Foreign and Critical Vendors** | On the Petition Date, pursuant to the First Day Pleadings, the Debtors will seek, among other things, authority from the Bankruptcy Court to pay up to: $3 million in relief to satisfy critical vendor obligations; and $25 million in relief to satisfy foreign vendor obligations, in each case subject to motions and orders that are reasonably acceptable to the Require Consenting Lenders and the approval of the Bankruptcy Court (collectively, the "**Permitted Vendor Relief Payments**"). |
| **New Common Stock** | On the Effective Date, in the event of the Recapitalization, one or more of the Reorganized Debtors (as determined by the Debtors and the Required Consenting First Lien Lenders) shall make an issuance of new common equity (the "**New Common Stock**"). On the Effective Date, the New Common Stock will be distributed to Holders of Allowed First Lien Claims in respect of such Claims in accordance with the Restructuring Term Sheet and the Plan. |
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be in form and substance subject to the consent rights set forth herein and in the Restructuring Support Agreement. |

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| Each Holder of an Allowed Claim, Interest, or Intercompany Interest as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim, Interest, or Intercompany Interest. | | | |
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| Unclassified Non-Voting Claims | | | |
| N/A | **DIP Claims** | On the Effective Date, each Holder of a DIP Claim arising under or pursuant to the DIP Financing shall receive:<br><br>• in the event of the Recapitalization, (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full; or<br><br>• in the event of a Sale Transaction, payment in full in Cash (including all DIP Fees and Premiums). | N/A |
| N/A | **Administrative Claims** | On the Effective Date, each Holder of an Allowed Administrative Claim[3] shall be paid in full in Cash on the Effective Date: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving | N/A |

---

[3]    For purposes of this Restructuring Term Sheet, "Administrative Claim" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims (to be defined in the Plan); and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| | | rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim. | |
| N/A | **Priority Tax Claims** | On the Effective Date, each Holder of a Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| Class 1 | **Other Secured Claims** | On the Effective Date, each Holder of an Allowed Other Secured Claim[4] shall receive: (i) payment in full in Cash in an amount equal to its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 2 | **Other Priority Claims** | Each Holder of an Allowed Other Priority Claim[5] shall be paid in full in Cash on the Effective Date or in the ordinary course of business (by the Reorganized Debtors) as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 3 | **First Priority Claims** | On the Effective Date, each Holder of an Allowed First Priority Claim shall receive:<br><br>• in the event of the Recapitalization, its *pro rata* distribution of 100% of the New Common Stock (subject to dilution from (a) MIP Equity and (b) DIP Fees and Premiums, subject to the DIP Premium Conversion Election Option; or | Impaired / Entitled to Vote |

---

[4]    For purposes of this Restructuring Term Sheet, "Other Secured Claim" shall mean any Secured Claim that is not a DIP Claim, First Lien Claim, Equipment Financing Claim, or Second Lien Claim.

[5]    For purposes of this Restructuring Term Sheet, "Other Priority Claim" shall mean any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| | | • in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Cash. | |
| **Class 4** | **Second Lien Secured Claims** | Each Holder of an Allowed Second Lien Secured Claim shall receive:<br><br>• in the event of the Recapitalization, no recovery or distribution on account of their Second Lien Secured Claim; *provided* that, if the Second Lien Condition is satisfied, each Holder of an Allowed Second Lien Secured Claim shall receive 5-year warrants to purchase up to 8.5% of the New Common Stock with a strike price set at $818 million;[6] or<br><br>• in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Cash after all First Priority Claims have been satisfied in full in Cash. | Impaired / Entitled to Vote |
| **Class 5** | **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive:<br><br>• in the event of the Recapitalization, no recovery or distribution on account of their General Unsecured Claims; or<br><br>• in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Cash after all First Priority Claims and Second Lien Claims have been satisfied in full in Cash. | Impaired / Entitled to Vote |

