**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
jsussberg@kirkland.com

Chad J. Husnick, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
chusnick@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| CAREISMATIC BRANDS, LLC, *et al.*, | Case No. 24-10561 (VFP) |
| Debtors. [1] | (Joint Administration Requested) |

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/careismatic.  The location of Debtor Careismatic Brands, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is:  1119 Colorado Avenue, Santa Monica, California 90401.

**DEBTORS' MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION,
(V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING
A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (the "Motion")[2] for the relief set forth

herein.  In support of this Motion, the Debtors respectfully submit the First Day Declaration and

the *Declaration of Joshua Abramson in Support of the Debtors' Motion for Entry of Interim and*

*Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the*

*Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative*

*Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI)*

*Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Abramson Declaration"),

filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state

the following:

**Introduction**

1.     The Debtors commenced these chapter 11 cases to raise incremental liquidity and

consummate the value-maximizing restructuring transactions contemplated in the restructuring

support agreement (the "Restructuring Support Agreement").   The Restructuring Support

Agreement enjoys the support of approximately 76% of the holders of First Lien Loans and

---

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Kent Percy, Chief Restructuring Officer of Careismatic Brands, LLC, in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration.

approximately 70% of the holders of Second Lien Term Loans, as well as the support of the Company's outstanding equity interests (the "Sponsor").    In connection with entry into the Restructuring Support Agreement, the Debtors secured commitments from (i) an ad hoc group holding approximately 73% of the First Lien Loans and approximately 20% of the Second Lien Term Loans, represented by Milbank LLP, as legal counsel, and Houlihan Lokey Capital, Inc., as investment banker (the "First Lien Ad Hoc Group"), and (ii) an ad hoc group holding approximately 3% of the First Lien Term Loans and 50% of the Second Lien Term Loans, represented by King & Spalding LLP (the "Cross-Holder Group") to provide the proposed $125 million super priority senior secured delayed draw debtor-in-possession financing facility (the "DIP Facility").  The DIP Facility includes new money commitments of up to $125 million in term loans, the consensual use of Cash Collateral, and the potential conversion of the DIP Facility to an exit term loan upon the Effective Date (the "Exit Term Loan Facility").  Upon entry of the Interim Order, the Debtors would receive immediate access to $50 million of new money commitments under the DIP Facility and an additional $75 million upon entry of the Final Order.

2.    As described in the First Day Declaration, the Debtors have an immediate need for liquidity as they enter these chapter 11 cases with approximately $12 million in cash on hand, which is insufficient to support their global operations during the first days of these chapter 11 cases.  Without the DIP Facility, the Debtors would risk being financially unable to meet their obligations in the ordinary course.  Accordingly, if approved, the Debtors will use the proceeds of the DIP Facility to, among other things, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, maintain favorable relationships with their vendors, fund general and corporate operating needs and the administration of these chapter 11 cases, and provide adequate protection to the Debtors' prepetition secured

lenders, all in accordance with the initial DIP budget, a copy of which is attached to the Interim

Order as Exhibit B (the "Budget").

3.      The DIP Facility is the culmination of several weeks of discussions between the

Debtors and their various stakeholders regarding the Debtors' path forward.  In September 2023,

the Debtors retained PJT Partners, LP ("PJT"), as investment banker, to help explore various

strategic alternatives for their capital structure, which initially included, among other things, a

potential liability management transaction to be effectuated out-of-court or by other means.  In the

months leading up to these chapter 11 cases, the Debtors and their advisors spent significant time

exploring strategic alternatives and engaged with the Debtors' existing stakeholders, including the

First Lien Ad Hoc Group.  However, the Debtors' cash position further deteriorated in the final

months of 2023 and no actionable proposal materialized.  As such, and in light of the Debtors'

overleveraged capital structure, the Debtors and their advisors commenced discussions with the

First Lien Ad Hoc Group in December 2023 regarding the terms of a value-maximizing,

comprehensive restructuring.  Beginning in mid-January, the Debtors also engaged the Cross-

Holder Group to further build consensus.  These discussions bore fruit, ultimately leading to

agreement on the terms of the Restructuring Support Agreement.

4.      The DIP Facility is a fundamental component of these chapter 11 cases—indeed,

the potential restructuring transactions contemplated under the Restructuring Support Agreement

would be impossible without it.  With that in mind, in January 2024, PJT engaged with various

third-party lenders to assess potential interest in providing debtor-in-possession financing ("DIP

Financing") while negotiations with respect to the Restructuring Support Agreement remained

ongoing.  Specifically, in January 2024, in addition to the First Lien Ad Hoc Group, the Debtors

engaged in discussions with 14 sophisticated financial institutions that are experienced in

providing emergency debtor-in-possession financings in special situations, including other existing lenders and third parties. Over the course of December and January, the Debtors engaged with both the First Lien Ad Hoc Group and these various potential lenders on DIP Financing structures in an effort to reduce the costs and improve the terms on these proposals. *See* Abramson Decl. ¶ 15. In total, of the 14 potential lenders contacted in the weeks leading up to the filing of these cases, including 2 existing lenders not in the First Lien Ad Hoc Group and 12 third parties, none provided alternative DIP Financing proposals to the Debtors. *Id.* at ¶ 16.

5.      In late December 2023, the First Lien Ad Hoc Group provided the Debtors with an initial DIP term sheet. Following extensive arm's length, good faith negotiations over the course of December and January, and with no alternative postpetition financing available, the Debtors, the First Lien Ad Hoc Group, and the Cross-Holder Group came to terms on the proposed DIP Facility. The proposed DIP Facility, if approved, will provide the Debtors with $125 million of new liquidity for use during the pendency of these chapter 11 cases, of which $50 million will be made available following entry of the Interim Order, with an additional $75 million to be made available following entry of the Final Order. Importantly, the "DIP to exit" structure of the DIP Facilities will provide the Company with post-emergence liquidity that will position the Debtors' business for long-term success. Absent entry into the DIP Facility, the Debtors will have insufficient liquidity to continue operating their enterprise and paying their debts as they come due, with no other readily available sources of additional financing.

6.      The Debtors also seek the Court's authorization to use Cash Collateral (as defined herein). The nature of the Debtors' business requires the Debtors to have immediate use of Cash Collateral. Without access to Cash Collateral, the Debtors will not be able to meet their near-term liquidity needs, such as funding payroll and operational expenses and maintaining

favorable relationships with their vendors, suppliers, employees, and customers.  *See* First Day

Decl. ¶ 61.  The Debtors' prepetition secured lenders have consented to the continued use of Cash

Collateral under the terms included in the Interim Order (and as summarized in detail below).

