## Exhibit A

## Interim Order

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
jsussberg@kirkland.com

Chad J. Husnick, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
chusnick@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>CAREISMATIC BRANDS, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24- 10561 (VFP)<br><br>(Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI)
SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://www.donlinrecano.com/careismatic.  The location of Debtor
Careismatic Brands, LLC's principal place of business and the Debtors' service address in these chapter 11 cases
is:  1119 Colorado Avenue, Santa Monica, California 90401.

Page | 2)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

The relief set forth on the following pages, numbered two (2) through sixty-seven (67), is

**ORDERED**.

(Page | 2)

| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
|---|---|
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Upon the motion (the "<u>DIP Motion</u>")[2] of Careismatic Brands, LLC and each of the above-captioned debtors-in-possession (collectively, the "<u>Debtors</u>"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, and 9013-4 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Local Rules</u>"), seeking entry of this interim order (this "<u>Interim Order</u>") and the Final Order (as defined herein and, together with this Interim Order, the "<u>DIP Orders</u>") among other things:

- authorizing New Trojan Parent, Inc. (the "<u>Borrower</u>") to obtain postpetition financing ("<u>DIP Financing</u>") pursuant to a senior secured, superpriority, debtor in possession multi-draw term loan facility (the "<u>DIP Facility</u>"), subject to the terms and conditions set forth in that certain Debtor-In-Possession Credit and Guaranty Agreement attached hereto as **<u>Exhibit A</u>** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>") by and among the Borrower, the other Debtors as guarantors (in such capacity, the "<u>DIP Guarantors</u>" and, together with the Borrower, the "<u>DIP Loan Parties</u>"), the financial institutions or other entities from time to time party thereto as the Lenders (the "<u>DIP Lenders</u>"), and Jeffries Finance LLC, as administrative agent and collateral agent (in such capacity, together with its successors and permitted assigns, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "**<u>DIP Secured Parties</u>**"), consisting of (i) term loans (the "<u>DIP Loans</u>" and the commitments therefor, the "<u>DIP Commitments</u>") in an aggregate principal amount of $125 million, of which $50 million will be available immediately upon entry of this Interim Order and an additional $75 million will be available following entry of the Final Order and in accordance with the DIP Credit Agreement;

- authorizing the Borrower to incur, and the DIP Guarantors to jointly and severally guarantee, the DIP Loans and all extensions of credit, financial accommodations,

---

[2] Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Motion or DIP Credit Agreement (as defined herein).

Page | 3)
Debtors:                CAREISMATIC BRANDS, LLC, *et al.*
Case No.               Case No. 24-10561 (VFP)
Caption of Order:      Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                       (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                       and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                       Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                       Hearing, and (VII) Granting Related Relief

reimbursement obligations, fees and premiums (including, as set forth herein, the backstop premium (the "Backstop Premium"), commitment premium (the "Commitment Premium") and exit premium (the "Exit Premium" and, together with the Backstop Premium and Commitment Premium, the "DIP Premiums")), costs, expenses, and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) as and when due or payable under the DIP Documents (as defined below), including pursuant to the Fee Letter attached hereto as **Exhibit C**, and including the DIP Premium Conversion Election Option (as defined in the DIP Motion) (collectively, the "DIP Obligations");

- authorizing the DIP Loan Parties to execute, deliver, and perform under the DIP Credit Agreement and all other documents and instruments (including the Jefferies Fee Letter) that may be reasonably requested by the DIP Agent or the DIP Lenders in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the DIP Credit Agreement, the "DIP Documents");

- subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth herein, granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code (the "DIP Superpriority Claims");

- granting to the DIP Agent, for itself and for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein (the "DIP Liens");

- authorizing the DIP Agent, acting at the direction of the Requisite Lenders, to take all commercially reasonable actions to implement the terms of this Interim Order;

- subject to entry of a Final Order, waiving (a) the Debtors' right to surcharge Prepetition Collateral (as defined below) and the DIP Collateral (together with the Prepetition Collateral, the "Collateral") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- subject to entry of a Final Order, waiving the doctrine of "marshaling" and other similar equitable doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties (as defined below);

Page | 4)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

- authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral (as defined below) solely in accordance with the Approved Budget (as defined below), the DIP Orders and the DIP Documents;

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtors to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "Diminution in Value");

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order;

- scheduling a hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and the entry of a final order (the "Final Order"), and approving the form of notice with respect to the Final Hearing; and

- granting related relief.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Joshua Abramson in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Abramson Declaration"), and the *Declaration of Kent Percy, Chief Restructuring Officer of*

4

Page | 5)
Debtors:              CAREISMATIC BRANDS, LLC, *et al.*
Case No.              Case No. 24-10561 (VFP)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                      Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                      Hearing, and (VII) Granting Related Relief

*Careismatic Brands, LLC, in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the evidence submitted and arguments made at the hearing held on January 24, 2024 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable, in the best interests of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' estates; and it appearing that the DIP Loan Parties' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Page | 6)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

A.    *Petition Date*.  On January 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

B.    *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    *Jurisdiction and Venue*.  This Court has core jurisdiction over these cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the DIP Motion consistent with Article III of the United States Constitution.  Venue for these cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. § 1408.  The predicates for the relief sought herein are sections 105, 345(b), 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 363(m), 503, 506(c) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, and 9013-4.

D.    *Committee Formation*.  As of the date hereof, the United States Trustee for the District of New Jersey (the "U.S. Trustee") has not appointed an official committee of unsecured creditors (the "Creditors' Committee") in these cases.

Page | 7)
Debtors:            CAREISMATIC BRANDS, LLC, *et al.*
Case No.            Case No. 24-10561 (VFP)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                    Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                    Hearing, and (VII) Granting Related Relief

E.    *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and

(c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion and the Interim Hearing

has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules and Bankruptcy

Local Rules, and no other or further notice was required under the circumstances.  The interim

relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their

estates pending the Final Hearing.

F.    *Cash Collateral*.  As used herein, the term "Cash Collateral" shall mean all of the

Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or

will constitute "cash collateral" of any of the Prepetition Secured Parties or the DIP Secured Parties

within the meaning of section 363(a) of the Bankruptcy Code.

G.    *Debtors' Stipulations*.  Subject to the provisions and limitations contained in

paragraph 18 hereof, and after consultation with their attorneys and financial advisors, the Debtors

admit, stipulate and agree that:

(i)    *Prepetition First Lien Credit Agreement*.  Pursuant to that certain First Lien

Credit Agreement, dated as of January 6, 2021 (as amended, amended and restated, restated,

supplemented or otherwise modified from time to time before the Petition Date, the "Prepetition

First Lien Credit Agreement" and, together with the other "Loan Documents" (as defined in the

Prepetition First Lien Credit Agreement) and any other agreements and documents executed or

delivered in connection therewith, each as it may be amended, restated, amended and restated,

supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition First Lien

7

Page | 8)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Loan Documents"), by and among (a) CBI Intermediate, Inc. ("Holdings"), as holdings, (b) the Borrower, as borrower (together with Holdings, the "Prepetition First Lien Loan Parties"), (c) UBS AG, Stamford Branch, as administrative agent and collateral agent (the "Prepetition First Lien Agent"), and (d) the lenders from time to time thereunder (the "Prepetition First Lien Lenders" and, together with the Prepetition First Lien Agent, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Loan Parties incurred "Obligations" (as defined in the Prepetition First Lien Credit Agreement, and together with all accrued but unpaid interest, fees, and expenses due thereon in accordance with the terms of the Prepetition First Lien Credit Agreement and Prepetition First Lien Loan Documents, the "Prepetition First Lien Obligations");

(ii)      *Prepetition Second Lien Credit Agreement*.  Pursuant to that certain Second Lien Credit Agreement, dated as of January 6, 2021 (as amended, amended and restated, restated, supplemented or otherwise modified from time to time before the Petition Date, the "Prepetition Second Lien Credit Agreement" and, collectively with the other "Loan Documents" (as defined in the Prepetition Second Lien Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition Second Lien Loan Documents"), by and among (a) Holdings, as holdings, (b) Borrower, as borrower (together with Holdings, the "Prepetition Second Lien Loan Parties"), (c) UBS AG, Stamford Branch, as administrative agent and collateral agent (the "Prepetition Second Lien Agent" and, together with the Prepetition First Lien Agent, the "Prepetition Agents") and (d) the lenders from

Page | 9)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

time to time thereunder (the "<u>Prepetition Second Lien Lenders</u>" and, together with the Prepetition

Second Lien Agent, the "<u>Prepetition Second Lien Secured Parties</u>"), the Prepetition Second Lien

Loan Parties incurred "Obligations" (as defined in the Prepetition Second Lien Credit Agreement,

and together with all accrued but unpaid interest, fees, and expenses due thereon in accordance

with the terms of the Prepetition Second Lien Credit Agreement and Prepetition Second Lien Loan

Documents, the "<u>Prepetition Second Lien Obligations</u>");

(iii)     *Prepetition Equipment Financing Agreement*.  Pursuant to that certain

Master Equipment Lease Agreement #32224, dated as of July 25, 2023 (as amended, amended and

restated, restated, supplemented or otherwise modified from time to time prior to the Petition Date,

the "<u>Prepetition Equipment Financing Agreement</u>" and, collectively with the other "Loan

Documents" (as defined in the Prepetition Equipment Financing Agreement) and any other

agreements and documents executed or delivered in connection therewith, each as may be

amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to

the Petition Date, the "<u>Prepetition Equipment Financing Documents</u>" and, together with the

Prepetition First Lien Loan Documents and Prepetition Second Lien Loan Documents, the

"<u>Prepetition Loan Documents</u>"), by and among Careismatic Brands, LLC (the "<u>Prepetition

Equipment Financing Borrower</u>" and, together with the Prepetition First Lien Loan Parties and the

Prepetition Second Lien Loan Parties, the "<u>Prepetition Loan Parties</u>") and Wingspire Equipment

Finance LLC (the "<u>Prepetition Equipment Financing Lender</u>" and, together with the Prepetition

First Lien Secured Parties and the Prepetition Second Lien Secured Parties, the "<u>Prepetition

Page | 10)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Secured Parties"), the Prepetition Equipment Financing Borrower incurred Obligations (as defined in the Prepetition Equipment Financing Agreement, and together with all accrued but unpaid interest, fees, and expenses due thereon in accordance with the terms of the Prepetition Equipment Financing Agreement and Prepetition Equipment Financing Documents, the "Prepetition Equipment Financing Obligations" and, together with the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations, the "Prepetition Secured Obligations");

(iv)     *Prepetition Junior Lien Intercreditor Agreement*. Pursuant to that certain Junior Lien Intercreditor Agreement, dated as of January 6, 2021 (as amended, amended and restated, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Junior Lien Intercreditor Agreement"), by and between the Prepetition First Lien Agent and the Prepetition Second Lien Agent, the parties thereto agreed, among other things, (i) that any lien on the Common Collateral (as defined in the Prepetition Junior Lien Intercreditor Agreement, the "Prepetition Common Collateral") securing or purporting to secure any Prepetition First Lien Obligations shall have priority over and be senior in all respects and prior to any lien on the Prepetition Common Collateral securing or purporting to secure any Prepetition Second Lien Obligations, (ii) to consent to, or not oppose, certain actions taken, or rights asserted, by the Prepetition First Lien Secured Parties or Prepetition Second Lien Secured Parties, as applicable, and (iii) to refrain from taking certain actions with respect to the Prepetition Common Collateral.

(v)     *Prepetition Pari Passu Intercreditor Agreement*.  Pursuant to that certain Pari Passu Intercreditor Agreement, dated as of July 28, 2023 (as amended, amended and restated,

Page | 11

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

restated, supplemented or otherwise modified from time to time prior to the Petition Date, the

"Prepetition Pari Passu Intercreditor Agreement"), by and between the Prepetition First Lien Agent

and the Prepetition Equipment Financing Lender, the parties thereto agreed, among other things,

(i) that any proceeds of the Prepetition Common Collateral shall be shared *pro rata* among the

Prepetition First Lien Secured Parties and the Prepetition Equipment Financing Lender and (ii) to

refrain from taking certain actions with respect to the Prepetition Common Collateral.

(vi)    *Prepetition First Lien Obligations*. As of the Petition Date, the Prepetition

First Lien Loan Parties were justly and lawfully indebted and liable to the Prepetition First Lien

Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind,

for Prepetition First Lien Obligations in the aggregate amount of not less than approximately $690

million, including accrued and unpaid interest thereon and any fees, premium, expenses and

disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and

financial advisors' fees), costs, charges, indemnities, and other Prepetition First Lien Obligations

of whatever nature, whether or not contingent, whenever arising, accrued, accruing, due, owing or

chargeable in respect of the Prepetition First Lien Loan documents;

(vii)    *Prepetition Second Lien Obligations*. As of the Petition Date, the

Prepetition Second Lien Loan Parties were justly and lawfully indebted and liable to the

Prepetition Second Lien Secured Parties without defense, challenge, objection, claim,

counterclaim, or offset of any kind, for Prepetition Second Lien Obligations in the aggregate

amount of not less than $110 million, including accrued and unpaid interest thereon and any fees,

Page | 12)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

premium, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other Prepetition Second Lien Obligations incurred under the Prepetition Second Lien Loan Documents;

(viii)    *Prepetition Equipment Financing Obligations*.  As of the Petition Date, the Prepetition Equipment Financing Borrower was justly and lawfully indebted and liable to the Prepetition Equipment Financing Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Prepetition Equipment Financing Obligations in the aggregate amount of not less than $2.9 million, including accrued and unpaid interest thereon and any fees, premium, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other Prepetition Equipment Financing Obligations incurred under the Prepetition Equipment Financing Documents;

(ix)    *Validity of Prepetition Secured Obligations*.    The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties, as applicable, enforceable in accordance with the respective terms of the relevant documents, and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties, or any amount applied or paid, on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance

Page | 13)

| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

actions under Chapter 5 of the Bankruptcy Code or otherwise), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(x) *Validity, Perfection and Priority of Prepetition First Liens*. As of the Petition Date, substantially all of the assets and property of the Prepetition First Lien Loan Parties, including Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition First Lien Collateral") are subject to a first priority security interest in and continuing lien on (the "Prepetition First Liens") in favor of the Prepetition First Lien Secured Parties, junior, subject and subordinate only to the liens expressly permitted by the Prepetition First Lien Loan Documents (the "Prepetition First Lien Permitted Senior Liens") and solely to the extent such Prepetition First Lien Permitted Senior Liens are (a) valid, perfected and non-avoidable on the Petition Date, or (b) valid and in existence on the Petition Date but perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code;

(xi) *Validity, Perfection and Priority of Prepetition Second Liens*. As of the Petition Date, substantially all of the assets and property of the Prepetition Second Lien Loan Parties, including Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Second Lien Collateral"), are subject to a second priority security interest in and continuing lien on (the "Prepetition Second Liens") in favor of the Prepetition Second Lien Secured Parties, junior, subject and subordinate only to (i) liens of the Prepetition First Lien Agent

13

Page | 14)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

with respect to the Prepetition Common Collateral and (ii) the liens expressly permitted by the

Prepetition Second Lien Loan Documents (the "Prepetition Second Lien Permitted Senior Liens")

and solely to the extent such Prepetition Second Lien Permitted Senior Liens are (a) valid,

perfected and non-avoidable on the Petition Date or (b) valid and in existence on the Petition Date

but perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy

Code;

(xii)    *Validity, Perfection and Priority of Prepetition Equipment Financing Liens*.

As of the Petition Date, substantially all of the assets and property of the Prepetition Equipment

Financing Borrower, including Cash Collateral, and all proceeds, products, accessions, rents, and

profits thereof, in each case whether then owned or existing or thereafter acquired or arising

(collectively, the "Prepetition Equipment Financing Collateral" and, together with the Prepetition

First Lien Collateral and the Prepetition Second Lien Collateral, the "Prepetition Collateral") are

subject to a security interest in and continuing lien on (the "Prepetition Equipment Financing

Liens" and, together with the Prepetition First Liens and Prepetition Second liens, the "Prepetition

Liens") in favor of the Prepetition Equipment Financing Lender, *pari passu* with the liens of the

Prepetition First Lien Agent and junior, subject and subordinate only to the liens expressly

permitted by the Prepetition Equipment Financing Documents (the "Prepetition Equipment

Financing Permitted Senior Liens" and, together with the Prepetition First Lien Permitted Senior

Liens and the Prepetition Second Lien Permitted Senior Liens, the "Prepetition Permitted Senior

Liens") and solely to the extent such Prepetition Equipment Financing Permitted Senior Liens are

14

Page | 15)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(a) valid, perfected and non-avoidable on the Petition Date or (b) valid and in existence on the

Petition Date but perfected subsequent to the Petition Date in accordance with section 546(b) of

the Bankruptcy Code;

(xiii)    *Attachment Lien*.  In March 2023, Michelman & Robinson LLP ("M&R")

initiated arbitration against Debtor Careismatic Brands, LLC in the Superior Court of California,

seeking to recover alleged legal fees owed following M&R's representation of Debtor Careismatic

Brands, LLC (f/k/a Careismatic Brands, Inc.) in certain litigation matters.  Following the entry of

a non-binding arbitration award (the "Non-Binding Award") on account of the approximately

$10.1 million in disputed amounts (the "Disputed Amount"), M&R sought a writ of attachment

against the Debtors' available cash to satisfy the Non-Binding Award.  On January 2, 2024, Debtor

Careismatic Brands, LLC and M&R entered into a stipulation (the "Stipulation") whereby the

Debtors agreed to the entry of a right to attach order on a segregated account containing the

Disputed Amount (the "Attachment Account"), which would provide M&R with an attachment

lien (the "Attachment Lien") encumbering the Disputed Amount pursuant to section 481.010 *et

seq*. of the California Code of Civil Procedure ("CCP").  Section 493.030 of the CCP provides that

"the filing of a petition commencing a voluntary or involuntary case under [the Bankruptcy Code]

terminates a lien…of attachment if the lien was created within 90 days prior to the filing of the

petition."  Because the Debtors commenced these chapter 11 cases within the 90-day period

following entry of the order on the Stipulation, in accordance with the CCP, the Attachment Lien

is no longer effective and is not a Prepetition Lien.

15

Page | 16)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(xiv)    *Waiver of Challenge*.    None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under Chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(xv)    *No Control*.    None of the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

(xvi)    *No Claims or Causes of Action*.    As of the Petition Date, there are no claims or causes of action held by the Debtors or their estates against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among the Debtors and any Prepetition Secured Party; and

(xvii)    *Release*.    Effective as of the date of entry of the Final Order, each of the Debtors and (subject to the provisions of paragraph 18 hereof) each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and

16

Page | 17)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

each of their respective Representatives, each in their capacity as such (collectively, the "Released Parties"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or in tort, in each case, arising out of or related to the Prepetition Loan Documents, the DIP Facility, the DIP Documents, the DIP Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Interim Order (collectively, the "Released Claims"); *provided* that the release set forth in this section shall not release any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's bad faith, fraud, gross negligence or willful misconduct.

H.    *Findings Regarding DIP Financing and Use of Cash Collateral.*

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the DIP Loan Parties to obtain financing pursuant to the DIP Documents.

(ii)    The Debtors have demonstrated an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in order to permit,

Page | 18)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

among other things, the orderly continuation of the operation of their businesses, maintaining business relationships with vendors, suppliers and customers, making payroll, satisfying other working capital and operational needs, and funding administrative expenses of these chapter 11 cases. Access to sufficient working capital and liquidity under the DIP Documents and other financial accommodations provided under the DIP Documents, as well as through the use of Cash Collateral, is necessary for the avoidance of immediate irreparable harm to the Debtors' estates and for the preservation and maintenance of their going concern value.

(iii)    The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing on more favorable terms than under the DIP Documents and from sources other than the DIP Lenders. The Debtors are also unable to obtain secured credit without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims and incurring the Adequate Protection Obligations (as defined herein) on the terms and subject to the conditions set forth in this Interim Order and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated by the Prepetition Collateral, all of which constitutes the Prepetition Secured Parties' Cash Collateral under section 363(a) of the Bankruptcy Code. The Debtors desire and need to continue using the Prepetition Secured Parties' Cash Collateral for general corporate purposes.

Page | 19)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(v)　　　Based on the DIP Motion, the First Day Declaration, the Abramson Declaration and the record and argument presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents, and the terms of the adequate protection granted to the Prepetition Secured Parties in paragraph 13 of this Interim Order (the "Adequate Protection") are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties under the circumstances.

(vi)　　　This Interim Order, the DIP Financing, the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties (each of whom acted in good faith), and all of the loans and other financial accommodations extended by the DIP Secured Parties to the DIP Loan Parties under, in respect of, or in connection with, the DIP Financing and the DIP Documents shall be deemed to have been extended by the DIP Agent and the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Agent and the DIP Secured Parties (and their respective successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

Page | 20)
Debtors:                CAREISMATIC BRANDS, LLC, *et al*.
Case No.                Case No. 24-10561 (VFP)
Caption of Order:       Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                        (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                        and Superpriority Administrative Adequate Expense Claims, (IV) Granting Adequate
                        Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                        Hearing, and (VII) Granting Related Relief

(vii)    The Prepetition Secured Parties have acted in good faith regarding the DIP

Financing and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral),

and the Prepetition Secured Parties (and their respective successors and assigns) shall be entitled

to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this

Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties and the DIP Secured Parties have acted in

good faith and without negligence, misconduct, or violation of public policy or law, in respect of

all actions taken by them in connection with or related in any way to negotiating, implementing,

documenting, or obtaining requisite approvals of this Interim Order, the DIP Facility and the use

of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate

Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of

Cash Collateral, the DIP Documents, and all other documents related to and all transactions

contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties and the DIP Secured

Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan

Documents and the DIP Documents, as applicable.

(ix)    The Prepetition Secured Parties are entitled to the Adequate Protection as

and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy

Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed

Adequate Protection are fair and reasonable, reflect the Debtors' prudent exercise of business

Page | 21)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral, including Cash Collateral.

(x)     To the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed to have consented to the use of Prepetition Collateral, including Cash Collateral, and the priming of the Prepetition Liens by the DIP Liens, in each case on the terms set forth in this Interim Order and the DIP Documents; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and solely for the purposes set forth in the DIP Credit Agreement, (y) be construed as consent by any party to the terms of any financing or any other lien encumbering Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any Prepetition Secured Party to seek new, different or additional adequate protection or assert any other right, and the rights of any other party in interest, including the DIP Loan Parties and the DIP Secured Parties, to object to such relief are hereby preserved.

(xi)    The Debtors have prepared and delivered to the advisors to the DIP Secured Parties an initial budget (the "Initial DIP Budget"), attached hereto as **Exhibit B**. The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby. The Initial DIP Budget may be modified, amended, extended, and

21

Page | 22)
Debtors:                CAREISMATIC BRANDS, LLC, *et al*.
Case No.                Case No. 24-10561 (VFP)
Caption of Order:       Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                        (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                        and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                        Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                        Hearing, and (VII) Granting Related Relief

updated from time to time in accordance with the DIP Credit Agreement, and, once approved by

the Requisite Lenders, such modified, amended, extended, and/or updated budget shall supplement

and replace the Initial DIP Budget.  Each subsequent budget, once approved by the Requisite

Lenders in accordance with the DIP Credit Agreement, shall modify, replace, supplement or

supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP

Budget and each subsequent approved budget, an "Approved Budget").  The Debtors believe that

the Initial DIP Budget is reasonable under the circumstances. In determining to extend postpetition

financing under the DIP Documents and this Interim Order, the DIP Secured Parties are relying,

in part, upon the DIP Loan Parties' agreement to comply with the Approved Budget (subject only

to permitted variances), this Interim Order and the other DIP Documents.

(xii)    Subject to entry of the Final Order, each of the Prepetition Secured Parties

shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the

"equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to

the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the

Prepetition Collateral.

I.    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order

pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Absent the relief granted in this Interim

Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the

DIP Financing and continued use of Prepetition Collateral (including Cash Collateral), in

accordance with this Interim Order and the DIP Documents, are therefore in the best interests of

Page | 23)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. The DIP

Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-3.

J.    *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens.* Nothing

herein constitutes a finding or ruling by this Court that any alleged Prepetition Permitted Senior

Lien is valid, senior, enforceable, perfected, or non-avoidable. Moreover, nothing herein shall

prejudice the rights of any party-in-interest, including the Debtors, the DIP Agent, the DIP Secured

Parties, or Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority,

avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien. For the

avoidance of doubt, the right of a seller of goods to reclaim goods under section 546(c) of the

Bankruptcy Code does not constitute a Prepetition Permitted Senior Lien, and such right is

expressly subject to the DIP Liens and Prepetition Liens. The Prepetition Liens and the DIP Liens

are continuing liens, and the DIP Collateral is and will continue to be encumbered by such liens.

K.    *Intercreditor Agreements.* Pursuant to Section 510 of the Bankruptcy Code, the

Prepetition Junior Lien Intercreditor Agreement, the Prepetition Pari Passu Intercreditor

Agreement, and any other intercreditor or subordination provisions contained in any of the other

Prepetition Loan Documents (collectively, the "Intercreditor Agreements") shall (i) remain in full

force and effect, (ii) continue to govern the relative priorities, rights, and remedies of the

Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties

with respect to replacement liens, administrative expense claims and superpriority administrative

expense claims or amounts payable in respect thereof), and (iii) not be deemed to be amended,

Page | 24)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

altered or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

L.        Based upon the DIP Motion, the foregoing findings of fact and conclusions of law, and the overall record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.        *Motion Granted.*  The DIP Motion is granted on an interim basis on the terms and subject to the conditions set forth in this Interim Order and in the DIP Documents. All objections to the Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.        *Authorization of the DIP Financing and the DIP Documents.*

(a)        The DIP Loan Parties are hereby authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to execute, deliver, enter into and perform all of their obligations under the DIP Documents and perform such other acts as may be necessary, appropriate or desirable in connection therewith, subject to the terms of this Interim Order and the DIP Documents.  The Borrower is hereby authorized to borrow up to $125 million in DIP Loans pursuant to the DIP Credit Agreement, with $50 million available to be drawn on an interim basis, and the DIP Guarantors are hereby authorized to guarantee the Borrower's obligations under the DIP Credit Agreement.  The proceeds of the DIP Loans shall be

Page | 25)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

used solely for the purposes permitted under the DIP Documents and the Interim Order, subject to and in accordance with the Approved Budget (subject to any permitted variances).

(b)       In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents, execute or record pledge and security agreements, mortgages, financing statements and other similar documents, if any, and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable in connection with for the DIP Financing, including:

(i)       the execution and delivery of, and performance under, each of the DIP Documents;

(ii)       the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Agent (acting at the direction of the Requisite Lenders) may accept, it being understood that no further approval of this Court shall be required for any such amendments, waivers, consents or other modifications or the payment of any fees, including attorneys', accountants', appraisers' and financial advisors' fees, and other expenses, charges, costs, indemnities and other like obligations in connection therewith that do not shorten the maturity of the DIP Facility, increase the aggregate DIP Commitments, increase the rate of interest or fees payable thereunder, or release any DIP Liens.  Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court;

25

Page | 26)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(iii)     the non-refundable payment to the DIP Agent and the DIP Secured Parties, as the case may be, of any fees or premiums in connection with the DIP Facility, including any amendment fees or premiums (including the Backstop Premium, Commitment Premium, and Exit Premium, *provided*, that until entry of the Final Order, the Backstop Premium, Commitment Premium, and Exit Premium are due and payable to the DIP Secured Parties only with respect to the $50 million in DIP Commitments approved in this Interim Order), servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment premiums, exit fees, closing date fees, prepayment fees or agency fees), and any amounts due in respect of any indemnification and expense reimbursement obligations, including, subject to the review procedures set forth in paragraph 17 below, fees and expenses of professionals retained by, or on behalf of, any of the DIP Agent (including, without limitation, those of Paul Hastings LLP and any local counsel or other advisors in any foreign jurisdiction, and any other advisors as permitted under the DIP Documents) and the DIP Secured Parties (including those of Milbank LLP, Houlihan Lokey, and Gibbons P.C. or other advisors in any foreign jurisdiction, and any other advisors as permitted under the DIP Documents), in each case, as provided and to the extent set forth in in the DIP Documents  (collectively, the "DIP Fees and Expenses"), without the need to file retention or fee applications; the payment of the foregoing amounts shall be irrevocable, and shall be deemed to have been approved upon entry of this Interim Order, whether any such obligations arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and, upon payment thereof, shall not be

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law. Upon the Closing Date (as defined in the DIP Credit Agreement), all DIP Fees and Expenses shall be fully earned and non-refundable and shall be payable with and at the times and in the manners specified in the DIP Documents, including in accordance with the DIP Premium Conversion Election Option following entry of the Final Order.

3. *DIP Obligations*. Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their respective estates and any successors thereto, including any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon execution and delivery of the DIP Documents, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by any of the DIP Loan Parties to any of the DIP Agent or the Secured Parties, in each case, under the DIP Documents and this Interim Order, including all DIP Fees and Expenses, indemnities and other amounts. The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations. Except as permitted hereby, including paragraph 18 below, no obligation, payment, transfer, or grant of security interest hereunder or under the DIP Documents to the DIP Agent and/or the DIP

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No.: | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      Subject to entry of the Final Order, the terms of the DIP Premium Conversion Election Option are approved.

5.      *Carve-Out.*

(a)      As used in this Interim Order, the "Carve Out" means the sum of (i) all fees of each Debtor required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section

Page | 29)
Debtors:            CAREISMATIC BRANDS, LLC, *et al.*
Case No.            Case No. 24-10561 (VFP)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                    Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                    Hearing, and (VII) Granting Related Relief

328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor

Professionals, the "Professional Persons") at any time before or on the first business day following

delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by

the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional

Fees of Professional Persons in an aggregate amount not to exceed $5,000,000 incurred after the

first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the

extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts

set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the

foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other

electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S.

Trustee, and counsel to the Creditors' Committee, if any, (collectively, the "Carve-Out Notice

Parties") which notice may be delivered following the occurrence and during the continuation of

an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that

the Post-Carve Out Trigger Notice Cap has been invoked.

      (b)     Carve Out Reserves. On the day on which a Carve Out Trigger Notice is

given by the DIP Agent to the Carve-Out Notice Parties (the "Termination Declaration Date"), the

Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the

Debtors for DIP Loans under the DIP Commitments (on a pro rata basis based on the then

outstanding DIP Commitments), in an amount equal to the then unpaid amounts of the Allowed

Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also

Page | 30)
Debtors:             CAREISMATIC BRANDS, LLC, *et al*.
Case No.             Case No. 24-10561 (VFP)
Caption of Order:    Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                     (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                     and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                     Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                     Hearing, and (VII) Granting Related Relief

constitute a demand to the Debtors to utilize all cash on hand as of such date and any available

cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts

of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated

account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-

Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination

Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors

for DIP Loans under the DIP Commitments (on a pro rata basis based on the then outstanding DIP

Commitments), in an amount equal to the Post Carve Out Trigger Notice Cap (any such amounts

actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize

all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding

the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve

Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account

at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve

Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-

Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

On the first business day following the Termination Declaration Date, notwithstanding anything

in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default

(as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy

any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the

DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each

Page | 31)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

DIP Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.

(c)    Application of Carve Out Reserves.

(i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, subject to clause (iii) below, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent (for the benefit of itself and the DIP Secured Parties), unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.

(ii)    All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, subject to clause (iii) below, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent (for the benefit of itself and the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such

Page | 32

Debtors:            CAREISMATIC BRANDS, LLC, *et al.*

Case No.            Case No. 24-10561 (VFP)

Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief

excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.

