| | |
|---|---|
| **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (*pro hac vice* pending)<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>jsussberg@kirkland.com<br><br>Chad J. Husnick, P.C. (*pro hac vice* pending)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>chusnick@kirkland.com | **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone:  (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com<br><br>*Proposed Co-Counsel to the Debtors and Debtors in Possession* |

*Proposed Co-Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CAREISMATIC BRANDS, LLC, *et al*.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-10561 (VFP)<br><br>(Joint Administration Requested) |

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/careismatic.  The location of Debtor Careismatic Brand, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is:  1119 Colorado Avenue, Santa Monica, California 90401.

**DECLARATION OF
JOSHUA ABRAMSON IN SUPPORT
OF THE DEBTORS' MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III)
GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Joshua Abramson, declare as follows under penalty of perjury:

1. I am a Partner in the Restructuring and Special Situations Group ("RSSG") at PJT Partners LP ("PJT"). PJT is a global investment banking firm listed on the New York Stock Exchange, and has its principal offices at 280 Park Avenue, New York, New York 10017.

2. For the past four months, my team and I have worked closely with the Debtors on their current restructuring process. As such, I am generally familiar with the above-captioned debtors and debtors in possession's (collectively, the "Debtors") day-to-day operations, business affairs, financial performance, and restructuring efforts.[2]

3. I submit this declaration (this "Declaration") in support of the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* (the "Motion"),[3] which, as noted in the Motion, seeks approval of a debtor-in-possession

---

[2] The Debtors anticipate filing an application to retain PJT as their investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

[3] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion, filed contemporaneously herewith, or the *Declaration of Kent Percy, Chief Restructuring Officer of Careismatic Brands, LLC, in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith, as applicable.

2

financing facility in an aggregate principal amount of $125 million (the "DIP Facility"). As further described in the Motion, the DIP Facility includes a $125 million super-priority senior secured delayed draw debtor-in-possession financing facility, which includes new money commitments of up to $125 million in term loans, the consensual use of Cash Collateral, and the conversion of the DIP Facility to an exit term loan upon the Effective Date (the "Exit Term Loan Facility").[4] Upon entry of the Interim Order, the Debtors would receive immediate access to $50 million of new money commitments under the DIP Facility and an additional $75 million upon entry of the Final Order.

4. Unless otherwise indicated, all statements set forth in this Declaration are based upon (a) my personal knowledge or opinion based on my experience and expertise, (b) information I received from the Debtors, other members of the PJT team, or the Debtors' other advisors, (c) my review of relevant documents, and/or (d) my opinion based on my experience as a restructuring professional. I am not being specifically compensated for this testimony other than through the proposed compensation that PJT received in its capacity as an advisor to the Debtors.[5] I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors. If called to testify as a witness, I could and would testify competently to the statements set forth herein.

### Qualifications

5. PJT is a leading global financial advisory firm with more than 1,000 employees in eleven offices in the U.S., Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement. PJT is an

---

[4] The material terms of the DIP Facility are set forth in detail in the Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Documents (as defined in the Motion).

[5] Pursuant to PJT's engagement letter with the Debtors, subject to Court approval thereof, PJT will be entitled to receive certain fees in connection with the financing facilities described herein.

industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of post-petition financing. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

6. I received a B.A. from Wesleyan University, a J.D. from the University of Pennsylvania Law School, and an MBA from the Wharton School of the University of Pennsylvania. I have more than fourteen years of finance experience, with more than eleven years of restructuring experience.

7. I joined PJT when it was spun off from The Blackstone Group L.P. ("Blackstone") effective October 1, 2015. Upon the consummation of the spin-off, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring employees became employees of PJT.

8. Prior to joining PJT, I spent three years in Blackstone's Restructuring & Reorganization Group. I have advised companies, creditors, and sponsors in restructurings, special situations, financings, mergers, and acquisitions. I have worked across numerous industries including consumer, retail, entertainment, healthcare, gaming, industrials, real estate, hospitality, aerospace and defense, oil and gas, and shipping.

9. In addition to acting as the investment banker to the Debtors prior to and during these Chapter 11 Cases, some of my other more notable publicly disclosed restructuring assignments include: API Heat Transfer, Belk, Caesars Entertainment, CEDC, Centric Brands, Deluxe Entertainment, Envision Healthcare, Excel Maritime, Full Beauty, Genco Shipping & Trading,

Gibson Brands, Incora, J. Crew, Jack Cooper, Monitronics, Overseas Shipping Group, Quicksilver, Revlon, Rue21, Scandinavian Airlines, TridentUSA Health, and Washington Prime.

