**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
jsussberg@kirkland.com

Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
chusnick@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| CAREISMATIC BRANDS, LLC, *et al.*, | Case No. 24-10561 (VFP) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**DISCLOSURE STATEMENT RELATING TO THE JOINT**
**PLAN OF REORGANIZATION OF CAREISMATIC BRANDS, LLC AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

</div>

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.donlinrecano.com/careismatic.  The location of Debtor Careismatic Brands, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is:  1119 Colorado Avenue, Santa Monica, California 90401.

THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.   THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF CAREISMATIC BRANDS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.[2]

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, attached hereto as **Exhibit A**, or the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "Disclosure Statement Motion"), filed contemporaneously herewith.

**INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by, the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws").   Any representation to the contrary is a criminal offense.  The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock and Second Lien Warrants under the Plan (other than any New Common Stock underlying the Management Incentive Plan), and to the extent such exemption is not available, then the Debtors shall seek to offer, issue, and distribute such New Common Stock and Second Lien Warrants under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.  Neither the Solicitation Materials nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration and will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws.   Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements."  However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms.  Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates.  These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- Business strategy;

- Financial condition, revenues, cash flows, and expenses;

- The adequacy of the Debtors' capital resources and liquidity;

- Levels of indebtedness, liquidity, and compliance with debt covenants;

- Financial strategy, budget, projections, and operating results;

- The amount, nature, and timing of capital expenditures;

- Availability and terms of capital;

- Successful results from the Debtors' operations;

- The integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- Costs of conducting the Debtors' other operations;

- General economic and business conditions;

- Effectiveness of the Debtors' risk management activities;

- Counterparty credit risk;

- The outcome of pending and future litigation;

- Uncertainty regarding the Debtors' future operating results;

- Plans, objectives, and expectations;

- Risks in connection with acquisitions;

- The potential adoption of new governmental regulations; and

- The Debtors' ability to satisfy future cash obligations.

**Statements concerning these and other matters are not guarantees of the Post-Effective Date Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Post-Effective Date Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l) the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and**

general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the Exit Financing Arrangements, as applicable, and the New Common Stock and Second Lien Warrants, to be entered into, or issued, as applicable and as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with landlords, suppliers, partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

## TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................................. 1

II.     PRELIMINARY STATEMENT ......................................................................... 1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND THE PLAN ................................................................................................ 4

        A.    What is chapter 11?........................................................................................ 4
        B.    Why are the Debtors sending me this Disclosure Statement?........................... 4
        C.    Am I entitled to vote on the Plan? ................................................................... 4
        D.    What is the "toggle" feature of the Plan?......................................................... 5
        E.    What is the Sale Transaction under the Plan?................................................... 5
        F.    What is the Recapitalization Transaction under the Plan?................................. 6
        G.    When will I be informed if the Debtors "toggle" to a Recapitalization
              Transaction?................................................................................................... 6
        H.    What will I receive from the Debtors if the Plan is consummated?.................... 6
        I.    What will I receive from the Debtors if I hold an Allowed Administrative Claim,
              DIP Claim, Professional Fee Claim, or a Priority Tax Claim? ....................... 10
        J.    Are any regulatory approvals required to consummate the Plan?.................... 13
        K.    What happens to my recovery if the Plan is not confirmed or does not go
              effective?...................................................................................................... 13
        L.    If the Plan provides that I get a distribution, do I get it upon Confirmation or
              when the Plan goes effective, and what is meant by "Confirmation," "Effective
              Date," and "Consummation?".......................................................................... 13
        M.    What are the sources of Cash and other consideration required to fund the Plan?........... 13
        N.    Are there risks to owning the New Common Stock upon the Debtors' emergence
              from chapter 11?........................................................................................... 14
        O.    Is there potential litigation related to the Plan?............................................. 14
        P.    What is the Management Incentive Plan and how will it affect the distribution
              I receive under the Plan?................................................................................ 14
        Q.    Does the Plan preserve Causes of Action?..................................................... 14
        R.    Will there be releases, exculpation, and injunction granted to parties in interest as
              part of the Plan? ........................................................................................... 15
        S.    When is the deadline to vote on the Plan? ..................................................... 20
        T.    How do I vote on the Plan?............................................................................ 20
        U.    Why is the Bankruptcy Court holding a Confirmation Hearing? ..................... 20
        V.    What is the purpose of the Confirmation Hearing? ........................................ 20
        W.    What is the effect of the Plan on the Debtors' ongoing businesses? ............... 20
        X.    Will any party have significant influence over the corporate governance and
              operations of the Post-Effective Date Debtors?............................................. 21
        Y.    Who do I contact if I have additional questions with respect to this Disclosure
              Statement or the Plan? .................................................................................. 21
        Z.    Do the Debtors recommend voting in favor of the Plan? ................................ 22
        AA.   Who Supports the Plan?................................................................................. 22

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
        OVERVIEW ..................................................................................................... 22

        A.    Careismatic's Corporate History and Business Operations. ........................... 22

B.    The Debtors' Organizational and Capital Structure.............................................26

V.    **EVENTS LEADING TO THE CHAPTER 11 FILINGS** ...............................................**29**

A.    Challenges Facing the Debtors' Business..........................................................29
B.    Proactive Approach to Address Financial and Operational Issues. ...................30

VI.    **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE**
**CHAPTER 11 CASES** ..........................................................................................**31**

A.    First Day Relief and Other Case Matters...........................................................31
B.    Approval of the DIP Facility.............................................................................32
C.    Appointment of Unsecured Creditors' Committee.............................................33
D.    Sale Process and Bidding Procedures................................................................33
E.    Proposed Confirmation Schedule. .....................................................................33

VII.    **SUMMARY OF THE PLAN** ...................................................................................**34**

A.    General Settlement of Claims, Interests, and Intercompany Interests. ..............34
B.    Restructuring Transactions. ...............................................................................34
C.    Section 1146 Exemption....................................................................................35
D.    The Recapitalization Transaction.......................................................................36
E.    The Sale Transaction. ........................................................................................41
F.    Cancellation of Existing Agreements, Interests, and Intercompany Interests. ...46
G.    Preservation of Causes of Action. .....................................................................46
H.    Closing the Chapter 11 Cases. ...........................................................................47

VIII.    **OTHER KEY ASPECTS OF THE PLAN** .................................................................**47**

A.    Treatment of Executory Contracts and Unexpired Leases..................................47
B.    Conditions Precedent to Confirmation and Consummation of the Plan. ............51

IX.    **RISK FACTORS**...................................................................................................**53**

A.    Bankruptcy Law Considerations........................................................................53
B.    Risks Related to Recoveries Under the Plan.......................................................57
C.    Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses. ..........59
D.    Risks Related to the Offer and Issuance of Securities Under the Plan. ..............63

X.    **SOLICITATION AND VOTING PROCEDURES** ......................................................**65**

A.    Holders of Claims Entitled to Vote on the Plan..................................................65
B.    Voting Record Date. ..........................................................................................65
C.    Voting on the Plan. ............................................................................................65
D.    Ballots Not Counted..........................................................................................65
E.    Votes Required for Acceptance by a Class.........................................................66
F.    Certain Factors to Be Considered Prior to Voting. ............................................66
G.    Solicitation Procedures. .....................................................................................66

XI.    **CONFIRMATION OF THE PLAN** .........................................................................**67**

A.    The Confirmation Hearing..................................................................................67
B.    Requirements for Confirmation of the Plan........................................................67
C.    Feasibility..........................................................................................................68
D.    Acceptance by Impaired Classes. ......................................................................68

E.     Confirmation Without Acceptance by All Impaired Classes. ............................................. 69

F.     Valuation of the Debtors. ........................................................................................ 70

G.    Liquidation Analysis. ............................................................................................. 70

**XII.   CERTAIN SECURITIES LAW MATTERS** ................................................................. **70**

A.    New Common Stock. ............................................................................................. 70

B.    Exemption from Registration Requirements; Issuance of New Common Stock and Second Lien Warrants under the Plan. ........................................................ 71

C.    Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. ........................................................................ 72

**XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....................................................................................................... **75**

A.    Introduction. .......................................................................................................... 75

B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Post-Effective Date Debtors. ..................................................................... 76

C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. ..................................................................... 80

D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote. .................................................... 86

E.    FATCA. ................................................................................................................. 89

F.    Information Reporting and Backup Withholding. .............................................. 90

**XIV.  RECOMMENDATION OF THE DEBTORS** .......................................................... **91**

## EXHIBITS[1]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      RSA

EXHIBIT C      Organizational Structure Chart

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Financial Projections

EXHIBIT F      Valuation Analysis

---

[1]    Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION

Careismatic Brands, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Careismatic"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Careismatic Brands, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Careismatic is the leading designer, marketer, and distributor of medical apparel, footwear, and accessories.  Founded in 1995 in Chatsworth, California, Careismatic has grown from operating a single flagship brand, Cherokee Medical Uniforms ("Cherokee"), to a portfolio of seventeen brands.  Careismatic offers value to its stakeholders through its spectrum of medical apparel and workwear and omnichannel distribution capabilities across the globe.  Careismatic is the market leader in the $3 billion domestic medical scrubs industry with dominant positions in the wholesale and online marketplace segments.

Careismatic's mission is simple:  support those who care for others by providing a wide choice of products, technologies, and brands focused on the caregiver.  Through its commitment to this mission, Careismatic's portfolio of brands and products have become emblematic of patient care.  As its business has expanded over the years, Careismatic has continued to support caretakers and healthcare workers in delivering high-quality patient care in approximately 65 countries around the world.

Careismatic's commitment to caregivers was particularly visible during the COVID-19 pandemic, when Careismatic redoubled its efforts to stand by and support frontline workers.  The COVID-19 pandemic highlighted Careismatic's mission—finding new ways to elevate healthcare professionals by providing high-quality apparel and personal protective equipment—and how this mission remains central to Careismatic's growth.  The pandemic led to sharp increases in medical apparel demand, validating Careismatic's investments into new brands, technologies, and manufacturing capacity.  This confluence of factors led to record-setting revenue for Careismatic in both 2020 and 2021, with revenue growing to $687 million in 2021 (approximately 38% greater than the $498 million in revenue posted in 2019).

Despite this success, over the past two years certain operational and financial factors have stressed Careismatic's financial condition and ultimately necessitated the Debtors' commencement of these Chapter 11 Cases. While Careismatic expanded capacity to meet market demand in 2020 and 2021, demand has normalized to its historical trendline in 2022 and 2023.  Macroeconomic issues, including a rapid and dramatic rise in interest rates, persistent supply chain disruptions, rising material costs, and a challenging labor market exacerbated significantly weaker industry-wide demand.  In addition to market headwinds and the challenges posed by rapidly shifting consumer preferences, the lingering effect of Careismatic's legacy business model—including a lack of integration amongst acquired brands (leading to internal inefficiencies

and redundancies), poor inventory forecasting and controls (further exacerbated by COVID-19 supply chain disruptions), and material ongoing litigation—has proved distracting, burdensome, and costly to the Debtors.

In an effort to address the significant headwinds and liquidity challenges facing Careismatic following the COVID-19 pandemic, in October 2022, investment vehicles managed or advised by Partners Group (USA) Inc. or its affiliates (collectively, the "Sponsor"), provided Careismatic with a much-needed infusion of capital in the form of the approximately $30 million unsecured Sponsor Loans.[4]  In addition to the Sponsor Loans, beginning in late 2023, an affiliate of the Sponsor, party to that certain Services Agreement with Careismatic, dated as of January 6, 2021 (the "Services Agreement"), determined in effort to help preserve Careismatic's liquidity, it would defer reimbursement of certain expenses to which it is entitled under the Services Agreement, and defer and accrue the management fees due and owing pursuant to the Services Agreement, resulting in additional liquidity for Careismatic.  Despite the Sponsor's material contributions and concessions, however, the market challenges and legacy obligations facing Careismatic persisted and have required additional action and contingency planning.

In recognition of the foregoing, over the course of the two months preceding the Petition Date, the Debtors, with the assistance of their advisors, and the support and cooperation of the Sponsor, engaged in detailed turnaround discussions and hard-fought negotiations with (i) the First Lien Ad Hoc Group holding approximately 73% of the First Lien Loans and approximately 20% of the Second Lien Term Loans (each as defined herein), represented by Milbank LLP, as legal counsel, and Houlihan Lokey Capital, Inc., as financial advisor, and (ii) the Cross-Holder Ad Hoc Group, holding approximately 3% of the First Lien Loans and 50% of the Second Lien Term Loans, represented by King & Spalding LLP.  Since November, the Debtors have worked with the First Lien Ad Hoc Group on the terms of a go-forward restructuring, and, beginning in mid-January, the Debtors also engaged the Cross-Holder Ad Hoc Group to further build consensus.  On January 22, 2024, after extensive, arm's-length negotiations, the Debtors entered into the Restructuring Support Agreement (the "RSA"), attached hereto as **Exhibit B**, with the First Lien Ad Hoc Group, the Cross-Holder Ad Hoc Group, and Partners Group (USA) Inc. and its affiliates that hold Claims against or Interests in one or more of the Debtors (the "Sponsor RSA Parties" and, together with all signatories to the RSA the "RSA Parties").

The key terms of the RSA, which are reflected in the Plan, include:

- the optionality to pursue a restructuring via (i) the sale of the New Common Stock or the all or substantially all of the Debtors' assets (the "Assets") or, in the event the Sale Process yields no Successful Bid, (ii) the equitization of 100% of the Allowed First Priority Claims (subject to dilution from the MIP Equity and the DIP Premiums, and, if applicable, the exercise of the Second Lien Warrants), subject to the DIP Premium Conversion Election Option;

- the DIP Facility, including $125 million new money debtor-in-possession financing, which shall, in the event of the Recapitalization Transaction, convert into the Exit Term Loan Facility;

- in the event of the Recapitalization Transaction, the total deleveraging of all prepetition funded debt on Careismatic's balance sheet through a debt-for-equity exchange of the First Priority Claims and Second Lien Warrants issued in satisfaction of the Allowed Second Lien Secured Claims;

---

[4]    The Sponsor Loan Agreements (as defined below) were approved by Careismatic after the board of directors of CBI Parent, L.P. and Careismatic Brands, Inc. (n/k/a Careismatic Brands, LLC) were informed of the Sponsor Loans' terms, Careismatic's liquidity situation, and the availability of alternative financing from other sources.

- mutual releases between Careismatic and each of the RSA Parties, among others; and

- the cancellation of existing Interests.

To facilitate the postpetition Sale Process, the Debtors filed a motion to establish procedures to govern an efficient marketing and auction process to realize the full value of the Assets or the New Common Stock (either the New Common Stock or Assets, the "Sale Package") [Docket No. 123] (the "Bidding Procedures Motion" and the procedures contemplated thereby and attached as Exhibit I to the order approving the Bidding Procedures Motion (the "Bidding Procedures"). The Bidding Procedures provide the best path to (a) garner potential interest in the Sale Package, (b) receive the highest recovery available for all of the Debtors' stakeholders, and (c) conduct a market check on the value of the proposed recoveries to Holders of Claims contemplated by the Recapitalization Transaction while ensuring sufficient time to receive and evaluate bids, hold an Auction (if any) (as defined in the Bidding Procedures Motion), negotiate any and all necessary documentation, and confirm a plan of reorganization while remaining in compliance with the milestones set forth in the DIP Credit Agreement. The DIP Credit Agreement and RSA contemplate the following milestones with respect to these Chapter 11 Cases and the Plan:

| Date | DIP / RSA Milestone |
|---|---|
| January 27, 2024 | Entry of the Interim DIP Order |
| March 1, 2024 | Entry of Final DIP Order. |
| March 1, 2024 | Entry of Bidding Procedures Order |
| March 7, 2024 | Filing of Plan and Disclosure Statement |
| April 21, 2024 | Entry of Disclosure Statement Order |
| May 21, 2024 | Entry of Confirmation Order |

The Debtors have prepared and filed the Plan concurrently herewith, which includes a toggle structure to provide flexibility to implement a Sale Transaction or, if no Successful Bid is received in connection with the Sale Process, "toggle" to the Recapitalization Transaction, pursuant to which the Debtors will eliminate all prepetition funded debt via the equitization of all First Priority Claims in exchange for the New Common Stock. The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases and the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Donlin, Recano & Company, Inc., the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), actually receives such ballots by April 22, 2024, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan includes customary debtor and third-party releases. The CBI Parent Transaction Committee and the Intermediate Transaction Committee (together, the "Transaction Committees"), with the assistance of their respective counsel are (i) actively investigating potential Claims or Causes of Action that CBI Parent and CBI Intermediate, Inc., respectively, or their respective Estates may hold against certain insiders, affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions. Accordingly, the release provisions contained in the Plan remain subject to ongoing review by the Transaction Committees. The Debtors, acting at the direction of the Transaction Committees, and with the consent of the Required Consenting First Lien Lenders, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date pending the outcome of those investigations.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim, Interest, or Intercompany Interest as of the Voting Record Date (*i.e.*, as of March 15, 2024) (as defined below). Each category of Holders of Claims, Interests, or Intercompany Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims, Interests, and Intercompany Interests | Status | Voting Rights |
|-------|-----------------------------------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Priority Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claims, Interests, and Intercompany Interests | Status | Voting Rights |
|---|---|---|---|
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What is the "toggle" feature of the Plan?**

The Plan will implement the Sale Transaction unless no Successful Bid is received in connection with the Sale Process, at which time the Debtors will pivot or "toggle" to the Recapitalization Transaction. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Plan did not include a "toggle" feature, which reduces expenses and permits the Debtors to emerge in either scenario on the expedited timeline currently contemplated.

A vote to accept the Plan is a vote to approve both the Sale Transaction and the Recapitalization Transaction. If the Debtors "toggle" to the Recapitalization Transaction pursuant to the Plan, the Debtors will file and serve a notice of such Recapitalization Transaction in advance of the Confirmation Hearing.

**E.      What is the Sale Transaction under the Plan?**

In the event of the Sale Transaction, a Purchaser would purchase either 100% of the New Common Stock or all or substantially all Assets through a Successful Bid (*i.e.*, a bid that is not a Credit Bid) following the Sale Process to be conducted pursuant to the Bidding Procedures. Pursuant to the Bidding Procedures, a Successful Bid constitutes the highest or otherwise best bid to purchase the Sale Package and satisfies the Sale Transaction Trigger.[5] All Holders of First Priority Claims and DIP Claims are permitted to credit bid such Claims in connection with the Sale Process. However, the Sale Transaction will only be consummated where the Successful Bid is not a Credit Bid, otherwise the Plan shall "toggle" to the Recapitalization Transaction.

If the Sale Transaction is consummated, the sale proceeds provided by the winning bidder shall be distributed in accordance with the Plan. Holders of DIP Claims would receive payment in full in Cash (including all DIP Premiums), Holders of First Priority Claims would receive their *pro rata* share of Excess Distributable Consideration, Holders of Second Lien Secured Claims would receive their *pro rata* distribution of Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash, and Holders of General Unsecured Claims would receive their *pro rata* share of Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash.

---

[5]   Pursuant to the Bidding Procedures, the "Sale Transaction Trigger" occurs when (i) the Debtors determine, in their reasonable business judgment, after consultation with the Consultation Parties, that acceptance of one or more Qualified Bids is value maximizing for the Debtors' estates, and (ii) the Required Consenting First Lien Lenders consent to their treatment under the Sale Transaction ((i) and (ii) collectively, the "Sale Transaction Trigger"); *provided* that the Required Consenting First Lien Lenders will be deemed to consent to any Sale Transaction that pays in full in cash all (i) Allowed DIP Claims, and (ii) First Priority Claims; provided further that any Sale Transaction that does not pay in full in cash all Allowed DIP Claims is subject to the terms and conditions of the DIP Credit Agreement (including any applicable requirements to obtain the consent of the Requisite Lenders (as defined in the DIP Orders) or all affected DIP Lenders).

**F.      What is the Recapitalization Transaction under the Plan?**

The Plan contemplates that the Debtors will pursue a Sale Transaction to obtain a Successful Bid from a third-party Purchaser.  If the Debtors do not receive a Successful Bid, or if the winning bid is a Credit Bid, the Debtors will "toggle" to the Recapitalization Transaction, which provides for the equitization of 100% of the Allowed First Priority Claims, subject to dilution from the (x) MIP Equity, (y) the DIP Premiums, and (z) if applicable, the exercise of the Second Lien Warrants, subject to the DIP Premium Conversion Election Option.

In the event of a Recapitalization Transaction, (i) Holders of DIP Claims will receive (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full (including all DIP Premiums), (ii) Holders of First Priority Claims will receive their *pro rata* distribution of 100% of the New Common Stock (subject to dilution from (a) MIP Equity, (b) DIP Premiums, and (c) if applicable, the exercise of the Second Lien Warrants, subject to the DIP Premium Conversion Election Option), (iii) Holders of Second Lien Secured Claims will receive no recovery or distribution on account of their Allowed Second Lien Secured Claim; *provided* that, if the Second Lien Condition is satisfied, each Holder of an Allowed Second Lien Secured Claim will receive its *pro rata* share of the Second Lien Warrants, and (iv) Holders of General Unsecured Claims will receive no recovery or distribution on account of their Allowed General Unsecured Claims.

**G.      When will I be informed if the Debtors "toggle" to a Recapitalization Transaction?**

If the Debtors "toggle" to a Recapitalization Transaction in accordance with the Plan, then the Debtors will file and serve a notice of such Recapitalization Transaction in advance of the Voting Deadline (as defined in the Disclosure Statement Motion).

**H.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims, Interests, and Intercompany Interests under the Plan.  Any estimates of Claims, Interests, and Intercompany Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS, AND INTERCOMPANY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[6]**

---

[6]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| | | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|---|
| Class | Claim/Interest/ Intercompany Interest | Treatment of Claim/ Interest/Intercompany Interest | Projected Allowed Amount of Claims | Estimated % Recovery Under the Sale Transaction | Estimated % Recovery Under the Recapitalization Transaction |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim and at the option of the Debtors:<br><br>• payment in full in Cash of its Allowed Other Secured Claim;<br><br>• the collateral securing its Allowed Other Secured Claim;<br><br>• reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or<br><br>• such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $[●] | [●]% | [●]% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim, or as and when due in the ordinary course of business of the Post-Effective Date Debtors, or otherwise as consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $[●] | [●]% | [●]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|---|
| **Class** | **Claim/Interest/ Intercompany Interest** | **Treatment of Claim/ Interest/Intercompany Interest** | **Projected Allowed Amount of Claims** | **Estimated % Recovery Under the Sale Transaction** | **Estimated % Recovery Under the Recapitalization Transaction** |
| Class 3 | First Priority Claims | Except to the extent that a Holder of an Allowed First Priority Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed First Priority Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction of such Claim:<br><br>• in the event of the Recapitalization Transaction, its *pro rata* share of 100% of the New Common Stock (subject to dilution from (a) MIP Equity, (b) DIP Premiums, and (c) if applicable, the exercise of the Second Lien Warrants, subject to the DIP Premium Conversion Election Option); or<br><br>• in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Consideration. | $[●] | [●]% | [●]% |
| Class 4 | Second Lien Secured Claims | Except to the extent that a Holder of an Allowed Second Lien Secured Claim agrees to less favorable treatment on the Effective Date, each Holder of an Allowed Second Lien Secured Claim shall receive, in full and final satisfaction of such Claim:<br>• in the event of the Recapitalization Transaction, (A) if the Second Lien Condition is not satisfied, no recovery or distribution on account of its Allowed Second Lien Secured Claim; and (B) if | $[●] | [●]% | [●]% |

| | | **SUMMARY OF EXPECTED RECOVERIES** | | | |
|---|---|---|---|---|---|
| **Class** | **Claim/Interest/ Intercompany Interest** | **Treatment of Claim/ Interest/Intercompany Interest** | **Projected Allowed Amount of Claims** | **Estimated % Recovery Under the Sale Transaction** | **Estimated % Recovery Under the Recapitalization Transaction** |
| | | the Second Lien Condition is satisfied, its *pro rata* share of the Second Lien Warrants; or <br> • in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash. | | | |
| Class 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim: <br> • in the event of the Recapitalization Transaction, no recovery or distribution on account of such Allowed General Unsecured Claims; or <br> • in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash. | $[●] | [●]% | [●]% |
| Class 6 | Intercompany Claims | Subject to any specific provisions contained in the Plan Supplement, each Intercompany Claim shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on | N/A | N/A | N/A |

| | | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|---|
| **Class** | **Claim/Interest/ Intercompany Interest** | **Treatment of Claim/ Interest/Intercompany Interest** | **Projected Allowed Amount of Claims** | **Estimated % Recovery Under the Sale Transaction** | **Estimated % Recovery Under the Recapitalization Transaction** |
| | | account of such Claims, or such other treatment as determined by the Post-Effective Date Debtors and the Required Consenting First Lien Lenders. | | | |
| Class 7 | Intercompany Interests | Subject to any specific provisions contained in the Plan Supplement, each Intercompany Interest shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, in all cases with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interests, or such other treatment as determined by the Post-Effective Date Debtors and the Required Consenting First Lien Lenders. | N/A | N/A | N/A |
| Class 8 | Interests | On the Effective Date, all Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Interests shall receive no recovery or distribution on account of their Interests. | N/A | N/A | N/A |

**I.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, Professional Fee Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims, Interests, and Intercompany Interests set forth in Article III of the Plan.

**1.    Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative

Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by a Debtor in the ordinary course of its business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Post-Effective Date Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

**2.      DIP Claims.**

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive: (i) in the event of the Recapitalization Transaction, either (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full (including all DIP Premiums); or (ii) in the event of the Sale Transaction, payment in full in Cash (including all DIP Premiums). The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Documents as of the Effective Date. Any exercise of the DIP Premium Conversion Election Option shall be given effect in accordance with the terms of the DIP Credit Agreement, the Final DIP Order, and the Plan. The agreements set forth in section 10.8 of the DIP Credit Agreement shall survive the Effective Date, and, in the event the Exit Term Loan Facility is entered into, continue on the same terms set forth in the DIP Credit Agreement.

**3.      Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**4.      Professional Fee Claims.**

**a.      Final Fee Applications and Payment of Professional Fee Claims.**

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The

Post-Effective Date Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account.

**b.  Professional Fee Escrow Account.**

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Post-Effective Date Debtors, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors, without any further action or order of the Bankruptcy Court; provided, however, in the event of the Sale Transaction, any remaining amount in the Professional Fee Escrow Account shall constitute Residual Cash and be distributed to Holders of Allowed Claims in accordance with Article III of the Plan.

**c.  Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment. If a Professional does not provide an estimate, the Debtors or the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of determining the Professional Fee Amount.

**d.  Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and/or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**5.  Payment of Restructuring Expenses.**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.

**J.      Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.  In the case of a Sale Transaction, a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (and expiration or early termination of the waiting period thereunder) may be required as a condition precedent to any asset sale that exceeds the applicable size of the transaction threshold.

**K.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.

**L.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  *See* Article VIII.B of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

**M.      What are the sources of Cash and other consideration required to fund the Plan?**

If the Recapitalization Transaction is consummated, the Debtors shall fund or make distributions under the Plan, as applicable, with:  (i) the proceeds from the Exit Financing Arrangements; (ii) the New Common Stock; (iii) the Debtors' Cash on hand; and (iv) the Second Lien Warrants.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and Second Lien Warrants (if applicable), is expected to be exempt from Securities Act registration, as described more fully in Article IV.D.9 of the Plan.

If the Sale Transaction is consummated, the Debtors shall fund distributions under the Plan with: (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors (if any).  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan

applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**N.      Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11?**

Yes.  *See* Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**O.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XI.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**P.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

In the event of a Recapitalization Transaction, following the Effective Date, the New Board shall adopt and implement the Management Incentive Plan, which provides that up to 15 percent of the New Common Stock as of the Effective Date, on a fully diluted basis, will be reserved for issuance to be used to incentivize and compensate employees, directors, consultants, and other service providers of the Post-Effective Date Debtors.  The terms of, and issuance of any awards under, the Management Incentive Plan shall be at the sole discretion of the New Board.

**Q.      Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity, whether arising before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Post-Effective Date Debtors.  The Post-Effective Date Debtors or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**No Person or Entity may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and Post-Effective**

**Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement to file motions or substitutions of parties or counsel in each such matter.

**R.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan and among other things, the DIP Facility, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (I) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN; (II) ALL HOLDERS OF CLAIMS WHO ARE DEEMED TO ACCEPT THE PLAN BUT WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN; (III) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN, OTHER THAN THOSE WHO WERE NOT SENT A BALLOT OR AN OPT OUT FORM IN ACCORDANCE WITH ANY FILED DISCLOSURE STATEMENT ORDER, AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN; AND (IV) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT OR NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

The Transaction Committees, with the assistance of their respective counsel are (i) actively investigating potential Claims or Causes of Action CBI Parent and CBI Intermediate, Inc., respectively, and/or their respective Estates may hold against certain insiders, affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions. Accordingly, the release provisions contained in the Plan remain subject to ongoing review by the Transaction Committees and with the consent of the Required Consenting First Lien Lenders. The Debtors, acting at the direction of the Transaction Committees, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date pending the outcome of those investigations.

**1.      Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, the Purchase Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns. The Holders of such Secured Claim (and the applicable agents for such Holders) shall be directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (or the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**2.      Releases by the Debtors**

**Notwithstanding anything contained herein, in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Post-Effective Date Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any avoidance actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Post-Effective Date Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Post-Effective Date Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own**

16

right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Debtor Release, the Exit Financing Arrangements, the Exit Facilities Documents, the Disclosure Statement, the Plan Supplement, the Plan and related agreements , instruments, and other documents in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, the Exit Facilities  Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Post-Effective Date Debtors, asserting any claim or Cause of Action released pursuant to the Debtor Release.

3.      Releases by Holders of Claims, Interests, and Intercompany Interests

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, each of the Released Parties, will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to

assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the distribution of any Cash or other property to any Released Party, the assertion or enforcement of rights or remedies against any Person, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Exit Financing Arrangements, the Exit Facilities Documents, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided in Article VIII.D of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the releases provided in Article VIII.D of the Plan are: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the releases contained in Article VIII.D of the Plan; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to Article VIII.D of the Plan.

4.    Exculpation

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to

reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

     5.        Injunction

     Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Post-Effective Date Debtors has been liquidated and distributed in accordance with the terms of the Plan, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Intercompany Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

     No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action constitutes a direct or derivative claim and represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.

     Upon entry of the Confirmation Order, all Holders of Claims, Interests, or Intercompany Interests, and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the

**implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim, Interest, or Intercompany Interests, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.**

**For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.**

**S.     When is the deadline to vote on the Plan?**

The Voting Deadline is April 22, 2024, at 4:00 p.m. (prevailing Eastern Time).

**T.     How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly **completed, executed, and delivered as directed so that it is actually received Claims and Noticing Agent on or before the Voting Deadline, *i.e.*, April 22, 2024, at 4:00 p.m., prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**U.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**V.     What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**W.     What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code or pursuing a going-concern sale. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**X.    Will any party have significant influence over the corporate governance and operations of the Post-Effective Date Debtors?**

In the event of the Recapitalization Transaction, as of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, which shall be consistent in all respects with the Governance Term Sheet.  Each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.

In the event of the Sale Transaction, as of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed; *provided* that in the event of the Recapitalization Transaction, the New Board shall be appointed pursuant to the terms set forth in the Governance Term Sheet.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, or other governing body, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, including those powers set forth in Article IV.E of the Plan.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers.