---

[6]    For the avoidance of doubt, the warrants shall not include Black Scholes protections.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| Class 6 | Intercompany Claims | Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Claims, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Consenting First Lien Lenders. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| Class 7 | Intercompany Interests | Intercompany Interests (as defined in the Restructuring Support Agreement) shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting First Lien Lenders. (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled and released without any distribution on account of such Intercompany Interests, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Consenting First Lien Lenders. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| Class 8 | Interests | On the Effective Date, all Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Each Holder of an Interest shall receive no recovery or distribution on account of their Interests. | Impaired / Deemed to Reject |
| General Provisions Regarding the Restructuring | | | |
| Restructuring Transactions | | The Confirmation Order shall be deemed to authorize and ratify, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein.  On the Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. | |
| Tax Matters | | The parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring Transactions and the transactions related thereto in a tax efficient and cost-effective manner, that is reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders. | |

| Treatment of Claims and Interests | |
|---|---|
| **Restructuring Steps Plan** | The Plan Supplement shall include a restructuring steps plan (the "**Restructuring Steps Plan**"), in form and substance reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders, that shall outline the steps, considerations, treatment of Intercompany Claims and Intercompany Interests, and agreed funding, as applicable, for any Reorganized Debtor or Company Party, including any foreign non-Debtor Company Party (each as defined in the Restructuring Support Agreement). |
| **Debtor Releases, Third-Party Releases, Injunction, and Exculpation** | Subject in all respects to the conclusion of the transaction committees' investigations, the Plan will include customary releases, injunctions, and exculpations in each case to the fullest extent permitted by law and effective as of the Effective Date based on the terms set forth in **Exhibit B** to this Restructuring Term Sheet. |
| **Management Incentive Plan** | In the event of the Recapitalization, the Plan will provide for the establishment of a post-emergence management incentive plan to be designed and adopted by the New Board (as defined below) following the Effective Date, to be used to incentivize and compensate employees, directors, consultants and other service providers (the "**Management Incentive Plan**"), which will include (i) the ability to grant restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock (or equivalent Cash value thereof) representing up to 15.0% of the New Common Stock on a fully diluted basis, (the "**MIP Equity**") and (ii) other terms and conditions customary for similar type equity plans as determined by the New Board in its sole discretion (including, with respect to participants, allocation of awards, and vesting). |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed or assumed and assigned (as applicable) pursuant to section 365 of the Bankruptcy Code.<br><br>The Required Consenting First Lien Lenders shall have a reasonable consent right over the assumption, assumption and assignment, or rejection of all contracts and unexpired leases under the Plan. |
| **Securities Law Matters** | To extent applicable, on the Effective Date, the Reorganized Debtors shall issue New Common Stock in accordance with the terms of the Plan, the Definitive Documents, and applicable law (including applicable securities laws).<br><br>The New Common Stock will be issued pursuant to section 1145 of the Bankruptcy Code (the "**Section 1145 Exemption**") or, to the extent that the Section 1145 Exemption is either not permitted or not applicable, section 4(a)(2) of the Securities Act or another exemption thereunder. Any New Common Stock issued pursuant to the Section 1145 Exemption will be freely transferrable under applicable securities laws without further registration, subject to certain restrictions on affiliates and underwriters under applicable securities laws. |
| **Governance** | In the event of the Recapitalization, the new board of directors or managers of the Reorganized Debtors (as applicable) (the "**New Board**") shall be determined |

12

| Treatment of Claims and Interests | |
|---|---|
| | in accordance with the term sheet attached hereto as **Exhibit D** (the "**Governance Term Sheet**").  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.<br><br>In connection with the Effective Date, and consistent with the Governance Term Sheet and section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors shall adopt the applicable organizational documents as determined by the Debtors and the Required Consenting First Lien Lenders. |
| **Employee Matters** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Creditors consent to the continuation of the Debtors' wages, compensation, and benefits programs according to existing terms and practices, including executive compensation programs and executive employment agreements (the "**Assumed Plans**"); *provided* that (i) Assumed Plans shall not include any existing equity or equity-based programs and awards, and (ii) each Assumed Plan shall be amended, to the extent applicable, to exclude any right(s) to receive future equity or equity-based awards provided for under any Assumed Plans, and such awards and rights described in the foregoing subsections (i) and (ii) shall be terminated as of the Effective Date for no consideration).<br><br>Without Bankruptcy Court approval or approval of the Required Consenting First Lien Lenders, the Debtors will not be permitted to establish any annual, short-term or long-term compensation programs unless such program(s) are (i) in the ordinary course of business and consistent with past practice and (ii) performance-based (*i.e.*, are only eligible to be paid upon achievement of pre-established performance goals).<br><br>The occurrence of the Effective Date shall not be deemed to result in an accelerated payment event or a "good reason" or other constructive termination event for purposes of any Debtor compensation or benefit plan; *provided*, that employees who, as of the date hereof, are party to Assumed Plans with a contractual entitlement to severance may, at their sole discretion, elect to treat the occurrence of the Effective Date as "good reason" or a constructive termination event. |
| **D&O Insurance** | The Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect prior to the Effective Date (including any tail policy), and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.  Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement such directors' and officers' insurance policies as the Debtors deems necessary, including by purchasing any tail coverage (including a tail policy).<br><br>It shall be a condition precedent to entry into the Restructuring Support Agreement that the Debtors shall have bound and secured non-refundable six-year tail policy, which shall provide at least the same coverage and amounts |