7.      Overall, the DIP Facility is the culmination of extensive prepetition negotiations

between the Debtors and the DIP Lenders and is the best and only currently available financing

option for the Debtors in these chapter 11 cases.  Access to the proposed DIP Facility will provide

the Debtors with crucial liquidity necessary to effectively and efficiently administer these

chapter 11 cases, allowing the Debtors to focus on consummating the transactions contemplated

in Restructuring Support Agreement.  Importantly, the "DIP to exit" structure of the DIP Facility

will provide the Debtors with post-emergence liquidity that will position the Debtors' business for

long-term success and obviate the need for a costly debt or equity raise at the end of these

chapter 11 cases to refinance the DIP Facility.  Further, the proposed DIP Financing, including the

exit financing feature thereof, together with the significant restructuring transactions set forth in

the Restructuring Support Agreement, will convey a positive message to the Debtors'

counterparties, vendors, and other stakeholders that these chapter 11 cases are sufficiently funded

and that the Debtors' business is on the path to improved, sustainable results.  *See* Abramson Decl.

¶ 23.  As set forth in the Abramson Declaration, under the current circumstances, and given the

lack of alternatives, the DIP Facility is reasonable.  *See* Abramson Decl. ¶ 28.

8.      Thus, for the reasons set forth herein, in the First Day Declaration, and in the

Abramson Declaration, the Debtors believe that approval of the DIP Facility and access to Cash

Collateral will maximize the value of the Debtors' estates for the benefit of all of the Debtors'

stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors

respectfully request that the Court approve the relief requested herein and enter an interim order

substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

## Jurisdiction and Venue

9.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-3 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

## Relief Requested

12.      By this Motion, the Debtors seek entry of the Interim Order and the Final Order:

a.      Authorizing New Trojan Parent, Inc., in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the Debtors, other than the DIP Borrower, the "DIP Guarantors") on a joint and several basis, in the aggregate principal amount of $125 million (the "DIP Loans"), consisting of:

(i).      a senior secured, superpriority, debtor-in-possession multi-draw term loan facility in an aggregate principal amount of $125 million, $50 million of which shall be made available subject to and upon entry of the Interim Order; and

(ii).      $75 million of which shall be made available following entry of the
Final Order, in each case subject to the terms and conditions set forth
in the DIP Orders and the DIP Documents (as defined herein); and

b.      approving the terms of, and authorizing the Debtors party thereto to execute
and deliver, the DIP Credit Agreement and any other agreements,
instruments and documents related thereto (collectively,
the "DIP Documents"), and to perform such other acts as may be necessary
or desirable in connection with the DIP Documents;

c.      authorizing the Debtors to execute and deliver the DIP Documents, to incur
all obligations owing thereunder to the DIP Secured Parties (collectively,
the "DIP Obligations"), grant the DIP Agent and DIP Lenders allowed
superpriority administrative expense claim status in each of these
chapter 11 cases and any successor cases, subject to the Carve Out (as
defined in the Interim Order) and otherwise perform all of their respective
obligations under the DIP Documents, including payment of the DIP
Premiums (as defined below) and, subject to entry of the Final Order,
complying with the DIP Premium Conversion Election Option (as defined
below);

d.      subject to the Carve Out, granting to the DIP Agent (on behalf of the
DIP Parties) automatically perfected security interests in and liens on all of
the DIP Collateral (as defined in the Interim Order), including, without
limitation, all property constituting "cash collateral" as defined in
section 363(a) of the Bankruptcy Code, (including, without limitation, all
cash and cash equivalents and other amounts from time to time on deposit
or maintained by the Debtors in any deposit or securities account or
accounts as of the Petition Date) other than payroll, trust, tax withholding
and employee benefit accounts, or accounts located outside of the
United States, or any cash or cash equivalents received by the Debtors after
the Petition Date as proceeds of the Prepetition Collateral
(together, "Cash Collateral"), which liens shall be subject to the priorities
set forth herein;

e.      authorizing and directing the Debtors to use proceeds of the DIP Facility
and Cash Collateral to:  (a) pay the principal, interest, fees, expenses and
other amounts payable and reimbursable under the DIP Documents or the
Interim Order as such become due, including, without limitation,
commitment fees and the fees and disbursements of the DIP Lender
Professionals (as defined in the Interim Order); (b) make permitted adequate
protection payments; (c) provide financing for working capital and other
general corporate purposes, including for bankruptcy-related costs and
expenses; and (d) to fund the Carve Out Reserves, all to the extent provided
in, and in accordance with, the Budget, the Interim Order and the DIP
Documents;

f.     authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim Order), including all property constituting Cash Collateral of the Prepetition Secured Parties (each term as defined Interim Order) on an interim basis in accordance with both the Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral ("Diminution in Value"), subject to the restrictions set forth in the DIP Documents and the Interim Order;

g.     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein solely to the extent necessary to permit the Debtors, their affiliates, and the DIP Lenders implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

h.     authorizing payment of the certain fees and expenses;

i.     waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order;

j.     scheduling a final hearing (the "Final Hearing") to consider the relief requested herein on a final basis and approving the form of notice with respect to the Final Hearing; and

k.     granting related relief.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-3**

**II.     Concise Statement regarding the DIP Facility.**

13.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.[3]