(iii)    Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 5(b), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 5(b), prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.

(iv)    Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due

Page | 33

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the DIP Superpriority Claims, and the Adequate Protection 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(d)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the chapter 11 cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-

Debtors:          CAREISMATIC BRANDS, LLC, *et al*.
Case No.          Case No. 24-10561 (VFP)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
(II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
and Superpriority Administrative Expense Claims, (IV) Granting Adequate
Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
Hearing, and (VII) Granting Related Relief

for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP

Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted

under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

6.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code,

all of the DIP Obligations shall constitute allowed superpriority administrative expense claims

against the DIP Loan Parties on a joint and several basis (without the need to file any proof of

claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter

arising, of any kind whatsoever, including all administrative expenses of the kind specified in

sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or

other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a),

507(b), 726, of the Bankruptcy Code (including the Adequate Protection Obligations), whether or

not such expenses or claims may become secured by a judgment lien or other non-consensual lien,

levy or attachment, except for the Carve-Out.  The DIP Superpriority Claims shall be payable

from, and have recourse to, all prepetition and postpetition property of the DIP Loan Parties and

all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547,

548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code

(collectively, the "Avoidance Actions") but, subject to the entry of the Final Order, including any

proceeds or property recovered as a result of any Avoidance Actions, whether by judgment,

settlement or otherwise (collectively, the "Avoidance Proceeds"), subject only to the Carve-Out.

The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the

34

Page | 35)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

7.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable DIP Liens are hereby granted to the DIP Agent for its own benefit and for the benefit of the DIP Secured Parties (all property identified in clauses (a) through (d) below being collectively referred to as the "DIP Collateral"):

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, subject only to the Carve-Out, a first priority lien on and security interest in all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, including 100% of the equity interests in all of the Debtors' non-Debtor subsidiaries and affiliates, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions, but including, upon and subject to entry of the Final Order, the Avoidance Proceeds (collectively, the "Unencumbered Property").

Page | 36)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(b)     *Liens Priming Certain Prepetition Secured Parties' Liens*.   Pursuant to section 364(d)(1) of the Bankruptcy Code, subject solely to the Carve-Out and the Prepetition Permitted Senior Liens, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Collateral, wherever located (the "<u>DIP Priming Liens</u>").   Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the Prepetition Liens on the Prepetition Collateral, (B) senior to any Adequate Protection Liens, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.   The Prepetition Liens with respect to the Prepetition Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)     *Liens Junior to Certain Other Liens*.   Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, as of the Petition Date, is subject to the Prepetition Permitted Senior Liens, which shall be immediately junior to the Prepetition Permitted Senior Liens, but senior to the Prepetition Liens and Prepetition Adequate Protections Liens.

(d)     *No Senior Liens*.   The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit

36

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

of the Debtors' estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided

for in the DIP Documents or in this Interim Order, any liens or security interests arising after the

Petition Date, including any liens or security interests granted in favor of any federal, state,

municipal or other governmental unit (including any regulatory body), commission, board or court

for any liability of the DIP Loan Parties, or (C) any intercompany liens; or (ii) subordinated to or

made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy

Code.

8.      *Protection of DIP Lenders' and Prepetition Secured Parties' Rights.*

(a)      So long as any DIP Obligations are outstanding or the DIP Lenders have

any outstanding DIP Commitments, the Prepetition Secured Parties shall: (i) have no right to and

shall take no action to foreclose upon, or recover in connection with, the liens granted thereto

pursuant to the Prepetition Loan Documents or this Interim Order, including the Adequate

Protection Liens, or otherwise seek to exercise or enforce any rights or remedies against the DIP

Collateral; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of

liens on, any DIP Collateral to the extent such transfer, disposition, sale or release is authorized

under the DIP Documents; (iii) not file any financing statements, trademark filings, copyright

filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect

their security interests in the DIP Collateral other than (x) to perfect the liens granted pursuant to

this Interim Order (including by the DIP Agent filing financing statements or other documents) or

(y) as may be required by applicable state or foreign law to complete a previously commenced

Page | 38)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

process of perfection or to continue the perfection of valid and non-avoidable liens or security

interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan

Parties' cost and expense, any termination statements, releases and/or assignments in favor of the

DIP Agent or the DIP Secured Parties or other documents necessary to effectuate and/or evidence

the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to

any sale or disposition permitted by the DIP Documents and this Interim Order.

(b)        Except as set forth in clause (c) immediately below, to the extent any

Prepetition Secured Party has possession of, or control over, any Prepetition Collateral or DIP

Collateral, or has been listed as a secured party on any certificate of title for a titled good

constituting Prepetition Collateral or DIP Collateral, such Prepetition Secured Party shall be

deemed to have such possession or control or be so listed as a gratuitous bailee and/or gratuitous

agent for the benefit of the DIP Agent and the DIP Secured Parties, and such Prepetition Secured

Party shall comply with the instructions of the DIP Agent, acting at the direction of the Requisite

Lenders, with respect to any of the foregoing.

(c)        Any proceeds of Prepetition Collateral received by any Prepetition Secured

Party, whether in connection with the exercise of any right or remedy (including setoff) relating to

the Prepetition Collateral or otherwise, shall be segregated and held in trust for the benefit of the

DIP Secured Parties, and forthwith paid over to the DIP Agent in the same form as received, with

any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The

DIP Agent is hereby authorized to make any such endorsements as agent for the applicable

38

Page | 39)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Prepetition Agent or the Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

(d)     The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or an order of the Court.

(e)     Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Requisite Lenders, the DIP Agent (acting at the direction of the Requisite Lenders under the DIP Documents) may, following delivery of written notice (a "Termination Notice"), which may be done by e-mail, on not less than five (5) business days' notice (such five (5) business day period, the "DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents and the Prepetition Equipment Financing Lender, lead counsel to the Creditors' Committee, and to the U.S. Trustee (the "Remedies Notice Parties"), in each case without further notice to, hearing of, or order from this Court:  (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents to use Cash Collateral (subject to the provisions related to the Carve-Out), (b) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Agent or the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Documents. Any automatic stay otherwise applicable to the foregoing, whether arising under sections 105 or

Page | 40)
Debtors:             CAREISMATIC BRANDS, LLC, *et al.*
Case No.             Case No. 24-10561 (VFP)
Caption of Order:    Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                     (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                     and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                     Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                     Hearing, and (VII) Granting Related Relief

362 of the Bankruptcy Code or otherwise, is hereby modified to the extent necessary to permit the

DIP Agent to effectuate the foregoing, *provided* that, during the DIP Agent Remedies Notice

Period, the Debtors, the  Creditors' Committee (if appointed) and/or any party in interest shall be

entitled to seek an emergency hearing (with the DIP Agent consenting to such emergency hearing)

with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and

is continuing or to obtain non-consensual use of Cash Collateral.  Upon delivery of a Termination

Notice by the DIP Agent, without further notice or order of the Court, the DIP Secured Parties'

and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur

additional DIP Obligations hereunder will, subject to the expiration of the DIP Agent Remedies

Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Secured

Parties will have no further obligation to provide any DIP Loans or other financial

accommodations.  As soon as reasonably practicable following receipt of a Termination Notice,

the Debtors shall file a copy of same on the docket.

(f)     Following an Event of Default (as defined in the DIP Documents) and the

delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence

below or any other remedies (other than those set forth in paragraph 8(e)), the DIP Secured Parties

shall be required to file a motion with the Court seeking emergency relief (the "Stay Relief

Motion") on not less than five (5) business days' notice to the Remedies Notice Parties (which

may run concurrently with the DIP Agent Remedies Notice Period) for an order of the Court

modifying the automatic stay in these cases to permit the DIP Secured Parties to, subject to the

Page | 41)
Debtors:              CAREISMATIC BRANDS, LLC, *et al.*
Case No.              Case No. 24-10561 (VFP)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                      Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                      Hearing, and (VII) Granting Related Relief

Carve-Out provisions: (a) freeze monies or balances in the Debtors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any DIP Secured Party against the DIP Obligations; (c) enforce any and all rights against the DIP Collateral, including foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect the DIP Secured Parties from enforcing such security interests.  Until such time that the Stay Relief Motion has been adjudicated by the Court, and subject to the other terms of this Interim Order, and subject further to any terms and conditions that the Court may impose, the Debtors may use Cash Collateral and the proceeds of the DIP Facility to the extent drawn prior to the occurrence of the Event of Default to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates set forth in the Approved Budget.

(g)    No rights, protections or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of

Page | 42

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

9.      *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of these cases or any Successor Cases or any proceeding that may result therefrom, including liquidation, shall be charged against or recovered from the DIP Collateral or Prepetition Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, each Prepetition Agent, and Prepetition Equipment Financing Lender, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties or Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral (including Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise.

10.      *No Marshaling*.  Subject to entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the doctrine of "marshaling" or any similar equitable doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligations, or the Prepetition Collateral, as applicable.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties.

Page | 43)
Debtors:              CAREISMATIC BRANDS, LLC, *et al*.
Case No.              Case No. 24-10561 (VFP)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                      Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                      Hearing, and (VII) Granting Related Relief

11.    *Payments Free and Clear*.  Any and all payments made to the DIP Agent on behalf

of itself and the DIP Secured Parties, the DIP Secured Parties or Prepetition Secured Parties

pursuant to this Interim Order, the DIP Documents or any subsequent order of the Court shall be

irrevocable, received free and clear of any claim, charge, assessment or other liability, including,

subject to entry of the Final Order, any claim or charge arising out of or based on, directly or

indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by

through or on behalf of the Debtors.

12.    *Use of Cash Collateral*.  The Debtors are hereby authorized, solely on the terms

and subject to the conditions of this Interim Order and the DIP Documents, to use all Cash

Collateral in accordance with the DIP Documents and Approved Budget (subject to permitted

variances).

13.    *Adequate Protection of Prepetition Secured Parties*.  Pursuant to sections 361, 362,

363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective

interests in the Prepetition Collateral (including Cash Collateral) as an inducement to the

Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their

Cash Collateral, the Prepetition Secured Parties are granted the following Adequate Protection

(collectively, the "Adequate Protection Obligations"):

(a)    *Prepetition First Lien Secured Parties' Adequate Protection Liens*.  The

Prepetition First Lien Agent is hereby granted, for the benefit of the Prepetition First Lien Secured

Parties, effective and perfected upon the date of this Interim Order and without the necessity of

Page | 44)
Debtors:                CAREISMATIC BRANDS, LLC, *et al.*
Case No.                Case No. 24-10561 (VFP)
Caption of Order:       Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                        (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                        and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                        Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                        Hearing, and (VII) Granting Related Relief

the execution of any mortgages, security agreements, pledge agreements, financing statements or

other agreements, a valid, perfected replacement security interest in and lien on account and to the

extent of the Prepetition First Lien Secured Parties' Diminution in Value upon all of the DIP

Collateral (the "First Lien Adequate Protection Liens"), which First Lien Adequate Protection

Liens shall be (i) in the case of the Prepetition Collateral, *pari passu* with the Equipment Financing

Adequate Protection Liens (as defined below) and senior to all other liens except the DIP Liens,

the Prepetition Permitted Senior Liens, and the Carve-Out (to which they shall be junior, subject,

and subordinate to), and (ii) in the case of Unencumbered Property, junior, subject, and subordinate

to the Carve-Out and the DIP Liens and *pari passu* with the Equipment Financing Adequate

Protection Liens.

      (b)    *Prepetition First Lien Secured Parties' Section 507(b) Claim*.  The

Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, is hereby

granted an allowed superpriority administrative expense claim under section 507(b) of the

Bankruptcy Code against the DIP Loan Parties on a joint and several basis (without the need to

file any proof of claim) on account of the Prepetition First Lien Secured Parties' Diminution in

Value (the "First Lien 507(b) Claim"), which First Lien 507(b) Claim shall be payable from and

have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but

including subject to entry of the Final Order, the Avoidance Proceeds).  The First Lien 507(b)

Claim shall be *pari passu* with the Equipment Financing 507(b) Claim (as defined below) and

senior to all other claims against the DIP Loan Parties, now existing or hereafter arising, of any

Page | 45)
Debtors:            CAREISMATIC BRANDS, LLC, *et al.*
Case No.            Case No. 24-10561 (VFP)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                    Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                    Hearing, and (VII) Granting Related Relief

kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and

507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment

lien or other non-consensual lien, levy or attachment, except for the Carve-Out and the DIP

Superpriority Claim.

(c)     *Prepetition First Lien Secured Parties' Fees and Expenses*. As further

adequate protection, the DIP Loan Parties shall currently pay in cash, the reasonable and

documented prepetition and postpetition fees and out-of-pocket expenses of (i) the Prepetition First

Lien Agent, (ii) Davis Polk & Wardwell LLP and Greenberg Traurig, LLP, each in their capacities

as counsel and local counsel to the Prepetition First Lien Agent, respectively, and (iii) Milbank

LLP, Houlihan Lokey, and Gibbons P.C., each as advisor to the First Lien Ad Hoc Group (the

"First Lien Adequate Protection Fees and Expenses"), subject to the review procedures set forth

in paragraph 17 of this Interim Order; *provided* that for the avoidance of doubt, the First Lien

Adequate Protection Fees and Expenses shall only be paid to such advisors in their capacity as

advisors to the Prepetition First Lien Secured Parties.

(d)     *Prepetition Second Lien Secured Parties' Adequate Protection Liens*.  The

Prepetition Second Lien Agent is hereby granted, for the benefit of the Prepetition Second Lien

Secured Parties, effective and perfected upon the date of this Interim Order and without the

necessity of the execution of any mortgages, security agreements, pledge agreements, financing

statements or other agreements, a valid, perfected replacement security interest in and lien on

account of the Prepetition Second Lien Secured Parties' Diminution in Value upon all of the DIP

Page | 46)
Debtors:              CAREISMATIC BRANDS, LLC, *et al*.
Case No.              Case No. 24-10561 (VFP)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                      Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                      Hearing, and (VII) Granting Related Relief

Collateral (the "Second Lien Adequate Protection Liens") (i) in the case of the Prepetition

Collateral, junior, subject, and subordinate to the Carve-Out, the DIP Liens, the First Lien

Adequate Protection Liens, the Equipment Financing Adequate Protection Liens, and the

Prepetition Permitted Senior Liens, and (ii) in the case of the Unencumbered Property, junior,

subject, and subordinate to the Carve-Out, the DIP Liens, the First Lien Adequate Protection Liens,

and the Equipment Financing Adequate Protection Liens.

(e)     *Prepetition Second Lien Secured Parties' Section 507(b) Claim*.    The

Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Secured Parties, is

hereby granted an allowed superpriority administrative expense claim under section 507(b) of the

Bankruptcy Code against the DIP Loan Parties on a joint and several basis (without the need to

file any proof of claim) on account of the Prepetition Second Lien Secured Parties' Diminution in

Value (the "Second Lien 507(b) Claim"), which Second Lien 507(b) Claim shall be payable from

and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but

including subject to entry of the Final Order, the Avoidance Proceeds).  The Second Lien 507(b)

Claim shall be senior to all other claims against the DIP Loan Parties, now existing or hereafter

arising, of any kind whatsoever, including all administrative expenses of the kind specified in

sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become

secured by a judgment lien or other non-consensual lien, levy or attachment, except for (i) the

Carve-Out, (ii) the DIP Superpriority Claim, (iii) the First Lien 507(b) Claim, and (iv) the

Equipment Financing 507(b) Claim.

46

Page | 47)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(f)     *Reporting Requirements.*  As further adequate protection to the Prepetition

First Lien Secured Parties and Prepetition Second Lien Secured Parties, the Debtors shall comply

with all reporting requirements set forth in the DIP Credit Agreement and provide the Prepetition

Agents, for distribution to the Prepetition First Lien Secured Parties and Prepetition Second Lien

Secured Parties and, to the extent applicable, counsel to such parties (and subject to applicable

confidentiality restrictions in any of the Prepetition First Lien Loan Documents and Prepetition

Second Lien Loan Documents, including with respect to any "private" side lender database), with

all written financial reporting, periodic reporting and other information required to be provided to

the DIP Agent or DIP Secured Parties under the DIP Documents, including with regards to any

Approved Budget and any related variance reporting (the "Adequate Protection Reporting

Requirement"). Upon indefeasible payment in full of all DIP Obligations, the Prepetition First

Lien Secured Parties and Prepetition Second Lien Secured Parties shall continue to be entitled

hereby to satisfaction of the Adequate Protection Reporting Requirement.

(g)     *Prepetition Equipment Financing Secured Parties' Adequate Protection*

*Liens.*  The Prepetition Equipment Financing Lender is hereby granted, effective and perfected

upon the date of this Interim Order and without the necessity of the execution of any mortgages,

security agreements, pledge agreements, financing statements or other agreements, on account of

the Prepetition Equipment Financing Lender's Diminution in Value, a valid, perfected replacement

security interest in and lien upon all of the DIP Collateral (the "Equipment Financing Adequate

Protection Liens" and, together with the First Lien Adequate Protection Liens and the Second Lien

Page | 48

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), which Equipment Financing

Adequate Protection Liens shall be junior, subject, and subordinate to the Carve-Out, the DIP

Liens, and the Prepetition Permitted Senior Liens and *pari passu* with the First Lien Adequate

Protection Liens.

(h)     *Prepetition Equipment Financing Secured Parties' 507(b) Claim*.  The

Prepetition Equipment Financing Lender is hereby granted, pursuant to section 507(b) of the

Bankruptcy Code, on account of the Prepetition Equipment Financing Lender's Diminution in

Value, an allowed superpriority administrative expense claim (the "<u>Equipment Financing 507(b)</u>

<u>Claim</u>" and, together with the First Lien 507(b) Claim and the Second lien 507(b) Claim, the

"<u>Adequate Protection 507(b) Claims</u>"), which Equipment Financing 507(b) Claim shall be payable

from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance

Actions but subject to entry of the Final Order, the Avoidance Proceeds).  The Equipment

Financing 507(b) Claim shall be *pari passu* with the First Lien 507(b) Claim and senior to all other

claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever,

including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment, except for (i) the Carve-Out and (ii) the DIP Superpriority

Claim.

Page | 49)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

14.     *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, required under the Prepetition Loan Documents and the DIP Documents, as applicable.

15.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens under the terms of this Interim Order, the DIP Agent, the DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required, to execute, in the name of the DIP Loan Parties or the Prepetition Loan Parties (as applicable), as their true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law), and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Agent (acting at the direction of the Requisite Lenders) or take possession of certificated securities, or take any other similar action in a manner not inconsistent herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "Perfection Actions").  All Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and each Prepetition Secured Party to take any Perfection Action.  For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order,

Page | 50)
Debtors:          CAREISMATIC BRANDS, LLC, *et al*.
Case No.          Case No. 24-10561 (VFP)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                  (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                  and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                  Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                  Hearing, and (VII) Granting Related Relief

whether or not the DIP Agent (on behalf of itself and the DIP Secured Parties), the DIP Secured

Parties or the Prepetition Secured Parties take any Perfection Actions.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP

Agent, each Prepetition Agent, and Prepetition Equipment Financing Lender, be filed or recorded

in the filing or recording offices in addition to or *in lieu* of any financing statements, mortgages,

notices of lien or similar instruments, and all filing and recording offices are hereby authorized

and directed to accept a certified copy of this Interim Order for such filing and/or recording, as

applicable.

16.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Other than the claims and liens expressly granted or permitted by this

Interim Order, including the Carve-Out, no claim or lien having a priority superior to or *pari passu*

with those granted by this Interim Order shall be permitted while any of the DIP Obligations, DIP

Commitments, or the Adequate Protection Obligations remain outstanding, and, except as

otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the

Adequate Protection Liens shall not be: (i) junior to any lien or security interest that is avoided and

preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii)

subordinated to or made *pari passu* with any other lien or security interest, whether under section

364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any

liens arising after the Petition Date including any liens in favor of any federal, state, municipal or

other domestic or foreign governmental unit (including any regulatory body), commission, board

50

Page | 51)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

or court for any liability of the DIP Loan Parties; or (iv) junior to any intercompany liens or intercompany interests of the DIP Loan Parties.

(b)     The occurrence and continuance of any Event of Default shall, after written notice by the DIP Agent (acting at the direction of Requisite Lenders) to the Borrower, counsel to the Borrower, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any) constitute an event of default under this Interim Order (each an "Event of Default") and, upon such notice, interest, including, where applicable, default interest, shall accrue and be payable as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of these chapter 11 cases under section 1112 of the Bankruptcy Code or converting any of these cases to a Successor Case: (A) the DIP Superpriority Claim, the Adequate Protection 507(b) Claims, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order, and shall remain binding on all parties in interest until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full and all DIP Commitments cancelled; (B) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations

| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
|---|---|
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

incurred prior to the actual receipt of written notice by the DIP Agent, Prepetition Agents or Prepetition Equipment Financing Lender, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority and enforceability of the DIP Liens, the Adequate Protection Liens, and the Carve-Out.  Notwithstanding any such reversal, modification, vacatur or stay, the DIP Obligations, DIP Liens, Adequate Protection Obligations, Adequate Protection Liens, DIP Superpriority Claim, and the Adequate Protection 507(b) Claims incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agents or Prepetition Equipment Financing Lender, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order, and the DIP Documents.

(d)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties granted by this Interim Order and the DIP Documents, as well as the Carve-Out, shall survive, and shall not be modified, impaired or discharged by the entry of an order (i) converting or dismissing any of these cases, or terminating the joint administration of these cases; (ii) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code; (iii) confirming a chapter 11 plan in any of these cases.  The terms

Page | 53)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

and provisions of this Interim Order and the DIP Documents shall continue in in full force and effect in these cases and in any Successor Cases until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments are terminated.  Any confirmation order entered in these cases shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Secured Parties under the DIP Documents, other than after the payment in full and in cash of all DIP Obligations and the termination of the DIP Commitments.

17.    *Payment of Fees and Expenses*.  The Jefferies Fee Letter is hereby approved, and the DIP Loan Parties are authorized and directed to pay the DIP Fees and Expenses and First Lien Adequate Protection Fees and Expenses, in each case as provided for in this Interim Order and the other DIP Documents.  Subject to the review procedures set forth in this paragraph 17, payment of the DIP Fees and Expenses and First Lien Adequate Protection Fees and Expenses shall not be subject to review or allowance by the Court.  Professionals for the DIP Secured Parties, Prepetition First Lien Secured Parties, and Prepetition Agents shall not be required to comply with the U.S. Trustee fee guidelines with respect to their fees and expenses, *provided, however*, that any time any such professionals seeks payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, such professional shall provide summary copies of its invoices (including aggregate amounts of fees and expenses and total amount of time on a per-professional basis), which are not required to contain time detail, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted, summarized,

Page | 54)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, to the DIP Loan Parties, counsel to the Creditors' Committee, and the U.S. Trustee (together, the "Review Parties"); *provided, however*, that (i) the provision of such invoices shall not constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law; and *provided further that,* the Debtors, U.S. Trustee and the Creditors' Committee shall have the right to request additional details regarding the services rendered and expenses incurred by such professionals (each, an "Information Request").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) business days after receipt (the "Review Period"), which shall not be extended by the delivery of an Information Request.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the last date of the Review Period, the Debtors shall pay such invoices within five (5) business days.  If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of such invoice without the necessity of filing formal fee applications, regardless of whether the invoiced amount arose or was incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Credit

Page | 55)

| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Agreement) any costs, fees, expenses (including reasonable and documented legal fees and expenses) and other compensation contemplated by the DIP Documents.  No attorney or advisor to any DIP Secured Party, any Prepetition First Lien Secured Party, or any Prepetition Agent shall be required to file an application with the Court seeking compensation for services or reimbursement of expenses.  Any and all fees, costs, and expenses paid prior to the Petition Date by any Debtor to (i) the DIP Secured Parties in connection with the DIP Facility or (ii) the Prepetition First Lien Secured Parties or the Prepetition Agents in connection with these cases, are hereby approved and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

18.     *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including the Creditors' Committee and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner, in all circumstances and for all purposes unless: (a) the Creditors' Committee or another party in interest with requisite standing has filed and served, withing the appliable Challenge Period (as defined below), an adversary proceeding or contested matter (i) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (ii) asserting or prosecuting any Avoidance Action or any other claims,

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

counterclaims or causes of action, objections, contests or defenses (each, a "Challenge") against

any Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors,

managers, principals, employees, agents, financial advisors, attorneys, accountants, investment

bankers, consultants, representatives and other professionals and the respective successors and

assigns thereof, in each case in their respective capacity as such (collectively, the

"Representatives") in connection with or related to the Prepetition Loan Documents, the

Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral and (b) a final

non-appealable order is entered in favor of the plaintiff sustaining such Challenge. For the purposes

of this paragraph, the "Challenge Period" shall be: (w) as to the Creditors' Committee, 60 calendar

days after the appointment of the Creditors' Committee, (x) if a chapter 11 trustee is appointed or

elected prior to the end of the Challenge Period, solely for such trustee, the date that is the later of

(1) 60 calendar days after entry of this Interim Order, or (2) the date that is 30 calendar days after

their appointment, (y) if no Creditors' Committee is appointed, for all other parties in interest, 75

calendar days after entry of this Interim Order, and (z) any such later date as has been agreed to by

(A) the Prepetition First Lien Agent with respect to the Prepetition First Lien Obligations or the

Prepetition First Liens, (B) the Prepetition Second Lien Agent with respect to the Prepetition

Second Lien Obligations or the Prepetition Second Liens, (C) the Prepetition Equipment Financing

Lender with respect to the Prepetition Equipment Financing Obligations or the Prepetition

Equipment Financing Liens, or (D) has been ordered by the Court for cause upon within any

applicable period.   Any pleading filed in connection with a Challenge shall set forth with

Debtors:              CAREISMATIC BRANDS, LLC, *et al.*
Case No.              Case No. 24-10561 (VFP)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                      Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                      Hearing, and (VII) Granting Related Relief

specificity the basis for such Challenge, and any Challenges not so specified prior to the expiration

of the applicable Challenge Period shall be deemed forever waived, released and barred.  If no

Challenge is timely and properly filed or the Court does not rule in favor of the plaintiff in any

Challenge then: (1) the Debtors' stipulations, admissions, agreements and releases contained in

this Interim Order shall be binding on all parties in interest; (2) the Prepetition Secured Obligations

shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment,

recharacterization, subordination (whether equitable, contractual, or otherwise, except as provided

in the Intercreditor Agreements), disallowance, impairment, counterclaim, cross-claim, or any

other challenge under the Bankruptcy Code or any applicable law or regulation by any person or

entity for all purposes in these cases and any Successor Case; (3) the Prepetition Liens shall be

deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, not subject to

defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether

equitable, contractual (other than as provided in the Intercreditor Agreements), or otherwise),

disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy

Code or any applicable law or regulation by any person or entity (collectively, the "Disputes"),

and any such Disputes shall be deemed forever waived, released and barred.  If any Challenge is

filed during the Challenge Period, the stipulations, admissions, agreements and releases contained

in this Interim Order shall nonetheless remain binding and preclusive on each person or entity,

except to the extent that such stipulations, admissions, agreements and releases were expressly and

successfully challenged in such Challenge as determined in a final, non-appealable order of a court

Debtors:            CAREISMATIC BRANDS, LLC, *et al.*

Case No.            Case No. 24-10561 (VFP)

Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                    Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                    Hearing, and (VII) Granting Related Relief

of competent jurisdiction.  Nothing in this Interim Order vests or confers on any person or entity

(each as defined in the Bankruptcy Code), including any Creditors' Committee, standing to pursue

any claim or cause of action belonging to the Debtors or their estates, including any Challenge

with respect to the Prepetition Loan Documents, Prepetition Secured Obligations or Prepetition

Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of

any plan of reorganization in these cases.

19.      *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding

any other provision of this Interim Order or any other order entered by the Court, no DIP Loans,

DIP Collateral, Prepetition Collateral (including, in each case, Cash Collateral) or any portion of

the Carve-Out, may be used directly or indirectly, including through reimbursement of

professional fees of any non-Debtor party, in connection with (a) the investigation, threatened

initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation

(i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective

Representatives, or any action purporting to do the foregoing in respect of the DIP Obligations,

DIP Liens, DIP Superpriority Claim, Prepetition Secured Obligations, Prepetition Liens, Adequate

Protection Liens, or Adequate Protection 507(b) Claims or (ii) challenging the amount, validity,

perfection, priority or enforceability of or asserting any defense, counterclaim or offset with

respect to the DIP Obligations or DIP Liens, the Prepetition Secured Obligations or Prepetition

Liens, the DIP Documents or Prepetition Loan Documents, including, in the case of each (i) and

(ii), for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the

Page | 59)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $100,000 (the "Investigation Cap"); *provided* that any fees or expenses of the Committee Professionals in excess of the Investigation Cap shall not be entitled to administrative expense priority under section 503(b) of the Bankruptcy Code or otherwise, (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, as applicable, and the liens, claims and rights granted to such parties under the DIP Orders; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this Interim Order, the Prepetition Loan Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted by the DIP Documents) that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection 507(b) Claims; or € to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, agreed to in writing by the DIP Agent (acting at the direction of the Requisite Lenders), expressly permitted under this

Page | 60)
Debtors:            CAREISMATIC BRANDS, LLC, *et al*.
Case No.            Case No. 24-10561 (VFP)
Caption of Order:    Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
(II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
and Superpriority Administrative Expense Claims, (IV) Granting Adequate
Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
Hearing, and (VII) Granting Related Relief

Interim Order or under the DIP Documents (including the Approved Budget, subject to permitted

variances), in each case unless all DIP Obligations, Prepetition Secured Obligations, Adequate

Protection Obligations, and claims granted to the DIP Secured Parties and the Prepetition Secured

Parties under this Interim Order, have been paid in full in cash and all DIP Commitments have

been terminated or otherwise agreed to in writing by the DIP Agent (acting at the direction of the

Requisite Lenders).

20.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions

of this Interim Order, including all findings herein, shall be binding upon all parties in interest in

these cases, including the DIP Secured Parties, the Prepetition Secured Parties, any statutory or

non-statutory committees appointed or formed in these cases, the Debtors and their respective

successors and assigns (including any chapter 7 or chapter 11 trustee appointed or elected for the

estate of any Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or

any other fiduciary appointed as a legal representative of any Debtor or with respect to the property

of any Debtor's estate) and shall inure to the benefit of the DIP Secured Parties, the Prepetition

Secured Parties, the Debtors, and their respective successors and assigns; *provided* that the DIP

Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of

the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter

7 trustee or chapter 11 trustee or similar responsible person.

21.     Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents

or any other documents related to the transactions contemplated hereby shall in any way be

Page | 61)
Debtors:            CAREISMATIC BRANDS, LLC, *et al*.
Case No.            Case No. 24-10561 (VFP)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                    Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                    Hearing, and (VII) Granting Related Relief

construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

22.    *Limitation of Liability*. In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as permitted in this Interim Order, the DIP Documents or Prepetition Loan Documents, as applicable, subject to entry of the Final Order, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the Debtors' operations; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal

Page | 62)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

Revenue Code).  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Representatives.