### The Retention of PJT

10. PJT was engaged by the Debtors in September 2023 to provide advisory and investment banking services in connection with the Debtors' potential restructuring. PJT has been significantly involved in negotiations with the Debtors' capital structure constituents on the terms of the Restructuring Support Agreement (as defined herein) and the Debtors' efforts to use Cash Collateral and obtain postpetition, debtor-in-possession financing.

11. As a result of the prepetition work performed by PJT on behalf of the Debtors, PJT has acquired significant knowledge of the Debtors' financial affairs, business operations, capital structure, assets, key stakeholders, financing documents, and other related materials and information.

### The Debtors' Need for Postpetition Financing and Access to Cash Collateral

12. I understand that information regarding the Debtors' cash needs leading up to the Petition Date and the need for the relief requested in the Motion is addressed in the First Day Declaration. As further described in the First Day Declaration, given the Debtors' unsustainable liquidity challenges, the Debtors require immediate access to proceeds under the proposed DIP Facility and use of Cash Collateral to, among other things, fund operational expenses, including payroll, and to administer these chapter 11 cases and avoid significant degradation of the Debtors' estates.

13. PJT, together with the Debtors' other advisors, undertook a detailed analysis of the Debtors' operations and funding needs in the months leading up to the Petition Date. From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow

the Debtors to continue operations and administer their chapter 11 cases while working with their advisors and key stakeholders to consummate the value-maximizing transactions contemplated by the Restructuring Support Agreement.

### The Debtors' Efforts to Obtain Postpetition Financing

14. In December 2023, the Debtors, with the assistance of their advisors, commenced discussions with an ad hoc group holding approximately 73% of the First Lien Term Loans and approximately 21% of the Second Lien Term Loans (the "First Lien Ad Hoc Group"), represented by Milbank LLP, as legal counsel, and Houlihan Lokey Capital, Inc., as financial advisor, regarding the terms of a comprehensive restructuring transaction. Given the Debtors' immediate liquidity needs, these discussions involved soliciting interest by the members of the First Lien Ad Hoc Group in providing debtor-in-possession financing ("DIP Financing").

15. In late December 2023, the First Lien Ad Hoc Group, with the assistance of their advisors, provided the Debtors with an initial DIP Financing term sheet and over the course of the following weeks leading up to the Petition Date, the Debtors and the First Lien Ad Hoc Group exchanged DIP Financing proposals. While negotiations with the First Lien Ad Hoc Group progressed, the Debtors and their advisors, led by PJT, undertook concerted efforts to obtain additional proposals for DIP Financing. Specifically, in January 2024, in addition to the First Lien Ad Hoc Group, the Debtors engaged in discussions with 14 sophisticated financial institutions that are experienced in providing emergency debtor-in-possession financings in special situations, including other existing lenders and third parties. Over the course of December and January, the Debtors engaged with both the First Lien Ad Hoc Group and these various potential lenders on DIP Financing structures in an effort to reduce the costs and improve the terms on these proposals.

6

16. In total, of the 14 potential lenders contacted in the weeks leading up to the filing of these cases, including 2 existing lenders not in the First Lien Ad Hoc Group and 12 third parties, none provided alternative DIP Financing proposals to the Debtors. The lenders contacted were not interested in providing alternative DIP Financing proposals because of, among other reasons, their lack of desire to (i) provide a DIP facility on a junior basis, (ii) seek to provide a priming facility on a nonconsensual basis, or (iii) lend against the Debtors' relatively limited pool of unencumbered assets that could be utilized for a non-priming DIP.

17. After these discussions, the Debtors, in consultation with their advisors, determined that the best option for the Company was proceeding with the proposal by the First Lien Ad Hoc Group given the acute liquidity need and the lack of alternative proposals. My understanding is that the prepetition first lien lenders were not willing to agree to third party DIP Financing on either a consensual *pari passu* basis or consensual priming basis.