**Y.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Donlin, Recano & Company, Inc., via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Donlin, Recano & Company, Inc.
> c/o Equiniti
> Re: Careismatic Brands, LLC, et al.
> 48 Wall Street, 22nd Floor
> New York, NY 10005
>
> *By electronic mail at:*
> cbinfo@drc.equiniti.com
>
> *By telephone (toll free) at:*
> 800-416-3743 (domestic) or 212-481-1411 (international) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at www.donlinrecano.com/careismatic (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**Z.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims and Interests and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  A Sale Transaction will significantly delever the Debtors' balance sheet, and a Recapitalization Transaction, if any, will only allow for a higher or otherwise better recovery (in addition to deleveraging the balance sheet).  Either a Sale Transaction or Recapitalization Transaction will allow for a quick confirmation by no later than 120 calendar days after the Petition Date.

**AA.      Who Supports the Plan?**

The Plan is supported by the Debtors and the Holders of Claims, Interests, and Intercompany Interests that have agreed to the RSA and the Restructuring Term Sheet, which include (i) the First Lien Ad Hoc Group, (ii) the Cross-Holder Ad Hoc Group, and (iii) the Sponsor RSA Parties.  Signatories to the RSA, including the First Lien Ad Hoc Group, the Cross-Holder Ad Hoc Group collectively hold approximately 84% of First Lien Term Loan Claims and 70% of Second Lien Claims.

**IV.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**A.      Careismatic's Corporate History and Business Operations.**

**1.      Corporate History.**

Established in 1995 in Chatsworth, California, the Debtors (at the time, operating under the name Strategic Partners), purchased Cherokee, one of the most popular brands of "scrubs," out of bankruptcy, becoming Careismatic's first and flagship brand.



Over time, Careismatic has expanded to become a portfolio of reliable brands, offering a wide array of medical apparel, footwear, and accessories across distribution channels. Careismatic's initial growth is attributable to their innovative design and licensing partnerships. Careismatic began entering into licensing agreements with brands such as Disney and Marvel to create themed scrubs designed for pediatric use. As one of the first companies to put cartoon characters on medical scrubs, Careismatic's partnerships with Disney, Marvel, and others created a new market segment. In 2009, Careismatic extended this strategy further by entering into a licensing agreement to sell its medical apparel under the Dickies brand—one of the most trusted brands in workwear.



During this period, Careismatic also solidified its position as the premier player in the medical apparel wholesale market. Working with its national retailer clients, Careismatic became one of the first medical apparel companies to invest online by building out the retailers' web stores, which were designed for Careismatic to receive and fulfill customer orders without the retailer needing to hold Careismatic's inventory. These growth strategies worked: by 2010, Careismatic had over 500 employees and dozens of retailer clients.

After over 20 years of sustained growth, Careismatic, recognizing a shift in the medical apparel marketplace, looked to enter its next stage of growth by building out its online marketplace presence (*e.g.*, Amazon) and DTC offerings. In 2016, under new leadership, Careismatic invested heavily in its online presence to keep up with its competitors. These investments also marked an evolution of Careismatic's image from a wholesale supplier to a more dynamic business serving both large retailer clients and end customers (*i.e.*, healthcare workers).

More recently, recently, Careismatic has conducted a rebranding to Careismatic Brands in 2020 and was acquired by funds managed by Partners Group—its current Sponsor—in 2021. More importantly, during the subsequent period, Careismatic's brand acquisition and development strategies have evolved. Instead of entering licensing agreements with non-medical brands to emboss on Careismatic's apparel, Careismatic acquired brands to adapt to shifting customer expectations. Careismatic also built a broad portfolio that could provide scale to its distribution platform and leverage Careismatic's technology, manufacturing capabilities, and network to serve diverse customer needs.

Today, Careismatic's portfolio of brands includes Cherokee, Classroom Uniforms, AllHeart, Infinity, Med Couture, Scrubstar, Heartsoul Scrubs, Silverts Adaptive Apparel, Healing Hands Scrubs, Medelita, and BALA Footwear. These brands account for approximately 88% of Careismatic's revenues. Below is a timeline of Careismatic's key acquisitions:



- **Classroom Uniforms**. One of the first brands acquired by Careismatic, Classroom Uniforms, along with its sister brand Real School, has been a leader in the school uniform space since 1995.

- **AllHeart**.  Acquired in 2018, AllHeart is an online store for medical apparel, footwear, accessories, and medical devices.  AllHeart sells a wide range of brands under its own labels (*AllHeart, AllHeart Basics, and AllHeart Luxe Supreme*), other Careismatic brands, and other market-leading brands.

   

- **Healing Hands Scrubs**.  Healing Hands is a medical apparel company founded by Bansi Lakhani, who was inspired to create Careismatic after he received care from dedicated and caring nurses following a heart attack.  Based in New Jersey, Healing Hands offers premium scrubs for both men and women.

- **Infinity**.  Infinity is an imprint of Cherokee that sells scrubs and footwear, adapted to meet the needs of people working in demanding clinical environments.



- **Scrubstar.**  Offered exclusively through Walmart and Walmart.com, Scrubstar offers high-quality, comfortable medical apparel at unbeatable prices.

- **Medelita**.  Founded in 2008, Medelita is known for high-end, tailored medical apparel designs crafted from cutting-edge performance fabrics.

 

- **Med Couture**.  A premium medical apparel brand for women, Med Couture is sold through a number of brick-and-mortar and online retailers (including AllHeart.com and Amazon).  Med Couture also offers the Rothwear line of medical apparel for men.

- **Heartsoul Scrubs**.  A fierce, feminine, far-from-ordinary medical apparel brand for women with a huge and loyal following.  Offered online and at retailers nationwide.

- **Silverts Adaptive Apparel**.  For over 90 years, Silverts has been providing reliable adaptive apparel and footwear to fit a range of needs.

- **BALA Footwear.**  Founded in 2020 in Portland, Oregon, by former Nike executives Brian Lockard and John Eberle and former Under Armor executive Caprice Neely, BALA seeks to achieve comfort for its medical professional customers by leveraging features prevalent in athletic footwear.



2.    **Business Operations.**

Headquartered in Santa Monica, California, Careismatic employs approximately 800 full-time U.S. employees, and generated approximately $559 million of revenue in 2023.  Through its portfolio of brands and distribution platform, including its one million square foot distribution facility in Texas, Careismatic serves every type of customer, at every price point, through all distribution channels.  Careismatic's platform can be broadly segmented into (i) wholesale, (ii) Walmart, (iii) DTC, and (iv) online marketplace.

a.    **Wholesale.**

Careismatic's wholesale business (both U.S. and international) remains its largest segment and it continues to dominate the market—making up over 50% of the U.S. wholesale market and one of the largest players globally.

Domestically, Careismatic's wholesale business contributes 46% of net sales of Careismatic. Careismatic has over 2,300 wholesale customers, comprised of national and regional retailers, independent stores, institutional purchasers (*e.g.*, hospitals, medical offices, patient care facilities), and independent websites.  Medical scrubs make up approximately 90% of revenues from U.S. Wholesale customers.  Key customers include national medical apparel retailers such as Uniform Advantage, Scrubs and Beyond, Uniform Destination, and Uniform Factory Outlet.

Careismatic's international wholesale business constitutes 9% of net sales.  Careismatic's international wholesale customers span approximately 65 countries with its largest international markets being in Latin America, Canada, Europe, and the Middle East.  Careismatic continues to prioritize the growth of its international business both through a dedicated international sales team and partnering with third-party logistics providers to better serve customers globally.

b.    **Walmart.**

Careismatic first began selling to Walmart in 1997.  Today, Careismatic sells two brands through Walmart:  (i) Scrubstar, a Walmart private label brand available in approximately 3,900 stores and online; and (ii) Genuine Dickies, a premium scrubs brands launched in 2022 (available in approximately 305 stores and online).  Careismatic is uniquely able to meet Walmart's service level, pricing requirements, and

geographic footprint. In addition, Careismatic offers Walmart store-specific analytics, which allow its stores to optimize sales and inventory productivity. While competitors have unsuccessfully attempted to become the primary supplier for Walmart, Careismatic has maintained pole position by delivering on consumer requirements, product quality, and service level requirements needed to serve Walmart at scale.

### c.  Direct-to -Consumer.

Reorganizing changing consumer preferences, Careismatic has continued to invest in its DTC business. Careismatic believes that its DTC business will become a core source of growth in the years to come and a major driver of gross margin expansion. Careismatic's DTC strategy is focused on its single multi-site single check out portal (the "MSSC Portal"), which will allow Careismatic to efficiently scale its DTC business, enable Careismatic to fully capture retail economics, and reduce customer acquisition costs. Careismatic continues to work on integrating its brands to the MSSC Portal while simultaneously modernizing its Careismatic Rewards Program for a better retail user experience. In the future, Careismatic looks to leverage its DTC capabilities and expects significant margin expansion over the next five years.

### d.  Online Marketplace.

Complementing Careismatic's direct-to-consumer segment, Careismatic began selling its products on Amazon and Walmart Marketplace in 2019. Careismatic's Online Marketplace is its fastest-growing segment, having grown 33% annually since 2019 and accounting for 16% of Careismatic's net sales today. Careismatic has an approximate 50% market share on Amazon. In addition to being the fastest growing segment, Online Marketplace sales have the highest gross margins (over 60%), which Careismatic expects to continue to improve driven by product assortment optimization and pricing management.

### 3.    Recent Events.

Since 2021, the medical apparel industry has faced a variety of challenges, including a reversion to the mean demand following the pandemic, which indirectly created a spike in demand for Careismatic's products. COVID-19 also accelerated the average consumer's shift to purchasing online, which has had an outsized benefit to apparel companies already focused on online distribution. The shift to online sales has invited new competition to the space, which has squeezed longtime industry players, such as Careismatic, out of otherwise available market share. Finally, recent shifts in technology companies' restrictions on targeted advertising has created severe disruption for ecommerce brands and markets.

Careismatic has been proactively addressing these challenges since 2021. In response to the COVID-19 supply chain disruption, Careismatic reduced its cash conversion cycle (*i.e.*, the number of days it takes Careismatic to convert inventory into cash from sales) by nearly half. Careismatic has also continuously worked to integrate its recently-acquired business lines to realize scale and eliminate redundancies. Careismatic also focused on a more efficient spend on advertising investments. Finally, and perhaps most importantly, new management has focused its efforts on (i) rebuilding customer relationships, (ii) improving margins through streamlined costs and optimized pricing, and (iii) transitioning from its legacy operational model to utilizing third parties to realize savings and reduce mandatory capital expenditures.

### B.    The Debtors' Organizational and Capital Structure.

### 1.    Careismatic's Organizational Structure.

An overview of Careismatic's current organizational structure, in simplified form, is reflected below. A comprehensive organization chart is attached hereto as **Exhibit B**.



* Careismatic Brands Asia Limited (Hong Kong), Careismatic Brands do Brasil (Brazil), Careismatic Brands Europe Limited (UK), Careismatic Brands NL B.V. (Netherlands), De Soto Technologies Private Limited (India), Silvert's Holdings, Ltd. (British Columbia)

2.    **Careismatic's Prepetition Capital Structure.**

As of the Petition Date, Careismatic had approximately $832.9 million in total outstanding funded debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount** |
| **First Lien Term Loans** | January 2026 | $590 million |
| **First Lien Revolving Loans** | January 2028 | $100 million |
| **Second Lien Term Loans** | January 2029 | $110 million |
| **Sponsor Loans** | October 2025 | $32.9 million |
| **Total Outstanding Funded Debt:** | | **$832.9 million** |

### a. Prepetition ABL Facility.

Pursuant to that Credit and Security Agreement dated March 9, 2023 (as amended, restated, supplemented, or modified from time to time prior to, and in effect immediately before the Petition Date, the "ABL Facility") by and among Careismatic Receivables LLC, a Delaware limited liability company, as borrower, Careismatic Brands, LLC, a California limited liability company, as Pennsylvania corporation, as the servicer, administrator, and collector of the receivables, GLAS USA LLC, as administrative agent, GLAS Americas LLC, as collateral agent, KKR Credit Advisors (US) LLC, as structuring advisor, and the lenders party thereto from time to time, the Debtors have access to an asset-based revolving credit facility in an aggregate principal amount of $30 million.  The ABL Facility was set to mature on March 9, 2025.  On January 18, 2024, the Debtors determined to pay off the ABL Facility in the ordinary course of business.

### b. First Lien Credit Agreement.

The Debtors are obligors under that certain First Lien Credit Agreement, dated as of January 6, 2021 (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the First Lien Credit Agreement, dated as of June 8, 2023, the "First Lien Credit Agreement"), by and among CBI Intermediate, Inc., a Delaware corporation, as holdings, CBI Buyer, Inc., a Delaware corporation, as the Merger Sub or the Initial Borrower, New Trojan Parent, Inc., a Delaware corporation, as successor to Merger Sub and the Borrower, the lenders from time to time party thereto (the "First Lien Lenders"), UBS AG, Stamford Branch, as administrative agent and collateral agent.  As of the Petition Date, an aggregate balance of approximately $690 million, including accrued and unpaid interest in outstanding loans under the First Lien Credit Agreement, consisting of approximately: (i) $590 million outstanding of first lien term loans, which carry an interest rate of Adjusted Term SOFR plus 3.25% per annum, and mature on January 1, 2028 (together, the "First Lien Term Loans"); and (ii) $100 million of outstanding of first lien revolving loans, which carry an interest rate of Adjusted Term SOFR plus 3.75% (which may be decreased to 3.50% or 3.25% upon meeting certain deleveraging benchmarks), and mature on January 1, 2026 (the "First Lien Revolving Loans," and together with the First Lien Term Loans, the "First Lien Loans").  The First Lien Loans are secured by a first priority lien on substantially all of the Debtors' assets, excluding cash.

### c. Second Lien Credit Agreement.

On January 6, 2023, Debtor New Trojan Parent, Inc., a Delaware, LLC, as borrower, CBI Intermediate, Inc., a Delaware Corporation, as holdings, the lenders party thereto from time to time (the "Second Lien Lenders"), and UBS AG, Stamford Branch, as administrative and collateral agent entered into that certain Second Lien Credit Agreement (as amended by Amendment No. 1 to the Second Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the Second Lien Credit Agreement, dated as of June 8, 2023, the "Second Lien Credit Agreement").  As of the Petition Date, the aggregate balance of the term loans provided under the Second Lien Credit Agreement are approximately $110 million, including accrued and unpaid interest (the "Second Lien Term Loans").  The Second Lien Term Loans carry an interest rate of Adjusted Term SOFR plus 7.25% and matures on January 1, 2029.  The Second Lien Term Loans are secured by a second priority lien on substantially all of the Debtors' assets.

The relative rights and priorities of the First Lien Lenders and the Second Lien Lenders in respect of priority are set forth in that certain Junior Lien Intercreditor Agreement, dated as of January 6, 2021, between UBS AG Stamford Branch, in its capacity both as collateral agent under the First Lien Credit Agreement and collateral agent under the Second Lien Credit Agreement.

### d. Sponsor Loans.

On October 17, 2022, Careismatic Brands, LLC, a Delaware, LLC, as borrower, and the Sponsor, entered into a series of unsecured intercompany notes (collectively, the "Sponsor Loan Agreements" and the indebtedness thereunder, the "Sponsor Loans").  As of the Petition Date, the outstanding principal amount on account of the Sponsor Loans was $32.9 million, including accrued and unpaid interest.  The Sponsor Loans bear an interest rate equal to 8% per annum, payable in kind.  The Sponsor Loans have a maturity date of the earliest of:  (i) October 17, 2025; (ii) the date of the consummation of a Change of Control (as defined in the Sponsor Loan Agreements); and (iii) the date of the consummation of a Qualifying IPO (as defined in the Sponsor Loan Agreements ).

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Challenges Facing the Debtors' Business.

At a critical time during its operational transformation, the Debtors are facing a set of unanticipated challenges and a constrained liquidity position.  *First*, Careismatic is confronting a decline in demand as a result of the post-COVID-19 market-wide downturn in the medical apparel industry.  *Second*, Careismatic is facing challenges posed by a higher interest rate environment and persistent supply chain disruptions.  *Third*, the Debtors hold one-time legacy obligations in connection with the resolution of certain litigation and compensation to former employees and advisors.  *Fourth*, the Debtors' current capital structure is overleveraged given the downward cash flow forecasts.  Taken together, these factors have resulted in a significantly diminished operational and financial outlook for the Debtors.  Simply put, without a comprehensive restructuring of their balance sheet, the Debtors will be unable to continue as a going concern.

### 1.    Softening Demand.

The COVID-19 pandemic caused a spike in market-wide demand for medical apparel in the United States and globally.  To keep up with demand, Careismatic ramped up production, expanding its production capacity to meet customer needs.  While Careismatic expects demand to return to levels consistent with historical growth rates, demand remains temporarily depressed as the market normalizes following all-time highs during 2020 and 2021.  Today, aggregate demand is approximately 65% of 2020 and 2021 demand.  Careismatic's cash position has been challenged as demand returns to its historical growth-rate more slowly than anticipated.  Despite this, Careismatic firmly believes this is a trough period and not an indicator of future performance, as revenue growth is expected to return in the near term as demand for medical apparel rebounds to its historical growth rates.

### 2.    Increased Costs.

Like many businesses, Careismatic's business has not been immune to the consequences of markedly higher interest rates, persistent inflation, and macroeconomic headwinds that have reverberated through the economy.  Beginning in 2021, rising interest rates, supply chain delays and the cost of materials, labor, and fuel, led to increased costs and reduced margins across Careismatic's portfolio.  In 2021, Careismatic's interest expense increased to $42 million—over 82% greater than prior to the COVID-19 pandemic.[7]  In 2023, Careismatic's interest expense rose to an estimated $64 million—approximately 42% greater than 2022 and 178% greater than 2019.  This has impacted profit margins.

---

[7]    Interest expense excludes interest income from the sale of certain interest rate swaps and mark-to-market gains on interest rate swaps retained.

### 3. Ongoing Litigation.

Careismatic is involved in certain ongoing material litigation. Some of the costs associated with these litigation matters are largely liquidated, and others continue to develop. For either category, absent a comprehensive financial restructuring, the outcomes of such material litigation, including the cost of settlement, would constitute a significant decrease in liquidity that would alter Careismatic's ability to meet ordinary course obligations.

### 4. Balance Sheet and Liquidity Constraints.

Due to the above-mentioned factors, Careismatic has experienced significant financial performance deterioration and liquidity constraints. In 2023, Careismatic's estimated EBITDA dropped to $50 million (approximately 39% less than 2022 EBITDA), with estimated EBITDA falling to $5 million in the fourth quarter. Today, the Debtors have approximately $12.4 million in remaining liquidity. Accordingly, absent a comprehensive financial restructuring, it is highly unlikely that the Debtors would be able to continue to operate and meet their obligations as they become due.

## B. Proactive Approach to Address Financial and Operational Issues.

### 1. Operational Changes.

In response to growing liquidity issues, Careismatic, under new management, has taken steps to implement its "back to basics" plan by reducing expenditures, increasing operational efficiencies, and improving margins. Careismatic has focused efforts across four major areas. *First*, Careismatic continues to implement channel diversification strategies to reach both wholesale and retail customers. With the latter, Careismatic is refining its DTC model to increase brand exposure and create a streamlined online shopping experience. As it grows its DTC market share, Careismatic expects to realize greater profits by capturing full retail economics.

*Second*, Careismatic is restructuring its brand profile to more clearly align to customer needs. To do so, Careismatic has taken its well-known brands and retooled them to target specific customer segments. *Third*, Careismatic has continued to integrate recently acquired brands by conducting a top-to-bottom evaluation of its enterprise to reduce redundancies and drive operating inefficiencies. This has lowered previous modules' costs by consolidating cross-platform brand work groups. *Finally*, the Debtors have restructured their real estate footprint by consolidating facility locations and engaging third-party logistics providers where doing so would reduce costs (in particular, in operations in Canada and Europe). These operating initiatives have had and will continue to have a significant positive impact on Careismatic's free cash, through reduced operating costs and improved margins.

### 2. Enhanced Corporate Governance.

In connection with its contingency planning efforts and in consultation with its advisors, Careismatic reviewed its existing corporate governance infrastructure. Careismatic determined that it was in the best interests of Careismatic and its stakeholders to establish two Transaction Committees and to appoint one experienced independent and disinterested director to each: (i) Harvey Tepner to the board of CBI Parent and (ii) Roger Meltzer to the board of CBI Intermediate. Messrs. Tepner and Meltzer are the sole members of the respective Transaction Committees and have full delegation of authority to make decisions related to the restructuring. On December 29, 2023, CBI Intermediate retained McDonald Hopkins LLC as independent counsel, and on January 8, 2024, CBI Parent retained Kobre & Kim LLP as independent counsel. The Transaction Committees of CBI Parent and CBI Intermediate, with the assistance of their respective counsel, are (i) actively investigating potential claims or causes of action CBI Parent and CBI Intermediate, respectively, and/or their respective estates may hold against certain insiders, affiliates,

and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions.

**3.    Liability Management Phase.**

In the months leading up to these Chapter 11 Cases, Careismatic and its advisors, with the support and cooperation of the Sponsor, spent significant time exploring strategic alternatives. As part of these efforts, Careismatic retained PJT, AlixPartners, and K&E, and with their assistance engaged Careismatic's existing stakeholders, including the First Lien Ad Hoc Group. Unfortunately, Careismatic's cash position further deteriorated in the final months of 2023 and no actionable proposal materialized, reducing the possibility of a successful liability management transaction. As a result, in December 2023, Careismatic and its advisors began preparing for the increasing necessity of a chapter 11 filing.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed the <u>First Day Pleadings</u>[8] designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Amended Declaration of Kent Percy, Chief Restructuring Officer of Careismatic Brands, LLC in Support of the Debtors' Chapter 11 Petitions and First Day Motion* [Docket No. 33], and below:

- **Schedules Extension Motion:** Debtors' Motion Seeking Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) 2015.3 Reports, and (II) Granting Related Relief [Docket No. 4].

- **Creditor Matrix Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (C) Redact Certain Personally Identifiable Information, and (II) Granting Related Relief [Docket No. 5].

- **Case Management Motion:** Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief [Docket No. 6].

- **Donlin Recano Retention Application:** Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date, and (II) Granting Related Relief [Docket No. 7].

- **NOL Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, and (II) Granting Related Relief [Docket No. 8].

---

[8]    The First Day Pleadings, and all orders for relief entered in these Chapter 11 Cases, can be viewed free of charge on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/careismatic.

- **Joint Administration Motion:** Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief [Docket No. 9].

- **Taxes Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief [Docket No. 10].

- **Insurance & Surety Bond Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered Into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief [Docket No. 11].

- **Utilities Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief [Docket No. 12].

- **Customer Programs Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief [Docket No. 13].

- **Critical Vendors Motion:** Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (II) Granting Related Relief [Docket No. 14].

- **Wages Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No. 15].

- **Cash Management Motion:** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Debtor Bank accounts, Business Forms, and Books and Records, and (D) Continue Intercompany Transactions, and (II) Granting Related Relief [Docket No. 16].

## B.    Approval of the DIP Facility.

On January 24, 2024, the Bankruptcy Court entered an order [Docket No. 60] approving, on an interim basis, the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final hearing, and (VII) Granting Related Relief* (the "Interim DIP Order"). The DIP Facility consists of (i) a new-money super-senior secured delayed draw debtor-in-possession financing facility in an aggregate principal amount of $125 million, $50 million of which has been made available upon the Court's entry of the Interim DIP Order, and $75 million of which shall be made available following entry of the Final DIP Order, and (ii) the Debtors' use of Cash Collateral. The hearing on the approval of the DIP Facility on a final basis is currently scheduled for February 22, 2024, at 2:00 p.m. (prevailing Eastern Time).

The "DIP to exit" structure of the DIP Facility will provide Careismatic with post-emergence liquidity that will position the Debtors' business for long-term success. Absent entry into the DIP Facility, the Debtors will have insufficient liquidity to continue operating their enterprise and paying their debts as they come due, with no other readily available sources of additional financing. As such, the DIP Facility is essential to the Debtors' realization of a successful, value-maximizing restructuring.

## C.      Appointment of Unsecured Creditors' Committee.

On February 2, 2024, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 136], as amended on February 14, 2024 [Docket No. 204], appointing the Committee. The three-member Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and FTI Consulting LLC as its financial advisor. The Committee originally consisted of Ball Up, LLC, Koi Design, LLC and Cordial Experience, Inc. The Committee, as reconsisituted, includes following entities:

- Ball Up, LLC;

- Angela Mendoza; and

- Koi Design, LLC

Immediately after the Committee's appointment, the Debtors began sharing diligence with the Committee, which remains ongoing. The Debtors have also proactively engaged the Committee regarding the key components of these Chapter 11 Cases, including the Sale Process. As a result of such discussions, information transfer and dialogue between the Debtors and the Committee remains ongoing.

## D.      Sale Process and Bidding Procedures.

As described above, in late January 2024, the Debtors, with the assistance of PJT Partners, Inc., proposed investment bank to the Debtors, launched a comprehensive Sale Process to engage interested third parties in the potential Sale Transaction. In connection with the Sale Process, the Debtors, with the assistance of their advisors, filed the Bidding Procedures Motion, seeking authority to proceed with an expeditious, yet flexible, bidding and sale process.

The Debtors, through the Bidding Procedures Motion, are seeking authority to (a) conduct the proposed Sale Process by which the Debtors will solicit and, if value-maximizing, in accordance with the terms of the RSA and the Restructuring Term Sheet, select the highest or otherwise best offer(s)for the purchase of the Sale Package, and (b) establish certain dates and deadlines related thereto and schedule an Auction, if any.

## E.      Proposed Confirmation Schedule.

Under the DIP Credit Agreement and RSA, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions. The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to Careismatic's business, and curtail professional fees and administrative costs. To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | March 15, 2024 |
| Solicitation Mailing Deadline | Three (3) business days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Five (5) business days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) |
| Plan Supplement Filing Deadline | The date that is no later than three (3) days prior to the Voting Deadline |
| Voting Deadline | April 22, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Objection Deadline | April 22, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Report | April 26, 2024 |
| Confirmation Brief and Confirmation Reply Deadline | April 26, 2024 |
| Confirmation Hearing Date | April 30, 2024, at 2:30 p.m., prevailing Eastern Time or such other date as may be scheduled by the Court |

## VII.   SUMMARY OF THE PLAN

The Plan contemplates the following key terms described below.  In addition, the Plan contains additional detail, including descriptions of the provisions governing distributions under the Plan, the procedures for resolving contingent, unliquidated, and disputed claims, and provisions related to modification, revocation, or withdrawal of the Plan, among others.

### A.    General Settlement of Claims, Interests, and Intercompany Interests.

As discussed in the Plan and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and Intercompany Interests, and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and Intercompany Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests (as applicable) in any Class are intended to be and shall be final.

### B.    Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions (which, for the avoidance of doubt, shall be in form, substance, and structure reasonably acceptable to the Required Consenting First Lien Lenders) as may be necessary or appropriate to effect any transaction described in,

34

approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable: (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the Exit Facilities Documents and entry into the Exit Financing Arrangements; (v) the issuance and distribution of the New Common Stock as set forth in the Plan, including in connection with the DIP Premium Conversion Election Option; (vi) the execution and delivery of the Second Lien Warrants Documents and any filings related thereto, and the issuance of the Second Lien Warrants thereunder (if applicable); (vii) solely in the event of the Recapitalization Transaction, with respect to the Post-Effective Date Debtors, the implementation of the Management Incentive Plan and any distribution of MIP Equity; (viii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Post-Effective Date Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (ix) such other transactions that, in the reasonable business judgment of the Debtors or the Post-Effective Date Debtors, as applicable, the Required Consenting First Lien Lenders (in accordance with the Plan) and, if applicable, the Purchaser, are required to effectuate the Restructuring Transactions; and (x) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

Subject in all respects to the Bidding Procedures, the Debtors shall pursue the Sale Transaction unless the Debtors determine, with the consent of the Required Consenting First Lien Lenders, to pursue the Recapitalization Transaction. The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, the Purchaser, and the Consenting Creditors, as applicable, to undertake the Restructuring Transactions contemplated by the Plan and the Definitive Documents.

## C.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Post-Effective Date Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to: (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Post-Effective Date Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the Exit Financing Arrangements; (vi) the Sale Transaction; or (vii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon

entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D.      The Recapitalization Transaction.

If the Recapitalization Transaction occurs, the following provisions shall govern.

#### 1.      The Post-Effective Date Debtors.

On the Effective Date, the New Board shall be established, and each Post-Effective Date Debtor shall adopt its New Organizational Documents.  The Post-Effective Date Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

#### 2.      Sources of Consideration for Plan Distributions.

The Debtors shall fund or make distributions under the Plan, as applicable, with:  (i) the proceeds from the Exit Financing Arrangements, (ii) the New Common Stock, (iii) the Debtors' Cash on hand, and (iv) the Second Lien Warrants.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and Second Lien Warrants (if applicable), is expected to be exempt from Securities Act registration, as described more fully in Article IV.D.9 of the Plan.

##### (a)      The Exit Financing Arrangements.

On the Effective Date, the Post-Effective Date Debtors shall enter into or assume, as applicable, the Exit Term Loan Facility or another Acceptable Alternative Exit Facility, each on the terms set forth in the applicable Exit Facilities Documents.  Confirmation of the Plan shall be deemed approval of the Exit Financing Arrangements and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the Post-Effective Date Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization for the Post-Effective Date Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Financing Arrangements.  Execution of the Exit Term Loan Facility Documents by the agent thereof shall be deemed to bind all Holders of DIP Claims as if each such Holder had executed the applicable Exit Facilities Documents with appropriate authorization.

In the event the Exit Term Loan Facility is entered into, the DIP Commitments giving rise to the DIP Claims shall be refinanced by means of a cashless settlement whereby such DIP Commitments shall be converted on a dollar-for-dollar basis into the Exit Term Loans in accordance with the DIP Documents and the Exit Facilities Documents (subject to the DIP Premium Conversion Election Option), and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit

Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit Term Loan Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value, (b) shall be legal, valid, binding, and enforceable Liens on, and security interests in, the collateral specified thereunder in accordance with the terms of the applicable Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the applicable Exit Facilities Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Post-Effective Date Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

      **(b)**      **Issuance of the New Common Stock.**

Reorganized Careismatic shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan and that may be issuable upon exercise of the Second Lien Warrants. The issuance of the New Common Stock shall be authorized without the need for any further corporate action. On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan, and, in the event of the Sale Transaction whereby the Purchaser purchases New Common Stock, the Purchase Agreement.

All of the shares of New Common Stock issued pursuant to the Plan (or upon exercise of the Second Lien Warrants, if applicable) shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Common Stock, including any New Common Stock issuable upon exercise of the Second Lien Warrants, shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Post-Effective Date Debtor(s). The New Common Stock will not be registered under the Securities Act or on any national securities exchange as of the Effective Date.

      **(c)**      **Issuance of the Second Lien Warrants.**

Solely to the extent the Second Lien Condition is satisfied, on the Effective Date, Reorganized Careismatic will issue the Second Lien Warrants to Holders of Allowed Second Lien Secured Claims; *provided, however*, that a Holder of a Second Lien Claim may designate a trustee, agent, nominee, or one or more Affiliates to receive and hold the Second Lien Warrants on behalf of such Holder. All of the Second Lien Warrants that may be issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the Second Lien Warrants shall be duly authorized without the need for any

further corporate action and without any further action by the Debtors or the Post Effective Date Debtors, as applicable, validly issued, fully paid, and non assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan, the New Organizational Documents, or the Second Lien Warrants Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Post Effective Date Debtor(s). The Second Lien Warrants Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of Second Lien Warrants shall be bound thereby (without any further action or signature) in all respects, whether or not such Holder has executed any Second Lien Warrants Documents. The Second Lien Warrants will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the DTC.