13

| Treatment of Claims and Interests | |
|---|---|
| | and containing terms and conditions that are no less advantageous in the aggregate to the insured than the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Debtors. |
| **Indemnification Obligations** | Any obligations of the Debtors pursuant to corporate charters, bylaws, limited partnership agreements, limited liability company agreements, written deeds of indemnity, or other organizational documents in place as of the Effective Date to indemnify current and former officers, directors, partners, managers, members, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, managers, members, partners, agents, or employees, based upon any act or omission for or on behalf of the Debtors (the "**Indemnification Obligations**") will not be discharged or impaired by confirmation of the Plan; *provided* that the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or causes of action for which indemnification is barred under applicable law, the Debtors' organization documents, or applicable agreements governing the Debtors' indemnification obligations.  All such Indemnifications Obligations will be assumed by the Debtors under the Plan (and shall be treated as executory contracts to be assumed under the Plan, to the extent applicable) and will continue as obligations of the Reorganized Debtors.  Any Claim based on the Company's obligations thereunder will be an Allowed Claim.<br><br>In the event the Restructuring Transactions are effectuated via the Sale Transaction or the Recapitalization (which shall include the scenario in which the Credit Bid is the Successful Bid), all such Indemnification Obligations shall be assumed and assigned in their entirety to the applicable party (*i.e.*, to a third-party purchaser in the Sale Transaction or the applicable entities pursuant to the Recapitalization).  Any Third-Party Bid that does not provide for the assumption and assignment of such Indemnification Obligations cannot be considered a Successful Bid. |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the Plan (the "**Retained Causes of Action**").<br><br>For the avoidance of doubt, any Claims or Causes of Action against the Consenting Creditors and/or their Affiliates and/or advisors shall not be Retained Causes of Action. |

| Treatment of Claims and Interests |
|---|
| **Conditions Precedent to the Effective Date** | The Effective Date will be subject to the satisfaction of customary conditions, including the following (as applicable) (the "**Conditions Precedent**"): |

(i)     the Definitive Documents (as defined in the Restructuring Support Agreement) shall be consistent with the Restructuring Support Agreement and otherwise approved by the Debtors and the Required First Lien Initial Consenting Creditors with their respective consent and approval rights as set forth in the Restructuring Support Agreement;

(ii)    the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(iii)   the DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the DIP Lenders party thereto;

(iv)    the Restructuring Transactions have been implemented in accordance with the Restructuring Steps Plan in all material respects;

(v)     the Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal the Bankruptcy Court shall have entered the Confirmation Order, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal;

(vi)    the Plan Supplement, Definitive Documents, Plan, and all schedules, documents, supplements, and exhibits thereto, the Exit Financing Arrangement, shall have become effective and shall be in full force and effect, subject to the consent and approval rights set forth in the Restructuring Support Agreement;

(vii)   the New Common Stock shall have been issued (with all conditions precedent thereto having been satisfied or waived);

(viii)  all Consenting Creditor Fees and Expenses (as defined in the Restructuring Support Agreement) and any other professional fees and other amounts required to be paid pursuant to the Restructuring Support Agreement, in any Definitive Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash, including for the avoidance of doubt all accrued and unpaid fees and expenses of advisors to the First Lien Ad Hoc Group; *provided* that the Consenting Creditors Fees and Expenses of the Cross-Holder Ad Hoc Group shall not be paid in an amount greater than $200,000 (in the aggregate).