---

[3]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | New Trojan Parent, Inc. (the "<u>Borrower</u>").<br><br>*See* DIP Credit Agreement, Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of Holdings, CBI Midco, CBI Parent and each Subsidiary of Holdings (other than the Borrower or any Excluded Subsidiary) (each as defined in the DIP Credit Agreement).<br><br>*See* DIP Credit Agreement, § 1.01 |
| **Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Jefferies Finance LLC, as Administrative Agent (together with its permitted successors in such capacity, the "<u>DIP Administrative Agent</u>") and Collateral Agent (together with its permitted successors in such capacity, the "<u>DIP Collateral Agent</u>").<br><br>*See* DIP Credit Agreement, Preamble |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The entities listed on the signature pages to the DIP Credit Agreement and any other Person that becomes a party to the DIP Credit Agreement pursuant to an Assignment Agreement (defined in the DIP Credit Agreement).<br><br>*See* DIP Credit Agreement, § 1.01 |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes standard and customary conditions that require the Borrower to provide periodic reports to the DIP Agent and their respective professionals regarding the Approved Budget, consolidated financial statements of the Borrower, and certain other matters.<br><br>*See* DIP Credit Agreement, § 5.1 |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-3 | "Maturity Date" means means with respect to the Loans, the earlier of<br><br>(i)     nine (9) months from the Interim Order Entry Date,<br>(ii)    the earlier of the effective date and the date of the substantial consummation (as defined in Section 1102(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court,<br>(iii)   the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Credit Parties to a Chapter 7 liquidation,<br>(iv)   the acceleration of the Loans or termination of the Commitments under the DIP Credit Agreement, including, without limitation, as a result of the occurrence of an Event of Default or<br>(v)    the date that is thirty (30) days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date.<br><br>*See* DIP Credit Agreement, § 1.01. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Aggregate principal amount of $125,000,000, with $50,000,000 available upon entry of the Interim Order and the remaining $75,000,000 available upon entry of the Final Order.<br><br>*See* DIP Credit Agreement § 2.1. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Credit Agreement § 3. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-3 | |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | (a) The Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) as follows:<br><br>(i)     if a Base Rate Loan, at the Base Rate <u>plus</u> the Applicable Margin; or<br>(ii)    if a Term Benchmark Loan, at Adjusted Term SOFR <u>plus</u> the Applicable Margin; and<br><br>(b) The basis for determining the rate of interest with respect to the Loans, and the Interest Period with respect to any Term Benchmark Loan, shall be selected by the Borrower and notified to each Agent and the Lenders pursuant to the Funding Notice or applicable Conversion/Continuation Notice, as the case may be.<br><br>(c)    In connection with Term Benchmark Loans there shall be no more than three (3) Interest Periods outstanding at any time.  In the event the Borrower fails to specify between a Base Rate Loan or a Term Benchmark Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Term Benchmark Loan) will be automatically converted into a Base Rate Loan on the last day of then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  In the event the Borrower fails to specify an Interest Period for any Term Benchmark Loan in the applicable Funding Notice or Conversion/Continuation Notice, the Borrower shall be deemed to have selected an Interest Period of one (1) month.  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, the DIP Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Term Benchmark Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof to the Borrower and each Lender holding Loans.<br><br>(d)    Interest payable pursuant to Section 2.5(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365 day or 366 day year, as the case may be, and (ii) in the case of Term Benchmark Loans, on the basis of a 360 day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan, the last Interest Payment Date with respect to such Loan or, with respect to a Base Rate Loan being converted from a Term Benchmark Loan, the date of conversion of such Term Benchmark Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Term Benchmark Loan, the date of conversion of such Base Rate Loan to such Term Benchmark Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.<br><br>(e)    Except as otherwise set forth in the DIP Credit Agreement, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided that with respect to any voluntary |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.<br><br>Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter, after as well as before judgment, bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable on demand at a rate that is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans); <u>provided</u> that in the case of Term Benchmark Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Term Benchmark Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agents or any Lender.<br><br>*See* DIP Credit Agreement, § 1.01 ("Base Rate", "Base Rate Loan", "Applicable Margin", "Term Benchmark Loan", "Adjusted Term SOFR"), §§ 2.5, 2.7. |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-3 | The Debtors will use cash collateral and the proceeds of the DIP Facility to fund working capital and certain permitted administrative expenses of the Debtors during the pendency of the Chapter 11 Cases in accordance with the Budget and the terms of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement Preamble, § 2.3. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Interim Order.<br><br>*See* Interim Order ¶ 13. |
| **Budget and Variance Reporting**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-3 | The Debtors are permitted to use the proceeds of the DIP Facility and the Cash Collateral in accordance with the Initial DIP Budget, substantially in the form attached to the Interim Order as <u>Exhibit B</u>.<br><br>*See* Interim Order ¶ <u>Exhibit B</u>. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | The DIP Facility contains events of default that are usual and customary for debtor-in-possession financing, including:<br><br>(i)   <u>Failure to Make Payments When Due</u>.  Failure by the Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan, any fee, premium (including Exit Premium) or any other amount due hereunder, in the case of this clause (ii), within three Business Days after the date due; or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | (ii)  Default in Other Agreements.  (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount (or Net Mark-to-Market Exposure) of $250,000 or more beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts (or Net Mark-to-Market Exposure) referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; provided that an event described in this paragraph shall not at any time constitute an Event of Default if the exercise of the rights and remedies by a holder of such Indebtedness against the obligors thereof is and remains subject to the automatic stay in the Chapter 11 Cases; or

(iii)    Breach of Certain Covenants.  Failure of any Credit Party to perform or comply with any term or condition contained in (i) Section 2.3, 5.1(f), Section 5.2 (solely with respect to the Borrower), Section 5.14, Section 5.17 or Section 6, and (ii) Sections 5.1(a), 5.1(b), 5.1(d), 5.1(p) and 5.1(q), Section 5.13, or Section 5.16, and such default shall not have been remedied or waived within one (1) Business Day; or

(iv)    Breach of Representations, Etc.  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(v)    Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other paragraph of this Section 8.1, and such default shall not have been remedied or waived within thirty (30) days; or

(vi)    [Reserved].

(vii)    [Reserved].

(viii)    [Reserved].