23.    *Master Proofs of Claim*.  Neither the Prepetition Agents nor any other Prepetition Secured Party shall be required to file proofs of claim in these cases or any Successor Cases in order to assert claims for payment of the Prepetition Secured Obligations.  The description of the claims and liens in respect of the Prepetition Secured Obligations set forth in this Interim Order shall be deemed to constitute proofs of claim in respect of such claims and their secured status. However, in order to facilitate the processing of claims, each Prepetition Agent and the Prepetition Equipment Financing Lender is authorized, but not directed or required, to file a master proof of claim in the Debtors' lead case *In re Careismatic Brands, LLC*, No. 24-10561 (VFP), on behalf of the applicable Prepetition Secured Parties (each, a "Master Proof of Claim"), which shall be deemed to have been filed against each Debtor.  Any Master Proof of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 23 and the filing of Master Proofs of Claim, if any, are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote

Page | 63)
Debtors:            CAREISMATIC BRANDS, LLC, *et al*.
Case No.            Case No. 24-10561 (VFP)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                    Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                    Hearing, and (VII) Granting Related Relief

separately on any plan filed in these cases. The Master Proofs of Claim shall not be required to include any instruments, agreements or other documents evidencing the obligations owing by each Debtor to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent and Prepetition Equipment Financing Lender. The DIP Secured Parties shall not be required to file proofs of claim with respect to the DIP Obligations.

24.    *Insurance*. To the extent that any Prepetition Agent or the Prepetition Equipment Financing Lender is listed as a loss payee under the insurance policies of any of the DIP Loan Parties, the DIP Agent (on behalf of itself and the DIP Lenders) shall also be deemed to be a loss payee under such insurance policies until the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and shall act in that capacity and distribute any proceeds recovered or received in respect of such insurance policies.

25.    *Milestones*. The Debtors shall comply with the following covenants and milestones in accordance with the dates indicated below, or any later date approved by the Requisite Lenders in their sole discretion (collectively, the "Milestones" and each a "Milestone"):

(a)    as soon as practicable, but in no event later than the date that is five (5) calendar days after the Petition Date, the Court shall have entered the Interim DIP Order;

(b)    as soon as practicable, but in no event later than the date that is thirty (30) calendar days after the Petition Date, the Court shall have entered the Final DIP Order;

Page | 64

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

(c)    as soon as practicable, but in no event later than the date that is forty-five (45) calendar days after the Petition Date, the Company Parties shall have filed a Plan and Disclosure Statement;

(d)    as soon as practicable, but in no event later than the date that is ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order; and

(e)    as soon as practicable, but in no event later than the date that is one hundred and twenty (120) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

26.    *Credit Bidding*.  Subject to the lien priorities set forth herein and in the Intercreditor Agreements and unless the Court for cause orders otherwise, (a) the DIP Agent shall have the right to credit bid, up to the full amount of the DIP Obligations in any sale of the DIP Collateral and (b) each Prepetition Agent and the Prepetition Equipment Financing Lender shall have the right, consistent with the provisions of the applicable Prepetition Loan Documents (and provided the DIP Obligations have been indefeasibly repaid in full in cash and the DIP Commitments have been terminated), to credit bid, up to the full amount of the applicable Prepetition Secured Obligations, in the sale of the applicable Prepetition Collateral, in each case, without the need for further Court order authorizing the same, whether any such sale is effectuated through section 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise.

Page | 65)
Debtors:              CAREISMATIC BRANDS, LLC, *et al*.
Case No.              Case No. 24-10561 (VFP)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Superpriority Administrative Expense Claims, (IV) Granting Adequate
                      Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final
                      Hearing, and (VII) Granting Related Relief

27.     *Effectiveness*.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d),

7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal

Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon

its entry and there shall be no stay of execution or effectiveness of this Interim Order.

28.     *Governing Order*.  Notwithstanding the relief granted in any other order issued by

this Court, (i) all payments and actions by any Debtor pursuant to the authority granted therein

shall be subject to this Interim Order, including compliance with the Approved Budget (subject to

permitted variances) and all other terms and conditions hereof, (ii) to the extent there is any

inconsistency between the terms of any such other order and this Interim Order, this Interim Order

shall control, in each case, except to the extent expressly provided otherwise in the other order,

and (iii) in the event of any inconsistency between the provisions of this Interim Order, the DIP

Documents or Prepetition Loan Documents, the provisions of this Interim Order shall govern.

29.     *Headings*.  Paragraph headings used herein are for convenience only and shall not

affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

30.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the

DIP Documents, in the event that any person or entity other than any the DIP Loan Party receives

any payment on account of a security interest in the DIP Collateral, receives any DIP Collateral or

any proceeds of the DIP Collateral or receives any other payment with respect thereto from any

other source prior to indefeasible payment in full in cash of all DIP Obligations and termination

of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold,

Page | 66)

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al.* |
| Case No. | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

any such DIP Collateral or any payment on account or proceeds thereof in trust for the benefit of

the DIP Agent and the DIP Secured Parties and shall immediately turn over such collateral or

proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance

with the DIP Documents and this Interim Order.

31.     The use of the terms "include", "includes", or "including" in this Interim Order is

not limiting regardless of whether it is expressly stated.

32.     *Attachment Lien.*   As a result of the release of the Attachment Lien upon the

commencement of these chapter 11 cases as described in paragraph G(xiii) above, the Disputed

Amount in the Attachment Account is no longer encumbered by the Attachment Lien.

33.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in

each case to the extent applicable, are satisfied by the contents of the DIP Motion.

34.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order

does not create any rights for the benefit of any third party, creditor, equity holder or any direct,

indirect or incidental beneficiary.

35.     *Necessary Action*.  The Debtors, the DIP Secured Parties, and the Prepetition

Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to

implement the terms of this Interim Order.

36.     *Retention of Jurisdiction*.  This Court shall retain jurisdiction to enforce the

provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation

Page | 67

| | |
|---|---|
| Debtors: | CAREISMATIC BRANDS, LLC, *et al*. |
| Case No.: | Case No. 24-10561 (VFP) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief |

and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

37.     *Final Hearing*.  The Final Hearing shall be held on _____, 2024 at __:__ p.m. (prevailing Eastern Time).

38.     *Objections*.  Any objections or responses to entry of a final order on the DIP Motion shall be filed on or prior to _____, 2024 at __:__ p.m. (prevailing Eastern Time).  Any party objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Debtors, (b) the DIP Agent, and counsel thereto, Paul Hastings, 200 Park Avenue, New York, New York 10166, Attn: Jayme Goldstein and Alex Cota; (c) counsel to the First Lien Ad Hoc Group, Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn: Evan R. Fleck and Nelly Almeida, (d) counsel to the Cross-Holdings Group, King & Spalding LLP, 1185 6th Avenue, New York, New York 10036, Attn: Peter Montoni and Matt Warren; (e) the Office of the United States Trustee for the District of New Jersey; (f) if appointed, counsel to the Creditors' Committee; (g) the Prepetition Agents, and counsel thereto, Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, New York 10017, Attn: Brian M. Resnick and Michael Pera; and (h) the Prepetition Equipment Financing Lender, and counsel thereto [●].

39.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties that were given notice of the Interim Hearing and to any party that has filed with this Court a request for notices in these cases.

## **Exhibit A**

**DIP Credit Agreement**

**Execution Version**

DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

dated as of January [___], 2024

among

NEW TROJAN PARENT, INC.
as Borrower

CBI INTERMEDIATE, INC.,
as Holdings

HOLDINGS, CBI MIDCO, INC., and CBI PARENT, L.P.,

as Guarantors,

CERTAIN SUBSIDIARIES OF BORROWER,
as Guarantors,

VARIOUS LENDERS,

and

JEFFERIES FINANCE LLC,
as DIP Administrative Agent and DIP Collateral Agent

_____

$125,000,000 SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FACILITY

## TABLE OF CONTENTS

                                                                                              Page

SECTION 1. DEFINITIONS AND INTERPRETATION ................................................................. 1
    1.1      Definitions. ........................................................................................................ 1
    1.2      Accounting Terms.......................................................................................... 30
    1.3      Interpretation, Etc. ....................................................................................... 30
    1.4      [Reserved]...................................................................................................... 31
    1.5      Divisions ......................................................................................................... 31
    1.6      Benchmark Notification ............................................................................... 31

SECTION 2. LOANS ............................................................................................................... 32
    2.1      Loans................................................................................................................ 32
    2.2      Pro Rata Shares; Availability of Funds..................................................... 32
    2.3      Use of Proceeds ............................................................................................. 33
    2.4      Evidence of Debt; Register; Lenders' Books and Records; Notes. .................. 34
    2.5      Interest on Loans........................................................................................... 35
    2.6      Conversion/Continuation. ........................................................................... 36
    2.7      Default Interest ............................................................................................. 36
    2.8      [Reserved]....................................................................................................... 36
    2.9      Voluntary Prepayments................................................................................ 37
    2.10    Mandatory Prepayments. ............................................................................ 37
    2.11    [Reserved]....................................................................................................... 38
    2.12    Waivable Mandatory Prepayments. .......................................................... 38
    2.13    General Provisions Regarding Payments.................................................. 38
    2.14    Ratable Sharing ............................................................................................. 39
    2.15    Alternate Rate of Interest. ........................................................................... 40
    2.16    Increased Costs; Capital Adequacy. .......................................................... 42
    2.17    Taxes; Withholding, Etc. .............................................................................. 43
    2.18    Obligation to Mitigate ................................................................................. 47
    2.19    Fees .................................................................................................................. 47
    2.20    Removal or Replacement of a Lender ....................................................... 47

SECTION 3. CONDITIONS PRECEDENT ................................................................................. 48
    3.1      Closing Date ................................................................................................... 48
    3.2      Final Loan Date ............................................................................................. 52

SECTION 4. REPRESENTATIONS AND WARRANTIES ............................................................ 52
    4.1      Organization; Requisite Power and Authority; Qualification.................... 52
    4.2      Equity Interests and Ownership ................................................................. 52
    4.3      Due Authorization ........................................................................................ 53
    4.4      No Conflict ..................................................................................................... 53
    4.5      Governmental Consents ............................................................................... 53
    4.6      Binding Obligation ....................................................................................... 53
    4.7      Historical Financial Statements ................................................................. 53
    4.8      [Reserved]....................................................................................................... 54
    4.9      [Reserved]....................................................................................................... 54
    .        54
    4.10    Adverse Proceedings, Etc. ........................................................................... 54
    4.11    Payment of Taxes.......................................................................................... 54

i

4.12    Properties. ...................................................................................................... 54
4.13    Environmental Matters ...................................................................................... 55
4.14    Careismatic Receivables .................................................................................... 55
4.15    Material Contracts .............................................................................................. 55
4.16    Governmental Regulation .................................................................................. 55
4.17    Federal Reserve Regulations; Exchange Act. .................................................. 55
4.18    Employee Matters .............................................................................................. 56
4.19    Employee Benefit Plans ..................................................................................... 56
4.20    [Reserved]. ......................................................................................................... 57
4.21    Compliance with Laws. ..................................................................................... 57
4.22    Disclosure ........................................................................................................... 58
4.23    Use of Proceeds .................................................................................................. 58
4.24    [Reserved] ........................................................................................................... 58
4.25    Classification as Priority Lien Obligations; etc ............................................. 58
4.26    Certain Indebtedness ......................................................................................... 58
4.27    Insurance ............................................................................................................. 58
4.28    Intellectual Property; Licenses, Etc. ................................................................ 58
4.29    The Holding Companies ..................................................................................... 59
4.30    [Reserved]. ......................................................................................................... 59
4.31    Secured, Super-Priority Obligations ............................................................... 59
4.32    DIP Order ............................................................................................................ 60
4.33    Budget ................................................................................................................. 60

SECTION 5. AFFIRMATIVE COVENANTS ............................................................... 60
5.1    Financial Statements and Other Reports ......................................................... 60
5.2    Existence .............................................................................................................. 64
5.3    Obligations and Taxes ........................................................................................ 64
5.4    Maintenance of Properties ................................................................................. 64
5.5    Insurance .............................................................................................................. 64
5.6    Books and Records; Inspections ........................................................................ 65
5.7    Lenders Calls ....................................................................................................... 65
5.8    Compliance with Laws and Contractual Obligations ...................................... 65
5.9    Environmental ..................................................................................................... 65
5.10    Covenant to Guarantee Obligations and Provide Security ........................... 67
5.11    Additional Material Real Estate Assets. .......................................................... 67
5.12    Further Assurances ............................................................................................ 68
5.13    [Reserved]. .......................................................................................................... 68
5.14    Post-Closing Obligations ................................................................................... 69
5.15    [Reserved]. .......................................................................................................... 69
5.16    Chapter 11 Cases ............................................................................................... 69

SECTION 6. NEGATIVE COVENANTS ....................................................................... 69
6.1    Indebtedness ........................................................................................................ 69
6.2    Liens ..................................................................................................................... 70
6.3    Restricted Payments ........................................................................................... 71
6.4    Investments .......................................................................................................... 72
6.5    Financial Covenants. ........................................................................................... 72
6.6    Fundamental Changes; Disposition of Assets; Acquisitions .......................... 73
6.7    Disposal of Subsidiary Interests. ...................................................................... 73
6.8    Sales and Lease-Backs ........................................................................................ 73

6.9    Transactions with Shareholders and Affiliates ................................................. 73
6.10   Conduct of Business ........................................................................................... 74
6.11   Permitted Activities of the Holding Companies ................................................ 74
6.12   Amendments or Waivers of Organizational Documents .................................... 74
6.13   Amendments or Waivers of with respect to Certain Indebtedness ..................... 74
6.14   Accounting Method ............................................................................................ 74
6.15   Chapter 11 Claims; Adequate Protection ........................................................... 75
6.16   Chapter 11 Orders .............................................................................................. 75
6.17   Chapter 11 Cases ................................................................................................ 75

SECTION 7. GUARANTY ............................................................................................ 75
7.1    Guaranty of the Obligations .............................................................................. 75
7.2    Contribution by Guarantors ............................................................................... 75
7.3    Payment by Guarantors...................................................................................... 76
7.4    Liability of Guarantors Absolute ....................................................................... 76
7.5    Waivers by Guarantors ...................................................................................... 78
7.6    Guarantors' Rights of Subrogation, Contribution, Etc. ..................................... 78
7.7    Subordination of Other Obligations ................................................................... 79
7.8    Continuing Guaranty ......................................................................................... 79
7.9    Authority of Guarantors or the Borrower ........................................................... 79
7.10   Financial Condition of the Borrower .................................................................. 79
7.11   Discharge of Guaranty Upon Sale of Guarantor................................................. 79

SECTION 8. EVENTS OF DEFAULT ........................................................................... 80
8.1    Events of Default ............................................................................................... 80
8.2    Application of Proceeds ..................................................................................... 84

SECTION 9. AGENTS ................................................................................................... 85
9.1    Appointment of Agents ...................................................................................... 85
9.2    Powers and Duties ............................................................................................. 85
9.3    General Immunity. .............................................................................................. 86
9.4    Agents Entitled to Act as Lender ....................................................................... 87
9.5    Lenders' Representations, Warranties and Acknowledgment. ........................... 87
9.6    Right to Indemnity ............................................................................................. 88
9.7    Successor DIP Administrative Agent and DIP Collateral Agent........................ 88
9.8    Collateral Documents and Guaranty. ................................................................. 89
9.9    DIP Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim .......... 91
9.10   Posting of Communications to Platform............................................................. 91
9.11   Credit Bidding.................................................................................................... 92

SECTION 10. MISCELLANEOUS ................................................................................ 93
10.1   Notices. .............................................................................................................. 93
10.2   Expenses ............................................................................................................ 94
10.3   Indemnity; Limitation of Liability...................................................................... 95
10.4   Set-Off ............................................................................................................... 96
10.5   Amendments and Waivers. ................................................................................ 96
10.6   Successors and Assigns; Participations. ............................................................. 98
10.7   Independence of Covenants ............................................................................. 100
10.8   Survival of Representations, Warranties and Agreements................................. 101
10.9   No Waiver; Remedies Cumulative ................................................................... 101
10.10  Marshalling; Payments Set Aside .................................................................... 101

10.11   Severability ......................................................................................... 101
10.12   Obligations Several; Independent Nature of Lenders' Rights ....................... 101
10.13   Headings ............................................................................................ 101
10.14   Governing Law .................................................................................... 102
10.15   CONSENT TO JURISDICTION ............................................................ 102
10.16   WAIVER OF JURY TRIAL .................................................................. 102
10.17   Confidentiality .................................................................................... 102
10.18   Effectiveness; Counterparts ................................................................. 103
10.19   [Reserved]. ......................................................................................... 103
10.20   PATRIOT Act ..................................................................................... 103
10.21   Electronic Execution of Assignments .................................................... 104
10.22   No Fiduciary Duty ............................................................................... 104

SECTION 11. SECURITY AND ADMINISTRATIVE PRIORITY ............................... 104
11.1   Prepetition Obligations. ......................................................................... 104
11.2   Acknowledgment of Security Interests ..................................................... 104
11.3   Binding Effect of Documents ................................................................. 105
11.4   Collateral; Grant of Lien and Security Interest. ........................................ 105
11.5   Administrative Priority .......................................................................... 106
11.6   Grants, Rights and Remedies .................................................................. 106
11.7   No Filings Required ............................................................................... 106
11.8   Survival ................................................................................................ 106
11.9   Release ................................................................................................. 107


**APPENDICES:**    A        Commitments
                   B        Notice Addresses


**SCHEDULES:** 3.1   Organizational and Capital Structure
               4.1     Jurisdictions of Organization and Qualification
               4.2     Equity Interests and Ownership
               4.12    Real Estate Assets
               4.15    Material Contracts
               4.28    Intellectual Property
               5.14    Post-Closing Obligations
               6.1     Certain Indebtedness
               6.2     Certain Liens
               6.4     Certain Investments


**EXHIBITS:**    A-1     Funding Notice
                A-2     Conversion/Continuation Notice
                B       Form of Note
                C       Compliance Certificate
                D       Assignment Agreement
                E-1     Form of U.S. Tax Compliance Certificate
                E-2     Form of U.S. Tax Compliance Certificate
                E-3     Form of U.S. Tax Compliance Certificate
                E-4     Form of U.S. Tax Compliance Certificate

| F | Closing Date Certificate |
|---|---|
| G | Counterpart Agreement |
| H | Security Agreement |
| I | [Reserved] |
| J | [Reserved] |
| K | Intercompany Note |
| L | Initial Budget |

DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT, dated as of January [__], 2024, is entered into by and among NEW TROJAN PARENT, INC., a Delaware corporation (the "Borrower"), CBI INTERMEDIATE, INC., a Delaware corporation ("Holdings"), CBI MIDCO, INC. ("CBI Midco"), CBI PARENT, L.P. ("CBI Parent"), HOLDINGS, CBI MIDCO, CBI PARENT, AND CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, the Lenders party hereto from time to time, and Jefferies Finance LLC ("Jefferies"), as Administrative Agent (together with its permitted successors in such capacity, the "DIP Administrative Agent") and Collateral Agent (together with its permitted successors in such capacity, the "DIP Collateral Agent").

RECITALS:

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on January [__], 2024, (the "Petition Date"), the Borrower and certain of its Subsidiaries and parent companies (together with the Borrower, the "Debtors") commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested and the Lenders have agreed to provide a secured super-priority debtor-in-possession term loan facility to the Borrower (the "DIP Facility"), in an aggregate principal amount not to exceed $125,000,000, the proceeds of which will be used to fund working capital and certain permitted administrative expenses of the Debtors during the pendency of the Chapter 11 Cases in accordance with the Budget and the terms of this Agreement;

WHEREAS, the Borrower has agreed to secure all of its Obligations by granting to the DIP Administrative Agent, for the benefit of the Secured Parties, a First Priority Lien on substantially all of its respective assets, in accordance with the priorities provided in the DIP Order; and

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to DIP Administrative Agent, for the benefit of the Secured Parties, a lien on substantially all of their respective assets, in accordance with the priorities provided in the DIP Order.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

SECTION 1.  DEFINITIONS AND INTERPRETATION

1.1     Definitions.

The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"Acceptable Alternative Exit Facility" means an exit credit facility that refinances the Obligations in their entirety, which exit credit facility is on terms and conditions acceptable to the Required Consenting First Lien Lenders (as defined in the RSA) in their sole discretion.

1

"<u>Adequate Protection Order</u>" means all orders entered by the Bankruptcy Court pertaining to adequate protection, in form and substance satisfactory to the Requisite Lenders.

"<u>Adverse Proceeding</u>" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"<u>Affiliate</u>" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 20% or more of the Securities having ordinary voting power for the election of directors of such Person, or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.  For purposes of this Agreement and the other Credit Documents, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.

"<u>Agent</u>" means each of (i) the DIP Administrative Agent and (ii) the DIP Collateral Agent.

"<u>Agent Fee Letter</u>" means that certain Agent Fee Letter, dated as of the date hereof, by and among the Borrower and the DIP Administrative Agent.

"<u>Aggregate Amounts Due</u>" as defined in Section 2.14.

"<u>Aggregate Payments</u>" as defined in Section 7.2.

"<u>Agreement</u>" means this Debtor-In-Possession Credit and Guaranty Agreement, dated as of January [__], 2024.

"<u>Allowed Professional Fees</u>" as defined in the definition of "Carve-Out".

"<u>Anti-Corruption Laws</u>" means all applicable Laws relating to the prevention of corruption and bribery, including the FCPA, the U.K. Bribery Act of 2010, and all national and international Laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"<u>Anti-Money Laundering Laws</u>" means Laws relating to terrorism or money laundering, including Executive Order No. 13224, the PATRIOT Act and the Laws comprising or implementing the Bank Secrecy Act.

"<u>Applicable Margin</u>" means (a) with respect to any Loans comprising Term Benchmark Loans, 6.00% *per annum*, and (b) with respect to any Loans comprising Base Rate Loans, 5.00% *per annum*.

"<u>Asset Sale</u>" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (other than Holdings, the Borrower or any Guarantor Subsidiary), in one transaction or a series of related transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether

2

tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Equity Interests of any of Holdings' Subsidiaries, other than (i) inventory sold, leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued), (ii) obsolete, damaged, worn out, used, immaterial, unneeded or surplus property (including for purposes of recycling) which is determined in good faith to no longer be useful in the business of the Credit Parties, (iii) Ordinary Course Receivables sold in connection with the Receivables Financing Transaction and (iv) sales, leases or licenses out of other assets in the ordinary course of business for aggregate consideration of less than $250,000 with respect to any transaction or series of related transactions and less than $1,000,000 in the aggregate during the term of this Agreement.

"Assignment Agreement" means an assignment agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by the DIP Administrative Agent.

"Assignment Effective Date" as defined in Section 10.6(b).

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), chief financial officer or treasurer of such Person or, with respect to any Person that is not a corporation and that does not have officers, any individual holding any such position of the general partner, the sole member, managing member or similar governing body of such Person; provided that the secretary or assistant secretary of such Person shall have delivered an incumbency certificate to the DIP Administrative Agent as to the authority of such Authorized Officer.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.15(e).

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning assigned to such term in the preamble hereto; provided that "Bankruptcy Court" shall also mean any other court having competent jurisdiction over the Chapter 11 Cases.

"Base Rate" means, for any day, a rate per annum equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (iii) the sum of (a) Term SOFR (including any applicable interest rate floor) for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a Business Day, the immediately preceding Business Day) plus (b) 1.00% per annum. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively. If the Base Rate is being used as an alternate rate of interest pursuant to Section 2.15 (for the avoidance of doubt, only until any amendment has become effective pursuant to Section 2.15(c)), then the Base Rate shall be the greater of clauses (i) and (ii) above and shall be determined without reference to clause (iii) above.

3

"Base Rate Loan" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"Benchmark" means with respect to any Term Benchmark Loan, the Term SOFR; provided that if a Benchmark Transition Event, and the related Benchmark Replacement Date have occurred with respect to the Term SOFR, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.15.

"Benchmark Replacement" means, for any Available Tenor, the sum of: (a) the alternate benchmark rate that has been selected by the DIP Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment.  If the Benchmark Replacement as determined pursuant to the foregoing would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement and the other Credit Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the DIP Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day", the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the DIP Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the DIP Administrative Agent in a manner substantially consistent with market practice (or, if the DIP Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the DIP Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the DIP Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

4

(1)      in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2)      in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as a specified future date will no longer be, representative.

5

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.15 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.15.

"Beneficiary" means each Agent and each Lender, and "Beneficiaries" means, collectively, the Agent and the Lenders.

"Board of Governors" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"Borrower" as defined in the preamble hereto.

"Borrowing Date" means the date on which a Loan is made.

"Budget" means the Initial Budget, as modified pursuant to the definition thereof, and as the same may be further amended, supplemented, restated or otherwise modified from time to time with the written consent of the Requisite Lenders in their sole discretion, including any such amendment, supplement, restatement or other modification that extends the Budget to cover additional time periods beyond the initial 13 week period covered by the Initial Budget; provided that the Budget shall not be amended to delete or modify the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the DIP Order; provided further that the Budget shall be deemed to be amended or modified with the consent of the Requisite Lenders and such amendments or modifications shall be deemed to be permitted hereunder if neither the Requisite Lenders nor their advisors have objected to any amendments or modifications requested by the Borrower within five (5) Business Days of receipt of such request; provided further that the Budget shall permit the Permitted Vendor Relief Payments.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or Chicago or is a day on which banking institutions located in such states are authorized or required by law or other governmental action to close.

"Capital Lease" means all leases that have been or are required to be, in accordance with GAAP, recorded as a financing or capital leases (and, for the avoidance of doubt, not a straight-line or operating lease) on both the balance sheet and income statement for financial reporting purposes in accordance with GAAP as in effect on January 1, 2015; provided that for all purposes hereunder the amount of obligations under any Capital Lease shall be the amount thereof accounted for as a liability on a balance sheet in accordance with GAAP as in effect on January 1, 2015.

"Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order,

6

procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Administrative Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $5,000,000 incurred after the first business day following delivery by the DIP Administrative Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

"Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

"Cash Management Order" means all orders entered by the Bankruptcy Court pertaining to cash management.

"Cash" means money, currency or a credit balance in any demand or Deposit Account.

"Cash Equivalents" means, as at any date of determination, any of the following:  (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after such date; (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than three (3) months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within three (3) months after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $5,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"Casualty Event" as defined in the definition of "Net Insurance/Condemnation Proceeds."

"CBI Midco" as defined in the preamble hereto.

"CBI Parent" as defined in the preamble hereto.

"CFC" means (a) a "controlled foreign corporation" within the meaning of Section 957 of the Code and (b) any subsidiary of a Person or Persons described in clause (a) of this definition.

"Change of Control" means, (i) any combination of the Permitted Holders shall fail to beneficially (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date) own and control at least 50.1% on a fully diluted basis of the economic and voting interests in the Equity Interests of Holdings; (ii) the Sponsor shall cease to have the sole power (whether or not exercised and whether arising by ownership of Equity Interests, by contract or otherwise) to elect a majority of the members of the board of directors (or similar governing body) of Holdings; (iii) Holdings shall cease to directly beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Equity Interests of Borrower; (iv) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Holdings cease to be occupied by Persons who either (a) were members of the board of directors of Holdings on the Petition Date or (b) were nominated for election by the board of directors of Holdings, a majority of whom were directors on the Petition Date or whose election or nomination for election was previously approved by a majority of such directors; (v) any "change of control" or similar event under the Prepetition Credit Documents shall occur or (vi) except for Permitted Liens, Holdings shall create, incur, assume or suffer to exist any Lien upon any of the Equity Interests of the Borrower.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Chapter 11 Orders" means, collectively, the Cash Management Order, the Confirmation Order, the DIP Order and the Adequate Protection Order.

"Claim" has the meaning assigned to such term in Section 101(5) of the Bankruptcy Code.

"Closing Date" means the date on which all of the conditions precedent in Section 3.1 are satisfied (or waived in accordance with Section 10.5), the Loans are made and the Related Transactions are consummated.

"Closing Date Certificate" means a Closing Date Certificate substantially in the form of Exhibit F.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (i) all of the assets, property, rights and interests of the Credit Parties that are or are intended to be subject to the Liens created by or pursuant to the Security Documents and (ii) the "DIP Collateral" referred to in the DIP Order.

"Collateral Account" means a springing controlled segregated deposit account in respect of which the DIP Collateral Agent maintains a Control Agreement.

"Collateral Documents" means the Security Agreement, the Mortgages, the Intellectual Property Security Agreements, the Control Agreement, intercreditor agreements, agreement among lenders, and all other instruments, documents and agreements delivered by or on behalf of any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the DIP Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

8

"Commitment" means, as to each Lender, its obligation to make Loans to the Borrowers pursuant to Section 2.1(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Appendix A or in the Assignment Agreement pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the Commitments as of the Closing Date is $125,000,000.

"Committee Professionals" as defined in the definition of "Carve-Out".

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Communications" as defined in Section 5.1(o)(i).

"Compliance Certificate" means a Compliance Certificate substantially in the form of Exhibit C.

"Confirmation Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Requisite Lenders (and with respect to any provisions that affect the rights and duties of the DIP Administrative Agent, the DIP Administrative Agent), confirming a plan of reorganization.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contractual Obligation" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Contributing Guarantors" as defined in Section 7.2.

"Control Agreement" means an agreement, in form and substance satisfactory to the DIP Administrative Agent, which provides for the DIP Collateral Agent to have springing "control" (as defined in Section 9-104 of the UCC of the State of New York or Section 8-106 of the UCC of the State of New York, as applicable) of Deposit Accounts.

"Conversion/Continuation Date" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"Conversion/Continuation Notice" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"Copyrights" as defined in the Security Agreement.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Counterpart Agreement" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.10.

9

"<u>Creditors' Committee</u>" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code.

"<u>Credit Document</u>" means any of this Agreement, the Notes, if any, the Agent Fee Letter, the Fee Letter, the Collateral Documents, and all other documents, certificates, instruments or agreements executed and delivered by or on behalf of a Credit Party for the benefit of the DIP Administrative Agent or any Lender in connection with this Agreement on or after the date hereof.

"<u>Credit Party</u>" means the Borrower and each Guarantor and "<u>Credit Parties</u>" means, collectively, the Borrower and all Guarantors.

"<u>Daily Simple SOFR</u>" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the DIP Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the DIP Administrative Agent decides that any such convention is not administratively feasible for the DIP Administrative Agent, then the DIP Administrative Agent may establish another convention in its reasonable discretion.

"<u>Debtors</u>" shall have the meaning assigned to the term in the recitals hereto.

"<u>Debtor Professionals</u>" as defined in the definition of "Carve-Out".

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"<u>Default</u>" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"<u>Deposit Account</u>" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>DIP Administrative Agent</u>" as defined in the preamble hereto.

"<u>DIP Collateral Agent</u>" as defined in the preamble hereto.

"<u>DIP Facility</u>" shall have the meaning assigned to the term in the recitals hereto.

"<u>DIP Liens</u>" as defined in Section 4.31(b).

"<u>DIP Order</u>" means, collectively, the Interim Order and the Final Order.

"<u>DIP Premiums Conversion Option</u>" means the option of each Lender to convert all or any portion of the principal amount of the Loans attributable to each of the Exit Premium, the Closing Payment (as defined in the Fee Letter) and the Backstop Premium (as defined in the Fee Letter) into New Common Stock issued pursuant to the Plan (each as defined in the RSA) at a 40.0% discount to the Plan Enterprise Value (as defined in the Plan (as defined in the RSA)).

"<u>Disqualified Lender</u>" means any natural persons, trusts, and any investment vehicles and trusts of any natural persons.

"<u>Disposition</u>" or "<u>Dispose</u>" means the conveyance, assignment, sale, lease or sublease (as lessor or sublessor), license, exchange, transfer or other disposition (including any sale and leaseback transaction and any sale of Equity Interests held in another Person) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, and, shall include any issuance by a Person of any of its Equity Interests to another Person.