18. Accordingly, the Debtors, with the assistance of their advisors, focused their efforts on negotiating a comprehensive restructuring support agreement, including the proposed DIP Facility, with the First Lien Ad Hoc Group and the Consenting Sponsor. Beginning in mid-January, the Debtors also engaged in discussions regarding DIP financing with an ad hoc group holding approximately 3% of the First Lien Term Loans and approximately 50% of the Second Lien Term Loans (the "Cross-Holder Group"), represented by King & Spalding LLP, to further build consensus. The members of the Cross-Holder Group were among the prepetition lenders PJT engaged with to seek an alternative DIP Financing proposal. Although the members of the Cross-Holder Group were each unwilling to provide an alternative DIP Financing proposal, as noted in the First Day Declaration, the Debtors, the First Lien Ad Hoc Group, and the

Cross-Holder Group subsequently came to a mutual agreement on the terms and conditions of the DIP Facility, including the use of Cash Collateral.

19. As noted in the Motion, the Debtors commenced these chapter 11 cases with a restructuring support agreement (the "Restructuring Support Agreement") entered into with the First Lien Ad Hoc Group, the Cross-Holder Group, and the Sponsor (together, the "RSA Parties"), which together comprise approximately 76 percent of the holders the first lien claims, approximately 70 percent of the holders of second lien claims, and the holders of the Company's outstanding equity interests. As further described in the Motion, the Restructuring Support Agreement contemplates, among other things, effectuating a value maximizing restructuring transaction through "prearranged" chapter 11 cases either through a standalone recapitalization or sale to a third-party and deleveraging the Company's balance sheet through a debt-for-equity exchange of the claims arising under the First Lien Credit Agreement (the "First Lien Claims" and the holders thereof, the "Prepetition First Lien Lenders"). The Restructuring Support Agreement also provides for DIP Financing to fund costs throughout these chapter 11 cases. The provision of DIP Financing is a critical component of the Restructuring Support Agreement; as described in further detail in the First Day Declaration, the Debtors require immediate access to additional liquidity to fund these chapter 11 cases and consummate the value-maximizing transactions contemplated in the Restructuring Support Agreement.

## The Proposed DIP Facility

20. As further described in the Motion, the proposed DIP Facility is a $125 million super-senior secured delayed draw DIP Financing facility which, if approved, will provide the Debtors with $125 million of new liquidity for use during the pendency of these chapter 11 cases, of which $50 million is expected to be made available following entry of the Interim Order and

$75 million is to be made available following entry of the Final Order (the loans under the DIP Facility, the "DIP Commitments" and the lenders thereof, the "DIP Lenders"). The members of the First Lien Ad Hoc Group and the Cross-Holder Group shall backstop 100% of the DIP Facility pursuant to the terms of the DIP Credit Agreement (such commitment, the "Backstop Commitment" and such members, each, a "Backstop Lender" and collectively, the "Backstop Parties"). Following entry of the Interim Order, participation in the DIP Facility shall be offered ratably to all Holders of First Lien Claims such that (a) 15% of the DIP Commitments shall be allocated on a *pro rata* basis to the Backstop Parties and (b) the remaining 85% of the DIP Commitments shall be allocated on a *pro rata* basis to all Holders of First Lien Claims.

21. In connection with the DIP Facility, as described in the Motion, the Debtors have agreed, subject to Court approval, to grant liens on certain unencumbered property and pay interest and certain fees, including a backstop premium, commitment premium, and exit premium. Specifically, the Debtors have agreed to pay the following, as described in the Motion:

a. ***Interest Rate***. The Borrower will pay interest at SOFR plus 6.00 percent for loans made under the DIP Facility (the "DIP Loans") paid monthly in cash (the "Interest Rate"). The Interest Rate is subject to a 2.00 percent default interest rate adjustment.

b. ***Backstop Premium***. The Borrower will pay a backstop premium (the "Backstop Premium") upon entry of the Interim Order of 11.00 percent of the DIP Commitments, payable in-kind to each Backstop Lender, as such DIP Commitments are approved by the Court, according to each Backstop Lender's pro rata share of the Backstop Commitments.

c. ***Commitment Premium***. The Borrower will pay a commitment premium (the "Commitment Premium") upon entry of the Interim Order of 3.5 percent of the DIP Commitments, payable in-kind to each DIP Lender, as such DIP Commitments are approved by the Court, according to each DIP Lender's pro rata share of the DIP Commitments.

d. ***Exit Premium.*** The Borrower will pay an exit premium (the "Exit Premium" and, together with the Backstop Premium and the Commitment Premium, the "DIP Premiums") of 3.5 percent of the DIP Commitments payable to each DIP Lender

9

(i) in-kind upon conversion into the Exit Term Loan Facility or (ii) in Cash upon repayment in full of the DIP Facility, in each case according to each DIP Lender's pro rata share of the DIP Commitments.