### 3.    Vesting of Assets in the Post-Effective Date Debtors.

Except as otherwise provided in the Plan  or the Exit Facilities Documents (if applicable), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors under the Plan shall vest in each respective Post-Effective Date Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Facilities Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, as applicable). On and after the Effective Date, except as otherwise provided herein, each Post-Effective Date Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, Intercompany Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 4.    Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5.    Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (a) adoption or assumption, as applicable, of the obligations set forth in Article IV.D.11 of the Plan; (b) selection of the directors, officers, or managers for the Post-Effective Date Debtors; (c) the distribution of the New Common Stock; (d) entry into the Second Lien Warrants

Documents and the issuance and distribution of the Second Lien Warrants; (e) implementation of the Restructuring Transactions; (f) entry into the Exit Facilities Documents and incurrence (or assumption, as applicable) of debt thereunder; (g) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (h) adoption of the New Organizational Documents; (i) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (j) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity security Holders, directors, officers, or managers of the Debtors or the Post-Effective Date Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including the New Common Stock, the New Organizational Documents, the Exit Financing Arrangements, the Exit Facilities Documents, the Second Lien Warrants, the Second Lien Warrants Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.D.9 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 6.    New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan. To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Effective Date Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included in the Plan Supplement. After the Effective Date, each Post-Effective Date Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Post-Effective Date Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents. For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Post-Effective Date Debtors.

### 7.    Directors and Officers of the Post-Effective Date Debtors.

As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, which shall be consistent in all respects with the Governance Term Sheet. Each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.

**8.    Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Post-Effective Date Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**9.    Certain Securities Law Matters.**

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, it is expected that the offering, issuance, and distribution of the New Common Stock and the Second Lien Warrants (as well as exercising the Second Lien Warrants) as contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan, including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums and including upon exercise of the Second Lien Warrants, as well as the Second Lien Warrants themselves, in each case, on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock or Second Lien Warrants in the New Organizational Documents or the Second Lien Warrants Documents, as applicable.

The shares of New Common Stock, including the MIP Equity, and upon exercise of the Second Lien Warrants, and the Second Lien Warrants themselves, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

**10.    Management Incentive Plan.**

On or as soon as reasonably practicable following the Effective Date, the New Board shall adopt and implement the Management Incentive Plan to be used to incentivize and compensate employees, directors, consultants, and other service providers of the Post-Effective Date Debtors, which Management Incentive Plan will include (i) the ability to grant restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock (or equivalent Cash value thereof) representing up to 15.0% of the New Common Stock on a fully diluted basis and (ii) other terms and conditions customary for similar type equity plans as determined by the New Board in its sole discretion (including with respect to participants, allocation of awards, and vesting).

11.    **Employment Obligations.**

All Assumed Plans shall be assumed by the Post-Effective Date Debtors as of the Effective Date and shall remain in place. The Post-Effective Date Debtors shall continue to honor their obligations under such Assumed Plans; *provided* that (i) the Assumed Plans shall not include any equity or equity-based programs and awards, and (ii) each Assumed Plan shall be amended, to the extent applicable, to exclude any right(s) to receive future equity or equity-based awards provided for under any Assumed Plans, and such awards and rights described in the foregoing subsections (i) and (ii) shall be terminated as of the Effective Date for no consideration. Without Bankruptcy Court approval or approval of the Required Consenting First Lien Lenders, the Debtors will not be permitted to establish any annual, short-term, or long-term compensation programs unless such program(s) are (i) in the ordinary course of business and consistent with past practice and (ii) performance-based (i.e., are only eligible to be paid upon achievement of pre-established performance goals).

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

The occurrence of the Effective Date shall not be deemed to result in an accelerated payment event or a "good reason" or other constructive termination event for purposes of any Debtor compensation or benefit plan; *provided* that employees who, as of the Effective Date, are party to Assumed Plans with a contractual entitlement to severance may, in their sole discretion, elect to treat the occurrence of the Effective Date as "good reason" or constructive termination event.

12.    **Director and Officer Liability Insurance.**

After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

E.    **The Sale Transaction.**

If the Sale Transaction occurs, the following provisions shall govern.

1.    **The Sale Transaction.**

On the Effective Date, the Purchaser shall purchase substantially all of the Debtors' assets or 100% of the New Common Stock, in each case, free and clear of all Liens, Claims, Interests, Intercompany Interests, charges, or other encumbrances (except for those encumbrances expressly assumed by the Purchaser under the Purchase Agreement or the Plan) in exchange for the Purchase Price as set forth in the Purchase Agreement. The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, and the Purchaser, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Purchase Agreement, which may be the Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors or the Purchaser, as applicable, may operate their businesses and may use,

acquire, or dispose of property and compromise or settle any Claims, Interests, Intercompany Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.       **Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors (if any). Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.       **Post-Effective Date Debtors.**

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible as authorized by the Bankruptcy Court; (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided hereunder; (iv) establishing and funding the Distribution Reserve Accounts; (v) enforcing and prosecuting the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (vi) filing appropriate tax returns; (vii) complying with any continuing obligations under the Purchase Agreement; and (viii) administering the Plan in an efficacious manner.  The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date or assigned to the Purchaser under the Purchase Agreement shall vest in the Post-Effective Date Debtors and shall be administered by the Plan Administrator, and the net proceeds thereof shall constitute Excess Distributable Consideration.

4.       **Plan Administrator.**

On the Effective Date, the Persons acting as managers, directors, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers and authority of the Post-Effective Date Debtors' managers, directors, and officers.  The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in connection with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors. The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer. The Debtors, after the Confirmation Date and before the Effective Date, and the Post-Effective Date Debtors or Plan Administrator, on and after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including: (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (viii) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.E of the Plan; (ix) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (x) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (xi) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind Down Reserve.

### a. Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors. The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

### b. Compensation of the Plan Administrator.

The Plan Administrator's compensation shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the reasonable fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

### c.    Plan Administrator Expenses.

All reasonable costs, expenses, and obligations incurred by the Plan Administrator or the Post-Effective Date Debtors in administering the Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

### d.    Exculpation, Indemnification, Insurance, and Liability Limitation.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors.  The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

### e.    Tax Returns.

In the event of the Sale Transaction, after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

### f.    Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Plan Administrator or Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed, such Cash or other property shall constitute Residual Cash (in the event all Allowed Professional Fee Claims have been satisfied in full in Cash and the Disputed Claims Reserve Account has been funded with the Disputed Claims Reserve Amount), and shall be immediately allocated and distributed to the Holders of Allowed First Priority Claims.

5. **Wind Down.**

As soon as practicable after the Effective Date, the Plan Administrator shall:  (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of each Post-Effective Date Debtor under the applicable laws of its state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Interests and Intercompany Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, objection, and resolution of final applications for Allowance of the Professional Fee Claims.

The filing of the monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

6. **Effectuating Documents; Further Transactions.**

Prior to the Effective Date, the Debtors and the Purchaser are, and on and after the Effective Date, the Post-Effective Date Debtors, the Purchaser, and the Plan Administrator are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

7. **Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (a) consummation of the Sale Transaction; (b) consummation of the Wind Down; and (c) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan or corporate structure of the Debtors or Post-Effective Date Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors.  The authorizations and approvals contemplated by Article IV.E of the Plan shall be effective notwithstanding any requirements under non bankruptcy law.

**8.      Directors and Officers of the Post-Effective Date Debtors.**

As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed; *provided* that in the event of the Recapitalization Transaction, the New Board shall be appointed pursuant to the terms set forth in the Governance Term Sheet.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, or other governing body, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, including those powers set forth in Article IV.E of the Plan.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers.

**F.      Cancellation of Existing Agreements, Interests, and Intercompany Interests.**

On the Effective Date, except with respect to the Exit Facility Documents (if applicable) or to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims, Interests, or Intercompany Interests, including credit agreements and indentures, shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder.  Holders of, or parties to, such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding anything to the contrary in the Plan, (x) any cancelled instruments, securities, and other documentation shall continue in effect solely for the purposes of allowing Holders of Claims to receive distributions as specified under the Plan, as applicable, and (y) any agreement that governs the rights of the Agents shall continue in effect solely for purposes of allowing the Agents, as applicable, to (i) receive any distributions under the Plan and distribute them to the Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, in each case in accordance with the terms of the Plan, (ii) maintain, enforce, or exercise any right to compensation, contribution, expense reimbursement, or indemnification that (1) may be owed to the applicable Agent under the Plan, the DIP Documents, or the First Lien Credit Documents (including by the Debtors or the Post-Effective Date Debtors), and that (2) by its terms survives termination of such document; (iii) maintain, enforce, or exercise its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable or allocable under the Plan to Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to any of the Agents or Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, and (v) without limiting the foregoing clause (ii), maintain, enforce, or exercise any right to compensation, contribution, expense reimbursement, or indemnification of the Agents, as applicable, and any predecessor thereof vis-à-vis parties other than the Debtors and the Post-Effective Date Debtors.

**G.      Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity, whether arising

before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Post-Effective Date Debtors. The Post-Effective Date Debtors or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**No Person or Entity may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement to file motions or substitutions of parties or counsel in each such matter.

## H.    Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Post-Effective Date Debtors or the Plan Administrator, as applicable, shall be permitted to close all of the Chapter 11 Cases except one, and all contested matters relating to any Debtor, including objections to Claims, shall be administered and heard in such remaining Chapter 11 Case.

## VIII.    OTHER KEY ASPECTS OF THE PLAN

### A.    Treatment of Executory Contracts and Unexpired Leases.

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the date that is ninety (90) days after the Effective Date, each Executory Contract and Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically assumed, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) is identified on the Assumed Executory Contracts and Unexpired Leases List as of the Effective Date, in which case such Executory Contract or Unexpired Lease shall be assumed as of the Effective Date; (ii) is identified on the Rejected Executory Contracts and Unexpired Leases List as of the Effective Date, in which case such Executory Contract or Unexpired Lease shall be rejected as of the Effective Date; (iii) previously expired or terminated pursuant to its own terms; (iv) is the subject of a motion to reject Filed on or before the Effective Date; or (v) is an insurance policy; *provided* that, in the event of the Recapitalization Transaction, the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed).  The assumption of Executory Contracts and Unexpired Leases pursuant to the Plan may include the assignment of certain of such contracts to Affiliates or the Purchaser.  The Plan constitutes a motion for approval of the foregoing assumptions and assignments, and the Confirmation Order will constitute an order of the Bankruptcy Court granting such motion.

Notwithstanding anything to the contrary in the Plan, the Debtors and the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List and the Rejected Executory Contracts and Unexpired Leases List (i) to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List and the Rejected Executory Contracts and Unexpired Leases List at any time prior to the Effective Date, and (ii) to add any Executory Contract or Unexpired Lease to the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List not otherwise identified on the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List at any time through and including ninety (90) days after the Effective Date, the modifications thereto shall constitute assumption or rejection of such Executory Contract or Unexpired Lease as of the date of such modification, notwithstanding anything contained in Article V.A of the Plan; *provided* that, subject to Article V.C of the Plan, at any time during such ninety (90)-day period after the Effective Date, the Post-Effective Date Debtors shall remain liable for any and all amounts incurred under any such Executory Contract and Unexpired Lease not on the Rejected Executory Contracts and Unexpired Leases List in the ordinary course of business. The Debtors shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List to the counterparties to the Executory Contracts or Unexpired Leases affected thereby. In the event of a Sale Transaction, such alteration, amendment, modification, or supplement shall be subject to the consent of the Purchaser.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements of Executory Contracts and Unexpired Leases executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Except as set forth in Article IV.D.11 of the Plan, to the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

2.      **Indemnification Obligations.**

Consistent with applicable law, all Indemnification Obligations, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date; *provided* that the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any Claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organization documents, or applicable agreements governing the Indemnification Obligations. All such Indemnification Obligations shall be deemed and treated as Executory Contracts to be assumed and assigned in their entirety by the Debtors under the Plan to the

48

Post-Effective Date Debtors, in the event of the Recapitalization Transaction, or to the Purchaser, in the event of the Sale Transaction.

**3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Counterparties to Executory Contracts or Unexpired Leases deemed rejected shall be served with a notice of rejection of their Executory Contracts and Unexpired Leases via service of the Confirmation Order and the Plan Supplement.  Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (i) thirty (30) days after the date of service of notice on the affected claimant of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, which notice shall set forth the date by which such Proofs of Claim must be filed, or (ii) thirty (30) days after service of notice on the affected claimant of any rejection that occurs after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Debtors or the Post-Effective Date Debtors, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

The Post-Effective Date Debtors shall pay all Cure Claims, if any, on the Effective Date.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to a proposed assumption, including pursuant to the Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than thirty (30) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Post-Effective Date Debtor without the need for any objection by the Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Post-Effective Date Debtors, as applicable, of the Cure; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Post-Effective Date Debtors may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or the Post-Effective Date Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or the Post-Effective Date Debtors, as applicable, with respect to which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Post-Effective Date Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

5.      **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Post-Effective Date Debtors.

Nothing in the Plan, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Post-Effective Date Debtors) or draw on any collateral or security therefor.

6.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

7.      **Reservation of Rights.**

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Post-Effective Date Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date

Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

### 8.     Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9.     Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the Post-Effective Date Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### B.     Conditions Precedent to Confirmation and Consummation of the Plan.

### 1.     Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1.          the Restructuring Transactions shall have been implemented in accordance with the Restructuring Steps Plan in all material respects;

2.          the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance consistent with the RSA and otherwise reasonably acceptable to the Required Consenting First Lien Lenders, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal;

3.          the Bankruptcy Court shall have entered the Confirmation Order, which order shall have become a Final Order;

4.          in the event of the Recapitalization Transaction or Sale Transaction, as applicable, the New Common Stock shall have been issued;

5.          in the event of the Recapitalization Transaction, solely to the extent the Second Lien Condition has occurred, the Second Lien Warrants shall have been issued in accordance with the Second Lien Warrants Documents;

6.          the RSA shall not have been terminated and shall remain in full force and effect;

7.          the DIP Facility shall be in full force and effect and there shall be no defaults under the DIP Documents continuing unless waived by the requisite DIP Lenders in accordance with the terms and conditions of the DIP Documents;

8.          the Plan Supplement, Definitive Documents, Plan, and all schedules, documents, supplements, and exhibits thereto, the Exit Financing Arrangement, or the Purchase Agreement, as applicable, shall have become effective and shall be in full force and effect;

9.          all Restructuring Expenses and any other professional fees and other amounts required to be paid pursuant to the RSA, in any Definitive Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash;

10.          any and all requisite governmental, regulatory, and third-party approvals and consents necessary to effectuate the Restructuring Transactions shall have been obtained, and all applicable waiting periods shall have expired;

11.          the Exit Facilities Documents, as applicable, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the Required Consenting First Lien Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

12.          in the event of the Sale Transaction, the Distribution Reserve Accounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

13.          in the event of the Sale Transaction, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;

14.          all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court (including for the avoidance of doubt all professional fees and other amounts required to be paid pursuant to the RSA) shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

15.          the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and

16.          the DIP Claims shall have been satisfied in accordance with Article II.B of the Plan.

**2.          Waiver of Conditions.**

The conditions to the Effective Date set forth in Article IX of the Plan, except for the conditions set forth in Article IX.A.7, 9, 12, 15, and 16 of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting First Lien Lenders and, in the event of the Sale Transaction, the Purchaser, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**3.          Effect of Failure of Conditions.**

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity in any respect; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

IX.    **RISK FACTORS**

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE POST-EFFECTIVE DATE DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.    **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against, and Interests and Intercompany Interests in, the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims Against, and Interests and Intercompany Interests in, the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

53

2.      **Parties in Interest May Object to the Plan's Classification of Claims, Interests, and Intercompany Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims, Interests, and Intercompany Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims, Interests, and Intercompany Interests each encompassing Claims, Interests, or Intercompany Interests, as applicable, that are substantially similar to the other Claims, Interests, or Intercompany Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.      **The RSA May Be Terminated.**

As more fully set forth in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Stakeholders (as defined in the RSA) of their respective obligations under the documents. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

4.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

5.      **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 7.  The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 8.  Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**9.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**10.      The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**11.      Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**12.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

13. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Post-Effective Date Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to the findings of the Transaction Committees and objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

B. **Risks Related to Recoveries Under the Plan.**

1. **Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Post-Effective Date Debtors Following the Effective Date.**

Assuming that the Effective Date occurs, Holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock (including, as applicable, shares issued upon exercise of the Second Lien Warrants) may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Post-Effective Date Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Post-Effective Date Debtors and consequently impact the value of the shares of New Common Stock or Second Lien Warrants. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may mean that subsequent sales of New Common Stock by other holders may be at a lower price per share of New Common Stock or the Second Lien Warrants. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Post-Effective Date Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Post-Effective Date Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Post-Effective Date Debtors' businesses, financial condition, and operating results.

2. **Estimated Valuations of the Exit Financing Arrangements, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

3.    **The New Common Stock is Subject to Dilution.**

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the New Common Stock issued in connection with the conversion of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued in connection with the emergence or post-emergence, including pursuant to the Management Incentive Plan, the DIP Premiums (assuming the DIP Premium Conversion Election Option is exercised), and the Second Lien Warrants.

4.    **The Terms of the Exit Facilities Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the Exit Facilities Documents have not been finalized and are subject to negotiations between the Debtors and the Required Consenting First Lien Lenders. Holders of Claims that are not the Required Consenting First Lien Lenders will not participate in these negotiations, and the results of such negotiations may affect the rights of the holders of the New Common Stock following the Effective Date. As a result, the final terms of the Exit Facilities Documents may be less favorable to Holders of Claims, Interests, and Intercompany Interests than as described herein and in the Plan.

5.    **A Decline in the Post-Effective Date Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt.**

The Debtors' or the Post-Effective Date Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Post-Effective Date Debtors, as applicable. Downgrades in the Post-Effective Date Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

6.    **The Post Effective Date Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Post-Effective Date Debtors may not be able to achieve their projected financial results. The Financial Projections attached hereto as **Exhibit E** represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Post-Effective Date Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Post-Effective Date Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

7.    **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Post-Effective Date Debtors and Holders of certain Claims.

**8.    The Debtors' General Unsecured Creditors May Not Receive Any Recovery.**

The Plan currently provides no recovery for Holders of General Unsecured Claims in the event of the Recapitalization Transaction.

**C.    Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses.**

**1.    The Post-Effective Date Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Post-Effective Date Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Post-Effective Date Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Post-Effective Date Debtors' control. The Post-Effective Date Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Post-Effective Date Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Financing Arrangements and upon emergence.

**2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**3.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity.  So

long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Post-Effective Date Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

###### 4.    Financial Results May Be Volatile and May Not Reflect Historical Trends.

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

###### 5.    The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.

The Debtors' operations are subject to various federal, state and local laws and regulations.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Post-Effective Date Debtors.

**6.      The Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Post-Effective Date Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Post-Effective Date Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Post-Effective Date Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Post-Effective Date Debtors' businesses and financial stability, however, could be material.

**7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**8.      Contract Counterparty Performance Issues that May Result in Additional Costs to the Debtors, Reductions in Revenues, or the Payment of Liquidated Damages.**

The Debtors may encounter difficulties as a result of delays in materials provided by suppliers or third parties, delays, or difficulties in equipment and material delivery, schedule changes, delays from a supplier's failure to timely obtain permits or rights-of-way or meet other regulatory requirements, weather-related delays, and other factors, some of which are beyond the Debtors' control, that impact the Debtors' ability to complete a project in accordance with the original delivery schedule.  Further, the Debtors contract with third-party subcontractors to assist them with the completion of contracts, and such subcontractors may be unavailable or delayed in performing services for the Debtors or other parties.  Any delay or failure by these third parties in the completion of their portion of the project may result in delays in the overall progress of the project or may cause the Debtors to incur additional costs, or both.  If the Debtors' suppliers fail to satisfy their obligations to the Debtors, the Debtors may be unable to maintain the timely delivery of products to retail partners or may be required to expend significant additional costs.  Delays and additional costs may be substantial and, in some cases, the Debtors may be required to compensate the retail partner for such delay.

**9.      Volatile Shipping and Production Prices.**

The Debtors' financial condition, results of operations, and cash flows will depend, in large part, upon prevailing market prices for medical apparel and workwear and associated fixed shipping and logistics costs.  Purchases from the Debtors' partners are subject to significant price fluctuations over relatively short periods of time and can be unpredictable.  Such factors that may materially impact the medical apparel and workwear markets and Careismatic's financial results include:

- economic conditions;

- the effectiveness of demand-side management;

- political impacts of shipping prices (current or future), particularly the imposition of increased tariffs;

- an increase in market competitors;

- freight cost volatility; and

- price volatility caused by shifting consumer demands.

Given the volatility of medical apparel prices and given that the Debtors operate on orders from its various partners, revenues and profitability will be subject to increased volatility, and the Debtors' financial condition, results of operations and cash flows could be materially adversely affected.

**10.      The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**11.      The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results.**

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products, including renewals of current contracts.  Existing customers may decide not to renew or to reduce their contracts with the Debtors or not to purchase additional products from the Debtors in the future, which could have a material adverse effect on the Debtors' business and results of operations.  In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, the quality of the Debtors' customer service, and the Debtors' ability to update their products and develop new products needed by customers. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.  The Debtors' revenue, which has been largely recurring in nature, comes from the sale of the Debtors' products and services under fixed-term contracts.  The Debtors do not have a unilateral right to extend these contracts at the end of their term.  If customers cancel or decide not to renew their contracts, the Debtors' business and financial results could be adversely and materially affected.

**D.      Risks Related to the Offer and Issuance of Securities Under the Plan.**

**1.      The Debtors Do Not Intend to Register the Offer or Sale of New Common Stock and Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

The New Common Stock will not be registered under the Securities Act or any Blue-Sky Laws. As summarized in Article XII of this Disclosure Statement, entitled "Certain Securities Laws Matters," certain of the New Common Stock may not be re-offered or resold except pursuant to an exemption from the registration requirements of the Securities Act and applicable Blue-Sky Laws.  The Debtors do not intend currently to register the New Common Stock under the Securities Act.

The Debtors believe that all shares of New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums but other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above will satisfy the requirements of section 1145(a) of the Bankruptcy Code. Accordingly, the Debtors believe that such New Common Stock (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws. Holders of such restricted securities may not be entitled to have their restricted securities registered and are not permitted to resell them except in accordance with an available exemption from registration under the Securities Act. Generally, Rule 144 of the Securities Act would permit the resale of securities received by a Person after a specified holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity Interests by affiliates of the issuer.  Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

The Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities.  *See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters."

**2.     A Liquid Trading Market for the Shares of New Common Stock or Second Lien Warrants May Not Develop.**

The New Common Stock and the Second Lien Warrants will be new issuances of securities, and there is no established trading market for those securities.  An active trading market for those securities may never develop, or if developed, may not be sustained.  The Debtors do not intend to apply for the New Common Stock or the Second Lien Warrants to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  The liquidity of any market for shares of New Common Stock or the Second Lien Warrants will depend upon, among other things, the number of holders of shares of New Common Stock and Second Lien Warrants, Post-Effective Date Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock or Second Lien Warrants will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock or Second Lien Warrants may be substantially limited.  The lack of an active market may also impair your ability to sell your New Common Stock or the Second Lien Warrants at the time you wish to sell them or at a price you consider reasonable.  The lack of an active market may also reduce the market price of your shares of New Common Stock or your Second Lien Warrants.  Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock or Second Lien Warrants indefinitely.  Further, transfers of the New Common Stock and the Second Lien Warrants held by certain holders will be subject to transfer restrictions under applicable securities laws and/or the New Organizational Documents, as discussed more fully below.

**3.     Holders of the New Common Stock and the Second Lien Warrants May Not Have Access to the Same Level of Information Available to Holders of Registered Securities.**

The New Common Stock and the Second Lien Warrants will not be registered under the Securities Act or any state securities laws.  As a result, the Post-Effective Date Debtors will not be subject to the reporting requirements of the Securities Act or the Exchange Act, and the information available to holders of the New Common Stock or Second Lien Warrants may be less than would be required if the New Common Stock or Second Lien Warrants were registered.  Such a reduced availability of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock and the Second Lien Warrants.

**4.     Certain Securities will be Subject to Resale Restrictions.**

The New Common Stock underlying the Management Incentive Plan to be issued under the Plan has not been registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction.  Such securities will be issued and sold, if at all, pursuant to an exemption from registration under the applicable securities laws.  Accordingly, such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law.  In addition, holders of New Common Stock issued pursuant to Section 1145(a) of the Bankruptcy Code who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions.  See Article XII of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the Securities.

### X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

#### A.    Holders of Claims Entitled to Vote on the Plan.

Holders of Claims in Classes 3, 4, and 5 (the "Voting Classes") are entitled to vote to accept or reject the Plan.  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.  The Debtors are *not* soliciting votes from Holders of Claims, Interests or Intercompany Interests in Classes 1, 2, 6, 7, or 8.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

#### B.    Voting Record Date.

The Voting Record Date is **March 15, 2024** (the "Voting Record Date"). The Voting Record Date is the date on which it will be determined which Holders of Claims that are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.  For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package (as defined below) based on a Claim arising from a rejected executory contract or unexpired lease if such claim is filed by the Voting Record Date.

#### C.    Voting on the Plan.

The Voting Deadline is **April 22, 2024, at 4:00 p.m. (prevailing Eastern Time**).  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is actually received by the Claims and Noticing Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

#### D.    Ballots Not Counted.

No ballot will be counted toward Confirmation if, among other things: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order and the Solicitation Procedures attached thereto.

**E.      Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**F.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**G.      Solicitation Procedures.**

**1.      Claims and Noticing Agent.**

The Debtors have retained Donlin, Recano & Company, Inc. to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.      Solicitation Package.**

The following Solicitation Materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (b) the applicable forms of Ballots, together with detailed voting instructions and instructions on how to submit the Ballots; (c) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Classes to vote to accept the Plan; (d) the Confirmation Hearing Notice;

(e) this Disclosure Statement (and the exhibits hereto, including the Plan); (f) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); (g) a pre-addressed, postage pre-paid reply envelope; and (h) any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

      **3.**      **Distribution of the Solicitation Package and Plan Supplement.**

The Debtors are causing the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes no later than three (3) Business Days following entry of the Disclosure Statement Order, which is thirty-one (31) days before the Voting Deadline (*i.e.*, 4:00 p.m. (prevailing Eastern Time) on April 22, 2024).

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by:  (a) calling the Debtors' restructuring hotline at 800-416-3743 (domestic) or 212-481-1411 (international), (b) emailing tocbinfo@drc.equiniti.com and/or (c) writing to the Claims and Noticing Agent at Donlin, Recano, & Company, Inc., c/o Equiniti, re: Careismatic Brands, LLC, et al., 48 Wall Street, 22nd Floor, New York, NY 10005.  You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://www.donlinrecano.com/Careismatic (free of charge), or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than three (3) days prior to the Voting Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## XI.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.    Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims, Interests, and Intercompany Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**C.      Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their restructuring advisors, AlixPartners and Kirkland & Ellis LLP, are analyzing their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors prepared their projected consolidated balance sheet, income statement, and statement of cash flows attached hereto as **Exhibit E** (the "Financial Projections"). Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Post-Effective Date Debtors.

Based upon the Financial Projections to be filed, the Debtors believe that Post-Effective Date Debtors will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

**D.      Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[9]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

---

[9]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles such claim or equity or equity interest.

Pursuant to Article III.E of the Plan, if a Class containing Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

**E.    Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**1.    No Unfair Discrimination.**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**2.    Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims, Interests or Intercompany Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

F.      **Valuation of the Debtors.**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors, which estimate is attached to this Disclosure Statement as **Exhibit F** (the "Valuation Analysis").  The Valuation Analysis should be considered in conjunction with the risk factors discussed in Article IX of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections.  The Valuation Analysis is subject to various important qualifiers and assumptions that are set forth therein, and Holders of Claims should carefully review the information in the Valuation Analysis in its entirety.  The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting Classes.  This valuation is not, and is not to be construed as, (1) a recommendation to any Holder of Claims as to how to vote on, or otherwise act with respect to, the Plan, (2) an opinion as to the fairness from a financial point of view of the consideration to be received pursuant to the Restructuring Transactions, or (3) an appraisal of the assets of the Post-Effective Date Debtors.

G.      **Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of their restructuring advisors, AlixPartners and Kirkland & Ellis LLP.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

## XII.   CERTAIN SECURITIES LAW MATTERS

A.      **New Common Stock.**

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock to certain Holders of prepetition Claims against the Debtors.  The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

The Debtors further believe that the issuance of the New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums, but other than any New Common Stock underlying the Management Incentive Plan) after the Petition Date pursuant to the restructuring transactions under the Plan is, and subsequent transfers of such New Common Stock by the holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in certain limited circumstances.

In addition, any New Common Stock underlying the Management Incentive Plan will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, and will also be considered "restricted securities." Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The following discussion of the issuance and transferability of the New Common Stock and the Second Lien Warrants relates solely to matters arising under federal securities laws and state securities laws. The rights of holders of New Common Stock and Second Lien Warrants, including the right to transfer such interests, will also be subject to any restrictions in the Governance Term Sheet to the extent applicable. Recipients of the New Common Stock and Second Lien Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

**B.      Exemption from Registration Requirements; Issuance of New Common Stock and Second Lien Warrants under the Plan.**

All shares of New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums, but other than any New Common Stock underlying the Management Incentive Plan) and, in the event of a Recapitalization Transaction, the Second Lien Warrants, will be issued after the Petition Date in reliance of Section 1145(a) of the Bankruptcy Code, without registration under the Securities Act, state securities laws or any similar federal, state, or local law.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property. The Debtors believe that all shares of New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums, but other than any New Common Stock underlying the Management Incentive Plan) and, in the event of a Recapitalization Transaction, the Second Lien Warrants, issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Common Stock and Second Lien Warrants. Recipients of the New Common Stock and Second Lien Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws. As discussed below, the exemptions provided for in

section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

**C.    Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

      **1.    Resales of New Common Stock Issued Pursuant to Section 1145.**

New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock issued in exchange for First Priority Claims or issued in connection with the equitization of any DIP Premiums pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Common Stock who are deemed to be "underwriters" may be entitled

to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock. However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 may not be available for resales of such New Common Stock by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE POST-EFFECTIVE DATE DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON STOCK AND SECOND LIEN WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

2. **Resales of New Common Stock Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or Other Available Exemptions from Registration.**

To the extent the exemption set forth Section 1145(a) of the Bankruptcy Code is unavailable, New Common Stock will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration. Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Stock by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods

under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Stock offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock are exempt from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Stock will also be subject to any applicable transfer restrictions contained in the Governance Term Sheet.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK OR SECOND LIEN WARRANTS MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Post-Effective Date Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Allowed First Priority Claims, Allowed Second Lien Secured Claims, or Allowed General Unsecured Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS, as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders of Allowed First Priority Claims, Allowed Second Lien Secured Claims, or Allowed General Unsecured Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction).  Moreover, this summary does not address any aspect of U.S. non-income (including state or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income).  Furthermore, this summary assumes that a Holder of an Allowed Claim holds only Claims in a single class and holds such Claims and New Common Stock, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Post-Effective Date Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form. This discussion also assumes that none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and that each of the Allowed Claims are denominated in U.S. dollars.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from that described below.  For the avoidance of doubt, this summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed First Priority Claim, an Allowed Second Lien Secured Claim, or an Allowed General Unsecured Claim that for U.S. federal income tax purposes is:  (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of an Allowed First Priority Claim, Allowed Second Lien Secured Claim, or Allowed General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of an Allowed First Priority Claim, Allowed Second Lien Secured Claim, or Allowed General Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Allowed First Priority Claims, Allowed Second Lien Secured Claims, and Allowed General Unsecured Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

**B.**  **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Post-Effective Date Debtors.**

**1.**  **Characterization of the Restructuring Transactions.**

The Debtors expect that the Restructuring Transactions will be structured in one of two ways:  (a) a Recapitalization Transaction, or (b) a Sale Transaction of (i) the New Common Stock (an "Equity Investment Transaction") or (ii) all or substantially all of the Assets (an "Asset Sale").  The Debtors will pursue a Sale Transaction unless no Successful Bid is received in connection with the Sale Process or the winning bid is a Credit Bid, in which case the Recapitalization Transaction will be implemented.