| Treatment of Claims and Interests | |
|---|---|
| | (ix)    any and all requisite governmental, regulatory, and third-party approvals and consents necessary to effectuate the Restructuring Transactions shall have been obtained, including Bankruptcy Court approval, and all applicable waiting periods shall have expired; and<br><br>(x)    such other conditions as may be mutually agreed to by the Debtors and the Required Consenting First Lien Lenders.<br><br>The Conditions Precedent may be waived, in whole or in part, in writing by the Debtors and the Required Consenting First Lien Lenders. |
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including in respect of the cancellation of Interests and Intercompany Interests, the vesting of assets, release of Liens, the compromise and settlement of Claims, and the resolution of disputed Claims. |
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted by the Restructuring Support Agreement. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters to the extent consistent with applicable law. |
| **Credit Rating** | Prior to the entry of the Final DIP Order, the Debtors shall use its best efforts to obtain a corporate credit rating in respect of the DIP Facility.<br><br>On the Effective Date, the Debtors shall have obtained a corporate credit rating in respect of the Exit Term Loan Facility. |

**<u>Schedule 1</u>**

*[Omitted from Filing Version]*

**<u>Exhibit A</u>**

**DIP Credit Agreement**

**[Filed on Docket]**

**Exhibit B**

**Releases and Exculpations;[1] Defined Terms**

---

[1] The following remains subject to ongoing investigations being conducted by the Transaction Committee of CBI Parent, L.P. and the Transaction Committee of CBI Intermediate, Inc.

**A.        *Releases by the Debtors.***

Notwithstanding anything contained herein, the Plan, or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Reorganized Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Reorganized Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Term Loan Facility Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claim, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Reorganized Debtors, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**B.        *Releases by Third Parties.***

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, each of the Released Parties, will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself

and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Term Loan Facility Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (the "**Third-Party Release**").

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

## C.    *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Term Loan Facility Documents, and all other Definitive Documents, the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the

Reorganized Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**D.      Injunction.**

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Reorganized Debtors has been liquidated and distributed in accordance with the terms of the Plan, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Intercompany Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the terms of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims, Interests, or Intercompany Interests, and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim, Allowed Interest, or Allowed Intercompany Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

\* \* \* \* \* \*

### Restructuring Term Sheet – Definitions

"Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

"Agent" means any administrative agent, collateral agent, or similar Entity under the First Lien Facility or the Second Lien Term Loan Facility, including any successors thereto.

"Allowed" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a proof of Claim timely Filed by the applicable bar date (or for which Claim a proof of Claim is not required under the Plan, the Bankruptcy Code, or a final order of the Bankruptcy Court); (b) a Claim that is listed in the Company's schedules of assets and liabilities as not contingent, not unliquidated, and not disputed and for which no proof of Claim has been timely Filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a final order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so interposed, such Claim shall have been Allowed by a final order of the Bankruptcy Court.

"Bidding Procedures" means those bidding procedures to be agreed by the Debtors and the Required Consenting First Lien Creditors, including what constitutes a Successful Bid.

"Cash" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

"Causes of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws).  Causes of Action include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

"<u>CBI Parent</u>" means CBI Parent, L.P.

"<u>Claim</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code.

"<u>Confirmation Date</u>" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"<u>Confirmation Order</u>" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"<u>Consenting Stakeholders</u>" means, collectively, the Consenting Creditors and the Sponsor.

"<u>Consummation</u>" means the occurrence of the Effective Date.

"<u>DIP Claim</u>" means those Claims in respect of the DIP Commitments, including the DIP Fees and Premiums.

"<u>DIP Documents</u>" means any documents or agreements governing the DIP Facility, which shall be consistent in all material respects with the Restructuring Support Agreement and the DIP Orders and otherwise in form and substance satisfactory to the DIP Lenders.

"<u>Disclosure Statement</u>" means the disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as approved by the Confirmation Order.

"<u>Entity</u>" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"<u>Excess Distributable Cash</u>" means Cash arising from the Sale Proceeds, if any, after funding the treatment of the DIP Claims, Administrative Claims, Secured Tax Claims, Other Secured Claims, Other Priority Tax Claims, and Other Priority Claims set forth in the Plan; *provided* that any Cash placed in an escrow account for the payment of professional fees shall not be Excess Distributable Cash.

"<u>Exculpated Parties</u>" means, collectively:  (a) the Debtors; (b) the Reorganized Debtors; (c) any statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code and its members; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons, directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"<u>Exit Term Loan Facility Documents</u>" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"File " or "Filed" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"First Day Pleadings" means the first-day pleadings that the Debtors determine are necessary or desirable to File.