(ix)    Dissolution.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (x)      Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in a Material Adverse Effect; (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Code or ERISA on the Collateral securing obligations that are expressly subordinated in priority to the Obligations, or (iii) the receipt of a notice from a Governmental Authority relating to the intention to terminate any Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan and a Material Adverse Effect would reasonably be expected to result therefrom; or <br><br> (xi)      Change of Control.  A Change of Control shall occur; or <br><br> (xii)      Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the DIP Collateral Agent or any Secured Party to take any action within its control, (iii) any Credit Party shall contest the validity or enforceability of any Credit Document or deny that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents or (iv) the Obligations shall cease to constitute First Priority obligations of the Credit Parties; or <br><br> (xiii)      Subordinated Indebtedness.  Any Subordinated Indebtedness permitted hereunder or the guarantees thereof shall cease, for any reason, to be validly subordinated to the Obligations of the Credit Parties hereunder, as provided in the documents governing such Subordinated Indebtedness, or any Credit Party, any Affiliate of any Credit Party shall take any action in violation of or contest in any manner the validity or enforceability of the applicable subordination provisions with respect to such Subordinated Indebtedness; or <br><br> (xiv)      Final Order.  A Final Order shall not have been entered by the Bankruptcy Court on or before the date that is thirty (30) days after the entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without prior consent of the Requisite Lenders; or <br><br> (xv)      RSA.  The RSA is terminated in accordance with its terms; or <br><br> (xvi)      Chapter 11 Cases. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (a) Any Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Debtor shall file any pleading requesting any such relief; or a motion shall be filed by any Debtor for the approval of, or there shall arise, (i) any other Claim having priority senior to or pari passu with the claims of the DIP Administrative Agent and Lenders under the Credit Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein and in the DIP Order; or <br><br> (b) Any Debtor files a motion in the Chapter 11 Cases to obtain additional or replacement financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code, except with the express written consent of the Requisite Lenders; or <br><br> (c) Any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition Claim (or the Debtor shall otherwise make a payment on any prepetition claim) other than (x) as provided for in the DIP Order and included in the Budget (together with such variances thereto as are permitted pursuant to Section 6.5(a)) or (y) otherwise consented to by the Requisite Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,000 in the aggregate or to permit other actions that would have a material adverse effect on the Credit Parties or their estates, or (iii) approving any settlement or other stipulation not approved by the Requisite Lenders and not included in the Budget (together with such variances thereto as are permitted pursuant to Section 6.5(a)) with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor; or <br><br> (d) (1) any Chapter 11 Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Debtor shall apply for authority to do so) without the written consent of the Requisite Lenders (or any Debtor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph) or (2) any Chapter 11 Order shall cease to be in full force and effect; or <br><br> (e) Any of the Credit Parties shall fail to comply with the terms and conditions of any Chapter 11 Order in any material respect; or <br><br> (f) The Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Debtor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph); or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (g) Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Requisite Lenders; or<br><br>(h) The Credit Parties or any of their Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Credit Parties or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Administrative Agent; or<br><br>(i) (A) The Credit Parties or any of their Affiliates shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Credit Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Administrative Agent or contest any material provision of any Credit Document, (B) such Liens and/or super-priority claims shall otherwise cease to be valid, perfected and enforceable in all respects or (C) or any material provision of any Credit Document shall cease to be effective; or<br><br>(j) Any judgments which are in the aggregate in excess of $250,000 as to any postpetition obligation shall be rendered against any of the Credit Parties and the enforcement thereof shall not be stayed; or there shall be rendered against any of the Credit Parties a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Credit Parties to perform their obligations under the Credit Documents or the value of the Collateral; or<br><br>(k) (A) The Credit Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (B) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders; or<br><br>(l) Any Credit Party shall fail to execute and deliver to the DIP Administrative Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Administrative Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the DIP Administrative Agent (for the benefit of the Secured Parties) under the DIP Order; or<br><br>(m) The Confirmation Order is not entered by the Bankruptcy Court on or before May 20, 2024 (i.e., 120 days after the Closing Date), or such later date to which the Requisite Lenders have consented in writing.<br><br>*See* DIP Credit Agreement § 8.1. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for DIP financings of this type by the Borrower in favor of the DIP Agent, the DIP Lenders, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them subject to customary carve-outs.<br><br>*See* DIP Credit Agreement § 10.3. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | As of the Petition Date, the Prepetition Secured Parties, as defined in the Interim Order, have an interest in Cash Collateral subject to the terms of the DIP Credit Agreement and Interim Order.<br>*See* Interim Order ¶ G. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Order provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and the Creditors' Committee (if appointed) pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 5. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | <u>Backstop Premium</u>.  The Borrower will pay a backstop fee (the "<u>Backstop Premium</u>") of 11.00 percent on the DIP Commitments, payable in-kind to each Backstop Lender, as such DIP Commitments are approved by the Court, according to its pro rata share of the Backstop Commitments.<br><br><u>Commitment Premium</u>.   The Borrower will pay a commitment premium (the "<u>Commitment Premium</u>") of 3.50 percent of the DIP Commitments, payable in-kind to each DIP Lender, as such DIP Commitments are approved by the Court, according to its pro rata share of the DIP Commitments; and<br><br><u>Exit Premium</u>.  The Borrower will pay an exit premium (the "<u>Exit Premium</u>" and, together with the Backstop Premium and Commitment Premium, the "<u>DIP Premiums</u>") of 3.50 percent of the DIP Commitments payable to each DIP Lender (i) in-kind upon conversion into the Exit Term Loan Facility and (ii) in Cash upon repayment in full of the DIP Facility, in each case in according to each DIP Lender's pro rata share of the DIP Commitments.<br><br>Subject to entry of the Final Order and the terms of the Restructuring Support Agreement, each of the DIP Premiums may be equitized at a 40.0 percent discount to plan enterprise value at each DIP Lenders' or Backstop Parties' (as applicable) discretion (the "<u>DIP Premium Conversion Election Option</u>").<br><br>*See* Interim Order §§ 2(b)(3), 4; DIP Credit Agreement § 2.19; Fee Letter. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>Local Rule 4001-3<br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | *Section 506(c) Claims*.  Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of these cases or any Successor Cases or any proceeding that may result therefrom, including liquidation, shall be charged against or recovered from the DIP Collateral or Prepetition Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, each Prepetition Agent, and Prepetition Equipment Financing Lender, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties or Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral (including Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *Section 552(b)*.  Subject to entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the doctrine of "marshaling" or any similar equitable doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligations, or the Prepetition Collateral, as applicable.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties.<br><br>*See* Interim Order ¶¶ 9, 10. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-3 | Proceeds from Avoidance Actions shall be subject to liens upon entry of the Final Order.<br><br>*See* Interim Order ¶ 7. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-3 | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens as set forth in the Interim Order.<br><br>*See* Interim Order ¶ G. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-3 | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable DIP Liens are hereby granted to the DIP Agent for the benefit of the DIP Secured Parties (all property identified in clauses (a) through (d) below being collectively referred to as the "DIP Collateral"):<br><br>*Liens on Unencumbered Property.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, subject only to the Carve-Out, a first priority lien on and security interest in all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, including 100% of the equity interests in all of the Debtors' non-Debtor subsidiaries and affiliates, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions, but including, upon and subject to entry of the Final Order, the Avoidance Proceeds (collectively, the "Unencumbered Property").<br><br>*Liens Priming Certain Prepetition Secured Parties' Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, subject solely to the Carve-Out and the Prepetition Permitted Senior Liens, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Collateral, wherever located (the "DIP Priming Liens").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the Prepetition Liens on the Prepetition Collateral, (B) senior to any Adequate Protection Liens, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | respect to the Prepetition Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens. |
| | *Liens Junior to Certain Other Liens.*  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, as of the Petition Date, is subject to the Prepetition Permitted Senior Liens, which shall be immediately junior to the Prepetition Permitted Senior Liens, but senior to the Prepetition Liens and Prepetition Adequate Protections Liens. |
| | *No Senior Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code. |
| | *See* Interim Order ¶ 7. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Credit Parties shall comply with the following covenants and milestones in accordance with the dates indicated below, or any later date approved by the Requisite Lenders in their sole discretion (collectively, the "Milestones" and each a "Milestone"):<br><br>(i)   Entry of Interim Order by the Bankruptcy Court shall be no later than five (5) days after the Closing Date;<br><br>(ii)  Entry of Final Order by the Bankruptcy Court shall be no later than thirty (30) days after the Closing Date;<br><br>(iii) Filing of Disclosure Statement and a plan of reorganization with the Bankruptcy Court shall be no later than forty-five (45) days after the Closing Date;<br><br>(iv) Bankruptcy Court approval of Disclosure Statement shall be no later than ninety (90) days after the Closing Date; and<br><br>(v)  Confirmation by the Bankruptcy Court of a plan of reorganization shall be no later than one hundred twenty (120) days after the Closing Date.<br><br>See DIP Credit Agreement § 5.17; Interim Order ¶ 25. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | *Challenge Period.*  No later than (a) 60 calendar days after the appointment of a Creditors' Committee (if appointed), (b) if a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period, solely for such trustee, that date that is the later of (1) 60 calendar days from the entry of the Interim Order, or (2) the date that is 30 calendar days after their appointment, (c) if no Creditors' Committee is appointed, for all other parties in interest, 75 calendar days after entry of the Interim Order and (d) any such later date as has been agreed to by (1) the Prepetition First Lien Agent with respect to the Prepetition First Lien Obligations or the Prepetition First Liens, (B) the Prepetition Second Lien |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Agent with respect to the Prepetition Second Lien Obligations or the Prepetition Second Liens, (C) the Prepetition Equipment Financing Lender with respect to the Prepetition Equipment Financing Obligations or the Prepetition Equipment Financing Liens, or (D) has been ordered by the Court for cause upon within any applicable period (the foregoing time periods. |
| | *See* Interim Order ¶ 18. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The DIP Loan Parties are hereby authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to execute, deliver, enter into and perform all of their obligations under the DIP Documents and perform such other acts as may be necessary, appropriate or desirable in connection therewith, subject to the terms of this Interim Order and the DIP Documents.  The Borrower is hereby authorized to borrow up to $125 million in DIP Loans pursuant to the DIP Credit Agreement, with $50 million available to be drawn on an interim basis, and the DIP Guarantors are hereby authorized to guarantee the Borrower's obligations under the DIP Credit Agreement.  The proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Documents and the Interim Order, subject to and in accordance with the Approved Budget (subject to any permitted variances). |
| | *See* Interim Order ¶ 2(a). |
| | Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Requisite Lenders, the DIP Agent (acting at the direction of the Requisite Lenders under the DIP Documents) may, following delivery of written notice (a "Termination Notice"), which may be done by e-mail, on not less than five (5) business days' notice (such five (5) business day period, the "DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents and the Prepetition Equipment Financing Lender, lead counsel to the Creditors' Committee, and to the U.S. Trustee (the "Remedies Notice Parties"), in each case without further notice to, hearing of, or order from this Court:  (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents to use Cash Collateral (subject to the provisions related to the Carve-Out), (b) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Agent or the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Documents.  Any automatic stay otherwise applicable to the foregoing, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified to the extent necessary to permit the DIP Agent to effectuate the foregoing, *provided* that, during the DIP Agent Remedies Notice Period, the Debtors, the  Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Agent consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral.  Upon delivery of a Termination Notice by the DIP Agent, without further notice or order of the Court, the DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the DIP Agent Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Secured Parties will have no further obligation to provide any DIP Loans or other financial accommodations.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket. |
| | *See* Interim Order ¶ 8(a). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and each Prepetition Secured Party to take any Perfection Action. For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order, whether or not the DIP Agent (on behalf of itself and the DIP Secured Parties), the DIP Secured Parties or the Prepetition Secured Parties take any Perfection Actions.<br><br>*See* Interim Order ¶ 15(a). |