"<u>Disqualified Equity Interests</u>" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in Cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"<u>Dollars</u>" and the sign "<u>$</u>" mean the lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary organized under the laws of the United States, any State thereof or the District of Columbia.

"<u>Eligible Assignee</u>" means any Person (other than a natural person) that is (i) a Lender, (ii) an Affiliate of any Lender, (iii) a Related Fund, and (iv) any other Person approved by the DIP Administrative Agent (such approval not to be unreasonably withheld or delayed); <u>provided</u> that no Credit Party, Affiliate of a Credit Party or Disqualified Lender shall be an Eligible Assignee.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates.

"<u>Environmental Claim</u>" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to human health or safety (relating to use of or exposure to Hazardous Materials), natural resources or the environment.

"<u>Environmental Laws</u>" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other legally binding requirements of Governmental Authorities relating to (i) protection of the environment, including relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health (relating to use of or exposure to Hazardous Materials) or the protection of human, plant or animal health or safety (relating to use of or exposure to Hazardous Materials), in any manner applicable to Holdings or any of its Subsidiaries or any Facility.

11

"Equity Interests" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which that Person is a member; and (iii) for purposes relating to Section 412 of the Code only, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Person is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to liabilities arising after (but solely relating to and incurred during) such period for which Holdings or such Subsidiary could be liable under the Code or ERISA.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for thirty (30) day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or Section 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or Section 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is insolvent within the meaning of Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or Section 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Holdings or any of its Subsidiaries of fines, penalties, taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Holdings or any of its Subsidiaries in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption

12

from taxation under Section 501(a) of the Code; (xi) the imposition of a Lien pursuant to Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code; (xii) the occurrence of a prohibited transaction within the meaning of Section 406 of ERISA with respect to any Employee Benefit Plan; or (xiii) the occurrence of any Foreign Plan Event.

"Event of Default" means each of the conditions or events set forth in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Subsidiary" means (i) any Foreign Subsidiary of Borrower that is a CFC, (ii) each Foreign Subsidiary Holding Company, (iii) each Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC or a Foreign Subsidiary Holding Company and (iv) for the period from the Petition Date to the date that is 90 days after the Petition Date, Careismatic Receivables LLC. Notwithstanding the foregoing, (a) any Subsidiary that provides a guaranty or otherwise is an obligor in respect of the Prepetition Credit Documents shall not in any event be an Excluded Subsidiary (and if such Subsidiary is an Excluded Subsidiary at the time of providing such guaranty or otherwise becoming an obligor on the Prepetition Credit Documents, shall cease to be deemed an Excluded Subsidiary) and (b) no Subsidiary that is a Guarantor on the Closing Date shall be deemed an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding (including backup withholding) Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment (or otherwise in any Credit Document) pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.20) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Loans of such Lender; provided that at any time prior to the making of the Loans, the Exposure of any Lender shall be equal to such Lender's Commitment.

"Extraordinary Receipts" means any Cash received by Holdings or any of its Subsidiaries not in the ordinary course of business and consisting of (i) judgments, proceeds of settlements, or other consideration of any kind in connection with any cause of action, (ii) indemnity payments (except to the extent used to pay related liabilities owing to third parties unaffiliated with the Credit Parties), (iii) proceeds of tax refunds and (iv) any purchase price adjustment received in connection with any purchase agreement (other than a working capital or net asset adjustment). Extraordinary Receipts shall exclude any payments received in connection with the collection of any contested or disputed accounts receivables received in the ordinary course of business, and any payments received in connection with the Receivables Financing Transaction.

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"Fair Market Value" means, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or, pursuant to a specific delegation of authority by such board of directors or a designated senior executive officer, of Holdings, or the Subsidiary of Holdings which is selling or owns such asset.

"Fair Share" as defined in Section 7.2.

"Fair Share Contribution Amount" as defined in Section 7.2.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the U.S. Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§78dd-1 et seq.).

"Federal Funds Effective Rate" means for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the immediately preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to the DIP Administrative Agent on such day on such transactions as determined by the DIP Administrative Agent.

"Fee Letter" means that certain Fee Letter, dated as of the date hereof, by and among the Borrower and the DIP Administrative Agent, for the benefit of the Lenders.

"Final Facility Effective Date" has the meaning specified therefor in Section 3.2.

"Final Loan" means a Loan made on the Final Loan Date.

"Final Loan Date" means the date on which the Final Loans are made, which date shall be not later than [__] Business Days after the Final Order Entry Date.

"Final Order" means the final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving the Agreement and the other Credit Documents with respect to the Credit Parties (including, without limitation, the DIP Premiums Conversion Option), in form and substance satisfactory to the Requisite Lenders in their sole discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Requisite Lenders.

14

"Final Order Entry Date" means the date on which the Final Order shall have been entered on the docket of the Bankruptcy Court.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Maturity Date.

"Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief executive officer, chief financial officer or controller of Holdings that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is senior in priority to any other Lien to which such Collateral is subject.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"Flood Certificate" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"Flood Hazard Property" means any Real Estate Asset subject to a mortgage in favor of the DIP Collateral Agent, for the benefit of Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"Flood Program" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004.

"Flood Zone" means areas having special flood hazards as described in the National Flood Insurance Act of 1968.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Credit Party or any of their respective Subsidiaries with respect to employees employed outside the United States and that is not subject to United States Laws.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of material unfunded liabilities in excess of the amount permitted under any applicable law, (b) the failure of Holdings or its Subsidiaries to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Credit Party or any their respective Subsidiaries under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any

15

participating employer therein, or (e) the occurrence of any transaction that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any material liability by any Credit Party or any of their respective Subsidiaries, or the imposition on any Credit Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Foreign Subsidiary Holding Company" means (a) Equity Interests (and, if applicable, Indebtedness) of one or more Foreign Subsidiaries that are CFCs or other Foreign Subsidiary Holding Companies or (b) that is treated as a disregarded entity for U.S. federal income tax purposes, and all assets of which are located outside of the United States and which may include Equity Interests (or, if applicable, Indebtedness) of one or more Foreign Subsidiaries or other Foreign Subsidiary Holding Companies.

"Funding Guarantors" as defined in Section 7.2.

"Funding Notice" means a notice substantially in the form of Exhibit A-1.

"GAAP" means, subject to the provisions of Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"Government Official" includes any employee, agent, or instrumentality of any government, including departments or agencies of a government and businesses that are wholly or partially government-owned, and any employees of such businesses, as well as departments or agencies of public international organizations.  This term includes, but is not limited to, all employees, agents, and instrumentalities of state-owned or state-controlled entities or businesses, including hospitals, laboratories, universities, and other research institutions.  The term "Government Official" also applies to individuals who are members of political parties or hold positions in political parties.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government, any court, any securities exchange or any self-regulatory organization, in each case whether associated with a state of the United States, the United States, or a foreign entity or government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Grantor" as defined in the Security Agreement.

"Guaranteed Obligations" as defined in Section 7.1.

"Guarantor" means each of Holdings, CBI Midco, CBI Parent and each Subsidiary of Holdings (other than the Borrower or any Excluded Subsidiary).

"Guarantor Subsidiary" means each Guarantor other than Holdings.

"Guaranty" means the guaranty of each Guarantor set forth in Section 7.

16

"<u>Hazardous Materials</u>" means any contaminant, pollutant, chemical, waste, material or substance the Release of or exposure to which is prohibited, limited or regulated by any Governmental Authority or for which liability may be imposed under Environmental Law.

"<u>Hazardous Materials Activity</u>" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"<u>Hedging Agreement</u>" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

"<u>Historical Financial Statements</u>" means as of the Closing Date, (i) the audited financial statements of Holdings and its Subsidiaries, for the immediately preceding three (3) Fiscal Years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial statements of Holdings and its Subsidiaries as of the most recent Fiscal Quarter ended after the date of the most recent audited financial statements and at least ninety (90) days prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six - or nine-month period, as applicable, ending on such date, and, in the case of clauses (i) and (ii), certified by the chief financial officer of Borrower that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"<u>Holding Companies</u>" means, collectively, Holdings and any other direct or indirect holding company of Borrower (which, for the avoidance of doubt, shall not include Sponsor).

"<u>Holdings</u>" as defined in the preamble hereto.

"<u>Increased-Cost Lenders</u>" as defined in Section 2.20.

"<u>Indebtedness</u>" means, as applied to any Person, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services, including any earn-out obligations, purchase price adjustments and profit-sharing arrangements arising from purchase and

sale agreements (excluding trade payables and intercompany payables incurred in the ordinary course of business that are not overdue by more than 90 days); (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) Disqualified Equity Interests; (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including under any Hedging Agreement, in each case, whether entered into for hedging or speculative purposes or otherwise; (xii) all obligations of such Person in respect of the sale or factoring of receivables; and (xiii) any liability or agreement of such Person to purchase, repurchase or otherwise acquire any Indebtedness or Equity Interest from any other Person, including any "repo" or other similar arrangement. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor. The "amount" or "principal amount" of any guaranty or other contingent liability referred to in clause (viii), (ix) or (x) above shall be an amount equal to the stated or determinable amount of the primary obligation in respect of which such guaranty or other contingent obligation is made or, (x) if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith or (y) if the amount of the guaranty or other contingent liability is less than the determinable amount of the primary obligation  (e.g., because of limited recourse to the guarantor), the maximum amount of potential liability on account of such guaranty or other contingent obligation.

"<u>Indemnified Liabilities</u>" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including  intraparty claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees, disbursements and other charges of counsel) in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity, whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the syndication of the credit facilities provided for herein or the use or intended use of the proceeds thereof, any amendments, waivers or consents with respect

18

to any provision of this Agreement or any of the other Credit Documents, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the commitment letter (and any related fee letter or closing payment letter) delivered by any Agent or any Lender to Borrower or Sponsor with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim, any Hazardous Materials Activity in violation of, or resulting in liability under, Environmental Law relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"Indemnified Taxes" means (a) any Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" as defined in Section 10.3(a).

"Initial Budget" shall mean the 13-week cash flow forecast for the 13-week period beginning on the Closing Date substantially in the form of Exhibit L.

"Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Loans of such Lender; provided that at any time prior to the making of the Loans, the Loan Exposure of any Lender shall be equal to such Lender's Commitment.

"Intellectual Property" as defined in the Security Agreement.

"Intellectual Property Asset" means, at the time of determination, any interest (fee, license or otherwise) then owned by any Credit Party in any Intellectual Property.

"Intellectual Property Security Agreements" has the meaning assigned to that term in the Security Agreement.

"Intercompany Note" means a promissory note substantially in the form of Exhibit K evidencing Indebtedness owed among Credit Parties and their Subsidiaries.

"Interest Payment Date" means with respect to (i) any Loan that is a Base Rate Loan, the last Business Day of each month, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan and (ii) any Loan that is a Term Benchmark Loan, the last day of each Interest Period applicable to such Loan.

"Interest Period" means, in connection with a Term Benchmark Loan, an interest period of one month (subject to the availability for the Benchmark applicable to the relevant Loan) (i) initially, commencing on the Borrowing Date or applicable Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided that, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) no tenor that has been removed from this definition pursuant to Section 2.15(e) shall be available for specification in such Conversion/Continuation Notice.

"<u>Interest Rate Determination Date</u>" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"<u>Interim Loan</u>" means a Loan made on the Closing Date.

"<u>Interim Order</u>" means the interim order of the Bankruptcy Court with respect to the Credit Parties, which, among other matters, authorizes the Credit Parties to execute and perform under this Agreement and authorizes the use of Cash Collateral, in form and substance satisfactory to the Requisite Lenders in their sole discretion (and with respect to any provisions that affect the rights and duties of the DIP Administrative Agent, the DIP Administrative Agent), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Requisite Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the DIP Administrative Agent, the DIP Administrative Agent).

"<u>Interim Order Entry Date</u>" means the date on which the Interim Order shall have been entered on the docket of the Bankruptcy Court.

"<u>Investment</u>" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than the Borrower or any Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person (other than Holdings, the Borrower or any Guarantor Subsidiary), of any Equity Interests of such Person; (iii) any direct or indirect loan, advance or capital contributions by Holdings or any of its Subsidiaries to any other Person (other than Holdings, the Borrower or any Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; (iv) all investments consisting of any exchange traded or over the counter derivative transaction, including any Hedging Agreement, whether entered into for hedging or speculative purposes or otherwise; and (v) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  The amount of any Investment of the type described in clauses (i), (ii), (iii) and (v) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"<u>Joint Venture</u>" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"<u>KKR Facility</u>" means that certain Credit and Security Agreement, dated as of March 9, 2023, by and among Careismatic Receivables, LLC, Careismatic Brands, LLC, the lenders party thereto, GLAS USA LLC, as administrative agent, GLAS Americas LLC, as collateral agent and KKR Credit Advisors (US) LLC, as structuring advisor.

"<u>Laws</u>" means, with respect to any Person, (i) the common law and any federal, state, local, foreign, multinational or international statutes, laws, treaties, judicial decisions, standards, rules and regulations, guidances, guidelines, ordinances, rules, judgments, writs, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions (including administrative or judicial precedents or authorities), in each case whether now or hereafter in effect, and (ii) the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Leasehold Property" means any leasehold interest of any Credit Party as lessee under any lease of real property.

"Lender" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"Lien" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"Liquidity" means, as of any date of determination, all Unrestricted Cash of the Credit Parties on such date.

"Loan" means a Loan made by a Lender to Borrower pursuant to Section 2.1(a).

"Margin Stock" as defined in Regulation U.

"Material Adverse Effect" means a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties or assets of Holdings and its Subsidiaries taken as a whole; (ii) the ability of any Credit Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party; (iv) the Collateral or the DIP Collateral Agent's Liens (on behalf of the Secured Parties) on the Collateral or the priority of such Liens; or (v) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"Material Contract" means any Contractual Obligation of any Credit Party or any Subsidiary of a Credit Party as to which the breach, nonperformance or termination (without contemporaneous replacement) thereof could reasonably be expected to have a Material Adverse Effect.

"Material Real Estate Asset" means any fee-owned Real Estate Asset having a Fair Market Value in excess of $250,000 as of the date of the acquisition thereof; provided that that the Fair Market Value of all fee-owned Real Estate Assets that are not Material Real Estate Assets shall not exceed $1,000,000 in the aggregate.

"Maturity Date" means with respect to the Loans, the earlier of (i) nine (9) months from the Interim Order Entry Date, (ii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1102(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (iii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Credit Parties to a Chapter 7 liquidation, (iv) the acceleration of the Loans or termination of the Commitments hereunder, including, without limitation, as a result of the occurrence of an Event of Default or (v) the date that is thirty (30) days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date.

"Milestone" as defined in Section 5.17.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means a mortgage in form and substance reasonably satisfactory to the DIP Administrative Agent.

21

"<u>Mortgaged Property</u>" as defined in Section 5.11(d).

"<u>Multiemployer Plan</u>" means any Employee Benefit Plan which is subject to Title IV of ERISA and is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"<u>Narrative Report</u>" means, with respect to the financial statements for which such narrative report is required, a customary management's discussion and analysis, describing the results of operations of Holdings and its Subsidiaries for the applicable period to which such financial statements relate.

"<u>Net Asset Sale Proceeds</u>" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Subsidiaries from such Asset Sale, <u>minus</u> (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale, <u>provided</u> that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds.

"<u>Net Insurance/Condemnation Proceeds</u>" means an amount equal to:  (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder, (b) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking (any event of the type referenced in clauses (a) and (b) above being referred to as a "<u>Casualty Event</u>") or (c) under any business interruption or similar insurance policy in respect of a covered loss thereunder, <u>minus</u> (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

"<u>Net Mark-to-Market Exposure</u>" of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Hedging Agreements or other Indebtedness of the type described in clause (xi) of the definition thereof.  As used in this definition, "unrealized losses" means the Fair Market Value of the cost to such Person of replacing such Hedging Agreement or such other Indebtedness as of the date of determination (assuming the Hedging Agreement or such other Indebtedness were to be terminated as of that date), and "unrealized profits" means the Fair Market Value of the gain to such Person of replacing such Hedging Agreement or such other Indebtedness as of the date of determination (assuming such Hedging Agreement or such other Indebtedness were to be terminated as of that date).

"<u>Non-Consenting Lender</u>" as defined in Section 2.20.

"<u>Non-Public Information</u>" means material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to the Borrower or its Affiliates or their Securities.

"<u>Note</u>" means a promissory note in the form of Exhibit B.

"Obligations" means all obligations (whether now existing or hereafter arising, absolute or contingent, joint, several or independent) of every nature of each Credit Party, including obligations from time to time owed to the Agents (including former Agents), the Lenders or any of them, under any Credit Document, whether for principal, premium, interest (including interest and premium which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest or premium in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

"Obligee Guarantor" as defined in Section 7.7.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Ordinary Course Receivables" means accounts receivable of Holdings and its Subsidiaries generated in the ordinary course of business of Holdings and its Subsidiaries

"Organizational Documents" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association and its by-laws, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (iii) with respect to any general partnership, its partnership agreement and (iv) with respect to any limited liability company, its articles or certificate of formation or organization and its operating agreement or limited liability company agreement.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.20).

"Paid in Full" or "Payment in Full" means:

(a)      payment in full in cash of the principal of, premium and interest (including premium and interest accruing on or after the commencement of any bankruptcy proceeding, whether or not such interest would be allowed in such bankruptcy proceeding) constituting the Obligations;

(b)      payment in full in cash of all other amounts that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time (such indemnification obligations, "Unmatured Surviving Obligations")) with respect to the Obligations; and

23

(c)        termination or expiration of all commitments of the holders of the Obligations, to extend credit or make loans or other credit accommodations to any of the Credit Parties.

"<u>Participant Register</u>" as defined in Section 10.6(g)(i).

"<u>Patents</u>" as defined in the Security Agreement.

"<u>PATRIOT Act</u>" as defined in Section 3.1(m).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation or any successor thereto.

"<u>Pension Plan</u>" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Code or Section 302 or Title IV of ERISA.

"<u>Perfection Certificate</u>" means a certificate in form satisfactory to the DIP Collateral Agent that provides information with respect to the personal or mixed property of each Credit Party.

"<u>Permitted Adequate Protection Payments</u>" means the adequate protection payments to the secured parties under the Prepetition Credit Documents pursuant to the terms of the Adequate Protection Order.

"<u>Permitted Deviation</u>" means, as of any Testing Date, (i) for the first three full calendar weeks following the Petition Date, a cumulative Operating Receipts Variance up to 20% or a cumulative Operating Disbursements Variance up to 20% on an aggregate basis contained in the Budget; (ii) for the first four full calendar weeks following the Petition Date, a cumulative Operating Receipts Variance up to 17.5% or a cumulative Operating Disbursements Variance up to 17.5% on an aggregate basis contained in the Budget; and (iii) for the trailing four-week period for each Testing Date thereafter, a cumulative Operating Receipts Variance up to 15% or a cumulative Operating Disbursements Variance up to 12.5% on an aggregate basis contained in the Budget (the three and four-week periods set forth in these clauses (i)–(iii) each, a "<u>Test Period</u>"). Each Test Period shall begin on the applicable Sunday and end on the Saturday immediately prior to the applicable Testing Date; <u>provided</u> that the first Test Period hereunder shall begin on the Petition Date, if the Petition Date does not fall on a Sunday.

"<u>Permitted Holders</u>" means (a) the Sponsor and (b) any Affiliate of the Sponsor (other than any portfolio company thereof); <u>provided</u> that no Person shall be a Permitted Holder under clause (b) of this definition unless Sponsor shall at all times (i) beneficially own and control more voting and/or economic interests in the Equity Interests in Holdings than all Persons under clause (b) of this definition collectively and (ii) beneficially own and control at least 40% on a fully diluted basis of the voting and economic interests in the Equity Interests in Holdings.

"<u>Permitted Liens</u>" means each of the Liens permitted pursuant to Section 6.2 (subject to the subordination and/or intercreditor provisions as contemplated thereby, to the extent applicable).

"<u>Permitted Vendor Relief Payments</u>" means an amount equal to $3,000,000 to satisfy critical vendor obligations and $25,000,000 to satisfy foreign vendor obligations.

"<u>Person</u>" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"Petition Date" has the meaning assigned to the term in the recitals hereto.

"Platform" as defined in Section 9.10.

"Post-Carve Out Trigger Notice Cap" as defined in the definition of "Carve-Out".

"Prepetition Agents" as defined in the definition of "Prepetition Credit Documents".

"Prepetition Facilities" as defined in the definition of "Prepetition Credit Documents".

"Prepetition Lenders" as defined in the definition of "Prepetition Credit Documents".

"Prepetition Credit Documents" means that that certain (i) First Lien Credit Agreement, dated as of January 6, 2021 (the "Prepetition First Lien Credit Agreement"), among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, UBS AG, Stamford Branch, as administrative agent and as collateral agent (the "Prepetition 1L Agent"), and the lenders and issuing banks party thereto from time to time (the "Prepetition 1L Lenders") and (ii) Second Lien Credit Agreement, dated as of January 6, 2021 (the "Prepetition Second Lien Credit Agreement"), among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, UBS AG, Stamford Branch, as administrative agent and as collateral agent (the "Prepetition 2L Agent", and together with the Prepetition 1L Agent, the "Prepetition Agents"), and the lenders party thereto from time to time (the "Prepetition 2L Lenders", and together with the Prepetition 1L Lenders, the "Prepetition Lenders") (in the case of each of clauses (i) and (ii), as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Facilities").

"Prepetition Obligations" means all indebtedness, obligations and liabilities of the Borrower and its Subsidiaries to the Prepetition Agent and the Prepetition Lenders incurred prior to the Petition Date arising from or related to the Prepetition Credit Documents and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition 1L Agent" as defined in the definition of "Prepetition Credit Documents".

"Prepetition 1L Lenders" as defined in the definition of "Prepetition Credit Documents".

"Prepetition 2L Agent" as defined in the definition of "Prepetition Credit Documents".

"Prepetition 2L Lenders" as defined in the definition of "Prepetition Credit Documents".

"Prime Rate" means the "U.S. Prime Lending Rate" as published in *The Wall Street Journal* as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the DIP Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the DIP Administrative Agent).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

25

"<u>Principal Office</u>" means, for the DIP Administrative Agent's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as the DIP Administrative Agent may from time to time designate to the Borrower and each Lender.

"<u>Pro Rata Share</u>" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by dividing (a) the Loan Exposure of that Lender by (b) the aggregate Loan Exposure of all Lenders.  For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the Loan Exposure by (B) an amount equal to the sum of the aggregate Loan Exposure of all Lenders.

"<u>Professional Persons</u>" as defined in the definition of "Carve-Out".

"<u>Real Estate Asset</u>" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"<u>Receivables Financing Transaction</u>" means the transaction or series of related transactions entered into by Strategic Distribution, L.P. pursuant to that certain Receivables Purchase Agreement, dated as of February 16, 2016 (the "<u>Receivables Purchase Agreement</u>") by and among Strategic Distribution, L.P., and Wells Fargo Bank, National Association (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof).

"<u>Recipient</u>" means the DIP Administrative Agent or any Lender, as applicable.

"<u>Reference Time</u>" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the Term SOFR, 5:00 a.m. (Chicago time) on the day that is two Business Days preceding the date of such setting, or (2) if such Benchmark is not the Term SOFR, the time determined by the DIP Administrative Agent in its reasonable discretion.

"<u>Register</u>" as defined in Section 2.4(b).

"<u>Regulation T</u>" means Regulation T of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation X</u>" means Regulation X of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Related Fund</u>" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"<u>Related Transactions</u>" means, collectively, (a) the execution and delivery by the Credit Parties of the Credit Documents to which they are a party and the borrowings hereunder and the use of proceeds thereof, (b) the other transactions related to or entered into in connection with any of the foregoing and (c) the payment of fees, premiums, charges, costs and expenses in connection with the foregoing.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material

into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material).

"Relevant Governmental Body" means the CME Term SOFR Administrator, the Federal Reserve Board and/or the NYFRB, a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Replacement Lender" as defined in Section 2.20.

"Required Prepayment Date" as defined in Section 2.12(c).

"Requisite Lenders" means, at any time, one or more Lenders having or holding Exposure and representing more than 50% of the aggregate Exposure of all Lenders at such time.

"Restricted Payment" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings, the Borrower or any of their respective Subsidiaries (or any direct or indirect parent of the Borrower or Holdings) now or hereafter outstanding, except a dividend payable solely in shares of stock to the holders of that class (other than Disqualified Equity Interests); (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings or the Borrower or any of their respective Subsidiaries (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings, the Borrower or any of their respective Subsidiaries (or any direct or indirect parent of the Borrower or Holdings) now or hereafter outstanding; (iv) management or similar fees payable to Sponsor or any of its Affiliates; and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to any Subordinated Indebtedness.

"RSA" as defined in Section 2.14.

"S&P" means Standard & Poor's, a Division of S&P Global, Inc.

"Sanctioned Country" means any country or region that is the subject or target of a comprehensive embargo under Sanctions (as of the date hereof, Cuba, Iran, North Korea, Syria and the Crimea Region of Ukraine, the Donetsk and Luhansk Regions of Ukraine, and the non-government controlled areas of the Zaporizhzhia and Kherson Regions of Ukraine).

"Sanctioned Person" means any Person that is: (i) identified on a Sanctions List; (ii) domiciled, organized or resident in a Sanctioned Country; (iii) owned or controlled by, or acting for or on behalf of, directly or indirectly, any Person described in the foregoing clauses (i) or (ii); or (iv) otherwise the subject or target of Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by any Sanctions Authority.

"Sanctions Authority" means: (a) the U.S. government, including OFAC and the U.S. Department of State; (b) the United Nations Security Council; (c) the European Union and each of its member states; (d) the United Kingdom, including the Office of Financial Sanctions Implementation of Her Majesty's Treasury; and (e) any other relevant national or supra-national Governmental Authority with jurisdiction over the Credit Parties and their respective Subsidiaries.

"<u>Sanctions List</u>" means any Sanctions-related list of designated Persons maintained by any Sanctions Authority, including the Specially Designated Nationals and Blocked Persons List maintained by OFAC.

"<u>Secured Parties</u>" has the meaning assigned to that term in the Security Agreement.

"<u>Securities</u>" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"<u>Securities Act</u>" means the Securities Act of 1933.

"<u>Security Agreement</u>" means the Superpriority Debtor-in-Possession Pledge and Security Agreement to be executed by the Borrower and each Guarantor substantially in the form of Exhibit H.

"<u>SOFR</u>" means, with respect to any day, a rate per annum equal to the secured overnight financing rate for such day published by the SOFR Administrator on the SOFR Administrator's Website on the immediately succeeding Business Day.

"<u>SOFR Administrator</u>" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Administrator's Website</u>" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"<u>Sponsor</u>" means Partners Group (USA) Inc.

"<u>Subordinated Indebtedness</u>" means (i) any unsecured Indebtedness incurred by the Borrower or any Guarantor Subsidiary that is expressly subordinated in right of payment to the Obligations on terms reasonably acceptable to the DIP Administrative Agent and (ii) Indebtedness under the Prepetition Second Lien Credit Agreement.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; <u>provided</u> that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"<u>Tax</u>" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding, including backup withholding (together with interest, penalties and other additions thereto) of any nature imposed by any Governmental Authority.

"Term Benchmark Loan" means a Loan bearing interest at a rate determined by reference to the Benchmark.

"Term SOFR" means, with respect to any Term Benchmark Loan and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Determination Day" as defined in the definition of Term SOFR Reference Rate.

"Term SOFR Reference Rate"  means, for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Loan denominated in Dollars and for any tenor comparable to the applicable Interest Period, the rate per annum determined by the DIP Administrative Agent as the forward-looking term rate based on SOFR; provided that if the Term SOFR Reference Rate as so determined would be less than 1.00%, such rate shall be deemed to be 1.00% for the purposes of this Agreement.  If by 5:00 pm (New York City time) on the fifth U.S. Government Securities Business Day immediately following any Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR has not occurred, then the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding Business Day is not more than five Business Days prior to such Term SOFR Determination Day.

"Terminated Lender" as defined in Section 2.20.

"Title Policy" as defined in Section 5.11(d)(iii).

"Trademarks" as defined in the Security Agreement.

"Type of Loan" means, with respect to any Loan, a Base Rate Loan or a Term Benchmark Loan.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unmatured Surviving Obligation" as defined in the definition of "Paid in Full" or "Payment in Full".

"Unrestricted Cash" means the aggregate amount of Cash held in bank accounts of Borrower and the Guarantors to the extent that the use of such Cash for application to payment of the Obligations or other Indebtedness is not prohibited by law or any contract or other agreement (including, with respect to Cash held in a bank account of any Guarantor Subsidiary, that such Guarantor Subsidiary is not subject to any restriction on its ability to distribute such Cash to Borrower), and such Cash and Cash Equivalents are free and clear of all Liens (other than Liens in favor of DIP Collateral Agent and any statutory Liens in favor of banks (including rights of set-off)).

29

"U.S." or "United States" means the United States of America.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 2.17(e).

"Waivable Mandatory Prepayment" as defined in Section 2.12(c).

"Withholding Agent" means the Borrower and the DIP Administrative Agent.

1.2    Accounting Terms.  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Holdings to the Lenders pursuant to Section 5.1(a) and 5.1(b) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable).  If any change in GAAP results in a change in the calculation of the financial covenants or interpretation of related provisions of this Agreement or any other Credit Document, then if either Borrower or the Requisite Lenders shall request an amendment to such provisions of this Agreement, then the Borrower, the DIP Administrative Agent and the Requisite Lenders agree to negotiate an amendment to such provisions of this Agreement so as to equitably reflect such changes in GAAP with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such change in GAAP as if such change had not been made; provided that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by Holdings shall be given effect for purposes of measuring compliance with financial covenants, unless the Borrower and the Requisite Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP.  Until the Borrower and the Requisite Lenders have agreed to any amendment referred to in the prior sentence, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the financial statements prior to the applicable change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Financial Accounting Standards Board Accounting Standards Codification 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

1.3    Interpretation, Etc.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a

Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The terms lease and license shall include sub-lease and sub-license, as applicable.  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (e) the word "from" when used in connection with a period of time means "from and including" and the word "until" means "to but not including", (f) references to days, months, quarters and years refer to calendar days, months, quarters and years, respectively and (g) any reference to any law shall include all statutory and regulatory provisions consolidating, amendment, replacing or interpreting such law and any reference to any law or regulation shall refer to such law or regulation as amended, modified or supplemented from time to time.  Notwithstanding anything contained herein to the contrary, in the event of any conflict between the terms and conditions of the DIP Order and of this Agreement, the provisions of the DIP Order shall govern and control.

1.4    [Reserved].

1.5    Divisions.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interest at such time.

1.6    Benchmark Notification.  The interest rate on a Loan denominated in Dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.15(b) provides a mechanism for determining an alternative rate of interest.  The DIP Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The DIP Administrative Agent and its Affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.

31

## SECTION 2.  LOANS

2.1    <u>Loans</u>.

(a)    <u>Loans</u>.  Subject to the terms and conditions hereof, each Lender severally agrees to make Loans to the Borrower in an aggregate amount equal to such Lender's Commitment (the "<u>Loans</u>"). The Borrower may make only two borrowings under the Commitments that shall be, in the case of the Interim Loans, on the Closing Date and in an aggregate principal amount not to exceed $50,000,000 and, in the case of the Final Loans, on the Final Loan Date and in an aggregate principal amount not to exceed $75,000,000.  The Commitments in respect of the Interim Loans shall terminate automatically immediately after the making of the Interim Loans on the Closing Date and the Commitments in respect of the Final Loans shall terminate automatically immediately after the making of the Final Loans on the Final Loan Date.  All Loans and all other amounts owed hereunder with respect to the Loans shall be Paid in Full not later than the Maturity Date.  Proceeds of the Loans shall be deposited in the Collateral Account and used solely as permitted herein.  Any amounts borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.