Further, in the event of the Recapitalization (as described further in the First Day Declaration), on the Effective Date, each Holder of a claim arising under or pursuant to the DIP Financing (a "DIP Claim") shall receive (a) its *pro rata* share of the Exit Term Loan Facility or (b) if the Debtors and a majority of Holders of DIP Claims shall so agree on an alternative exit facility, payment in full in cash. On the Effective Date, if the Company pursues a Recapitalization, each of the DIP Lenders shall have the right to convert their Backstop Premium, Exit Premium, and/or Commitment Premium into New Common Stock in accordance with the DIP Premium Conversion Election Option.[6] In the event of a Sale Transaction (as described further in the First Day Declaration), each holder of a DIP Claim shall receive payment in full in Cash (including all DIP Premiums). As noted in the Motion, the proposed DIP Facility also contains certain milestones that the Debtors must meet throughout their chapter 11 cases.

### The Proposed DIP Facility is the Best and Only Postpetition Financing Arrangement Currently Available to the Debtors

22. Based on my experience with DIP Financing transactions as well as my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP Facility is the best, and in fact, the only, financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases.

23. The proposed DIP Facility is expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to

---

[6] As described in the Motion, subject to entry of the Final Order, each of the DIP Premiums may be equitized at a 40.0 percent discount to plan enterprise value at each DIP Lenders' or Backstop Parties' (as applicable) discretion (the "DIP Premium Conversion Election Option").

10

effectively and efficiently administer these chapter 11 cases and maximizes the value of the enterprise by providing the Debtors with access to crucial liquidity at the outset of these chapter 11 cases, allowing the Debtors and their advisors to focus on facilitating the consummation of the proposed restructuring transactions in the Restructuring Support Agreement and exiting chapter 11 expeditiously.

24. Importantly, the "DIP to exit" structure of the DIP Facility will provide the Debtors with post-emergence liquidity that will position the Debtors' business for long-term success and obviate the need for a costly debt or equity raise at the end of these Chapter 11 Cases to refinance the DIP Facility. Further, the proposed DIP Financing, including the exit financing feature thereof, together with the significant restructuring transactions set forth in the Restructuring Support Agreement, will convey a positive message to the Debtors' counterparties, vendors, and other stakeholders that these chapter 11 cases are sufficiently funded and that the Debtors' business is on the path to improved, sustainable results. In short, the proposed DIP Facility will allow the Debtors to maximize value by continuing operations with minimal disruption.

25. Additionally, the terms of the proposed DIP Facility are the result of the negotiations and the DIP marketing process described above. As previously noted, the Debtors, with the assistance of their advisors, solicited and considered other sources of postpetition financing to determine whether the Debtors could obtain such postpetition financing on better terms. However, none of the other parties contacted provided financing proposals for an alternative DIP Facility.

### The Proposed DIP Facility was Negotiated at Arms' Length

26. Over the course of several weeks, my team and I, along with the Debtors' other advisors, actively negotiated the terms and provisions of the DIP Facility on behalf of the Debtors.

The process was rigorous and marked by hard bargaining with the First Lien Ad Hoc Group and the Cross-Holder Group and their respective advisors. During that time, the parties exchanged many rounds of term sheets and mark-ups. Over the course of these negotiations, the economic and other terms of the DIP Facility improved to the benefit of the Debtors.

27. The fees and rates to be paid under the proposed DIP Facility, as summarized above, were the subject of heavily negotiated, arm's-length discussions between the Debtors and the DIP Lenders, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.

28. Based on my experience in financing processes, and under the current circumstances, given the lack of any other alternatives, I believe that the DIP Facility is reasonable.

## Conclusion

29. In sum, for the reasons stated above, and based on my experience with debtor-in-possession financing transactions as well as my participation and involvement in the negotiation of the postpetition financing alternatives for the Debtors, I believe that the proposed DIP Facility is the best and, in fact, only financing option currently available to the Debtors under the facts and circumstances of these chapter 11 cases.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  January 23, 2024            /s/ Joshua Abramson
                                                Name:  Joshua Abramson
                                                Title:   Partner
                                                                      PJT Partners, LP