Whether the Debtors will recognize any gain or loss as a result of consummating the Restructuring Transactions will depend on whether the Restructuring Transactions are structured as a Recapitalization Transaction or a Sale Transaction and the manner in which such transaction is implemented.  In a Sale Transaction structured as an Asset Sale, the Debtors will generally realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in the Assets sold.  Any such gain generally will be

reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain will be recognized by the Debtors and result in a cash tax obligation. A Recapitalization Transaction, if structured in a certain manner could give rise to similar tax consequences for the Debtors. In either a Recapitalization Transaction or a Sale Transaction, the Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in an Asset Sale, the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions") and other tax attributes.

### 2. Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the issue price of any new indebtedness issued by the debtor, and (ii) the fair market value of any new consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction. Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt discharge occurs has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Post-Effective Date Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. 163(j) Deductions are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the New Common Stock, the Second Lien Warrants, and any other consideration, such as the purchase price paid in a Sale Transaction, none of which can be known until after the Plan is consummated. Accordingly, the Debtors are currently unable to determine the Post-Effective Date Debtors and the precise effect that the COD Income exclusion rules will have on Reorganized Careismatic and its U.S. federal income tax attributes.

### 3. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in tax attributes for excluded COD Income described above, the Post-Effective Date Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### a. General Sections 382 and 383 Annual Limitations.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses (a "<u>NUBIL</u>"),163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "<u>Pre-Change Losses</u>") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to a Restructuring Transaction or the sale of New Common Stock pursuant to an Equity Investment Transaction will result in an "ownership change" of the Debtors for these purposes, and that the Post-Effective Date Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC (described below) applies.

### b. General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "<u>382 Limitation</u>") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.81 percent for February 2024). The 382 Limitation may be increased to the extent that the Post-Effective Date Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "<u>Recognition Period</u>"), or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[10] If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period. Section 383 of the

---

[10] Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation. However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area. Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Post Effective Date Debtors with respect to any "ownership change" that occurs pursuant to the Plan.

IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Unless the special 382(l)(5) Exception (described below) applies, if the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). As discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### c.   Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Post-Effective Date Debtors undergo another "ownership change" within two years after the Effective Date, then the Post-Effective Date Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. Rather, the resulting limitation would be determined under the regular rules for ownership changes under Section 382 and 383 of the IRC.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Post-Effective Date Debtors will elect out of its application so that the 382(l)(6) Exception instead applies. Whether the Post-Effective Date Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Post-Effective Date Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

**1.      U.S. Federal Income Tax Consequences to U.S. Holders of the Consummation of the Restructuring Transactions: Treatment of Debt as a Security.**

The U.S. federal income tax consequences to a U.S. Holder of Allowed Claims in a Recapitalization Transaction will depend, in part, on whether, for U.S. federal income tax purposes, (a) the Allowed First Priority Claim or Allowed Second Lien Secured Claim, as applicable, surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (b) the New Common Stock or Second Lien Warrants, as applicable, received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or an entity that is a "party to a reorganization" with such entity).  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

Due to the inherently factual nature of the determination of whether a debt instrument constitutes a "security," U.S. Holders of Allowed First Priority Claims and Allowed Second Lien Secured Claims are urged to consult their tax advisors regarding the status of the Allowed First Priority Claims and Allowed Second Lien Secured Claims, as applicable, as "securities" for U.S. federal income tax purposes.

**2.      Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Priority Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed First Priority Claim will receive its *pro rata* share of, (a) in the event of the Recapitalization Transaction, 100 percent of the New Common Stock issued pursuant to the Plan on the Effective Date, subject to dilution on account of (i) the MIP Equity, (ii) DIP Premiums, subject to the DIP Premium Conversion Election Option, and (iii) if applicable, the exercise of the Second Lien Warrants, and (b) in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration.

**a.      Treatment of U.S. Holders of Allowed First Priority Claims if the Restructuring Transactions are structured as a Recapitalization Transaction.**

The U.S. federal income tax consequences to a U.S. Holder of an Allowed First Priority Claim in a Recapitalization Transaction will depend on the manner in which the transaction is implemented and the identity of the issuer of the New Common Stock.  In a Recapitalization Transaction, if either (i) an Allowed First Priority Claims is not treated as a "security," or (ii) the entity issuing the New Common Stock under the Plan is not the same entity as the Debtor against which the Allowed First Priority Claims are asserted

(or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims for New Common Stock is expected to be treated as a taxable exchange pursuant to section 1001 of the IRC. In that case, a U.S. Holder of an Allowed First Priority Claim generally should recognize gain or loss equal to (a) the fair market value of the New Common Stock received as of the date such New Common Stock is distributed less (b) the U.S. Holder's adjusted tax basis in its Allowed First Priority Claim.  The adjusted tax basis of a U.S. Holder's Allowed First Priority Claims generally will equal such U.S. Holder's purchase price for such Allowed First Priority Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed First Priority Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "Market Discount."  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in the New Common Stock equal to the fair market value of the New Common Stock as of the date such New Common Stock is distributed to such U.S. Holder.  The holding period for any such New Common Stock should begin on the day following the receipt of such New Common Stock.

In a Recapitalization Transaction where a U.S. Holder's Allowed First Priority Claim is treated as a "security" for tax purposes and the entity issuing the New Common Stock under the Plan is the same entity as the Debtor against which such Allowed First Priority Claims is asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims for New Common Stock is expected to be treated as part of a "reorganization" within the meaning of section 368 of the IRC.  In that case, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID) or any property received other than the New Common Stock, and subject to the rules relating to market discount (as described below under "Market Discount"), a U.S. Holder of an Allowed First Priority Claim should not recognize gain or loss with respect to such Allowed First Priority Claim.  A U.S. Holder should obtain a tax basis in the New Common Stock equal to the tax basis in their Allowed First Priority Claim and should have a holding period in such New Common Stock that includes the U.S. Holder's holding period in their Allowed First Priority Claim.

Regardless of whether a Recapitalization Transaction is treated as taxable, the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

     **b.  Treatment of U.S. Holders of Allowed First Priority Claims if the Restructuring Transactions are structured as a Sale Transaction.**

If the Restructuring Transactions are structured as a Sale Transaction, then the exchange of any Allowed First Priority Claims by a U.S. Holder should generally be treated as a taxable exchange pursuant to section 1001 of the IRC, though the consequences will depend in significant part on the final mechanism that results in the consummation of the Restructuring Transactions.  In such case, subject to potential installment sale treatment and the discussion below regarding recognition of loss, a U.S. Holder of an Allowed First Priority Claim generally should recognize gain or loss equal to (a) the amount of Cash received, if any, less (b) the U.S. Holder's adjusted tax basis in its Allowed First Priority Claim.  The adjusted tax basis of a U.S. Holder's Allowed First Priority Claims generally will equal such U.S. Holder's purchase price for such Allowed First Priority Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed First Priority Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any

amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

It is possible that U.S. Holders of Allowed First Priority Claims will receive some amounts on the Effective Date and additional value after the Effective Date. If a U.S. Holder of a Claim receives additional value following the Effective Date, such U.S. Holder may be required to defer all or a portion of any tax loss on their Claim until the relevant Post-Effective Date Debtors have distributed all value or the U.S. Holder disposes of its Claim. U.S. Holders should consult their own tax advisors regarding the timing of any gain or loss relating to their Claims.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

3.      **Consequences of the Restructuring Transactions to U.S. Holders of Allowed Second Lien Secured Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed Second Lien Secured Claim will receive its *pro rata* share of, (a) in the event of the Recapitalization Transaction, no recovery or distribution on account of their Allowed Second Lien Secured Claim; *provided* that, if the Second Lien Condition is satisfied, each Holder of an Allowed Second Lien Secured Claim shall receive its *pro rata* share of the Second Lien Warrants, and (b) in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash.

a.      **Treatment of U.S. Holders of Allowed Second Lien Secured Claims if the Restructuring Transactions are structured as a Recapitalization Transaction.**

The U.S. federal income tax consequences to a U.S. Holder of an Allowed Second Lien Secured Claim in a Recapitalization Transaction will depend on the manner in which the transaction is implemented and the identity of the issuer of the Second Lien Warrants. In a Recapitalization Transaction, if either (i) an Allowed Second Lien Secured Claim is not treated as a "security," or (ii) the entity issuing, in the event the Second Lien Condition is satisfied, the Second Lien Warrants under the Plan is not the same entity as the Debtor against which the Allowed Second Lien Secured Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In that case, a U.S. Holder of an Allowed Second Lien Secured Claim generally should recognize gain or loss equal to (a) the fair market value of the Second Lien Warrants received as of the date such Second Lien Warrants are distributed less (b) the U.S. Holder's adjusted tax basis in its Allowed Second Lien Secured Claim. The adjusted tax basis of a U.S. Holder's Allowed Second Lien Secured Claims generally will equal such U.S. Holder's purchase price for such Allowed Second Lien Secured Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed Second Lien Secured Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." If

recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations. A U.S. Holder should obtain a tax basis in each Second Lien Warrant equal to the fair market value of such Second Lien Warrant as of the date such Second Lien Warrant is distributed to such U.S. Holder plus, if such Second Lien Warrant is exercised, the exercise price of the Second Lien Warrant. The holding period for any such Second Lien Warrant should begin on the day following the exercise of the Second Lien Warrant.

In a Recapitalization Transaction where a U.S. Holder's Allowed Second Lien Secured Claim is treated as a "security" for tax purposes and in the event the Second Lien Condition is satisfied, the entity issuing the Second Lien Warrants pursuant to the Plan is the same entity as the Debtor against which such Allowed First Priority Claims is asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims for Second Lien Warrants is expected to be treated as part of a "reorganization" within the meaning of section 368 of the IRC. In that case, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID) or any property received other than the Second Lien Warrants, and subject to the rules relating to market discount (as described below under "Market Discount"), a U.S. Holder of an Allowed Second Lien Secured Claim should not recognize gain or loss with respect to such Allowed Second Lien Secured Claim. A U.S. Holder should obtain a tax basis in the Second Lien Warrants equal to the tax basis in their Allowed Second Lien Secured Claim and should have a holding period in such Second Lien Warrants that includes the U.S. Holder's holding period in their Allowed Second Lien Secured Claim.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### b. Treatment of U.S. Holders of Allowed Second Lien Secured Claims if the Restructuring Transactions are structured as a Sale Transaction.

If the Restructuring Transactions are structured as a Sale Transaction, then the exchange of any Allowed Second Lien Secured Claims by a U.S. Holder should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In such case, subject to potential installment sale treatment and the discussion below regarding recognition of loss, a U.S. Holder of an Allowed Second Lien Secured Claim generally should recognize gain or loss equal to (a) the amount of Cash received, if any, less (b) the U.S. Holder's adjusted tax basis in its Allowed Second Lien Secured Claim. The adjusted tax basis of a U.S. Holder's Allowed Second Lien Secured Claims generally will equal such U.S. Holder's purchase price for such Allowed Second Lien Secured Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed Second Lien Secured Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

It is possible that U.S. Holders of Allowed Second Lien Secured Claims will receive some amounts after the Effective Date. If a U.S. Holder of an Allowed Second Lien Secured Claim receives value following the Effective Date, such U.S. Holder may be required to defer all or a portion of any tax loss on

their Claim until the relevant Post-Effective Date Debtors have distributed all value or the U.S. Holder disposes of its Claim. U.S. Holders should consult their own tax advisors regarding the timing of any gain or loss relating to their Claims.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

4.      **Consequences of the Restructuring Transactions to U.S. Holders of Allowed General Unsecured Claims.**

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, (a) in the event of the Recapitalization Transaction, no recovery or distribution on account of such Allowed General Unsecured Claims, and (b) in the event of the Sale Transaction, its pro rata distribution of the Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash. Accordingly, subject to the discussion of accrued interest and market discount below, each Holder of a General Unsecured Claim would, in the event of the Sale Transaction, generally recognize gain or loss in the exchange in an amount equal to the difference between (i) the sum of the amount of Cash received from its distribution of the Excess Distributable Consideration and (ii) such Holder's adjusted tax basis in its General Unsecured Claim. Generally, this gain or loss will be subject to the rules described above in "Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Priority Claims - Treatment of U.S. Holders of Allowed First Priority Claims if the Restructuring Transactions are structured as a Sale Transaction."

5.      **Accrued Interest.**

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but untaxed interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.*

84

6. **Market Discount.**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Allowed Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued).  To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (i.e., up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property will be treated as ordinary income to the extent of such accrued, but not recognized, market discount.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim.*

7. **Limitations on Capital Losses.**

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

8. **Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock.**

   a. **Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Careismatic as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New

Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Careismatic has sufficient earnings and profits and certain holding period requirements are satisfied.

### b.  Sale, Redemption, or Repurchase of New Common Stock.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock.  Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed First Priority Claims or recognized an ordinary loss on the exchange of its Allowed First Priority Claims for New Common Stock.

### D.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed First Priority Claims, Allowed Second Lien Secured Claims, and Allowed General Unsecured Claims.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock or Second Lien Warrants, as applicable.

### 1.  Gain Recognition by Non-U.S. Holders of Allowed Claims.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims.  Any gain realized by a Non-U.S. Holder of an Allowed Claim on the exchange of its Allowed Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or

business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    Accrued Interest.

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to Allowed Claims generally will not be subject to U.S. federal income or withholding tax, provided that such Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that such Non-U.S. Holder is not a U.S. person, unless:

(a)    such Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of Debtor's stock entitled to vote;

(b)    such Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Debtor (each, within the meaning of the IRC);

(c)    such Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any).  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

3.      **Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock.**

a.  **Dividends.**

Any distributions made with respect to New Common Stock (other than certain distributions of stock of Reorganized Careismatic) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Careismatic, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such New Common Stock and then, generally, capital gain).  Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Reorganized Careismatic is considered a "U.S. real property holding corporation" (a "USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes.  In the event the New Common Stock are regularly traded on an established market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of equity interests that includes New Common Stock during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

b.  **Sale, Redemption, or Repurchase of New Common Stock.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless:

(i)      such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)     such gain is effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)     the issuer of such New Common Stock is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of New Common Stock generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a Non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business. A Non-U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) such Non-U.S. Holder's holding period for its interests in the corporation.

In general, FIRPTA will not apply upon a Non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the Non-U.S. Holder did not directly or indirectly own more than 5 percent of the value of the New Common Stock during a specified testing period.

**E.     FATCA.**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final Treasury Regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW COMMON STOCK.**

**F.      Information Reporting and Backup Withholding.**

The Debtors, the Post-Effective Date Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. Further, the Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  February 27, 2024

Careismatic Brands, LLC
on behalf of itself and all other Debtors

By: ___/s/ Kent Percy_____

Kent Percy
Chief Restructuring Officer

## Exhibit A

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAREISMATIC BRANDS, LLC, *et al.*,[1] | ) Case No. 24-10561 (VFP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**JOINT PLAN OF REORGANIZATION OF CAREISMATIC BRANDS, LLC
AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Felice R. Yudkin, Esq. (NJ Bar No. 014962005)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:      (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      jsussberg@kirkland.com

Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2000
Email:      chusnick@kirkland.com

*Proposed Co-Counsel to the
Debtors and Debtors in Possession*

*Proposed Co-Counsel to the
Debtors and Debtors in Possession*

Dated:  February 27, 2024

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://donlinrecano.com/careismatic.   The location of Debtor Careismatic Brands, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is:  1119 Colorado Avenue, Santa Monica, California 90401.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..........................................................................................................1
    A.    Defined Terms. ........................................................................................................................1
    B.    Rules of Interpretation. .........................................................................................................15
    C.    Computation of Time. ...........................................................................................................16
    D.    Governing Law. ....................................................................................................................16
    E.    Reference to Monetary Figures. ...........................................................................................16
    F.    Reference to the Debtors or the Post-Effective Date Debtors. ............................................16
    G.    Controlling Document. .........................................................................................................16
    H.    Consultation, Notice, Information, and Consent Rights. ......................................................16

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES ......................................................................................17
    A.    Administrative Claims. .........................................................................................................17
    B.    DIP Claims. ...........................................................................................................................17
    C.    Priority Tax Claims. .............................................................................................................17
    D.    Professional Fee Claims. ......................................................................................................18
    E.    Payment of Restructuring Expenses. ....................................................................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS, AND INTERCOMPANY INTERESTS ...................................................................................19
    A.    Classification of Claims, Interests, and Intercompany Interests. .........................................19
    B.    Treatment of Claims, Interests, and Intercompany Interests. ..............................................19
    C.    Special Provision Governing Unimpaired Claims. ...............................................................23
    D.    Elimination of Vacant Classes. ............................................................................................23
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. .........................................23
    F.    Intercompany Interests. ........................................................................................................23
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................23
    H.    Controversy Concerning Impairment. ..................................................................................23

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................23
    A.    General Settlement of Claims, Interests, and Intercompany Interests. .................................23
    B.    Restructuring Transactions. ..................................................................................................24
    C.    Section 1146 Exemption. ......................................................................................................24
    D.    The Recapitalization Transaction. ........................................................................................25
    E.    The Sale Transaction. ...........................................................................................................30
    F.    Cancellation of Existing Agreements, Interests, and Intercompany Interests. .....................34
    G.    Preservation of Causes of Action. ........................................................................................34
    H.    Closing the Chapter 11 Cases. .............................................................................................35

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........35
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ........................35
    B.    Indemnification Obligations. ................................................................................................36
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..........................36
    D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .......................36
    E.    Insurance Policies. ................................................................................................................37
    F.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........37
    G.    Reservation of Rights. ..........................................................................................................38
    H.    Nonoccurrence of Effective Date. ........................................................................................38
    I.    Contracts and Leases Entered Into After the Petition Date. .................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................................38

A. Timing and Calculation of Amounts to Be Distributed..................................................38
B. Disbursing Agent. ...........................................................................................................38
C. Rights and Powers of Disbursing Agent. ......................................................................38
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions...................39
E. Manner of Payment.........................................................................................................40
F. Compliance with Tax Requirements. .............................................................................40
G. Allocations. ....................................................................................................................40
H. No Postpetition Interest on Claims................................................................................40
I. Foreign Currency Exchange Rate. .................................................................................41
J. Setoffs and Recoupment. ...............................................................................................41
K. Claims Paid or Payable by Third Parties.......................................................................41

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,   UNLIQUIDATED, AND DISPUTED
               CLAIMS ..............................................................................................................42
A. Disputed Claims Process................................................................................................42
B. Allowance of Claims.......................................................................................................42
C. Estimation of Claims.......................................................................................................42
D. Claims Administration Responsibilities.........................................................................43
E. Time to File Objections to Claims. ................................................................................43
F. Adjustment to Claims, Interests, or Intercompany Interests without Objection............43
G. Disputed and Contingent Claims Reserve......................................................................43
H. Disallowance of Claims. ................................................................................................43
I. Amendments to Proofs of Claim. ..................................................................................43
J. Distributions Pending Allowance. .................................................................................44
K. Distributions After Allowance. ......................................................................................44

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................44
A. Discharge of Claims and Termination of Interests and Intercompany Interests. ..........44
**B. Release of Liens. ...........................................................................................................44**
**C. Releases by the Debtors. ...............................................................................................45**
**D. Releases by Holders of Claims, Interests, and Intercompany Interests. ......................46**
**E. Exculpation. ..................................................................................................................46**
**F. Injunction. .....................................................................................................................47**
G. Protections Against Discriminatory Treatment. ............................................................48
H. Document Retention. ......................................................................................................48
I. Reimbursement or Contribution.....................................................................................48

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN...................................48
A. Conditions Precedent to the Effective Date. .................................................................48
B. Waiver of Conditions......................................................................................................49
C. Effect of Failure of Conditions. ....................................................................................50
D. Substantial Consummation.............................................................................................50

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .............................50
A. Modification and Amendments.......................................................................................50
B. Effect of Confirmation on Modifications.......................................................................50
C. Revocation or Withdrawal of Plan. ...............................................................................50

ARTICLE XI. RETENTION OF JURISDICTION ....................................................................................51

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................................................52
A. Immediate Binding Effect..............................................................................................52
B. Additional Documents. ..................................................................................................53
C. Payment of Statutory Fees. ...........................................................................................53
D. Statutory Committee and Cessation of Fee and Expense Payment. ..............................53
E. Reservation of Rights.....................................................................................................53

F.  Successors and Assigns.................................................................................................53
G.  Notices. .............................................................................................................................54
H.  Term of Injunctions or Stays.......................................................................................55
I.  Entire Agreement. .........................................................................................................55
J.  Exhibits. ...........................................................................................................................55
K.  Nonseverability of Plan Provisions. ..........................................................................55
L.  Votes Solicited in Good Faith......................................................................................55
M.  Closing of Chapter 11 Cases. ......................................................................................56
N.  Waiver or Estoppel.........................................................................................................56
O.  Creditor Default. ............................................................................................................56

## INTRODUCTION

Careismatic Brands, LLC and the above-captioned debtors and debtors in possession propose this Plan for the resolution of the outstanding Claims and Interests pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims, Interests, and Intercompany Interests pursuant to the Bankruptcy Code. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations as well as a summary and description of the Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "*Acceptable Alternative Exit Facility*" means, in the event of the Recapitalization Transaction, an exit financing facility other than the Exit Term Loan Facility that is acceptable to the Required Consenting First Lien Lenders.

2.      "*Acceptable Alternative Exit Facility Documents*" means the documents governing the Acceptable Alternative Exit Facility, together with any related notes, certificates, agreements, security agreements, documents, and instruments related to or executed in connection therewith.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; (d) adequate protection Claims provided for in the DIP Orders; and (e) Restructuring Expenses.

4.      "*Administrative Claims Bar Date*" means, for any Administrative Claim arising on or prior to March 18, 2024, establishing March 28, 2024, at 5:00 p.m., prevailing Eastern Time, as the last date and time by which claimants holding such Administrative Claims must File Proofs of Claim, and for any Administrative Claims arising after March 18, 2024, such Claims must be Filed by the earlier of: (a) the 15th day of the month following the month in which the Claim arose and (b) 14 days following the Effective Date.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity were a debtor in a case under the Bankruptcy Code.

6.      "*Agents*" means, collectively, the DIP Agent, the Exit Agent, the First Lien Agent, and the Second Lien Agent, including, in each case, any successors thereto.

7.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the applicable bar date (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) a Claim that is listed in

the Debtors' Schedules as not contingent, not unliquidated, and not Disputed and for which no Proof of Claim asserting a different amount or classification has been timely Filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; provided that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so interposed, such Claim shall have been Allowed by a Final Order of the Bankruptcy Court; *provided, further,* that unless expressly waived by the Plan or otherwise permitted by the Plan, the Allowed amount of a Claim shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

8.     "*Assumed Executory Contracts and Unexpired Leases List*" means the list to be included in the Plan Supplement, as determined by the Debtors and, in the event of the Sale Transaction, reasonably acceptable to the Purchaser, of Executory Contracts and Unexpired Leases that will be assumed by the Debtors, pursuant to the Plan, which list may be amended from time to time and, in the event of the Sale Transaction, with the reasonable consent of the Purchaser.

9.     "*Assumed Plans*" means, collectively, the Debtors' wages, compensation, and benefits programs according to existing terms and practices as of the date of this Plan, including executive compensation programs and executive employment agreements.

10.     "*Backstop Commitment*" means the Backstop Parties' commitment to backstop 100% of the DIP Facility pursuant to the DIP Credit Agreement in exchange for the Backstop Premium.

11.     "*Backstop Party*" means the Consenting Creditors providing the Backstop Commitment.

12.     "*Backstop Premium*" means an amount equal to 11.0% of the DIP Commitments, payable in-kind to each Backstop Party, according to its *pro rata* share of the DIP Commitments, which may be equitized in accordance with the DIP Premium Conversion Election Option.

13.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

14.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey.

15.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

16.     "*Bidding Procedures*" means the bidding procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

17.     "*Bidding Procedures Documents*" means the Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order.

18.     "*Bidding Procedures Motion*" means the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures and Auction, (II) Approving Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. 123].

19.     "*Bidding Procedures Order*" means the order approving the Bidding Procedures Motion and Bidding Procedures.

20.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

21.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

22.     "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

23.     "*Cause of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws). Causes of Action include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims, Interests, or Intercompany Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

24.     "*CBI Parent*" means CBI Parent, L.P.

25.     "*CBI Parent Transaction Committee*" means the transaction committee of the board of directors of CBI Parent.

26.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.     "*Claims and Noticing Agent*" means Donlin Recano & Company, Inc., the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases pursuant to the *Order (I) Authorizing the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 71].

29.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.     "*Class*" means a class of Claims, Interests, or Intercompany Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32.     "*Commitment Premium*" means an amount equal to 3.5% of the DIP Commitments, payable in-kind to each DIP Lender, according to its *pro rata* share of the DIP Commitments, which may be equitized in accordance with the DIP Premium Conversion Election Option.

33.     "*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the U.S. Trustee on February 2, 2024 [Docket No. 136] in the Chapter 11 Cases, as amended on February 14, 2024 [Docket No. 204], the membership of which may be further reconstituted from time to time by the U.S. Trustee.

34.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

35.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

36.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

37.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and, in the event of the Sale Transaction, shall also be in form and substance reasonably acceptable to the Purchaser.  The Confirmation Order may also be the Sale Order.

38.      "*Consenting Creditors*" means, collectively, the First Lien Ad Hoc Group and the Cross-Holder Ad Hoc Group.

39.      "*Consenting Stakeholders*" means, collectively, the Consenting Creditors and the Sponsor.

40.      "*Consummation*" means the occurrence of the Effective Date.

41.      "*Credit Bid*" means any credit bid of any Claims by Holders of First Lien Secured Claims or DIP Claims in connection with the Sale Process.

42.      "*Cross-Holder Ad Hoc Group*" means, collectively, those Holders of First Lien Term Loan Claims and Second Lien Claims represented by the Cross-Holder Ad Hoc Group Advisors, that are signatories to the RSA.

43.      "*Cross-Holder Ad Hoc Group Advisors*" means King & Spalding LLP.

44.      "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

45.      "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

46.      "*Debtor*" means each of the Debtors in its individual capacity as debtor and debtor in possession in the Chapter 11 Cases.

47.      "*Debtor Release*" means the release set forth in Article VIII.C hereof.

48.      "*Debtors*" means, collectively, each of the following:  AllHearts, LLC; Careismatic, LLC; Careismatic Brands, LLC; Careismatic Group Inc.; Careismatic Group II Inc.; CBI Intermediate, Inc.; CBI Midco, Inc.; CBI Parent; Krazy Kat Sportswear LLC; Marketplace Impact, LLC; Med Couture, LLC; Medelita, LLC; New Trojan Parent, Inc.; Pacoima Limited, LLC; Silverts Adaptive, LLC; Strategic Distribution, L.P.; Strategic General Partners, LLC; Strategic Partners Acquisition Corp.; Strategic Partners Corp.; Strategic Partners Midco, LLC; Trojan Buyer, Inc.; and Trojan Holdco, Inc.

49.      "*Definitive Documents*" means, collectively and as applicable, (a) this Plan (including the releases set forth in Article VIII herein) and all exhibits hereto; (b) the Plan Supplement and the documents contained therein; (c) the Confirmation Order; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) all material pleadings Filed by the Debtors in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto; (g) all motions, orders, filings, documents, and agreements related to either the Recapitalization Transaction or the Sale Transaction, as applicable, including any motion to approve the Disclosure Statement, (h) the Solicitation Materials; (i) the New Organizational Documents (if applicable); (j) the DIP Orders; (k) the DIP Documents; (l) the Exit Facilities Documents, (m) the Second Lien Warrants Documents;

(n) any KEIP or KERP (if applicable); (o) any and all filings with or requests for regulatory or other approvals from any governmental entity or unit, other than ordinary course filings and requests, necessary or desirable to implement the Restructuring Transactions; (p) the Bidding Procedures Documents; (q) the Purchase Agreement (if applicable); and (r) such other agreements, instruments, and documentation as may be necessary to consummate and document the transactions contemplated by the Plan.

50.      "*DIP Agent*" means the administrative agent and collateral agent under the DIP Facility.

51.      "*DIP Agent Advisors*" means (i) Paul Hastings LLP, (ii) Porzio, Bromberg & Newman, P.C., and (iii) any other advisors permitted under the DIP Documents.

52.      "*DIP Claims*" means any Claim against any Debtor derived from, based upon, or arising under the DIP Facility, the DIP Credit Agreement (including accrued but unpaid interest and fees arising under the DIP Credit Agreement), or the other DIP Documents, including any DIP Premiums, payable on the terms provided for in the DIP Credit Agreement and the DIP Orders.

53.      "*DIP Commitments*" means the loans under the DIP Facility.

54.      "*DIP Credit Agreement*" means that certain Debtor-in-Possession Credit and Guaranty Agreement, dated as of January 24, 2024, by and among New Trojan Parent, Inc., as Borrower, CBI Intermediate, Inc., as Holdings, all other Debtors, the guarantors party thereto, the lenders party thereto, and Jefferies Finance LLC, as administrative agent and collateral agent.

55.      "*DIP Documents*" means, collectively, the DIP Credit Agreement and any other documents governing the DIP Facility, including the DIP Orders.

56.      "*DIP Facility*" means the superpriority senior secured debtor-in-possession credit facility provided for under the DIP Documents.

57.      "*DIP Lenders*" means, collectively, each lender under the DIP Facility.

58.      "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

59.      "*DIP Premium Conversion Election Option*" means the right of each Holder of a DIP Claim to elect, at its sole discretion, to convert the DIP Premiums that such Holder earned in connection with the DIP Facility into New Common Stock at the Discount Value; *provided* that the DIP Premium Conversion Election Option shall not apply in the event that:  (i) the Debtors' restructuring is consummated through either (a) the Sale Transaction or (b) a Plan that provides for payment in full in Cash on the Effective Date of all First Priority Claims and DIP Claims; or (ii) an Acceptable Alternative Exit Facility is approved and becomes effective.

60.      "*DIP Premiums*" means, collectively, the Backstop Premium, the Commitment Premium, and the Exit Premium, each of which may be equitized in accordance with the DIP Premium Conversion Election Option.

61.      "*Disbursing Agent*" means the Post-Effective Date Debtors, or any Entity the Debtors or the Post-Effective Date Debtors select to make or to facilitate distributions in accordance with the Plan, which Entity may include the Claims and Noticing Agent, the Agents (with the respective Agent's prior written consent), or the Plan Administrator, as applicable.

62.      "*Disclosure Statement*" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

63.      "*Disclosure Statement Order*" means any order of the Bankruptcy Court approving the adequacy of the Disclosure Statement.

64.      "*Discount Value*" means 40.0% to the plan enterprise value of $[●] million.

65.     "*Disputed*" means, as to a Claim, Interest, or Intercompany Interest, a Claim, Interest, or Intercompany Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

66.     "*Disputed Claims Reserve*" means the account to be established on the Effective Date and funded with the Disputed Claims Reserve Amount for distribution as set forth in Article VII.G, if any.

67.     "*Disputed Claims Reserve Account*" means the account funded with the Disputed Claims Reserve Amount.

68.     "*Disputed Claims Reserve Amount*" means Cash in an amount to be determined by the Debtors in consultation with the Required Consenting First Lien Lenders, which amount shall be used to fund the Disputed Claims Reserve.

69.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing or such other date agreed to by the Debtors and the Required Consenting First Lien Lenders.

70.     "*Distribution Reserve Accounts*" means, in the event of the Sale Transaction, the Priority Claims Reserve and the Wind-Down Reserve established pursuant to the Plan.

71.     "*DTC*" means the Depository Trust Company.