"First Lien Credit Documents" means any documents governing the First Lien Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"First Lien Deficiency Claim" means any First Lien Claim that is not a First Lien Secured Claim.

"First Lien Facility" means that certain term loan facility under the First Lien Credit Agreement.

"First Lien Secured Claim" means any First Lien Claim that is a Secured Claim.

"First Priority Claim" means the Equipment Financing Claims and the First Lien Secured Claims.

"General Unsecured Claims" means any Claim that is not: (a) an Administrative Claim; (b) a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; (c) a Priority Tax Claim; (d) a DIP Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a First Priority Claim; or (h) an Intercompany Claim. For the avoidance of doubt, General Unsecured Claims shall include the Sponsor Loan Claims and Second Lien Deficiency Claims.

"Governing Body" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

"Holder" means a Person or an Entity holding a Claim or an Interest, as applicable.

"Intercompany Claim" means any Claim against a Debtor held by another Debtor.

"Intercompany Interest" means, other than an Interest, as defined in the Restructuring Support Agreement, any shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, profits interests, puts, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests in a Debtor held by another Debtor.

"Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

"New Organizational Documents" means the documents providing for corporate governance of Reorganized CBI and the other Reorganized Debtors, as applicable, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and in form and substance subject to the consent rights set forth in the Restructuring Support Agreement.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity.

"<u>Plan Supplement</u>" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the confirmation hearing to the extent available.

"<u>Professional Claim</u>" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"<u>Reinstated</u>," or "<u>Reinstatement</u>" shall mean with respect to a Claim, Interest, or Intercompany Interest, that the Claim, Interest, or Intercompany Interest shall be rendered Unimpaired.

"<u>Related Party</u>" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"<u>Released Parties</u>" means collectively, and in each case solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each DIP Lender; (e) each of the Agents; (f) each member of the First Lien Ad Hoc Group; (g) each member of the Ad Hoc Cross-Holder Group; (h) each Backstop Party; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j) (and, in addition to each of the foregoing, where any of the foregoing is an investment manager or advisor for a beneficial Holder, such beneficial Holder); *provided* that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

"<u>Releasing Parties</u>" means collectively, and each solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each DIP Lender; (e) each of the Agents; (f) each member of the First Lien Ad Hoc Group; (g) each member of the Ad Hoc Cross-Holder Group; (h) each Backstop Party; (i) all Holders of Claims that vote to accept the Plan; (j) all Holders of Claims who are deemed to accept the Plan but who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (k) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with any Filed Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (l) all Holders of Claims or Interests who vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the

applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (m) each current and former Affiliate of each Entity in clause (a) through (l); and (n) each Related Party of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that, for the avoidance of doubt, an Entity in clause (i) through clause (l) shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not withdrawn or otherwise resolved before the Confirmation order is entered.

"Reorganized Debtor" means a Debtor on and after the Effective Date.

"Second Lien Condition" means the satisfaction of each of the following: (i) Holders of 66.67% in principal amount of Second Lien Claims shall have executed counterpart signature pages to the Restructuring Support Agreement prior to the Petition Date; and (ii) the class of Second Lien Claims shall have voted to accept the Plan by the voting deadline.

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of January 6, 2021, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent (as amended, restated, amended and restated, supplemented and/or otherwise modified).

"Second Lien Credit Documents" means any documents governing the Second Lien Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"Second Lien Deficiency Claims" means Second Lien Claims that are not Second Lien Secured Claims, in the amount of $50 million.

"Second Lien Secured Claim" means any Second Lien Claim that is a Secured Claim.

"Second Lien Term Loan Facility" means that certain term loan facility under the Second Lien Credit Agreement.

"Secured Claim" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"Sponsor" means, collectively, Partners Group AG and its affiliated investment funds and affiliates and portfolio companies of the foregoing that hold Company Claims/Interests (as defined in the Restructuring Support Agreement) (each solely in their capacity as such).

"Subsidiary Debtors" means all Debtors other than CBI Parent.

"Successful Bid" means following a Sale Process, the qualified bid or combination of qualified bids, that the Debtors determine (subject to the terms and conditions to be set forth in the Bidding Procedures), in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties, is the highest or otherwise best bid to purchase the New Common Stock or all or substantially all assets of the Debtors via a confirmable Plan.

"Third-Party Bid" means a qualified third-party bid, as determined in accordance with customary requirements to be set forth in the Bidding Procedures.