## III.  The Debtors' Prepetition Capital Structure

14.     As of the Petition Date, the Debtors have approximately $832.9 million in total outstanding funded debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Amount Outstanding** |
| **First Lien Term Loans** | January 2026 | $590 million |
| **First Lien Revolving Loans** | January 2028 | $100 million |
| **Second Lien Term Loans** | January 2029 | $110 million |
| **Unsecured PIK Note** | October 2025 | $32.9 million |
| **Total Outstanding Funded Debt:** | | **$832.9 million** |

## IV.  Funded Indebtedness.

### A.     First Lien Credit Agreement.

15.     The Debtors are obligors under that certain First Lien Credit Agreement, dated as of January 6, 2021 (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the First Lien Credit Agreement, dated as of June 8, 2023, the "First Lien Credit Agreement"), by and among CBI Intermediate, Inc., a Delaware corporation, as holdings, CBI Buyer, Inc., a Delaware corporation, as the Merger Sub or the Initial Borrower, New Trojan Parent, Inc., a Delaware corporation, as successor to Merger Sub and the Borrower, the lenders from time to time party thereto (the "First Lien Lenders"), UBS AG,

Stamford Branch, as administrative agent and collateral agent. As of the Petition Date, an aggregate balance of approximately $690 million, including accrued and unpaid interest in outstanding loans under the First Lien Credit Agreement, consisting of approximately: (a) $590 million outstanding of first lien term loans, which carry an interest rate of Adjusted Term SOFR plus 3.25% per annum, and mature on January 1, 2028 (together, the "First Lien Term Loans"); and (b) $100 million of outstanding of first lien revolving loans, which carry an interest rate of Adjusted Term SOFR plus 3.75% (which may be decreased to 3.50% or 3.25% upon meeting certain deleveraging benchmarks) and mature on January 1, 2026 (the "First Lien Revolving Loans," and together the "First Lien Loans"). The First Lien Loans are secured by a first priority lien on substantially all of the Debtors' assets.

### B. Second Lien Credit Agreement.

1. On January 6, 2023, Debtor New Trojan Parent, Inc., a Delaware, LLC, as borrower, CBI Intermediate, Inc., a Delaware Corporation, as holdings, the lenders party thereto from time to time (the "Second Lien Lenders"), and UBS AG, Stamford Branch, as administrative and collateral agent entered into that certain Second Lien Credit Agreement (as amended by Amendment No. 1 to the Second Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the Second Lien Credit Agreement, dated as of June 8, 2023, the "Second Lien Credit Agreement"). As of the Petition Date, the aggregate balance of the term loans provided under the Second Lien Credit Agreement are approximately $110 million, including accrued and unpaid interest (the "Second Lien Term Loans"). The Second Lien Term Loans carry an interest rate of Adjusted Term SOFR plus 7.25% and matures on January 1, 2029. The Second Lien Term Loans are secured by a second priority lien on substantially all of the Debtors' assets, excluding cash.

16.     The relative rights and priorities of the First Lien Lenders and the Second Lien

Lenders in respect of priority are set forth in that certain Junior Lien Intercreditor Agreement,

dated as of January 6, 2021, between UBS AG Stamford Branch, in its capacity both as collateral

agent under the First Lien Credit Agreement and collateral agent under the Second Lien Credit

Agreement.

**C.     Prepetition Pari Passu Intercreditor Agreement.**

17.     Pursuant to that certain Pari Passu Intercreditor Agreement, dated as of July 28,

2023 (as amended, amended and restated, restated, supplemented or otherwise modified from time

to time prior to the Petition Date, the "Prepetition Pari Passu Intercreditor Agreement"), by and

between the Prepetition First Lien Agent and the Prepetition Equipment Financing Lender (defined

below), the parties thereto agreed, among other things, (i) that any proceeds of the Prepetition

Common Collateral shall be shared *pro rata* among the Prepetition First Lien Secured Parties and

the Prepetition Equipment Financing Lender and (ii) to refrain from taking certain actions with

respect to the Prepetition Common Collateral.

**D.     Sponsor PIK Notes.**

18.     On October 17, 2022, Careismatic Brands, LLC, a Delaware, LLC, as borrower,

and the Sponsor, entered into a series of unsecured intercompany notes (collectively, the "Sponsor

PIK Notes").  As of the Petition Date, the outstanding principal amount on account of the Sponsor

PIK Notes was $32.9 million, including accrued and unpaid interest.  The Sponsor PIK Notes bear

an interest rate equal to 8% per annum, payable in kind.  The Sponsor PIK Notes have a maturity

date of the earliest of: (a) October 17, 2025; (b) the date of the consummation of a Change of

Control (as defined in the Sponsor PIK Notes); and (c) the date of the consummation of a

Qualifying IPO (as defined in the Sponsor PIK Notes).

### E.    Equipment Financing Agreement.

19.    Pursuant to that certain Master Equipment Lease Agreement #32224, dated as of July 25, 2023 (as amended, amended and restated, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Equipment Financing Agreement" and, collectively with the other "Loan Documents" (as defined in the Prepetition Equipment Financing Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition Equipment Financing Documents"), by and among Debtor Careismatic Brands, LLC (the "Prepetition Equipment Financing Borrower" and, together with the Prepetition First Lien Loan Parties and the Prepetition Second Lien Loan Parties, the "Prepetition Loan Parties") and Wingspire Equipment Finance LLC (the "Prepetition Equipment Financing Lender and, together with the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties, the "Prepetition Secured Parties"), the Prepetition Equipment Financing Borrower incurred certain obligations (together with all accrued but unpaid interest, fees, and expenses due thereon in accordance with the Prepetition Financing Agreement and Prepetition Financing Documents, the "Prepetition Equipment Financing Obligations" and, together with the Prepetition First Lien Obligations and Prepetition Second Lien Obligations, the "Prepetition Secured Obligations").