(b)    <u>Borrowing Mechanics for Loans</u>.

(i)    The Borrower shall deliver to the DIP Administrative Agent a fully executed Funding Notice no later than three Business Days prior to the applicable Borrowing Date (or such shorter period as may be acceptable to the DIP Administrative Agent).  Promptly upon receipt by the DIP Administrative Agent of such Funding Notice, the DIP Administrative Agent shall notify each Lender of the proposed borrowing.

(ii)    Each Lender shall make its Loan available to the DIP Administrative Agent not later than 12:00 p.m. (New York City time) on the Borrowing Date, by wire transfer of same day funds in Dollars, at the principal office designated by the DIP Administrative Agent.  Upon satisfaction or waiver of the conditions precedent specified herein, the DIP Administrative Agent shall make the proceeds of the Loans available to the Borrower on the Borrowing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the DIP Administrative Agent from the Lenders to be credited to the account of the Borrower at the Principal Office designated by the DIP Administrative Agent or to such other account as may be designated to the DIP Administrative Agent by the Borrower.

2.2    <u>Pro Rata Shares; Availability of Funds</u>.

(a)    <u>Pro Rata Shares</u>.  All Loans shall be made, and all participations purchased, by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

(b)    <u>Availability of Funds</u>.  Unless the DIP Administrative Agent shall have been notified by any Lender prior to the Borrowing Date that such Lender does not intend to make available to the DIP Administrative Agent, the amount of such Lender's Loan requested on the Borrowing Date, the DIP Administrative Agent may assume that such Lender has made such amount available to the DIP Administrative Agent on the Borrowing Date and the DIP Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to the Borrower a corresponding amount on the Borrowing

32

Date.  If such corresponding amount is not in fact made available to the DIP Administrative Agent by such Lender, the DIP Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the Borrowing Date until the date such amount is paid to the DIP Administrative Agent at the customary rate set by the DIP Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate.  If such Lender does not pay such corresponding amount forthwith upon the demand of the DIP Administrative Agent, the DIP Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the DIP Administrative Agent, together with interest thereon, for each day from the Borrowing Date until the date such amount is paid to the DIP Administrative Agent at the rate payable hereunder for Base Rate Loans for the Loans.  Nothing in this Section 2.2(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.

2.3    Use of Proceeds.  The proceeds of the Loans shall be applied in accordance with the Budget, including the Permitted Vendor Relief Payments.  No part of the proceeds of any Loan will be used, whether directly or indirectly:

(a)    in any manner that causes or would reasonably be expected to cause such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Securities Exchange Act;

(b)    for any purpose that is prohibited under the Bankruptcy Code or the Interim Order and the Final Order;

(c)    to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Administrative Agent, the Lenders, the Prepetition 1L Agent or the Prepetition 1L Lenders or their respective rights and remedies under the Credit Documents, the Interim Order, the Final Order or the Prepetition Credit Documents or (ii) any other action which with the giving of notice or passing of time would result in an Event of Default under the Credit Documents;

(d)    to investigate, commence, prosecute or finance in any way any action, proceeding or objection with respect to or related to: (i) the claims, liens or security interest of the DIP Administrative Agent, the DIP Collateral Agent, the Lenders, or the Prepetition 1L Lenders or their respective rights and remedies under this Agreement, the other Credit Documents, the DIP Order or the Prepetition Credit Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the DIP Administrative Agent, the DIP Collateral Agent, the Lenders, the Prepetition 1L Agent or the Prepetition 1L Lenders seeking (x) to avoid, subordinate or recharacterize the Obligations or any of the DIP Administrative Agent's, the DIP Collateral Agent's, the Prepetition 1L Agent's or any Prepetition 1L Lender's Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the DIP Administrative Agent, the DIP Collateral Agent, the Lenders, the Prepetition 1L Agent or the Prepetition 1L Lenders or their Collateral or "Collateral" under (and as defined in) the Prepetition First Lien Credit Agreement) in connection with the Credit Documents or the Prepetition First Lien Credit Agreement or (z) to prevent or restrict the exercise by any or all of the DIP Administrative Agent, the DIP Collateral Agent, the Lenders, the Prepetition 1L Agent or the Prepetition 1L Lenders of any of their respective rights or remedies under the Credit Documents or the Prepetition Credit Documents, (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of a release under the Plan of Reorganization against the DIP Administrative Agent, the DIP Collateral Agent, the Lenders and the Prepetition 1L Lenders, (iii) certain stipulations to be made by the Credit Parties

33

and approved by the Interim Order; provided that, advisors to the Creditors' Committee, if one is appointed, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition Credit Documents at an aggregate expense for such investigation not to exceed $50,000, provided that no portion of such amount may be used to prosecute any such claims or (iv) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder;

(e)        for the payment of fees, expenses, interest or principal under the Prepetition Credit Documents (other than permitted adequate protection payments pursuant to the Interim DIP Order and the Final DIP Order);

(f)        unless the Exit Conversion (as defined in the RSA) takes place, to make any distribution under a plan of reorganization in the Chapter 11 Cases that does not result in the Payment in Full of the Obligations; and

(g)        to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Administrative Agent acting at the direction of the Requisite Lenders.

Nothing herein shall in any way prejudice or prevent the DIP Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the DIP Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

2.4        Evidence of Debt; Register; Lenders' Books and Records; Notes.

(a)        Lenders' Evidence of Debt.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; provided that (i) the failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any applicable Loans, and (ii) in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)        Register.  The DIP Administrative Agent (or its agent or sub-agent appointed by it), acting solely for U.S. federal income tax purposes as an agent of the Borrower, shall maintain at its Principal Office a register for the recordation of the names and addresses of the Lenders and Loans (including both principal and stated interest) of each Lender from time to time (the "Register").  The Register shall be available for inspection by the Borrower or any Lender (with respect to (i) any entry relating to such Lender's Loans and (ii) the identity of the other Lenders (but not any information with respect to such other Lenders' Loans)) at any reasonable time and from time to time upon reasonable prior notice.  The DIP Administrative Agent shall record, or shall cause to be recorded, in the Register the Loans in accordance with the provisions of Section 10.6, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; provided that failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's Obligations in respect of any Loan.  The Borrower hereby designates the DIP Administrative Agent to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.4, and the Borrower hereby agrees that, to the extent

34

the DIP Administrative Agent serves in such capacity, the DIP Administrative Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees."

(c)  Notes.  If so requested by any Lender to the Borrower (with a copy to the DIP Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, the Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after the Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loan.

2.5  Interest on Loans.

(a)  Except as otherwise set forth herein, the Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)  if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(ii)  if a Term Benchmark Loan, at Term SOFR plus the Applicable Margin; and

(b)  The basis for determining the rate of interest with respect to the Loans, and the Interest Period with respect to any Term Benchmark Loan, shall be selected by the Borrower and notified to each Agent and the Lenders pursuant to the Funding Notice or applicable Conversion/Continuation Notice, as the case may be.

(c)  In connection with Term Benchmark Loans there shall be no more than three (3) Interest Periods outstanding at any time.  In the event the Borrower fails to specify between a Base Rate Loan or a Term Benchmark Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Term Benchmark Loan) will be automatically converted into a Base Rate Loan on the last day of then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  In the event the Borrower fails to specify an Interest Period for any Term Benchmark Loan in the applicable Funding Notice or Conversion/Continuation Notice, the Borrower shall be deemed to have selected an Interest Period of one (1) month.  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, the DIP Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Term Benchmark Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof to the Borrower and each Lender holding Loans.

(d)  Interest payable pursuant to Section 2.5(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Term Benchmark Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan, the last Interest Payment Date with respect to such Loan or, with respect to a Base Rate Loan being converted from a Term Benchmark Loan, the date of conversion of such Term Benchmark Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Term Benchmark Loan, the date of conversion of such Base Rate Loan to such Term Benchmark Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)      Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided that with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

2.6      Conversion/Continuation.

(a)      Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, the Borrower shall have the option:

(i)      to convert at any time all or any part of any Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount from one Type of Loan to another Type of Loan; provided that a Term Benchmark Loan may only be converted on the expiration of the Interest Period applicable to such Term Benchmark Loan; or

(ii)      upon the expiration of any Interest Period applicable to any Term Benchmark Loan, to continue all or any portion of such Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount as a Term Benchmark Loan.

(b)      The Borrower shall deliver a Conversion/Continuation Notice to the Agents no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Term Benchmark Loan).  Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Term Benchmark Loans shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.   If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to the Agents in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

2.7      Default Interest .  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter, after as well as before judgment, bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable on demand at a rate that is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided that in the case of Term Benchmark Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Term Benchmark Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agents or any Lender.

2.8      [Reserved].

2.9     Voluntary Prepayments.

(a)     At any time and from time to time:

(i)     with respect to Base Rate Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount; and

(ii)     with respect to Term Benchmark Loans, the Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.

(b)     All such prepayments shall be made:

(i)     upon not less than one Business Day's prior notice in the case of Base Rate Loans; and

(ii)     upon not less than three Business Days' prior notice in the case of Term Benchmark Loans;

in each case given to the DIP Administrative Agent by 12:00 p.m. (New York City time) on the date required. Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment pursuant to this Section 2.9 shall be applied as specified in Section 2.12(a) and be subject to the Exit Premium set forth in Section 2.19. Notwithstanding anything herein to the contrary, in the event that (x) the Obligations are being refinanced in full or (y) a Recapitalization (as defined in the RSA) is consummated, each of the Lenders shall be given a reasonable opportunity to elect the DIP Premiums Conversion Option prior to the consummation of such refinancing or Recapitalization, as applicable; provided that in the event that (i) the Debtors' restructuring is consummated through either (a) a Sale Transaction (as defined in the RSA) to a third party or (b) a plan of reorganization that provides for the payment in full in Cash of the First Lien Claims (as defined in the RSA) and the Obligations on the effective date of any such plan or the closing of any such Sale Transaction (as applicable) or (ii) an Acceptable Alternative Exit Facility is approved by the Bankruptcy Court, no Lender will have the right to elect the DIP Premiums Conversion Option.

2.10     Mandatory Prepayments.

(a)     Asset Sales. Not later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries of any Net Asset Sale Proceeds, the Borrower shall prepay the Loans in an aggregate amount equal to such Net Asset Sale Proceeds.

(b)     Insurance/Condemnation Proceeds. Not later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries, or the DIP Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

(c)     [Reserved].

(d)     Issuance of Debt. On the date of receipt by Holdings or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other

37

than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e)      [Reserved].

(f)      <u>Extraordinary Receipts</u>.   On the date of receipt by Holdings or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such Extraordinary Receipts.

(g)      <u>Prepayment Certificate</u>.   Concurrently with any prepayment of the Loans pursuant to Sections 2.10(a) through 2.10(f), the Borrower shall deliver to the DIP Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable proceeds or Extraordinary Receipt, as the case may be.   In the event that the Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and the Borrower shall concurrently therewith deliver to the DIP Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(h)      <u>Application</u>.   Any such prepayments pursuant to this Section 2.10 shall be applied as specified in Section 2.12(b).

2.11    [Reserved].

2.12    <u>Waivable Mandatory Prepayments</u>.   Anything contained herein to the contrary notwithstanding, so long as any Loans are outstanding, in the event the Borrower is required to make any mandatory prepayment other than a prepayment required under Section 2.10(d) (a "<u>Waivable Mandatory Prepayment</u>") of the Loans, not less than five Business Days prior to the date (the "<u>Required Prepayment Date</u>") on which the Borrower is required to make such Waivable Mandatory Prepayment, the Borrower shall notify the DIP Administrative Agent of the amount of such prepayment, and the DIP Administrative Agent will promptly thereafter notify each Lender holding an outstanding Loan of the amount of such Lender's Pro Rata Share of such Waivable Mandatory Prepayment and such Lender's option to refuse such amount.   Each such Lender may exercise such option by giving notice to the Borrower and the DIP Administrative Agent of its election to do so on or before the third Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Borrower and the DIP Administrative Agent of its election to exercise such option on or before the third Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Required Prepayment Date, the Borrower shall pay to the DIP Administrative Agent the amount of the Waivable Mandatory Prepayment, which amount shall (i) be applied in an amount equal to that portion of the Waivable Mandatory Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders, and (ii) with respect to any remaining balance, be returned to the Borrower (in which event the Borrower may use the proceeds for any purpose not prohibited by the Credit Documents)

2.13    <u>General Provisions Regarding Payments</u>.

(a)      All payments by the Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, recoupment, set-off or counterclaim, free of any restriction or condition, and delivered to the DIP Administrative Agent not later than 12:00 p.m. (New

York City time) on the date due at the Principal Office of the DIP Administrative Agent for the account of the Lenders; for purposes of computing interest and fees, funds received by the DIP Administrative Agent after that time on such due date shall be deemed to have been paid by the Borrower on the next succeeding Business Day.

(b)      All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)      The DIP Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate to the DIP Administrative Agent, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by the DIP Administrative Agent.

(d)      [Reserved].

(e)      The Borrower hereby authorizes the DIP Administrative Agent to charge the Borrower's accounts with the DIP Administrative Agent in order to cause timely payment to be made to the DIP Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(f)      The DIP Administrative Agent shall deem any payment by or on behalf of the Borrower hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the DIP Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  The DIP Administrative Agent shall give prompt notice to the Borrower and each applicable Lender if any payment is non-conforming.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a).  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.7 from the date such amount was due and payable until the date such amount is Paid in Full.

(g)      If an Event of Default shall have occurred and not otherwise been waived or cured, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1 or pursuant to any sale of, any collection from, or other realization upon all or any part of the Collateral, all payments or proceeds received by the Agents in respect of any of the Obligations, shall be applied in accordance with the application arrangements described in Section 8.2.

2.14      Ratable Sharing.  The Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other

Credit Documents (collectively, the "Aggregate Amounts Due" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify the DIP Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of the Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  The Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by the Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.  The provisions of this Section 2.14 shall not be construed to apply to (a) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it, (c) acceptance of the Waivable Mandatory Prepayment or (d) any payment, prepayment or redemption expressly contemplated in that certain Restructuring Support Agreement, dated on or about the date hereof (the "RSA"), by and among the Company Parties and the Consenting Stakeholders (as such terms are defined therein) or the DIP Order.

2.15    Alternate Rate of Interest.

(a)    Subject to clauses (b), (c), (d), (e) and (f) of this Section 2.15:

(i)    if the DIP Administrative Agent determines (which determination shall be conclusive absent manifest error) prior to the commencement of any Interest Period for a Term Benchmark Loan, that adequate and reasonable means do not exist for ascertaining Term SOFR or the Term SOFR (including because the Term SOFR Reference Rate is not available or published on a current basis) for such Interest Period; or

(ii)    the DIP Administrative Agent is advised by the Requisite Lenders that prior to the commencement of any Interest Period for a Term Benchmark Loan, Term SOFR for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans (or its Loan) included in such Loan for such Interest Period;

then the DIP Administrative Agent shall give notice thereof to the Borrower and the Lenders in accordance with Section 10.1 as promptly as practicable thereafter and, until the DIP Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Conversion/Continuation Notice that requests the conversion of any Loans to or continuation of any Loans as, a Term Benchmark Loan shall be ineffective.  Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower's receipt of the notice from the DIP Administrative Agent referred to in this Section 2.15(a), then until (x) the DIP Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist and (y) the Borrower delivers a new Conversion/Continuation Notice in accordance with the terms of Section 2.6, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if

such day is not a Business Day), be converted by the DIP Administrative Agent to, and shall constitute, a Base Rate Loan.

(b)      Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the DIP Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Requisite Lenders.

(c)      Notwithstanding anything to the contrary herein or in any other Credit Document, the DIP Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective with prior written consent of the Requisite Lenders.

(d)      The DIP Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the DIP Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.15, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.15.

(e)      Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the DIP Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the DIP Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the DIP Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)      Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any Conversion/Continuation Notice of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any request for a Term Benchmark Loan into a request for

a conversion to a Base Rate Loan.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.  Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, then until such time as a Benchmark Replacement is implemented pursuant to this Section 2.14, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the DIP Administrative Agent to, and shall constitute a Base Rate Loan.

2.16    <u>Increased Costs; Capital Adequacy</u>.

(a)    <u>Compensation For Increased Costs and Taxes</u>.  Subject to the provisions of Section 2.17 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (A) any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (regardless of whether the underlying law, treaty or governmental rule, regulation or order was issued or enacted prior to the date hereof), including the introduction of any new law, treaty or governmental rule, regulation or order but excluding solely proposals thereof, or any determination of a court or Governmental Authority, in each case that becomes effective after the date hereof, or (B) any guideline, request or directive by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law) or any implementation rules or interpretations of previously issued guidelines, requests or directives, in each case that is issued or made after the date hereof:  (i) subjects any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, liquidity, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender or any company controlling such Lender; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or any company controlling such Lender or such Lender's obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, the Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or in a lump sum or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to the Borrower (with a copy to the DIP Administrative Agent) a statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    <u>Capital Adequacy Adjustment</u>.  In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (A) the adoption, effectiveness, phase-in or applicability of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with

42

the interpretation or administration thereof, or (B) compliance by any Lender (or its applicable lending office) or any company controlling such Lender with any guideline, request or directive regarding capital adequacy or liquidity (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, in each case after the date hereof, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans, or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy), then from time to time, within five Business Days after receipt by the Borrower from such Lender of the statement referred to in the next sentence, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company on an after-tax basis for such reduction.  Such Lender shall deliver to the Borrower (with a copy to the DIP Administrative Agent) a statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.  For the avoidance of doubt, subsections (a) and (b) of this Section 2.16 shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (i) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (ii) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented.

2.17    Taxes; Withholding, Etc.

(a)    Defined Terms.  For purposes of this Section 2.17, the term "applicable law" includes FATCA.

(b)    Payments Free and Clear of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payments of Other Taxes by a Credit Party.  Without duplication of any Tax paid under Section 2.17(b), the Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the DIP Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Credit Parties.  The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not

43

such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the DIP Administrative Agent), or by the DIP Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 2.17, such Credit Party shall deliver to the DIP Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Administrative Agent.

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the DIP Administrative Agent, at the time or times and in the manner prescribed by applicable law and such other time or times reasonably requested by the Borrower or the DIP Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the DIP Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the DIP Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the DIP Administrative Agent as will enable the Borrower or the DIP Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17 (ii)(A), (ii)(B) and (ii)(C) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the DIP Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the DIP Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the DIP Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the DIP Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect

44

to payments of interest under any Credit Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner; and

(C)    if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the DIP Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the DIP Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the DIP Administrative Agent as may be necessary for the Borrower and the DIP Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(D)    For the avoidance of doubt, each person that shall become a Lender pursuant to Section 10.6 shall, upon the effectiveness of the related transfer,

45

be required to provide all of the forms and statements required pursuant to this Section 2.17.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the DIP Administrative Agent in writing of its legal inability to do so.

(iii)    On or prior to the Closing Date, the DIP Administrative Agent shall deliver to the Borrower either (A) a duly completed original of IRS Form W-9 certifying that the DIP Administrative Agent is a U.S. Person or (B) (i) a duly completed original IRS W-8ECI  or Form W-8BEN-E  with respect to payments received by it as a beneficial owner and (ii) a duly completed original of IRS Form W-8IMY certifying that (A) the DIP Administrative Agent is a U.S. branch of a foreign bank and the DIP Administrative Agent agrees to be treated as a U.S. Person with respect to any payments made to it under any Credit Document or (B) it is a qualified intermediary that assumes primary withholding responsibility under Chapters 3 and 4 and primary Form 1099 reporting and backup withholding responsibility for payments to such account.  The DIP Administrative Agent agrees that if such IRS Form W-9, W-8ECI, W-8BEN-E or W-8IMY previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or promptly notify the Borrower in writing of its legal inability to do so.

(g)    _Treatment of Certain Refunds_.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    _Survival_.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the DIP Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

(i)    _Indemnification by the Lenders_.  Each Lender shall severally indemnify the DIP Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the DIP Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any

46

Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(g) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the DIP Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the DIP Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the DIP Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the DIP Administrative Agent to the Lender from any other source against any amount due to the DIP Administrative Agent under this paragraph (e).

2.18    Obligation to Mitigate. Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would entitle such Lender to receive payments under Section 2.16 or 2.17, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Loans through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.16 or 2.17 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided that such Lender will not be obligated to utilize such other office pursuant to this Section 2.18 unless the Borrower agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above. A certificate as to the amount of any such expenses payable by the Borrower pursuant to this Section 2.18 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to the Borrower (with a copy to the DIP Administrative Agent) shall be conclusive absent manifest error.

2.19    Fees.

(a)    The Borrower agrees to pay each Lender and each Agent the fees set forth in the Agent Fee Letter, the Fee Letter and such other fees in the amounts and at the times separately agreed upon by the Requisite DIP Lenders.

(b)    The Borrower agrees to pay to the DIP Administrative Agent, for the ratable account of each Lender, an exit premium in an amount equal to 3.50% of the sum of the principal amount of Loans repaid or refinanced on such date (the "Exit Premium") upon termination, conversion, acceleration, and/or repayment or prepayment (whether pursuant to voluntary or mandatory prepayments provisions hereunder) of the Loans, including on the Maturity Date. The Exit Premium shall be fully earned on the Closing Date.

2.20    Removal or Replacement of a Lender. Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "Increased-Cost Lender") shall give notice to the Borrower that such Lender is entitled to receive payments under Section 2.16 or 2.17, and in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.18, (ii) the circumstances which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after the Borrower's request for such withdrawal; or (b) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b), the consent of Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a

47

"Non-Consenting Lender") whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender or Non-Consenting Lender that is not (or not affiliated with) the DIP Administrative Agent (the "Terminated Lender"), the Borrower may, by giving notice to the DIP Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans in full to one or more Eligible Assignees (each, a "Replacement Lender") in accordance with the provisions of Section 10.6 and the Borrower shall pay the fees, if any, payable thereunder in connection with any such assignment from an Increased-Cost Lender, a Non-Consenting Lender; provided that (1) in the case of any such assignment resulting from a claim for compensation under Section 2.16 or payment required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments thereafter; (2) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender; (3) on the date of such assignment, the Borrower shall pay any amounts payable to such Terminated Lender pursuant to Section 2.16 or 2.17; or otherwise as if it were a prepayment pursuant to Section 2.9; and (4) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender.  Each Lender agrees that if the Borrower exercises its option hereunder to cause an assignment by such Lender as a Non-Consenting Lender or Terminated Lender, such Lender shall, promptly after receipt of notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.6.  In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs the DIP Administrative Agent to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.6 on behalf of a Non-Consenting Lender or Terminated Lender and any such documentation so executed by the DIP Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 10.6.

## SECTION 3.  CONDITIONS PRECEDENT

3.1    Closing Date.  The effectiveness of this Agreement and the obligation of each Lender to make a Loan on any Borrowing Date are subject to satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a)    Credit Documents.  The DIP Administrative Agent shall have received copies of (i) this Agreement, (ii) the Security Agreement, (iii) each of the Notes and (iv) each of the Intellectual Property Security Agreements, in each case executed and delivered by each Credit Party which is a party thereto.

(b)    Organizational Documents; Incumbency; Resolutions; Good Standing Certificates.  The DIP Administrative Agent shall have received, in respect of each Credit Party, (i) sufficient copies of each Organizational Document of each Credit Party, and, to the extent applicable, certified as of the Closing Date or a recent date prior thereto by the appropriate Governmental Authority; (ii) signature and incumbency certificates of the officers of such Credit Party, or the managing member or general party of such Credit Party; (iii) resolutions of the board of directors or similar governing body of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation; and (v)

signature and incumbency certificates of one or more officers of the Borrower who are authorized to execute Funding Notices delivered under this Agreement.

(c)    <u>Organizational and Capital Structure</u>.  The organizational structure and capital structure of Holdings and its Subsidiaries shall be as set forth on Schedule 4.2.

(d)    <u>No Indebtedness</u>.    On the Closing Date, after giving effect to the Related Transactions, Holdings and its Subsidiaries shall have outstanding no existing Indebtedness (other than the Indebtedness expressly permitted to be outstanding under this Agreement) and the DIP Administrative Agent shall have received reasonably satisfactory evidence of the termination of any existing Indebtedness (including the KKR Facility any and all commitments relating thereto, but excluding any existing Indebtedness expressly permitted to be outstanding under this Agreement) and the release of all Liens in connection therewith, in each case on terms reasonably satisfactory to the DIP Administrative Agent.

(e)    <u>Lien and Judgment Searches</u>.  The DIP Administrative Agent shall have received:

(i)    the results of a Lien search (including a search as to judgments, pending litigation, bankruptcy and Tax matters), in form and substance reasonably satisfactory to the DIP Administrative Agent, made against the Credit Parties under the UCC (or applicable judicial docket) as in effect in each jurisdiction in which filings or recordations under the UCC should be made to evidence or perfect security interests in all assets of such Credit Party, indicating among other things that the assets of each such Credit Party are free and clear of any Lien (except for Permitted Liens); and

(ii)    searches of ownership of intellectual property in the appropriate governmental offices and such patent, trademark and/or copyright filings as may be requested by the DIP Administrative Agent to the extent necessary or reasonably advisable to perfect the DIP Collateral Agent's security interest in intellectual property Collateral.

(f)    <u>Personal Property Collateral</u>.  Each Credit Party shall have delivered to the DIP Collateral Agent:

(i)    UCC-1 financing statements in respect of security interests granted by each Credit Party for filing in all applicable jurisdictions;

(ii)    [reserved];

(iii)    a completed Perfection Certificate dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby; and

(iv)    fully executed Intellectual Property Security Agreements, in proper form for filing or recording in all appropriate places in all applicable jurisdictions, memorializing and recording the encumbrance of the Intellectual Property Assets listed in Annex 4 to the Security Agreement;.

(g)    <u>Financial Statements</u>.  The DIP Administrative Agent shall have received from Holdings (i) the Historical Financial Statements and (ii) pro forma consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the Closing Date, the related financings and

the other transactions contemplated by the Credit Documents to occur on or prior to the Closing Date, which pro forma financial statements shall be in form and substance satisfactory to the DIP Administrative Agent.

(h)     [Reserved].

(i)     Opinions of Counsel to Credit Parties.  Agents and Lenders and their respective counsel shall have received originally executed copies of the favorable written opinions, each dated the Closing Date, of (i) Kirkland & Ellis LLP, New York counsel for the Credit Parties and (ii) Cole Schotz P.C., New Jersey counsel for the Credit Parties, in each case as to such matters as the DIP Administrative Agent may reasonably request and in form and substance reasonably satisfactory to the DIP Administrative Agent (and each Credit Party hereby instructs such counsel to deliver such opinions to the Agents and Lenders).

(j)     Fees.  All closing payments, costs, fees, expenses (including reasonable, documented, out-of-pocket legal fees and expenses) and other compensation payable to each Agent and the Lenders shall have been paid (or shall concurrently be paid) to the extent then due; provided that, in the case of costs and expenses, an invoice of such costs and expenses shall have been presented not less than two Business Days prior to the Closing Date.

(k)     [Reserved].

(l)     Closing Date Certificate.  Holdings and the Borrower shall have delivered to the DIP Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(m)     "Know-Your-Customer".  To the extent requested at least 10 Business Days prior to the Closing Date, the Lenders shall have received at least 5 Business Days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the "PATRIOT Act").

(n)     Funding Notice.  The DIP Administrative Agent shall have received a fully executed and delivered Funding Notice as required pursuant to Section 2.1(b), which Funding Notices may be delivered on or prior to the Closing Date; provided that all certifications made under such Funding Notices shall be made (or deemed made) as of the Closing Date.

(o)     Representations and Warranties.  The representations and warranties of each Credit Party set forth in the Credit Documents shall be true and correct in all material respects on the Closing Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date.

(p)     Governmental Authorizations and Consents.  Each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the DIP Administrative Agent.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain,

50

prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(q)    No Litigation.  Except for claims, actions, suits, investigations, and litigation existing on and prior to the Petition Date and previously disclosed to the Lenders, and except for claims, actions, suits, investigations, litigation or proceedings stayed by 11 U.S.C. § 362, there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending in any court or before any arbitrator or Governmental Authority that, in the reasonable opinion of the DIP Administrative Agent, singly or in the aggregate, could have a Material Adverse Effect and there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, in the reasonable opinion of DIP Administrative Agent, singly or in the aggregate, which relates to the Loans or the transactions contemplated by the Credit Documents.

(r)    Commencement of Chapter 11 Cases.  The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Requisite Lenders and shall be in form and substance reasonably acceptable to the Requisite Lenders.

(s)    Interim Order.  The Interim Order shall have been entered by the Bankruptcy Court by not later than the date occurring three (3) Business Days after the date hereof and the DIP Administrative Agent shall have received a true and complete copy of such order, and such order shall and shall be in form and substance reasonably satisfactory to the Requisite Lenders (and with respect to any provisions that affect the rights or duties of the DIP Administrative Agent, the DIP Administrative Agent), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Requisite Lenders (and with respect to any provisions that affect the rights or duties of the DIP Administrative Agent, the DIP Administrative Agent).

(t)    Other Bankruptcy Court Filings.  All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, including the Cash Management Order and Adequate Protection Order, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Requisite Lenders in their sole discretion.

(u)    No Trustee; Control Over Collateral.  (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral; provided that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors reasonably believe will be successful.

(v)    Prepetition Obligations.  The Prepetition Lenders shall have received adequate protection in respect of the Liens securing the Prepetition Obligations in accordance with the DIP Order.

(w)    [Reserved].

(x)    Budget.  The DIP Administrative Agent and Lenders shall have received all periodic updates required under the Budget and any variance reports required hereunder. The Credit Parties shall be in compliance with the Budget.

(y)    Chapter 11 Orders.

(i)    Each Chapter 11 Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the DIP Administrative Agent and the Requisite Lenders;

(ii)    No appeal of the DIP Order shall have been filed or remain pending as of the applicable Funding Date; and

(iii)    The Credit Parties shall be in compliance with each Chapter 11 Order.

3.2    Final Loan Date.  The obligation of each Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") of, and subject to, the satisfaction, or waiver in accordance with Section 10.5, of the following conditions:

(a)    Conditions Precedent Generally.  Satisfaction of each of the conditions precedent set forth in Section 3.1 above; and

(b)    Final Order.

(i)    The Final Order shall have been entered by the Bankruptcy Court within a date which is thirty (30) days following the Interim Order Entry Date, and the DIP Administrative Agent shall have received a true and complete copy of such order.

(ii)    The Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Administrative Agent and the Requisite Lenders.

SECTION 4.  REPRESENTATIONS AND WARRANTIES

In order to induce the DIP Administrative Agent and the Lenders to enter into this Agreement, each Credit Party represents and warrants to the DIP Administrative Agent and the Lenders, on the Closing Date, that the following statements are true and correct:

4.1    Organization; Requisite Power and Authority; Qualification.  Each of Holdings and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

4.2    Equity Interests and Ownership.  The Equity Interests of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable.  Except as

52

set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Equity Interests of Holdings or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Holdings or any of its Subsidiaries.  Schedule 4.2 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date both before and after giving effect to the Related Transactions.

   4.3 <u>Due Authorization</u>.  Subject to the entry by the Bankruptcy Court of the DIP Order, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

   4.4 <u>No Conflict</u>.  The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries, (ii) any of the Organizational Documents of Holdings or any of its Subsidiaries, or (iii) any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Subsidiaries entered into after the Petition Date; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of the DIP Collateral Agent, for the benefit of the Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Holdings or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

   4.5 <u>Governmental Consents</u>.  Subject to the entry by the Bankruptcy Court of the DIP Order, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the DIP Collateral Agent for filing and/or recordation, as of the Closing Date.