72.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

73.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

74.     "*Equipment Financing Claims*" means any Claim on account of the Equipment Lease Agreement.

75.     "*Equipment Lease Agreement*" means that certain Master Equipment Lease Agreement dated July 25, 2023, by and among Wingspire Equipment Finance LLC, as Lessor, and Careismatic Brands, LLC, as Lessee.

76.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

77.     "*Excess Distributable Consideration*" means, in the event of the Sale Transaction, all Cash of the Debtors or the Post-Effective Date Debtors, as applicable, on or after the Effective Date, including any Cash comprising the Purchase Price and the Residual Cash, after payment of the Allowed Administrative Claims, DIP Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims, each as set forth in the Plan, and funding the Professional Fee Escrow Account, *plus* any non-Cash consideration comprising the Purchase Price (if any) *plus* any proceeds generated by any Cause of Action retained by the Post-Effective Date Debtors.

78.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a et seq, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

79.     "*Exculpated Partie*s" means, collectively: (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Committee; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons, directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other

professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

80.    "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

81.    "*Exit Agent*" means the administrative agent and collateral agent under the Exit Facilities Documents.

82.    "*Exit Facilities Documents*" means, as applicable, either the Exit Term Loan Facility Documents or the Acceptable Alternative Exit Facility Documents.

83.    "*Exit Facility Lenders*" means, collectively, each lender under the applicable Exit Financing Arrangement.

84.    "*Exit Financing Arrangements*" means the Exit Term Loan Facility or the Acceptable Alternative Exit Facility, as applicable.

85.    "*Exit Premium*" means an amount equal to 3.5% of the DIP Commitments payable to each DIP Lender, according to its *pro rata* share of the DIP Commitments, (i) in-kind upon conversion into the Exit Term Loan Facility or (ii) in Cash upon repayment in full of the DIP Facility (which, for the avoidance of doubt, shall also be subject to the DIP Premium Conversion Election Option).

86.    "*Exit Term Loan Credit Agreement*" means the credit agreement with respect to the Exit Term Loan Facility.

87.    "*Exit Term Loans*" means the loans issued on account of the Exit Term Loan Facility.

88.    "*Exit Term Loan Facility*" means, in the event of the Recapitalization Transaction, a new term loan facility wherein the DIP Commitments are converted to Exit Term Loan Facility Loans.

89.    "*Exit Term Loan Facility Documents*" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

90.    "*Exit Term Loan Facility Loans*" means loans issued under the Exit Term Loan Facility.

91.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

92.    "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

93.    "*Final DIP Order*" means the Final Order approving the DIP Facility and the DIP Documents and authorizing the Debtors' use of Cash Collateral.

94.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail

to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

95.    "*First Day Pleadings*" means those certain pleadings Filed by the Debtors contemporaneously with their voluntary petitions on the Petition Date.

96.    "*First Lien Ad Hoc Group*" means, collectively, those Holders of First Lien Term Loan Claims and Second Lien Claims represented by the First Lien Ad Hoc Group Advisors, that are signatories to the RSA or any subsequent Holder of First Lien Term Loan Claims, First Lien RCF Claims, and Second Lien Claims that becomes party thereto as a member of the First Lien Ad Hoc Group, in accordance with the terms of the RSA.

97.    "*First Lien Ad Hoc Group Advisors*" means (i) Milbank LLP, (ii) Gibbons P.C., (iii) Houlihan Lokey Capital, Inc., (iv) St. Onge Company, and (v) any regulatory counsel or other advisors retained by the First Lien Ad Hoc Group.

98.    "*First Lien Agent*" means UBS AG, Stamford Branch, as administrative and collateral agent to the First Lien Credit Agreement.

99.    "*First Lien Credit Agreement*" means that certain First Lien Credit Agreement, dated as of January 6, 2021, among New Trojan Parent, Inc., a Delaware corporation, as Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, the issuing banks thereto from time to time, the Swing Line Lender party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent.

100.    "*First Lien Credit Documents*" means any documents governing the First Lien Revolving Credit Facility and First Lien Term Loan Facility, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments related to or executed in connection therewith.

101.    "*First Lien RCF Claims*" means any Claim on account of the First Lien Revolving Credit Facility.

102.    "*First Lien Revolving Credit Facility*" means that certain first lien revolving credit facility issued pursuant to the First Lien Credit Agreement.

103.    "*First Lien Secured Claims*" means any First Priority Claim that is a Secured Claim.

104.    "*First Lien Term Loan Claims*" means any Claim on account of the First Lien Credit Agreement arising out of the term loans issued thereby, plus applicable interest, fees, costs, expenses, and premiums.

105.    "*First Lien Term Loan Facility*" means that certain term loan credit facility issued pursuant to the First Lien Credit Agreement.

106.    "*First Priority Claims*" means, collectively, the First Lien RCF Claims, the First Lien Term Loan Claims, and the Equipment Financing Claims.

107.    "*General Unsecured Claim*" means any Claim that is not (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) a DIP Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a First Priority Claim; (h) a Second Lien Secured Claim; or (i) an Intercompany Claim.  For the avoidance of doubt, General Unsecured Claims shall include the Sponsor Loan Claims and the Second Lien Deficiency Claims.

108.    "*Governance Term Sheet*" means that certain Governance Term Sheet attached as <u>Exhibit D</u> to the Restructuring Term Sheet.

109. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Post-Effective Date Debtors, as applicable.

110. "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

111. "*Holder*" means a Person or an Entity holding a Claim, Interest, or Intercompany Interest, as applicable.

112. "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

113. "*Indemnification Obligations*" means any obligations of the Debtors pursuant to corporate charters, bylaws, limited partnership agreements, limited liability company agreements, written deeds of indemnity, or other organizational documents in place as of the Effective Date to indemnify current and former officers, directors, partners, managers, members, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, managers, members, partners, agents, or employees, based upon any act or omission for or on behalf of the Debtors.

114. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

115. "*Intercompany Interest*" means, other than an Interest, any shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, profits interests, puts, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests in a Debtor held by another Debtor.

116. "*Interests*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests in CBI Parent, and puts, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of CBI Parent (in each case whether or not arising under or in connection with any employment agreement).

117. "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 60].

118. "*Intermediate Transaction Committee*" means the transaction committee of the board of directors of CBI Intermediate, Inc.

119. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

120. "*KEIP*" means any key executive incentive plan or similar proposal or documentation that would require Bankruptcy Court approval to make payments to "insiders" during the course of the Chapter 11 Cases.

121. "*KERP*" means any key employee retention plan or similar proposal or documentation that would require Bankruptcy Court approval to make payments to non-"insiders" during the course of the Chapter 11 Cases.

122. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

123. "*Management Incentive Plan*" means, in the event of the Recapitalization Transaction, a post-emergence incentive plan to be designed and adopted by the New Board following the Effective Date, to be used to incentivize and compensate employees, directors, consultants, and other service providers which will include

the ability to grant restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock (or equivalent Cash value thereof) representing up to 15.0% of the New Common Stock on a fully diluted basis.

124.    "*MIP Equity*" means any New Common Stock under the Management Incentive Plan as authorized by the New Board.

125.    "*New Board*" means the Governing Body of Reorganized Careismatic, which, in the event of the Recapitalization Transaction, shall consist of the Chief Executive Officer of the Post-Effective Date Debtors and six members appointed by the First Lien Ad Hoc Group in accordance with the Governance Term Sheet.

126.    "*New Common Stock*" means the new common equity issued by Reorganized Careismatic on the Effective Date.

127.    "*New Organizational Documents*" means, in the event of the Recapitalization Transaction, the documents providing for corporate governance of Reorganized Careismatic and the other Post-Effective Date Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and, in the event of the Sale Transaction, in form and substance reasonably acceptable to the Purchaser.

128.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

129.    "*Other Secured Claim*" means any Secured Claim against the Debtors other than the DIP Claims, the First Lien Secured Claims, or the Second Lien Secured Claims.

130.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

131.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

132.    "*Plan"* means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

133.    "*Plan Administrator*" means, in the event of the Sale Transaction, the Person selected by the Debtors to administer all assets of the Estates vested in the Post-Effective Date Debtors, and thereafter, all assets held from time to time by the Post-Effective Date Debtors.

134.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Interests, or other eligible Entities under and in accordance with the Plan.

135.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors, to the extent reasonably practicable, no later than three (3) days before the voting deadline provided in the Solicitation Materials or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Organizational Documents; (b) the identity and members of the New Board, which shall be consistent with the Governance Term Sheet; (c) the Schedule of Retained Causes of Action; (d) the Exit Facilities Documents; (e) the Restructuring Steps Plan; (f) the Assumed Executory Contracts and Unexpired Leases List, if any; (g) the Rejected Executory Contracts and Unexpired Leases List, if any; (h) in the event of the Sale Transaction, the Purchase Agreement, if any; (i) in the event of the Sale Transaction, the identity of the Plan Administrator and the terms of compensation of the Plan Administrator; and (j) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

136.    "*Post-Effective Date Debtors*" means (i) in the event of the Recapitalization Transaction, the Debtors, as reorganized pursuant to and under the Plan, or (ii) in the event of a Sale Transaction, the Debtors or any successors or assigns thereto, by transfer, merger, consolidation, or otherwise, on and after the Effective Date.

137.    "*Prepetition Agent Advisors*" means (i) Davis Polk & Wardwell LLP and (ii) Greenberg Traurig, LLP, in each case in their capacity as advisors to the First Lien Agent and the Second Lien Agent.

138.    "*Priority Claims*" means, collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims.

139.    "*Priority Claims Reserve*" means, in the event of the Sale Transaction, the account to be established and funded with the Priority Claims Reserve Amount on the Effective Date and maintained thereafter by the Plan Administrator for distribution to Holders of Priority Claims (except for Professional Fee Claims) as set forth in Article II.

140.    "*Priority Claims Reserve Amount*" means, in the event of the Sale Transaction, Cash in an amount to be determined in the Debtors' reasonable business judgment, which amount shall be used by the Plan Administrator to fund the Priority Claims Reserve.

141.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

142.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

143.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals reasonably estimated in good faith that they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

144.    "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

145.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

146.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

147.    "*Purchase Agreement*" means the purchase agreement, if any, to be entered into by the Debtors and the Purchaser in accordance with the Bidding Procedures.  The Purchase Agreement may be the Plan.

148.    "*Purchase Price*" means the purchase price to be paid by the Purchaser.

149.    "*Purchaser*" means the "[Purchaser]" under as defined in the Purchase Agreement (if any).

150.    "*Recapitalization Transaction*" means, in the event a Sale Process yields no bid that is a Successful Bid other than a Credit Bid (*i.e.*, no Sale Transaction occurs), the equitization of 100% of the Allowed First Priority Claims, subject to dilution from the (i) MIP Equity, (ii) the DIP Premiums, and (iii) the exercise of the Second Lien Warrants (if applicable).  A Successful Bid that is a Credit Bid constitutes the Recapitalization Transaction.

151.    "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims or Intercompany Interests, that the Claim, Interest, or Intercompany Interest shall be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

152.    "*Rejected Executory Contracts and Unexpired Leases List*" means the list to be included in the Plan Supplement, as determined by the Debtors and, in the event of the Sale Transaction, reasonably acceptable to the Purchaser, of Executory Contracts and Unexpired Leases that will be rejected by the Debtors, pursuant to the Plan, which list may be amended from time to time and, in the event of the Sale Transaction, with the reasonable consent of the Purchaser.

153.    "*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

154.    "*Released Party*" means collectively, and in each case solely in its capacity as such: (a) each of the Debtors; (b) each of the Post-Effective Date Debtors; (c) each Consenting Stakeholder; (d) each DIP Lender; (e) each of the Agents; (f) each member of the First Lien Ad Hoc Group; (g) each member of the Cross-Holder Ad Hoc Group; (h) each Backstop Party; (i) each of the Exit Facility Lenders; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k) (and, in addition to each of the foregoing, where any of the foregoing is an investment manager or advisor for a beneficial Holder, such beneficial Holder); *provided* that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases set forth in Article VIII.D; or (y) timely objects to the releases set forth in Article VIII.D and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

155.    "*Releasing Party*" means collectively, and each solely in its capacity as such: (a) each of the Debtors; (b) each of the Post-Effective Date Debtors; (c) each Consenting Stakeholder; (d) each DIP Lender; (e) each of the Agents; (f) each member of the First Lien Ad Hoc Group; (g) each member of the Cross-Holder Ad Hoc Group; (h) each Backstop Party; (i) each of the Exit Facility Lenders; (j) all Holders of Claims that vote to accept the Plan; (k) all Holders of Claims who are deemed to accept the Plan but who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (l) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with any Filed Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (m) all Holders of Claims or Interests who vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (n) each current and former Affiliate of each Entity in clause (a) through (m); and (o) each Related Party of each Entity in clause (a) through (n) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that, for the avoidance of doubt, an Entity in clause (j) through clause (m) shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not withdrawn or otherwise resolved before the Confirmation order is entered.

156.    "*Reorganized Careismatic*" means, if the Recapitalization Transaction occurs, one or more Post-Effective Date Debtors or a new entity, in each case to be determined by the Debtors and the Required Consenting First Lien Lenders, to issue the New Common Stock, on and after the Effective Date.

157.    "*Required Consenting First Lien Lenders*" means, as of the relevant date, Consenting Creditors holding at least 50.01% of the aggregate outstanding principal amount of the First Priority Claims that are held by Consenting Creditors.

158. "*Residual Cash*" means, in the event of the Sale Transaction, the sum of (a) any amounts remaining in the Professional Fee Escrow Account after payment in full of all Allowed Professional Fee Claims and (b) any amounts remaining in the Disputed Claim Reserve after the final resolution of Disputed Claims.

159. "*Restructuring Expenses*" means the (x) reasonable and documented fees and expenses accrued from the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of: (i) the First Lien Ad Hoc Group Advisors, (ii) the Cross-Holder Ad Hoc Group Advisors; *provided*, that fees and expenses of the Cross-Holder Ad Hoc Group Advisors shall not be paid in an amount greater than $250,000 in the aggregate, (iii) the DIP Agent Advisors, and (iv) the Prepetition Agent Advisors; and (y) the reasonable and documented prepetition and postpetition agency fees of the First Lien Agent and Second Lien Agent that have accrued and not otherwise been paid by, or on behalf of, the Debtors as of the Effective Date.

160. "*Restructuring Steps Plan*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan (to be included in the Plan Supplement), and, in the event of the Sale Transaction, the Purchase Agreement. The Restructuring Steps Plan shall, among other things, designate Reorganized Careismatic.

161. "*Restructuring Term Sheet*" means the term sheet attached to the RSA as <u>Exhibit B</u>.

162. "*Restructuring Transactions*" means the transactions described in Article IV.A, Article IV.B, Article IV.C; and, with respect to the Recapitalization Transaction, Article IV.D, and with respect to the Sale Transaction, Article IV.E.

163. "*RSA*" means that certain restructuring support agreement, dated as of January 22, 2024, by and among the Debtors and the Consenting Stakeholders, including all exhibits thereto (including the Restructuring Term Sheet).

164. "*Sale Order*" means any Final Order approving the Sale Transaction, including the Confirmation Order.

165. "*Sale Process*" means the sale and marketing process to be conducted pursuant to the Bidding Procedures.

166. "*Sale Transaction*" means a sale of the New Common Stock or all or substantially all of the Debtors' assets to the Purchaser in exchange for the Purchase Price that is not a Credit Bid.

167. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors (to be included in the Plan Supplement) that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, in the event of the Sale Transaction, subject to the consent of the Purchaser.

168. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

169. "*Second Lien Agent*" means UBS AG, Stamford Branch, as administrative and collateral agent to the Second Lien Credit Agreement.

170. "*Second Lien Claims*" means any Claim on account of the Second Lien Credit Agreement.

171. "*Second Lien Condition*" means the condition that the class of Second Lien Claims shall have voted to accept the Plan by the voting deadline provided in the Solicitation Materials.

172. "*Second Lien Credit Agreement*" means that certain Second Lien Credit Agreement, dated as of January 6, 2021, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a

Delaware corporation, as Holdings, the lenders party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent (as amended, restated, amended and restated, supplemented and/or otherwise modified).

173.    "*Second Lien Credit Documents*" means any documents governing the Second Lien Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

174.    "*Second Lien Deficiency Claim*" means (i) in the event of the Recapitalization Transaction, the Second Lien Claims that are not Second Lien Secured Claims, which shall be Allowed in the aggregate amount of $50 million if the Second Lien Condition is met, or (ii) in the event of a Sale Transaction, the Second Lien Claims which shall be Allowed in the aggregate amount of the Second Lien Claims less the amount of the Allowed Second Lien Secured Claims as set forth in Article III.B.4(b)(ii) of the Plan.

175.    "*Second Lien Secured Claims*" means any Second Lien Claim that is a Secured Claim.

176.    "*Second Lien Term Loan Facility*" means that certain term loan facility under the Second Lien Credit Agreement.

177.    "*Second Lien Warrants*" means 5-year warrants to purchase up to 8.5% of the New Common Stock issued on account of the Allowed Second Lien Secured Claims with a strike price set at $818 million, and which shall not include Black Scholes protections.

178.    "*Second Lien Warrants Documents*" means any documents governing the Second Lien Warrants.

179.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

180.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

181.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

182.    "*Solicitation Materials*" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

183.    "*Sponsor*" means, collectively, Partners Group (USA) Inc. and its affiliates that hold Claims against or Interests in one or more of the Debtors.

184.    "*Sponsor Loan Agreements*" means, collectively, those certain agreements, each dated October 17, 2022, among certain limited partners of CBI Parent, as co-issuers and Careismatic Brands, LLC (f/k/a Careismatic Brands, Inc.), as Borrower.

185.    "*Sponsor Loan Claims*" means any Claim on account of any Sponsor Loan Agreement.

186.    "*Successful Bid*" has the meaning set forth in the Bidding Procedures.

187.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of New Jersey.

188.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

189.    "*Unimpaired*" means, with respect to a Class of Claims, Interests, or Intercompany Interests, a Class of Claims, Interests, or Intercompany Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

190.    "*Wind Down*" means, in the event of the Sale Transaction not involving the sale of New Common Stock, the wind down and dissolution of the Debtors' Estates as set forth in Article IV.E.5.

191.    "*Wind-Down Amount*" means, in the event of the Sale Transaction not involving the sale of New Common Stock, Cash in an amount to be determined by the Debtors with the consent of the Required Consenting First Lien Lenders to fund the Wind Down in accordance with Article IV.E.5 of the Plan.

192.    "*Wind-Down Reserve*" means, in the event of the Sale Transaction not involving the sale of New Common Stock, the account to be established and maintained by the Plan Administrator and funded with the Wind-Down Amount in accordance with Article IV.E.5 of the Plan and for Plan Administrator purposes in accordance with Article IV.E.4; *provided* that any portion of the Wind-Down Amount remaining after the Plan Administrator has implemented the Wind Down shall be distributed to Holders of Allowed Claims in accordance with Article III.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (ii) shall affect any party's consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the RSA); (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a Claim, Interest, or Intercompany Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (viii) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (ix) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation"; (x) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (xi) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xiii) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xiv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xv) any immaterial effectuating provisions may be interpreted by the Post-Effective Date Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (xvi) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan; any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Post-Effective Date Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Post-Effective Date Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors and the Post-Effective Date Debtors shall mean the Debtors and the Post-Effective Date Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document or instrument in the Plan Supplement, the terms of the relevant document or instrument in the Plan shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all respective consultation, information, notice, and consent rights set forth in the RSA and the DIP Credit Agreement, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA or the DIP Credit Agreement, as applicable, is terminated in accordance with its terms.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the RSA, as applicable, shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims, Interests, and Intercompany Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by a Debtor in the ordinary course of its business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Post-Effective Date Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

B.      *DIP Claims*.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive:  (i) in the event of the Recapitalization Transaction, either (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full (including all DIP Premiums); or (ii) in the event of the Sale Transaction, payment in full in Cash (including all DIP Premiums).  The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Documents as of the Effective Date.  Any exercise of the DIP Premium Conversion Election Option shall be given effect in accordance with the terms of the DIP Credit Agreement, the Final DIP Order, and the Plan.  The agreements set forth in section 10.8 of the DIP Credit Agreement shall survive the Effective Date, and, in the event the Exit Term Loan Facility is entered into, continue on the same terms set forth in the DIP Credit Agreement.

C.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.      *Professional Fee Claims.*

1.    Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Post-Effective Date Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account.

2.    Professional Fee Escrow Account.

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Post-Effective Date Debtors, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors, without any further action or order of the Bankruptcy Court; *provided*, *however*, in the event of the Sale Transaction, any remaining amount in the Professional Fee Escrow Account shall constitute Residual Cash and be distributed to Holders of Allowed Claims in accordance with Article III.

3.    Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment.  If a Professional does not provide an estimate, the Debtors or the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of determining the Professional Fee Amount.

4.    Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and/or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*,

*however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS,
### AND INTERCOMPANY INTERESTS

A.        *Classification of Claims, Interests, and Intercompany Interests.*

The Plan constitutes a separate Plan for each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims, Interests, and Intercompany Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim, Interest, or an Intercompany Interest, or any portion thereof, is classified in a particular Class only to the extent that such Claim, Interest, or Intercompany Interest or such portion thereof qualifies within the description of that Class and is classified in other Class(es) to the extent that such Claim, Interest, or Intercompany Interest or such portion thereof qualifies within the description of such other Class(es).  A Claim, Interest, or an Intercompany Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim, Interest, or Intercompany Interest is an Allowed Claim, Interest, or Intercompany Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against, and Interests and Intercompany Interests in, the Debtors pursuant to the Plan is as follows:

| Class | Claims, Interests, and Intercompany Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Priority Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.        *Treatment of Claims, Interests, and Intercompany Interests.*

Each Holder of an Allowed Claim, Interest, or Intercompany Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim, Interest, or Intercompany Interest, except to the extent different treatment is agreed to by the Post-Effective Date Debtors, and the Holder of such Allowed Claim, Interest, or Intercompany Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim, Interest, or Intercompany Interest, as applicable, shall receive such treatment on the Effective Date.

1.    Class 1 - Other Secured Claims

(a)    *Classification*:  Class 1 consists of all Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim and at the option of the Debtors:

   (i)    payment in full in Cash of its Allowed Other Secured Claim;

   (ii)    the collateral securing its Allowed Other Secured Claim;

   (iii)    Reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or

   (iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.  <u>Class 2 - Other Priority Claims</u>

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim, or as and when due in the ordinary course of business of the Post-Effective Date Debtors, or otherwise as consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.  <u>Class 3 – First Priority Claims</u>

(a)    *Classification*:  Class 3 consists of all First Priority Claims.

(b)    *Allowance*: To the extent permitted by the Bankruptcy Code, (i) the First Lien Term Loan Claims are Allowed in the aggregate principal amount of $589,875,000.00, plus interest, fees, expenses and other amounts arising and payable under and in accordance with the First Lien Credit Documents; and (ii) the First Lien RCF Claims are Allowed in the aggregate principal amount of $100,000,000.00, plus interest, fees, expenses and other amounts arising and payable under and in accordance with the First Lien Credit Documents.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed First Priority Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed First Priority Claim (or its designated Affiliate, managed fund or account, or other designee) shall receive, in full and final satisfaction of such Claim:

(i)     in the event of the Recapitalization Transaction, its *pro rata* share of 100% of the New Common Stock (subject to dilution from (a) MIP Equity, (b) DIP Premiums, and (c) the exercise of the Second Lien Warrants (if applicable), subject to the DIP Premium Conversion Election Option); or

(ii)     in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration.

(d)     *Voting*: Class 3 is Impaired under the Plan, and Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.     <u>Class 4 – Second Lien Secured Claims</u>

(a)     *Classification*: Class 4 consists of all Second Lien Secured Claims.

(b)     *Allowance*:

(i)     in the event of the Recapitalization Transaction, and if the Second Lien Condition is satisfied, the Second Lien Secured Claims are deemed Allowed in the aggregate principal amount of $60,000,000 plus interest, fees, expenses, and other amounts arising and payable under and in accordance with the Second Lien Credit Documents; or

(ii)     in the event of the Sale Transaction, the Second Lien Secured Claims are Allowed in the amount equal to the Excess Distributable Consideration remitted to the Holders of Second Lien Secured Claims in accordance with Article III.B.4(c)(ii) of the Plan.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Secured Claim agrees to less favorable treatment on the Effective Date, each Holder of an Allowed Second Lien Secured Claim shall receive, in full and final satisfaction of such Claim:

(i)     in the event of the Recapitalization Transaction, (A) if the Second Lien Condition is not satisfied, no recovery or distribution on account of its Allowed Second Lien Secured Claim; and (B) if the Second Lien Condition is satisfied, its *pro rata* share of the Second Lien Warrants; or

(ii)     in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash.

(d)     *Voting*: Class 4 is Impaired under the Plan, and Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.     <u>Class 5 – General Unsecured Claims</u>

(a)     *Classification*: Class 5 consists of all General Unsecured Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim:

(i)     in the event of the Recapitalization Transaction, no recovery or distribution on account of such Allowed General Unsecured Claims; or

(ii)     in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash.

(c)     *Voting*:  Class 5 is Impaired under the Plan, and Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.   Class 6 – Intercompany Claims

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  Subject to any specific provisions contained in the Plan Supplement, each Intercompany Claim shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Claims, or such other treatment as determined by the Post-Effective Date Debtors and the Required Consenting First Lien Lenders.

(c)     *Voting*:  Class 6 is Unimpaired if the Class 6 Claims are Reinstated or Impaired if the Class 6 Claims are cancelled.  Holders of Class 6 Claims are conclusively presumed to have either accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.   Class 7 – Intercompany Interests

(a)     *Classification*:  Class 7 consists of all Intercompany Interests.

(b)     *Treatment*:  Subject to any specific provisions contained in the Plan Supplement, each Intercompany Interest shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, in all cases with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interests, or such other treatment as determined by the Post-Effective Date Debtors and the Required Consenting First Lien Lenders.

(c)     *Voting*:  Class 7 is Unimpaired if the Class 7 Intercompany Interests are Reinstated or Impaired if the Class 7 Intercompany Interests are cancelled.  Holders of Class 7 Intercompany Interests are conclusively deemed to have either accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8.   Class 8 – Interests

(a)     *Classification*:  Class 8 consists of all Interests.

(b)     *Treatment*:  On the Effective Date, all Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Interests shall receive no recovery or distribution on account of their Interests.

(c)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.      *Elimination of Vacant Classes.*

Any Class of Claims, Interests, or Intercompany Interests that does not have an Allowed Claim, Interest, or Intercompany Interest or a Claim, Interest, or Intercompany Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock, and in exchange for the agreement of the Debtors and/or the Post-Effective Date Debtors, as applicable, under the Plan to make certain distributions to the Holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims, Interests, or Intercompany Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims, Interests, or Intercompany Interests to render such Class of Claims, Interests, or Intercompany Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims, Interests, or Intercompany Interests or any Class of Claims, Interests, or Intercompany Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims, Interests, and Intercompany Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and Intercompany Interests, and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith

compromise and settlement of all such Claims, Interests, and Intercompany Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

Before, on, and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions (which, for the avoidance of doubt, shall be in form, substance, and structure reasonably acceptable to the Required Consenting First Lien Lenders) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the Exit Facilities Documents and entry into the Exit Financing Arrangements; (v) the issuance and distribution of the New Common Stock as set forth in the Plan, including in connection with the DIP Premium Conversion Election Option; (vi) the execution and delivery of the Second Lien Warrants Documents and any filings related thereto, and the issuance of the Second Lien Warrants thereunder (if applicable); (vii) solely in the event of the Recapitalization Transaction, with respect to the Post-Effective Date Debtors, the implementation of the Management Incentive Plan and any distribution of MIP Equity; (viii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Post-Effective Date Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (ix) such other transactions that, in the reasonable business judgment of the Debtors or the Post-Effective Date Debtors, as applicable, the Required Consenting First Lien Lenders (in accordance with this Plan) and, if applicable, the Purchaser, are required to effectuate the Restructuring Transactions; and (x) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

Subject in all respects to the Bidding Procedures, the Debtors shall pursue the Sale Transaction unless the Debtors determine, with the consent of the Required Consenting First Lien Lenders, to pursue the Recapitalization Transaction.  The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, the Purchaser, and the Consenting Creditors, as applicable, to undertake the Restructuring Transactions contemplated by this Plan and the Definitive Documents.

C.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Post-Effective Date Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to:  (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Post-Effective Date Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the Exit Financing Arrangements; (vi) the Sale Transaction; or (vii) the making, delivery, or recording of any deed or other instrument

of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

D.      *The Recapitalization Transaction.*

If the Recapitalization Transaction occurs, the following provisions shall govern.

1.      The Post-Effective Date Debtors.

On the Effective Date, the New Board shall be established, and each Post-Effective Date Debtor shall adopt its New Organizational Documents.  The Post-Effective Date Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

2.      Sources of Consideration for Plan Distributions.

The Debtors shall fund or make distributions under the Plan, as applicable, with:  (i) the proceeds from the Exit Financing Arrangements, (ii) the New Common Stock, (iii) the Debtors' Cash on hand, and (iv) the Second Lien Warrants.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and Second Lien Warrants (if applicable), is expected to be exempt from Securities Act registration, as described more fully in Article IV.D.9 below.

(a)      The Exit Financing Arrangements.

On the Effective Date, the Post-Effective Date Debtors shall enter into or assume, as applicable, the Exit Term Loan Facility or another Acceptable Alternative Exit Facility, each on the terms set forth in the applicable Exit Facilities Documents.  Confirmation of the Plan shall be deemed approval of the Exit Financing Arrangements and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the Post-Effective Date Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization for the Post-Effective Date Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Financing Arrangements.  Execution of the Exit Term Loan Facility Documents by the agent thereof shall be deemed to bind all Holders of DIP Claims as if each such Holder had executed the applicable Exit Facilities Documents with appropriate authorization.

In the event the Exit Term Loan Facility is entered into, the DIP Commitments giving rise to the DIP Claims shall be refinanced by means of a cashless settlement whereby such DIP Commitments shall be converted on a dollar-for-dollar basis into the Exit Term Loans in accordance with the DIP Documents and the Exit Facilities Documents (subject to the DIP Premium Conversion Election Option), and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit Term Loan Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value, (b) shall be legal, valid, binding, and enforceable Liens on, and security interests in, the collateral specified thereunder in accordance with the terms of the applicable Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the applicable Exit Facilities Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Post-Effective Date Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(b)    Issuance of the New Common Stock.

Reorganized Careismatic shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan and that may be issuable upon exercise of the Second Lien Warrants.  The issuance of the New Common Stock shall be authorized without the need for any further corporate action.  On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan, and, in the event of the Sale Transaction whereby the Purchaser purchases New Common Stock, the Purchase Agreement.

All of the shares of New Common Stock issued pursuant to the Plan (or upon exercise of the Second Lien Warrants, if applicable) shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Common Stock, including any New Common Stock issuable upon exercise of the Second Lien Warrants, shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Post-Effective Date Debtor(s).  The New Common Stock will not be registered under the Securities Act or on any national securities exchange as of the Effective Date.

(c)    Issuance of the Second Lien Warrants.

Solely to the extent the Second Lien Condition is satisfied, on the Effective Date, Reorganized Careismatic will issue the Second Lien Warrants to Holders of Allowed Second Lien Secured Claims; *provided*, *however*, that a Holder of a Second Lien Claim may designate a trustee, agent, nominee, or one or more Affiliates to receive and hold the Second Lien Warrants on behalf of such Holder.  All of the Second Lien Warrants that may be issued pursuant to this Plan and the shares of New Common Stock that may be issued upon exercise of the Second Lien Warrants shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Post-Effective Date Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in this Plan, the New Organizational Documents, or the Second Lien Warrants Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Post-Effective Date Debtor(s).  The Second Lien Warrants Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of Second Lien Warrants shall be bound thereby (without any further action or signature) in all respects, whether or not such Holder has executed any

Second Lien Warrants Documents.  The Second Lien Warrants will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the DTC.