"Unimpaired" means, with respect to a class of Claims, Interests, or Intercompany Interests, a class of Claims, Interests, or Intercompany Interests, that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**Exhibit C**

**DIP Fees and Premiums**

**Interest Rate:**
All amounts outstanding under the DIP Facility will bear interest at the rate of adjusted SOFR plus 6.0% per annum and shall be paid monthly.

**Default Interest**:
During the continuance of an Event of Default, the DIP Commitments and all other outstanding obligations under the DIP Facility will bear interest at an additional 2.0% per annum above the interest rate otherwise applicable.

**Backstop Premium:**
An amount equal to 11.0% of the DIP Commitments, payable in-kind to each Backstop Lender, according to its *pro rata* share of the Backstop Commitments, which may be equitized in accordance with the DIP Premium Conversion Election Option.

**Commitment Premium:**
An amount equal to 3.5% of the DIP Commitments, payable in-kind to each DIP Lender, according to its *pro rata* share of the DIP Commitments, which may be equitized in accordance with the DIP Premium Conversion Election Option.

**Exit Premium:**
An amount equal to 3.5% of the DIP Commitments payable to each DIP Lender (i) in-kind upon conversion into the Exit Term Loan Facility, which may be equitized in accordance with the DIP Premium Conversion Election Option, or (ii) subject to the DIP Premium Conversation Election Option, in Cash upon repayment in full of the DIP Facility, according to its *pro rata* share of the DIP Commitments.

**DIP Premiums**:
Collectively, the Backstop Premium, the Commitment Premium, and the Exit Premium (each subject to the terms and conditions of the DIP Premium Conversion Election Option).

**Agency Fees:**
As agreed with the DIP Agent.

**Nature of Interest, Discount, Premiums and Fees:**
Non-refundable under all circumstances.

**<u>Exhibit D</u>**

**Governance Term Sheet**

PROPOSED GOVERNANCE TERMS FOR

REORGANIZED CAREISMATIC BRANDS, LLC (THE "COMPANY")

This term sheet (this "**Governance Term Sheet**") sets forth the principal terms of the proposed governance structure of the Company after its emergence from the Chapter 11 process.  This Governance Term Sheet is referenced in, and appended to, that certain Restructuring Support Agreement dated as of January 22, 2024, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**RSA**").  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the RSA.

THIS GOVERNANCE TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS GOVERNANCE TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THIS GOVERNANCE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| | |
|---|---|
| **Corporate Form:** | The Company is expected to be a Delaware limited liability company, subject to a determination by the ad hoc group of Holders of First Lien Claims represented by Milbank LLP and Houlihan Lokey Capital, Inc. (the "**Ad Hoc Group**"). |
| **Board of Directors:** | <u>Number of Directors</u>: The Company will be governed by a seven member board of directors appointed by the Ad Hoc Group, including the chief executive officer of the Reorganized Debtors, in accordance with **Schedule I** attached hereto.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. |
| | Any seat that is not subject to designation will be selected by a vote of the holders of Common Stock ("**Stockholders**"). |
| | <u>Observers</u>: To the extent a Stockholder with Board director designation right selects a director who is not employed by or otherwise affiliated with such Stockholder, that Stockholder will receive the right to appoint a board observer. |
| | <u>Transfer of Designation Rights</u>: A Stockholder with board director designation rights may transfer such rights in connection with a sale of common stock representing more than 50% of the shares of Common Stock such Stockholder held at emergence, it being understood that following the transfer such board designation right shall remain subject to the same fall-aways, and to the requirements to designate jointly, as described above. |
| | <u>Quorum</u>: A majority of the total number of the directors then in office will constitute a quorum. |
| | <u>Chairman/Lead Director</u>: There will be an Executive Chairman, with the initial Executive Chairman to be determined prior to emergence by the Ad |