### F.    Attachment Lien.

20.    In March 2023, Michelman & Robinson LLP ("M&R") initiated arbitration against Debtor Careismatic Brands, LLC in the Superior Court of California, seeking to recover alleged legal fees owed following M&R's representation of Debtor Careismatic Brands, LLC (f/k/a Careismatic Brands, Inc.) in certain litigation matters.  Following the entry of a non-binding arbitration award (the "Non-Binding Award") on account of the approximately $10.1 million in

disputed amounts (the "<u>Disputed Amount</u>"), M&R sought a writ of attachment against the Debtors'

available cash to satisfy the Non-Binding Award.  On January 2, 2024, Debtor Careismatic Brands,

LLC and M&R entered into a stipulation (the "<u>Stipulation</u>") whereby the Debtors agreed to the

entry of a right to attach order on a segregated account containing the Disputed Amount (the

"<u>Attachment Account</u>"), which would provide M&R with an attachment lien (the "<u>Attachment

Lien</u>") encumbering the Disputed Amount pursuant to section 481.010 *et seq*. of the California

Code of Civil Procedure ("<u>CCP</u>").   Section 493.030 of the CCP provides that "the filing of a

petition commencing a voluntary or involuntary case under [the Bankruptcy Code] terminates a

lien…of attachment if the lien was created within 90 days prior to the filing of the petition."

Because the Debtors commenced these chapter 11 cases within the 90-day period following entry

of the order on the Stipulation, in accordance with the CCP, the Attachment Lien is no longer

effective and is not a Prepetition Lien.

<u>**The DIP Facility**</u>

**I.      The Debtors' Need for Access to Financing and the Use of Cash Collateral.**

21.      As described in the First Day Declaration, the Debtors require immediate access to

the DIP Facility and continued use of Cash Collateral to operate their enterprise and implement

the restructuring transactions contemplated by the Restructuring Support Agreement.  *See* First

Day Decl. ¶¶ 58, 61.  As of the Petition Date, the Debtors only have $12 million in cash on hand,

which is not sufficient to support business operations as a going concern in the near term or for the

duration of these chapter 11 cases.  *See* First Day Decl. ¶ 56.

22.      Prior to the Petition Date, the Debtors, in consultation with their proposed

restructuring advisor, AlixPartners, reviewed and analyzed their cash needs and prepared

projections of postpetition cash needs for the Debtors' business in the initial thirteen weeks of

these chapter 11 cases, including the Budget.  *See* First Day Decl. ¶ 58.  The Debtors and their

advisors believe that the Budget and the projections therein provide an accurate reflection of the Debtors' likely funding requirements over the next thirteen weeks and are reasonable and appropriate under the circumstances. *Id*. Furthermore, the Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases. *Id.*

23.     Based on these analyses, the Debtors determined that they would require approximately $125 million to fund these chapter 11 cases and meet their cashflow needs. Immediate access to the DIP Facility and Cash Collateral is essential to not only fund these chapter 11 cases, but also to meet working capital and business operating needs, including maintaining relationships with their customers, vendors, suppliers, and employees. *Id.* at ¶ 59.

24.     Therefore, the Debtors believe the use of Cash Collateral and entry into the DIP Facility is essential to preserve and maximize the value of their estates and responsibly administer these chapter 11 cases.

**A.     Alternative Sources of Financing Are Not Available on Better Terms.**

25.     It would not be prudent, or even possible, to administer these chapter 11 estates on a cash collateral basis, rendering postpetition financing a necessity.  In light of the Debtors' overleveraged capital structure, the Debtors and their advisors commenced discussions with the First Lien Ad Hoc Group beginning in December 2023 regarding the terms of a comprehensive restructuring transaction. *See* Abramson Decl. ¶ 14.  Given the Debtors' immediate liquidity needs, discussions with the First Lien Ad Hoc Group involved soliciting interest by the members of the First Lien Ad Hoc Group in providing postpetition financing. *Id*.

26.     In late December 2023, the First Lien Ad Hoc Group, with the assistance of their advisors, provided the Debtors with an initial DIP Financing term sheet.  Over the course of the following weeks leading up to the Petition Date, the Debtors and the First Lien Ad Hoc Group exchanged DIP Financing proposals. *Id*. at 15. As negotiations with the First Lien Ad Hoc Group

progressed, the Debtors, led by PJT, undertook concerted efforts to obtain additional proposals for DIP Financing. Specifically, in January 2024, in addition to the First Lien Ad Hoc Group, the Debtors engaged in discussions with 14 sophisticated financial institutions that are experienced in providing emergency DIP Financing in special situations, including other existing lenders and third parties. *Id*. Over the course of December and January, the Debtors engaged with both the First Lien Ad Hoc Group and these various potential lenders on DIP Financing structures in an effort to reduce the costs and improve the terms on these proposals. In total, of the 14 potential lenders contacted in the weeks leading up to the filing of these cases, including 2 existing lenders not in the First Lien Ad Hoc Group and 12 third parties, none provided alternative DIP Financing proposals to the Debtors. *Id*. at 16.

27.      After these discussions, the Debtors, in consultation with their advisors, determined that the best option for the Company was proceeding with the proposal by the First Lien Ad Hoc Group given the acute liquidity need and the lack of alternative proposals. The Debtors' prepetition first lien lenders were not willing to agree to third party DIP Financing on either a consensual *pari passu* basis or consensual priming basis. *Id.* at ¶ 17. The Debtors likely did not receive any interest in providing alternative DIP financing proposals from the lenders contacted because of, among other reasons, such parties' lack of desire to (i) provide a DIP facility on a junior basis, (ii) seek to provide a priming basis on a nonconsensual basis, or (iii) lend against the Debtors' relatively limited pool of unencumbered assets that could be utilized for a non-priming DIP facility. *Id*. at 16.

28.      Accordingly, the Debtors, with the assistance of their advisors, focused their efforts on negotiating a comprehensive restructuring support agreement, including the proposed DIP Facility, with the First Lien Ad Hoc Group and the Consenting Sponsor. *Id*. at 18. Beginning in

mid-January, the Debtors also engaged in discussions regarding DIP financing with the Cross-Holder Group, represented by King & Spalding LLP, to further build consensus. The members of the Cross-Holder Group were among the prepetition lenders PJT engaged with to seek an alternative DIP Financing proposal. Although the members of the Cross-Holder Group were each unwilling to provide an alternative DIP Financing proposal, the Debtors, the First Lien Ad Hoc Group, and the Cross-Holder Group subsequently came to a mutual agreement on the terms and conditions of the DIP Facility, including the use of Cash Collateral. *Id.*

29. Importantly, the "DIP to exit" structure of the DIP Facility will provide the Debtors with post-emergence liquidity that will position the Debtors' business for long-term success and obviate the need for a costly debt or equity raise at the end of these Chapter 11 Cases to refinance the DIP Facility. Further, the proposed DIP Financing, including the exit financing feature thereof, together with the significant restructuring transactions set forth in the Restructuring Support Agreement, will convey a positive message to the Debtors' counterparties, vendors, and other stakeholders that these chapter 11 cases are sufficiently funded and that the Debtors' business is on the path to improved, sustainable results. *Id.* at ¶ 24. The DIP Facility pending approval before the Court is reasonable and is the best, and, in fact, only financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases. *Id.* at ¶¶ 28, 29.