   4.6 <u>Binding Obligation</u>.  Subject to the entry by the Bankruptcy Court of the DIP Order, each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

   4.7 <u>Historical Financial Statements</u>.  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.  As of the Closing Date, neither Holdings nor any of its Subsidiaries has any contingent liability or liability for Taxes, long-term lease or unusual forward or

long-term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings and any of its Subsidiaries taken as a whole.

4.8     [Reserved].

4.9     [Reserved].

4.10     Adverse Proceedings, Etc.   Except for Adverse Proceedings existing on and prior to the Petition Date and disclosed in writing to the Lenders, there are no Adverse Proceedings that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.   Neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

4.11     Payment of Taxes.   Except as otherwise permitted or required under Section 5.3, pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, all U.S. federal, state and other material tax returns and reports of Holdings and its Subsidiaries required to be filed by any of them have been timely filed, and all Taxes shown on such tax returns to be due and payable, and all other taxes, assessments, fees and other governmental charges upon Holdings and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable, except where (i) there is a proposed Tax assessment against Holdings or any of its Subsidiaries which is being actively contested by Holdings or such Subsidiary in good faith and by appropriate proceedings, provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor, or (ii) the failure to pay such Taxes, either individually or in the aggregate, would not have a Material Adverse Effect.

4.12     Properties.

(a)     Title.   Each of Holdings and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid licensed rights in (in the case of licensed interests in intellectual property) and (iv) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.6.   Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)     Real Estate.   As of the Closing Date, Schedule 4.12 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment.   Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Holdings does not have knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable

against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

4.13    Environmental Matters.  Neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  To each of Holdings' and its Subsidiaries' knowledge, there are and have been, no conditions, occurrences, or Hazardous Materials Activities that could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither Holdings nor any of its Subsidiaries nor, to any Credit Party's knowledge, any predecessor of Holdings or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and none of Holdings' or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent, in each case that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  No Release of Hazardous Materials, or any Hazardous Materials Activity by Holdings or any of its Subsidiaries has resulted in an Environmental Claim, which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

4.14    Careismatic Receivables.  Careismatic Receivables, LLC owns no assets or other personal or real property (other than Cash and accounts receivable).

4.15    Material Contracts.  Schedule 4.15 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date, and all such Material Contracts are in full force and effect and no defaults currently exist thereunder as of the Closing Date.

4.16    Governmental Regulation.  Neither Holdings nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.17    Federal Reserve Regulations; Exchange Act.

(a)    None of Holdings, the Borrower or any of their Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No portion of the proceeds of any Loan shall be used in any manner, whether directly or indirectly, that causes or could reasonably be expected to cause, such Loan or the application of

such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

4.18    **Employee Matters**.  There is (a) no unfair labor practice charge pending against Holdings or any of its Subsidiaries, or to the knowledge of Holdings and the Borrower, threatened against any of them before the National Labor Relations Board and no arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Holdings or any of its Subsidiaries or to the knowledge of Holdings and the Borrower, threatened against any of them, (b) no strike or organized work stoppage in existence or, to the knowledge of Holdings and the Borrower, threatened  against Holdings or any of its Subsidiaries, and (c) to the knowledge of Holdings and the Borrower, no union organizing activity is taking place with respect to any employees of Holdings or any of its Subsidiaries, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

4.19    **Employee Benefit Plans**.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings and each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no ERISA Event has occurred or is reasonably expected to occur.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and except to the extent required under Section 4980B of the Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings, or any of its Subsidiaries.  The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Holdings, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan by an amount that would reasonably be expected to result in a Material Adverse Effect.  As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of Holdings, its Subsidiaries and their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA would not reasonably be expected to result in a Material Adverse Effect.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Foreign Plan has been maintained in material compliance with its terms and with the requirements of any and all applicable laws, rules, regulations and orders of any Governmental Authority and has been maintained, where required, in good standing with applicable regulatory authorities.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (x) each Foreign Plan which is required under all applicable laws, rules, regulations and orders of any Governmental Authority to be funded satisfies in all material respects any applicable funding standard under all applicable laws, rules, regulations and orders of any Governmental Authority, and (y) each Foreign Plan which is not funded or which is not required to be fully funded under all applicable laws, rules, regulations and orders of any Governmental Authority, the unfunded obligations of such Foreign Plan are properly accrued and/or reflected on the books and records of Holdings and its Subsidiaries in all material respects.

4.20    [Reserved].

4.21    Compliance with Laws.

(a)    Generally.  Each of Holdings and its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Holdings or any of its Subsidiaries), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    Anti-Money Laundering Laws, Etc.  None of the Credit Parties or any of their respective Subsidiaries or any of the directors or officers of the Credit Parties or any of their respective Subsidiaries, or to the knowledge of each Credit Party, any of the Affiliates, employees or agents of the Credit Parties or any of their respective Subsidiaries: (i) is taking or will take any action that would constitute or give rise to a violation of Anti-Money Laundering Laws; or (ii) is  subject to any action, proceeding, litigation, claim or investigation with regard to any actual or alleged violation of Anti-Money Laundering Laws.

(c)    Anti-Corruption Laws, Etc.

(i)    None of the Credit Parties or any of their respective Subsidiaries or any of the directors or officers of the Credit Parties or any of their respective Subsidiaries, or to the knowledge of each Credit Party, any of the Affiliates, employees or agents of the Credit Parties or any of their respective Subsidiaries: (A) is taking or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or knowingly indirectly, to any Government Official or commercial counterparty to influence official action or secure an improper advantage or in other any manner that would constitute or give rise to a violation of applicable Anti-Corruption Laws: or (B) subject to any action, proceeding, litigation, claim or investigation with regard to any actual or alleged violation of Anti-Corruption Laws.

(ii)    None of the Credit Parties or any of their respective Subsidiaries is conducting any internal investigation or is in the process of making a voluntary, directed, or involuntary disclosure to any Governmental Authority with respect to any alleged act or omission arising under or relating to any noncompliance with any applicable Anti-Corruption Law; and

(iii)    The Borrower will not use, directly or knowingly indirectly, any part of the proceeds of the Loans: (A) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any Government Official or commercial counterparty to influence official action or secure an improper advantage, in each case in violation of applicable Anti-Corruption Laws; or (B) in any manner that would constitute or give rise to a violation of applicable Anti-Corruption Laws.

(d)    Sanctions.  None of the Credit Parties or any of their respective Subsidiaries or any of the directors or officers of the Credit Parties or any of their respective Subsidiaries, or to the knowledge of each Credit Party, any of the Affiliates, employees or agents of the Credit Parties or any of their respective Subsidiaries (i) is a Sanctioned Person; (ii) is engaged or intends to engage in the future in any dealings with, involving or for the benefit of, any Sanctioned Person, in each case in violation of applicable

Sanctions; (iii) is taking any action, directly or indirectly, that would constitute or give rise to a violation of applicable Sanctions or (iv) is subject to any action, proceeding, litigation, claim or investigation with regard to any actual or alleged violation of Sanctions.  None of the Credit Parties or any of their respective Subsidiaries is conducting any internal investigation or is in the process of making a voluntary, directed, or involuntary disclosure to OFAC or any other Governmental Authority with respect to any alleged act or omission arising under or relating to any noncompliance with any applicable Sanctions.  The Borrower will not use, directly or indirectly, any part of any proceeds of the Loans: (A) to fund or facilitate any activities or business of, with or involving any Sanctioned Person in violation of applicable Sanctions; or (B) in any manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

4.22    Disclosure.  No representation or warranty of any Credit Party contained in any Credit Document or in any other documents, certificates or statements furnished to any Agent or Lender by or on behalf of Holdings or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections, budgets and forward looking information and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Holdings or the Borrower to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to Holdings or the Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

4.23    Use of Proceeds.  The proceeds of the Loans shall be used for the purposes set forth in Section 2.3.

4.24    [Reserved].

4.25    Classification as Priority Lien Obligations; etc.  The Obligations constitute First Priority senior secured obligations of the Credit Parties and are the only such obligations of the Credit Parties.

4.26    Certain Indebtedness.  As of the Closing Date, the only Indebtedness of Holdings and its Subsidiaries (other than intercompany Indebtedness) consists of the Obligations, Indebtedness listed on Schedule 6.1, and Indebtedness expressly permitted to be outstanding under this Agreement.

4.27    Insurance.  Holdings and its Subsidiaries maintains the insurance required by Section 5.5.

4.28    Intellectual Property; Licenses, Etc.  Except as set forth on Schedule 4.30, each of Holdings and its Subsidiaries owns or licenses or otherwise has the right to use all Patents, Patent applications, Trademarks, Trademark applications, service marks, trade names, Copyrights, Copyright applications and other Intellectual Property rights that are necessary in all material respects for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, and all such Intellectual Property owned by a Credit Party is subsisting and, to the knowledge of such party, valid and enforceable, has not been abandoned, and is not subject to any outstanding order, judgment or decree restricting its use or adversely affecting such party's rights thereto, except, in each case,

for such failure to possess such rights, infringements, conflicts, nonsubsistence, invalidity, unenforceability, abandonment or outstanding orders, judgments or decrees, which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Except as set forth in Schedule 4.28, no such Intellectual Property is the subject of any material licensing agreement as to which any of Holdings or its Subsidiaries is a party.  To the knowledge of any of Holdings or its Subsidiaries, no slogan or other advertising device, product, process, method, substance or other Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by any of Holdings or its Subsidiaries infringes any Patent, Trademark, service mark, trade name, Copyright, license or other Intellectual Property owned by any other Person in any material respect, and no claim or litigation regarding any of the foregoing is pending or, to the knowledge of any Credit Party, threatened in writing, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.29    The Holding Companies.  None of the Holding Companies currently or will (a) conduct, transact or otherwise engage in any business or operations other than those incidental to (i) its ownership of the Equity Interests of the Borrower, (ii) the maintenance of its legal existence, (iii) the performance of the Credit Documents and (iv) any transaction that such Holding Company is expressly permitted to enter into or consummate under Section 6 or (b) own, hold or maintain any material assets (including Equity Interests in Subsidiaries) other than the Equity Interests of the Borrower.

4.30    [Reserved].

4.31    Secured, Super-Priority Obligations.  On and after the Closing Date:

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Credit Documents and the DIP Order and (y) the hearings for the approval of the DIP Order was given in each case.  Borrower shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order;

(b)    The provisions of this Agreement and the DIP Order (subject to the entry thereof) are effective to create in favor of the DIP Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "DIP Liens") subject only to the Carve-Out, having the priority provided for herein and in the DIP Order, and enforceable against the Credit Parties;

(c)    Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order (subject to the entry thereof), all Obligations and all other obligations of the Credit Parties under the Credit Documents at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Credit Parties, the estates of Credit Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out;

(d)    Pursuant to Section 364(c)(2) of the Bankruptcy Code and DIP Order (subject to the entry thereof), all Obligations are secured by a first priority perfected Lien on all unencumbered assets of the Credit Parties (now existing or hereafter acquired) and all proceeds thereof that were not subject to a perfected, non-avoidable Lien as of the Petition Date, subject only to the Carve-Out;

(e)        [Reserved]; and

(f)        Pursuant to Section 364(d) of the Bankruptcy Code, all Obligations are secured by a perfected first priority senior priming Lien on all assets of the Credit Parties (now existing or hereafter acquired) and all proceeds thereof that are subject to a Lien securing any Prepetition Obligations.  The aforesaid perfected first priority senior priming Lien shall be senior in all respects to any Lien securing any Prepetition Obligations and any adequate protection liens granted in favor of the Prepetition Agent and the Prepetition Lenders, but shall be subject and junior to (i) the Carve-Out and (ii) any valid, perfected and unavoidable Liens in existence on the Closing Date on such assets of the Credit Parties that pursuant to the terms of the DIP Order are senior in priority the DIP Liens.

4.32    DIP Order.  The DIP Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of Requisite Lenders.

4.33    Budget.  The Budget was prepared in good faith by the management of the Credit Parties, based on assumptions believed by the management of the Credit Parties to be reasonable at the time made and upon information believed by the management of the Credit Parties to have been accurate based upon the information available to the management of the Credit Parties at the time such Budget was furnished.

## SECTION 5.  AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until Payment in Full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

5.1    Financial Statements and Other Reports.  Holdings and the Borrower will deliver to each Agent and the Lenders:

(a)        Monthly Reports.  As soon as available, and in any event within thirty (30) days after the end of each month ending after the Closing Date, the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such month and for the period from the beginning of the current Fiscal Year to the end of such month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year in reasonable detail.

(b)        Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter ending after the Closing Date, the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)        [Reserved].

(d)     Compliance Certificate.  Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Section 5.1(b), a duly executed and completed Compliance Certificate;

(e)     Statements of Reconciliation after Change in Accounting Principles.  If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Holdings and its Subsidiaries delivered pursuant to Section 5.1(b) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the DIP Administrative Agent;

(f)     Notice of Default.  Promptly upon any officer of Holdings or the Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default under any Credit Document; (ii) that any Person has given any notice to Holdings or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(b); or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrower has taken, is taking and proposes to take with respect thereto;

(g)     Notice of Litigation.  Promptly upon any officer of Holdings or the Borrower obtaining knowledge of (i) any Adverse Proceeding not previously disclosed in writing by the Borrower to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii), if adversely determined could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, notice thereof together with such other information as may be reasonably available to Holdings or the Borrower (including delivery of copies of notices received by the Borrower) to enable Lenders and their counsel to evaluate such matters;

(h)     Pension Plans; ERISA.

(A)     Promptly (but in any event within ten (10) Business Days) following the DIP Administrative Agent's reasonable request therefore, copies of any actuarial reports relating to the Pension Plans that are prepared in order to comply with then statutory or auditing requirements;

(B)     (B)     (x) Promptly (but in any event within ten (10) Business Days) upon receiving written notice becoming  aware of the occurrence of or forthcoming occurrence of (i) any ERISA Event, (ii) the adoption of any new Pension Plan by any Credit Party, any of its Subsidiaries or any of their ERISA Affiliates or the adoption of any new Foreign Plan that provides defined benefit pension benefits by any Credit Party or any of its Subsidiaries, (iii) the adoption of an amendment to a Pension Plan or Foreign Plan that provides defined benefit pension benefits if such amendment results in a material increase in benefits or

61

unfunded liabilities, (iv) the receipt of a notice from a Governmental Authority relating to the intention to terminate any Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (v) the existence of any fact or circumstance that could reasonably be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Code of Section 303(k) of ERISA, or (vi) the commencement of contributions by any Credit Party, any of its Subsidiaries or any of their respective ERISA Affiliates to a Multiemployer Plan, in the case of each of (i) through (vi) above, that would reasonably be expected, individually or in the aggregate, to result in a  Material Adverse Effect, a notice specifying the nature thereof, what action Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (y) with reasonable promptness (but in any event within ten (10) Business Days after receiving a request therefore), copies of (1) each Schedule SB (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as the DIP Administrative Agent shall reasonably request;

(i)     [Reserved].

(j)     [Reserved].

(k)     <u>Information Regarding Collateral</u>.  Prompt notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure, (iii) in any Credit Party's jurisdiction of organization or (iv) in any Credit Party's Federal Taxpayer Identification Number or state organizational identification number.  The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the DIP Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral as contemplated in the Collateral Documents.  The Borrower also agrees promptly to notify the DIP Collateral Agent if any material portion of the Collateral is damaged or destroyed;

(l)     [Reserved].

(m)     <u>Anti-Corruption Laws; Anti-Money Laundering Laws</u>.   The Borrower shall promptly notify the DIP Administrative Agent in the event that it or any Credit Party or any of their respective Subsidiaries, directors, officers or employees becomes subject to any action, proceeding, litigation, claim or investigation with regard to any actual or alleged violation of Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.  Promptly following any request therefor, the Borrower shall provide any information and documentation reasonably requested by the DIP Administrative Agent or any Lender for purposes of compliance with applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

(n)    Other Information.  (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Holdings to its security holders acting in such capacity or by any Subsidiary of Holdings to its equity holders, bondholders or holders of any other of its securities acting in such capacity or by any Subsidiary of Holdings to its security holders other than Holdings or another Subsidiary of Holdings, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Holdings or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any other Governmental Authority, (iii) all press releases and other statements made available generally by Holdings or any of its Subsidiaries to the public concerning material developments in the business of Holdings or any of its Subsidiaries, and (B) such other information and data with respect to Holdings or any of its Subsidiaries as from time to time may be reasonably requested by any Agent or any Lender.

(o)    Electronic Delivery.

(i)    Notwithstanding anything in any Credit Document to the contrary, each Credit Party hereby agrees that upon reasonable request by the DIP Administrative Agent, it will use its reasonable best efforts to provide to the DIP Administrative Agent all information, documents and other materials that it is obligated to furnish to the DIP Administrative Agent pursuant to the Credit Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for an extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under any Credit Document prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under any Credit Document or (D) is required to be delivered to satisfy any condition set forth in Sections 3.1 (all such non-excluded communications being referred to herein collectively as the "Communications"), by transmitting the Communications in accordance with Section 10.1(c).

(ii)    The DIP Administrative Agent agrees that the receipt of the Communications in accordance with Section 10.1(c) shall constitute effective delivery of the Communications to the DIP Administrative Agent for purposes of this Section 5.1(o) unless otherwise requested by the DIP Administrative Agent pursuant to Section 10.1(c).

(iii)    Nothing in this Section 5.1(o) shall prejudice the right of any Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(p)    Budget Variance and Rolling 13-Week Cash Flow Reports.  By 5:00 p.m. (New York time) on each of the third Business Days after the first and second full calendar weeks following the Petition Date (which shall not be Testing Dates, as defined below), and by 5:00 pm. (New York time) on each third Business Day thereafter (each, a "Testing Date"), the Borrower shall deliver to the DIP Administrative Agent and Lenders, a report, in form and substance reasonably satisfactory to the DIP Administrative Agent, setting forth (i) for the immediately preceding week (ending on the Saturday immediately preceding the applicable reporting deadline) and for the cumulative period from the Petition Date through the immediately preceding Saturday, the actual and budgeted results for such week and cumulative post-Petition Date time period by line item in the Budget, together with a reasonably detailed written explanation of all material variances, and (ii) for the 13-week period beginning on the immediately preceding Sunday, the

63

projected weekly results by line item in the Budget, together with a reasonably detailed written explanation of all projected material variances (as compared to the immediately preceding rolling 13-week forecast delivered by the Borrower).

(q)    <u>Chapter 11 Case Filings</u>.  Furnish to the DIP Administrative Agent, the Lenders and their counsel promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any other Credit Party with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Borrower or any other Credit Party to the Creditors' Committee (if one is appointed).

5.2    <u>Existence</u>.  Except as otherwise permitted under Section 6.6, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; <u>provided</u> that no Credit Party (other than the Borrower with respect to existence) or any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders.

5.3    <u>Obligations and Taxes</u>.  Each Credit Party will timely pay all material obligations arising after the Petition Date promptly and in accordance with their terms and timely pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property arising after the Petition Date, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Petition Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof, before the same shall become in default; provided that the Borrower and each of its Subsidiaries shall not be required to pay and discharge or to cause to be paid and discharged any such obligation, tax, assessment, charge, levy or claim if (i) the validity or amount thereof is being contested in good faith by appropriate proceedings (if the Borrower or its Subsidiaries shall have set aside on their books adequate reserves therefor), (ii) the failure to pay such taxes, assessments and governmental charges or levies, either individually or in the aggregate, would not have a Material Adverse Effect, or (iii) non-payment and discharge thereof is permitted or required under the Bankruptcy Code or an order of the Bankruptcy Court.

5.4    <u>Maintenance of Properties</u>.  Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition (ordinary wear and tear excepted) all material properties used or useful in the business of Holdings and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

5.5    <u>Insurance</u>.  Holdings will maintain or cause to be maintained, with financially sound and reputable insurers, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Holdings and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Without limiting the generality of the foregoing, Holdings will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the Flood Program, in each case in compliance with any applicable regulations of the Board of Governors, and (b) replacement

value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.  Subject to Section 5.14, each such policy of insurance shall (i) name the DIP Collateral Agent, for the benefit of the Secured Parties, as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a lender's loss payable endorsement, satisfactory in form and substance to the DIP Collateral Agent, that names the DIP Collateral Agent, for the benefit of the Secured Parties, as lender loss payee thereunder and use reasonable efforts to provide for at least thirty (30) days' prior notice to the DIP Collateral Agent of any modification or cancellation of such policy.

5.6     Books and Records; Inspections.  Each Credit Party will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities.  Each Credit Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by any Lender (including the right to appoint third party agents) to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.

5.7     Lenders Calls.  Holdings and the Borrower will participate in weekly conference calls (which may take place by telephone, web conference or other remote methods) with the DIP Administrative Agent and Lenders in connection with the delivery of reports pursuant to Section 5.1(p) at such time as may be agreed to by the Borrower and the DIP Administrative Agent.

5.8     Compliance with Laws and Contractual Obligations.

(a)     Each Credit Party will comply, and shall cause each of its Subsidiaries to comply (i) with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all applicable ERISA and all Environmental Laws, Sanctions, the PATRIOT Act and/or any Anti-Money Laundering Law and Anti-Corruption Law) and (ii) Contractual Obligations, in each case, noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Each Credit Party will comply, and shall cause its Subsidiaries and any of their respective directors, officers and employees to comply, with applicable Anti-Money Laundering Laws, Anti-Corruption Laws and Sanctions in all respects.  Each Credit Party shall continue to maintain in effect and enforce, and shall procure that each of its Subsidiaries continues to maintain in effect and enforce, policies and procedures designed to promote and achieve compliance by such Credit Party and its Subsidiaries and their respective directors, officers and employees with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

5.9     Environmental.

(a)     Environmental Disclosure.  Holdings will deliver to the DIP Administrative Agent and the Lenders:

(i)     promptly    following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of

65

Holdings or any of its Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to environmental matters at any Facility or with respect to any Environmental Claims that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(ii)    promptly upon the occurrence thereof, notice describing in reasonable detail (1) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, (2) any remedial action taken by Holdings or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and (3) Holdings or the Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(iii)    reasonably promptly following the sending or receipt thereof by Holdings or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (2) any Release required to be reported to any Governmental Authority that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, and (3) any request for information from any Governmental Authority that suggests such Governmental Authority is investigating whether Holdings or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(iv)    prompt notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Holdings or any of its Subsidiaries that could reasonably be expected to (A) expose Holdings or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Holdings or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and (2) any proposed action to be taken by Holdings or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Holdings or any of its Subsidiaries to any additional obligations or requirements under any Environmental Laws that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect; and

(v)    with promptness, such other documents and information as from time to time may be reasonably requested by the DIP Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)    Hazardous Materials Activities, Etc.  Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions reasonably necessary and required under Environmental Law to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material

Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.10    <u>Covenant to Guarantee Obligations and Provide Security</u>.  In the event that any Person becomes a Domestic Subsidiary (other than an Excluded Subsidiary) of Borrower, Borrower shall (a) promptly cause such Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Security Agreement by executing and delivering to the Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, legal opinions and certificates reasonably requested by the DIP Collateral Agent. In the event that any Person becomes a CFC or a Foreign Subsidiary Holding Company that is a Subsidiary of the Borrower, and the ownership interests of such CFC or Foreign Subsidiary Holding Company are owned by the Borrower or by any Domestic Subsidiary thereof, the Borrower shall, or shall cause such Domestic Subsidiary to, deliver, all such documents, instruments, agreements, legal opinions and certificates reasonably requested by the DIP Collateral Agent, and the Borrower shall take, or shall cause such Domestic Subsidiary to take, all of the actions referred to in Section 3.1(f) necessary to grant and to perfect a First Priority Lien in favor of the DIP Collateral Agent, for the benefit of Secured Parties, under the Security Agreement in 100% of the voting and non-voting stock of such ownership interests.  With respect to each such Subsidiary, the Borrower shall promptly send to the DIP Administrative Agent notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of the Borrower, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of the Borrower; and such notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

5.11    <u>Additional Material Real Estate Assets</u>.

(a)    In the event that any Credit Party acquires a Material Real Estate Asset or a Real Estate Asset owned on the Closing Date becomes a Material Real Estate Asset and such interest in such Material Real Estate Asset has not otherwise been made subject to the Lien of the Collateral Documents in favor of the DIP Collateral Agent, for the benefit of Secured Parties, then such Credit Party shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates, including the items specified in Section 5.11(d), that the DIP Collateral Agent shall reasonably request to create in favor of the DIP Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets.

(b)    [Reserved].

(c)    The Borrower shall, at the request of the DIP Collateral Agent, deliver, from time to time, to the DIP Collateral Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which the DIP Collateral Agent has been granted a Lien.

(d)    In the case of any Material Real Estate Asset referred to in Section 5.11(a), the applicable Credit Party shall provide the DIP Collateral Agent with Mortgages with respect to such Real Estate Asset (each, a "<u>Mortgaged Property</u>"), as the case may be, within thirty (30) days of the acquisition of such Real Estate Asset (or the date a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset) together with:

67

(i)      evidence that counterparts of any such Mortgage has been duly executed, acknowledged and delivered and is in form suitable for filing or recording in all filing or recording offices that the DIP Collateral Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the DIP Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees that are due and payable have been paid or otherwise provided for in a manner reasonably satisfactory to the DIP Administrative Agent;

(ii)     an opinion of counsel (which counsel shall be reasonably satisfactory to the DIP Collateral Agent) in each state in which a Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as the DIP Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the DIP Collateral Agent;

(iii)    (A) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to the DIP Collateral Agent with respect to each Mortgaged Property (each, a "Title Policy"), in amounts not less than the Fair Market Value of each Mortgaged Property, together with a title report issued by a title company with respect thereto and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to the DIP Collateral Agent and (B) evidence satisfactory to the DIP Collateral Agent that such Credit Party has paid to the title company or to the appropriate Governmental Authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Mortgaged Property in the appropriate real estate records; and

(iv)     (A) a completed Flood Certificate with respect to each Mortgaged Property, which Flood Certificate shall (x) be addressed to the DIP Collateral Agent and (y) otherwise comply with the Flood Program; (B)  if the Flood Certificate states that such Mortgaged Property is located in a Flood Zone, the Borrower's acknowledgment of receipt of notification from the DIP Collateral Agent (x) as to the existence of such Mortgaged Property and (y) as to whether the community in which each Mortgaged Property is located is participating in the Flood Program; and (C)  if such Mortgaged Property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that the Borrower has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program.

5.12    Further Assurances.  At any time or from time to time upon the request of the DIP Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as any Agent may reasonably request in order to effect fully the purposes of the Credit Documents.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as any Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of Holdings, and its Subsidiaries and all of the outstanding Equity Interests of the Borrower and its Subsidiaries (subject to limitations contained in the Credit Documents with respect to CFC's).

5.13    [Reserved].

68

5.14    Post-Closing Obligations.  Each of the Credit Parties shall satisfy the requirements set forth on Schedule 5.14 on or before the date specified for such requirement or such later date to be determined by the DIP Administrative Agent.

5.15    [Reserved].

5.16    Chapter 11 Cases.  The Credit Parties shall comply with each Chapter 11 Order.

5.17    Milestones.  The Credit Parties shall comply with the following covenants and milestones in accordance with the dates indicated below, or any later date approved by the Requisite Lenders in their sole discretion (collectively, the "Milestones" and each a "Milestone"):

(a)    Entry of Interim Order by the Bankruptcy Court shall be no later than five (5) days after the Closing Date;

(b)    Entry of Final Order by the Bankruptcy Court shall be no later than thirty (30) days after the Closing Date;

(c)    Filing of Disclosure Statement and a plan of reorganization with the Bankruptcy Court shall be no later than forty-five (45) days after the Closing Date;

(d)    Bankruptcy Court approval of Disclosure Statement shall be no later than ninety (90) days after the Closing Date; and

(e)    Confirmation by the Bankruptcy Court of a plan of reorganization shall be no later than one hundred twenty (120) days after the Closing Date.

## SECTION 6.  NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until Payment in Full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

6.1    Indebtedness.  Unless explicitly permitted in the Budget, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, provided that the following Indebtedness shall be permitted:

(a)    the Obligations;

(b)    Indebtedness of the Borrower and the other parties thereto under the Prepetition First Lien Credit Agreement in an aggregate principal amount outstanding not to exceed $695,000,000;

(c)    Indebtedness of the Borrower and the other parties thereto under the Prepetition Second Lien Credit Agreement in an aggregate principal amount outstanding not to exceed $111,000,000;

(d)    Indebtedness of the Borrower and the other parties thereto under that certain Equipment Schedule #01 to Master Equipment Lease Agreement #32224, dated as of July 28, 2023

and those certain Lease Documents, among Careismatic Brands, LLC and Wingspire Equipment Finance LLC, in an aggregate principal amount outstanding not to exceed $2,900,000;

(e)    Indebtedness of any Credit Party to any other Credit Party or any other of its respective Subsidiaries; provided that (i) all such Indebtedness shall be evidenced by the Intercompany Note, and, if owed to a Credit Party, shall be subject to a First Priority Lien pursuant to the Security Agreement, (ii) if owing to a non-Credit Party from a Credit Party, then all such Indebtedness shall be unsecured and subordinated in right of payment to the Payment in Full of the Obligations pursuant to the terms of the Intercompany Note, (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any Indebtedness owed by such Subsidiary to the Borrower or to any of its Subsidiaries for whose benefit such payment is made and (iv) such Indebtedness is permitted as an Investment under Sections 6.4(d) and (e);

(f)    Indebtedness which may be deemed to exist pursuant to any performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(g)    Indebtedness in respect of netting services and overdraft protections in connection with deposit accounts;

(h)    guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Credit Parties and their Subsidiaries;

(i)    Indebtedness described in Schedule 6.1, but not any extensions, renewals or replacements of such Indebtedness;

(j)    to the extent constituting Indebtedness, Indebtedness in respect of any the Receivables Financing Transaction in an aggregate principal amount outstanding not to exceed $[_____]; and

(k)    other Indebtedness (other than Indebtedness for borrowed money) in an aggregate principal amount not to exceed $500,000.

6.2    Liens.  Unless explicitly permitted by the Budget, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired or licensed, or any income, profits or royalties therefrom, provided that the following Liens shall be permitted:

(a)    Liens in favor of the DIP Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)    Liens for Taxes if such obligations with respect to such Taxes are not yet subject to penalties for non-payment or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and adequate reserves have been made in accordance with GAAP;

(c)    Liens on the assets of the Credit Parties securing Indebtedness permitted pursuant to Section 6.1(b);

(d)     Liens on the assets of the Credit Parties securing Indebtedness permitted pursuant to Section 6.1(c);

(e)     Liens on the assets of the Credit Parties securing Indebtedness permitted pursuant to Section 6.1(d);

(f)     statutory Liens of landlords, banks (and rights of set-off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(g)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security;

(h)     Liens incurred to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(i)     easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of any Credit Party or any of its Subsidiaries;

(j)     Liens described in Schedule 6.2;

(k)     other Liens in an aggregate principal amount not to exceed $500,000; <u>provided</u> that such Liens shall not secure Indebtedness for borrowed money; and

(l)     Liens on Ordinary Course Receivables transferred in connection with the Receivables Financing Transaction, including Liens on such receivables resulting from precautionary UCC filings or from re-characterization or any such sale as a financing or a loan.