3.  <u>Vesting of Assets in the Post-Effective Date Debtors</u>.

Except as otherwise provided in the Plan or the Exit Facilities Documents (if applicable), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors under the Plan shall vest in each respective Post-Effective Date Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Facilities Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, as applicable).  On and after the Effective Date, except as otherwise provided herein, each Post-Effective Date Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, Intercompany Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.  <u>Corporate Existence</u>.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.  <u>Corporate Action</u>.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (a) adoption or assumption, as applicable, of the obligations set forth in Article IV.D.11; (b) selection of the directors, officers, or managers for the Post-Effective Date Debtors; (c) the distribution of the New Common Stock; (d) entry into the Second Lien Warrants Documents and the issuance and distribution of the Second Lien Warrants; (e) implementation of the Restructuring Transactions; (f) entry into the Exit Facilities Documents and incurrence (or assumption, as applicable) of debt thereunder; (g) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (h) adoption of the New Organizational Documents; (i) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (j) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity security Holders, directors, officers, or managers of the Debtors or the Post-Effective Date Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including the New Common Stock, the New Organizational Documents, the Exit Financing Arrangements, the Exit Facilities Documents, the Second Lien Warrants, the Second Lien Warrants Documents, and any and all other

agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.D.9 shall be effective notwithstanding any requirements under non-bankruptcy law.

      6.   <u>New Organizational Documents</u>.

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Effective Date Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included in the Plan Supplement.  After the Effective Date, each Post-Effective Date Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Post-Effective Date Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents.  For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Post-Effective Date Debtors.

      7.   <u>Directors and Officers of the Post-Effective Date Debtors.</u>

As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, which shall be consistent in all respects with the Governance Term Sheet.  Each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.

      8.   <u>Effectuating Documents; Further Transactions</u>.

On and after the Effective Date, the Post-Effective Date Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

      9.   <u>Certain Securities Law Matters</u>.

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, it is expected that the offering, issuance, and distribution of the New Common Stock and the Second Lien Warrants (as well as exercising the Second Lien Warrants) as contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan, including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums and including upon exercise of the Second Lien Warrants, as well as the Second Lien Warrants themselves, in each case, on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code

relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock or Second Lien Warrants in the New Organizational Documents or the Second Lien Warrants Documents, as applicable.

The shares of New Common Stock, including the MIP Equity, and upon exercise of the Second Lien Warrants, and the Second Lien Warrants themselves, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

10. <u>Management Incentive Plan.</u>

On or as soon as reasonably practicable following the Effective Date, the New Board shall adopt and implement the Management Incentive Plan to be used to incentivize and compensate employees, directors, consultants, and other service providers of the Post-Effective Date Debtors, which Management Incentive Plan will include (i) the ability to grant restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock (or equivalent Cash value thereof) representing up to 15.0% of the New Common Stock on a fully diluted basis and (ii) other terms and conditions customary for similar type equity plans as determined by the New Board in its sole discretion (including with respect to participants, allocation of awards, and vesting).

11. <u>Employment Obligations.</u>

All Assumed Plans shall be assumed by the Post-Effective Date Debtors as of the Effective Date and shall remain in place. The Post-Effective Date Debtors shall continue to honor their obligations under such Assumed Plans; *provided* that (i) the Assumed Plans shall not include any equity or equity-based programs and awards, and (ii) each Assumed Plan shall be amended, to the extent applicable, to exclude any right(s) to receive future equity or equity-based awards provided for under any Assumed Plans, and such awards and rights described in the foregoing subsections (i) and (ii) shall be terminated as of the Effective Date for no consideration. Without Bankruptcy Court approval or approval of the Required Consenting First Lien Lenders, the Debtors will not be permitted to establish any annual, short-term, or long-term compensation programs unless such program(s) are (i) in the ordinary course of business and consistent with past practice and (ii) performance-based (*i.e.*, are only eligible to be paid upon achievement of pre-established performance goals).

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

The occurrence of the Effective Date shall not be deemed to result in an accelerated payment event or a "good reason" or other constructive termination event for purposes of any Debtor compensation or benefit plan; *provided* that employees who, as of the Effective Date, are party to Assumed Plans with a contractual entitlement to severance may, in their sole discretion, elect to treat the occurrence of the Effective Date as "good reason" or constructive termination event.

12. <u>Director and Officer Liability Insurance.</u>

After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

E.   *The Sale Transaction.*

If the Sale Transaction occurs, the following provisions shall govern.

1.   The Sale Transaction.

On the Effective Date, the Purchaser shall purchase substantially all of the Debtors' assets or 100% of the New Common Stock, in each case, free and clear of all Liens, Claims, Interests, Intercompany Interests, charges, or other encumbrances (except for those encumbrances expressly assumed by the Purchaser under the Purchase Agreement or the Plan) in exchange for the Purchase Price as set forth in the Purchase Agreement. The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, and the Purchaser, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Purchase Agreement, which may be this Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, Intercompany Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.   Sources of Consideration for Plan Distributions.

The Debtors shall fund distributions under the Plan with:  (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors (if any). Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

3.   Post-Effective Date Debtors.

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible as authorized by the Bankruptcy Court; (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided hereunder; (iv) establishing and funding the Distribution Reserve Accounts; (v) enforcing and prosecuting the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (vi) filing appropriate tax returns; (vii) complying with any continuing obligations under the Purchase Agreement; and (viii) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date or assigned to the Purchaser under the Purchase Agreement shall vest in the Post-Effective Date Debtors and shall be administered by the Plan Administrator, and the net proceeds thereof shall constitute Excess Distributable Consideration.

4.    Plan Administrator.

On the Effective Date, the Persons acting as managers, directors, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers and authority of the Post-Effective Date Debtors' managers, directors, and officers.    The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in connection with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer.  The Debtors, after the Confirmation Date and before the Effective Date, and the Post-Effective Date Debtors or Plan Administrator, on and after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including:  (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (viii) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.E; (ix) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (x) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (xi) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

(a)    Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors.  The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

(b)    Compensation of the Plan Administrator.

The Plan Administrator's compensation shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the reasonable fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in

connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

(c)     Plan Administrator Expenses.

All reasonable costs, expenses, and obligations incurred by the Plan Administrator or the Post-Effective Date Debtors in administering the Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

(d)     Exculpation, Indemnification, Insurance, and Liability Limitation.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors.  The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

(e)     Tax Returns.

In the event of the Sale Transaction, after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

(f)     Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Plan Administrator or Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed, such Cash or other property shall constitute Residual Cash (in the event all Allowed Professional Fee Claims have been satisfied in full in Cash and the Disputed Claims Reserve Account has been funded with the Disputed Claims Reserve Amount), and shall be immediately allocated and distributed to the Holders of Allowed First Priority Claims.

5.     Wind Down.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of each Post-Effective Date Debtors under the applicable laws of its state of incorporation or formation (as applicable); and

(iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Interests and Intercompany Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, objection, and resolution of final applications for Allowance of the Professional Fee Claims.

The filing of the monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

6. Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors and the Purchaser are, and on and after the Effective Date, the Post-Effective Date Debtors, the Purchaser, and the Plan Administrator are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

7. Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (a) consummation of the Sale Transaction; (b) consummation of the Wind Down; and (c) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan or corporate structure of the Debtors or Post-Effective Date Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors. The authorizations and approvals contemplated by this Article IV.E shall be effective notwithstanding any requirements under non bankruptcy law.

8. Directors and Officers of the Post-Effective Date Debtors.

As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed; *provided* that in the event of the Recapitalization Transaction, the New Board shall be appointed pursuant to the terms set forth in the Governance Term Sheet.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, or other governing body, as applicable, of the Debtors with respect to its affairs. Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, including those powers set forth in this Article IV.E.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers.

F.      *Cancellation of Existing Agreements, Interests, and Intercompany Interests.*

On the Effective Date, except with respect to the Exit Facility Documents (if applicable) or to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims, Interests, or Intercompany Interests, including credit agreements and indentures, shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder. Holders of, or parties to, such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding anything to the contrary herein, (x) any cancelled instruments, securities, and other documentation shall continue in effect solely for the purposes of allowing Holders of Claims to receive distributions as specified under the Plan, as applicable, and (y) any agreement that governs the rights of the Agents shall continue in effect solely for purposes of allowing the Agents, as applicable, to (i) receive any distributions under the Plan and distribute them to the Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, in each case in accordance with the terms of the Plan, (ii) maintain, enforce, or exercise any right to compensation, contribution, expense reimbursement, or indemnification that (1) may be owed to the applicable Agent under the Plan, the DIP Documents, or the First Lien Credit Documents (including by the Debtors or the Post-Effective Date Debtors), and that (2) by its terms survives termination of such document; (iii) maintain, enforce, or exercise its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable or allocable under the Plan to Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to any of the Agents or Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, and (v) without limiting the foregoing clause (ii), maintain, enforce, or exercise any right (that by its terms survive termination of the applicable document) to compensation, contribution, expense reimbursement, or indemnification of the Agents, as applicable, and any predecessor thereof, vis-à-vis parties other than the Debtors and the Post-Effective Date Debtors.

G.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity, whether arising before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Post-Effective Date Debtors. The Post-Effective Date Debtors or the Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**No Person or Entity may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy

Court, in each case without the need or requirement to file motions or substitutions of parties or counsel in each such matter.

H.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Post-Effective Date Debtors or the Plan Administrator, as applicable, shall be permitted to close all of the Chapter 11 Cases except one, and all contested matters relating to any Debtor, including objections to Claims, shall be administered and heard in such remaining Chapter 11 Case.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the date that is ninety (90) days after the Effective Date, each Executory Contract and Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically assumed, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) is identified on the Assumed Executory Contracts and Unexpired Leases List as of the Effective Date, in which case such Executory Contract of Unexpired Lease shall be assumed as of the Effective Date; (ii) is identified on the Rejected Executory Contracts and Unexpired Leases List as of the Effective Date, in which case such Executory Contract of Unexpired Lease shall be rejected as of the Effective Date; (iii) previously expired or terminated pursuant to its own terms; (iv) is the subject of a motion to reject Filed on or before the Effective Date; or (v) is an insurance policy; *provided* that, in the event of the Recapitalization Transaction, the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed).  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates or the Purchaser.  The Plan constitutes a motion for approval of the foregoing assumptions and assignments, and the Confirmation Order will constitute an order of the Bankruptcy Court granting such motion.

Notwithstanding anything to the contrary in the Plan, the Debtors and the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List and the Rejected Executory Contracts and Unexpired Leases List (i) to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List and the Rejected Executory Contracts and Unexpired Leases List at any time prior to the Effective Date, and (ii) to add any Executory Contract or Unexpired Lease to the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List not otherwise identified on the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List at any time through and including ninety (90) days after the Effective Date, the modifications thereto shall constitute assumption or rejection of such Executory Contract or Unexpired Lease as of the date of such modification, notwithstanding anything contained in this Article V.A; *provided* that, subject to Article V.C hereof, at any time during such ninety (90)-day period after the Effective Date, the Post-Effective Date Debtors shall remain liable for any and all amounts incurred under any such Executory Contract and Unexpired Lease not on the Rejected Executory Contracts and Unexpired Leases List in the ordinary course of business.  The Debtors shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List to the counterparties to the Executory Contracts or Unexpired Leases affected thereby.  In the event of a Sale Transaction, such alteration, amendment, modification, or supplement shall be subject to the consent of the Purchaser.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements of Executory Contracts and Unexpired Leases executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Except as set forth in Article IV.D.11, to the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.     *Indemnification Obligations.*

Consistent with applicable law, all Indemnification Obligations, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date; *provided* that the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any Claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organization documents, or applicable agreements governing the Indemnification Obligations. All such Indemnification Obligations shall be deemed and treated as Executory Contracts to be assumed and assigned in their entirety by the Debtors under the Plan to the Post-Effective Date Debtors, in the event of the Recapitalization Transaction, or to the Purchaser, in the event of the Sale Transaction.

C.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Counterparties to Executory Contracts or Unexpired Leases deemed rejected shall be served with a notice of rejection of their Executory Contracts and Unexpired Leases via service of the Confirmation Order and the Plan Supplement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (i) thirty (30) days after the date of service of notice on the affected claimant of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, which notice shall set forth the date by which such Proofs of Claim must be filed, or (ii) thirty (30) days after service of notice on the affected claimant of any rejection that occurs after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Debtors or the Post-Effective Date Debtors, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

D.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Post-Effective Date Debtors shall pay all Cure Claims, if any, on the Effective Date. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to a proposed assumption, including pursuant to the Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than thirty (30) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court. Any such request that is not timely

Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Post-Effective Date Debtor without the need for any objection by the Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Post-Effective Date Debtors, as applicable, of the Cure; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Post-Effective Date Debtors may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or the Post-Effective Date Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or the Post-Effective Date Debtors, as applicable, with respect to which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Post-Effective Date Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V.D shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

E.     *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Post-Effective Date Debtors.

Nothing in the Plan, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Post-Effective Date Debtors) or draw on any collateral or security therefor.

F.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

G.      *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Post-Effective Date Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the Post-Effective Date Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests (as applicable) in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or at such other time as provided for in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Post-Effective Date Debtors.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise

such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

>    2.    Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Post-Effective Date Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

>    1.    Record Date for Distribution.

On the Distribution Record Date, (i) the Claims Register and (ii) the loan registers maintained by each of the Agents, respectively, shall each be deemed closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register or such loan registers as of the close of business on the Distribution Record Date.

>    2.    Delivery of Distributions in General.

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims or Interests as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate:  (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date (or of a designee designated by a Holder of First Priority Claims); (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Post-Effective Date Debtors, or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Post-Effective Date Debtors.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims or Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Post-Effective Date Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

All distributions to Holders of Allowed DIP Claims shall be deemed to be made by the DIP Agent. Regardless of whether such distributions are made by the DIP Agent or by the Disbursing Agent at the reasonable discretion of the DIP Agent, any applicable charging lien shall attach to the property to be distributed to Holders of Allowed DIP Claims in the same manner as if such distributions were made through the DIP Agent.

>    3.    Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock (including upon exercising any Second Lien Warrant) that is not a whole number, the actual distribution shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock or Second Lien Warrants to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Post-Effective Date Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheatment, abandoned property, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder related to such property or interest in property shall be discharged and forever barred.  The Post-Effective Date Debtors and the Disbursing Agent shall have no obligation to attempt to locate a Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

E.    *Manner of Payment.*

Except as set forth herein, all distributions of New Common Stock and Second Lien Warrants to the Holders of applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Post-Effective Date Debtors, as applicable.

Any distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Post-Effective Date Debtor.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and the Post-Effective Date Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances in a tax-efficient manner.

G.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the DIP Orders, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in the Plan, each Post-Effective Date Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Post-Effective Date Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment (other than for the DIP Claims held by the DIP Lenders) is either (i) agreed in amount among the relevant Post-Effective Date Debtor(s) and Holder of the Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date Debtor or its successor of any and all claims, rights, and Causes of Action that such Post-Effective Date Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against or Interests in one or more of the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors, as applicable, unless such Holder has provided notice of such recoupment in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Claims Paid or Payable by Third Parties.*

1.  <u>Claims Paid by Third Parties.</u>

The Debtors or the Post-Effective Date Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Post-Effective Date Debtor, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Post-Effective Date Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Post-Effective Date Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder timely to repay or return such distribution shall result in the Holder owing the applicable Post-Effective Date Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is fully repaid.

2.  <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.  <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article III of the Plan), nothing contained in the Plan shall constitute or be deemed a

release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

The Debtors and the Post-Effective Date Debtors shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of:  (a) the Effective Date or (b) the applicable claims bar date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Post-Effective Date Debtor, as applicable, without the need for any objection by the Debtor or Post-Effective Date Debtor, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of the Plan, each of the Post-Effective Date Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim, Interest, or Intercompany Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

**Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.**

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim, Interest, or Intercompany Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim, Interest, or Intercompany Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim, Interest, or Intercompany Interest, including during the litigation of any objection to any Disputed Claim, Interest, or Intercompany Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim, Interest, or Intercompany Interest that has been expunged from the Claims Register but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, Interest, or Intercompany Interest, that estimated amount shall constitute a maximum limitation on such Claim, Interest, or Intercompany Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Post-Effective Date Debtors as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim, Interest, or Intercompany Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such

estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim, Interest, or Intercompany Interest is estimated.

D.     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Post-Effective Date Debtors and/or the Plan Administrator (and, in the event of the Sale Transaction, the Purchaser, solely with respect to any assumed liabilities) shall have the sole authority:  (i) to File, withdraw, or litigate to judgment, objections to Claims, Interests, or Intercompany Interests; (ii) to settle or compromise any Disputed Claim, Interest, or Intercompany Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Post-Effective Date Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, Interest, or Intercompany Interest, including the Causes of Action retained pursuant to the Plan.

E.     *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the applicable Claims objection deadline, as such deadline may be extended from time to time.

F.     *Adjustment to Claims, Interests, or Intercompany Interests without Objection.*

**Any duplicate Claim, Interest, or Intercompany Interest or any Claim, Interest, or Intercompany Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Post-Effective Date Debtors and/or the Plan Administrator, as applicable, without the Post-Effective Date Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim, Interest, or Intercompany Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.**

G.     *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Post-Effective Date Debtors may establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Post-Effective Date Debtors consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.  Following the final resolution of all Disputed Claims, any residual amounts in the Disputed Claims Reserve shall constitute Residual Cash and be immediately distributed to Holders of Allowed First Priority Claims.

H.     *Disallowance of Claims.*

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Post-Effective Date Debtors, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be disallowed pursuant to section 502(d) of the Bankruptcy Code if:  (1) the Entity, on the one hand, and the Debtors or the Post-Effective Date Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferees liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

I.     *Amendments to Proofs of Claim.*

On or after the Effective Date, a Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Post-Effective Date Debtors, and any such new or amended Proof of Claim Filed that is not authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by

the Post-Effective Date Debtors; *provided* that the foregoing shall not apply to Administrative Claims or claims Filed by Governmental Units.

J.        *Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim, Interest, or Intercompany Interest is Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim, Interest, or Intercompany Interest unless and until such Disputed Claim, Interest, or Intercompany Interest becomes an Allowed Claim, Interest, or Intercompany Interest.

K.        *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim, or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.        *Discharge of Claims and Termination of Interests and Intercompany Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Post-Effective Date Debtors), Interests, Intercompany Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests and Intercompany Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests, or Intercompany Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims, Interests, or Intercompany Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such Claim has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims), subject to the occurrence of the Effective Date.

B.        **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, the Purchase Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security**

interests shall revert to the Post-Effective Date Debtors and their successors and assigns. The Holders of such Secured Claim (and the applicable agents for such Holders) shall be directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (or the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.    *Releases by the Debtors.*

Notwithstanding anything contained herein or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Post-Effective Date Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any avoidance actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Post-Effective Date Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Post-Effective Date Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Exit Financing Arrangements, the Exit Facilities Documents, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claim, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to

any of the Debtors, the Debtors' Estates, or, if applicable, the Post-Effective Date Debtors, asserting any claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by Holders of Claims, Interests, and Intercompany Interests.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, each of the Released Parties, will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the distribution of any Cash or other property to any Released Party, the assertion or enforcement of rights or remedies against any Person, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Exit Financing Arrangements, the Exit Facilities Documents, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided in this Article VIII.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the releases provided in this Article VIII.D are: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the releases contained in this Article VIII.D; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to this Article VIII.D.

E.      *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants

Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

F.    *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Post-Effective Date Debtors has been liquidated and distributed in accordance with the terms of the Plan, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Intercompany Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action constitutes a direct or derivative claim and represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.

**Upon entry of the Confirmation Order, all Holders of Claims, Interests, or Intercompany Interests, and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim, Interest, or Intercompany Interests, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Effective Date Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against the Post-Effective Date Debtors, or another Entity with whom the Post-Effective Date Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Post-Effective Date Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Post-Effective Date Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (i) such Claim has been adjudicated as non-contingent or (ii) the Holder of the relevant Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Steps Plan in all material respects;

2.      the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance consistent with the RSA and otherwise reasonably acceptable to the Required Consenting First Lien Lenders, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal;

3.      the Bankruptcy Court shall have entered the Confirmation Order, which order shall have become a Final Order;

4.      in the event of the Recapitalization Transaction or Sale Transaction, as applicable, the New Common Stock shall have been issued;

5.          in the event of the Recapitalization Transaction, solely to the extent the Second Lien Condition has occurred, the Second Lien Warrants shall have been issued in accordance with the Second Lien Warrants Documents;

6.          the RSA shall not have been terminated and shall remain in full force and effect;

7.          the DIP Facility shall be in full force and effect and there shall be no defaults under the DIP Documents continuing unless waived by the requisite DIP Lenders in accordance with the terms and conditions of the DIP Documents;

8.          the Plan Supplement, Definitive Documents, Plan, and all schedules, documents, supplements, and exhibits thereto, the Exit Financing Arrangement, or the Purchase Agreement, as applicable, shall have become effective and shall be in full force and effect;

9.          all Restructuring Expenses and any other professional fees and other amounts required to be paid pursuant to the RSA, in any Definitive Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash;

10.         any and all requisite governmental, regulatory, and third-party approvals and consents necessary to effectuate the Restructuring Transactions shall have been obtained, and all applicable waiting periods shall have expired;

11.         the Exit Facilities Documents, as applicable, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the Required Consenting First Lien Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

12.         in the event of the Sale Transaction, the Distribution Reserve Accounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind-Down Amount;

13.         in the event of the Sale Transaction, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of this Plan;

14.         all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court (including for the avoidance of doubt all professional fees and other amounts required to be paid pursuant to the RSA) shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

15.         the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and

16.         the DIP Claims shall have been satisfied in accordance with Article II.B.

B.      *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX, except for the conditions set forth in Article IX.A.7, 9, 12, 15, and 16 of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting First Lien Lenders and, in the event of the Sale Transaction, the Purchaser, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity in any respect; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.      *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that the consent of the Cross-Holder Ad Hoc Group shall be required solely to the extent any such modification to the Plan seeks to modify the treatment of the Second Lien Claims under the Plan or otherwise disproportionately and negatively affects the Cross-Holder Ad Hoc Group in its capacity as Holders of First Lien Secured Claims or DIP Claims.  Subject to those restrictions on modifications set forth in the Plan, and the requirements of section 1127 of the Bankruptcy Code, rule 3019 of the Bankruptcy Rules, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify, the Plan with respect to such Debtor, one or more times, after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Intercompany Interests, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including the amount of Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Post-Effective Date Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.        ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

7.        enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Plan Supplement;

8.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.       issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.       resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, discharges, and exculpations contained in the Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by Holders of Claims pursuant to Article VI.K hereof;

13.        enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.        determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the RSA and the Purchase Agreement (if applicable);

15.        enter an order concluding or closing the Chapter 11 Cases;

16.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.        consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.        determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements (including the Purchase Agreement, if applicable), documents, or instruments executed in connection with the Plan;

20.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.        hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

22.        enforce all orders previously entered by the Bankruptcy Court; and

23.        hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Facilities Documents shall be governed by the jurisdictional provisions therein, and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

<div align="center">

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**

</div>

*A.        Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Effective Date Debtors, the Purchaser (if applicable), and any and all Holders of Claims, Interests, or Intercompany Interests (irrespective of whether such Claims, Interests, or Intercompany Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim, Interest, or Intercompany Interest has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the RSA. The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Post-Effective Date Debtors, (or funded by the Post-Effective Date Debtors and disbursed by the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) for each quarter (including any fraction thereof) until such Post-Effective Date Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee and any other statutory committee appointed in these Chapter 11 Cases shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

All monthly reports shall be Filed, and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, (or funded by the Post-Effective Date Debtors and disbursed by the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) on the Effective Date, and following the Effective Date, the Post-Effective Date Debtors (or funded by the Post-Effective Date Debtors and disbursed by the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) and shall File quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims, Interests, or Intercompany Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

G.    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    if to the Debtors, to:

Careismatic Brands, LLC
Attention:        Sidharth Lakhani, Chief Executive Officer; Sean Bogue, Chief Financial Officer
E-mail address:   slakhani@careismatic.com
                  sbogue@careismatic.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:        Joshua A. Sussberg
E-mail addresses: jsussberg@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:        Chad J. Husnick
E-mail address:   chusnick@kirkland.com

2.    if to the First Lien Ad Hoc Group, to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:        Evan R. Fleck; Nelly Almeida
E-mail address:   efleck@milbank.com
                  nalmeida@milbank.com

3.    if to the Cross-Holder Ad Hoc Group, to:

King & Spalding LLP
1185 6th Avenue
New York, NY 10036
Attention:        Peter Montoni; Matt Warren
E-mail address:   pmontoni@kslaw.com;
                  mwarren@kslaw.com

4.    if to the Sponsor, to:

Partners Group (USA) Inc.
1114 Avenue of the Americas, 37th Floor
New York, NY 10036
Attention:        Philip Wolf
E-mail address:   philip.wolf@partnersgroup.com

with copies to:

Ropes & Gray LLP
1211 6th Avenue
New York, NY 10036
Attention:       Gregg Galardi
E-mail address:    gregg.galardi@ropesgray.com

After the Effective Date, the Debtors have authority to notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**H.**      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**I.**      *Entire Agreement.*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**J.**      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.donlinrecano.com/clients or the Bankruptcy Court's website at www.njb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**K.**      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan, and, in the event of the Sale Transaction, any deletion or modification thereof shall be subject to the reasonable consent of the Purchaser); and (iii) nonseverable and mutually dependent.

**L.**      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code,

the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals nor the Post-Effective Date Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Post-Effective Date Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim, Interest, or Intercompany Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim, Interest, or Intercompany Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a Holder of a Claim or Interest, or the Purchaser in contravention of the provisions of the Plan shall be deemed an event of default under the Plan.  Upon an event of default, the Post-Effective Date Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Post-Effective Date Debtors in remedying such default.  Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may:  (a) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award a judgment against such defaulting Holder of a Claim or Interest in favor of the Post-Effective Date Debtors in an amount, including interest, if applicable, to compensate the Post-Effective Date Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

[*Remainder of page intentionally left blank.*]

Dated:  February 27, 2024

Careismatic Brands, LLC
on behalf of itself and all other Debtors


_/s/ Kent Percy_
      Name:   Kent Percy
      Title:    Chief Restructuring Officer

**Exhibit B**

**RSA**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and incorporating all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of January 22, 2024 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Careismatic Brands, LLC, a company incorporated under the Laws of California ("**Careismatic**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold approximately 73% of the First Lien Claims and approximately 20% of the Second Lien Claims that (i) are members of the First Lien Ad Hoc Group that have executed and delivered counterpart signature pages to this Agreement on the date hereof (such entities, the "**First Lien Initial Consenting Creditors**") or (ii) have executed and delivered a Joinder or Transfer Agreement to counsel to the Company Parties (such entities the "**First Lien Joining Consenting Creditors**," and together with the First Lien Initial Consenting Creditors, the "**First Lien Consenting Creditors**");

    iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold 3% of First Lien Claims and 50% of Second Lien Claims that are members of the Cross-Holder Ad Hoc Group that have executed and delivered counterpart signature pages to this Agreement on the date hereof (such entities, the "**Cross-Holder Creditors**," and together with the First Lien Consenting Creditors, the "**Consenting Creditors**"); and

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

iv.    Partners Group (USA) Inc. or its affiliates that hold Company Claims/Interests (each solely in their capacity as such, collectively, the "**Sponsor**" and, together with the other entities in clause (ii) and clause (iii), the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**") and the debtor-in-possession financing credit agreement attached as **Exhibit C** hereto (the "**DIP Credit Agreement**") and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    Definitions.  The following terms shall have the following definitions:

"**Acceptable Alternative Exit Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the First Lien Credit Agreement or Second Lien Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to the Restructuring Transactions.

"**Backstop Commitment**" has the meaning set forth in the Restructuring Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court that, among other things, approves (i) bidding procedures, (ii) the form and manner of notice of auction(s), (iii) the procedures for assumption and assignment of certain executory contracts and unexpired leases, and (iv) the date for auction(s), if necessary.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Careismatic**" has the meaning set forth in the preamble of this Agreement.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (ii) the right to object to or otherwise contest Claims or interests; (iii) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against a Company Party, including the First Lien Claims, Second Lien Claims, or Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Hearing**" means a hearing before the Bankruptcy Court to consider confirmation of the Plan and approval of this Agreement, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Creditor Fees and Expenses**" means (i) the First Lien Consenting Creditor Fees and Expenses and (ii) the Cross-Holder Creditor Fees and Expenses.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Cross-Holder Creditors**" means that certain ad hoc group of holders of First Lien Claims and Second Lien Claims represented by King & Spalding LLP, as counsel.

"**Cross-Holder Creditor Fees and Expenses**" means all reasonable and documented fees and expenses (whether incurred at any point prior to or after the commencement of the Chapter 11 Cases) incurred by the Cross-Holder Ad Hoc Group, and any advisors thereto in connection with the formulation, development, negotiation, documentation or implementation of this Agreement, the Restructuring Term Sheet, the Restructuring Transactions contemplated thereby or hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, including the fees and expenses of King & Spalding LLP, as counsel to the Cross-Holder Ad Hoc Group; *provided*, that the Cross-Holder Creditor Fees and Expenses shall not be paid in an amount greater than $250,000 in the aggregate.

"**Debtors**" means the Company Parties from and after the commencement of the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means Jefferies Finance LLC and its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement by and among the Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Orders**" has the meaning set forth in the Restructuring Term Sheet.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Financing Arrangements**" has the meaning set forth in the Restructuring Term Sheet.

"**Exit Term Loan Facility**" has the meaning set forth in the Restructuring Term Sheet.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Ad Hoc Group**" means that certain ad hoc group of holders of First Lien Claims represented by Milbank LLP and Gibbons P.C., as counsel, and Houlihan Lokey Capital, Inc., as investment banker.

"**First Lien Claims**" means any Claim on account of the First Lien Loans.

"**First Lien Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**First Lien Consenting Creditor Fees and Expenses**" means all reasonable and documented fees and expenses (whether incurred at any point prior to or after the commencement of the Chapter 11 Cases) incurred by the First Lien Ad Hoc Group and any advisors thereto in connection with the formulation, development, negotiation, documentation or implementation of this Agreement, the Restructuring Term Sheet, the Restructuring Transactions contemplated thereby or hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, including the fees and expenses of: (i) Milbank LLP and Gibbons P.C., as counsel to the First Lien Ad Hoc Group, and any regulatory counsel or other advisors retained by the First Lien Ad Hoc Group; (ii) Houlihan Lokey, as investment banker to the First Lien Ad Hoc Group; and (iii) St. Onge Company, as third-party logistics advisor to the First Lien Ad Hoc Group.

"**First Lien Credit Agreement**" means that certain agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as borrower, CBI Intermediate, Inc., a Delaware corporation, as holdings, the lenders party thereto from time to time, the issuing banks thereto from time to time, the Swing Line Lender party thereto from time to time, and UBS AG, Stamford Branch, as administrative agent and collateral agent.

6

"**First Lien Initial Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**First Lien Joining Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**First Lien Loans**" means loans outstanding under the First Lien Credit Agreement.

"**Governing Body**" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity.

"**Governmental Authority**" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization (other than the Bankruptcy Court).

"**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any CBI Parent, L.P., and puts, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of CBI Parent, L.P. (in each case whether or not arising under or in connection with any employment agreement).

"**Interim DIP Order**" has the meaning set forth in the Restructuring Term Sheet.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

"**Joining Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the case milestones set forth in Section 3.02.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**PJT**" means PJT Partners LP.