| | Hoc Group. |
| | Fiduciary Duties; Corporate Opportunities: There will be a waiver of fiduciary duties to the fullest extent permitted by law, including a customary waiver of the corporate opportunity doctrine for shareholders and their representatives (including those serving as directors). |
| **Minority Protections:** | All transactions between the Company or any of its subsidiaries on the one hand and any Stockholder or its affiliates (including portfolio companies thereof) on the other hand will require approval of a majority of the disinterested directors (subject to customary exceptions, including for equity issuances subject to the preemptive rights described below).<br><br>Any liquidation, dissolution or winding up, or voluntary commencement of any bankruptcy or similar proceeding, with respect to the Company shall require the approval of at least 5 directors.<br><br>Any merger or other business combination involving the Company (including a sale of all or substantially all of the Company's assets) shall require the approval of both the Board and the holders of a majority of the outstanding Common Stock. |
| **Transfers:** | Transfers of Common Stock will be subject to a ROFO in favor of the Company and, to the extent the Company elects not to exercise, any Stockholder that holds 7.5% or more of the issued and outstanding Common Stock at the time of the transfer, subject to customary exceptions including for (i) affiliate transfers, (ii) certain transfers to a broker acting on a non-principal basis and (iii) transfers of less than 2.5% of the issued and outstanding Common Stock in any 6 month period (so long as the shares transferred do not represent more than 50% of the transferring Stockholder's holdings of Common Stock as of Emergence.)<br><br>Additionally: (i) each transferee will be required to enter into a joinder to the Company's LLC agreement (or shareholders agreement, as applicable) as a condition to any transfer; (ii) transfers must comply with applicable securities laws; and (iii) shares of Common Stock may not be transferred to competitors. |
| **Tag-Along Rights:** | Except with respect to transfers by Stockholders to their affiliates, Stockholders will have the right to participate pro rata in any direct or indirect transfer (through one or more related transactions) of 15% or more of the outstanding Common Stock by one or more other Stockholders. |
| **Drag-Along Rights:** | Holders of a majority of the outstanding Common Stock will have the right to cause a sale of the Company for cash or securities which are registered under the '33 Act, are freely tradable and listed for trading on a national securities exchange (without the consent of any other stockholders of the Company or the Board), and all other Stockholders will be required to consent to, and raise no objection against or assert appraisal rights with respect to, such sale of the Company, and to take all actions reasonably requested in order to consummate such sale. |
| **Preemptive Rights:** | Each Stockholder that, together with its affiliates, holds at least 1% of the issued and outstanding Common Stock will have preemptive rights to |

| | |
|---|---|
| | subscribe for its pro rata share of any equity securities (including securities convertible into or rights to subscribe for or purchase equity securities) issued by the Company or any of its subsidiaries, or to participate in its pro rata share of any issuance of debt securities to, or borrowing of any money (in the form of a term loan or otherwise) from, any Stockholders or affiliate thereof directly or indirectly, subject to customary exceptions. |
| **Amendments:** | Amendment of the organizational documents of the Company shall generally require approval of the Board and the holders of a majority of the issued and outstanding Common Stock; provided that (a) any amendment that would (i) have a material and adverse effect on any Stockholder's rights with respect to a Tag-Along Sale or Drag-Along Sale, the right of first offer or a pre-emptive rights issuance, or on other customary matters (such as no requirement to make additional capital contributions or limited liability), or (ii) would have a disproportionate material adverse effect on any Stockholder compared to other Stockholders (including by modifying such Stockholder's director or observer appointment rights) shall require the written consent of such Stockholder and (b) any amendment that does not adversely affect any Stockholder in any material respect may be made by the Board, without the consent of any Stockholder, to the extent permitted by law. |
| **Information Rights:** | The Company will provide each Stockholder with annual audited and quarterly unaudited financial statements, within customary time periods following the end of the relevant reporting period or event and subject to customary exceptions and limitations, as applicable.  In addition, each Stockholder that, together with its affiliates, holds at least 1% of the issued and outstanding Common Stock shall be invited to attend a conference call held by the Company to discuss the results of operations for the relevant reporting period and to answer questions posed by Stockholders with regard to those results (provided that such calls shall not start until 1 year following emergence unless the Board elects to have them commence sooner), and shall have other reasonable access rights. |

**Schedule I**

*[Omitted from Filing Version]*

# **EXHIBIT C**

**DIP Credit Agreement**

**[Filed on Docket]**

## EXHIBIT D

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among Careismatic Brands, LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions of the Agreement as a Consenting Stakeholder, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____
Name:
Title:
Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Loans | |
| Interests | |

---

[1]    Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT E

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Careismatic Brands, LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof and receive the rights and benefits thereto to the extent the Transferor was thereby bound and received such rights and benefits, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

This Transfer Agreement shall be governed by the governing law set forth in the Agreement.

Date Executed:

_____

Name:
Title:
Address:


E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Loans | |
| Interests | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.