**B.      The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.**

30. Absent the liquidity infusion to be provided by the DIP Facility, the Debtors would experience significant business disruption, would need to meaningfully curtail their operations, and would face numerous other value-destructive consequences. *See* First Day Decl. ¶ 56. Cash-on-hand and expected inflows would not be sufficient to fund their operations as a going concern in the near term or for the duration of these chapter 11 cases. *Id.* The DIP Facility will provide the Debtors with sufficient liquidity to stabilize their operations and fund the

administration of these chapter 11 cases as the Debtors seek to proceed expeditiously toward a value-maximizing resolution.  The DIP Facility will also provide the Debtors with the necessary liquidity to fund their business operations during these chapter 11 cases and maintain relationships with their customers, vendors, suppliers, and employees.  Consequently, the DIP Facility is necessary to preserve the value of the Debtors' estates.  *See* First Day Decl. at ¶¶ 56, 59.

**Basis for Relief**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

A.    **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

31.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and use Cash Collateral.

32.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

33.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

34.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP Lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor***

> *constituencies and the likelihood of a successful reorganization.*
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

35.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following a rigorous process marked by hard bargaining with the First Lien Ad Hoc Group and Cross-Holder Group and their respective advisors, during which the economic and other terms of the DIP Facility improved to the benefit of the Debtors. *See* Abramson Decl. ¶ 26. Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to proceed expeditiously forward a value-maximizing resolution. *See* First Day Decl. ¶¶ 58, 59. Without the DIP Facility, the Debtors would experience significant business disruption, would need to meaningfully curtail their operations, and would face a number of other value-destructive consequences. *Id.* at ¶ 56. The DIP Facility will provide the Debtors with the necessary liquidity to fund their business operations during these chapter 11 cases and maintain relationships with their customers, vendors, suppliers, and employees. *Id.* at ¶ 56.

36.    Importantly, the "DIP to exit" structure of the DIP Facility will provide the Debtors with post-emergence liquidity that will position the Debtors' business for long-term success and obviate the need for a costly debt or equity raise at the end of these Chapter 11 Cases to refinance the DIP Facility. *See* Abramson Decl. at ¶ 24. Further, the proposed DIP Financing, including the exit financing feature thereof, together with the significant restructuring transactions set forth in the Restructuring Support Agreement, will convey a positive message to the Debtors'

counterparties, vendors, and other stakeholders that these chapter 11 cases are sufficiently funded and that the Debtors' business is on the path to improved, sustainable results. In short, the proposed DIP Facility will allow the Debtors to maximize value by continuing operations with minimal disruption. *Id*.

37.     The Debtors negotiated the DIP Facility and other DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that DIP Facility is the best and, in fact, only financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases. *See* Abramson Decl. ¶ 29. Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

38.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

39.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities and were a necessary feature to provide security for the proposed financings. Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon. *See, e.g.*, *In re Rite Aid Corporation*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 17, 2023) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by

applicable law); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D. N.J. May 24, 2023) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D. N.J. Apr. 24, 2023) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re Am. Apparel, LLC*, No. 16-12551 (Bankr. D. Del. Dec. 12, 2016) (same).

40.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

41.     As described above and as set forth in the Abramson Declaration, PJT engaged in discussions with 14 third parties regarding potential interest in providing DIP Financing to the

Debtors, including both existing lenders not in the First Lien Ad Hoc Group and third parties, but none of these parties provided proposals for DIP Financing to the Debtors.  As a result, the Debtors, in consultation with their advisors, determined that the best option for the Company was to move forward with the proposal by the First Lien Ad Hoc Group given the Company's acute liquidity need and the lack of alternative proposals.  *See* Abramson Decl. ¶¶ 16, 17.  The prepetition first lien lenders were not willing to agree to third party DIP Financing on either a consensual *pari passu* basis or consensual priming basis.  *Id*.  Further, no third party would be willing to provide DIP Financing on an unsecured basis given the circumstances of these chapter 11 cases.

42.    Therefore, the Debtors, in consultation with their advisors, focused their efforts on negotiating a comprehensive restructuring support agreement, including DIP Financing, with the First Lien Ad Hoc Group and the Consenting Sponsor.  *Id.*  Absent the liquidity infusion to be provided by the DIP Facility, the Debtors would experience significant business disruption, would need to meaningfully curtail their operations, and would face a number of other value-destructive consequences.  *See* First Day Decl. at ¶ 56.  Given the Debtors' financial circumstances, the Debtors believe that the DIP Facility, as set forth in the DIP Documents, is reasonable under the circumstances.  For these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.  *See* Abramson Decl. at ¶ 28.

43.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject

to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

44.    Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Secured Parties' interest in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

45.    Given the Debtors' current financial position, they are highly unlikely to succeed in demonstrating that the Prepetition Secured Parties are oversecured or that they could otherwise be adequately protected. Yet, even if the Debtors could make such a showing, doing so would likely result in a costly, uncertain, and value-destructive dispute. Here, the requisite Prepetition Secured Parties have consented to having their prepetition liens primed by the postpetition superpriority liens in connection with the DIP Facility. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

## C.    No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.

46.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber*

*Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

47.     As noted above, the DIP Facility is best and, in fact, the only financial option available to the Debtors under the facts and circumstances of these chapter 11 cases.  As described in the Abramson Declaration, while negotiations with the First Lien Ad Hoc Group progressed, the Debtors and their advisors, led by PJT, undertook concerted efforts to obtain additional proposals for DIP Financing.  Specifically, in January 2024, in addition to the First Lien Ad Hoc Group, the Debtors engaged in discussions with 14 sophisticated financial institutions that are experienced in providing emergency debtor-in-possession financings in special situations, including other existing lenders and third parties.  *See* Abramson Decl. at ¶ 15.  Over the course of December and January, the Debtors engaged with both the First Lien Ad Hoc Group and these various potential lenders on DIP Financing structures in an effort to reduce the costs and improve the terms on these proposals.

48.    In total, of the 14 potential lenders contacted in the weeks leading up to the filing of these cases, including 2 existing lenders not in the First Lien Ad Hoc Group and 12 third parties, none provided alternative DIP Financing proposals to the Debtors.  *Id*. at ¶ 16.   The lenders contacted were not interested in providing alternative DIP Financing proposals because of, among other reasons, their lack of desire to (i) provide a DIP facility on a junior basis, (ii) seek to provide a priming facility on a nonconsensual basis, or (iii) lend against the Debtors' relatively limited pool of unencumbered assets that could be utilized for a non-priming DIP.  *Id.*   Further, the prepetition first lien lenders were not willing to agree to third party DIP Financing on either a consensual *pari passu* basis or consensual priming basis.  *Id*. at ¶ 17.