6.3     <u>Restricted Payments</u>.  No Credit Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Payment, provided that the following Restricted Payments shall be permitted:

(a)     any Subsidiary of the Borrower may declare and pay dividends or make other distributions ratably to its equity holders;

(b)     any Credit Party and any Subsidiary of the Credit Parties may make distributions to any other Credit Party and any other Subsidiary of the Credit Parties, in each case, in respect of payments incurred in connection with the Chapter 11 Cases and to maintain its corporate and legal existence (including to make distributions to pay such fees (including professional fees), costs and expenses relating to such maintenance);

71

(c)      with respect to any taxable year in which Borrower is treated as a corporation for U.S. federal, state, and/or local income tax purposes that is a member of a consolidated, combined or similar income tax group (a "Tax Group") of which CBI Midco is the common parent, the portion of any U.S. federal, state and/or local income Taxes (including minimum Taxes) (or franchise and similar Taxes imposed in lieu of such minimum Taxes), as applicable, of such Tax Group that is attributable to the taxable income of Holdings, Borrower and its Subsidiaries; provided that for each such taxable year, the aggregate amount of such payments made in respect of such taxable year shall not exceed the amount that Holdings, Borrower and the Subsidiaries that are members of such Tax Group would have been required to pay if Holdings, Borrower and such Subsidiaries had been a stand-alone Tax Group; provided, further, that the permitted payments pursuant to this clause (c) with respect to the Taxes of any entity that is not a Credit Party shall be limited to the amount actually paid by such entity to Holdings, Borrower or other Credit Party for the purposes of paying such consolidated, combined or similar Taxes; and

(d)      payments of principal and/or interest in respect of Indebtedness under the Prepetition Second Lien Credit Agreement, to the extent explicitly provided for and permitted in the Budget.

6.4      Investments.  Unless explicitly permitted by the Budget, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, provided that the following Investments shall be permitted:

(a)      Each Investment described in Schedule 6.4 but not including any extensions or increases thereof or additions thereto;

(b)      Investments in Cash and Cash Equivalents;

(c)      equity Investments owned as of the Closing Date in any Subsidiary and Investments made after the Closing Date in the Borrower, in any such Subsidiary that is a wholly-owned Guarantor Subsidiary and any other wholly-owned Guarantor Subsidiary of the Borrower;

(d)      intercompany loans to the extent permitted under Section 6.1(e);

(e)      loans and advances to employees of Holdings and its Subsidiaries in an aggregate principal amount outstanding not to exceed $100,000 at any time outstanding; and

(f)      other Investments in an aggregate amount not to exceed $500,000 during the term of this Agreement, provided that, immediately prior to, and after giving effect to such Investment, no Event of Default shall have occurred and be continuing or would result therefrom.

Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Payment not otherwise permitted under the terms of Section 6.3.

6.5      Financial Covenants.

(a)      Budget Compliance.  The proceeds of Loans made under this Agreement and all proceeds of Collateral shall be used by the Credit Parties solely for the purposes and, subject to the variances provided for below, up to the amounts set forth in the Budget for the applicable line item during the applicable Test Period and for each Test Period, (1) total actual cumulative operating receipts of the Borrower and its Subsidiaries for such Test Period as compared to total cumulative operating receipts for such Test Period set forth in the Budget, shall not have a negative variance that is in excess of the Permitted Deviation of the amount set forth in the Budget for such Test Period ("Operating Receipts Variance") and

(2) total actual cumulative operating disbursements (excluding debt service and professional fees) of the Borrower and the other Credit Parties during such Test Period shall not exceed the amount set forth in the Budget for such Test Period by more than Permitted Deviation ("Operating Disbursements Variance").

(b)    Liquidity.  The Credit Parties shall not permit Liquidity to be less than $15,000,000 at any time.

6.6    Fundamental Changes; Disposition of Assets; Acquisitions.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or license, exchange, transfer, divide or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, provided that following shall be permitted:

(a)    Dispositions of inventory sold, leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued);

(b)    Dispositions of obsolete, damaged, worn out, used, immaterial, unneeded or surplus property (including for purposes of recycling); and

(c)    Dispositions of Ordinary Course Receivables in connection with the Receivables Financing Transaction.

6.7    Disposal of Subsidiary Interests.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly issue, sell, assign, pledge or otherwise encumber or dispose of any Equity Interests of any of its Subsidiaries, except to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to issue, sell, assign, pledge or otherwise encumber or dispose of any Equity Interests of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

6.8    Sales and Lease-Backs.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which any Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Holdings or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by any Credit Party to any Person (other than Holdings or any of its Subsidiaries) in connection with such lease.

6.9    Transactions with Shareholders and Affiliates.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Holdings on terms that are less favorable to Holdings or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction between or among any Credit Party and any Subsidiary of

73

the Credit Parties in the ordinary course of business and consistent with past practice and the Budget, (ii) reasonable and customary fees paid to members of the board of directors (or similar governing body) of the Credit Parties and any Subsidiary of the Credit Parties, (iii) compensation arrangements for officers and other employees of the Credit Parties and any Subsidiary of the Credit Parties entered into in the ordinary course of business and, to the extent applicable, approved by the Bankruptcy Court, and (iv) to the extent applicable, transactions expressly permitted by Section 6.3 and Section 6.4.

6.10    <u>Conduct of Business</u>. From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by such Credit Party on the Closing Date and similar or related businesses and (ii) such other lines of business as may be consented to by Requisite Lenders.

6.11    <u>Permitted Activities of the Holding Companies</u>.  Holdings shall not, nor shall it permit any other Holding Company to, (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness and obligations under this Agreement or the other Credit Documents; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired, leased or licensed by it other than the Liens created under the Collateral Documents to which it is a party or permitted pursuant to Section 6.2; (c) engage in any business or activity or own any assets other than (i) holding 100% of the Equity Interests of the Borrower, (ii) performing its obligations and activities incidental thereto under the Credit Documents and (iii) making Restricted Payments and Investments to the extent permitted by this Agreement; (d) consolidate with or merge with or into, or convey, transfer, lease or license all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (f) create or acquire any Subsidiary or make or own any Investment in any Person other than the Borrower; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

6.12    <u>Amendments or Waivers of Organizational Documents</u>. No Credit Party shall nor shall it permit any of its Subsidiaries to, agree to any amendment, restatement, supplement or other modification to, or waiver of, any of its Organizational Documents after the Closing Date in a manner materially adverse to the Lenders without in each case obtaining the prior consent of the Requisite Lenders to such amendment, restatement, supplement or other modification or waiver.

6.13    <u>Amendments or Waivers of with respect to Certain Indebtedness</u>. No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or otherwise change the terms of any Indebtedness (which, for the avoidance of doubt, shall include the Receivables Financing Transaction) of the Credit Parties existing on the Petition Date, or make any payment consistent with an amendment thereof or change thereto, if the effect of such amendment or change is to increase the interest rate on such Indebtedness, change (to earlier dates) any dates upon which payments of principal or interest are due thereon, change any event of default or condition to an event of default with respect thereto (other than to eliminate any such event of default or increase any grace period related thereto), change the redemption, prepayment or defeasance provisions thereof, change the subordination provisions of any such Indebtedness (if applicable) (or of any guaranty thereof), or if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligor thereunder or to confer any additional rights on the holders of such Indebtedness (or a trustee or other representative on their behalf) which would be adverse to any Credit Party or Lenders.

6.14    <u>Accounting Method</u>. No Credit Party shall, nor shall it permit any of its Subsidiaries to modify or change its fiscal year, Fiscal Quarter or its method of accounting (other than as may be required to conform to GAAP).

6.15    Chapter 11 Claims; Adequate Protection.  No Credit Party shall incur, create, assume, suffer to exist or permit (i) any administrative expense, unsecured claim, or other super-priority claim or Lien that is pari passu with or senior to the claims of the Secured Parties against the Credit Parties hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than Permitted Adequate Protection Payments.

6.16    Chapter 11 Orders.  Absent consent of the Requisite Lenders, no Credit Party shall make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Chapter 11 Order, in each case, in a manner adverse to the Lenders.

6.17    Chapter 11 Cases.  Except as otherwise permitted pursuant to the Chapter 11 Orders, no Credit Party shall consent to termination or reduction of the Exclusivity Period or fail to object to any motion seeking to terminate or reduce the Exclusivity Period other than a motion filed by or with the consent of the Requisite Lenders.  No Credit Party shall seek or consent to any modification, stay, vacation, amendment or other modification of the Confirmation Order without the prior consent of the Requisite Lenders.  No Credit Party shall seek Bankruptcy Court approval of any exit credit facility, other than the Exit Term Loan Facility (as defined in the Restructuring Term Sheet (as defined in the RSA)) and an Acceptable Alternative Exit Facility.

## SECTION 7.  GUARANTY

7.1    Guaranty of the Obligations.  Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the DIP Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual Payment in Full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

7.2    Contribution by Guarantors.  All Guarantor Subsidiaries desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor Subsidiary (a "Funding Guarantor") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations.  "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder

75

shall not be considered as assets or liabilities of such Contributing Guarantor.  "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor Subsidiary is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

　　　　　7.3　　　Payment by Guarantors.  Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to the DIP Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

　　　　　7.4　　　Liability of Guarantors Absolute.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than Payment in Full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

　　　　　(a)　　　this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

　　　　　(b)　　　the DIP Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default;

　　　　　(c)　　　the obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

　　　　　(d)　　　payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the DIP Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be

deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Credit Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment

to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which the Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5     <u>Waivers by Guarantors</u>.   Each Guarantor hereby waives, for the benefit of Beneficiaries:  (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Credit Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than Payment in Full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.6     <u>Guarantors' Rights of Subrogation, Contribution, Etc.</u>  Until the Guaranteed Obligations shall have been indefeasibly Paid in Full in Cash, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been Paid in Full, each Guarantor shall withhold

exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and Paid in Full, such amount shall be held in trust for the DIP Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the DIP Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.7    Subordination of Other Obligations.  Any Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the DIP Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the DIP Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.8    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been Paid in Full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.9    Authority of Guarantors or the Borrower.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.10    Financial Condition of the Borrower.  Any Loan may be continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower.  Each Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Beneficiary.

7.11    Discharge of Guaranty Upon Sale of Guarantor.  If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be Disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such

79

successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Disposition.

## SECTION 8.  EVENTS OF DEFAULT

8.1    <u>Events of Default</u>.  If any one or more of the following conditions or events shall occur:

(a)    <u>Failure to Make Payments When Due</u>.  Failure by the Borrower to pay (i) when due any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan, any fee, premium (including Exit Premium) or any other amount due hereunder, in the case of this clause (ii), within three Business Days after the date due; or

(b)    <u>Default in Other Agreements</u>.  (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount (or Net Mark-to-Market Exposure) of $250,000 or more beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party with respect to any other term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts (or Net Mark-to-Market Exposure) referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; <u>provided</u> that an event described in this paragraph shall not at any time constitute an Event of Default if the exercise of the rights and remedies by a holder of such Indebtedness against the obligors thereof is and remains subject to the automatic stay in the Chapter 11 Cases; or

(c)    <u>Breach of Certain Covenants</u>.  Failure of any Credit Party to perform or comply with any term or condition contained in (i) Section 2.3, 5.1(f), Section 5.2 (solely with respect to the Borrower), Section 5.14, Section 5.17 or Section 6, and (ii) Sections 5.1(a), 5.1(b), 5.1(d), 5.1(p) and 5.1(q), Section 5.13, or Section 5.16, and such default shall not have been remedied or waived within one (1) Business Day; or

(d)    <u>Breach of Representations, Etc.</u>  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    <u>Other Defaults Under Credit Documents</u>.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other paragraph of this Section 8.1, and such default shall not have been remedied or waived within thirty (30) days; or

(f)    [Reserved].

(g)    [Reserved].

(h)    [Reserved].

(i)    Dissolution.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(j)    Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in a Material Adverse Effect; (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Code or ERISA on the Collateral securing obligations that are expressly subordinated in priority to the Obligations, or (iii) the receipt of a notice from a Governmental Authority relating to the intention to terminate any Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan and a Material Adverse Effect would reasonably be expected to result therefrom; or

(k)    Change of Control.  A Change of Control shall occur; or

(l)    Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of the DIP Collateral Agent or any Secured Party to take any action within its control, (iii) any Credit Party shall contest the validity or enforceability of any Credit Document or deny that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents or (iv) the Obligations shall cease to constitute First Priority obligations of the Credit Parties; or

(m)    Subordinated Indebtedness.  Any Subordinated Indebtedness permitted hereunder or the guarantees thereof shall cease, for any reason, to be validly subordinated to the Obligations of the Credit Parties hereunder, as provided in the documents governing such Subordinated Indebtedness, or any Credit Party, any Affiliate of any Credit Party shall take any action in violation of or contest in any manner the validity or enforceability of the applicable subordination provisions with respect to such Subordinated Indebtedness; or

(n)    Final Order.  A Final Order shall not have been entered by the Bankruptcy Court on or before the date that is thirty (30) days after the entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without prior consent of the Requisite Lenders; or

(o)    RSA.  The RSA is terminated in accordance with its terms; or

(p)    Chapter 11 Cases.

(i)    Any Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Debtor shall file any pleading requesting any such relief; or a motion shall be filed by any Debtor for the approval of, or there shall arise, (i) any other Claim having priority senior to or pari passu with the claims of the DIP Administrative Agent and Lenders under the Credit Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein and in the DIP Order; or

(ii)    Any Debtor files a motion in the Chapter 11 Cases to obtain additional or replacement financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code, except with the express written consent of the Requisite Lenders; or

(iii)    Any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition Claim (or the Debtor shall otherwise make a payment on any prepetition claim) other than (x) as provided for in the DIP Order and included in the Budget (together with such variances thereto as are permitted pursuant to Section 6.5(a)) or (y) otherwise consented to by the Requisite Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,000 in the aggregate or to permit other actions that would have a material adverse effect on the Credit Parties or their estates, or (iii) approving any settlement or other stipulation not approved by the Requisite Lenders and not included in the Budget (together with such variances thereto as are permitted pursuant to Section 6.5(a)) with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor; or

(iv)    (A) any Chapter 11 Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Debtor shall apply for authority to do so) without the written consent of the Requisite Lenders (or any Debtor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph) or (B) any Chapter 11 Order shall cease to be in full force and effect; or

(v)    Any of the Credit Parties shall fail to comply with the terms and conditions of any Chapter 11 Order in any material respect; or

(vi)    The Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Debtor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph); or

(vii)    Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Requisite Lenders; or

(viii)    The Credit Parties or any of their Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Credit Parties or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Administrative Agent; or

(ix)    (A) The Credit Parties or any of their Affiliates shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Credit Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Administrative Agent or contest any material provision of any Credit Document, (B) such Liens and/or super-priority claims shall otherwise cease to be valid, perfected and enforceable in all respects or (C) or any material provision of any Credit Document shall cease to be effective; or

(x)    Any judgments which are in the aggregate in excess of $250,000 as to any postpetition obligation shall be rendered against any of the Credit Parties and the enforcement thereof shall not be stayed; or there shall be rendered against any of the Credit Parties a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Credit Parties to perform their obligations under the Credit Documents or the value of the Collateral; or

(xi)    (A) The Credit Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (B) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders; or

(xii)    Any Credit Party shall fail to execute and deliver to the DIP Administrative Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Administrative Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the DIP Administrative Agent (for the benefit of the Secured Parties) under the DIP Order; or

(xiii)    The Confirmation Order is not entered by the Bankruptcy Court on or before [_____ __], 2024, or such later date to which the Requisite Lenders have consented in writing;

THEN, that has not been waived by the Requisite Lenders, the DIP Administrative Agent may, following delivery of written notice (a "Termination Notice"), which may be done by e-mail, on not less than five (5) business days' notice (such five (5) business day period, the "DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents and the Prepetition Equipment Financing Lender (as defined in the Interim Order), lead counsel to the Creditors' Committee (if appointed), and to the U.S. Trustee (the "Remedies Notice Parties"), without further notice to, hearing of, or order from the Bankruptcy Court:  (a) immediately terminate and/or revoke the Debtors' right under the Interim Order and any other Credit Documents to use Cash Collateral (subject to the provisions related to the Carve-Out), (b) terminate this Agreement and any Credit Document as to any future liability or obligation of the Secured Parties but without affecting any of the Obligations or the Liens securing the Obligations; (c) declare all Obligations to be immediately due and payable; and (d) invoke the

right to charge interest at the default rate hereunder.  At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Credit Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable DIP Order or other Credit Documents.

Any automatic stay otherwise applicable to the foregoing, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, shall be modified to the extent necessary to permit the DIP Administrative Agent to effectuate the foregoing, provided that, during the DIP Agent Remedies Notice Period, the Debtors, the  Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Administrative Agent consenting to such emergency hearing) with the Bankruptcy Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral.  Upon delivery of a Termination Notice by the DIP Administrative Agent, without further notice or order of the Bankruptcy Court, the Secured Parties' and the Prepetition Secured Parties' (as defined in the Interim Order) consent to use Cash Collateral and the Debtors' ability to incur additional obligations pursuant to the DIP Order will, subject to the expiration of the DIP Agent Remedies Notice Period and unless the Bankruptcy Court orders otherwise, automatically terminate and the Secured Parties will have no further obligation to provide any Loans or other financial accommodations.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket of the Bankruptcy Court.

Following an Event of Default and the delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than as set forth in the DIP Order), the Secured Parties shall be required to file a motion with the Bankruptcy Court seeking emergency relief (the "Stay Relief Motion") on not less than five (5) Business Days' notice to the Remedies Notice Parties (which may run concurrently with the DIP Agent Remedies Notice Period) for an order of the Bankruptcy Court modifying the automatic stay in these cases to permit the Secured Parties to, subject to the Carve-Out provisions: (a) freeze monies or balances in the Debtors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Administrative Agent or any Secured Party against the Obligations; (c) enforce any and all rights against the Collateral, including, without limitation, foreclosure on all or any portion of the Collateral, occupying the Debtors' premises, sale or disposition of the Collateral; and (d) take any other actions or exercise any other rights or remedies permitted under the DIP Order, the Credit Documents or applicable law.  If the Secured Parties are permitted by the Bankruptcy Court to take any enforcement action with respect to the Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the Secured Parties in their efforts to enforce their security interest in the Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect the Secured Parties from enforcing such security interests.  Until such time that the Stay Relief Motion has been adjudicated by the Bankruptcy Court, and subject to the other terms of the DIP Order, and subject further to any terms and conditions that the Bankruptcy Court may impose, the Debtors may use Cash Collateral and the proceeds of the Loans to the extent drawn prior to the occurrence of the Event of Default to pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates set forth in the Budget.

   8.2  <u>Application of Proceeds</u>.  Notwithstanding anything to the contrary contained in this Agreement or any Credit Document, upon the occurrence and during the continuance of an Event of Default and after the acceleration of the principal amount of any of the Loans hereunder, any and all payments received by the DIP Administrative Agent, including proceeds of Collateral, shall be applied:

(i)      *first*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to the DIP Administrative Agent and the DIP Collateral Agent with respect to this Agreement, the other Credit Documents or the Collateral;

(ii)      *second*, to all fees, premium (including the Exit Premium), costs, indemnities, liabilities, obligations and expenses incurred by or owing to any Lender with respect to this Agreement, the other Credit Documents or the Collateral;

(iii)      *third*, to accrued and unpaid interest on the Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts);

(iv)      *fourth*, to the principal amount of the Obligations;

(v)      *fifth*, to any other Indebtedness or obligations of any Credit Party owing to the DIP Administrative Agent, any Lender or any other Secured Party under the Credit Documents for which the DIP Administrative Agent has received notice of such Obligations as being outstanding; and

(vi)      *sixth*, to the Borrower or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.

In carrying out the foregoing, (x) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (y) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category.

## SECTION 9.  AGENTS

9.1      <u>Appointment of Agents</u>.  Jefferies Finance LLC is hereby appointed the DIP Administrative Agent and the DIP Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Jefferies Finance LLC to act as the DIP Administrative Agent and the DIP Collateral Agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 are solely for the benefit of the Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries.

9.2      <u>Powers and Duties</u>.  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

85

9.3     General Immunity.

(a)     No Responsibility for Certain Matters.  No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Anything contained herein to the contrary notwithstanding, the DIP Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)     Exculpatory Provisions.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of Requisite Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.3(b).  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under any Debtor Relief Law.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Holdings and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

(c)     Delegation of Duties.  The DIP Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by the DIP Administrative Agent.  The DIP Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 shall apply to any of the Affiliates of the DIP Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the DIP Administrative Agent.  All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 shall apply

86

to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein.  Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by the DIP Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to the DIP Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

(d)    Erroneous Payments.  The parties hereto agree that an erroneous payment shall not pay, prepay, repay discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party, except, in each case, to the extent such erroneous payment is, and solely with respect to the amount of such erroneous payment that is, comprised of funds received by the DIP Administrative Agent from the Borrower or any other Credit Party for the purpose of making such erroneous payment. Nothing in this Section 9.3(d) shall be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for),  the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such erroneous payment not been made by the DIP Administrative Agent.

9.4    Agents Entitled to Act as Lender.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Holdings or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

9.5    Lenders' Representations, Warranties and Acknowledgment.

(a)    Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with the Loans hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

9.6    <u>Right to Indemnity</u>.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify the DIP Administrative Agent and the DIP Collateral Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction; <u>provided</u> <u>further</u> that no action taken in accordance with the directions of Requisite Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.6.  If any indemnity furnished to the DIP Administrative Agent or the DIP Collateral Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; <u>provided</u> that (i) in no event shall this sentence require any Lender to indemnify the DIP Administrative Agent or the DIP Collateral Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof, and (ii) this sentence shall not be deemed to require any Lender to indemnify the DIP Administrative Agent or the DIP Collateral Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.  The undertaking in this Section 9.6 shall survive termination of the Commitments, the payment of all other Obligations and the resignation of the Agent.

9.7    <u>Successor DIP Administrative Agent and DIP Collateral Agent</u>.

(a)    The DIP Administrative Agent shall have the right to resign at any time by giving prior notice thereof to Lenders and the Borrower or may be removed at any time with ten (10) Business Days' prior written notice from the Requisite Lenders delivered to the DIP Administrative Agent and the Borrower.  The DIP Administrative Agent shall have the right to appoint a financial institution to act as the DIP Administrative Agent and/or the DIP Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Requisite Lenders, and the DIP Administrative Agent's resignation shall become effective on the earliest of (i) thirty (30) days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor DIP Administrative Agent by the Borrower and the Requisite Lenders or (iii) such other date, if any, agreed to by the DIP Administrative Agent and the Requisite Lenders.  Upon any such notice of resignation or removal, if a successor DIP Administrative Agent has not already been appointed by the retiring DIP Administrative Agent, Requisite Lenders shall have the right, upon five Business Days' notice to the Borrower, to appoint a successor DIP Administrative Agent; <u>provided</u> that a DIP Administrative Agent that has been removed by the Requisite Lenders shall have no right to appoint a successor DIP Administrative Agent.  If neither Requisite Lenders nor the DIP Administrative Agent have appointed a successor DIP Administrative Agent, Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring DIP Administrative Agent; <u>provided</u> that, until a successor DIP Administrative Agent is so appointed by Requisite Lenders or the DIP Administrative Agent, any collateral security held by the DIP Administrative Agent in its role as the DIP Collateral Agent on behalf of the Lenders under any of the Credit Documents shall continue to be held by the retiring DIP Collateral Agent as nominee until such time as a successor the DIP Collateral Agent is appointed.  Upon the acceptance of any appointment as the DIP Administrative Agent hereunder by a successor DIP Administrative Agent, that successor DIP Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed DIP Administrative Agent and the retiring or

removed DIP Administrative Agent shall promptly (i) transfer to such successor DIP Administrative Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor DIP Administrative Agent under the Credit Documents, and (ii) at the expense of the Credit Parties, execute and deliver to such successor DIP Administrative Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor DIP Administrative Agent of the security interests created under the Collateral Documents, whereupon such retiring DIP Administrative Agent shall be discharged from its duties and obligations hereunder.  Except as provided above, any resignation of Jefferies Finance LLC or its successor as the DIP Administrative Agent pursuant to this Section 9.7 shall also constitute the resignation of Jefferies Finance LLC or its successor as the DIP Collateral Agent.  After any retiring DIP Administrative Agent's resignation hereunder as the DIP Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the DIP Administrative Agent hereunder.  Any successor DIP Administrative Agent appointed pursuant to this Section 9.7 shall, upon its acceptance of such appointment, become the successor DIP Collateral Agent for all purposes hereunder.

(b)    In addition to the foregoing, the DIP Collateral Agent may resign at any time by giving prior notice thereof to the Lenders and the Grantors, and the DIP Collateral Agent may be removed at any time with or without cause by an instrument or concurrent instruments delivered to the Grantors and the DIP Collateral Agent signed by Requisite Lenders.  The DIP Administrative Agent shall have the right to appoint a financial institution as the DIP Collateral Agent hereunder, subject to the reasonable satisfaction of the Borrower and the Requisite Lenders and the DIP Collateral Agent's resignation shall become effective on the earliest of (i) thirty (30) days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor DIP Collateral Agent by the Borrower and the Requisite Lenders or (iii) such other date, if any, agreed to by the DIP Collateral Agent and the Requisite Lenders.  Upon any such notice of resignation, Requisite Lenders shall have the right, upon five Business Days' notice to the DIP Administrative Agent, to appoint a successor DIP Collateral Agent.  Until a successor DIP Collateral Agent is so appointed by Requisite Lenders or the DIP Administrative Agent, any collateral security held by the DIP Collateral Agent on behalf of the Lenders under any of the Credit Documents shall continue to be held by the retiring DIP Collateral Agent as nominee until such time as a successor DIP Collateral Agent is appointed.  Upon the acceptance of any appointment as the DIP Collateral Agent hereunder by a successor DIP Collateral Agent, that successor DIP Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed DIP Collateral Agent under this Agreement and the Collateral Documents, and the retiring DIP Collateral Agent under this Agreement shall promptly (i) transfer to such successor DIP Collateral Agent all sums, Securities and other items of Collateral held hereunder or under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor DIP Collateral Agent under this Agreement and the Collateral Documents, and (ii) at the expense of the Credit Parties, execute and deliver to such successor DIP Collateral Agent or otherwise authorize the filing of such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor DIP Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed DIP Collateral Agent shall be discharged from its duties and obligations under this Agreement and the Collateral Documents.  After any retiring DIP Collateral Agent's resignation hereunder as the DIP Collateral Agent, the provisions of this Agreement and the Collateral Documents shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement or the Collateral Documents while it was the DIP Collateral Agent hereunder.

9.8    Collateral Documents and Guaranty.

(a)     <u>Agents under Collateral Documents and Guaranty</u>.  Each Secured Party hereby further authorizes the DIP Administrative Agent or the DIP Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 10.5, without further consent or authorization from any Secured Party, the DIP Administrative Agent or the DIP Collateral Agent, as applicable may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.

(b)     <u>Right to Realize on Collateral and Enforce Guaranty</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the DIP Administrative Agent, the DIP Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by the DIP Administrative Agent or the DIP Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the DIP Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the DIP Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the DIP Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the DIP Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or the Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Requisite Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the DIP Collateral Agent at such sale or other disposition.

(c)     [Reserved].

(d)     <u>Release of Collateral and Guarantees, Termination of Credit Documents</u>. Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations have been Paid in Full and all Commitments have terminated or expired, upon request of the Borrower, the DIP Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Credit Document.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(e)     The DIP Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the DIP Collateral Agent's Lien thereon, or any certificate

prepared by any Credit Party in connection therewith, nor shall the DIP Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

9.9 <u>DIP Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim</u>. In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Credit Party, the DIP Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the DIP Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the DIP Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the DIP Administrative Agent and its respective agents and counsel and all other amounts due to the DIP Administrative Agent under Sections 2.10 and 10.3 allowed in such judicial proceeding); and

(c) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the DIP Administrative Agent and, in the event that the DIP Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the DIP Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the DIP Administrative Agent and its agents and counsel, and any other amounts due the DIP Administrative Agent under Sections 2.19, 10.2 and 10.3. To the extent that the payment of any such compensation, expenses, disbursements and advances of the DIP Administrative Agent, its agents and counsel, and any other amounts due to the DIP Administrative Agent under Sections 2.19, 10.2 and 10.3 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the DIP Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the DIP Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

9.10 <u>Posting of Communications to Platform</u>.

(a) Each Credit Party and each of the Lenders agrees that the DIP Administrative Agent may, but shall not be obligated to, make the Communications available to such Lender by posting the Communications on IntraLinks or SyndTrak or a substantially similar electronic platform chosen by the DIP Administrative Agent to be its electronic transmission system (each such system, a "<u>Platform</u>"). Each Credit Party acknowledges and agrees that the distribution of material through an electronic medium is not

necessarily secure and that there are confidentiality and other risks associated with such distribution. In consideration for the convenience and other benefits afforded by such distribution and for the other consideration provided hereunder, the receipt and sufficiency of which is hereby acknowledged, each of the Lenders and each Credit Party hereby approves distribution of the Communications through the Platform and understands and assumes the risks of such distribution.

(b)    EACH PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF ANY PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR ANY PLATFORM. IN NO EVENT SHALL ANY AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, THE "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY OTHER CREDIT PARTY, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE AGENTS' TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(c)    Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to a Platform shall constitute effective delivery of the Communications to such Lender for purposes of Section 10.1. Each Lender agrees (A) to notify the DIP Administrative Agent (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(d)    Nothing in this Section 9.10 shall prejudice the right of any Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

(e)    Each of the Lenders and each Credit Party agree that the DIP Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Platform in accordance with the DIP Administrative Agent's generally-applicable document retention procedures and policies.

9.11    Credit Bidding.    The Secured Parties hereby irrevocably authorize the DIP Administrative Agent, at the direction of the Requisite Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with

the consent or at the direction of) the DIP Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the DIP Administrative Agent at the direction of the Requisite Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid (i) the DIP Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the DIP Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the DIP Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Requisite Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Requisite Lenders contained in Section 9.2 of this Agreement), (iv) the DIP Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the DIP Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

## SECTION 10.  MISCELLANEOUS

10.1    Notices.

(a)    Notices Generally.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or the Agents shall be sent, in writing, or by any telecommunication device capable of creating a written record (including electronic mail), and addressed to such Person at its address as set forth on Appendix B or in the other relevant Credit Document or at such other address as shall be notified in writing (x) in the case of the Borrower, the DIP Administrative Agent or the DIP Collateral Agent, to the other parties, (y) in the case of any Lender, to the DIP Administrative Agent and (z) in the case of all other parties, to the Borrower and the DIP Administrative Agent.

(b)    <u>Effectiveness of Notice</u>.  All notices, demands, requests, consents and other communications described in clause (a) above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, (ii) if delivered by mail, when deposited in the mails, (iii) if delivered by posting to a Platform, an Internet website or a similar telecommunication device requiring that a user have prior access to such Platform, website or other device (to the extent permitted by Section 9.10 to be delivered thereunder), when such notice, demand, request, consent and other communication shall have been made generally available on such Platform, Internet website or similar device to the class of Person being notified (regardless of whether any such Person must accomplish, and whether or not any such Person shall have accomplished, any action prior to obtaining access to such items, including registration, disclosure of contact information, compliance with a standard user agreement or undertaking a duty of confidentiality) and such Person has been notified that such communication has been posted to such Platform and (iv) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (a) above.

(c)    <u>Use of Platform</u>.  Notwithstanding clauses (a) and (b) above (unless the DIP Administrative Agent requests that the provisions of clauses (a) and (b) above be followed) and any other provision in this Agreement or any other Credit Document providing for the delivery of any Communication by any other means, the Credit Parties shall deliver all Communications to the DIP Administrative Agent by properly transmitting such Communications in an electronic/soft medium in a format acceptable to the DIP Administrative Agent to such electronic mail address (or similar means of electronic delivery) as the DIP Administrative Agent may notify the Borrower.  Nothing in this clause (c) shall prejudice the right of the DIP Administrative Agent or any of the Lenders to deliver any Communication to any Credit Party in any manner authorized in this Agreement or to request that the Borrower effects delivery in such manner.