"**PJT Agreement**" means that certain engagement letter, dated January 19, 2024, by and among PJT, Kirkland and Ellis LLP, and Careismatic Brands, LLC.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code to be consistent in all respects with this Agreement and otherwise reasonably acceptable to the Required Consenting First Lien Lenders.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Prepetition Credit Agreements**" means the First Lien Credit Agreement and the Second Lien Credit Agreement.

"**Qualified Marketmaker**" means an Entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Recapitalization**" has the meaning set forth in the Restructuring Term Sheet.

"**Reorganized Debtors**" means, from and after the Effective Date, the Debtors (together with any applicable newly-formed entity formed to implement the Plan).

"**Required Consenting Creditors**" means the Required Consenting First Lien Lenders and the Cross-Holder Creditors.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, First Lien Initial Consenting Creditors holding at least 50.01% of the aggregate outstanding principal amount of First Lien Loans that are held by the First Lien Initial Consenting Creditors.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement. For the avoidance of doubt, "Restructuring Transactions" include both the Sale Transaction and the Recapitalization.

"**Rules**" means Rule 501(a)(1), (2), (3), (7), and (8) of the Securities Act.

"**Sale Transaction**" has the meaning set forth in the Restructuring Term Sheet.

"**Second Lien Claims**" means any Claim on account of the Second Lien Loans.

"**Second Lien Credit Agreement**" means that certain agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party

thereto from time to time, and UBS AG, Stamford Branch, as administrative agent and collateral agent.

"**Second Lien Loans**" means loans outstanding under the Second Lien Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement).

"**Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Termination Event**" means the occurrence of a termination event arising under Section 11.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

9

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.**      *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)      holders of at least two-thirds of the aggregate outstanding principal amount of First Lien Loans shall have executed and delivered counterpart signature pages of this Agreement;

(c)      the Cross-Holder Creditors shall have executed and delivered counterpart signature pages of this Agreement;

(d)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred; and

(e)      the Company Parties shall have paid in full in cash all invoiced, then outstanding, accrued, and unpaid Consenting Creditor Fees and Expenses; *provided* that such invoices are received by the Company Parties by January 17, 2024;

**Section 3.**      *Bankruptcy Process; Milestones*.

3.01.   <u>Definitive Documents</u>.

(a)      The Definitive Documents governing the Restructuring Transactions shall include the following:  (i) the Plan and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto; (ii) the Plan Supplement and the documents contained therein; (iii) the Confirmation Order; (iv) the Disclosure Statement; (v) the order of the Bankruptcy Court

approving the Disclosure Statement and the other Solicitation Materials; (vi) the First Day Pleadings and all orders sought pursuant thereto; (vii) all motions, orders, filings, documents, and agreements related to either the Recapitalization or the Sale Transaction, as applicable, including the Disclosure Statement motion and any documentation relating to solicitation of the Plan; (viii) such other documents (including any related motions, orders, agreements, instruments, schedules, or exhibits) that are reasonably desired or necessary to consummate and document the transactions contemplated by this Agreement, the Restructuring Term Sheet, and the Plan; (ix) the DIP Documents and the DIP Orders; (x) such documents, motions or orders reasonably desired or necessary to consummate and document the Exit Financing Arrangements; (xi) such documentation with respect to warrants issued on account of Second Lien Secured Claims, which shall include terms consistent with the terms and conditions set forth on **Exhibit B** attached hereto (the "**Warrants Documents**"); (xii) any agreement with respect to any new proposed key employee retention or incentive program, or other similar program, plan, or agreement; and (xiii) any shareholder agreement, organizational documents, evidence of equity interests (including share certificates or other mutually agreed evidence of equity interests to be issued in accordance with the Restructuring Transactions), or other governance documents for the Reorganized Debtors.

(b)      The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to good faith negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions (and any Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date) shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12, or shall otherwise be in form and substance reasonably acceptable to (i) the Company Parties; (ii) the Required Consenting First Lien Lenders; (iii) the Cross-Holder Creditors (x) solely with respect to provisions of those documents governing the treatment of Second Lien Claims and (y) solely to the extent such documents are modified, amended, or supplemented such that the rights of the Cross-Holder Creditors are disproportionately and negatively affected with respect to any and all rights granted to the Cross-Holder Creditors, each in their capacity as a Backstop Party; and (iv) the Sponsor, solely with respect to provisions thereof that materially and adversely affect the rights of the Sponsor (if any).

3.02.   _Milestones_.  The Company shall implement the Restructuring Transactions in accordance with the following Milestones, as applicable, unless extended or waived in writing by the Required Consenting First Lien Lenders (which may be by electronic mail between applicable counsel):

(a)      _Entry of Interim DIP Order_.  As soon as practicable, but in no event later than the date that is five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(b)      _Entry of Final DIP Order_.  As soon as practicable, but in no event later than the date that is thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

(c)      Entry of Bidding Procedures Order.  As soon as practicable, but in no event later than the date that is thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order.

(d)      Filing of Plan and Disclosure Statement.  As soon as practicable, but in no event later than the date that is forty-five (45) calendar days after the Petition Date, the Company Parties shall have filed a Plan and Disclosure Statement, in each case in form and substance acceptable to the Required Consenting First Lien Lenders.

(e)      Entry of Disclosure Statement Order.  As soon as practicable, but in no event later than the date that is ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order.

(f)      Entry of Confirmation Order.  As soon as practicable, but in no event later than the date that is one hundred and twenty (120) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

**Section 4.**      *Commitments of the Consenting Stakeholders*.

4.01.   General Commitments, Forbearances, and Waivers.

(a)      During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees in respect of all of its Company Claims/Interests to:

(i)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)      use commercially reasonable efforts to support the Company Parties' efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b);

(iv)      not direct (or cause to be directed) any Agent to take any action inconsistent with such Consenting Stakeholder's obligations under this Agreement or the Plan and, if any applicable Agent takes any action inconsistent with such Consenting Stakeholder's obligations under this Agreement or the Plan, such Consenting Stakeholder shall use its commercially reasonable efforts to direct such Agent to cease, withdraw, and refrain from taking any such action; *provided* that in no instance shall any Consenting Creditor be required to provide an indemnity to any Agent, as applicable, in connection with such efforts;

(v)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement and otherwise reasonably acceptable to the Required Consenting First Lien Lenders to which it is required to be

12

a party, and solely with respect to the Warrants Documents, in form and substance reasonably acceptable to the Cross-Holder Creditors and the Required Consenting First Lien Lenders and consistent in all respects with the Restructuring Term Sheet and otherwise; and

(vi)    not object to or otherwise seek to hinder the Company Parties' payment to PJT of the fees and expenses set forth in the PJT Agreement.

(b)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will use commercially reasonable efforts to support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement; *provided, however*, that no Consenting Creditor shall be obligated to waive any condition to the consummation of any part of the Restructuring Transactions.

**Section 5.**    ***Additional Provisions Regarding the Consenting Stakeholders' Commitments***. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)    be construed to impair the rights of any Consenting Creditor from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and do not delay, interfere with, or impede the Restructuring Transactions;

(b)    limit or impair the ability of a Consenting Creditor to purchase, transfer, or enter into any transactions regarding Company Claims/Interests, subject to Section 8 hereof;

(c)    except as expressly provided herein, constitute a waiver under, or amendment of, the Prepetition Credit Agreements or otherwise limit or impair any right or remedy of any Consenting Creditor under the Prepetition Credit Agreements, or any other applicable agreement, instrument, or document that gives rise to a Consenting Creditor's Company Claims/Interests;

(d)    constitute a waiver under, or amendment of, the affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(e)    impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(f)    prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement (including the Restructuring Term Sheet);

(g)    require any Consenting Creditor to (i) incur any financial or other liability other than as expressly described in this Agreement, (ii) indemnify or otherwise incur any liability to the Sponsor or any Agent, (iii) take, or refrain from taking, any action where to do so would breach (A) any law or regulation or (B) any order or direction of any relevant court or Governmental Authority, or (iv) fail to comply with any antitrust or regulatory obligations as they may reasonably determine;

(h)    prevent any Consenting Creditor from (i) defending against or responding to any pleading filed with the Bankruptcy Court or any other court seeking to challenge the validity,

enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of its Company Claims/Interests or any liens or collateral securing its Company Claims/Interests or (ii) taking or directing any action relating to the maintenance, protection, or preservation of any collateral; or

(i)      prevent any Consenting Creditor from enforcing or exercising any rights, remedies, conditions, consents, or approval requirements under any of the Definitive Documents.

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties shall direct their subsidiaries to:

(a)      support, act in good faith, and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      to the extent any legal, financial, or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)      use commercially reasonable efforts to obtain promptly any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)      (i) provide counsel for the Consenting Creditors a reasonable opportunity (no less than three (3) Business  Days in advance of filing or such shorter period as may be necessary in light of exigent circumstances) to review draft copies of all First Day Pleadings, (ii) provide counsel for the Consenting Creditors a reasonable opportunity (no less than seven (7) Business Days in advance of filing or such shorter period as may be necessary in light of exigent circumstances) to review draft copies of all Definitive Documents that the Company Parties intend to file with the Bankruptcy Court, and (iii) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Stakeholders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable;

(g)      negotiate in good faith with the Consenting Creditors and each of their respective advisors regarding the preparation and execution of the Definitive Documents and the implementation of the Restructuring Transactions;

(h)      inform counsel to the First Lien Ad Hoc Group and counsel to the Cross-Holder Ad Hoc Group in writing (email being sufficient) as soon as reasonably practicable after becoming aware of (i) any matter or circumstance which they know to be a material impediment to the

implementation or consummation of the Restructuring Transactions, (ii) any notice of any commencement of any material involuntary insolvency proceedings or material legal suit, investigation, or enforcement action from or by any person in respect of any Company Party, (iii) any material breach of any of the terms, conditions, representations, warranties or covenants set forth in this Agreement (including a breach by any Company Party), or (iv) the occurrence of a Termination Event;

(i)      if any Company Party receives an Alternative Restructuring Proposal in the form of a term sheet or other written offer or proposal, the Company Parties shall (i) inform counsel to each of the Consenting Creditors in writing (email being sufficient) within twenty-four (24) hours of receiving such proposal, with such notice to include the material terms thereof (including the identity of the person(s) or Entity(s) involved) and the action taken or proposed to be taken by the Company Parties in response thereto, (ii) provide counsel to each of the Consenting Creditors, upon reasonable request, with regular updates as to the status and progress of such Alternative Restructuring Proposal, and (iii) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Consenting Creditors relating to such Alternative Restructuring Proposal; *provided* that this paragraph shall not apply to any and all bids received by the Company Parties and their advisors in connection with the Sale Transaction if the Consenting Creditors are participating in the Sale Transaction via a Credit Bid (as defined in the Restructuring Term Sheet); and

(j)      provide the Consenting Creditors with any information reasonably requested regarding the Company Parties and reasonable access to management and advisors of the Company Parties for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all respects;

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(e)      without the prior written consent of the Required Consenting First Lien Lenders (which consent shall not be unreasonably withheld), (i) (x) reject or enter into any material agreement or amendment or (y) grant any material consent or waiver relating thereto, (ii) settle or agree to the amount, priority, or treatment of any claim or liability, or (iii) enter into, adopt or

amend any employment or compensation-related agreement or collective bargaining agreement outside of the ordinary course of business, except as contemplated by this Agreement; or

(f)    file a motion seeking approval of, or otherwise affirmatively support, encourage, pursue, or participate in, any alternative Exit Term Loan Facility that is not an Acceptable Alternative Exit Facility, nor encourage any other person or Entity in any efforts related to the foregoing.

**Section 7.**    *Additional Provisions Regarding Company Parties' Commitments*.

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or its Governing Body, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.  If a Company Party determines to take any action or refrain from taking any action with respect to the Restructuring Transactions in reliance on this Section 7.01, such Company Party shall promptly (in any event within two (2) Business Days of such determination) provide written notice of such determination to counsel of each of the Consenting Creditors.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to  (i) consider, respond to, and facilitate Alternative Restructuring Proposals, (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity, (iii) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals, and (iv) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

7.03.    Nothing in this Agreement shall (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions, or (ii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**    *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Stakeholder; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided, however*, that (i) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (ii) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a Permitted Transferee under Section 8.01; and (ii) the Transfer otherwise is permitted under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any Claims and interests in favor of a bank or broker-dealer holding custody of such Claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims and interests.

**Section 9.** *Representations and Warranties of Consenting Stakeholders*.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Agreement Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 10.** *Mutual Representations, Warranties, and Covenants*.  Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Agreement Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate the

Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements, and has not participated in any discussions in furtherance of any such agreements or arrangements, that have not been disclosed to all Parties to this Agreement with either (i) the other Parties to this Agreement or (ii) any third party that is not Party to this Agreement where such restructuring or similar agreements or arrangements are related to the Restructuring Transactions contemplated by this Agreement.

**Section 11.**    *Termination Events*.

11.01.   <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated by the Required Consenting First Lien Lenders; and, solely with respect to the Cross-Holder Creditors, by the Cross-Holder Creditors; and, solely with respect to the Sponsor, by the Sponsor, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by one or more of the Company Parties of any provision set forth in this Agreement (including the commitments in Section 6 and/or Section 7) that remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)      the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      the Bankruptcy Court enters an order denying confirmation of the Plan on a final basis;

(d)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the

20

Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) rejecting this Agreement, (iv) terminating any Company Party's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan), or (v) dismissing any of the Chapter 11 Cases;

(e)      the Company Parties fail to pay any Consenting Creditor Fees and Expenses in accordance with this Agreement;

(f)      any of the Company Parties consummate an Alternative Restructuring Transaction that prevents the consummation of the Restructuring Transactions;

(g)      any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, or (iii) shall have been withdrawn;

(h)      in the case of a Definitive Document that is an order, including the Confirmation Order or the DIP Orders, such order shall have been stayed, reversed, vacated, or adversely modified;

(i)      the termination of the DIP Facility or the acceleration of any obligations thereunder or the termination of the Company's authorization for the Company to use cash collateral;

(j)      prior to the Petition Date, any Company Party (i) voluntarily commences any case or files any petition seeking winding up, dissolution, liquidation, administration, moratorium, receivership or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement or (ii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets;

(k)      the failure of the Company Parties to adhere to the Milestones set forth in Section 3.02; and

(l)      solely for the Sponsor, by the Sponsor, (i) upon the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order of the Bankruptcy Court, granting standing to any person other than a Company Party the right to prosecute or settle potential Claims or Causes of Action against the Sponsor or (ii) upon a modification of the release and exculpation provisions of the Plan that materially and adversely affects the interests of the Sponsor.

11.02. <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)    the Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)    the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (i) the Required Consenting Creditors, (ii) the Sponsor, and (iii) each Company Party.

11.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Effective Date.

11.05.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action; *provided* <u>however</u>, that, notwithstanding the foregoing or anything else to the contrary in this or any other document or agreement, in no event shall such termination relieve any Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the Termination Date as to such Party or (ii) any obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided, however*, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (i) any right of any Company Party or the ability of

22

any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (ii) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.     *Amendments and Waivers*.**

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by (i) each Company Party and the Required Consenting First Lien Lenders; (ii) solely with respect to any modification, amendment, waiver or supplement of the Cross-Holder Ad Hoc Group's (A) Cross-Holder Creditor Fees and Expenses, (B) releases, or (C) Second Lien Claim treatment, the Cross-Holder Creditors; and (iii) solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of the Sponsor, the Sponsor.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.     *Miscellaneous*.**

13.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto (together with any exhibits, annexes, or schedules thereto), including the Restructuring Term Sheet, is expressly incorporated herein and made a part

of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern; *provided* that this Agreement shall govern in the event of any inconsistency between Restructuring Term Sheet and this Agreement (or any other exhibits, annexes, and schedules hereto).

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  <u>TRIAL BY JURY WAIVER</u>.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company

Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Careismatic Brands, LLC
1119 Colorado Avenue,
Santa Monica, California 90401
Attention:  Sid Lakhani, Chief Executive Officer; Sean Bogue, Chief Financial Officer
E-mail address: slakhani@careismatic.com; sbogue@careismatic.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua Sussberg
E-mail address:  jsussberg@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Chad J. Husnick
E-mail address:  chusnick@kirkland.com

(b)     if to a First Lien Consenting Creditor, to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Evan R. Fleck; Nelly Almeida
E-mail address:  efleck@milbank.com; nalmeida@milbank.com

(c)     if to the Second Lien Consenting Creditor, to:

25

King & Spalding LLP
1185 6th Avenue
New York, NY 10036
Attention: Peter Montoni; Matt Warren
E-mail address: pmontoni@kslaw.com; mwarren@kslaw.com

(d)    if to the Sponsor, to:

Partners Group (USA) Inc.
1114 Avenue of the Americas, 37th Floor
New York, NY 10036
Attention: Philip Wolf
E-mail address: philip.wolf@partnersgroup.com

with copies to:

Ropes & Gray LLP
1211 6th Ave,
New York, NY 10036
Attention: Gregg Galardi
E-mail address: gregg.galardi@ropesgray.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.    <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.    <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.    <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any

26

such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19.  <u>Fees and Expenses</u>.  Pursuant to the DIP Orders, the Company Parties shall pay in full in cash all Consenting Creditor Fees and Expenses within five (5) business days of the Company's receipt of a statement setting forth such expenses.  The Plan, the Confirmation Order, the DIP Orders, and/or other Definitive Documents shall contain appropriate provisions to give effect to the obligations provided for in this Section 13.19.  Any amendment or modification to any engagement letter of any financial advisor, to the extent giving rise to a claim to reimbursement or payment from any Company Party, shall require the prior written consent of the First Lien Ad Hoc Group or the Cross-Holder Ad Hoc Group, as applicable.  To the extent there is any inconsistency between the terms of the DIP Orders and this Section 13.19, the terms of the DIP Orders shall control.

13.20.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13, any defined terms used in any of the foregoing Sections (solely to the extent used therein) and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

13.21.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.01(a), Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting First Lien Lenders, or the Cross-Holder Creditors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including

electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature pages omitted.*]

## <u>EXHIBIT A</u>

### Company Parties

1. AllHearts, LLC
2. Careismatic Group II Inc.
3. Careismatic Group Inc.
4. Careismatic, LLC
5. CBI Intermediate, Inc.
6. CBI Midco, Inc.
7. CBI Parent, L.P.
8. Krazy Kat Sportswear LLC
9. Marketplace Impact, LLC
10. Med Couture, LLC
11. Medelita, LLC
12. New Trojan Parent, Inc.
13. Pacoima Limited, LLC
14. Silverts Adaptive, LLC
15. Strategic Distribution, L.P.
16. Strategic General Partners, LLC
17. Strategic Partners Acquisition Corp.
18. Strategic Partners Corp.
19. Strategic Partners Midco, LLC
20. Trojan Buyer, Inc.
21. Trojan Holdco, Inc.

## EXHIBIT B

**Restructuring Term Sheet**

*Execution Version*

**Careismatic Brands, LLC,** *et al.*
**RESTRUCTURING TERM SHEET**

This restructuring term sheet (including all exhibits and schedules hereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") sets forth the principal terms and conditions of a proposed restructuring of Careismatic Brands LLC and certain of its direct and indirect affiliates and subsidiaries. This Restructuring Term Sheet does not address all terms, conditions, or other provisions that would be required in connection with the restructuring or that will be set forth in the Definitive Documents, which are subject to agreement in accordance with the restructuring support agreement to which this Restructuring Term Sheet is attached (including all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**"). Capitalized terms used and not defined in this Restructuring Term Sheet shall have their respective meanings as defined in **Exhibit B** hereof or the Restructuring Support Agreement, as applicable.

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAW. NOTHING IN THIS RESTRUCTURING TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE AND WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF EACH PARTY HERETO.**

**UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THE RESTRUCTURING TERM SHEET IS INCONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT WITH RESPECT TO SUCH PROVISION SHALL CONTROL.**

| Overview | |
|---|---|
| **Debtors** | The Entities that are listed on **Exhibit A** to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "**Debtor**" and, collectively, the "**Debtors**"). |
| **Restructuring Implementation** | The Restructuring Transactions will be implemented pursuant to confirmation of a prearranged chapter 11 plan implementing the terms and conditions set forth in this Restructuring Term Sheet (the "**Plan**") and in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**" and such cases, the "**Chapter 11 Cases**," and the date of the commencement of the Chapter 11 Cases, the "**Petition Date**"). <br><br> The Plan will be structured such that the Debtors may pursue: <br><br>     a)     a sale of the equity of the Reorganized Debtors or substantially all assets of the Debtors to the highest or otherwise best bidder |

| Overview |
| --- |

|  | through a Successful Bid that is <u>not</u> a Credit Bid (as defined below) (the "**Sale Transaction**") following a sale and marketing process to be conducted pursuant to the Bidding Procedures (the "**Sale Process**"); <u>or</u> |
| b) | in the event a Sale Process yields no Third-Party Bid that is a Successful Bid, providing for the equitization of 100% of the Allowed First Lien Claims (as defined below), subject to dilution from the (x) MIP Equity, (y) the DIP Premiums (as defined in **Exhibit C** hereto), subject to the DIP Premium Conversion Election Option (each as defined below) (the "**Recapitalization**").  In the event where the Successful Bid is the Credit Bid, the Debtors shall pursue confirmation of a Plan via the Recapitalization. |

In the event of a Sale Transaction, the sale proceeds (the "**Sale Proceeds**") provided by the winning bidder shall be distributed in accordance with this Restructuring Term Sheet and the Plan.

All Holders of First Lien Claims and DIP Claims shall be permitted to credit bid such Claims in connection with a Sale Process, with the structure of such credit bid to be discussed and agreed between the Debtors and the requisite Holders of the First Lien Claims and /or DIP Claims, as applicable (any such credit bid, the "**Credit Bid**").

A Sale Transaction or the Recapitalization (the "**Restructuring Transactions**") will be subject to the Definitive Documents, the terms of the Restructuring Support Agreement, and the consent rights set forth therein.

The Restructuring Transactions will be supported by (a) the undersigned Holders of First Lien Claims and Second Lien Claims, represented by Milbank LLP and Houlihan Lokey Capital, Inc. as of the date hereof, (the "**First Lien Initial Consenting Creditors**"),[1] (b) the undersigned Holders of First Lien Claims and Second Lien Claims represented by King & Spalding LLP as of the date hereof (the "**Cross-Holder Creditors**" and, in its capacity as an ad hoc group, the "**Cross-Holder Ad Hoc Group**", together, with the First Lien Consenting Creditors, the "**Consenting Creditors**"), (c) the Sponsor, and (d) the Debtors, in each case on the terms set forth herein.

The "**Effective Date**" will be the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Restructuring Support Agreement and the Plan has been substantially consummated.

From and after the Effective Date, the Debtors (together with any applicable newly-formed entity formed to implement the Plan) shall be referred to herein

---

[1]   In its capacity as an ad hoc committee, First Lien Consenting Creditors (as defined in the Restructuring Support Agreement) represented by Milbank LLP and Houlihan Lokey Capital, Inc. (the "<u>First Lien Ad Hoc Group</u>").

| Overview | |
|---|---|
| | as the "**Reorganized Debtors**" and Careismatic Brands, LLC shall be referred to herein as "**Reorganized CBI**," in each case subject to modification in the event that the Plan is structured in such a way that results in a particular Debtors being "left behind" or otherwise wound down in connection with the Plan. |
| **DIP Facility, DIP Lenders, Backstop Commitments and Backstop Parties** | The Debtors shall seek authority to obtain debtor-in-possession financing (the "**DIP Facility**") on the terms and conditions set forth in the DIP Credit Agreement, attached hereto as **Exhibit A** (the "**DIP Credit Agreement**" and the lenders thereunder, the "**Initial DIP Lenders**").<br><br>Certain Holders of First Lien Claims that comprise the First Lien Initial Consenting Creditors and the Cross-Holder Creditors shall backstop 100% of the DIP Facility pursuant to the DIP Credit Agreement (the "**Backstop Commitment**" and those First Lien Initial Consenting Creditors and Cross-Holder Creditors, the "**Backstop Parties**").<br><br>The DIP Facility in the aggregate amount of $125 million, consisting of (i) $50 million of which shall be funded upon the entry of an interim order by the Bankruptcy Court approving the DIP Facility (the "**Interim DIP Order**"), and (ii) $75 million of which shall be funded upon the entry of a final order by the Bankruptcy Court approving the DIP Facility (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**") (the loans under the DIP Facility, the "**DIP Commitments**"), in each case on the terms and conditions set forth in the DIP Credit Agreement and DIP Orders. The DIP Orders shall provide for the Debtors' consensual use of cash collateral (the "**Cash Collateral**") of the prepetition secured parties and approval of (i) each of the DIP fees and DIP Premiums referenced in **Exhibit C** (collectively, the "**DIP Fees and Premiums**") and (ii) the DIP Premium Conversion Election Option (as defined below). |
| **DIP Facility Subscription Process** | Participation in the DIP Facility shall be offered ratably to all Holders of First Lien Claims, on the following terms: (a) 15% of the DIP Commitments (as defined below) allocated on a *pro rata* basis to the Backstop Parties; and (b) the remaining 85% of the DIP Commitments allocated on a *pro rata* basis to all Holders of First Lien Claims ("**Existing First Lien Lenders**") (such process, the "**DIP Facility Subscription**").<br><br>On or after the date of entry of the Interim DIP Order, the Company Parties will request that the First Lien Agent post the Restructuring Support Agreement (inclusive of all exhibits) and a posting memo in respect of the syndication of the DIP Commitments to the First Lien Agent's website maintained for the Existing First Lien Lenders, which posting will provide blank signature pages to the Restructuring Support Agreement and the DIP Credit Agreement. Existing First Lien Lenders may subscribe for the DIP Commitments (or designate an affiliate to subscribe for the DIP Commitments) by delivering signature pages to the Restructuring Support Agreement and the DIP Credit Agreement in accordance with the instructions set forth in the posting memo (by 5:00 p.m. prevailing Eastern Time on February 6, 2024, the "**Subscription Deadline**"). |

| Overview | |
|---|---|
| | The record date for determining the right to subscribe, and the *pro rata* allocation of the DIP Facility Subscription, for DIP Commitments shall be January 17, 2024 (giving pro-forma effect to trades or assignments of First Lien Loan Claims that have not yet closed); *provided*, *however*, that the right to subscribe, and *pro rata* allocation of such subscription, shall transfer with the First Lien Claims to the extent of any trade or assignment of such First Lien Claims (in accordance with the requirements of the Restructuring Support Agreement, if applicable) made after entry of the Interim DIP Order and before the Subscription Deadline.   The Existing First Lien Lenders that elect to subscribe to the DIP Commitments (collectively, with the Initial DIP Lenders, the "**DIP Lenders**") shall be entitled to fund their *pro rata* share of 85% of the DIP Commitments, as set forth above. |
| **DIP Facility Maturity Date** | The earliest to occur of (i) the date falling nine months after entry by the Bankruptcy Court of the Interim DIP Order; (ii) the Effective Date, and (iii) the date of termination of the DIP Commitments and acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default under the DIP Facility (subject to any applicable cure or noticing periods set forth in the DIP Orders). |
| **Uses of Proceeds** | The use of the DIP Commitments will be set forth in the DIP Credit Agreement and will be subject, among other things, to the Budget (including Permitted Variances (as defined therein)).<br><br>No portion of the Debtors' Cash Collateral (as defined in the Bankruptcy Code), the proceeds of the DIP Facility, the Collateral (as defined in the DIP Credit Agreement), or the Carve-Out (as defined therein) may be used:<br><br>(a)   for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;<br><br>(b)   to finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Lenders or the First Lien Lenders (as defined below), or their respective rights and remedies under DIP Documents, the DIP Orders, or the applicable Prepetition Loan Documents (as defined in the DIP Credit Agreement); or (ii) any other action which, with the giving of notice or passing of time, would result in an "Event of Default" (as defined in the DIP Credit Agreement);<br><br>(c)   for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (other than permitted adequate protection payments pursuant to the DIP Orders);<br><br>(d)   unless the Exit Conversion (as defined herein) takes place, to make any distribution under a plan of reorganization that does not provide for the indefeasible payment of the DIP Commitments in full in Cash (including all DIP Fees and Premiums); or |

| Overview | |
|---|---|
| | (e)    except as may be permitted by the Budget, to make any payment in settlement of any Claim, action, or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Administrative Agent acting at the direction of the Requisite Lenders (each as defined in the DIP Credit Agreement). |
| **Claims and Interests to be Addressed** | Outstanding indebtedness of the Debtors, equity Interests, and Intercompany Interests in the Debtors that will be restructured or otherwise addressed pursuant to the Restructuring Transactions include:<br><br>(i)   indebtedness under that certain First Lien Credit Agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, the issuing banks thereto from time to time, the Swing Line Lender party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent (the "**First Lien Agent**" and such agreement, the "**First Lien Credit Agreement**"), comprised of revolving credit facility loans in an aggregate estimated principal amount outstanding of approximately $100 million, plus applicable interest, fees, costs, expenses, and premiums (the Claims in respect thereof, the "**First Lien RCF Claims**");<br><br>(ii)  indebtedness under that certain First Lien Credit Agreement, comprised of term loans in an aggregate estimated principal amount outstanding of approximately $590 million, plus applicable interest, fees, costs, expenses, and premiums (the Claims in respect thereof, together with the First Lien RCF Claims, the "**First Lien Claims**," and the Holders thereof, the "**First Lien Lenders**");<br><br>(iii) obligations arising under that certain Master Equipment Lease Agreement dated July 25, 2023, as amended from time to time, by and among Wingspire Equipment Finance LLC, as Lessor, and Careismatic Brands, LLC, as Lessee, in an aggregate estimated principal amount outstanding of approximately $2.9 million (the Claims in respect thereof, the "**Equipment Financing Claims**,");<br><br>(iv) indebtedness under that certain Second Lien Credit Agreement, dated as of January 6, 2021, and as amended from time to time, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent, comprised of term loans in |

| Overview | |
|---|---|
| | an aggregate estimated principal amount outstanding of approximately $110 million, plus applicable interest, fees, costs, and expenses (the claims in respect thereof, the "**Second Lien Claims**"); |
| | (v) unsecured intercompany notes under various agreements from certain limited partners of CBI Parent, L.P. (the "**Sponsor Loan Agreement**" and the Claims in respect thereof, the "**Sponsor Loan Claims**"), each dated as of October 17, 2022, between those Entities listed on **Schedule 1**, attached hereto, as co-issuer and Careismatic Brands, Inc. (n/k/a Careismatic Brands, LLC), a Delaware corporation, as Borrower, in the outstanding principal amount of $32.9 million;[2] |
| | (vi) Intercompany Claims and Intercompany Interests; and |
| | (vii) Interests (as defined in the Restructuring Support Agreement). |
| **Cash Collateral; DIP Facility** | The Restructuring Transactions shall be funded through: (i) the consensual use of Cash Collateral and the DIP Facility; and (ii) in the case of the Recapitalization, the Exit Financing Arrangement (as defined below).

The terms of the DIP Facility are set forth in the DIP Credit Agreement attached hereto as **Exhibit A**.

Notwithstanding anything herein to the contrary, the DIP Documents shall provide that, subject to entry of the Final DIP Order, each Holder of a DIP Claim shall be entitled to elect, at its sole discretion, to convert the DIP Premiums earned in connection with the DIP Facility into New Common Stock at a 40% discount to plan enterprise value; *provided, that* in the event that: (i) the Debtors' restructuring is consummated through either (a) a Sale Transaction (via a Third-Party Bid) or (b) a plan of reorganization that, in the case of each (a) and (b), provides for the payment in full, in Cash, of the First Lien Claims and the DIP Claims on the effective date of any such plan or the closing of any such Sale Transaction (as applicable); or (ii) an Acceptable Alternative Exit Facility (as defined below) is approved and becomes effective, such election will fall away (the election option, the "**DIP Premium Conversion Election Option**"). |
| **Exit Financing Arrangement** | On the Effective Date, in the event of the Recapitalization, the Reorganized Debtors shall enter into the following exit financing (the "**Exit Financing Arrangement**"):

(i) the DIP Commitments shall be converted into exit financing loans of the Reorganized Debtors (the "**Exit Conversion**") having the economic |

---

[2]   **Schedule 1** provides the principal amounts totaling $30 million.  The remaining $2.9 million constitutes accrued and unpaid interest.

| Overview | |
|---|---|
| | terms set forth below and otherwise in form and substance acceptable to the Required DIP Lenders (as defined in the Credit Agreement) (the "**Exit Term Loan Facility**" and the lenders thereto, the "**Exit Term Loan Lenders**"). |
| | a.  *Interest Rate*: (i) SOFR + 7.00% paid monthly in Cash <u>or</u> (ii) at the Debtors' sole discretion, solely for the first year following entry into the Exit Term Loan Facility, SOFR + 2.50% in Cash plus 6.50% PIK. |
| | b.  *Default Interest Rate*: SOFR + 9.00% paid monthly in Cash. |
| | c.  *Maturity*: The date falling five years after the Effective Date. |
| | d.  *Other*: Usual and customary covenants and call protection. |
| | In the event of a Recapitalization, the Debtors may seek an alternative to the Exit Term Loan Facility to present to the First Lien Ad Hoc Group for approval; provided that any such facility shall be on terms and conditions acceptable to the Required Consenting First Lien Lenders in their sole discretion (any such facility, an "**Acceptable Alternative Exit Facility**"). |
| **Foreign and Critical Vendors** | On the Petition Date, pursuant to the First Day Pleadings, the Debtors will seek, among other things, authority from the Bankruptcy Court to pay up to: $3 million in relief to satisfy critical vendor obligations; and $25 million in relief to satisfy foreign vendor obligations, in each case subject to motions and orders that are reasonably acceptable to the Require Consenting Lenders and the approval of the Bankruptcy Court (collectively, the "**Permitted Vendor Relief Payments**"). |
| **New Common Stock** | On the Effective Date, in the event of the Recapitalization, one or more of the Reorganized Debtors (as determined by the Debtors and the Required Consenting First Lien Lenders) shall make an issuance of new common equity (the "**New Common Stock**"). On the Effective Date, the New Common Stock will be distributed to Holders of Allowed First Lien Claims in respect of such Claims in accordance with the Restructuring Term Sheet and the Plan. |
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be in form and substance subject to the consent rights set forth herein and in the Restructuring Support Agreement. |

| **Treatment of Claims and Interests** |

| \multicolumn{4}{l}{Each Holder of an Allowed Claim, Interest, or Intercompany Interest as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim, Interest, or Intercompany Interest.} |

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| **Unclassified Non-Voting Claims** |
| N/A | **DIP Claims** | On the Effective Date, each Holder of a DIP Claim arising under or pursuant to the DIP Financing shall receive: <br><br> • in the event of the Recapitalization, (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full; or <br><br> • in the event of a Sale Transaction, payment in full in Cash (including all DIP Fees and Premiums). | N/A |
| N/A | **Administrative Claims** | On the Effective Date, each Holder of an Allowed Administrative Claim[3] shall be paid in full in Cash on the Effective Date: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving | N/A |

---

[3] For purposes of this Restructuring Term Sheet, "Administrative Claim" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims (to be defined in the Plan); and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| | | rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim. | |
| N/A | **Priority Tax Claims** | On the Effective Date, each Holder of a Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| Class 1 | **Other Secured Claims** | On the Effective Date, each Holder of an Allowed Other Secured Claim[4] shall receive: (i) payment in full in Cash in an amount equal to its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 2 | **Other Priority Claims** | Each Holder of an Allowed Other Priority Claim[5] shall be paid in full in Cash on the Effective Date or in the ordinary course of business (by the Reorganized Debtors) as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| Class 3 | **First Priority Claims** | On the Effective Date, each Holder of an Allowed First Priority Claim shall receive:<br><br>• in the event of the Recapitalization, its *pro rata* distribution of 100% of the New Common Stock (subject to dilution from (a) MIP Equity and (b) DIP Fees and Premiums, subject to the DIP Premium Conversion Election Option; or | Impaired / Entitled to Vote |

---

[4]   For purposes of this Restructuring Term Sheet, "Other Secured Claim" shall mean any Secured Claim that is not a DIP Claim, First Lien Claim, Equipment Financing Claim, or Second Lien Claim.

[5]   For purposes of this Restructuring Term Sheet, "Other Priority Claim" shall mean any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| | | • in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Cash. | |
| **Class 4** | **Second Lien Secured Claims** | Each Holder of an Allowed Second Lien Secured Claim shall receive:<br><br>• in the event of the Recapitalization, no recovery or distribution on account of their Second Lien Secured Claim; *provided* that, if the Second Lien Condition is satisfied, each Holder of an Allowed Second Lien Secured Claim shall receive 5-year warrants to purchase up to 8.5% of the New Common Stock with a strike price set at $818 million;[6] or<br><br>• in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Cash after all First Priority Claims have been satisfied in full in Cash. | Impaired / Entitled to Vote |
| **Class 5** | **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive:<br><br>• in the event of the Recapitalization, no recovery or distribution on account of their General Unsecured Claims; or<br><br>• in the event of the Sale Transaction, its *pro rata* distribution of Excess Distributable Cash after all First Priority Claims and Second Lien Claims have been satisfied in full in Cash. | Impaired / Entitled to Vote |

---

[6]   For the avoidance of doubt, the warrants shall not include Black Scholes protections.

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| Class 6 | Intercompany Claims | Intercompany Claims shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Claims, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Consenting First Lien Lenders. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| Class 7 | Intercompany Interests | Intercompany Interests (as defined in the Restructuring Support Agreement) shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting First Lien Lenders. (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled and released without any distribution on account of such Intercompany Interests, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Consenting First Lien Lenders. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| Class 8 | Interests | On the Effective Date, all Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Each Holder of an Interest shall receive no recovery or distribution on account of their Interests. | Impaired / Deemed to Reject |
| General Provisions Regarding the Restructuring | | | |
| Restructuring Transactions | | The Confirmation Order shall be deemed to authorize and ratify, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein.  On the Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. | |
| Tax Matters | | The parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring Transactions and the transactions related thereto in a tax efficient and cost-effective manner, that is reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders. | |

11

| **Treatment of Claims and Interests** |
| --- |

| | |
| --- | --- |
| **Restructuring Steps Plan** | The Plan Supplement shall include a restructuring steps plan (the "**Restructuring Steps Plan**"), in form and substance reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders, that shall outline the steps, considerations, treatment of Intercompany Claims and Intercompany Interests, and agreed funding, as applicable, for any Reorganized Debtor or Company Party, including any foreign non-Debtor Company Party (each as defined in the Restructuring Support Agreement). |
| **Debtor Releases, Third-Party Releases, Injunction, and Exculpation** | Subject in all respects to the conclusion of the transaction committees' investigations, the Plan will include customary releases, injunctions, and exculpations in each case to the fullest extent permitted by law and effective as of the Effective Date based on the terms set forth in **Exhibit B** to this Restructuring Term Sheet. |
| **Management Incentive Plan** | In the event of the Recapitalization, the Plan will provide for the establishment of a post-emergence management incentive plan to be designed and adopted by the New Board (as defined below) following the Effective Date, to be used to incentivize and compensate employees, directors, consultants and other service providers (the "**Management Incentive Plan**"), which will include (i) the ability to grant restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock (or equivalent Cash value thereof) representing up to 15.0% of the New Common Stock on a fully diluted basis, (the "**MIP Equity**") and (ii) other terms and conditions customary for similar type equity plans as determined by the New Board in its sole discretion (including, with respect to participants, allocation of awards, and vesting). |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed or assumed and assigned (as applicable) pursuant to section 365 of the Bankruptcy Code.<br><br>The Required Consenting First Lien Lenders shall have a reasonable consent right over the assumption, assumption and assignment, or rejection of all contracts and unexpired leases under the Plan. |
| **Securities Law Matters** | To extent applicable, on the Effective Date, the Reorganized Debtors shall issue New Common Stock in accordance with the terms of the Plan, the Definitive Documents, and applicable law (including applicable securities laws).<br><br>The New Common Stock will be issued pursuant to section 1145 of the Bankruptcy Code (the "**Section 1145 Exemption**") or, to the extent that the Section 1145 Exemption is either not permitted or not applicable, section 4(a)(2) of the Securities Act or another exemption thereunder.  Any New Common Stock issued pursuant to the Section 1145 Exemption will be freely transferrable under applicable securities laws without further registration, subject to certain restrictions on affiliates and underwriters under applicable securities laws. |
| **Governance** | In the event of the Recapitalization, the new board of directors or managers of the Reorganized Debtors (as applicable) (the "**New Board**") shall be determined |

| Treatment of Claims and Interests | |
|---|---|
| | in accordance with the term sheet attached hereto as **Exhibit D** (the "**Governance Term Sheet**").  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.<br><br>In connection with the Effective Date, and consistent with the Governance Term Sheet and section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors shall adopt the applicable organizational documents as determined by the Debtors and the Required Consenting First Lien Lenders. |
| **Employee Matters** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Creditors consent to the continuation of the Debtors' wages, compensation, and benefits programs according to existing terms and practices, including executive compensation programs and executive employment agreements (the "**Assumed Plans**"); *provided* that (i) Assumed Plans shall not include any existing equity or equity-based programs and awards, and (ii) each Assumed Plan shall be amended, to the extent applicable, to exclude any right(s) to receive future equity or equity-based awards provided for under any Assumed Plans, and such awards and rights described in the foregoing subsections (i) and (ii) shall be terminated as of the Effective Date for no consideration).<br><br>Without Bankruptcy Court approval or approval of the Required Consenting First Lien Lenders, the Debtors will not be permitted to establish any annual, short-term or long-term compensation programs unless such program(s) are (i) in the ordinary course of business and consistent with past practice and (ii) performance-based (*i.e.*, are only eligible to be paid upon achievement of pre-established performance goals).<br><br>The occurrence of the Effective Date shall not be deemed to result in an accelerated payment event or a "good reason" or other constructive termination event for purposes of any Debtor compensation or benefit plan; *provided*, that employees who, as of the date hereof, are party to Assumed Plans with a contractual entitlement to severance may, at their sole discretion, elect to treat the occurrence of the Effective Date as "good reason" or a constructive termination event. |
| **D&O Insurance** | The Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect prior to the Effective Date (including any tail policy), and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.  Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement such directors' and officers' insurance policies as the Debtors deems necessary, including by purchasing any tail coverage (including a tail policy).<br><br>It shall be a condition precedent to entry into the Restructuring Support Agreement that the Debtors shall have bound and secured non-refundable six-year tail policy, which shall provide at least the same coverage and amounts |

| Treatment of Claims and Interests | |
|---|---|
| | and containing terms and conditions that are no less advantageous in the aggregate to the insured than the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Debtors. |
| **Indemnification Obligations** | Any obligations of the Debtors pursuant to corporate charters, bylaws, limited partnership agreements, limited liability company agreements, written deeds of indemnity, or other organizational documents in place as of the Effective Date to indemnify current and former officers, directors, partners, managers, members, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, managers, members, partners, agents, or employees, based upon any act or omission for or on behalf of the Debtors (the "**Indemnification Obligations**") will not be discharged or impaired by confirmation of the Plan; *provided* that the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or causes of action for which indemnification is barred under applicable law, the Debtors' organization documents, or applicable agreements governing the Debtors' indemnification obligations. All such Indemnifications Obligations will be assumed by the Debtors under the Plan (and shall be treated as executory contracts to be assumed under the Plan, to the extent applicable) and will continue as obligations of the Reorganized Debtors. Any Claim based on the Company's obligations thereunder will be an Allowed Claim.<br><br>In the event the Restructuring Transactions are effectuated via the Sale Transaction or the Recapitalization (which shall include the scenario in which the Credit Bid is the Successful Bid), all such Indemnification Obligations shall be assumed and assigned in their entirety to the applicable party (*i.e.*, to a third-party purchaser in the Sale Transaction or the applicable entities pursuant to the Recapitalization). Any Third-Party Bid that does not provide for the assumption and assignment of such Indemnification Obligations cannot be considered a Successful Bid. |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the Plan (the "**Retained Causes of Action**").<br><br>For the avoidance of doubt, any Claims or Causes of Action against the Consenting Creditors and/or their Affiliates and/or advisors shall not be Retained Causes of Action. |

| Treatment of Claims and Interests |
|---|

| | |
|---|---|
| **Conditions Precedent to the Effective Date** | The Effective Date will be subject to the satisfaction of customary conditions, including the following (as applicable) (the "**Conditions Precedent**"): |

    (i)    the Definitive Documents (as defined in the Restructuring Support Agreement) shall be consistent with the Restructuring Support Agreement and otherwise approved by the Debtors and the Required First Lien Initial Consenting Creditors with their respective consent and approval rights as set forth in the Restructuring Support Agreement;

    (ii)    the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

    (iii)    the DIP Facility shall be in full force and effect and there shall be no defaults continuing unless waived by the DIP Lenders party thereto;

    (iv)    the Restructuring Transactions have been implemented in accordance with the Restructuring Steps Plan in all material respects;

    (v)    the Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal the Bankruptcy Court shall have entered the Confirmation Order, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal;

    (vi)    the Plan Supplement, Definitive Documents, Plan, and all schedules, documents, supplements, and exhibits thereto, the Exit Financing Arrangement, shall have become effective and shall be in full force and effect, subject to the consent and approval rights set forth in the Restructuring Support Agreement;

    (vii)    the New Common Stock shall have been issued (with all conditions precedent thereto having been satisfied or waived);

    (viii)    all Consenting Creditor Fees and Expenses (as defined in the Restructuring Support Agreement) and any other professional fees and other amounts required to be paid pursuant to the Restructuring Support Agreement, in any Definitive Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash, including for the avoidance of doubt all accrued and unpaid fees and expenses of advisors to the First Lien Ad Hoc Group; *provided* that the Consenting Creditors Fees and Expenses of the Cross-Holder Ad Hoc Group shall not be paid in an amount greater than $200,000 (in the aggregate).

| Treatment of Claims and Interests | |
|---|---|
| | (ix)   any and all requisite governmental, regulatory, and third-party approvals and consents necessary to effectuate the Restructuring Transactions shall have been obtained, including Bankruptcy Court approval, and all applicable waiting periods shall have expired; and<br><br>(x)   such other conditions as may be mutually agreed to by the Debtors and the Required Consenting First Lien Lenders.<br><br>The Conditions Precedent may be waived, in whole or in part, in writing by the Debtors and the Required Consenting First Lien Lenders. |
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including in respect of the cancellation of Interests and Intercompany Interests, the vesting of assets, release of Liens, the compromise and settlement of Claims, and the resolution of disputed Claims. |
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted by the Restructuring Support Agreement. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters to the extent consistent with applicable law. |
| **Credit Rating** | Prior to the entry of the Final DIP Order, the Debtors shall use its best efforts to obtain a corporate credit rating in respect of the DIP Facility.<br><br>On the Effective Date, the Debtors shall have obtained a corporate credit rating in respect of the Exit Term Loan Facility. |

## **Schedule 1**

*[Omitted from Filing Version]*

**<u>Exhibit A</u>**

**DIP Credit Agreement**

**[Filed on Docket]**

**<u>Exhibit B</u>**

**Releases and Exculpations;[1] Defined Terms**

---

[1]    The following remains subject to ongoing investigations being conducted by the Transaction Committee of CBI
Parent, L.P. and the Transaction Committee of CBI Intermediate, Inc.

### A.    *Releases by the Debtors.*

Notwithstanding anything contained herein, the Plan, or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Reorganized Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Reorganized Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Term Loan Facility Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claim, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Reorganized Debtors, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### B.    *Releases by Third Parties.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, each of the Released Parties, will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself

and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Term Loan Facility Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (the "**Third-Party Release**").

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

### C.    *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Term Loan Facility Documents, and all other Definitive Documents, the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the

Reorganized Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

**D.      Injunction.**

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Reorganized Debtors has been liquidated and distributed in accordance with the terms of the Plan, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Intercompany Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the terms of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims, Interests, or Intercompany Interests, and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim, Allowed Interest, or Allowed Intercompany Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

* * * * * *

### Restructuring Term Sheet – Definitions

"Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

"Agent" means any administrative agent, collateral agent, or similar Entity under the First Lien Facility or the Second Lien Term Loan Facility, including any successors thereto.

"Allowed" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a proof of Claim timely Filed by the applicable bar date (or for which Claim a proof of Claim is not required under the Plan, the Bankruptcy Code, or a final order of the Bankruptcy Court); (b) a Claim that is listed in the Company's schedules of assets and liabilities as not contingent, not unliquidated, and not disputed and for which no proof of Claim has been timely Filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a final order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so interposed, such Claim shall have been Allowed by a final order of the Bankruptcy Court.

"Bidding Procedures" means those bidding procedures to be agreed by the Debtors and the Required Consenting First Lien Creditors, including what constitutes a Successful Bid.

"Cash" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

"Causes of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws).  Causes of Action include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

"CBI Parent" means CBI Parent, L.P.

"Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Order" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consenting Stakeholders" means, collectively, the Consenting Creditors and the Sponsor.

"Consummation" means the occurrence of the Effective Date.

"DIP Claim" means those Claims in respect of the DIP Commitments, including the DIP Fees and Premiums.

"DIP Documents" means any documents or agreements governing the DIP Facility, which shall be consistent in all material respects with the Restructuring Support Agreement and the DIP Orders and otherwise in form and substance satisfactory to the DIP Lenders.

"Disclosure Statement" means the disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as approved by the Confirmation Order.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"Excess Distributable Cash" means Cash arising from the Sale Proceeds, if any, after funding the treatment of the DIP Claims, Administrative Claims, Secured Tax Claims, Other Secured Claims, Other Priority Tax Claims, and Other Priority Claims set forth in the Plan; *provided* that any Cash placed in an escrow account for the payment of professional fees shall not be Excess Distributable Cash.

"Exculpated Parties" means, collectively:  (a) the Debtors; (b) the Reorganized Debtors; (c) any statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code and its members; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), each such Entity's current and former control persons, directors, members of any committees of any Entity's board of directors or managers, equity Holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, advisory board members, financial advisors, attorneys (including any attorneys or other professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"Exit Term Loan Facility Documents" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"File " or "Filed" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"First Day Pleadings" means the first-day pleadings that the Debtors determine are necessary or desirable to File.

"First Lien Credit Documents" means any documents governing the First Lien Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"First Lien Deficiency Claim" means any First Lien Claim that is not a First Lien Secured Claim.

"First Lien Facility" means that certain term loan facility under the First Lien Credit Agreement.

"First Lien Secured Claim" means any First Lien Claim that is a Secured Claim.

"First Priority Claim" means the Equipment Financing Claims and the First Lien Secured Claims.

"General Unsecured Claims" means any Claim that is not: (a) an Administrative Claim; (b) a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; (c) a Priority Tax Claim; (d) a DIP Claim; (e) an Other Secured Claim; (f) an Other Priority Claim; (g) a First Priority Claim; or (h) an Intercompany Claim. For the avoidance of doubt, General Unsecured Claims shall include the Sponsor Loan Claims and Second Lien Deficiency Claims.

"Governing Body" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

"Holder" means a Person or an Entity holding a Claim or an Interest, as applicable.

"Intercompany Claim" means any Claim against a Debtor held by another Debtor.

"Intercompany Interest" means, other than an Interest, as defined in the Restructuring Support Agreement, any shares (or any class thereof), common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, profits interests, puts, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests in a Debtor held by another Debtor.

"Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

"New Organizational Documents" means the documents providing for corporate governance of Reorganized CBI and the other Reorganized Debtors, as applicable, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and in form and substance subject to the consent rights set forth in the Restructuring Support Agreement.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity.

"Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the confirmation hearing to the extent available.

"Professional Claim" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"Reinstated," or "Reinstatement" shall mean with respect to a Claim, Interest, or Intercompany Interest, that the Claim, Interest, or Intercompany Interest shall be rendered Unimpaired.

"Related Party" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"Released Parties" means collectively, and in each case solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each DIP Lender; (e) each of the Agents; (f) each member of the First Lien Ad Hoc Group; (g) each member of the Ad Hoc Cross-Holder Group; (h) each Backstop Party; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j) (and, in addition to each of the foregoing, where any of the foregoing is an investment manager or advisor for a beneficial Holder, such beneficial Holder); *provided* that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

"Releasing Parties" means collectively, and each solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each DIP Lender; (e) each of the Agents; (f) each member of the First Lien Ad Hoc Group; (g) each member of the Ad Hoc Cross-Holder Group; (h) each Backstop Party; (i) all Holders of Claims that vote to accept the Plan; (j) all Holders of Claims who are deemed to accept the Plan but who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (k) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with any Filed Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (l) all Holders of Claims or Interests who vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the

applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (m) each current and former Affiliate of each Entity in clause (a) through (l); and (n) each Related Party of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided* that, for the avoidance of doubt, an Entity in clause (i) through clause (l) shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not withdrawn or otherwise resolved before the Confirmation order is entered.

"Reorganized Debtor" means a Debtor on and after the Effective Date.

"Second Lien Condition" means the satisfaction of each of the following: (i) Holders of 66.67% in principal amount of Second Lien Claims shall have executed counterpart signature pages to the Restructuring Support Agreement prior to the Petition Date; and (ii) the class of Second Lien Claims shall have voted to accept the Plan by the voting deadline.

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of January 6, 2021, among New Trojan Parent, Inc., a Delaware corporation, as the Borrower, CBI Intermediate, Inc., a Delaware corporation, as Holdings, the lenders party thereto from time to time, and UBS AG, Stamford Branch, as administrative and collateral agent (as amended, restated, amended and restated, supplemented and/or otherwise modified).

"Second Lien Credit Documents" means any documents governing the Second Lien Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"Second Lien Deficiency Claims" means Second Lien Claims that are not Second Lien Secured Claims, in the amount of $50 million.

"Second Lien Secured Claim" means any Second Lien Claim that is a Secured Claim.

"Second Lien Term Loan Facility" means that certain term loan facility under the Second Lien Credit Agreement.

"Secured Claim" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"Sponsor" means, collectively, Partners Group AG and its affiliated investment funds and affiliates and portfolio companies of the foregoing that hold Company Claims/Interests (as defined in the Restructuring Support Agreement) (each solely in their capacity as such).

"Subsidiary Debtors" means all Debtors other than CBI Parent.

"Successful Bid" means following a Sale Process, the qualified bid or combination of qualified bids, that the Debtors determine (subject to the terms and conditions to be set forth in the Bidding Procedures), in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties, is the highest or otherwise best bid to purchase the New Common Stock or all or substantially all assets of the Debtors via a confirmable Plan.

"<u>Third-Party Bid</u>" means a qualified third-party bid, as determined in accordance with customary requirements to be set forth in the Bidding Procedures.

"<u>Unimpaired</u>" means, with respect to a class of Claims, Interests, or Intercompany Interests, a class of Claims, Interests, or Intercompany Interests, that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

## Exhibit C

### DIP Fees and Premiums

**Interest Rate:**

All amounts outstanding under the DIP Facility will bear interest at the rate of adjusted SOFR plus 6.0% per annum and shall be paid monthly.

**Default Interest**:

During the continuance of an Event of Default, the DIP Commitments and all other outstanding obligations under the DIP Facility will bear interest at an additional 2.0% per annum above the interest rate otherwise applicable.

**Backstop Premium:**

An amount equal to 11.0% of the DIP Commitments, payable in-kind to each Backstop Lender, according to its *pro rata* share of the Backstop Commitments, which may be equitized in accordance with the DIP Premium Conversion Election Option.

**Commitment Premium:**

An amount equal to 3.5% of the DIP Commitments, payable in-kind to each DIP Lender, according to its *pro rata* share of the DIP Commitments, which may be equitized in accordance with the DIP Premium Conversion Election Option.

**Exit Premium:**

An amount equal to 3.5% of the DIP Commitments payable to each DIP Lender (i) in-kind upon conversion into the Exit Term Loan Facility, which may be equitized in accordance with the DIP Premium Conversion Election Option, or (ii) subject to the DIP Premium Conversation Election Option, in Cash upon repayment in full of the DIP Facility, according to its *pro rata* share of the DIP Commitments.

**DIP Premiums**:

Collectively, the Backstop Premium, the Commitment Premium, and the Exit Premium (each subject to the terms and conditions of the DIP Premium Conversion Election Option).

**Agency Fees:**

As agreed with the DIP Agent.

**Nature of Interest, Discount, Premiums and Fees:**

Non-refundable under all circumstances.

**<u>Exhibit D</u>**

**Governance Term Sheet**

<div align="center">

**PROPOSED GOVERNANCE TERMS FOR**

**REORGANIZED CAREISMATIC BRANDS, LLC (THE "COMPANY")**

</div>

This term sheet (this "**Governance Term Sheet**") sets forth the principal terms of the proposed governance structure of the Company after its emergence from the Chapter 11 process.  This Governance Term Sheet is referenced in, and appended to, that certain Restructuring Support Agreement dated as of January 22, 2024, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**RSA**").  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the RSA.

THIS GOVERNANCE TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS GOVERNANCE TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THIS GOVERNANCE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| | |
|---|---|
| **Corporate Form:** | The Company is expected to be a Delaware limited liability company, subject to a determination by the ad hoc group of Holders of First Lien Claims represented by Milbank LLP and Houlihan Lokey Capital, Inc. (the "**Ad Hoc Group**"). |
| **Board of Directors:** | Number of Directors: The Company will be governed by a seven member board of directors appointed by the Ad Hoc Group, including the chief executive officer of the Reorganized Debtors, in accordance with **Schedule I** attached hereto.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. |
| | Any seat that is not subject to designation will be selected by a vote of the holders of Common Stock ("**Stockholders**"). |
| | Observers: To the extent a Stockholder with Board director designation right selects a director who is not employed by or otherwise affiliated with such Stockholder, that Stockholder will receive the right to appoint a board observer. |
| | Transfer of Designation Rights: A Stockholder with board director designation rights may transfer such rights in connection with a sale of common stock representing more than 50% of the shares of Common Stock such Stockholder held at emergence, it being understood that following the transfer such board designation right shall remain subject to the same fall-aways, and to the requirements to designate jointly, as described above. |
| | Quorum: A majority of the total number of the directors then in office will constitute a quorum. |
| | Chairman/Lead Director: There will be an Executive Chairman, with the initial Executive Chairman to be determined prior to emergence by the Ad |

| | Hoc Group. |
|---|---|
| | Fiduciary Duties; Corporate Opportunities: There will be a waiver of fiduciary duties to the fullest extent permitted by law, including a customary waiver of the corporate opportunity doctrine for shareholders and their representatives (including those serving as directors). |
| **Minority Protections:** | All transactions between the Company or any of its subsidiaries on the one hand and any Stockholder or its affiliates (including portfolio companies thereof) on the other hand will require approval of a majority of the disinterested directors (subject to customary exceptions, including for equity issuances subject to the preemptive rights described below).<br><br>Any liquidation, dissolution or winding up, or voluntary commencement of any bankruptcy or similar proceeding, with respect to the Company shall require the approval of at least 5 directors.<br><br>Any merger or other business combination involving the Company (including a sale of all or substantially all of the Company's assets) shall require the approval of both the Board and the holders of a majority of the outstanding Common Stock. |
| **Transfers:** | Transfers of Common Stock will be subject to a ROFO in favor of the Company and, to the extent the Company elects not to exercise, any Stockholder that holds 7.5% or more of the issued and outstanding Common Stock at the time of the transfer, subject to customary exceptions including for (i) affiliate transfers, (ii) certain transfers to a broker acting on a non-principal basis and (iii) transfers of less than 2.5% of the issued and outstanding Common Stock in any 6 month period (so long as the shares transferred do not represent more than 50% of the transferring Stockholder's holdings of Common Stock as of Emergence.)<br><br>Additionally: (i) each transferee will be required to enter into a joinder to the Company's LLC agreement (or shareholders agreement, as applicable) as a condition to any transfer; (ii) transfers must comply with applicable securities laws; and (iii) shares of Common Stock may not be transferred to competitors. |
| **Tag-Along Rights:** | Except with respect to transfers by Stockholders to their affiliates, Stockholders will have the right to participate pro rata in any direct or indirect transfer (through one or more related transactions) of 15% or more of the outstanding Common Stock by one or more other Stockholders. |
| **Drag-Along Rights:** | Holders of a majority of the outstanding Common Stock will have the right to cause a sale of the Company for cash or securities which are registered under the '33 Act, are freely tradable and listed for trading on a national securities exchange (without the consent of any other stockholders of the Company or the Board), and all other Stockholders will be required to consent to, and raise no objection against or assert appraisal rights with respect to, such sale of the Company, and to take all actions reasonably requested in order to consummate such sale. |
| **Preemptive Rights:** | Each Stockholder that, together with its affiliates, holds at least 1% of the issued and outstanding Common Stock will have preemptive rights to |

| | subscribe for its pro rata share of any equity securities (including securities convertible into or rights to subscribe for or purchase equity securities) issued by the Company or any of its subsidiaries, or to participate in its pro rata share of any issuance of debt securities to, or borrowing of any money (in the form of a term loan or otherwise) from, any Stockholders or affiliate thereof directly or indirectly, subject to customary exceptions. |
|---|---|
| **Amendments:** | Amendment of the organizational documents of the Company shall generally require approval of the Board and the holders of a majority of the issued and outstanding Common Stock; provided that (a) any amendment that would (i) have a material and adverse effect on any Stockholder's rights with respect to a Tag-Along Sale or Drag-Along Sale, the right of first offer or a pre-emptive rights issuance, or on other customary matters (such as no requirement to make additional capital contributions or limited liability), or (ii) would have a disproportionate material adverse effect on any Stockholder compared to other Stockholders (including by modifying such Stockholder's director or observer appointment rights) shall require the written consent of such Stockholder and (b) any amendment that does not adversely affect any Stockholder in any material respect may be made by the Board, without the consent of any Stockholder, to the extent permitted by law. |
| **Information Rights:** | The Company will provide each Stockholder with annual audited and quarterly unaudited financial statements, within customary time periods following the end of the relevant reporting period or event and subject to customary exceptions and limitations, as applicable.  In addition, each Stockholder that, together with its affiliates, holds at least 1% of the issued and outstanding Common Stock shall be invited to attend a conference call held by the Company to discuss the results of operations for the relevant reporting period and to answer questions posed by Stockholders with regard to those results (provided that such calls shall not start until 1 year following emergence unless the Board elects to have them commence sooner), and shall have other reasonable access rights. |

**Schedule I**

*[Omitted from Filing Version]*

## EXHIBIT C

**DIP Credit Agreement**

**[Filed on Docket]**

## EXHIBIT D

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among Careismatic Brands, LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions of the Agreement as a Consenting Stakeholder, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____

Name:
Title:
Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Loans | |
| Interests | |

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT E

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Careismatic Brands, LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof and receive the rights and benefits thereto to the extent the Transferor was thereby bound and received such rights and benefits, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

This Transfer Agreement shall be governed by the governing law set forth in the Agreement.

Date Executed:

_____
Name:
Title:
Address:


E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| First Lien Loans | |
| Interests | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**<u>Exhibit C</u>**

**Organizational Structure Chart**



# Careismatic Brands Organization Chart

**<u>Exhibit D</u>**

**Liquidation Analysis**

[*To be filed at a later date*]

**Exhibit E**

**Financial Projections**

[*To be filed at a later date*]

**<u>Exhibit F</u>**

**Valuation Analysis**

[*To be filed at a later date*]