49.    After these discussions, the Debtors, in consultation with their advisors, determined that the best option for the Company was proceeding with the proposal by the First Lien Ad Hoc Group given the acute liquidity need and the lack of alternative proposals.   Accordingly, the Debtors, with the assistance of their advisors, focused their efforts on negotiating a comprehensive restructuring support agreement, including the proposed DIP Facility, with the First Lien Ad Hoc Group, the Cross-Holder Group, and the Consenting Sponsor.   Simply put, the DIP Facility is the best and, in fact, only financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases.  *See* Abramson Decl. at ¶ 29.   Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.    The Debtors Should Be Authorized to Use the Cash Collateral.**

50.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.   The DIP Lenders and the requisite Prepetition Secured

Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

51.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

### A.    Adequate Protection Provided to the Prepetition Secured Parties.

52.    As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection (the "Adequate Protection Obligations") to protect against the postpetition diminution in value of the Cash Collateral resulting from the use,

sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay, including Adequate Protection Liens, Adequate Protection 507(b) Claims, and First Lien Adequate Protection Fees and Expenses (each as defined in the Interim Order).

**III.   The Debtors Should Be Authorized to Pay the DIP Premiums Required by the DIP Lenders Under the DIP Documents.**

53.      Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay a 11.00 percent Backstop Premium on the DIP Commitments, a 3.50 percent Commitment Premium on the DIP Commitments, and a 3.50 percent Exit Premium on the DIP Commitments payable upon conversion to the Exit Term Loan Facility or repayment in full of the DIP Facility.  *See* Abramson Decl. at ¶ 21.  Subject to entry of the Final Order and the terms of the Restructuring Support Agreement, upon emergence from these chapter 11 cases, each of the DIP Premiums may be equitized pursuant to the DIP Premium Conversion Election Option.  The ability for the Debtors to pay the DIP Premiums in equity upon emergence will allow the Company to maximize liquidity post-bankruptcy, setting up the Debtors for long-term success.

54.      Courts have approved similar fees in large chapter 11 cases.  *See, e.g., In re Instant Brands Acquisition Holdings, Inc*. No, 23-90716 (DRJ) (Bankr. S.D. Tex. August 9. 2023) (approving 20% of total DIP Fees); *In re Lucky Bucks LLC,* No. 23-10758 (KBO) (Bankr D. Del. July 14, 2023) (approving approximately 13% of total DIP Fees)*, In re MD Helicopter Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. April 4, 2022) (approving approximately 13% of total DIP Fees); *In re Performance Powersports Group Investor LLC*, No. 23-10047 (LSS) (Bankr. D. Delaware March 27, 2023) (approving approximately 13% of total DIP Fees); *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. March 3, 2023) (approving 18% of total DIP Fees); *In re*

*Cool Springs LLC,* No. 22-10912 (MFW) (Bankr. D. Delaware December 2, 2022) (approving approximately 13% of total DIP Fees).

55.     It is understood and agreed by all parties, that the fees and rates to be paid under the proposed DIP Facility were the subject of heavily negotiated, arm's-length discussions between the Debtors and the DIP Lenders, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Abramson Decl. ¶ 27.  Over the course of several weeks, PJT, along with the Debtors' other advisors, actively negotiated the terms and provisions of the DIP Facility on behalf of the Debtors.  The process was rigorous and marked by hard bargaining with the First Lien Ad Hoc Group and the Cross-Holder Group and their respective advisors.  *Id*. at 26.  During that time, the parties exchanged many rounds of term sheets and mark-ups.  Over the course of these negotiations, the economic and other terms of the DIP Facility improved to the benefit of the Debtors.  *Id*.  Further, the "DIP to exit" structure of the DIP Facility will provide the Debtors with post-emergence liquidity that will position the Debtors' business for long-term success and obviate the need for a costly debt or equity raise at the end of these chapter 11 cases to refinance the DIP Facility.  *Id.* at 24.

56.     Under the current circumstances, given the lack of any other alternatives, the DIP Facility is reasonable.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents (including the DIP Premiums and, subject to entry of the Final Order, the DIP Premium Conversion Election Option) in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

57.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

58.     As explained herein and in the Abramson Declaration, the DIP Documents are the result of: (a) the Debtors' determination that under the current circumstances, and given the lack of any other alternatives, the DIP Financing offered by the DIP Lenders provided the best and, in fact, only postpetition financing alternative available to the Debtors and (b) heavily negotiated, arm's length, good-faith negotiations between the Debtors and the DIP Lenders. *See* Abramson Decl. ¶¶ 27, 29. The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

59.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim

Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents or applicable law.

60. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Bed, Bath, and Beyond, Inc.*, No. 23-13359 (Bankr. D.N.J. April 24, 2023) (modifying the automatic stay as necessary to effectuate the terms of the order); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (same); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

61. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

62.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facility.  The Debtors will use cash to fund the operation of their business for a sufficient amount of time to effectuate the restructuring transactions completed by the Restructuring Support Agreement.  Substantially all of the Debtors' cash represents the Cash Collateral and the Debtors will not be able to meet their near-term liquidity needs without access to Cash Collateral.  *See* First Day Decl. at ¶ 61.  The Debtors rely on the Cash Collateral generated from their operations to, among other things, honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with their vendors, suppliers, employees, and customers.  At the outset of these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll and contractual obligations, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  *Id.*  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases.  The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  *See* First Day Decl. ¶ 59.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

63.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final

Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding

under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating,

and to implement the relief requested in the Debtors' other "first day" motions.  This relief will

enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable

harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

64.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 28 days

after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file

objections to this Motion.

### Request of Waiver of Stay

65.    To the extent that the relief sought in the Motion constitutes a use of property under

section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under

Bankruptcy Rule 6004(h).  Further, to the extent applicable, the Debtors request that the Court find

that the provisions of Bankruptcy Rule 6003 are satisfied.  As explained herein, the relief requested

in this Motion is immediately necessary for the Debtors to be able to continue to operate their

businesses and preserve the value of their estates.

### Waiver of Memorandum of Law

66.    The Debtors request that the Court waive the requirement to file a separate

memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the

Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

**No Prior Request**

67.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

**Notice**

68.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the District of New Jersey; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the First Lien Ad Hoc Group; (d) counsel to the Cross-Holder Group; (e) counsel to the Sponsor; (f) the agents under each of the Debtors' prepetition secured credit facilities and counsel thereto; (g) the office of the attorney general for each of the states in which the Debtors operate; (h) the United States Attorney's Office for the District of New Jersey; (i) the Internal Revenue Service; (j) counsel to the DIP Lenders; (k) counsel to the DIP Agent; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.   The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


*[Remainder of page intentionally blank]*

**WHEREFORE**, the Debtors request that the Court enter DIP Orders, in substantially the

forms submitted herewith, granting the relief requested herein and such other relief as is just and

proper under the circumstances.

Dated: January 23, 2024

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         jsussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         chusnick@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*