10.2    <u>Expenses</u>.  Whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay promptly (a) all the reasonable costs and expenses incurred in connection with the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrower and the other Credit Parties; (c) the reasonable, documented fees, expenses and disbursements of one counsel to the Agents and Milbank LLP, as counsel to the Lenders (including in each case allocated costs of one local counsel) in connection with the negotiation, preparation, delivery, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrower; (d) all the reasonable expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the DIP Collateral Agent, for the benefit of Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of one counsel to the Agents and one counsel to the Lenders (including in each case allocated costs of one local counsel) providing any opinions that any Agent or the Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) all the reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the DIP Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other reasonable costs and expenses incurred by each Agent and the Lenders in connection with the syndication of the Loans and Commitments and the transactions contemplated by the Credit Documents and any consents, amendments, waivers or other modifications thereto and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including reasonable attorneys' fees of one counsel (including allocated costs of local counsel) and costs of settlement, incurred by any Agent and one counsel (including allocated costs of local counsel) and costs of settlement, incurred by the Lenders in enforcing any Obligations of or in collecting

any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

10.3    Indemnity; Limitation of Liability.

(a)    Indemnity.  In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and each Lender and their Affiliates and each of their respective officers, partners, members, directors, trustees, advisors, employees, shareholders, attorneys, controlling persons, agents, sub-agents and each of their respective heirs, successors and assigns (each, an "Indemnitee"), from and against any and all Indemnified Liabilities; provided that no Credit Party shall have any obligation to any Indemnitee hereunder with respect to (i) any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence, bad faith or willful misconduct of such Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction or (ii) claims brought by an Indemnitee solely against another Indemnitee and not arising out of any act or omission of any Credit Party or any of their respective Affiliates other than claims against any Agent (or any of their respective Affiliates) in fulfilling their respective roles as Agent or any similar role in respect of the Loans.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.  This Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims damages, etc. arising from any non-Tax claim.

(b)    Limitation of Liability.

(i)    To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against each Lender, each Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and Holdings and the Borrower hereby waive, release and agree not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(ii)    Each Credit Party also agrees that no Lender, Agent nor their respective Affiliates, directors, employees, attorneys, agents or sub-agents will have any liability to any Credit Party or any person asserting claims on behalf of or in right of any Credit Party or any other person in connection with or as a result of this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, in each case, except in the case of any Credit Party to

95

the extent that any losses, claims, damages, liabilities or expenses incurred by such Credit Party or its affiliates, shareholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Lender, Agent or their respective Affiliates, directors, employees, attorneys, agents or sub-agents in performing its obligations under this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein; <u>provided</u> that in no event will such Lender, Agent or their respective Affiliates, directors, employees, attorneys, agents or sub-agents have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such Lender's, Agent's or their respective Affiliates', directors', employees', attorneys', agents' or sub-agents' activities related to this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein.

10.4    <u>Set-Off</u>.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, each Lender is hereby authorized by each Credit Party at any time or from time to time subject to the consent of the DIP Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than the DIP Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto or with any other Credit Document, irrespective of whether or not such Lender shall have made any demand hereunder.  The rights of each Lender and its Affiliates under this Section 10.4 are in addition to other rights and remedies (including other rights of set-off) that such Lender or its Affiliates may have.

10.5    <u>Amendments and Waivers</u>.

(a)    <u>Requisite Lenders' Consent</u>.  Subject to Section 2.15(b) and (c) and to the additional requirements of Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the concurrence of Requisite Lenders.

(b)    <u>Affected Lenders' Consent</u>.  Without the consent of each Lender that would be directly affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan or Note of such Lender;

(ii)    extend or increase any Commitment of such Lender;

(iii)    waive, reduce or postpone any scheduled repayment (but not prepayment), fees or expenses owed to such Lender;

(iv)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.7) of such Lender;

(v)    extend the time for payment of any such interest owed to such Lender;

(vi)    reduce the principal amount of any Loan of such Lender;

(vii)    amend, modify, terminate or waive any provision of this Section 10.5(b), Section 10.5(c) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(viii)    amend Section 2.13(g), Section 8.2 or the definition of "Requisite Lenders" or the relevant substance of any other provision in the Agreement referencing the pro rata share of a Lender (including the definition of "Pro Rata Share");

(ix)    release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except in connection with a "credit bid" undertaken by the DIP Collateral Agent at the direction of the Requisite Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Credit Documents (in which case only the consent of the Requisite Lenders will be needed for such release);

(x)    consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document; or

(xi)    amend the definition of "Eligible Assignee" or change any provision of Section 10.6 in any manner that makes assignments or transfers by any Lender more restrictive;

provided that, for the avoidance of doubt, all Lenders shall be deemed directly affected thereby with respect to any amendment described in clauses (vii), (viii), (ix), (x) and (xi).

(c)    Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall amend, modify, terminate or waive any provision of the Credit Documents as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent, as applicable.

(d)    Execution of Amendments, Etc.  The DIP Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

(e)    Corrections.  Notwithstanding anything to the contrary contained in this Section 10.5, the DIP Administrative Agent and the Borrower may amend or modify this Agreement and any other Credit Document to (i) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional assets or property for the benefit of the Secured Parties or join additional Persons as Credit Parties, and (ii) if the DIP Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents, then DIP Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other

party to any Credit Document if the same is not objected to by the Requisite Lenders within five (5) Business Days following receipt of notice thereof.

Notwithstanding anything herein to the contrary, the schedule of Commitments set forth on Appendix A hereto may be modified after the Closing Date by Milbank LLP and Houlihan Lokey, Inc. without the consent of any party hereto to effectuate the results of the syndication of such Commitments by Houlihan Lokey, Inc. after the Closing Date.

10.6    Successors and Assigns; Participations.

(a)    Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and the Lenders and other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register.  The Borrower, the DIP Administrative Agent and the Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(d).  Each assignment shall be recorded in the Register promptly following receipt by the DIP Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to the Borrower and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the "Assignment Effective Date."  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.6(b) shall be construed so that all Commitments or Loans, as applicable, are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code and any related United States Treasury Regulations (or any other relevant or successor provisions of the Code or of such United States Treasury Regulations).

(c)    Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations to any Person meeting the criteria of the definition of the term "Eligible Assignee" upon the giving of notice to DIP Administrative Agent.

(d)    Mechanics.  Assignments and assumptions of Loans and Commitments by the Lenders shall be effected by manual execution and delivery to the DIP Administrative Agent of an Assignment Agreement.  Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date.  In connection with all assignments there shall be delivered to the DIP Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to

deliver pursuant to Section 2.17(f), together with payment to the DIP Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in the case of an assignee which is already a Lender or is an Affiliate or Related Fund of a Lender or a Person under common management with a Lender) by the assignee or assignor.

(e)    Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control); and (iv) it will not provide any information obtained by it in its capacity as a Lender to Sponsor or any Affiliate of Sponsor.

(f)    Effect of Assignment.  Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided that anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to the DIP Administrative Agent for cancellation, and thereupon the Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new outstanding Loans of the assignee and/or the assigning Lender.

(g)    Participations.

(i)    Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.  Each Lender that sells a participation pursuant to this Section 10.6(g) shall, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, maintain a register on which it records the name and address of each participant and the principal amounts (and stated interest) of each participant's participation interest with respect to the Loan (each, a "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section

5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulation.  Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to the Loan for all purposes under this Agreement, notwithstanding any notice to the contrary.

(ii)      The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)     The Borrower agrees that each participant shall be entitled to the benefits of Sections 2.16 and 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) (it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section 10.6; provided that (x) a participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, except to the extent such entitlement to receive a greater payment results from a change in applicable law that occurs after the participant acquired the applicable participation.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided that such participant agrees to be subject to Section 2.14 as though it were a Lender.

(h)      Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 10.6 any Lender may assign, pledge and/or grant a security interest in all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided that (i) no Lender, as between the Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and (ii) in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

10.7     Independence of Covenants.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it

would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

10.8    <u>Survival of Representations, Warranties and Agreements</u>.    All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of the Loans.    Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.16, 2.17, 10.2, 10.3 and 10.4 and the agreements of the Lenders set forth in Sections 2.14, 9.3(b) and 9.6 shall survive the payment of the Loans and the termination hereof.

10.9    <u>No Waiver; Remedies Cumulative</u>.    No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.    The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

10.10    <u>Marshalling; Payments Set Aside</u>.    Subject to the DIP Order, neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.    To the extent that any Credit Party makes a payment or payments to the DIP Administrative Agent or the Lenders (or to the DIP Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercises any right of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or set-off had not occurred.

10.11    <u>Severability</u>.    In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.12    <u>Obligations Several; Independent Nature of Lenders' Rights</u>.    The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.    Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity.    The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

10.13    <u>Headings</u>.    Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

10.14    Governing Law.    This Agreement and the other Credit Documents shall be governed by, and construed in accordance with, the law of the State of New York, except to the extent New York law is superseded by the Bankruptcy Code.

10.15    CONSENT TO JURISDICTION.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OBLIGOR HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.    EACH OBLIGOR HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE OBLIGORS AT THEIR ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.1.  THE OBLIGORS AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OBLIGOR IN ANY OTHER JURISDICTION.  EACH OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY OBLIGOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH OBLIGOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS.

10.16    WAIVER OF JURY TRIAL.    EACH OBLIGOR, THE DIP ADMINISTRATIVE AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH OBLIGOR CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE DIP ADMINISTRATIVE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE DIP ADMINISTRATIVE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH OBLIGOR HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE DIP ADMINISTRATIVE AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT.

10.17    Confidentiality.    Each Agent and each Lender shall hold all Non-Public Information regarding Holdings, the Borrower and their respective Subsidiaries, Affiliates and their

businesses identified as such by the Borrower and obtained by such Agent or such Lender pursuant to the requirements of the Credit Documents in accordance with such Agent's and such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by the Borrower that, in any event, the DIP Administrative Agent may disclose such information to the Lenders and each Agent and each Lender and each Agent may make (i) disclosures of such information to Affiliates of such Lender or Agent and to their respective officers, directors, partners, members, employees, legal counsel, independent auditors, leverage facility providers and other advisors, experts or agents who need to know such information and on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.17), (ii) disclosures of such information reasonably required by any potential or prospective assignee, transferee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to the Borrower and its obligations (provided that such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 10.17 or other provisions at least as restrictive as this Section 10.17), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to Credit Parties received by it from any Agent or any Lender, (iv) disclosure on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (v) disclosures in connection with the exercise of any remedies hereunder or under any other Credit Document, (vi) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform the Borrower promptly thereof to the extent not prohibited by law) and (vii) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates (including any self-regulatory authority, such as the National Association of Insurance Commissioners).  In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Credit Documents.  Notwithstanding anything to the contrary herein, any Agent or Lender may place promotional materials on the Internet or World Wide Web in the form of a "tombstone" or otherwise describing the name and logo of the Borrower and its Subsidiaries (or any of them), and the amount, type and closing date of the Related Transactions.

10.18    Effectiveness; Counterparts.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by the Borrower and the DIP Administrative Agent of notification of such execution and authorization of delivery thereof.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

10.19    [Reserved].

10.20    PATRIOT Act.  Each Lender and the DIP Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such

Lender or the DIP Administrative Agent, as applicable, to identify such Credit Party in accordance with the PATRIOT Act.

      10.21  <u>Electronic Execution of Assignments</u>.   The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

      10.22  <u>No Fiduciary Duty</u>.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "<u>Lenders</u>"), may have economic interests that conflict with those of the Credit Parties, their stockholders and/or their affiliates.  Each Credit Party agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its stockholders or its affiliates, on the other.   The Credit Parties acknowledge and agree that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Credit Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its stockholders or its Affiliates on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person.  Each Credit Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Credit Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Credit Party, in connection with such transaction or the process leading thereto.

## SECTION 11.  SECURITY AND ADMINISTRATIVE PRIORITY

      11.1  <u>Prepetition Obligations</u>. Each of the Credit Parties hereby acknowledges, confirms and agrees that the Borrower and its Subsidiaries (including the Credit Parties) are each indebted to the Prepetition Agents and the Prepetition Lenders for the Prepetition Obligations, as of the Petition Date, in an aggregate principal amount of not less than $806,000,000 plus accrued and unpaid interest of at least $5,100,000, in respect of Prepetition Obligations under the Prepetition Credit Agreement plus fees, costs, expenses, charges and disbursements incurred in connection therewith (including attorneys' fees), indemnities, reimbursement obligations and other charges now or hereafter owed by the Borrower and its Subsidiaries (including the Credit Parties) to the Prepetition Agents and the Prepetition Lenders pursuant to the terms of the Prepetition Credit Agreement, all of which are unconditionally owing by the Borrower and its Subsidiaries (including the Credit Parties) to the Prepetition Agent and the Prepetition Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

      11.2  <u>Acknowledgment of Security Interests</u>.  As of Petition Date, each of the Credit Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) the Prepetition Agents and the Prepetition Lenders have valid, enforceable and

perfected first priority and senior liens (subject only to "Permitted Liens" (as defined in the Prepetition Credit Documents)) upon and security interests in all of the Collateral (as defined in the Prepetition Credit Documents) granted pursuant to the Prepetition Credit Documents and the other "Collateral Documents" (as defined in the Prepetition Credit Documents) as in effect on the Petition Date to secure all of the Prepetition Obligations and (ii) such Liens are not subject to avoidance, set off, counterclaim, recharacterization, reduction, disallowance, impairment or subordination (whether contractual, equitable or otherwise) or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

11.3    <u>Binding Effect of Documents</u>.  Each of the Credit Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) each of the Prepetition Credit Documents and the other "Collateral Documents" (as defined in the Prepetition Credit Documents) to which it is a party is in full force and effect as of the date hereof, (ii) the agreements and obligations of the Borrower and each of its Subsidiaries contained in the Prepetition Credit Documents and the other "Collateral Documents" (as defined in the Prepetition Credit Documents) constitute the legal, valid and binding obligations of each of the Borrower and its Subsidiaries enforceable against each of them in accordance with their respective terms and neither the Borrower nor any of its Subsidiaries has any valid defense, offset or counterclaim to the enforcement of such obligations and (iii) the Prepetition Agents and the Prepetition Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition Credit Documents and the other "Collateral Documents" (as defined in the Prepetition Credit Documents), except to the extent clauses (ii) and (iii) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

11.4    <u>Collateral; Grant of Lien and Security Interest</u>.

(a)    Pursuant to the DIP Order and in accordance with the terms thereof, as security for the full and timely payment and performance of all of the Obligations, each of the Credit Parties hereby assigns, pledges and grants to the DIP Collateral Agent, for the benefit of itself and the other Beneficiaries (the "<u>Secured Parties</u>"), a security interest in, and Lien on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible now existing or hereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Credit Parties, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the issued and outstanding Capital Stock entitled to vote (within the meaning of Treas.  Reg. Section 1.956-2(c)(2)) and all of the issued and outstanding Capital Stock not entitled to vote (within the meaning of Treas.  Reg. Section 1.956-2(c)(2)) of each Subsidiary that is directly owned by the Borrower or by any Domestic Subsidiary (excluding, for the avoidance of doubt, any Capital Stock or Indebtedness of a Subsidiary of (x) a Foreign Subsidiary, (y) a CFC or (z) a Foreign Subsidiary Holding Company), money, investment property, deposit accounts, all commercial tort claims and other causes of action other than Avoidance Actions, the proceeds of all Avoidance Actions (but only upon entry of the Final Order), all "Cash Collateral" (as defined in the DIP Order), and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of collateral described above (all property of the Borrowers subject to the security interest referred to in this clause (d)(i) being hereinafter, collectively, referred to as the "<u>Collateral</u>").

(b)    The security interests and Liens in favor of the DIP Collateral Agent in the Collateral shall be effective immediately upon the entry of the DIP Order and subject and subordinate only to the Carve-Out and the terms and conditions set forth in the DIP Order.  Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been paid in full.

(c)　　　Notwithstanding anything herein to the contrary (A) all proceeds received by the DIP Collateral Agent and the Lenders from the Collateral subject to the Liens granted in this clause (d) and in each other Credit Document shall be, upon the occurrence and during the continuation of an Event of Default or a default under the DIP Order, subject and subordinate to the prior payment of the Carve-Out and (B) no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any Collateral, and without limiting such Person's right to receive proceeds of a sale up to the amount of the Carve-Out owed to such Person, such Person shall not seek or object to the sale or other disposition of any Collateral.

(d)　　　Subject only to prior payment of Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the DIP Administrative Agent against any Credit Party in respect of any Obligation.

11.5　　Administrative Priority.　Each Credit Party agrees that its Obligations shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to prior payment of the Carve-Out and the terms and conditions of the DIP Order.

11.6　　Grants, Rights and Remedies.　The Liens and security interests granted pursuant to clause (d)(i) of this Section and the administrative priority granted pursuant to clause (e) of this Section may be independently granted by the Credit Documents and by other Credit Documents hereafter entered into.　This Agreement, the DIP Order and such other Credit Documents supplement each other, and the grants, priorities, rights and remedies of the DIP Administrative Agent and the Lenders hereunder and thereunder are cumulative.

11.7　　No Filings Required.　The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Order, and entry of the Interim Order shall have occurred on or before the date of any Loan prior to the Final Period and entry of the Final Order shall have occurred on or before the date of any Loan during the Final Period.　The DIP Collateral Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the DIP Order, or any other Credit Document.

11.8　　Survival.　The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the DIP Order and the other Credit Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Credit Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.　Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)　　　except to the extent of the Carve-Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on

106

parity with any claim of the DIP Administrative Agent and the Lenders against the Credit Parties in respect of any Obligation.  For the avoidance of doubt, during the Chapter 11 Cases until confirmation of a plan of reorganization, no fees, costs, expenses, charges and disbursements shall be payable by the Credit Parties to their attorneys, accountants or other professionals or to attorneys, accountants or other professionals of the Creditors' Committee unless otherwise set forth and in accordance with any order of the Bankruptcy Court;

(b)    the Liens in favor of the DIP Collateral Agent and the Lenders set forth in clause (b) of this Section shall constitute valid and perfected first priority Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the Liens in favor of the DIP Collateral Agent and the Lenders set forth herein and in the other Credit Documents shall continue to be valid and perfected without the necessity that the DIP Collateral Agent file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

11.9    <u>Release</u>.  Effective as of the date of entry of the Final Order, each of the Debtors and (subject to the provisions of the DIP Order) each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present, and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the Secured Parties, and each of their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "<u>Released Parties</u>"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or in tort, in each case, arising out of or related to the Prepetition Credit Documents, this Agreement, the Credit Documents, the Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Interim Order (collectively, the "<u>Released Claims</u>"); <u>provided</u> that the release set forth in this section shall not release any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's bad faith, fraud, gross negligence, or willful misconduct.

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**NEW TROJAN PARENT, INC.**, as Borrower

By: _____

Name:
Title:

**CBI INTERMEDIATE, INC.**, as Holdings

By: _____

Name:
Title:

**CBI MIDCO, INC.**
**CBI PARENT, L.P.**
**TROJAN HOLDCO, INC.**
**TROJAN BUYER, INC.**
**STRATEGIC PARTNERS ACQUISITION CORP.**
**STRATEGIC PARTNERS MIDCO, LLC**
**SILVERTS ADAPTIVE, LLC**
**CAREISMATIC, LLC**
**MARKETPLACE IMPACT, LLC**
**STRATEGIC GENERAL PARTNERS, LLC**
**PACOIMA LIMITED, LLC**
**STRATEGIC DISTRIBUTION, L.P.**
**STRATEGIC PARTNERS CORP.**
**CAREISMATIC GROUP INC.**
**CAREISMATIC GROUP II INC.**
**CAREISMATIC BRANDS, LLC**

as Guarantors

By: _____

Name: Sean Bogue

Debtor-In-Possession Credit and Guaranty Agreement

Title:   Chief Financial Officer

**KRAZY KAT SPORTSWEAR LLC**
**MED COUTURE, LLC**
**MEDELITA, LLC**
**ALLHEARTS, LLC**

as Guarantors

By: _____

Name: Sean Bogue
Title:   Vice President

**JEFFERIES FINANCE LLC,**
as the DIP Administrative Agent and the DIP Collateral
Agent

By:  _____
     Name:
     Title:

**[LENDERS]**, as Lender

By:    _____
       Name:
       Title:

**APPENDIX A**
**TO DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**

**Commitments**

| Lender | Interim Loan Commitment |
|---|---|
| [_____] | $[____] |
| Total | $[____] |

| Lender | Final Loan Commitment |
|---|---|
| [_____] | $[____] |
| Total | $[____] |

APPENDIX A-1

**APPENDIX B**
**TO DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**

**Notice Addresses**

[_____]

_____

_____

_____

Attention:      [_____]

Fax:            [_____]

Email:          [_____]

**Jefferies Finance LLC**,

as the DIP Administrative Agent and the DIP Collateral Agent

DIP Administrative Agent's Principal Office:
    520 Madison Avenue
    New York, NY 10022

## Exhibit B

### Initial DIP Budget

| ($ MM) | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period | Forecast Jan 2024 | Forecast Feb 2024 | Forecast Feb 2024 | Forecast Feb 2024 | Forecast Feb 2024 | Forecast Feb 2024 | Forecast Mar 2024 | Forecast Mar 2024 | Forecast Mar 2024 | Forecast Mar 2024 | Forecast Apr 2024 | Forecast Apr 2024 | Forecast Apr 2024 | |
| Week Start Date | Jan-21 | Jan-28 | Feb-04 | Feb-11 | Feb-18 | Feb-25 | Mar-03 | Mar-10 | Mar-17 | Mar-24 | Mar-31 | Apr-07 | Apr-14 | |
| Week End Date | Jan-27 | Feb-03 | Feb-10 | Feb-17 | Feb-24 | Mar-02 | Mar-09 | Mar-16 | Mar-23 | Mar-30 | Apr-06 | Apr-13 | Apr-20 | Total |
| **Total Operating Receipts** | **5.5** | **6.1** | **4.0** | **6.8** | **7.4** | **9.5** | **8.2** | **9.9** | **9.0** | **7.9** | **7.0** | **7.7** | **5.9** | **95.1** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise | (2.9) | (6.1) | (9.7) | (8.1) | (6.8) | (5.3) | (4.4) | (1.3) | (3.4) | (2.8) | (1.6) | (6.2) | (2.5) | (61.1) |
| Freight, Customs & Duties | (2.3) | (0.6) | (0.6) | (0.5) | (0.6) | (3.7) | (0.6) | (0.7) | (0.6) | (2.9) | (0.5) | (0.5) | (0.5) | (14.7) |
| Payroll & Commissions | (0.2) | (2.6) | (0.7) | (3.6) | (0.2) | (3.2) | (0.2) | (3.6) | (0.2) | (2.6) | (0.2) | (3.6) | (0.2) | (20.8) |
| Marketing & Advertising | (0.7) | (0.2) | (0.6) | (0.8) | (0.8) | (0.7) | (0.5) | (0.5) | (0.5) | (0.5) | (0.6) | (0.5) | (1.4) | (8.1) |
| Rent | - | (1.1) | - | - | - | (1.1) | - | - | - | - | (1.1) | - | - | (3.3) |
| Legal & Consulting | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.9) |
| Insurance | - | - | (0.1) | - | - | (0.0) | - | - | - | (0.0) | - | - | - | (0.1) |
| Other | (0.9) | (0.9) | (0.7) | (0.7) | (0.9) | (0.9) | (0.7) | (0.8) | (0.8) | (1.2) | (1.0) | (0.8) | (0.8) | (11.0) |
| **Total Operating Disb.** | **(7.4)** | **(11.8)** | **(12.7)** | **(13.9)** | **(9.5)** | **(15.2)** | **(6.6)** | **(7.2)** | **(5.7)** | **(10.3)** | **(5.2)** | **(11.9)** | **(5.7)** | **(123.1)** |
| **Net Cash Flow from Op.** | $ **(1.8)** | $ **(5.6)** | $ **(8.6)** | $ **(7.1)** | $ **(2.1)** | $ **(5.6)** | $ **1.6** | $ **2.6** | $ **3.3** | $ **(2.4)** | $ **1.8** | $ **(4.3)** | $ **0.2** | $ **(28.0)** |
| **Non- Op Receipts / (Disb.)** | | | | | | | | | | | | | | |
| Debt Principal / Int Pmts | 50.0 | - | - | - | 74.3 | - | - | - | (1.3) | - | - | - | - | 123.0 |
| Professional Fees | (0.6) | - | - | (2.8) | - | - | - | (2.3) | (6.5) | - | - | (2.1) | (7.8) | (22.2) |
| Inter-company transfers | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-Operational | 9.0 | - | - | - | - | - | - | - | - | - | - | - | - | 9.0 |
| **Total Non-Op Rcpts/(Disb.)** | **58.4** | **-** | **-** | **(2.8)** | **74.3** | **-** | **-** | **(2.3)** | **(7.9)** | **-** | **-** | **(2.1)** | **(7.8)** | **109.8** |
| **Total Net Cash Flow** | $ **56.6** | $ **(5.6)** | $ **(8.6)** | $ **(9.9)** | $ **72.2** | $ **(5.6)** | $ **1.6** | $ **0.3** | $ **(4.6)** | $ **(2.4)** | $ **1.8** | $ **(6.4)** | $ **(7.6)** | $ **81.8** |
| **Liquidity** | | | | | | | | | | | | | | |
| **Cash Balance - Start** | **12.4** | **68.9** | **63.3** | **54.7** | **44.8** | **117.0** | **111.4** | **113.0** | **113.3** | **108.7** | **106.3** | **108.1** | **101.8** | **12.4** |
| Net Cash Flow (+/-) | 56.6 | (5.6) | (8.6) | (9.9) | 72.2 | (5.6) | 1.6 | 0.3 | (4.6) | (2.4) | 1.8 | (6.4) | (7.6) | 81.8 |
| **Cash Balance - End** | **68.9** | **63.3** | **54.7** | **44.8** | **117.0** | **111.4** | **113.0** | **113.3** | **108.7** | **106.3** | **108.1** | **101.8** | **94.2** | **94.2** |
| DIP Availability | 75.0 | 75.0 | 75.0 | 75.0 | - | - | - | - | - | - | - | - | - | - |
| **Total Liquidity** | **143.9** | **138.3** | **129.7** | **119.8** | **117.0** | **111.4** | **113.0** | **113.3** | **108.7** | **106.3** | **108.1** | **101.8** | **94.2** | **94.2** |

AlixPartners

1

## **Exhibit C**

**Fee Letter**

January [___], 2024

New Trojan Parent, Inc.

Debtor-in-Possession Credit and Guaranty Agreement
Fee Letter

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Credit and Guaranty Agreement, dated as of January [___], 2024 (including, without limitation, the exhibits and annexes attached thereto, and as the same may be amended, amended and restated, supplemented or modified from time to time, the "DIP Credit Agreement"), by and among CBI Intermediate, Inc., a Delaware corporation ("Holdings"), New Trojan Parent, Inc., a Delaware corporation (together with its affiliates, the "Borrower" or "you"), the other guarantors party thereto, the lenders party thereto from time to time (the "DIP Lenders") and Jefferies Finance LLC, as administrative agent and collateral agent (the "DIP Administrative Agent", "we", or "us"), providing for a $125,000,000 (the "DIP Facility Commitment") senior secured superpriority first lien term loan facility for the Borrower (the "DIP Facility"). Capitalized terms used but not otherwise defined herein are used with the meanings assigned to such terms in the DIP Credit Agreement. This Fee Letter is the "Fee Letter" referred to in the DIP Credit Agreement.

1.    Commitment Premium.

As consideration for the DIP Lenders providing the DIP Facility, the Borrower hereby agrees to pay (or cause to be paid) to the DIP Administrative Agent (for ratable distribution to the DIP Lenders (or such other Persons as they may designate (except to a Disqualified Lender))) a commitment premium (the "Commitment Premium") in an aggregate amount equal to 3.50% of the DIP Facility Commitment. The Commitment Premium will be fully earned and payable on each Borrowing Date with respect to the Interim Loans or Final Loans, as applicable, in each case that are approved by the Bankruptcy Court and funded on such Borrowing Date. The Commitment Premium shall be paid-in-kind by increasing the principal amount of the Loans held by the DIP Lenders on each applicable Borrowing Date by the amount of the Commitment Premium.

2.    Backstop Premium.

As consideration for the DIP Lenders party to the DIP Credit Agreement as of the Closing Date committing to provide the entire principal amount of the DIP Facility, the Borrower hereby agrees to pay (or cause to be paid) to the DIP Administrative Agent (for ratable distribution to the DIP Lenders party to the DIP Credit Agreement as of the Closing Date (or such other Persons as they may designate (except to a Disqualified Lender))) a backstop premium (the "Backstop Premium") in an aggregate amount equal to 11.0% of the DIP Facility Commitment. The Backstop Premium will be fully earned and payable on each Borrowing Date with respect to the Interim Loans or Final Loans, as applicable, in each case that are approved by the Bankruptcy Court and funded on such Borrowing Date. The Backstop Premium shall be paid-in-kind by increasing the principal amount of the Loans held by the DIP Lenders as of the Closing Date by the amount of the Backstop Premium.

Notwithstanding the foregoing, subject to the terms and conditions of the RSA, at the option of each DIP Lender, the principal amount of the Loans attributable to each of the Commitment Premium and/or

the Backstop Premium may be equitized into new common equity of one or more of the Reorganized Debtors (as defined in the RSA) at a 40.0% discount to the Plan Enterprise Value (as defined in the Plan (as defined in the RSA)).

You agree that, once paid, the Commitment Premium, the Backstop Premium or any part thereof payable hereunder shall not be refundable under any circumstances. Except as expressly provided above or otherwise agreed in writing by the Borrower and the person entitled to such payment, neither the Commitment Premium nor the Backstop Premium shall be subject to reduction by way of set off or counterclaim, and shall be in addition to reimbursement of our reasonable and documented out-of-pocket expenses to the extent provided for in the DIP Credit Agreement and this Fee Letter.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing or purchase any commitments with respect to the DIP Facility.

2.    <u>Miscellaneous</u>.

This Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto.

This Fee Letter is subject to the terms and conditions of the Interim DIP Order or Final DIP Order, as applicable, entered by the Bankruptcy Court.

This Fee Letter and any claim, controversy or dispute arising under or relating to this Fee Letter (whether in contract, tort or otherwise) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the laws of the State of New York. The provisions of this Fee Letter shall survive the expiration or termination of the DIP Credit Agreement.

This Fee Letter may be executed in any number of counterparts, each of which, when so executed, will be deemed to be an original and all of which, taken together, will constitute one and the same Fee Letter. Delivery of an executed counterpart of a signature page to this Fee Letter by electronic transmission will be as effective as delivery of an original executed counterpart of this Fee Letter.

By the Borrower's execution of this Fee Letter, the Borrower agrees that the indemnification, jurisdiction, venue, service of process, waiver of jury trial, expense reimbursement and confidentiality provisions of the DIP Credit Agreement, are each incorporated herein by reference and shall apply as if fully set forth herein *mutatis mutandis*.

*[Signature Pages Follow]*

Please indicate your agreement with the foregoing terms and provisions by countersigning this letter agreement and returning to us executed counterparts hereof.

Very truly yours,

JEFFERIES FINANCE LLC

By: _____
    Name:
    Title:

Accepted and agreed to
as of the date first written above by:


NEW TROJAN PARENT, INC.


By: _____
     Name:
     Title: