**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted pro hac vice)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
jsussberg@kirkland.com

Chad J. Husnick, P.C. (admitted pro hac vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
chusnick@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel to the Debtors and Debtors in*
*Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| CAREISMATIC BRANDS, LLC, *et al.*, | Case No. 24-10561 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO THE SECOND AMENDED JOINT
PLAN OF REORGANIZATION OF CAREISMATIC BRANDS, LLC AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.donlinrecano.com/careismatic.  The location of Debtor Careismatic Brands, LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is:  1119 Colorado Avenue, Santa Monica, California 90401.

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF CAREISMATIC BRANDS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.[2]

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, attached hereto as **Exhibit A**, or the *Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 298] (the "Disclosure Statement Motion").

**HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN)**

WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND
FORWARD-LOOKING STATEMENTS**

The Plan and Disclosure Statement have neither been filed with, nor approved or disapproved by, the SEC or any similar federal, state, local, or foreign federal regulatory authority and neither the SEC nor any such similar regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue-Sky Laws"). Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock and Second Lien Warrants under the Plan (other than any New Common Stock underlying the Management Incentive Plan), and to the extent such exemption is not available, then the Debtors shall seek to offer, issue, and distribute such New Common Stock and Second Lien Warrants under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Neither the Solicitation Materials nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration and will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

This Disclosure Statement contains "forward-looking statements" within the meaning of United States securities laws. Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward-looking statements." However, not all forward-looking statements in this Disclosure Statement may contain one or more of these identifying terms. Forward-looking statements are based on the Debtors' current expectations, beliefs, assumptions, and estimates. These statements are subject to significant risks, uncertainties and assumptions that are difficult to predict and could cause actual results to differ materially and adversely from those expressed or implied in the forward-looking statements. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- Business strategy;

- Financial condition, revenues, cash flows, and expenses;

- The adequacy of the Debtors' capital resources and liquidity;

- Levels of indebtedness, liquidity, and compliance with debt covenants;

- Financial strategy, budget, projections, and operating results;

- The amount, nature, and timing of capital expenditures;

- Availability and terms of capital;

- Successful results from the Debtors' operations;

- The integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- Costs of conducting the Debtors' other operations;

- General economic and business conditions;

- Effectiveness of the Debtors' risk management activities;

- Counterparty credit risk;

- The outcome of pending and future litigation;

- Uncertainty regarding the Debtors' future operating results;

- Plans, objectives, and expectations;

- Risks in connection with acquisitions;

- The potential adoption of new governmental regulations; and

- The Debtors' ability to satisfy future cash obligations.

**Statements concerning these and other matters are not guarantees of the Post-Effective Date Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Post-Effective Date Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties and factors may include the following: (a) the Debtors' ability to confirm and consummate the Plan; (b) the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; (c) the Debtors' ability to reduce their overall financial leverage; (d) the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; (e) the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; (f) customer responses to the Chapter 11 Cases; (g) the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; (h) the Debtors' plans, objectives, business strategy, and expectations with respect to future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (i) the Debtors' levels of indebtedness and compliance with debt covenants; (j) additional post-restructuring financing requirements; (k) the amount, nature, and timing of the Debtors' capital expenditures and cash requirements, and the terms of capital available to the Debtors'; (l)**

the effect of competitive products, services, or procuring by competitors; (m) the outcome of pending and future litigation claims; (n) the proposed restructuring and costs associated therewith; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) the Debtors' ability to implement cost-reduction initiatives in a timely manner; (q) adverse tax changes; (r) the terms and conditions of the Exit Financing Arrangements, as applicable, and the New Common Stock and Second Lien Warrants, to be entered into, or issued, as applicable and as the case may be, pursuant to the Plan; (s) the results of renegotiating certain key commercial agreements and any disruptions to relationships with landlords, suppliers, partners, among others; (t) compliance with laws and regulations; and (u) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, you cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................ 1

II.  PRELIMINARY STATEMENT ................................................................... 1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .................................................................. 4

A.  What is chapter 11? ............................................................................ 4
B.  Why are the Debtors sending me this Disclosure Statement? ............ 4
C.  Am I entitled to vote on the Plan? ..................................................... 4
~~D.~~  ~~What is the "toggle" feature of the Plan?~~ ...................................... ~~5~~
~~E~~D.  What is the ~~Sale~~Recapitalization Transaction under the Plan? ...... 5
~~F.~~  ~~What is the Recapitalization Transaction under the Plan?~~ ............ ~~6~~
~~G.~~  ~~When will I be informed if the Debtors "toggle" to a Recapitalization Transaction?~~ ................................................. ~~6~~
~~H~~E.  What will I receive from the Debtors if the Plan is consummated? ... ~~6~~5
~~I~~F.  What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, Professional Fee Claim, or a Priority Tax Claim? ................................................................... ~~10~~9
~~J~~G.  Are any regulatory approvals required to consummate the Plan? ..... ~~13~~1
~~K~~H.  What happens to my recovery if the Plan is not confirmed or does not go effective? ................................................................ ~~13~~1
~~L~~I.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .......................................................... ~~13~~1
~~M~~J.  What are the sources of Cash and other consideration required to fund the Plan? .... ~~13~~1
~~N~~K.  Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11? ........................................ ~~14~~2
~~O~~L.  Is there potential litigation related to the Plan? .............................. ~~14~~2
~~P~~M.  What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? .............................. ~~14~~2
~~Q~~N.  Does the Plan preserve Causes of Action? ........................................ ~~15~~3
~~R~~O.  Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ................................................... ~~15~~3
~~S~~P.  When is the deadline to vote on the Plan? ......................................... ~~21~~9
~~T~~Q.  How do I vote on the Plan? ................................................................ ~~21~~9
~~U~~R.  Why is the Bankruptcy Court holding a Confirmation Hearing? ....... ~~21~~9
~~V~~S.  What is the purpose of the Confirmation Hearing? ........................... ~~21~~9
~~W~~T.  What is the effect of the Plan on the Debtors' ongoing businesses? .. ~~21~~9
~~X~~U.  Will any party have significant influence over the corporate governance and operations of the Post-Effective Date Debtors? .............. ~~21~~0
~~Y~~V.  Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................ ~~22~~0
~~Z~~W.  Do the Debtors recommend voting in favor of the Plan? ................... ~~22~~0
X.  Does the Committee recommend voting in favor of the Plan? ........... 21
~~AA~~Y.  Who Supports the Plan? ...................................................................... ~~23~~1

IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
       OVERVIEW ...................................................................................................... 231

       A.    Careismatic's Corporate History and Business Operations. ...................... 231
       B.    The Debtors' Organizational and Capital Structure. ................................. 275

V.     EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................. 3028

       A.    Challenges Facing the Debtors' Business. ................................................ 3028
       B.    Proactive Approach to Address Financial and Operational Issues. ........... 3129

VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE
       CHAPTER 11 CASES ...................................................................................... 320

       A.    First Day Relief. ....................................................................................... 320
       B.    Approval of the DIP Facility. ................................................................... 331
       C.    Appointment and Reconstitution of Unsecured Creditors' Committee. .... 342
       D.    Sale Process and Bidding Procedures. ...................................................... 342
       E.    Establishment of Claims Bar Dates. ......................................................... 342
       F.    Litigation Matters. .................................................................................... 364
       G.    Filing of Schedules. .................................................................................. 364
       H.    Proposed Confirmation Schedule. ............................................................. 364
       I.    Committee Standing Motion. .................................................................... 375
       J.    Investigations of Transaction Committees. ............................................... 375
       K.    The Committee Settlement. ...................................................................... 41

VII.   SUMMARY OF THE PLAN ............................................................................ 3942

       A.    General Settlement of Claims, Interests, and Intercompany Interests. ...... 402
       B.    Restructuring Transactions. ...................................................................... 403
       C.    Section 1146 Exemption. .......................................................................... 413
       D.    The Recapitalization Transaction. ............................................................ 414
       E.    The Sale Transaction. ............................................................................... 47
       FE.   Cancellation of Existing Agreements, Interests, and Intercompany Interests. ... 5149
       F.    The GUC Trust. ........................................................................................ 50
       G.    Preservation of Causes of Action. ............................................................ 52
       H.    Closing the Chapter 11 Cases. ................................................................. 53

VIII.  OTHER KEY ASPECTS OF THE PLAN .......................................................... 53

       A.    Treatment of Executory Contracts and Unexpired Leases. ....................... 53
       B.    Conditions Precedent to Confirmation and Consummation of the Plan. .... 57

IX.    RISK FACTORS ................................................................................................ 589

       A.    Bankruptcy Law Considerations. .............................................................. 59
       B.    Risks Related to Recoveries Under the Plan. ............................................ 63
       C.    Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses. ... 645
       D.    Risks Related to the Offer and Issuance of Securities Under the Plan. ...... 689

X.     SOLICITATION AND VOTING PROCEDURES ............................................. 701

       A.    Holders of Claims Entitled to Vote on the Plan. ...................................... 701
       B.    Voting Record Date. ................................................................................. 71

C.     Voting on the Plan. ........................................................................................... 71
D.     Ballots Not Counted. ......................................................................................... 71 2
E.     Votes Required for Acceptance by a Class. ...................................................... 71 2
F.     Certain Factors to Be Considered Prior to Voting. ........................................... 72
G.     Solicitation Procedures. .................................................................................... 72 3

XI.    **CONFIRMATION OF THE PLAN** .......................................................................... **73**

A.     The Confirmation Hearing. ................................................................................ 73
B.     Requirements for Confirmation of the Plan. ..................................................... 73 4
C.     Feasibility. ......................................................................................................... 74
D.     Acceptance by Impaired Classes. ...................................................................... 74
E.     Confirmation Without Acceptance by All Impaired Classes. ........................... 75
F.     Valuation of the Debtors. .................................................................................. 75 6
G.     Liquidation Analysis. ........................................................................................ 76

XII.   **CERTAIN SECURITIES LAW MATTERS** ............................................................. **76 7**

A.     New Common Stock. ......................................................................................... 76 7
B.     Exemption from Registration Requirements; Issuance of New Common Stock
       and Second Lien Warrants under the Plan. ....................................................... 77
C.     Resales of New Common Stock; Definition of "Underwriter" Under Section
       1145(b) of the Bankruptcy Code. ..................................................................... 78

XIII.  **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
       THE PLAN** ................................................................................................................. **81**

A.     Introduction. ...................................................................................................... 81
B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and
       the Post-Effective Date Debtors. ...................................................................... 82
C.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of
       Allowed Claims Entitled to Vote. ..................................................................... 86
D.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders
       of Allowed Claims Entitled to Vote. ................................................................. 92 3
E.     FATCA. .............................................................................................................. 95 7
F.     Information Reporting and Backup Withholding. .............................................. 96 7

XIV.   **RECOMMENDATION OF THE DEBTORS** ........................................................... **97 8**

**EXHIBITS[1]**

EXHIBIT A     Plan of Reorganization

EXHIBIT B     RSA

EXHIBIT C     Organizational Structure Chart

EXHIBIT D     Liquidation Analysis

EXHIBIT E     Financial Projections

EXHIBIT F     Valuation Analysis

---

[1]    Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION

Careismatic Brands, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Careismatic"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Second Amended Joint Plan of Reorganization of Careismatic Brands, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS ~~AND~~, THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RSA, AND THE COMMITTEE BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Careismatic is the leading designer, marketer, and distributor of medical apparel, footwear, and accessories.  Founded in 1995 in Chatsworth, California, Careismatic has grown from operating a single flagship brand, Cherokee Medical Uniforms ("Cherokee"), to a portfolio of seventeen brands.  Careismatic offers value to its stakeholders through its spectrum of medical apparel and workwear and omnichannel distribution capabilities across the globe.  Careismatic is the market leader in the $3 billion domestic medical scrubs industry with dominant positions in the wholesale and online marketplace segments.

Careismatic's mission is simple:  support those who care for others by providing a wide choice of products, technologies, and brands focused on the caregiver.  Through its commitment to this mission, Careismatic's portfolio of brands and products have become emblematic of patient care.  As its business has expanded over the years, Careismatic has continued to support caretakers and healthcare workers in delivering high-quality patient care in approximately 65 countries around the world.

Careismatic's commitment to caregivers was particularly visible during the COVID-19 pandemic, when Careismatic redoubled its efforts to stand by and support frontline workers.  The COVID-19 pandemic highlighted Careismatic's mission—finding new ways to elevate healthcare professionals by providing high-quality apparel and personal protective equipment—and how this mission remains central to Careismatic's growth.  The pandemic led to sharp increases in medical apparel demand, validating Careismatic's investments into new brands, technologies, and manufacturing capacity.  This confluence of factors led to record-setting revenue for Careismatic in both 2020 and 2021, with revenue growing to $687 million in 2021 (approximately 38% greater than the $498 million in revenue posted in 2019).

Despite this success, over the past two years certain operational and financial factors have stressed Careismatic's financial condition and ultimately necessitated the Debtors' commencement of these Chapter 11 Cases.  While Careismatic expanded capacity to meet market demand in 2020 and 2021, demand has normalized to its historical trendline in 2022 and 2023.  Macroeconomic issues, including a rapid and dramatic rise in interest rates, persistent supply chain disruptions, rising material costs, and a challenging labor market exacerbated significantly weaker industry-wide demand.  In addition to market headwinds and the challenges posed by rapidly shifting consumer preferences, the lingering effect of

Careismatic's legacy business model—including a lack of integration amongst acquired brands (leading to internal inefficiencies and redundancies), poor inventory forecasting and controls (further exacerbated by COVID-19 supply chain disruptions), and material ongoing litigation—has proved distracting, burdensome, and costly to the Debtors.

In an effort to address the significant headwinds and liquidity challenges facing Careismatic following the COVID-19 pandemic, in October 2022, investment vehicles managed or advised by Partners Group (USA) Inc. or its affiliates (collectively, the "Sponsor"), provided Careismatic with a much-needed infusion of capital in the form of the approximately $30 million unsecured Sponsor Loans.[2] In addition to the Sponsor Loans, beginning in late 2023, an affiliate of the Sponsor, party to that certain Services Agreement with Careismatic, dated as of January 6, 2021 (the "Services Agreement"), determined in effort to help preserve Careismatic's liquidity, it would defer reimbursement of certain expenses to which it is entitled under the Services Agreement, and defer and accrue the management fees due and owing pursuant to the Services Agreement, resulting in additional liquidity for Careismatic. Despite the Sponsor's material contributions and concessions, however, the market challenges and legacy obligations facing Careismatic persisted and have required additional action and contingency planning.

In recognition of the foregoing, over the course of the two months preceding the Petition Date, the Debtors, with the assistance of their advisors, and the support and cooperation of the Sponsor, engaged in detailed turnaround discussions and hard-fought negotiations with (i) the First Lien Ad Hoc Group holding approximately 73% of the First Lien Loans and approximately 20% of the Second Lien Term Loans (each as defined herein), represented by Milbank LLP, as legal counsel, and Houlihan Lokey Capital, Inc., as financial advisor, and (ii) the Cross-Holder Ad Hoc Group, holding approximately 3% of the First Lien Loans and 50% of the Second Lien Term Loans, represented by King & Spalding LLP. Since November, the Debtors have worked with the First Lien Ad Hoc Group on the terms of a go-forward restructuring, and, beginning in mid-January, the Debtors also engaged the Cross-Holder Ad Hoc Group to further build consensus. On January 22, 2024, after extensive, arm's-length negotiations, the Debtors entered into the Restructuring Support Agreement (the "RSA"), attached hereto as **Exhibit B**, with the First Lien Ad Hoc Group, the Cross-Holder Ad Hoc Group, and Partners Group (USA) Inc. and its affiliates that hold Claims against or Interests in one or more of the Debtors (the "Sponsor RSA Parties" and, together with all signatories to the RSA the "RSA Parties").

The key terms of the RSA, which are reflected in the Plan, include:

- the optionality to pursue a restructuring via (i) the sale of the New Common Stock or the all or substantially all of the Debtors' assets (the "Assets") or, in the event the Sale Process (as defined below) yields no Successful Bid, (ii) the equitization of 100% of the Allowed First Priority Claims (subject to dilution from the MIP Equity and the DIP Premiums, and, if applicable, the exercise of the Second Lien Warrants), subject to the DIP Premium Conversion Election Option;

- the DIP Facility, including $125 million new money debtor-in-possession financing, which shall, in the event of the Recapitalization Transaction, convert into the Exit Term Loan Facility;

- in the event of the Recapitalization Transaction, the total deleveraging of all prepetition funded debt on Careismatic's balance sheet through a debt-for-equity exchange of the First Priority

---

[2]   The Sponsor Loan Agreements (as defined below) were approved by Careismatic after the board of directors of CBI Parent, L.P. and Careismatic Brands, Inc. (n/k/a Careismatic Brands, LLC) were informed of the Sponsor Loans' terms, Careismatic's liquidity situation, and the availability of alternative financing from other sources.

Claims and Second Lien Warrants issued in satisfaction of the Allowed Second Lien Secured Claims;

- mutual releases between Careismatic and each of the RSA Parties, among others; and

- the cancellation of existing Interests.

To facilitate the postpetition marketing and sale process (the "Sale Process"), the Debtors filed a motion to establish procedures to govern an efficient marketing and auction process to realize the full value of the Assets or the New Common Stock (either the New Common Stock or Assets, the "Sale Package") [Docket No. 123] (the "Bidding Procedures Motion," the order approving the Bidding Procedures Motion [Docket No. 339], the "Bidding Procedures Order," and the procedures contemplated thereby and attached as Exhibit I to the Bidding Procedures Order, the "Bidding Procedures"). The Bidding Procedures provided the best path to (a) garner potential interest in the Sale Package, (b) receive the highest recovery available for all of the Debtors' stakeholders, and (c) conduct a market check on the value of the proposed recoveries to Holders of Claims contemplated by the Recapitalization Transaction while ensuring sufficient time to receive and evaluate bids, hold an Auction (if any) (as defined in the Bidding Procedures Motion), negotiate any and all necessary documentation, and confirm a plan of reorganization while remaining in compliance with the milestones set forth in the RSA and the DIP Credit Agreement. The Debtors, with the consent of the Required Consenting First Lien Lenders and after consultation with the Consultation Parties (as defined in the Bidding Procedures), subsequently extended the sale timeline set forth in the Bidding Procedures by filing the *Notice of Modified Sale Process Key Dates and Deadlines* [Docket No. 457] ("Sale Process Notice"), including extension of the deadline by which interested parties must submit binding bids until April 17, 2024, at 5:00 p.m. prevailing Eastern Time (the "Bid Deadline"). The Debtors did not receive any bids for the Sale Package in advance of the Bid Deadline. Accordingly, on April 17, 2024, the Debtors filed a *Notice of Cancellation of Action* [Docket No. 585] (the "Auction Cancellation Notice"), notifying all parties in interest that the Debtors, in accordance with the Bidding Procedures Order, had cancelled the Auction scheduled to occur on April 26, 2024 (if needed). The Plan includes a toggle structure whereby, if and when no bids were received, the Debtors can "toggle" to the Recapitalization Transaction, pursuant to which the Debtors will eliminate all prepetition funded debt via the equitization of all First Priority Claims in exchange for the New Common Stock. The Auction Cancellation Notice notified all parties in interest that the Debtors are pursuing the Recapitalization Transaction.

The DIP Credit Agreement and RSA contemplate the following milestones with respect to these Chapter 11 Cases and the Plan:

| Date | DIP / RSA Milestone |
|---|---|
| January 27, 2024 | Entry of the Interim DIP Order |
| March 1, 2024 | Entry of Final DIP Order. |
| March 1, 2024 | Entry of Bidding Procedures Order |
| March 7, 2024 | Filing of Plan and Disclosure Statement |
| April 21, 2024 | Entry of Disclosure Statement Order |
| May 31, 2024 | Entry of Confirmation Order |

The Plan includes a toggle structure to provide flexibility to implement a Sale Transaction or, if no Successful Bid is received in connection with the Sale Process, "toggle" to the Recapitalization Transaction, pursuant to which the Debtors will eliminate all prepetition funded debt via the equitization

~~of all First Priority Claims in exchange for the New Common Stock.~~ The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases and the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Donlin, Recano & Company, Inc., the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), actually receives such Ballots by May 23, 2024, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan includes customary debtor and third-party releases.  The CBI Parent Transaction Committee and the Intermediate Transaction Committee (together, the "Transaction Committees"), with the assistance of their respective counsel are (i) actively investigating potential Claims or Causes of Action that CBI Parent and CBI Intermediate, Inc. ("CBI Intermediate"), respectively, or their respective Estates may hold against certain insiders, affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions (each, an "Investigation" and together, the "Investigations").  The current findings and recommendations of the Investigations are set forth in Article VI.J.  The Debtors, acting at the direction of the Transaction Committees, and with the consent of the Required Consenting First Lien Lenders, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date pending the outcome of the Investigations.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim, Interest, or Intercompany Interest as of the Voting Record Date (*i.e.*, as of April 11, 2024) (as defined below).  Each category of Holders of Claims, Interests, or Intercompany Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims, Interests, and Intercompany Interests | Status | Voting Rights |
|-------|-----------------------------------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | First Priority Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class ~~6~~7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class ~~7~~8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class ~~8~~9 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D. What is the "toggle" feature of the Plan?**

~~The Plan will implement the Sale Transaction unless no Successful Bid is received in connection with the Sale Process, at which time the Debtors will pivot or "toggle" to the Recapitalization Transaction.  As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Plan did not include a "toggle" feature, which reduces expenses and permits the Debtors to emerge in either scenario on the expedited timeline currently contemplated.~~

~~A vote to accept the Plan is a vote to approve both the Sale Transaction and the Recapitalization Transaction.  If the Debtors "toggle" to the Recapitalization Transaction pursuant to the Plan, the Debtors will file and serve a notice of such Recapitalization Transaction in advance of the Confirmation Hearing.~~

**E. What is the Sale Transaction under the Plan?**

~~In the event of the Sale Transaction, a Purchaser would purchase either 100% of the New Common Stock or all or substantially all Assets through a Successful Bid (*i.e.*, a bid that is not a Credit Bid) following the Sale Process to be conducted pursuant to the Bidding Procedures.  Pursuant to the Bidding Procedures, a Successful Bid constitutes the highest or otherwise best bid to purchase the Sale Package and satisfies the Sale Transaction Trigger.[3] All Holders of First Priority Claims and DIP Claims~~

~~[3] business judgment, after consultation with the Consultation Parties, that acceptance of one or more Qualified Bids is value~~

are permitted to credit bid such Claims in connection with the Sale Process. However, the Sale Transaction will only be consummated where the Successful Bid is not a Credit Bid, otherwise the Plan shall "toggle" to the Recapitalization Transaction.

If the Sale Transaction is consummated, the sale proceeds provided by the winning bidder shall be distributed in accordance with the Plan. Holders of DIP Claims would receive payment in full in Cash (including all DIP Premiums), Holders of First Priority Claims would receive their *pro rata* share of Excess Distributable Consideration, Holders of Second Lien Secured Claims would receive their *pro rata* distribution of Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash, and Holders of General Unsecured Claims would receive their *pro rata* share of Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash.

**D.** **F. What is the Recapitalization Transaction under the Plan?**

The Plan contemplates that the Debtors will pursue a Sale Transaction to obtain a Successful Bid from a third-party Purchaser. If the Debtors do not receive a Successful Bid, or if the winning bid is a Credit Bid, the Debtors will "toggle" to the Recapitalization Transaction, which provides for the equitization of 100% of the Allowed First Priority Claims, subject to dilution from the (x) MIP Equity, (y) the DIP Premiums, and (z) if applicable, the exercise of the Second Lien Warrants, subject to the DIP Premium Conversion Election Option.

In the event of a Pursuant to the Recapitalization Transaction, (i) Holders of DIP Claims will receive (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full (including all DIP Premiums), (ii) Holders of First Priority Claims will receive their *pro rata* distribution of 100% of the New Common Stock (subject to dilution from (a) MIP Equity, (b) DIP Premiums, and (c) if applicable, the exercise of the Second Lien Warrants, subject to the DIP Premium Conversion Election Option), (iii) Holders of Second Lien Secured Claims will receive no recovery or distribution on account of their Allowed Second Lien Secured Claim; *provided* that, if the Second Lien Condition is satisfied, each Holder of an Allowed Second Lien Secured Claim will receive its *pro rata* share of the Second Lien Warrants, and (iv) Holders of General Unsecured Claims will receive no recovery or distribution on account of their Allowed General Unsecured Claims its *pro rata* share of the GUC Trust Net Assets.

**G. When will I be informed if the Debtors "toggle" to a Recapitalization Transaction?**

If the Debtors "toggle" to a Recapitalization Transaction in accordance with the Plan, then the Debtors will file and serve a notice of such Recapitalization Transaction in advance of the Voting Deadline (as defined in the Disclosure Statement Motion).

---

business judgment, after consultation with the Consultation Parties, that acceptance of one or more Qualified Bids is value maximizing for the Debtors' estates, and (ii) the Required Consenting First Lien Lenders consent to their treatment under the Sale Transaction (i) and (ii) collectively, the "Sale Transaction Trigger"); *provided* that the Required Consenting First Lien Lenders will be deemed to consent to any Sale Transaction that pays in full in cash all (i) Allowed DIP Claims, and (ii) Allowed First Priority Claims; *provided further* that any Sale Transaction that does not pay in full in Cash all Allowed DIP Claims is subject to the terms and conditions of the DIP Credit Agreement (including any applicable requirements to obtain the consent of the Requisite Lenders (as defined in the DIP Orders) or all affected DIP Lenders).

**E.** ~~**II.**~~ **What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims, Interests, and Intercompany Interests under the Plan.  Any estimates of Claims, Interests, and Intercompany Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

~~As of the date hereof, the Debtors believe that the Sale Process being conducted pursuant to the Bidding Procedures provides the best mechanism to estimate the post-Confirmation going concern value of the Debtors.  Because the Sale Process remains ongoing, pursuant to which the Debtors are soliciting bids for the New Common Stock or substantially all assets of the Debtors, the Debtors have not filed the Valuation Analysis (as defined herein) as of the date hereof.~~

~~**TO THE EXTENT THERE ARE NO QUALIFIED BIDS RECEIVED IN ADVANCE OF THE BID DEADLINE, THE DEBTORS WILL FILE THEIR VALUATION ANALYSIS ON APRIL 17, 2024 AFTER THE CONCLUSION OF THE BID DEADLINE (AS DEFINED IN THE BIDDING PROCEDURES) AND DISTRIBUTE A SUPPLEMENT TO THIS DISCLOSURE STATEMENT THAT PROVIDES AN ESTIMATE OF**~~ **THE PROJECTED RECOVERIES** ~~**TO ALL HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN**~~ **SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.** **FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**[43]

| Class | Claim/Interest/ Intercompany Interest | Treatment of Claim/ Interest/Intercompany Interest | Projected Allowed Amount of Claims | Estimated % Recovery ~~Under the Recapitalization Transaction~~ |
|---|---|---|---|---|
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim and at the option of the Debtors:<br><br>• payment in full in Cash of its Allowed Other Secured Claim; | $0 | 100% |

---

[43]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim/Interest/ Intercompany Interest | Treatment of Claim/ Interest/Intercompany Interest | Projected Allowed Amount of Claims | Estimated % Recovery ~~Under the Recapitalization Transaction~~ |
|---|---|---|---|---|
| | | <ul><li>the collateral securing its Allowed Other Secured Claim;</li><li>reinstatement of its Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or</li><li>such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.</li></ul> | | |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim, or as and when due in the ordinary course of business of the Post-Effective Date Debtors, or otherwise as consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $100,000 | 100% |
| Class 3 | First Priority Claims | Except to the extent that a Holder of an Allowed First Priority Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed First Priority Claim (or its designated Affiliate) managed fund or | $697,060,783.24 | ~~Unspecified[5]~~ 39.5%[4] |

[5] As described herein, the Debtors established a First Priority Claims Bid Deadline set forth in the *Notice of Modified Sale Process Key Dates and Deadlines* [Docket No. __] of May 6, 2024, at 5:00 p.m. prevailing Eastern Time. Because the Debtors do not want to prejudice the Sale Process by disclosing the estimated recoveries for First Priority Claims and Second Lien Secured Claims, such recovery is not estimated herein. As set forth herein, the Debtors will file the Valuation Analysis (as defined herein) and a supplement to this Disclosure Statement (the "Disclosure Statement Supplement") setting forth the projected recoveries on April 17, 2024 following the conclusion of the Bid Deadline. The Valuation Analysis and the Disclosure Statement Supplement shall be included in the Solicitation Packages (as defined in the Disclosure Statement Motion).

[4] The estimated recovery for First Priority Claims is based on a post-Effective Date Equity Value of approximately $275 million, as set forth in the Valuation Analysis attached hereto as **Exhibit F**. The estimated recovery for First Priority Claims does not account for dilution on account of the (i) MIP Equity, (ii) the DIP Premiums, and (iii) the exercise of the Second Lien Warrants (if applicable) and, therefore, the actual recovery for Holders of First Priority Claims may be lower.

| Class | Claim/Interest/ Intercompany Interest | Treatment of Claim/ Interest/Intercompany Interest | Projected Allowed Amount of Claims | Estimated % Recovery ~~Under the Recapitalization Transaction~~ |
|---|---|---|---|---|
| | | account, or other designee) shall receive, in full and final satisfaction of such Claim~~:~~<br><br>• ~~in the event of the Recapitalization Transaction,~~ its *pro rata* share of 100% of the New Common Stock (subject to dilution from (a) MIP Equity, (b) DIP Premiums, and (c) if applicable, the exercise of the Second Lien Warrants, subject to the DIP Premium Conversion Election Option)~~; or~~<br><br>• ~~.in the event of the Sale Transaction, its~~ *~~pro rata~~* ~~distribution of Excess Distributable Consideration.~~ | | |
| Class 4 | Second Lien Secured Claims | Except to the extent that a Holder of an Allowed Second Lien Secured Claim agrees to less favorable treatment on the Effective Date, each Holder of an Allowed Second Lien Secured Claim shall receive, in full and final satisfaction of such Claim:<br><br>• ~~in the event of the Recapitalization Transaction,~~ (~~A~~a) if the Second Lien Condition is not satisfied, no recovery or distribution on account of its Allowed Second Lien Secured Claim; and (~~B~~b) if the Second Lien Condition is satisfied, its *pro rata* share of the Second Lien Warrants~~; or~~<br><br>• ~~.in the event of the Sale Transaction, its~~ *~~pro rata~~* ~~distribution of the Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash.~~ | $~~60~~85,932,832.27 | ~~Unspecified~~N/A |

| Class | Claim/Interest/ Intercompany Interest | Treatment of Claim/ Interest/Intercompany Interest | Projected Allowed Amount of Claims | Estimated % Recovery ~~Under the Recapitalization Transaction~~ |
|---|---|---|---|---|
| Class 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim~~:~~<br>~~●~~, its *pro rata* share of the GUC Trust Net Assets.~~in the event of the Recapitalization Transaction, no recovery or distribution on account of such Allowed General Unsecured Claims; or~~<br>~~● in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash.~~ | $1~~67,639,762.~~30<br>~~6.4~~18.11 | ~~0~~2.5% |
| Class 6 | Subordinated Claims | Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Subordinated Claim shall receive, in full and final satisfaction of such Claim, no recovery or distribution. | $38,591,300.68 | 0% |
| Class ~~6~~7 | Intercompany Claims | Subject to any specific provisions contained in the Plan Supplement, each Intercompany Claim shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Claims, or such other treatment as determined by the Post-Effective Date Debtors and the Required Consenting First Lien | N/A | N/A |

| Class | Claim/Interest/Intercompany Interest | Treatment of Claim/Interest/Intercompany Interest | Projected Allowed Amount of Claims | Estimated % Recovery ~~Under the Recapitalization Transaction~~ |
|---|---|---|---|---|
| | | Lenders. | | |
| Class ~~7~~8 | Intercompany Interests | Subject to any specific provisions contained in the Plan Supplement, each Intercompany Interest shall be, at the option of the applicable Debtor or Post-Effective Date Debtor, in all cases with the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed), Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interests, or such other treatment as determined by the Post-Effective Date Debtors and the Required Consenting First Lien Lenders. | N/A | N/A |
| Class ~~8~~9 | Interests | On the Effective Date, all Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Interests. | N/A | N/A |

**F.** ~~1.~~ **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, Professional Fee Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims, Interests, and Intercompany Interests set forth in Article III of the Plan.

**1.    Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of DIP Claims, Professional Fee Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not

Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by a Debtor in the ordinary course of its business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors by the applicable Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Post-Effective Date Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

   **2.     DIP Claims.**

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to alternative treatment, and in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive: (i) in the event of the Recapitalization Transaction, either (a) such Holder's *pro rata* share of the Exit Term Loan Facility, subject to the DIP Premium Conversion Election Option, or (b) if there is an Acceptable Alternative Exit Facility, payment in Cash in full (including all DIP Premiums); or (ii) in the event of the Sale Transaction, payment in full in Cash (including all DIP Premiums). The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Documents as of the Effective Date. Any exercise of the DIP Premium Conversion Election Option shall be given effect in accordance with the terms of the DIP Credit Agreement, the Final DIP Order, and the Plan. The agreements set forth in section 10.8 of the DIP Credit Agreement shall survive the Effective Date, and, in the event the Exit Term Loan Facility is entered into, continue on the same terms set forth in the DIP Credit Agreement.

   **3.     Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

   **4.     Professional Fee Claims.**

   **a.     Final Fee Applications and Payment of Professional Fee Claims.**

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The

Post-Effective Date Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account.

**b. Professional Fee Escrow Account.**

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Post-Effective Date Debtors, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Post-Effective Date Debtors, without any further action or order of the Bankruptcy Court; provided, however, in the event of the Sale Transaction, any remaining amount in the Professional Fee Escrow Account shall constitute Residual Cash and be distributed to Holders of Allowed Claims in accordance with Article III of the Plan.

**c. Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three (3) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment. If a Professional does not provide an estimate, the Debtors or the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of determining the Professional Fee Amount.

**d. Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and/or the Post-Effective Date Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**5. Payment of Restructuring Expenses.**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases), without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be

submitted to the Debtors.  In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses arising directly out of the implementation of the Plan and Consummation thereof without any requirement for review or approval by the Bankruptcy Court or for any party to File a fee application with the Bankruptcy Court.

### G.    ~~J.~~ Are any regulatory approvals required to consummate the Plan?

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.  ~~In the case of a Sale Transaction, a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (and expiration or early termination of the waiting period thereunder) may be required as a condition precedent to any asset sale that exceeds the applicable size of the transaction threshold.~~

### H.    ~~K.~~ What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.

### I.    ~~L.~~ If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  *See* Article VIII.B of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Plan.

### J.    ~~M.~~ What are the sources of Cash and other consideration required to fund the Plan?

~~If the Recapitalization Transaction is consummated, the~~The Debtors shall fund or make distributions under the Plan, including the conveyance and funding of the GUC Trust Assets, as applicable, with:  (i) the proceeds from the Exit Financing Arrangements; (ii) the New Common Stock; (iii) the Debtors' Cash on hand; ~~and~~ (iv) the Second Lien Warrants; and (v) the proceeds of any Retained Causes of Action (if any).  The GUC Trust shall fund its distributions, as contemplated by the Plan, from the GUC Trust Net Assets.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and Second Lien Warrants (if applicable), is expected to be exempt from Securities Act registration, as described more fully in Article IV.D.9 of the Plan.

If the Sale Transaction is consummated, the Debtors shall fund distributions under the Plan with: (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors (if any). Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**K.** ~~N.~~ **Are there risks to owning the New Common Stock upon the Debtors' emergence from chapter 11?**

Yes. *See* Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**L.** ~~O.~~ **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article XI.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

On April 2, 2024, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 530] (the "Standing Motion"). The Standing Motion asserts, among other things, that the Committee should be granted standing to pursue, prosecute, and resolve, on behalf of the Estates: (i) a declaratory judgment that certain property of the Debtors is not subject to the liens or security interests granted to the Prepetition Secured Parties (as defined in the Final DIP Order); (ii) avoidance of certain unperfected liens and security interests asserted by the Prepetition Secured Parties against certain property of the Debtors; and (iii) an order reversing (or otherwise reserving for further investigation) certain of the other acknowledgements and agreements of the Debtors set forth in the Final DIP Order.

At the time of the filing of this Disclosure Statement, the Standing Motion is scheduled to be heard on April 23, 2024, and the Debtors' full response to the assertions and allegations set forth in the Standing Motion is forthcoming. For the avoidance of doubt, the Debtors intend to object to the Standing Motion. If the Bankruptcy Court were to grant the Standing Motion, it would unnecessarily extend these Chapter 11 Cases at great expense to the Debtors and their Estates and risk the highly consensual, value maximizing Restructuring Transactions the Debtors have negotiated.

On April 16, 2023, the Debtors filed the *Debtors' Objection to Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 578] (the "Standing Motion Objection"). As part of the Committee Settlement set forth in Article VI.K, the Settlement Parties have agreed to adjourn the hearing on the Committee's Standing Motion until the Confirmation Hearing currently scheduled for May 30, 2024. If the Plan that contemplates the Committee Settlement is not approved by the Bankruptcy Court, the Committee shall be entitled to prosecute the Standing Motion.

**M.    ~~P.~~ What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

~~In the event of a Recapitalization Transaction, f~~Following the Effective Date, the New Board shall adopt and implement the Management Incentive Plan, which provides that up to 15 percent of the New Common Stock as of the Effective Date, on a fully diluted basis, will be reserved for issuance to be used to incentivize and compensate employees, directors, consultants, and other service providers of the Post-Effective Date Debtors.  The terms of, and issuance of any awards under, the Management Incentive Plan shall be at the sole discretion of the New Board.

**N.    ~~Q.~~ Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity, whether arising before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Post-Effective Date Debtors; *provided* that, notwithstanding anything contained in the Plan, any Causes of Action against Non-Released Parties shall vest in the GUC Trust.  The Post-Effective Date Debtors ~~or the Plan Administrator, as applicable,~~ shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors~~,~~ or the GUC Trust, as applicable, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**No Person or Entity may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement to file motions or substitutions of parties or counsel in each such matter.

**O.    ~~R.~~ Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituencies in obtaining support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan and

among other things, the DIP Facility, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: (I) ALL HOLDERS OF CLAIMS THAT VOTE TO ACCEPT THE PLAN; (II) ALL HOLDERS OF CLAIMS WHO ARE DEEMED TO ACCEPT THE PLAN BUT WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN; (III) ALL HOLDERS OF CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN, OTHER THAN THOSE WHO WERE NOT SENT A BALLOT OR AN OPT OUT FORM IN ACCORDANCE WITH ANY FILED DISCLOSURE STATEMENT ORDER, AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN; AND (IV) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED FOR IN THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT OR NOTICE OF ~~NON-VOTING~~NON-VOTING STATUS INDICATING THAT THEY OPT NOT TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

The CBI Parent Transaction Committee and the Intermediate Transaction Committee (together, the "Transaction Committees"), with the assistance of their respective counsel are (i) actively investigating potential Claims or Causes of Action that CBI Parent and CBI Intermediate, respectively, or their respective Estates may hold against certain insiders, affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions (together, the "Investigations"). The current findings and recommendations of the Investigations are set forth in Article VI.J. The Debtors, acting at the direction of the Transaction Committees, and with the consent of the Required Consenting First Lien Lenders, reserve the right to revoke, withdraw, or modify the Plan in advance of the Confirmation Date pending the outcome of the Investigations.

1.      **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, ~~the Purchase Agreement (if applicable),~~ or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article**

**III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns.  The Holders of such Secured Claim (and the applicable agents for such Holders) shall be directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (or the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

2.       **Releases by the Debtors.**

Notwithstanding anything contained herein, in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each of the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors, their Estates, and, if applicable, the Post-Effective Date Debtors, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any aAvoidance aActions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Post-Effective Date Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, their Estates, the Post-Effective Date Debtors, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Exit Financing Arrangements, the Exit Facilities Documents, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Debtors do not, pursuant to the releases set forth above, release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) the Non-Released Parties, and (iii) any post-Effective Date obligations of any party of Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the

Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Post-Effective Date Debtors, asserting any claim or Cause of Action released pursuant to the Debtor Release.

3.        Releases by Holders of Claims, Interests, and Intercompany Interests.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, each of the Released Parties, will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim, Interest, or Intercompany Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among the Debtors and any Released Party, the distribution of any Cash or other property to any Released Party, the assertion or enforcement of rights or remedies against any Person, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the decision to File the Chapter 11 Cases, any intercompany transactions, the negotiation, formulation, documentation, preparation, or consummation of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Exit Financing Arrangements, the Exit Facilities Documents, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) the Non-Released Parties, and (iii) any post-Effective Date obligations of any party of Entity under the

Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt, no Non-Released Party shall be a Releasing Party or a Released Party under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases provided in Article VIII.D of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the releases provided in Article VIII.D of the Plan are: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the releases contained in Article VIII.D of the Plan; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to Article VIII.D of the Plan.

4.    Exculpation.

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Restructuring Transactions, the First Lien Credit Documents, the Second Lien Credit Documents, the New Organizational Documents, the New Common Stock, the Second Lien Warrants Documents, the Second Lien Warrants, the DIP Documents, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Post-Effective Date Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

For the avoidance of doubt, no Non-Released Party shall be an Exculpated Party under the Plan.

5.    Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all

Entities who have held, hold, or may hold Claims, Interests, or Intercompany Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors' Estates vested in the Post-Effective Date Debtors has been liquidated and distributed in accordance with the terms of the Plan, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Intercompany Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Intercompany Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action constitutes a direct or derivative claim and represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims, Interests, or Intercompany Interests, and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim, Interest, or Intercompany Interests, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim, Interest, or Intercompany Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

For the avoidance of doubt, nothing in the Plan, including, without limitation, the third-party release and injunction provisions, shall, and shall not be deemed to, prevent or impair the prosecution of the M&R Action against any non-Debtor defendants thereto (the "Non-Debtor Defendants"); *provided* that all rights are reserved as to ability of the Non-Debtor Defendants to assert defenses in the M&R Action, including, without limitation, that any claim in the M&R Action is derivative of the Debtors' rights or is otherwise property of the Debtors' Estates;

*provided further* **that the Bankruptcy Court shall retain exclusive jurisdiction with respect to the foregoing, as set forth in Article XI of the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**P.** ~~S.~~ **When is the deadline to vote on the Plan?**

The Voting Deadline is May 23, 2024, at 4:00 p.m. (prevailing Eastern Time).

**Q.** ~~T.~~ **How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballot"). For your vote to be counted, the Ballot containing your vote must be properly **completed, executed, and delivered as directed so that it is actually received Claims and Noticing Agent on or before the Voting Deadline,** *i.e.,* **May 23, 2024, at 4:00 p.m., prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures," for additional information.

**R.** ~~U.~~ **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**S.** ~~V.~~ **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**T.** ~~W.~~ **What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code or pursuing a going-concern sale. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Post-Effective Date Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**U.    ~~X.~~Will any party have significant influence over the corporate governance and operations of the Post-Effective Date Debtors?**

~~In the event of the Recapitalization Transaction, as~~As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, which shall be consistent in all respects with the Governance Term Sheet.  Each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.

~~In the event of the Sale Transaction, as of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed; *provided* that in the event of the Recapitalization Transaction, the New Board shall be appointed pursuant to the terms set forth in the Governance Term Sheet.~~

~~As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, or other governing body, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, including those powers set forth in Article IV.E of the Plan.~~

~~The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers.~~

**V.    ~~Y.~~Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Donlin, Recano & Company, Inc., via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Donlin, Recano & Company, Inc.
> c/o Equiniti
> Re: Careismatic Brands, LLC, et al.
> 48 Wall Street, 22nd Floor
> New York, NY 10005
>
> *By electronic mail at:*
> cbinfo@drc.equiniti.com
>
> *By telephone (toll free) at:*
> 800-416-3743 (domestic) or 212-481-1411 (international) and request to speak with a member of the Solicitation Team.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the documents from the Debtors' restructuring website at www.donlinrecano.com/careismatic (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**W.** ~~Z.~~ **Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan is in the best interest of all Holders of Claims and Interests and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan. ~~A Sale Transaction will significantly delever the Debtors' balance sheet, and a Recapitalization Transaction, if any, will only allow for a higher or otherwise better recovery (in addition to deleveraging the balance sheet). Either a Sale Transaction or Recapitalization Transaction~~ The Plan will allow for a quick confirmation by no later than 130 calendar days after the Petition Date.

**X.** **Does the Committee recommend voting in favor of the Plan?**

Yes. As detailed in the *Open Letter to Holders of General Unsecured Claims in Class 5 Recommending That They Vote to Accept the Debtors' Plan* (the "Committee Letter"), which is included in the Solicitation Materials, the Committee believes the Plan is in the best interests of Holders of General Unsecured Claims and recommends voting in favor of the Plan. Holders of Allowed General Unsecured Claims in Class 5 will each receive their *pro rata* share of the GUC Trust Net Assets, which includes $3.5 million in Cash and the assignment of certain GUC Trust Claims to the GUC Trust.

**Y.** ~~AA.~~ **Who Supports the Plan?**

The Plan is supported by the Debtors, the Committee, and the Holders of Claims, Interests, and Intercompany Interests that have agreed to the RSA and the Restructuring Term Sheet, which include (i) the First Lien Ad Hoc Group, (ii) the Cross-Holder Ad Hoc Group, (iii) the Sponsor RSA Parties, and (iv) parties that participated in the DIP Facility Subscription (as defined in the Restructuring Term Sheet) and executed joinders to the RSA in connection therewith (collectively, the "RSA Joinder Parties"). Signatories to the RSA, including the First Lien Ad Hoc Group, the Cross-Holder Ad Hoc Group, and the RSA Joinder Parties, collectively hold approximately 90% of First Lien Term Loan Claims, 11% of First Lien RCF Claims, and 70% of Second Lien Claims.

## IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. Careismatic's Corporate History and Business Operations.

#### 1. Corporate History.

Established in 1995 in Chatsworth, California, the Debtors (at the time, operating under the name Strategic Partners), purchased Cherokee, one of the most popular brands of "scrubs," out of bankruptcy, becoming Careismatic's first and flagship brand.



Over time, Careismatic has expanded to become a portfolio of reliable brands, offering a wide array of medical apparel, footwear, and accessories across distribution channels. Careismatic's initial growth is attributable to their innovative design and licensing partnerships. Careismatic began entering into licensing agreements with brands such as Disney and Marvel to create themed scrubs designed for pediatric use. As one of the first companies to put cartoon characters on medical scrubs, Careismatic's partnerships with Disney, Marvel, and others created a new market segment. In 2009, Careismatic extended this strategy further by entering into a licensing agreement to sell its medical apparel under the Dickies brand—one of the most trusted brands in workwear.



During this period, Careismatic also position as the premier player in the medical apparel wholesale market. Working with its national retailer clients, Careismatic became one of the first medical apparel companies to invest online by building out the retailers' web stores, which were designed for Careismatic to receive and fulfill customer orders without the retailer needing to hold Careismatic's inventory. These growth strategies worked: by 2010, Careismatic had over 500 employees and dozens of retailer clients.

After over 20 years of sustained growth, Careismatic, recognizing a shift in the medical apparel marketplace, looked to enter its next stage of growth by building out its online marketplace presence (*e.g.*, Amazon) and DTC offerings. In 2016, under new leadership, Careismatic invested heavily in its online presence to keep up with its competitors. These investments also marked an evolution of Careismatic's image from a wholesale supplier to a more dynamic business serving both large retailer clients and end customers (*i.e.*, healthcare workers).

More recently, recently, Careismatic has conducted a rebranding to Careismatic Brands in 2020 and was acquired by funds managed by Partners Group—its current Sponsor—in 2021. More importantly, during the subsequent period, Careismatic's brand acquisition and development strategies have evolved. Instead of entering licensing agreements with non-medical brands to emboss on Careismatic's apparel, Careismatic acquired brands to adapt to shifting customer expectations. Careismatic also built a broad portfolio that could provide scale to its distribution platform and leverage Careismatic's technology, manufacturing capabilities, and network to serve diverse customer needs.

Today, Careismatic's portfolio of brands includes Cherokee, Classroom Uniforms, AllHeart, Infinity, Med Couture, Scrubstar, Heartsoul Scrubs, Silverts Adaptive Apparel, Healing Hands Scrubs, Medelita, and BALA Footwear.  These brands account for approximately 88% of Careismatic's revenues. Below is a timeline of Careismatic's key acquisitions:



- **Classroom Uniforms**.  One of the first brands acquired by Careismatic, Classroom Uniforms, along with its sister brand Real School, has been a leader in the school uniform space since 1995.

- **AllHeart**.  Acquired in 2018, AllHeart is an online store for medical apparel, footwear, accessories, and medical devices.  AllHeart sells a wide range of brands under its own labels (*AllHeart, AllHeart Basics, and AllHeart Luxe Supreme*), other Careismatic brands, and other market-leading brands.

   

- **Healing Hands Scrubs**.  Healing Hands is a medical apparel company founded by Bansi Lakhani, who was inspired to create Careismatic after he received care from dedicated and caring nurses following a heart attack.  Based in New Jersey, Healing Hands offers premium scrubs for both men and women.

- **Infinity**.  Infinity is an imprint of Cherokee that sells scrubs and footwear, adapted to meet the needs of people working in demanding clinical environments.



- **Scrubstar.**  Offered exclusively through Walmart and Walmart.com, Scrubstar offers high-quality, comfortable medical apparel at unbeatable prices.

27

- **Medelita**.  Founded in 2008, Medelita is known for high-end, tailored medical apparel designs

 

  crafted from cutting-edge performance fabrics.

- **Med Couture**.  A premium medical apparel brand for women, Med Couture is sold through a number of brick-and-mortar and online retailers (including AllHeart.com and Amazon).  Med Couture also offers the Rothwear line of medical apparel for men.

- **Heartsoul Scrubs**.  A fierce, feminine, far-from-ordinary medical apparel brand for women with a huge and loyal following.  Offered online and at retailers nationwide.

- **Silverts Adaptive Apparel**.  For over 90 years, Silverts has been providing reliable adaptive apparel and footwear to fit a range of needs.

- **BALA Footwear.**  Founded in 2020 in Portland, Oregon, by former Nike executives Brian Lockard and John Eberle and former Under Armor executive Caprice Neely, BALA seeks to achieve comfort for its medical professional customers by leveraging features prevalent in athletic footwear.

  2.    **Business Operations.**

Headquartered in Santa Monica, California, Careismatic employs approximately 800 full-time U.S. employees, and generated approximately $559 million of revenue in 2023.  Through its portfolio of brands and distribution platform, including its one million square foot distribution facility in Texas, Careismatic serves every type of customer, at every price point, through all distribution channels. Careismatic's platform can be broadly segmented into (i) wholesale, (ii) Walmart, (iii) DTC, and (iv) online marketplace.

  a.    **Wholesale.**

Careismatic's wholesale business (both U.S. and international) remains its largest segment and it continues to dominate the market—making up over 50% of the U.S. wholesale market and one of the largest players globally.

Domestically, Careismatic's wholesale business contributes 46% of net sales of Careismatic. Careismatic has over 2,300 wholesale customers, comprised of national and regional retailers, independent stores, institutional purchasers (*e.g.*, hospitals, medical offices, patient care facilities), and independent websites. Medical scrubs make up approximately 90% of revenues from U.S. Wholesale customers. Key customers include national medical apparel retailers such as Uniform Advantage, Scrubs and Beyond, Uniform Destination, and Uniform Factory Outlet.

Careismatic's international wholesale business constitutes 9% of net sales. Careismatic's international wholesale customers span approximately 65 countries with its largest international markets being in Latin America, Canada, Europe, and the Middle East. Careismatic continues to prioritize the growth of its international business both through a dedicated international sales team and partnering with third-party logistics providers to better serve customers globally.

### b. Walmart.

Careismatic first began selling to Walmart in 1997. Today, Careismatic sells two brands through Walmart: (i) Scrubstar, a Walmart private label brand available in approximately 3,900 stores and online; and (ii) Genuine Dickies, a premium scrubs brands launched in 2022 (available in approximately 305 stores and online). Careismatic is uniquely able to meet Walmart's service level, pricing requirements, and geographic footprint. In addition, Careismatic offers Walmart store-specific analytics, which allow its stores to optimize sales and inventory productivity. While competitors have unsuccessfully attempted to become the primary supplier for Walmart, Careismatic has maintained pole position by delivering on consumer requirements, product quality, and service level requirements needed to serve Walmart at scale.

### c. Direct-to -Consumer.

Reorganizing changing consumer preferences, Careismatic has continued to invest in its DTC business. Careismatic believes that its DTC business will become a core source of growth in the years to come and a major driver of gross margin expansion. Careismatic's DTC strategy is focused on its single multi-site single check out portal (the "MSSC Portal"), which will allow Careismatic to efficiently scale its DTC business, enable Careismatic to fully capture retail economics, and reduce customer acquisition costs. Careismatic continues to work on integrating its brands to the MSSC Portal while simultaneously modernizing its Careismatic Rewards Program for a better retail user experience. In the future, Careismatic looks to leverage its DTC capabilities and expects significant margin expansion over the next five years.

### d. Online Marketplace.

Complementing Careismatic's direct-to-consumer segment, Careismatic began selling its products on Amazon and Walmart Marketplace in 2019. Careismatic's Online Marketplace is its fastest-growing segment, having grown 33% annually since 2019 and accounting for 16% of Careismatic's net sales today. Careismatic has an approximate 50% market share on Amazon. In addition to being the fastest growing segment, Online Marketplace sales have the highest gross margins (over 60%), which Careismatic expects to continue to improve driven by product assortment optimization and pricing management.

### 3. Recent Events.

Since 2021, the medical apparel industry has faced a variety of challenges, including a reversion to the mean demand following the pandemic, which indirectly created a spike in demand for Careismatic's products. COVID-19 also accelerated the average consumer's shift to purchasing online,

which has had an outsized benefit to apparel companies already focused on online distribution. The shift to online sales has invited new competition to the space, which has squeezed longtime industry players, such as Careismatic, out of otherwise available market share. Finally, recent shifts in technology companies' restrictions on targeted advertising has created severe disruption for ecommerce brands and markets.

Careismatic has been proactively addressing these challenges since 2021. In response to the COVID-19 supply chain disruption, Careismatic reduced its cash conversion cycle (*i.e.*, the number of days it takes Careismatic to convert inventory into cash from sales) by nearly half. Careismatic has also continuously worked to integrate its recently-acquired business lines to realize scale and eliminate redundancies. Careismatic also focused on a more efficient spend on advertising investments. Finally, and perhaps most importantly, new management has focused its efforts on (i) rebuilding customer relationships, (ii) improving margins through streamlined costs and optimized pricing, and (iii) transitioning from its legacy operational model to utilizing third parties to realize savings and reduce mandatory capital expenditures.

**B.      The Debtors' Organizational and Capital Structure.**

    **1.      Careismatic's Organizational Structure.**

An overview of Careismatic's current organizational structure, in simplified form, is reflected below. A comprehensive organization chart is attached hereto as **<u>Exhibit B</u>**.



## 2.    Careismatic's Prepetition Capital Structure.

As of the Petition Date, Careismatic had approximately $832.9 million in total outstanding funded debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| Facility | Maturity | Outstanding Principal Amount |
|---|---|---|
| **First Lien Term Loans** | January 2026 | $590 million |
| **First Lien Revolving Loans** | January 2028 | $100 million |
| **Second Lien Term Loans** | January 2029 | $110 million |
| **Sponsor Loans** | October 2025 | $32.9 million |
| **Total Outstanding Funded Debt:** | | **$832.9 million** |

### a. Prepetition ABL Facility.

Pursuant to that certain Credit and Security Agreement dated March 9, 2023 (as amended, restated, supplemented, or modified from time to time prior to, and in effect immediately before the Petition Date, the "ABL Facility") by and among Careismatic Receivables LLC, a Delaware limited liability company, as borrower, Careismatic Brands, LLC, a California limited liability company, as ~~Pennsylvania corporation, as~~ the servicer, administrator, and collector of the receivables, GLAS USA LLC, as administrative agent, GLAS Americas LLC, as collateral agent, KKR Credit Advisors (US) LLC, as structuring advisor, and the lenders party thereto from time to time, the Debtors have access to an asset-based revolving credit facility in an aggregate principal amount of $30 million.  The ABL Facility was set to mature on March 9, 2025.  On January 18, 2024, the Debtors determined to pay off the ABL Facility in the ordinary course of business.

### b. First Lien Credit Agreement.

The Debtors are obligors under that certain First Lien Credit Agreement, dated as of January 6, 2021 (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the First Lien Credit Agreement, dated as of June 8, 2023, the "First Lien Credit Agreement"), by and among CBI Intermediate, a Delaware corporation, as holdings, CBI Buyer, Inc., a Delaware corporation, as the Merger Sub or the Initial Borrower, New Trojan Parent, Inc., a Delaware corporation, as successor to Merger Sub and the Borrower, the lenders from time to time party thereto (the "First Lien Lenders"), and UBS AG, Stamford Branch, as administrative agent and collateral agent.  As of the Petition Date, an aggregate balance of approximately $690 million, including accrued and unpaid interest in outstanding loans under the First Lien Credit Agreement, consisting of approximately:  (i) $590 million outstanding of first lien term loans, which carry an interest rate of Adjusted Term SOFR plus 3.25% per annum, and mature on January 1, 2028 (together, the "First Lien Term Loans"); and (ii) $100 million of outstanding ~~of~~ first lien revolving loans, which carry an interest rate of Adjusted Term SOFR plus 3.75% (which may be decreased to 3.50% or 3.25% upon meeting certain deleveraging benchmarks), and mature on January 1, 2026 (the "First Lien Revolving Loans," and together with the First Lien Term Loans, the "First Lien Loans").  The First Lien Loans are secured by a first priority lien on substantially all of the Debtors' assets, excluding cash.

### c. Second Lien Credit Agreement.

On January 6, 2023, Debtor New Trojan Parent, Inc., a Delaware, LLC, as borrower, CBI Intermediate, a Delaware ~~C~~corporation~~,~~ as holdings, the lenders party thereto from time to time (the "Second Lien Lenders"), and UBS AG, Stamford Branch, as administrative and collateral agent entered into that certain Second Lien Credit Agreement (as amended by Amendment No. 1 to the Second Lien Credit Agreement, dated as of January 28, 2021, and as amended by Amendment No. 2 to the Second Lien Credit Agreement, dated as of June 8, 2023, the "Second Lien Credit Agreement").  As of the Petition Date, the aggregate balance of the term loans provided under the Second Lien Credit Agreement ~~are~~is approximately $110 million, including accrued and unpaid interest (the "Second Lien Term Loans").  The Second Lien Term Loans carry an interest rate of Adjusted Term SOFR plus 7.25% and mature~~s~~ on January 1, 2029.  The Second Lien Term Loans are secured by a second priority lien on substantially all of the Debtors' assets.

The relative rights and priorities of the First Lien Lenders and the Second Lien Lenders in respect of priority are set forth in that certain Junior Lien Intercreditor Agreement, dated as of January 6, 2021, between UBS AG Stamford Branch, in its capacity both as collateral agent under the First Lien Credit Agreement and collateral agent under the Second Lien Credit Agreement.

### d. Sponsor Loans.

On October 17, 2022, Careismatic Brands, LLC, a Delaware, LLC, as borrower, and the Sponsor, entered into a series of unsecured intercompany notes (collectively, the "Sponsor Loan Agreements" and the indebtedness thereunder, the "Sponsor Loans"). As of the Petition Date, the outstanding principal amount on account of the Sponsor Loans was $32.9 million, including accrued and unpaid interest. The Sponsor Loans bear an interest rate equal to 8% per annum, payable in kind. The Sponsor Loans have a maturity date of the earliest of: (i) October 17, 2025; (ii) the date of the consummation of a Change of Control (as defined in the Sponsor Loan Agreements); and (iii) the date of the consummation of a Qualifying IPO (as defined in the Sponsor Loan Agreements ).

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Challenges Facing the Debtors' Business.

At a critical time during its operational transformation, the Debtors are facing a set of unanticipated challenges and a constrained liquidity position. *First*, Careismatic is confronting a decline in demand as a result of the post-COVID-19 market-wide downturn in the medical apparel industry. *Second*, Careismatic is facing challenges posed by a higher interest rate environment and persistent supply chain disruptions. *Third*, the Debtors hold one-time legacy obligations in connection with the resolution of certain litigation and compensation to former employees and advisors. *Fourth*, the Debtors' current capital structure is overleveraged given the downward cash flow forecasts. Taken together, these factors have resulted in a significantly diminished operational and financial outlook for the Debtors. Simply put, without a comprehensive restructuring of their balance sheet, the Debtors will be unable to continue as a going concern.

### 1.    Softening Demand.

The COVID-19 pandemic caused a spike in market-wide demand for medical apparel in the United States and globally. To keep up with demand, Careismatic ramped up production, expanding its production capacity to meet customer needs. While Careismatic expects demand to return to levels consistent with historical growth rates, demand remains temporarily depressed as the market normalizes following all-time highs during 2020 and 2021. Today, aggregate demand is approximately 65% of 2020 and 2021 demand. Careismatic's cash position has been challenged as demand returns to its historical growth-rate more slowly than anticipated. Despite this, Careismatic firmly believes this is a trough period and not an indicator of future performance, as revenue growth is expected to return in the near term as demand for medical apparel rebounds to its historical growth rates.

### 2.    Increased Costs.

Like many businesses, Careismatic's business has not been immune to the consequences of markedly higher interest rates, persistent inflation, and macroeconomic headwinds that have reverberated through the economy. Beginning in 2021, rising interest rates, supply chain delays and the cost of materials, labor, and fuel, led to increased costs and reduced margins across Careismatic's portfolio. In 2021, Careismatic's interest expense increased to $42 million—over 82% greater than prior to the COVID-19 pandemic.[65]   In 2023, Careismatic's interest expense rose to an estimated $64

---

[65] Interest expense excludes interest income from the sale of certain interest rate swaps and mark-to-market gains on interest rate swaps retained.

million—approximately 42% greater than 2022 and 178% greater than 2019.  This has impacted profit margins.

### 3.    Ongoing Litigation.

Careismatic is involved in certain ongoing material litigation.  Some of the costs associated with these litigation matters are largely liquidated, and others continue to develop.  For either category, absent a comprehensive financial restructuring, the outcomes of such material litigation, including the cost of settlement, would constitute a significant decrease in liquidity that would alter Careismatic's ability to meet ordinary course obligations.

### 4.    Balance Sheet and Liquidity Constraints.

Due to the above-mentioned factors, Careismatic has experienced significant financial performance deterioration and liquidity constraints.  In 2023, Careismatic's estimated EBITDA dropped to $50 million (approximately 39% less than 2022 EBITDA), with estimated EBITDA falling to $5 million in the fourth quarter.  Today, the Debtors have approximately $12.4 million in remaining liquidity.  Accordingly, absent a comprehensive financial restructuring, it is highly unlikely that the Debtors would be able to continue to operate and meet their obligations as they become due.

## B.    Proactive Approach to Address Financial and Operational Issues.

### 1.    Operational Changes.

In response to growing liquidity issues, Careismatic, under new management, has taken steps to implement its "back to basics" plan by reducing expenditures, increasing operational efficiencies, and improving margins.  Careismatic has focused efforts across four major areas.  *First*, Careismatic continues to implement channel diversification strategies to reach both wholesale and retail customers.  With the latter, Careismatic is refining its DTC model to increase brand exposure and create a streamlined online shopping experience.  As it grows its DTC market share, Careismatic expects to realize greater profits by capturing full retail economics.

*Second*, Careismatic is restructuring its brand profile to more clearly align to customer needs.  To do so, Careismatic has taken its well-known brands and retooled them to target specific customer segments.  *Third*, Careismatic has continued to integrate recently acquired brands by conducting a top-to-bottom evaluation of its enterprise to reduce redundancies and drive operating inefficiencies.  This has lowered previous modules' costs by consolidating cross-platform brand work groups.  *Finally*, the Debtors have restructured their real estate footprint by consolidating facility locations and engaging third-party logistics providers where doing so would reduce costs (in particular, in operations in Canada and Europe).  As of February 2024, the Debtors commenced the transition from their historical facility locations in the United States to a third-party logistics provider, which transition remains ongoing.  These operating initiatives have had, and will continue to have, a significant positive impact on Careismatic's free cash, through reduced operating costs and improved margins.

### 2.    Enhanced Corporate Governance.

In connection with its contingency planning efforts and in consultation with its advisors, Careismatic reviewed its existing corporate governance infrastructure.  Careismatic determined that it was in the best interests of Careismatic and its stakeholders to establish two Transaction Committees and to appoint one experienced, independent and disinterested director to each:  (i) Harvey Tepner to the board of CBI Parent, and (ii) Roger Meltzer to the board of Intermediate (each, a "Disinterested Director" and collectively, the "Disinterested Directors").  Messrs. Tepner and Meltzer are the sole

members of the respective Transaction Committees and have full delegation of authority to make decisions related to the restructuring.  On December 29, 2023, Intermediate retained McDonald Hopkins LLC ("McDonald Hopkins") as independent counsel, and on January 8, 2024, CBI Parent retained Kobre & Kim LLP ("K&K") as independent counsel.  The Transaction Committees of CBI Parent and CBI Intermediate, with the assistance of their respective counsel, are (i) actively investigating potential claims or causes of action CBI Parent and CBI Intermediate, respectively, and/or their respective estates may hold against certain insiders, affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluating, among other things, the releases contemplated in the Restructuring Transactions.

> ### 3.      Liability Management Phase.

In the months leading up to these Chapter 11 Cases, Careismatic and its advisors, with the support and cooperation of the Sponsor, spent significant time exploring strategic alternatives.  As part of these efforts, Careismatic retained PJT, AlixPartners, and K&E, and with their assistance engaged Careismatic's existing stakeholders, including the First Lien Ad Hoc Group.   Unfortunately, Careismatic's cash position further deteriorated in the final months of 2023 and no actionable proposal materialized, reducing the possibility of a successful liability management transaction.  As a result, in December 2023, Careismatic and its advisors began preparing for the increasing necessity of a chapter 11 filing.

## VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   First Day Relief.

On the Petition Date, the Debtors filed the First Day Pleadings[76] designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Amended Declaration of Kent Percy, Chief Restructuring Officer of Careismatic Brands, LLC in Support of the Debtors' Chapter 11 Petitions and First Day Motion* [Docket No. 33], and below:

- **Schedules Extension Motion:**  Debtors' Motion Seeking Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) 2015.3 Reports, and (II) Granting Related Relief [Docket No. 4].

- **Creditor Matrix Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (C) Redact Certain Personally Identifiable Information, and (II) Granting Related Relief [Docket No. 5].

- **Case Management Motion:**  Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief [Docket No. 6].

---

[76]   The First Day Pleadings, and all orders for relief entered in these Chapter 11 Cases, can be viewed free of charge on the website of the Debtors' claims and noticing agent at https://www.donlinrecano.com/careismatic.

- **Donlin Recano Retention Application:**   Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date, and (II) Granting Related Relief [Docket No. 7].

- **NOL Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, and (II) Granting Related Relief [Docket No. 8].

- **Joint Administration Motion:**   Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief [Docket No. 9].

- **Taxes Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief [Docket No. 10].

- **Insurance & Surety Bond Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered Into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance and Surety Coverage, and (II) Granting Related Relief [Docket No. 11].

- **Utilities Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief [Docket No. 12].

- **Customer Programs Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief [Docket No. 13].

- **Critical Vendors Motion:**   Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (II) Granting Related Relief [Docket No. 14].

- **Wages Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No. 15].

- **Cash Management Motion:**   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Debtor Bank accounts, Business Forms, and Books and Records, and (D) Continue Intercompany Transactions, and (II) Granting Related Relief [Docket No. 16].

**B.      Approval of the DIP Facility.**

On February 29, 2024, the Bankruptcy Court entered an order [Docket No. 327] approving, on a final basis, the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final hearing, and (VII) Granting Related Relief* (the "Final DIP Order").  The DIP Facility consists of (i) a new-money super-senior secured delayed draw debtor-in-possession financing facility in an aggregate principal amount of $125 million, $50 million of which was made available upon the Court's entry of the Interim DIP Order and the remaining $75 million of which was made available following entry of the Final DIP Order, and (ii) the Debtors' use of Cash Collateral.

The "DIP to exit" structure of the DIP Facility will provide Careismatic with post-emergence liquidity that will position the Debtors' business for long-term success.  Absent entry into the DIP Facility, the Debtors will have insufficient liquidity to continue operating their enterprise and paying their debts as they come due, with no other readily available sources of additional financing.  As such, the DIP Facility is essential to the Debtors' realization of a successful, value-maximizing restructuring.

**C.      Appointment and Reconstitution of Unsecured Creditors' Committee.**

On February 2, 2024, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 136], as amended on February 14, 2024 [Docket No. 204], appointing the Committee.  The three-member Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and FTI Consulting LLC as its financial advisor.  The Committee originally consisted of Ball Up, LLC, Koi Design, LLC and Cordial Experience, Inc.   The Committee, as ~~reconstituted~~reconstituted, includes following entities:

- Ball Up, LLC;

- Angela Mendoza; and

- Koi Design, LLC

Immediately after the Committee's appointment, the Debtors began sharing diligence with the Committee, which remains ongoing.   The Debtors have also proactively engaged the Committee regarding the key components of these Chapter 11 Cases, including the Sale Process~~.  As a result of such discussions, information transfer and dialogue between the Debtors and the Committee remains ongoing~~, this Disclosure Statement, and the Plan.  Additional detail regarding the Committee Settlement is set forth in Article VI.K,

**D.      Sale Process and Bidding Procedures.**

As described above, in late January 2024, the Debtors, with the assistance of PJT Partners, Inc., investment bank to the Debtors, launched a comprehensive Sale Process ~~to engage interested third parties in the potential Sale Transaction~~.  In connection with the Sale Process, the Debtors, with the assistance of their advisors, filed the Bidding Procedures Motion, seeking authority to proceed with an expeditious, yet flexible, bidding and sale process.

On February 29, 2024, the Court entered the Bidding Procedures Order, authorizing the Debtors to (a) conduct the proposed Sale Process by which the Debtors will solicit and, if value-maximizing, in

accordance with the terms of the RSA and the Restructuring Term Sheet, select the highest or otherwise best offer(s)for the purchase of the Sale Package, and (b) establish certain dates and deadlines related thereto and schedule an Auction, if any.

On March 20, 2024, the Debtors filed the ~~Notice of Modified~~ Sale Process ~~Key Dates and Deadlines~~ [Docket No. 457]Notice, modifying the key dates and deadlines related to the Sale Process. On April 17, 2024 following termination of the Bid Deadline, and having received no binding bids as of such date, the Debtors filed the Auction Cancellation Notice, notifying all parties in interest of the cancellation of the Auction and the Debtors' pursuit of the Recapitalization Transaction.

**E.      Establishment of Claims Bar Dates.**

On February 29, 2024, the Bankruptcy Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date, Rejection Damages Bar Date, and Administrative Claims Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 338] (the "Bar Date Order"), setting bar dates by which certain entities holding Claims against Debtors that arose (or that are deemed to have arisen) prior to the Petition Date must file Proofs of Claim.  The Bar Date Order established the following bar dates:

| BAR DATES | |
|---|---|
| **General Claims Bar Date** | Establishing **April 2, 2024, at 5:00 p.m., prevailing Eastern Time**, as the last date and time for all Persons and Entities to submit proofs of claim based on prepetition claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code. |
| **Governmental Bar Date** | Solely as to Governmental Units, establishing **July 22, 2024, at 5:00 p.m., prevailing Eastern Time**, as the last date and time for each such Governmental Unit to file Proofs of Claim asserting Claims against any Debtor that arose on or before the Petition Date. |
| **Amended Schedules Bar Date** | In the event that the Debtors amend their Schedules (as defined herein), **establishing the later of (a) the General Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of the amendment to the Schedules, as the last date and time by which claimants holding Claims affected by the amendment must file Proofs of Claim against any Debtor.** |
| **Rejection Damages Bar Date** | Solely as to Claims arising from the Debtors' rejection of executory contracts and unexpired leases, **establishing the later of (a) (i) the General Claims Bar Date or (ii) the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease** as the last date and time by which claimants holding Claims based upon such rejection must file Proofs of Claim against any Debtor, **unless otherwise ordered by the Court**. |
| **Administrative Claims Bar Date** | Establishing the following dates and times as the last date and time for each entity (including individuals, partnerships, corporations, joint ventures, and trusts) to file proofs of claim based on any claim arising from costs and expenses of administration of the estates pursuant to section 503(b), other than section 503(b)(9) or 507(a)(2) of the Bankruptcy Code ("Administrative Claim") against any Debtors (the "Administrative Claims Bar Date," and |

|  | together with the General Claims Bar Date, the Governmental Bar Date, the Amended Schedules Bar Date, and the Rejection Damages Bar Date, as applicable, the "<u>Bar Date</u>" or "<u>Bar Dates</u>"): |
|  | For any Administrative Claims **arising on or prior to March 23, 2024, establishing April 2, 2024, at 5:00 p.m., prevailing Eastern Time**, as the last date and time by which claimants holding such Administrative Claims must file Proofs of Claim. |
|  | For any Administrative Claims **arising after March 23, 2024, such Claims must be filed by the earlier of:  (a) the 15th day of the month following the month in which the Claim arose and (b) 14 days following the effective date of any confirmed plan.** |

Pursuant to the Bar Date Order and in accordance with Bankruptcy Rule 3003(c)(2), any person or entity that is required, but fails, to file a Proof of Claim on or before the applicable Bar Date: (i) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a Proof of Claim with respect thereto); (ii) the Debtors and their property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (iii) such person or entity may will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (iv) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

**F.      Litigation Matters.**

On February 20, 2024, the Debtors commenced an adversary proceeding (the "<u>Adversary Proceeding</u>") seeking to extend the automatic stay to non-Debtor parties in the Los Angeles County Superior Court action captioned *Michelman & Robinson, LLP v. Partners Group et al.* (Case No. 23STVC05652) (the "~~Fee~~M&R Action").   On February 22, 2024, the Debtors filed the *Debtors' Motion for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Extends to the Fee Action; and in the Alternative, (II) Preliminarily Enjoining the Fee Action During the Pendency of These Chapter 11 Cases* [Adv. Proc. Docket No. 5] (the "<u>Motion to Enjoin</u>").

On March 8, 2024, the Debtors and the defendant, ~~Michelman & Robinson, LLP~~M&R, entered into the *Stipulation (I) Adjourning the Hearing on the Motion to Enjoin, (II) Setting the Discovery and Briefing Schedule Regarding the Motion to Enjoin, and (III) Extending the Answer Deadline* [Adv. Proc. Docket No. 11], which, among other things, adjourned the hearing on the Motion to Enjoin to April 30, 2024 at 2:30 p.m., prevailing Eastern Time.  <u>On April 8, 2024, the Debtors and M&R agreed to further adjourn the hearing on the Motion to Enjoin until May 30, 2024 at 10:00 a.m., prevailing Eastern Time [Adv. Proc. Docket No. 13].</u>

**G.      Filing of Schedules.**

On March 5, 2024, the Debtors filed their Schedules, which include, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

**H.      Proposed Confirmation Schedule.**

Under the DIP Credit Agreement and RSA, the Debtors agreed to certain milestones to ensure an orderly and timely implementation of the Restructuring Transactions.  The Debtors intend to proceed

swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to Careismatic's business, and curtail professional fees and administrative costs.  To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | April 11, 2024 |
| Solicitation Mailing Deadline | Three (3) business days following entry of the Disclosure Statement Order |
| Publication Deadline | Five (5) business days following entry of the Disclosure Statement Order |
| Plan Supplement Filing Deadline | The date that is no later than seven (7) days prior to the Voting Deadline |
| Voting Deadline | May 23, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Objection Deadline | May 23, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to File Voting Report | May 27, 2024 |
| Confirmation Brief and Confirmation Reply Deadline | May 27, 2024 |
| Confirmation Hearing Date | May 30, 2024, at 10:00 a.m., prevailing Eastern Time or such other date as may be scheduled by the Court |

## I.     Committee Standing Motion.

On April 2, 2024, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 530] (the "Standing Motion"), seeking authority to pursue, prosecute and resolve, on behalf of the Debtors' Estates, certain claims, as set forth in detail in the complaint attached as Exhibit B to the Standing Motion (the "Proposed Complaint").  The Standing Motion asserts, among other things, that the Committee should be granted standing to pursue, prosecute, and resolve, on behalf of the Estates:  (i) a declaratory judgment that certain property of the Debtors is not subject to the liens or security interests granted to the Prepetition Secured Parties (as defined in the Final DIP Order); (ii) avoidance of certain unperfected liens and security interests asserted by the Prepetition Secured Parties against certain property of the Debtors; and (iii) an order reversing (or otherwise reserving for further investigation) certain of the other acknowledgements and agreements of the Debtors set forth in the Final DIP Order.

~~At the time of the filing of this Disclosure Statement, the Standing Motion is scheduled to be heard on April 23, 2024, and the Debtors' full response to the assertions and allegations set forth in the Standing Motion is forthcoming.  For the avoidance of doubt, the Debtors intend to object to the Standing Motion.~~

On April 16, 2024, the Debtors filed the Standing Motion Objection [Docket No. 578].  As part of the Committee Settlement set forth in Article VI.K, the Settlement Parties have agreed to adjourn the hearing on the Committee's Standing Motion from April 23, 2024 until the Confirmation Hearing currently scheduled for May 30, 2024.  If the Plan that contemplates the Committee Settlement is not approved by the Bankruptcy Court, the Committee shall be entitled to prosecute the Standing Motion.

J.    **Investigations of Transaction Committees.**

In connection with its contingency planning efforts and in consultation with its advisors, Careismatic reviewed its existing corporate governance infrastructure. Careismatic determined that it was in the best interests of Careismatic and its stakeholders to establish two Transaction Committees and to appoint one experienced, independent and dDisinterested dDirector to each: (i) Harvey Tepner to the board of CBI Parent, and (ii) Roger Meltzer to the board of CBI Intermediate. Messrs. Tepner and Meltzer are the sole members of the respective Transaction Committees and have full delegation of authority to make decisions related to the restructuring. On December 29, 2023, CBI Intermediate retained McDonald Hopkins as independent counsel, and on January 8, 2024, CBI Parent retained K&K as independent counsel. On February 28, 2023, McDonald Hopkins and K&K retained Province, LLC ("Province"), as their financial advisor, to assist with evaluating Careismatic's solvency and financial condition at certain critical points. The Transaction Committees, with the assistance of their respective counsel, have and continue to (i) actively investigate potential claims or causes of action CBI Parent and CBI Intermediate, respectively, and/or their respective Estates may hold against certain insiders, Affiliates, and third parties that, if asserted, would increase recoveries to creditors, and (ii) evaluate, among other things, the releases contemplated by the Restructuring Transactions.

Over the course of the Investigations, K&K and McDonald Hopkins conducted 12 interviews and background discussions with, among others, current and former officers of the Debtors, current directors of the Debtors, representatives of the Sponsor, a representative of New Mountain Capital, LLC (together with its affiliates, "NMC"), a representative of NMC's investment banker in the acquisition of Careismatic by the Sponsor from NMC in 2021 (the "PG Acquisition"), Robert W. Baird & Co. Inc. ("Baird"), and a representative of the Debtors' auditor, Moss Adams LLP. Certain individuals sat for multiple sessions. ~~K&K and McDonald Hopkins collected over 54,000 documents from email collections and other internal documents of relevant custodians at Careismatic, the Sponsor, NMC, and Baird related to the Investigation Issues (as defined below), along with other materials and information gathered from public sources. With input from Messrs. Tepner and Meltzer, respectively, K&K and McDonald Hopkins performed targeted searches of the documents collected to identify those that were likely to be most relevant to the Investigation Issues.~~ A summary of the interviews is as follows:

| Individual | Background | Date/Duration | Participants |
|---|---|---|---|
| **Kent Percy (CBI)** | Chief Restructuring Officer (Jan. 2024 – Present)<br><br>Managing Director, AlixPartners (Sep. 2001 – Present) | 1/31/2024 (1 hour)<br><br>3/14/2024 (1 hour)<br><br>3/26/2024 (0.25 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>• Transaction Committees<br>• Province |
| **Chintan Shyani (CBI)** | Senior VP, Analytics & Supply Chain Planning (May 2023 – Present)<br><br>Senior VP, Analytics & Sales Operations (Dec. 2020 – May 2023)<br><br>Senior VP, Sales Planning & Analytics (Jan. 2017 – Dec. 2020)<br><br>Senior VP, Walmart Division, School Uniforms Division (Jan. 2013 – Jan. 2017)<br><br>VP, Sales Analytics | 3/7/2024 (2 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>• Province |

| | | | |
|---|---|---|---|
| | (Jul. 2011 – Jun. 2013) | | |
| **Sid Lakhani (CBI)** | CEO, CBI (Nov. 2023 – Present)<br><br>COO, CBI (Apr. 2022 – Nov. 2023)<br><br>CEO, Healing Hands (2010 – Apr. 2022)<br><br>VP, Krazy Katz Sportswear (Jan. 2007 – Sep. 2010) | 3/8/2024 (1 hour)<br>3/11/2024 (1 hour) | • Kobre & Kim<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>▪ Province |
| **Sean Bogue (CBI)** | CFO, CBI (Jun. 2023 – Present) | 3/14/2024 (1 hour)<br>3/26/2024 (0.25 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>• Province |
| **Michael Penner (CBI)** | Chairman, CBI Board (Mar. 2021 – Present)<br><br>Operating Partner, Partners Group (2022 – Present)<br><br>Chairman, Partners Group Canada (2022 – Present) | 3/27/2024 (2 hours)<br>4/2/2024 (1.5 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>▪ Kirkland & Ellis<br>▪ Skadden Arps<br>• Province<br>▪ |
| **Girisha Chandraraj (CBI)** | Former CEO of Careismatic Brands Inc. (Apr. 2022 – Nov. 2023)<br><br>Former Member of CBI Board of Directors (Apr. 2022 – Nov. 2023)<br><br>Co-Founder, RegVoyance (Jun. 2018 – Present) | 4/2/2024 (2 hours) | • Kobre & Kim<br>• Tucker Ellis<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>▪ Province |
| **Steve Davis (CBI)** | Director, CBI Parent LP (Jan. 2021 – Present)<br><br>Director, Trojan Parent, LLC (May 2017 – Dec. 2020)<br><br>Owner of Davis Advisory Services | 4/12/2024 (1 hour) | • Kobre & Kim<br>▪ McDonald Hopkins<br>▪ Skadden Arps<br>• Kirkland & Ellis<br>• Province<br>▪ |
| **Eric Lehman (CBI)** | Director, CBI Parent LP (May 2021 – Present) | 4/11/2024 (1.5 hours) | • Kobre & Kim<br>▪ McDonald Hopkins<br>▪ Skadden Arps<br>• Kirkland & Ellis<br>• Province |
| **Preston Grasty (Partners Group)** | Senior Investment Leader, Partners Group (July 2018 – Present)<br><br>Director & Member of Audit & Compensation Committees, CBI Parent, L.P. (2024 – Present)<br><br>Director, CBI Intermediate, Inc. (2024 – Present) | Dates:<br>1/26/2024 (1 hour)<br>3/20/2024 (2.5 hours) | • Kobre & Kim<br>• Ropes & Gray<br>• McDonald Hopkins<br>• Transaction Committees<br>▪ Province |

| | Director, New Trojan Parent, Inc. (2023 – Present) | | |
|---|---|---|---|
| **Chris Russell (Partners Group)** | Managing Director, Partners Group (Jan. 2018 – Present)<br><br>President and Treasurer, CBI Parent GP, LLC<br><br>Director, CBI Parent GP, LLC; CBI Parent LP, LP; CBI Midco, Inc; CBI Intermediate, Inc.; New Trojan Parent, Inc.; Trojan Holdco, Inc.; Trojan Buyer, Inc.; Strategic Partners Acquisition Corp.; Strategic Partners Corp.; Careismatic Brands, Inc. (Dec. 2020 – Aug. 2021; Mar. 2022 – Jan. 2023) | 3/18/2024 (2 hours) | • Kobre & Kim<br>• Ropes & Gray<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>• Province |
| **Matthew Tingler (Baird)** | Managing Director, Baird (Jul. 2009 – Present)<br><br>Deal lead for LBO | 3/20/2024 (1.5 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>• Paul Weiss<br>• Baird |
| **Lars Johansson (NMC)** | Managing Director, New Mountain (2007 – Present)<br><br>Director, Strategic Partners, Inc. (Jul. 2016 – Dec. 2020) | 3/15/2024 (2 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>• Kirkland & Ellis<br>• Province<br>• Paul Weiss |
| **Debbie Simon (Simon Financial)** | Founder and Principal, Simon Financial (2002 – Present) | 3/5/2024 (0.25 hours) | • Kobre & Kim |
| **Martin Hughes (Moss Adams)** | Audit Partner, Moss Adams (1989 – Present)<br><br>Managed CBI relationship | 3/18/2024 (0.5 hours) | • Kobre & Kim<br>• McDonald Hopkins<br>• Province |
| **Bob Rivollier (Ropes & Gray)** | Attorney, Ropes & Gray (Nov. 2016 – Present)<br><br>Assisted in drafting Singer Separation and Consulting Agreements | 4/1/2024 (1 hour) | • Kobre & Kim<br>• McDonald Hopkins<br>• Ropes & Gray |

K&K and McDonald Hopkins collected over 54,000 documents from email collections and other internal documents of relevant custodians at Careismatic, the Sponsor, NMC, and Baird related to the Investigation Issues (as defined below), along with other materials and information gathered from public sources. With input from Messrs. Tepner and Meltzer, respectively, K&K and McDonald Hopkins performed targeted searches of the documents collected to identify those that were likely to be most relevant to the Investigation Issues as follows:

| **Custodian** | **Affiliation** | **Date Range** | **Search Term Categories** |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| **1.** | **Kent Percy** | CBI | December 1, 2023 – Present | Terms related to corporate governance and loans |
| **2.** | **Chintan Shyani** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| **3.** | **Girisha Chandraraj** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| | | | January 1, 2023 – Present | Terms related to potential brand acquisitions |
| **4.** | **James Tagliani** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| **5.** | **Michael Singer** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| | | | January 1, 2020 – March 1, 2023 | Terms related to pending litigations and related law firms |
| **6.** | **Robert Pierpoint** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| **7.** | **Sean Bogue** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| **8.** | **Sid Lakhani** | CBI | January 1, 2020 – Dec 31, 2021 | Terms related to 2021 PG acquisition |
| | | | January 1, 2018 – Present | Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related |

| | | | party transactions, transfers |
|---|---|---|---|
| 9. **Michael Penner** | Independent Director | January 1, 2020 – Dec 31, 2021<br><br>January 1, 2018 – Present | Terms related to 2021 PG acquisition<br><br>Terms related to brand acquisitions, board governance, valuation and solvency analysis, loans, related party transactions, transfers |
| 10. **Christopher Russell** | PG | November 1, 2020 – November 30, 2023 | N/A – Documents produced by PG were responsive to certain diligence requests related to 2021 PG acquisition, corporate governance, and loans |
| 11. **Andrew Oliver** | PG | November 1, 2020 – November 30, 2023 | N/A – Documents produced by PG were responsive to certain diligence requests related to 2021 PG acquisition, corporate governance, and loans |
| 12. **Preston Grasty** | PG | November 1, 2020 – November 30, 2023 | N/A – Documents produced by PG were responsive to certain diligence requests related to 2021 PG acquisition, corporate governance, and loans |
| 13. **Ryan Ashley** | PG | November 1, 2020 – November 30, 2023 | N/A – Documents produced by PG were responsive to certain diligence requests related to 2021 PG acquisition, corporate governance, and loans |

To their knowledge, no documents, information, or witnesses were purposely withheld by Careismatic, the Sponsor, or NMC, although certain possible witnesses that are former employees of Careismatic did not respond to requests for interviews. Additionally, the Transaction Committees necessarily accepted as accurate and true the documents provided to them; if any of the information received is inaccurate, the Transaction Committees' conclusions could change. That said, the Transaction Committees have found no reason to not accept as true the documents provided to it.

### 1. Investigation of the CBI Parent Transaction Committee.

In accordance with its mandate, the CBI Parent Transaction Committee has conducted an Investigation to assess whether CBI Parent or its Estate hold colorable Claims or Causes of Action that, if pursued, could enhance creditor recoveries in these Chapter 11 Cases and identify whether, based on that assessment, modifications should be recommended to the proposed releases outlined in the Plan.

As part of the CBI Parent Independent Investigation, and as instructed by Mr. Tepner, K&K and Mr. Tepner identified certain transactions and issues involving the Debtors that may have affected CBI Parent, its Estate, and/or its creditors, including (a) the PG Acquisition; (b) a series of brand acquisitions undertaken by Careismatic since 2020 (the "Brand Acquisitions"); (c) certain other material transactions with third parties, including the Sponsor Loans and the ABL Facility; and (d) the conduct of CBI Parent's directors and officers in relation to key business decisions made by CBI Parent (collectively, the "Investigation Issues"), and have been evaluating the facts and circumstances surrounding these Investigation Issues.

As of the date of this Disclosure Statement, and based on interviews, records, and documents made available to K&K to date, as well as the financial analysis conducted by Province (collectively, the

"L.P. Investigation Record"), K&K's investigation, analysis, and review has identified certain former officers and directors and a former external advisor to Careismatic against whom certain colorable potential Claims may exist that may enhance creditor recoveries if pursued and/or who otherwise may have had conflicts of interest with Careismatic.  With the approval of Mr. Tepner, K&K recommended that the following be excluded from the proposed releases set forth in the Plan:

    1)      Michael L. Singer and the Singer Related Parties (as defined below);

    2)      Robert Pierpoint;

    2)      ~~Michelman & Robinson LLP ("M&R")~~; and

    3)      Sanford L. Michelman

As of the date of this Disclosure Statement, the Investigation of the CBI Parent Transaction Committee is substantially complete, and certain issues remain under review.  Mr. Tepner and K&K have, accordingly, reserved the right to propose further modifications to the proposed releases if warranted upon full conclusion of the CBI Parent Transaction Committee Investigation.

**2.**        **Investigation of the Intermediate Transaction Committee.**

The Intermediate Transaction Committee undertook an intensive and extensive investigation of potential Estate Claims and Causes of Action by CBI Intermediate and its stakeholders, which includes Claims that could be asserted by the operating companies of the Careismatic group.  The Intermediate Transaction Committee also considered whether the Plan releases contemplated in the Restructuring Transactions would impede such Claims or Causes of Action, and whether pursuit of such Claims or the limitation of the Plan releases to preserve such Claims would impede the Restructuring Transactions.

The scope of the Investigation included an analysis of Careismatic's acquisitions, loans, insider payments, and other material dealings since 2020, involving the Sponsor, which is the majority equity owner of Careismatic, NMC, which is a former majority equity owner of Careismatic, and certain of Careismatic's current and former officers and directors.  The Intermediate Transaction Committee conducted its Investigation through review of relevant documents, interviews of key witnesses, and analysis of potentially applicable law, including the Bankruptcy Code and certain state law.  McDonald Hopkins is continuing to review relevant documents and will conduct additional interviews, if necessary.  However, the Intermediate Transaction Committee is not aware of any documents or witnesses which would alter its conclusions reached to date.

In sum, while it is possible that the Intermediate Transaction Committee's additional work and due diligence could bring new facts or circumstances to light, the Intermediate Transaction Committee is not aware of anything that would lead it to amend or alter the conclusions it has reached to date.  After a thorough review of the facts and law, the Intermediate Transaction Committee has thus far reached the conclusion that certain Claims against Messrs. Singer and Pierpoint could have merit and has concluded that excluding such parties from the Plan releases is warranted.[8]  The Intermediate Transaction Committee has further concluded that excluding any Person or Entity that received consideration in connection with that certain Confidential Separation Agreement by and between Michael L. Singer, the Singer 1995 Family Trust, the Singer 2012 Irrevocable Trust, Careismatic Brands, LLC (f/k/a Careismatic Brands, Inc.), and CBI Parent, dated October 3, 2022, and any and all documentation related

---

[8]  ~~The Intermediate Transaction Committee notes that, in addition to its belief that possible Claims against Messrs. Singer and Pierpoint exist, these individuals did not respond to requests to be interviewed by McDonald Hopkins and K&K.~~

thereto, including, but not limited to, any repurchase agreements and severance agreements (the "Singer Related Parties"), is further warranted by the Investigation.  In addition, in light of the ongoing Claims and litigation with Sanford L. Michelman and his law firm, M&R, the Intermediate Transaction Committee also believes that Mr. Michelman and M&R should be excluded from the Plan releases.  While the Intermediate Transaction Committee is not opining on the likely success of such Claims, and it is certainly possible that the costs of pursuing such Claims could outweigh the benefits (particularly in light of the recovery for unsecured creditors in these Chapter 11 Cases), the Intermediate Transaction Committee believes these Claims should be excluded from the Plan releases.

The Intermediate Transaction Committee does not believe that excluding the Non-Released Parties discussed above from the Plan releases would jeopardize the Restructuring Transactions.  Accordingly, the Plan releases set forth in Plan do not provide for the release of the parties mentioned above.  As indicated, the investigation by the Intermediate Transaction Committee is ongoing.

**K.   The Committee Settlement.**

After hard-fought negotiations, the Debtors, the Committee, the First Lien Ad Hoc Group, the Cross-Holder Ad Hoc Group, and the Sponsor (collectively, the "Settlement Parties") reached a global settlement (the "Committee Settlement"), which is incorporated in the Plan.  As set forth in greater detail in the Plan, the Plan will establish the GUC Trust, and, on the Effective Date, the Debtors will transfer, or cause to be transferred, to the GUC Trust the "GUC Trust Assets," which include:  (i) $3.5 million in Cash; and (ii) all of their rights, title, and interests in the GUC Trust Claims.  The GUC Trust Claims include (i) any Claims and Causes of Action held by the Debtors and their respective Estates against  the Non-Released Parties; (ii) any Interchange Claims, and (iii) any Avoidance Action held by the Debtors and their Estates to the extent not released under the Plan, which shall include all Avoidance Actions against the Non-Released Parties; *provided* that the GUC Trust Claims shall not include (i) any Vendor Avoidance Actions or (ii) Retained Causes of Action.

Pursuant to the Committee Settlement, the Plan includes (i) a reduction in the Allowed amount of the Second Lien Deficiency Claims, which are General Unsecured Claims, from $50 million to $25 million, and (ii) revisions to the classification of certain Claims.  Specifically, Class 5 General Unsecured Claims includes all claims other than the Subordinated Claims, which now constitute Class 6.[7]  Holders of Class 5 General Unsecured Claims shall, pursuant to the Plan, receive their *pro rata* share of the GUC Trust Net Assets.[8]  The Committee has also agreed to support the Plan and the releases and exculpation provisions set forth in therein.

The Settlement Parties agree that the Committee's Standing Motion shall be adjourned to the Confirmation Hearing upon execution of the Committee Settlement while pending court approval.  If the Committee Settlement is not approved via Confirmation of the Plan that contemplates such Committee Settlement, the Committee shall be entitled to prosecute the Standing Motion.

---

[7]   "Subordinated Claims" means, collectively, (i) the Sponsor Loan Claims; (ii) any Claims arising out of advisory services provided by the Sponsor to one or more of the Debtors pursuant to that certain Services Agreement among Trojan Parent, Careismatic Brands, LLC, and Partners Group US Investment Services LLC dated as of January 6, 2021, and (iii) the Second Lien Deficiency Claims.

[8]   "GUC Trust Net Assets" means the GUC Trust Assets *less* all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets) incurred by the GUC Trust, any professionals retained by the GUC Trust, and any additional amount determined necessary by the GUC Trustee to adequately reserve for the operating expenses of the GUC Trust.

## VII.    SUMMARY OF THE PLAN

The Plan contemplates the following key terms described below.  In addition, the Plan contains additional detail, including descriptions of the provisions governing distributions under the Plan, the procedures for resolving contingent, unliquidated, and disputed claims, and provisions related to modification, revocation, or withdrawal of the Plan, among others.

### A.    General Settlement of Claims, Interests, and Intercompany Interests.

As discussed in the Plan and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and Intercompany Interests, and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and Intercompany Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests (as applicable) in any Class are intended to be and shall be final.

### B.    Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions (which, for the avoidance of doubt, shall be in form, substance, and structure reasonably acceptable to the Required Consenting First Lien Lenders) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and the other Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, and the other Definitive Documents; (iii) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the execution and delivery of the Exit Facilities Documents and entry into the Exit Financing Arrangements; (v) the issuance and distribution of the New Common Stock as set forth in the Plan, including in connection with the DIP Premium Conversion Election Option; (vi) the execution and delivery of the Second Lien Warrants Documents and any filings related thereto, and the issuance of the Second Lien Warrants thereunder (if applicable); (vii) ~~solely in the event of the Recapitalization Transaction,~~ with respect to the Post-Effective Date Debtors, the implementation of the Management Incentive Plan and any distribution of MIP Equity; (viii) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Post-Effective Date Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (ix) such other transactions that, in the reasonable business judgment of the Debtors or the Post-Effective Date Debtors, as applicable~~,~~ <u>and</u> the Required Consenting First Lien Lenders (in accordance with the Plan) ~~and, if applicable, the Purchaser,~~

are required to effectuate the Restructuring Transactions; and (x) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

~~Subject in all respects to the Bidding Procedures, the Debtors shall pursue the Sale Transaction unless the Debtors determine, with the consent of the Required Consenting First Lien Lenders, to pursue the Recapitalization Transaction.~~    The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, ~~the Purchaser,~~ and the Consenting Creditors, as applicable, to undertake the Restructuring Transactions contemplated by the Plan and the Definitive Documents.

**C.      Section 1146 Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Post-Effective Date Debtor~~, as applicable,~~ or to any other Person~~)~~, as applicable) of property under the Plan or pursuant to:  (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Post-Effective Date Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the grant of collateral as security for the Exit Financing Arrangements; or (vi) the ~~Sale Transaction; or (vii) the~~ making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**D.      The Recapitalization Transaction.**

~~If the Recapitalization Transaction occurs, the following provisions shall govern.~~

**1.      The Post-Effective Date Debtors.**

On the Effective Date, the New Board shall be established, and each Post-Effective Date Debtor shall adopt its New Organizational Documents.  The Post-Effective Date Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

2.    **Sources of Consideration for Plan Distributions.**

The Debtors shall fund or make distributions under the Plan, including the conveyance and funding of the GUC Trust Assets, as applicable, with:  (i)  the proceeds from the Exit Financing Arrangements; (ii) the New Common Stock; (iii) the Debtors' Cash on hand, and; (iv) the Second Lien Warrants; and (v) the proceeds of any Retained Causes of Action (if any).  The GUC Trust shall fund its distributions, as contemplated by the Plan, from the GUC Trust Net Assets.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and Second Lien Warrants (if applicable), is expected to be exempt from Securities Act registration, as described more fully in Article IV.D.9 of the Plan.

(a)    **The Exit Financing Arrangements.**

On the Effective Date, the Post-Effective Date Debtors shall enter into or assume, as applicable, the Exit Term Loan Facility or another Acceptable Alternative Exit Facility, each on the terms set forth in the applicable Exit Facilities Documents.  Confirmation of the Plan shall be deemed approval of the Exit Financing Arrangements and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby; all actions to be taken, undertakings to be made, and obligations to be incurred by the Post-Effective Date Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein; and authorization for the Post-Effective Date Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Financing Arrangements.  Execution of the Exit Term Loan Facility Documents by the agent thereof shall be deemed to bind all Holders of DIP Claims as if each such Holder had executed the applicable Exit Facilities Documents with appropriate authorization.

In the event the Exit Term Loan Facility is entered into, the DIP Commitments giving rise to the DIP Claims shall be refinanced by means of a cashless settlement whereby such DIP Commitments shall be converted on a dollar-for-dollar basis into the Exit Term Loans in accordance with the DIP Documents and the Exit Facilities Documents (subject to the DIP Premium Conversion Election Option), and all collateral that secures the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed and ratified, and shall automatically secure all obligations under the Exit Term Loan Facility Documents.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted in good faith, for legitimate business purposes, and for reasonably equivalent value, (b) shall be legal, valid, binding, and enforceable Liens on, and security interests in, the collateral specified thereunder in accordance with the terms of the applicable Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the applicable Exit Facilities Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Post-Effective Date Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other

filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(b)      **Issuance of the New Common Stock.**

Reorganized Careismatic shall be authorized to issue a certain number of shares of New Common Stock pursuant to its New Organizational Documents and any options or other equity awards, if any, reserved for the Management Incentive Plan and that may be issuable upon exercise of the Second Lien Warrants.  The issuance of the New Common Stock shall be authorized without the need for any further corporate action.  On the Effective Date, the New Common Stock shall be issued and distributed pursuant to, and in accordance with, the Plan~~, and, in the event of the Sale Transaction whereby the Purchaser purchases New Common Stock, the Purchase Agreement~~.

All of the shares of New Common Stock issued pursuant to the Plan (or upon exercise of the Second Lien Warrants, if applicable) shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Common Stock, including any New Common Stock issuable upon exercise of the Second Lien Warrants, shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, without the need for execution by any party thereto other than the applicable Post-Effective Date Debtor(s).  The New Common Stock will not be registered under the Securities Act or on any national securities exchange as of the Effective Date.

(c)      **Issuance of the Second Lien Warrants.**

Solely to the extent the Second Lien Condition is satisfied, on the Effective Date, Reorganized Careismatic will issue the Second Lien Warrants to Holders of Allowed Second Lien Secured Claims; *provided, however*, that a Holder of a Second Lien Claim may designate a trustee, agent, nominee, or one or more Affiliates to receive and hold the Second Lien Warrants on behalf of such Holder.  All of the Second Lien Warrants that may be issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the Second Lien Warrants shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or the Post Effective Date Debtors, as applicable, validly issued, fully paid, and non assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan, the New Organizational Documents, or the Second Lien Warrants Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Post Effective Date Debtor(s).  The Second Lien Warrants Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of Second Lien Warrants shall be bound thereby (without any further action or signature) in all respects, whether or not such Holder has executed any Second Lien Warrants Documents.  The Second Lien Warrants will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the DTC.

3.      **Vesting of Assets in the Post-Effective Date Debtors.**

Except as otherwise provided in the Plan or the Exit Facilities Documents (if applicable), or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all

property in each Debtor's Estate, all Causes of Action belonging to the Debtors or the Estates, and any property acquired by any of the Debtors under the Plan shall vest in each respective Post-Effective Date Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit Facilities Documents, and Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, as applicable).  On and after the Effective Date, except as otherwise provided herein, each Post-Effective Date Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, Intercompany Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

      **4.**        **Corporate Existence.**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

      **5.**        **Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (a) adoption or assumption, as applicable, of the obligations set forth in Article IV.D.11 of the Plan; (b) selection of the directors, officers, or managers for the Post-Effective Date Debtors; (c) the distribution of the New Common Stock; (d) entry into the Second Lien Warrants Documents and the issuance and distribution of the Second Lien Warrants; (e) implementation of the Restructuring Transactions; (f) entry into the Exit Facilities Documents and incurrence (or assumption, as applicable) of debt thereunder; (g) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (h) adoption of the New Organizational Documents; (i) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (j) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity security Holders, directors, officers, or managers of the Debtors or the Post-Effective Date Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors, including the New Common Stock, the New Organizational Documents, the Exit Financing

Arrangements, the Exit Facilities Documents, the Second Lien Warrants, the Second Lien Warrants Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.   The authorizations and approvals contemplated by Article IV.D.9 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 6.        New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Effective Date Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included in the Plan Supplement. After the Effective Date, each Post-Effective Date Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents, and the Post-Effective Date Debtors may file such amended certificates or articles of incorporation, bylaws, or other applicable formation and constituent documents as permitted by the laws of the applicable states, provinces, or countries of incorporation and the New Organizational Documents. For the avoidance of doubt, any claimant's acceptance of the New Common Stock shall be deemed to constitute its agreement to be bound by the New Organizational Documents without the need for execution by any party other than the Post-Effective Date Debtors.

### 7.        Directors and Officers of the Post-Effective Date Debtors.

As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed.  The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing, which shall be consistent in all respects with the Governance Term Sheet. Each such member and officer of the Post-Effective Date Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Post-Effective Date Debtors.

### 8.        Effectuating Documents; Further Transactions.

On and after the Effective Date, the Post-Effective Date Debtors and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 9.        Certain Securities Law Matters.

Pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, it is expected that the offering, issuance, and distribution of the New Common Stock and the Second Lien Warrants (as well as exercising the Second Lien Warrants) as

contemplated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of securities.

The shares of New Common Stock to be issued under the Plan, including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums and including upon exercise of the Second Lien Warrants, as well as the Second Lien Warrants themselves, in each case, on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Common Stock or Second Lien Warrants in the New Organizational Documents or the Second Lien Warrants Documents, as applicable.

The shares of New Common Stock, including the MIP Equity, and upon exercise of the Second Lien Warrants, and the Second Lien Warrants themselves, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

10.    **Management Incentive Plan.**

On or as soon as reasonably practicable following the Effective Date, the New Board shall adopt and implement the Management Incentive Plan to be used to incentivize and compensate employees, directors, consultants, and other service providers of the Post-Effective Date Debtors, which Management Incentive Plan will include (i) the ability to grant restricted stock units, options, New Common Stock, or other rights exercisable, exchangeable, or convertible into New Common Stock (or equivalent Cash value thereof) representing up to 15.0% of the New Common Stock on a fully diluted basis and (ii) other terms and conditions customary for similar type equity plans as determined by the New Board in its sole discretion (including with respect to participants, allocation of awards, and vesting).

11.    **Employment Obligations.**

All Assumed Plans shall be assumed by the Post-Effective Date Debtors as of the Effective Date and shall remain in place.  The Post-Effective Date Debtors shall continue to honor their obligations under such Assumed Plans; *provided* that (i) the Assumed Plans shall not include any equity or equity-based programs and awards, and (ii) each Assumed Plan shall be amended, to the extent applicable, to exclude any right(s) to receive future equity or equity-based awards provided for under any Assumed Plans, and such awards and rights described in the foregoing subsections (i) and (ii) shall be terminated as of the Effective Date for no consideration.  Without Bankruptcy Court approval or approval of the Required Consenting First Lien Lenders, the Debtors will not be permitted to establish any annual, short-term, or long-term compensation programs unless such program(s) are (i) in the ordinary course of business and consistent with past practice and (ii) performance-based (i.e., are only eligible to be paid upon achievement of pre-established performance goals).

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

The occurrence of the Effective Date shall not be deemed to result in an accelerated payment event or a "good reason" or other constructive termination event for purposes of any Debtor compensation or benefit plan; *provided* that employees who, as of the Effective Date, are party to Assumed Plans with a contractual entitlement to severance may, in their sole discretion, elect to treat the occurrence of the Effective Date as "good reason" or constructive termination event.

## 12.    Director and Officer Liability Insurance.

After the Effective Date, none of the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, other than those Indemnification Obligations or other employee obligations in favor of the Non-Released Parties which shall be deemed rejected, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date ~~(other than any Non-Released Party)~~ shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

~~**E. The Sale Transaction.**~~

~~If the Sale Transaction occurs, the following provisions shall govern.~~

~~**1. The Sale Transaction.**~~

~~On the Effective Date, the Purchaser shall purchase substantially all of the Debtors' assets or 100% of the New Common Stock, in each case, free and clear of all Liens, Claims, Interests, Intercompany Interests, charges, or other encumbrances (except for those encumbrances expressly assumed by the Purchaser under the Purchase Agreement or the Plan) in exchange for the Purchase Price as set forth in the Purchase Agreement. The Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, and the Purchaser, as applicable, to undertake the transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.~~

~~The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Purchase Agreement, which may be the Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Post-Effective Date Debtors or the Purchaser, as applicable, may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, Intercompany Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.~~

~~**2. Sources of Consideration for Plan Distributions.**~~

~~The Debtors shall fund distributions under the Plan with: (i) the proceeds from the Sale Transaction, (ii) the Debtors' Cash on hand, and (iii) the proceeds of any Causes of Action retained by the Post-Effective Date Debtors (if any). Each distribution and issuance referred to in Article VI of the~~

Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**3. Post-Effective Date Debtors.**

On and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible as authorized by the Bankruptcy Court; (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided hereunder; (iv) establishing and funding the Distribution Reserve Accounts; (v) enforcing and prosecuting the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (vi) filing appropriate tax returns; (vii) complying with any continuing obligations under the Purchase Agreement; and (viii) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be substituted as the party in lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date or assigned to the Purchaser under the Purchase Agreement shall vest in the Post-Effective Date Debtors and shall be administered by the Plan Administrator, and the net proceeds thereof shall constitute Excess Distributable Consideration.

**4. Plan Administrator.**

On the Effective Date, the Persons acting as managers, directors, and officers of the Post-Effective Date Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors and shall succeed to the powers and authority of the Post-Effective Date Debtors' managers, directors, and officers. The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in connection with the Wind Down and as otherwise provided in the Confirmation Order.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors. The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer. The Debtors, after the Confirmation Date and before the Effective Date, and the Post-Effective Date Debtors or Plan Administrator, on and after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind Down, without any further notice to or action, order, or approval of the Bankruptcy Court.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Post-Effective Date Debtors, including: (i) making distributions under the Plan; (ii) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Post-Effective Date Debtors in accordance with the Wind-Down Reserve; (iii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (iv) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (v) establishing and maintaining bank accounts in the name of the Post-Effective Date Debtors; (vi) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors; (viii) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.E of the Plan; (ix) administering and paying taxes of the Post-Effective Date Debtors, including filing tax returns; (x) representing the interests of the Post-Effective Date Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (xi) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

**a. Retention of Professionals.**

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Post-Effective Date Debtors. The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Post-Effective Date Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

**b. Compensation of the Plan Administrator.**

The Plan Administrator's compensation shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the reasonable fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

**c. Plan Administrator Expenses.**

All reasonable costs, expenses, and obligations incurred by the Plan Administrator or the Post-Effective Date Debtors in administering the Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

**d. Exculpation, Indemnification, Insurance, and Liability Limitation.**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors. The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

**e. Tax Returns.**

In the event of the Sale Transaction, after the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

**f. Dissolution of the Post-Effective Date Debtors.**

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Plan Administrator or Post-Effective Date Debtors, including the filing of any documents with the secretary of state for the state in which each Post-Effective Date Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

To the extent the Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed, such Cash or other property shall constitute Residual Cash (in the event all Allowed Professional Fee Claims have been satisfied in full in Cash and the Disputed Claims Reserve Account has been funded with the Disputed Claims Reserve Amount), and shall be immediately allocated and distributed to the Holders of Allowed First Priority Claims.

**5. Wind-Down.**

As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Post-Effective Date Debtors, as applicable, to comply with and abide by the terms of the Purchase Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of each Post-Effective Date Debtor under the applicable laws of its state of incorporation or formation (as applicable); and (iii) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the

need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to Post-Effective Date Debtors as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have canceled pursuant to the Plan all Interests and Intercompany Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, objection, and resolution of final applications for Allowance of the Professional Fee Claims.

The filing of the monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

**6. Effectuating Documents; Further Transactions.**

Prior to the Effective Date, the Debtors and the Purchaser are, and on and after the Effective Date, the Post-Effective Date Debtors, the Purchaser, and the Plan Administrator are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**7. Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (a) consummation of the Sale Transaction; (b) consummation of the Wind Down; and (c) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan or corporate structure of the Debtors or Post-Effective Date Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors. The authorizations and approvals contemplated by Article IV.E of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**8. Directors and Officers of the Post-Effective Date Debtors.**

As of the Effective Date, the term of the current members of the CBI Parent Transaction Committee, the Intermediate Transaction Committee, and the boards of directors of each of the applicable Debtor Entities shall expire, and the members for the initial term of the New Board shall be appointed; *provided* that in the event of the Recapitalization Transaction, the New Board shall be appointed pursuant to the terms set forth in the Governance Term Sheet.

~~As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, or other governing body, as applicable, of the Debtors with respect to its affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, including those powers set forth in Article IV.E of the Plan.~~

~~The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers.~~

**E.** ~~F.~~ **Cancellation of Existing Agreements, Interests, and Intercompany Interests.**

On the Effective Date, except with respect to the Exit Facility Documents (if applicable) or to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims, Interests, or Intercompany Interests, including credit agreements and indentures, shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, and the Agents shall be released from all duties and obligations thereunder. Holders of, or parties to, such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding anything to the contrary in the Plan, (x) any cancelled instruments, securities, and other documentation shall continue in effect solely for the purposes of allowing Holders of Claims to receive distributions as specified under the Plan, as applicable, and (y) any agreement that governs the rights of the Agents shall continue in effect solely for purposes of allowing the Agents, as applicable, to (i) receive any distributions under the Plan and distribute them to the Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, in each case in accordance with the terms of the Plan, (ii) maintain, enforce, or exercise any right to compensation, contribution, expense reimbursement, or indemnification that (1) may be owed to the applicable Agent under the Plan, the DIP Documents, or the First Lien Credit Documents (including by the Debtors or the Post-Effective Date Debtors), and that (2) by its terms survives termination of such document; (iii) maintain, enforce, or exercise its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable or allocable under the Plan to Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to any of the Agents or Holders of Allowed DIP Claims, Allowed First Priority Claims, or Allowed Second Lien Secured Claims, as applicable, and (v) without limiting the foregoing clause (ii), maintain, enforce, or exercise any right to compensation, contribution, expense reimbursement, or indemnification of the Agents, as applicable, and any predecessor thereof vis-à-vis parties other than the Debtors and the Post-Effective Date Debtors.

**F.** **The GUC Trust.**

**1.** **General Terms.**

On the Effective Date, the Debtors and the GUC Trustee shall enter into the GUC Trust Agreement and the GUC Trust Assets shall vest or deem to be vested in the GUC Trust automatically without further action by any Person, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. Under no circumstance shall the Debtors or the Post-Effective Date Debtors or any other party be required to contribute any additional assets to the GUC Trust other than the GUC Trust Assets. After the Effective

Date, neither the Debtors, Post-Effective Date Debtors, nor any other party shall have any interest in the GUC Trust Assets except as expressly set forth herein.

The GUC Trustee shall be the exclusive administrator of the assets of the GUC Trust (including the GUC Trust Assets) for purposes of section 1123(b)(3)(B) of the Bankruptcy Code with respect to any matters involving Class 5 General Unsecured Claims under the Plan for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement and with respect to the GUC Trust Claims.  The Confirmation Order shall contain a finding that the GUC Trust has standing to pursue the GUC Trust Claims on behalf of the Debtors.  The GUC Trustee shall be a party in interest under section 1109(b) of the Bankruptcy Code for purposes of the claims reconciliation process, including objecting to General Unsecured Claims; provided that the GUC Trustee may otherwise be a party in interest with the prior written consent of the Post-Effective Date Debtors or as otherwise ordered by the Bankruptcy Court.

The Debtors and the Post-Effective Date Debtors shall provide commercially reasonable access to the GUC Trustee and any professionals retained by the GUC Trust (at the sole cost and expense of the GUC Trust) to retrieve or access data reasonably necessary to prosecute the GUC Trust Claims; provided that the Debtors and Post-Effective Date Debtors shall not incur any expenses to provide such access to the GUC Trustee and any professionals retained by the GUC Trust.  To the extent the GUC Trust receives information from the Debtors or the Post-Effective Date Debtors in connection with the General Unsecured Claims or the GUC Trust Claims, the GUC Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors or the Post-Effective Date Debtors, as applicable, and the Debtors or the Post-Effective Date Debtors, as applicable, retain the sole right to waive their own privileges.  Reasonable agreements will be made with the GUC Trustee to ensure that confidential information and privileges are preserved, while permitting the GUC Trustee to use, as necessary to administer the GUC Trust, such information and privilege; absent such agreements, either the GUC Trustee or the Post-Effective Date Debtors may present the issue to the Bankruptcy Court for resolution.

The GUC Trust shall be administered by the GUC Trustee and governed by the GUC Trust Agreement, and the GUC Trustee shall have the sole power and authority to distribute the GUC Trust Net Assets to Holders of Allowed General Unsecured Claims in accordance with the treatment set forth in the Plan for Class 5.  The GUC Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Trust and the GUC Trustee; provided that, for the avoidance of doubt, any such indemnification shall be by the GUC Trust and the GUC Trustee alone and shall not implicate the Debtors or the Post-Effective Date Debtors.  In the event of any conflict between the terms of the Plan and the GUC Trust Agreement, the terms of the Plan shall govern.

The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the responsibility and requisite power to reconcile General Unsecured Claims, including asserting any objections thereto.  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the GUC Trust Fees and Expenses from the GUC Trust Assets.  The Debtors, the Post Effective Date Debtors, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Trust.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, such time as all distributions required to be made by the GUC Trustee under the Plan have been made, but in no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court).

Upon dissolution of the GUC Trust, any remaining GUC Trust Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement as appropriate; provided, however, that if the GUC Trustee reasonably determines that such remaining GUC Trust Net Assets are insufficient to render a further distribution practicable, the GUC

Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the GUC Trust, (ii) donate any balance to a charitable organization (A) described in Section 501(c)(3) of the Internal Revenue Code, (B) exempt from U.S. federal income tax under Section 501(a) of the Internal Revenue Code, (C) not a "private foundation" as defined in Section 509(a) of the Internal Revenue Code, and (D) that is unrelated to the Debtors, the GUC Trust, and any insider of the GUC Trustee, and (iii) dissolve the GUC Trust.

**2.**    **Tax Treatment.**

In furtherance of Article IV.F of the Plan, (i) it is intended that the GUC Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 677 of the Internal Revenue Code consistent with the terms of the Plan, and accordingly, all assets held by the GUC Trust are intended to be deemed for U.S. federal income tax purposes to have been distributed by the Debtors or the Post-Effective Date Debtors, as applicable, directly to the Holders of Allowed General Unsecured Claims in respect of such Claims, and then contributed by such Holders of Allowed General Unsecured Claims to the GUC Trust in exchange for their *pro rata* interests in the GUC Trust; (ii) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Net Assets in accordance with Treasury Regulation section 301.7701 4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Post-Effective Date Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee) and prepared pursuant to this Plan for all U.S. federal income tax purposes; (v) the "taxable year" of the GUC Trust shall be the "calendar year" as such terms are defined in section 441 of the Internal Revenue Code; (vi) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust and shall file such tax returns treating the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vii) the GUC Trustee shall annually send to each Holder of an interest in the GUC Trust a separate statement regarding such Holder's share of items of income, gain, loss, deduction or credit (including receipts and expenditures) of the GUC Trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the United States Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the United States Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for United States state and local income tax purposes.  If a "disputed ownership fund" election is made, (i) the GUC Trust Assets will be subject to entity-level taxation and (ii) all parties (including, without limitation, the Debtors, the Estates, Holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report for U.S. federal (and, to the extent applicable state, and local) income tax purposes consistently with the foregoing.

Any taxes (including with respect to earned interest, if any) imposed on the GUC Trust, including as a result of an election to be treated as a "disputed ownership fund" shall be paid by the GUC

Trustee out of the assets of the GUC Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The GUC Trustee may request an expedited determination of taxes of the GUC Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

The GUC Trust shall continue to have all of the rights and powers granted to the GUC Trust as set forth in this Plan and applicable non-bankruptcy law, and the GUC Trustee shall also have the rights, powers, and obligations set forth in the GUC Trust Agreement.

## G.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity, whether arising before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Post-Effective Date Debtors; *provided* that, notwithstanding anything contained herein, any Causes of Action against Non-Released Parties shall vest in the GUC Trust. The Post-Effective Date Debtors or the ~~Plan Administrator~~GUC Trustee, as applicable, shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, as appropriate, in accordance with the best interests of the ~~Post~~Post-Effective Date Debtors~~,~~ or the GUC Trust, as applicable, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Notwithstanding anything to the contrary herein, the Debtors or Post-Effective Date Debtors, as applicable, may not settle any Retained Cause of Action that would result in a Class 5 General Unsecured Claim without obtaining either (i) relief from a court with competent jurisdiction (and if such court is a court other than the Bankruptcy Court, the GUC Trustee shall be deemed, for purposes of such proposed settlement presented to such other court, a party-in-interest with standing to be heard in such other court for such purpose, solely to the extent that such settlement would result in a Class 5 General Unsecured Claim) or (ii) approval of the GUC Trustee.

**No Person or Entity may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement to file motions or substitutions of parties or counsel in each such matter.

## H.    Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Post-Effective Date Debtors ~~or the Plan Administrator, as applicable,~~ shall be permitted to close all of the Chapter 11 Cases except one, and all

contested matters relating to any Debtor, including objections to Claims, shall be administered and heard in such remaining Chapter 11 Case.

## VIII.    OTHER KEY ASPECTS OF THE PLAN

### A.    Treatment of Executory Contracts and Unexpired Leases.

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the date that is ninety (90) days after the Effective Date, each Executory Contract and Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically assumed, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) is identified on the Assumed Executory Contracts and Unexpired Leases List as of the Effective Date, in which case such Executory Contract or Unexpired Lease shall be assumed as of the Effective Date; (ii) is identified on the Rejected Executory Contracts and Unexpired Leases List as of the Effective Date, in which case such Executory Contract or Unexpired Lease shall be rejected as of the Effective Date; (iii) previously expired or terminated pursuant to its own terms; (iv) is the subject of a motion to reject Filed on or before the Effective Date; or (v) is an insurance policy; *provided* that, in the event of the Recapitalization Transaction, the assumption, assumption and assignment, or rejection of all Executory Contracts and Unexpired Leases shall be subject to the consent of the Required Consenting First Lien Lenders (not to be unreasonably withheld, conditioned, or delayed).  The assumption of Executory Contracts and Unexpired Leases pursuant to the Plan may include the assignment of certain of such contracts to Affiliates or the Purchaser.  The Plan constitutes a motion for approval of the foregoing assumptions and assignments, and the Confirmation Order will constitute an order of the Bankruptcy Court granting such motion.

Notwithstanding anything to the contrary in the Plan, the Debtors and the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List and the Rejected Executory Contracts and Unexpired Leases List (i) to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List and the Rejected Executory Contracts and Unexpired Leases List at any time prior to the Effective Date, and (ii) to add any Executory Contract or Unexpired Lease to the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List not otherwise identified on the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List at any time through and including ninety (90) days after the Effective Date, the modifications thereto shall constitute assumption or rejection of such Executory Contract or Unexpired Lease as of the date of such modification, notwithstanding anything contained in Article V.A of the Plan; *provided* that, subject to Article V.C of the Plan, at any time during such ninety (90)-day period after the Effective Date, the Post-Effective Date Debtors shall remain liable for any and all amounts incurred under any such Executory Contract and Unexpired Lease not on the Rejected Executory Contracts and Unexpired Leases List in the ordinary course of business.  The Debtors shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List or the Rejected Executory Contracts and Unexpired Leases List to the counterparties to the Executory Contracts or Unexpired Leases affected thereby.  In the event of a Sale Transaction, such alteration, amendment, modification, or supplement shall be subject to the consent of the Purchaser.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of

first refusal, and any other interests. Modifications, amendments, supplements, and restatements of Executory Contracts and Unexpired Leases executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Except as set forth in Article IV.D.11 of the Plan, to the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## 2. Indemnification Obligations.

Consistent with applicable law, all Indemnification Obligations (other than with respect to Non-Released Parties), shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date; *provided* that the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any Claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organization documents, or applicable agreements governing the Indemnification Obligations. All such Indemnification Obligations shall be deemed and treated as Executory Contracts to be assumed and assigned in their entirety by the Debtors under the Plan to the Post-Effective Date Debtors~~, in the event of the Recapitalization Transaction, or to the Purchaser, in the event of the Sale Transaction~~; *provided* that, notwithstanding the foregoing, any Indemnification Obligations or other employee obligations in favor of the Non-Released Parties shall be deemed and treated as an Executory Contract that has been rejected by the Post-Effective Date Debtors under the Plan, and the Debtors and the Post-Effective Date Debtors shall not honor, pay, or reimburse any Claims by a Non-Released Party for indemnification or reimbursement.

## 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Counterparties to Executory Contracts or Unexpired Leases deemed rejected shall be served with a notice of rejection of their Executory Contracts and Unexpired Leases via service of the Confirmation Order and the Plan Supplement. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (i) thirty (30) days after the date of service of notice on the affected claimant of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, which notice shall set forth the date by which such Proofs of Claim must be filed, or (ii) thirty (30) days after service of notice on the affected claimant of any rejection that occurs after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease with respect to which a Proof of Claims is not Filed with the Claims and Noticing Agent within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, the GUC Trust, or their property without the need for any objection by the Debtors ~~or,~~ the Post-Effective Date**

**Debtors, or the GUC Trust, as applicable, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged and shall be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim as set forth in Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Post-Effective Date Debtors shall pay all Cure Claims, if any, on the Effective Date.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to a proposed assumption, including pursuant to the Plan, or related Cure amount must be Filed, served, and actually received by counsel to the Debtors and the U.S. Trustee no later than thirty (30) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Post-Effective Date Debtor without the need for any objection by the Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Post-Effective Date Debtors, as applicable, of the Cure; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Post-Effective Date Debtors may also settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or the Post-Effective Date Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or the Post-Effective Date Debtors, as applicable, with respect to which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Post-Effective Date Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Post-Effective Date Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article V.D of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V.D of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

5.      **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the Post-Effective Date Debtors.

Nothing in the Plan, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Post-Effective Date Debtors) or draw on any collateral or security therefor.

6.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

7.      **Reservation of Rights.**

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Post-Effective Date Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Post-Effective Date Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

8.      **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtors or the Post-Effective Date Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**B.**      **Conditions Precedent to Confirmation and Consummation of the Plan.**

     **1.**      **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1.      the Restructuring Transactions shall have been implemented in accordance with the Restructuring Steps Plan in all material respects;

2.      the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance consistent with the RSA and otherwise reasonably acceptable to the Required Consenting First Lien Lenders, which order shall be in full force and effect and such orders shall not have been stayed, modified, or vacated on appeal;

3.      the Bankruptcy Court shall have entered the Confirmation Order, which order shall have become a Final Order;

4.      ~~in the event of the Recapitalization Transaction or Sale Transaction, as applicable,~~ the New Common Stock shall have been issued;

5.      ~~in the event of the Recapitalization Transaction,~~ solely to the extent the Second Lien Condition has occurred, the Second Lien Warrants shall have been issued in accordance with the Second Lien Warrants Documents;

6.      the RSA shall not have been terminated and shall remain in full force and effect;

<u>7.</u>      <u>the GUC Trust Agreement shall have been executed and the GUC Trust Assets shall have vested or be deemed to have vested in the GUC Trust;</u>

<u>8.</u>      ~~7.~~ the DIP Facility shall be in full force and effect and there shall be no defaults under the DIP Documents continuing unless waived by the requisite DIP Lenders in accordance with the terms and conditions of the DIP Documents;

<u>9.</u>      ~~8.~~ the Plan Supplement, Definitive Documents, Plan, and all schedules, documents, supplements, and exhibits thereto, <u>and</u> the Exit Financing Arrangements~~, or the Purchase Agreement, as applicable,~~ shall have become effective and shall be in full force and effect;

<u>10.</u>      ~~9.~~ all Restructuring Expenses and any other professional fees and other amounts required to be paid pursuant to the RSA, in any Definitive Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash;

<u>11.</u>      ~~10.~~ any and all requisite governmental, regulatory, and third-party approvals and consents necessary to effectuate the Restructuring Transactions shall have been obtained, and all applicable waiting periods shall have expired;

<u>12.</u>      ~~11.~~ the Exit Facilities Documents, as applicable, shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the parties thereto (with the consent of the Required Consenting First Lien Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

~~12. in the event of the Sale Transaction, the Distribution Reserve Accounts shall have been established and funded with the Priority Claims Reserve Amount and the Wind Down Amount;~~

~~13. in the event of the Sale Transaction, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;~~

13.        ~~14.~~ all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court (including for the avoidance of doubt all professional fees and other amounts required to be paid pursuant to the RSA) shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

14.        ~~15.~~ the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and

15.        ~~16.~~ the DIP Claims shall have been satisfied in accordance with Article II.B of the Plan.

**2.        Waiver of Conditions.**

The conditions to the Effective Date set forth in Article IX of the Plan, except for the conditions set forth in Article IX.A.7, 9, 12~~4, 15~~, and 16~~5~~ of the Plan (each of which may not be waived without the consent of the affected parties), may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting First Lien Lenders ~~and, in the event of the Sale Transaction, the Purchaser,~~ without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**3.        Effect of Failure of Conditions.**

If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims, Interests, or Intercompany Interests, or any other Entity in any respect; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

IX.      **RISK FACTORS**

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE POST-EFFECTIVE DATE DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.      **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against, and Interests and Intercompany Interests in, the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims Against, and Interests and Intercompany Interests in, the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

### 2. Parties in Interest May Object to the Plan's Classification of Claims, Interests, and Intercompany Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims, Interests, and Intercompany Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims, Interests, and Intercompany Interests each encompassing Claims, Interests, or Intercompany Interests, as applicable, that are substantially similar to the other Claims, Interests, or Intercompany Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3. The RSA May Be Terminated.

As more fully set forth in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Stakeholders (as defined in the RSA) of their respective obligations under the documents.

In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

### 4. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations of if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

### 5. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such

plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7. **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8. **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' services, and increasing expenses. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.

If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**9.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**10.      The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**11.      Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**12.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual

Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 13. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Post-Effective Date Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to the findings of the Transaction Committees and objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### B. Risks Related to Recoveries Under the Plan.

#### 1. Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Post-Effective Date Debtors Following the Effective Date.

Assuming that the Effective Date occurs, Holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock (including, as applicable, shares issued upon exercise of the Second Lien Warrants) may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Post-Effective Date Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Post-Effective Date Debtors and consequently impact the value of the shares of New Common Stock or Second Lien Warrants. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may mean that subsequent sales of New Common Stock by other holders may be at a lower price per share of New Common Stock or the Second Lien Warrants. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Post-Effective Date Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Post-Effective Date Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Post-Effective Date Debtors' businesses, financial condition, and operating results.

#### 2. Estimated Valuations of the Exit Financing Arrangements, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.

The Debtors' estimated recoveries to Holders of Allowed Claims and Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous

assumptions (the realization of many of which will be beyond the control of the Debtors), including:
(a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective
Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that
capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to
maintain critical existing customer relationships, including customer relationships with key customers.

3.      **The New Common Stock is Subject to Dilution.**

The ownership percentage represented by the New Common Stock distributed on the Effective
Date under the Plan will be subject to dilution from the New Common Stock issued in connection with
the conversion of any other options, warrants, convertible securities, exercisable securities, or other
securities that may be issued in connection with the emergence or post-emergence, including pursuant to
the Management Incentive Plan, the DIP Premiums (assuming the DIP Premium Conversion Election
Option is exercised), and the Second Lien Warrants.

4.      **The Terms of the Exit Facilities Documents Are Subject to Change Based on
Negotiation and the Approval of the Bankruptcy Court.**

The terms of the Exit Facilities Documents have not been finalized and are subject to
negotiations between the Debtors and the Required Consenting First Lien Lenders. Holders of Claims
that are not the Required Consenting First Lien Lenders will not participate in these negotiations, and the
results of such negotiations may affect the rights of the holders of the New Common Stock following the
Effective Date. As a result, the final terms of the Exit Facilities Documents may be less favorable to
Holders of Claims, Interests, and Intercompany Interests than as described herein and in the Plan.

5.      **A Decline in the Post-Effective Date Debtors' Credit Ratings Could Negatively
Affect the Debtors' Ability to Refinance Their Debt.**

The Debtors' or the Post-Effective Date Debtors' credit ratings could be lowered, suspended, or
withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment,
circumstances warrant, including as a result of exposure to the credit risk and the business and financial
condition of the Debtors or the Post-Effective Date Debtors, as applicable. Downgrades in the
Post-Effective Date Debtors' long-term debt ratings may make it more difficult to refinance their debt
and increase the cost of any debt that they may incur in the future.

6.      **The Post Effective Date Debtors May Not Be Able to Achieve Their Projected
Financial Results.**

The Post-Effective Date Debtors may not be able to achieve their projected financial results. The
Financial Projections attached hereto as **Exhibit E** represent the Debtors' management team's best
estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions
regarding the anticipated future performance of the Post-Effective Date Debtors' operations, as well as
the United States and world economies in general, and the industry segments in which the Debtors
operate in particular. While the Debtors believe that the Financial Projections contained in this
Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors
do not achieve their projected financial results, the value of the New Common Stock may be negatively
affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective
Date. Moreover, the financial condition and results of operations of the Post-Effective Date Debtors
from and after the Effective Date may not be comparable to the financial condition or results of
operations reflected in the Debtors' historical financial statements.

7.        **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Post-Effective Date Debtors and Holders of certain Claims.

~~8.  The Debtors' General Unsecured Creditors May Not Receive Any Recovery.~~

~~The Plan currently provides no recovery for Holders of General Unsecured Claims in the event of the Recapitalization Transaction.~~

**C.        Risks Related to the Debtors' and the Post-Effective Date Debtors' Businesses.**

1.        **The Post-Effective Date Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Post-Effective Date Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Post-Effective Date Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Post-Effective Date Debtors' control. The Post-Effective Date Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Post-Effective Date Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Financing Arrangements and upon emergence.

2.        **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the

Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Post-Effective Date Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends.

Unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Finally, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of

the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

**5.      The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.**

The Debtors' operations are subject to various federal, state and local laws and regulations. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Post-Effective Date Debtors.

**6.      The Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Post-Effective Date Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Post-Effective Date Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Post-Effective Date Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Post-Effective Date Debtors' businesses and financial stability, however, could be material.

**7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**8.      Contract Counterparty Performance Issues that May Result in Additional Costs to the Debtors, Reductions in Revenues, or the Payment of Liquidated Damages.**

The Debtors may encounter difficulties as a result of delays in materials provided by suppliers or third parties, delays, or difficulties in equipment and material delivery, schedule changes, delays from a supplier's failure to timely obtain permits or rights-of-way or meet other regulatory requirements, weather-related delays, and other factors, some of which are beyond the Debtors' control, that impact the Debtors' ability to complete a project in accordance with the original delivery schedule. Further, the Debtors contract with third-party subcontractors to assist them with the completion of contracts, and such subcontractors may be unavailable or delayed in performing services for the Debtors or other parties. Any delay or failure by these third parties in the completion of their portion of the project may result in delays in the overall progress of the project or may cause the Debtors to incur additional costs, or both. If the Debtors' suppliers fail to satisfy their obligations to the Debtors, the Debtors may be unable to maintain the timely delivery of products to retail partners or may be required to expend significant

additional costs. Delays and additional costs may be substantial and, in some cases, the Debtors may be required to compensate the retail partner for such delay.

### 9.      Volatile Shipping and Production Prices.

The Debtors' financial condition, results of operations, and cash flows will depend, in large part, upon prevailing market prices for medical apparel and workwear and associated fixed shipping and logistics costs. Purchases from the Debtors' partners are subject to significant price fluctuations over relatively short periods of time and can be unpredictable. Such factors that may materially impact the medical apparel and workwear markets and Careismatic's financial results include:

- economic conditions;

- the effectiveness of demand-side management;

- political impacts of shipping prices (current or future), particularly the imposition of increased tariffs;

- an increase in market competitors;

- freight cost volatility; and

- price volatility caused by shifting consumer demands.

Given the volatility of medical apparel prices and given that the Debtors operate on orders from its various partners, revenues and profitability will be subject to increased volatility, and the Debtors' financial condition, results of operations and cash flows could be materially adversely affected.

### 10.      The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 11.      The Debtors May Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results.

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products, including renewals of current contracts. Existing customers may decide not to renew or to reduce their contracts with the Debtors or not to purchase additional products from the Debtors in the future, which could have a

material adverse effect on the Debtors' business and results of operations.  In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, the quality of the Debtors' customer service, and the Debtors' ability to update their products and develop new products needed by customers.  Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.  The Debtors' revenue, which has been largely recurring in nature, comes from the sale of the Debtors' products and services under fixed-term contracts.  The Debtors do not have a unilateral right to extend these contracts at the end of their term.  If customers cancel or decide not to renew their contracts, the Debtors' business and financial results could be adversely and materially affected.

**D.    Risks Related to the Offer and Issuance of Securities Under the Plan.**

**1.    The Debtors Do Not Intend to Register the Offer or Sale of New Common Stock and Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

The New Common Stock will not be registered under the Securities Act or any Blue-Sky Laws.  As summarized in Article XII of this Disclosure Statement, entitled "Certain Securities Laws Matters," certain of the New Common Stock may not be re-offered or resold except pursuant to an exemption from the registration requirements of the Securities Act and applicable Blue-Sky Laws.  The Debtors do not intend currently to register the New Common Stock under the Securities Act.

The Debtors believe that all shares of New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums but other than any New Common Stock underlying the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above will satisfy the requirements of section 1145(a) of the Bankruptcy Code.  Accordingly, the Debtors believe that such New Common Stock (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws. Holders of such restricted securities may not be entitled to have their restricted securities registered and are not permitted to resell them except in accordance with an available exemption from registration under the Securities Act. Generally, Rule 144 of the Securities Act would permit the resale of securities received by a Person after a specified holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports

with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity Interests by affiliates of the issuer.  Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

The Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell such securities.  *See* Article XII of this Disclosure Statement, entitled "Certain Securities Law Matters."

### 2.    A Liquid Trading Market for the Shares of New Common Stock or Second Lien Warrants May Not Develop.

The New Common Stock and the Second Lien Warrants will be new issuances of securities, and there is no established trading market for those securities.  An active trading market for those securities may never develop, or if developed, may not be sustained.  The Debtors do not intend to apply for the New Common Stock or the Second Lien Warrants to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  The liquidity of any market for shares of New Common Stock or the Second Lien Warrants will depend upon, among other things, the number of holders of shares of New Common Stock and Second Lien Warrants, Post-Effective Date Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock or Second Lien Warrants will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock or Second Lien Warrants may be substantially limited.  The lack of an active market may also impair your ability to sell your New Common Stock or the Second Lien Warrants at the time you wish to sell them or at a price you consider reasonable.  The lack of an active market may also reduce the market price of your shares of New Common Stock or your Second Lien Warrants.  Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock or Second Lien Warrants indefinitely.  Further, transfers of the New Common Stock and the Second Lien Warrants held by certain holders will be subject to transfer restrictions under applicable securities laws and/or the New Organizational Documents, as discussed more fully below.

### 3.    Holders of the New Common Stock and the Second Lien Warrants May Not Have Access to the Same Level of Information Available to Holders of Registered Securities.

The New Common Stock and the Second Lien Warrants will not be registered under the Securities Act or any state securities laws.  As a result, the Post-Effective Date Debtors will not be subject to the reporting requirements of the Securities Act or the Exchange Act, and the information available to holders of the New Common Stock or Second Lien Warrants may be less than would be required if the New Common Stock or Second Lien Warrants were registered.  Such a reduced availability of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock and the Second Lien Warrants.

4.        **Certain Securities will be Subject to Resale Restrictions.**

The New Common Stock underlying the Management Incentive Plan to be issued under the Plan has not been registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction.  Such securities will be issued and sold, if at all, pursuant to an exemption from registration under the applicable securities laws.  Accordingly, such securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law.  In addition, holders of New Common Stock issued pursuant to Section 1145(a) of the Bankruptcy Code who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions. See Article XII of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the Securities.

X.        **SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

A.        **Holders of Claims Entitled to Vote on the Plan.**

Holders of Claims in Classes 3, 4, and 5 (the "Voting Classes") are entitled to vote to accept or reject the Plan.  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.  The Debtors are ***not*** soliciting votes from Holders of Claims, Interests or Intercompany Interests in Classes 1, 2, 6, 7, ~~or~~ 8 or 9.

+---+
| **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**. |
| |
| PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS. |
+---+

B.        **Voting Record Date.**

The Voting Record Date is **April 11, 2024** (the "Voting Record Date"). The Voting Record Date is the date on which it will be determined which Holders of Claims that are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.  For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package (as defined below) based on a Claim arising from a rejected executory contract or unexpired lease if such claim is filed by the Voting Record Date.

C.        **Voting on the Plan.**

The Voting Deadline is **May 23, 2024, at 4:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your Ballot or the master Ballot containing your vote is actually received by

the Claims and Noticing Agent on or before the Voting Deadline.  Ballots or master Ballots returned by facsimile will not be counted.

**D.      Ballots Not Counted.**

No Ballot will be counted toward Confirmation if, among other things:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims and Noticing Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described in the Disclosure Statement Order and the Solicitation Procedures attached thereto.

**E.      Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**F.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**G.    Solicitation Procedures.**

**1.    Claims and Noticing Agent.**

The Debtors have retained Donlin, Recano & Company, Inc. to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.    Solicitation Package.**

The following Solicitation Materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (b) the applicable forms of Ballots, together with detailed voting instructions and instructions on how to submit the Ballots; (c) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Classes to vote to accept the Plan; (d) solely for Holders of General Unsecured Claims, the Committee Letter, which sets forth the Committee's support for the Plan; (e) the Confirmation Hearing Notice; (ef) this Disclosure Statement (and the exhibits hereto, including the Plan); (fg) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); (gh) a pre-addressed, postage pre-paid reply envelope; and (hi) any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

**3.    Distribution of the Solicitation Package and Plan Supplement.**

The Debtors are causing the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes no later than three (3) Business Days following entry of the Disclosure Statement Order, which is approximately thirty-fourthirty (340) days before the Voting Deadline (*i.e.*, 4:00 p.m. (prevailing Eastern Time) on May 23, 2024).

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by:  (a) calling the Debtors' restructuring hotline at 800-416-3743 (domestic) or 212-481-1411 (international), (b) emailing tocbinfo@drc.equiniti.com_and/or (c) writing to the Claims and Noticing Agent at Donlin, Recano, & Company, Inc., c/o Equiniti, re: Careismatic Brands, LLC, et al., 48 Wall Street, 22nd Floor, New York, NY 10005.  You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://www.donlinrecano.com/Careismatic (free of charge), or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

**XI.    CONFIRMATION OF THE PLAN**

**A.    The Confirmation Hearing.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in

accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

**B.**      **Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims, Interests, and Intercompany Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**C.**      **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their restructuring advisors, AlixPartners and Kirkland & Ellis LLP, are analyzing their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Post-Effective Date Debtors.

On March 25, 2024, the Debtors filed the *Notice of Filing Liquidation Analysis and Financial Projections as Exhibits to the Disclosure Statement* [Docket No. 474].  The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

**D.**      **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[9]

[9]  A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class containing Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

**E.      Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**1.      No Unfair Discrimination.**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan

---

(a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims, Interests or Intercompany Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors, which estimate is attached to this Disclosure Statement as **Exhibit F** (the "Valuation Analysis").  ~~As described herein, the Valuation Analysis will be filed on April 17, 2024 following the conclusion of the Bid Deadline (as defined in the Bidding Procedures).~~

The Valuation Analysis should be considered in conjunction with the risk factors discussed in Article IX of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections.  The Valuation Analysis is subject to various important qualifiers and assumptions that are set forth therein, and Holders of Claims should carefully review the information in the Valuation Analysis in its entirety.  The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting Classes.  This valuation is not, and is not to be construed as, (1) a recommendation to any Holder of Claims as to how to vote on, or otherwise act with respect to, the Plan, (2) an opinion as to the fairness from a financial point of view of the consideration to be received pursuant to the Restructuring Transactions, or (3) an appraisal of the assets of the Post-Effective Date Debtors.

### G.    Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

On March 25, 2024, the Debtors filed the *Notice of Filing Liquidation Analysis and Financial Projections as Exhibits to the Disclosure Statement* [Docket No. 474].  Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of their restructuring advisors, AlixPartners and Kirkland & Ellis LLP.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    New Common Stock.

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Common Stock to certain Holders of prepetition Claims against the Debtors.  The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

The Debtors further believe that the issuance of the New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums, but other than any New Common Stock underlying the Management Incentive Plan) after the Petition Date pursuant to the restructuring transactions under the Plan is, and subsequent transfers of such New Common Stock by the holders thereof that are not "underwriters" (which definition includes "Controlling Persons") will be, exempt from federal and state securities registration requirements under the Bankruptcy Code, Securities Act and any applicable state securities laws as described in more detail below, except in certain limited circumstances.

In addition, any New Common Stock underlying the Management Incentive Plan will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, and will also be considered "restricted securities." Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder provide that the offering, issuance, and distribution of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

The following discussion of the issuance and transferability of the New Common Stock and the Second Lien Warrants relates solely to matters arising under federal securities laws and state securities laws.  The rights of holders of New Common Stock and Second Lien Warrants, including the right to transfer such interests, will also be subject to any restrictions in the Governance Term Sheet to the extent applicable.  Recipients of the New Common Stock and Second Lien Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.

### B.    Exemption from Registration Requirements; Issuance of New Common Stock and Second Lien Warrants under the Plan.

All shares of New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums, but other than any New Common Stock underlying the Management Incentive Plan) and, in the event of a Recapitalization Transaction, the Second Lien Warrants, will be issued after the Petition Date in reliance of Section 1145(a) of the Bankruptcy Code, without registration under the Securities Act, state securities laws or any similar federal, state, or local law.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of

issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property.  The Debtors believe that all shares of New Common Stock (including any New Common Stock which may be issued in connection with the equitization of any DIP Premiums, but other than any New Common Stock underlying the Management Incentive Plan) and, in the event of a Recapitalization Transaction, the Second Lien Warrants, issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Common Stock and Second Lien Warrants.  Recipients of the New Common Stock and Second Lien Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state securities laws.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

**C.      Resales of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

**1.      Resales of New Common Stock Issued Pursuant to Section 1145.**

New Common Stock (other than any New Common Stock underlying the Management Incentive Plan) to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or Blue-Sky Laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock issued in exchange for First Priority Claims or issued in connection with the equitization of any DIP Premiums pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely trade such New Common Stock. However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 may not be available for resales of such New Common Stock by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE POST-EFFECTIVE DATE DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON STOCK AND SECOND LIEN WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

### 2. Resales of New Common Stock Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or Other Available Exemptions from Registration.

To the extent the exemption set forth Section 1145(a) of the Bankruptcy Code is unavailable, New Common Stock will be offered, issued, and distributed in reliance of Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other

available exemptions from registration.  Any New Common Stock underlying the Management Incentive Plan will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable Blue-Sky Laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Common Stock by affiliates of the Debtors.  Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Common Stock offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Common Stock are exempt from the registration requirements of Section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Common Stock will also be subject to any applicable transfer restrictions contained in the Governance Term Sheet.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.  THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL**

**PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW COMMON STOCK OR SECOND LIEN WARRANTS MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Post-Effective Date Debtors, the GUC Trust, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Allowed First Priority Claims, Allowed Second Lien Secured Claims, or Allowed General Unsecured Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS, as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Post-Effective Date Debtors, the GUC Trust, or to Holders of Allowed First Priority Claims, Allowed Second Lien Secured Claims, or Allowed General Unsecured Claims in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy,

regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction).  Moreover, this summary does not address any aspect of U.S. non-income (including state or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income).  Furthermore, this summary assumes that a Holder of an Allowed Claim holds only Claims in a single class and holds such Claims and New Common Stock, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors and the Post-Effective Date Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form.  This discussion also assumes that none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and that each of the Allowed Claims is denominated in U.S. dollars.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from that described below.   For the avoidance of doubt, this summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of an Allowed First Priority Claim, an Allowed Second Lien Secured Claim, or an Allowed General Unsecured Claim that for U.S. federal income tax purposes is:  (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of an Allowed First Priority Claim, Allowed Second Lien Secured Claim, or Allowed General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of an Allowed First Priority Claim, Allowed Second Lien Secured Claim, or Allowed General Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Allowed First Priority Claims, Allowed Second Lien Secured Claims, and Allowed General Unsecured Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S.**

**FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Post-Effective Date Debtors.**

1.    **Characterization of the Restructuring Transactions.**

~~The Debtors expect that the Restructuring Transactions will be structured in one of two ways: (a) a Recapitalization Transaction, or (b) a Sale Transaction of (i) the New Common Stock (an "Equity Investment Transaction") or (ii) all or substantially all of the Assets (an "Asset Sale"). The Debtors will pursue a Sale Transaction unless no Successful Bid is received in connection with the Sale Process or the winning bid is a Credit Bid, in which case the Recapitalization Transaction will be implemented.~~

Whether the Debtors will recognize any gain or loss as a result of consummating the Restructuring Transactions will depend on  whether the Restructuring Transactions are structured as a ~~Recapitalization Transaction or a Sale Transaction and the manner in which such transaction is implemented. In a Sale~~<u>taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") or as a recapitalization of the Debtors. In a Taxable</u> Transaction ~~structured as an Asset Sale~~, the Debtors will generally realize gain or loss in an amount equal to the difference between the <u>fair market</u> value of the ~~consideration received by the Debtors (including, for this purpose, assumption of liabilities~~<u>assets transferred (or deemed transferred)</u> and the Debtors' tax basis in ~~the~~<u>such</u> ~~A~~<u>a</u>ssets ~~sold~~. Any such <u>realized</u> gain generally will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain will be recognized by the Debtors and result in a cash tax obligation. ~~A Recapitalization Transaction, if structured in a certain manner could give rise to similar tax consequences for the Debtors~~<u>If a Reorganized Debtor purchases (or is deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the IRC to treat such stock purchase as the purchase of the Debtors' assets. In a Taxable Transaction, Reorganized Care</u>is~~mic~~<u>generally will not succeed to any of the Debtors' existing tax attributes</u>. In either a ~~R~~<u>r</u>ecapitalization ~~Transaction or a Sale~~<u>of the Debtors or a Taxable</u> Transaction, the Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income") and, other than in ~~an Asset Sale~~<u>a Taxable Transaction</u>, the limitations on net operating losses ("<u>NOLs</u>"), deferred deductions under section 163(j) of the IRC ("<u>163(j) Deductions</u>") and other tax attributes.

2.    **Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the issue price of any new indebtedness issued by the debtor, and (ii) the fair market value of any new consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction. Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax

attributes occurs only after the taxable income (or loss) for the year in which the debt discharge occurs has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Post-Effective Date Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. 163(j) Deductions are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the New Common Stock, the Second Lien Warrants, and ~~any other consideration, such as the purchase price paid in a Sale Transaction, none of which can be known until after the Plan is consummated~~ the GUC Trust Assets. Accordingly, the Debtors are currently unable to determine the ~~Post-Effective Date Debtors and the~~ precise effect that the COD Income exclusion rules will have on Reorganized Careismatic and its U.S. federal income tax attributes.

**3.** **Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.**

After giving effect to the reduction in tax attributes for excluded COD Income described above, the Post-Effective Date Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

**a.** **General Sections 382 and 383 Annual Limitations.**

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses (a "NUBIL"), 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to a Restructuring Transaction ~~or the sale of New Common Stock pursuant to an Equity Investment Transaction~~ will result in an "ownership change"

of the Debtors for these purposes, and that the Post-Effective Date Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC (described below) applies.

### b.  General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.81 percent for ~~February~~changes that occur in April 2024).  The 382 Limitation may be increased to the extent that the Post-Effective Date Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period"), or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[10]  If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Unless the special 382(l)(5) Exception (described below) applies, if the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains).  As discussed below, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### c.  Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization.  If the 382(l)(5) Exception applies and the Post-Effective Date Debtors

---

[10]  Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area. Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Post Effective Date Debtors with respect to any "ownership change" that occurs pursuant to the Plan.

undergo another "ownership change" within two years after the Effective Date, then the Post-Effective Date Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  Rather, the resulting limitation would be determined under the regular rules for ownership changes under Section 382 and 383 of the IRC.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Post-Effective Date Debtors will elect out of its application so that the 382(l)(6) Exception instead applies.  Whether the Post-Effective Date Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Post-Effective Date Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### 4.    Transfer of GUC Trust Assets to GUC Trust

The GUC Trust is structured to qualify as a "grantor trust" for U.S. federal income tax purposes, to the extent permitted by applicable law, of which the Holders of Allowed General Unsecured Claims (the "GUC Trust Beneficiaries") would be treated as the grantors and owners thereof.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the GUC Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Plan provides that the GUC Trustee will so treat the GUC Trust as a liquidating trust on the GUC Trust's U.S. federal income tax return.  The Plan further provides that all parties shall treat any transfer of assets to the GUC Trust, for U.S. federal income purposes, as (a) a first-step transfer of the GUC Trust Assets to the GUC Trust Beneficiaries and, to the extent the GUC Trust Assets are allocable to Disputed Claims that are the responsibility of the GUC Trust to resolve, to the Disputed Claims Reserve followed by (b) a second-step transfer by such Holders to the GUC Trust of such portion of the GUC Trust Assets in exchange for the GUC Trust Interests (other than the GUC Trust Assets allocable to the Disputed Claims Reserve).

No ruling from the IRS has been or will be requested regarding the classification of the GUC Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust.  If the IRS were to successfully challenge the classification of the GUC Trust as a grantor trust, the U.S. federal income tax consequences to the GUC Trust and the GUC Trust Beneficiaries could vary from those discussed in the Plan and this U.S. Tax Discussion (including the potential for an entity-level tax).  For example, the IRS could characterize the GUC Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as reasonably practicable after the transfer of the GUC Trust Assets to the GUC Trust, the GUC Trustee shall make a good faith valuation of the GUC Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the GUC Trustee, and the Holders of Allowed General Unsecured Claims receiving interests in the GUC Trust shall take consistent positions with respect to the valuation of the GUC Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

The GUC Trust shall in no event be dissolved later than five years from the creation of the GUC Trust unless the bankruptcy court, upon motion within the six month period prior to the fifth anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or based on advice or an opinion of counsel satisfactory to the GUC Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the GUC Trust Assets.

**C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

**1.    U.S. Federal Income Tax Consequences to U.S. Holders of the Consummation of the Restructuring Transactions: Treatment of Debt as a Security.**

The U.S. federal income tax consequences to a U.S. Holder of Allowed Claims ~~in a Recapitalization Transaction~~ will depend, in part, on whether, for U.S. federal income tax purposes, (a) the Allowed First Priority Claim or Allowed Second Lien Secured Claim, as applicable, surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (b) the New Common Stock or Second Lien Warrants, as applicable, received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or an entity that is a "party to a reorganization" with such entity).  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

Due to the inherently factual nature of the determination of whether a debt instrument constitutes a "security", U.S. Holders of Allowed First Priority Claims and Allowed Second Lien Secured Claims are urged to consult their tax advisors regarding the status of the Allowed First Priority Claims and Allowed Second Lien Secured Claims, as applicable, as "securities" for U.S. federal income tax purposes.

2.    **Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Priority Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed First Priority Claim will receive its *pro rata* share of, (a) in the event of the Recapitalization Transaction, 100 percent of the New Common Stock issued pursuant to the Plan on the Effective Date, subject to dilution on account of (i) the MIP Equity, (ii) DIP Premiums, subject to the DIP Premium Conversion Election Option, and (iii) if applicable, the exercise of the Second Lien Warrants, and (b) in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration.

a.    **Treatment of U.S. Holders of Allowed First Priority Claims if the Restructuring Transactions are structured as a Recapitalization Transaction.**

The U.S. federal income tax consequences to a U.S. Holder of an Allowed First Priority Claim in a Recapitalization Transaction will depend on the manner in which the transaction is implemented and the identity of the issuer of the New Common Stock. In a Recapitalization Transaction, ifIf either (i) an Allowed First Priority Claims is not treated as a "security," or (ii) the entity issuing the New Common Stock under the Plan is not the same entity as the Debtor against which the Allowed First Priority Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims for New Common Stock is expected to be treated as a taxable exchange pursuant to section 1001 of the IRC. In that case, a U.S. Holder of an Allowed First Priority Claim generally should recognize gain or loss equal to (a) the fair market value of the New Common Stock received as of the date such New Common Stock is distributed less (b) the U.S. Holder's adjusted tax basis in its Allowed First Priority Claim. The adjusted tax basis of a U.S. Holder's Allowed First Priority Claims generally will equal such U.S. Holder's purchase price for such Allowed First Priority Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed First Priority Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "Market Discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations. A U.S. Holder should obtain a tax basis in the New Common Stock equal to the fair market value of the New Common Stock as of the date such New Common Stock is distributed to such U.S. Holder. The holding period for any such New Common Stock should begin on the day following the receipt of such New Common Stock.

In a Recapitalization Transaction whereOn the other hand, if a U.S. Holder's Allowed First Priority Claim is treated as a "security" for tax purposes and the entity issuing the New Common Stock under the Plan is the same entity as the Debtor against which such Allowed First Priority Claims is asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims for New Common Stock is expected to be treated as part of a "reorganization" within the meaning of section 368 of the IRC. In that case, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID) or any property received other than the New Common Stock, and subject to the rules relating to market discount (as described below under "Market Discount"), a U.S. Holder of an Allowed First Priority Claim should not recognize gain or loss with respect to such Allowed First Priority Claim. A U.S. Holder should obtain a tax basis in the New Common Stock equal to the tax basis in their Allowed First Priority Claim and

should have a holding period in such New Common Stock that includes the U.S. Holder's holding period in their Allowed First Priority Claim.

Regardless of whether a Recapitalization the Restructuring Transactions is are treated as taxable, the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

**b. Treatment of U.S. Holders of Allowed First Priority Claims if the Restructuring Transactions are structured as a Sale Transaction.**

If the Restructuring Transactions are structured as a Sale Transaction, then the exchange of any Allowed First Priority Claims by a U.S. Holder should generally be treated as a taxable exchange pursuant to section 1001 of the IRC, though the consequences will depend in significant part on the final mechanism that results in the consummation of the Restructuring Transactions.  In such case, subject to potential installment sale treatment and the discussion below regarding recognition of loss, a U.S. Holder of an Allowed First Priority Claim generally should recognize gain or loss equal to (a) the amount of Cash received, if any, less (b) the U.S. Holder's adjusted tax basis in its Allowed First Priority Claim. The adjusted tax basis of a U.S. Holder's Allowed First Priority Claims generally will equal such U.S. Holder's purchase price for such Allowed First Priority Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed First Priority Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount."  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

It is possible that U.S. Holders of Allowed First Priority Claims will receive some amounts on the Effective Date and additional value after the Effective Date. If a U.S. Holder of a Claim receives additional value following the Effective Date, such U.S. Holder may be required to defer all or a portion of any tax loss on their Claim until the relevant Post-Effective Date Debtors have distributed all value or the U.S. Holder disposes of its Claim.  U.S. Holders should consult their own tax advisors regarding the timing of any gain or loss relating to their Claims.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### 3. Consequences of the Restructuring Transactions to U.S. Holders of Allowed Second Lien Secured Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed Second Lien Secured Claim will receive its *pro rata* share of, (a) in the event of the Recapitalization Transaction, no recovery or distribution on account of their Allowed Second Lien Secured Claim; *provided* that, if the Second Lien Condition is satisfied, each Holder of an Allowed Second Lien Secured Claim shall receive its *pro rata* share of the Second Lien Warrants and (b) in the event of the Sale Transaction, its *pro rata* distribution of the Excess Distributable Consideration after all First Priority Claims have been satisfied in full in Cash.

a. **Treatment of U.S. Holders of Allowed Second Lien Secured Claims** ~~if the Restructuring Transactions are structured as a Recapitalization Transaction~~.

The U.S. federal income tax consequences to a U.S. Holder of an Allowed Second Lien Secured Claim ~~in a Recapitalization Transaction~~ will depend on the manner in which the transaction is implemented and the identity of the issuer of the Second Lien Warrants.  ~~In a Recapitalization Transaction, if~~If either (i) an Allowed Second Lien Secured Claim is not treated as a "security," or (ii) the entity issuing, in the event the Second Lien Condition is satisfied, the Second Lien Warrants under the Plan is not the same entity as the Debtor against which the Allowed Second Lien Secured Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims should generally be treated as a taxable exchange pursuant to section 1001 of the IRC.  In that case, a U.S. Holder of an Allowed Second Lien Secured Claim generally should recognize gain or loss equal to (a) the fair market value of the Second Lien Warrants received as of the date such Second Lien Warrants are distributed less (b) the U.S. Holder's adjusted tax basis in its Allowed Second Lien Secured Claim.  The adjusted tax basis of a U.S. Holder's Allowed Second Lien Secured Claims generally will equal such U.S. Holder's purchase price for such Allowed Second Lien Secured Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed Second Lien Secured Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."  Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount."  If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year.  Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.  A U.S. Holder should obtain a tax basis in each Second Lien Warrant equal to the fair market value of such Second Lien Warrant as of the date such Second Lien Warrant is distributed to such U.S. Holder plus, if such Second Lien Warrant is exercised, the exercise price of the Second Lien Warrant.  The holding period for any such Second Lien Warrant should begin on the day following the exercise of the Second Lien Warrant.

~~In a Recapitalization Transaction where~~On the other hand, if a U.S. Holder's Allowed Second Lien Secured Claim is treated as a "security" for tax purposes and in the event the Second Lien Condition is satisfied, the entity issuing the Second Lien Warrants pursuant to the Plan is the same entity as the Debtor against which such Allowed First Priority Claims is asserted (or an entity that is a "party to a reorganization" with such Debtor for U.S. federal income tax purposes), the exchange of such Claims for Second Lien Warrants is expected to be treated as part of a "reorganization" within the meaning of section 368 of the IRC.  In that case, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or OID) or any property received other than the Second Lien Warrants, and subject to the rules relating to market discount (as described below under "Market Discount"), a U.S. Holder of an Allowed Second Lien Secured Claim should not recognize gain or loss with respect to such Allowed Second Lien Secured Claim.  A U.S. Holder should obtain a tax basis in the Second Lien Warrants equal to the tax basis in their Allowed Second Lien Secured Claim and should have a holding period in such Second Lien Warrants that includes the U.S. Holder's holding period in their Allowed Second Lien Secured Claim.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

**4.** ~~b. Treatment of~~Consequences of the Restructuring Transactions to U.S. Holders of Allowed ~~Second Lien~~General ~~S~~Unsecured Claims ~~if the Restructuring Transactions are structured as a Sale Transaction~~

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Trust Net Assets on account of such Allowed General Unsecured Claims.

As discussed above in Article XIII.B.4 (*Transfer of GUC Trust Assets to GUC Trust*), the GUC Trust is intended to qualify as a grantor trust, to the extent permitted by applicable law, of which the GUC Trust Beneficiaries would be treated as the grantors and owners thereof. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the GUC Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the GUC Trust will report consistently with such position on the GUC Trust's U.S. federal income tax return. So treated, any transfer of assets to the GUC Trust will be deemed to occur, for U.S. federal income tax purposes, as (a) a first-step transfer of the GUC Trust Assets to the GUC Trust Beneficiaries and, to the extent the GUC Trust Assets are allocable to Disputed Claims that are the responsibility of the GUC Trust to resolve, to the Disputed Claims Reserve followed by (b) a second-step transfer by such Holders to the GUC Trust of such portion of the GUC Trust Assets in exchange for the GUC Trust Interests (other than the GUC Trust Assets allocable to the Disputed Claims Reserve).

~~If the Restructuring Transactions are structured as a Sale Transaction, then the exchange of any Allowed Second Lien Secured Claims by a U.S. Holder should generally be treated as a taxable exchange pursuant to section 1001 of the IRC. In such case, subject to potential installment sale treatment and the discussion below regarding recognition of loss, a~~A U.S. Holder of an Allowed ~~Second Lien~~General ~~S~~Unsecured Claim ~~generally~~ should recognize gain or loss under section 1001 of the IRC equal to the difference between (~~a~~i) the amount of Cash and the fair market value of the GUC Trust Assets deemed received~~, if any, less~~ by it that is not allocable to accrued but unpaid interest and (~~b~~ii) ~~the~~such U.S. Holder's adjusted tax basis (if any) in its Allowed ~~Second Lien~~General ~~S~~Unsecured Claim. ~~The adjusted tax basis of a U.S. Holder's Allowed Second Lien Secured Claims generally will equal such U.S. Holder's purchase price for such Allowed Second Lien Secured Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Allowed Second Lien Secured Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will~~Assuming such U.S. Holder holds such General Unsecured Claim as a capital asset, any gain or loss realized would be capital gain or loss~~.~~ (except, as described below, to the extent ~~described below under "~~of ~~M~~market ~~D~~discount~~."  If recognized gain or loss is capital gain or loss, it would generally constitute~~) and would be long-term capital gain or loss if ~~the~~such U.S. Holder's ~~has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.~~holding period in the Claim at the time of the Restructuring Transactions exceeds one year.  The treatment of accrued but unpaid interest and market discount is discussed below in Article XIII.C.5 (*Accrued Interest*) and Article XIII.C.6. (*Market Discount*).  U.S. Holders of Allowed General Unsecured Claims should obtain a tax basis in their *pro rata* share of each of the GUC Trust Assets equal to the fair market value of such Holder's *pro rata* share of each of the GUC Trust Assets as of the date such property is treated as having been distributed to such Holder

pursuant to (a) above, and the holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

It is possible that U.S. Holders of Allowed Second Lien Secured Claims will receive some amounts after the Effective Date. If a U.S. Holder of an Allowed Second Lien Secured Claim receives value following the Effective Date, such U.S. Holder may be required to defer all or a portion of any tax loss on their Claim until the relevant Post-Effective Date Debtors have distributed all value or the U.S. Holder disposes of its Claim.  U.S. Holders should consult their own tax advisors regarding the timing of any gain or loss relating to their Claims.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

**4.  Consequences of the Restructuring Transactions to U.S. Holders of Allowed General Unsecured Claims.**

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to less favorable treatment or such General Unsecured Claim has been paid prior to the Effective Date, each General Unsecured Claim shall receive, in full and final satisfaction of such Claim, (a) in the event of the Recapitalization Transaction, no recovery or distribution on account of such Allowed General Unsecured Claims, and (b) in the event of the Sale Transaction, its pro rata distribution of the Excess Distributable Consideration after all First Priority Claims and Second Lien Secured Claims have been satisfied in full in Cash. Accordingly, subject to the discussion of accrued interest and market discount below, each Holder of a General Unsecured Claim would, in the event of the Sale Transaction, generally recognize gain or loss in the exchange in an amount equal to the difference between (i) the sum of the amount of Cash received from its distribution of the Excess Distributable Consideration and (ii) such Holder's adjusted tax basis in its General Unsecured Claim.  Generally, this gain or loss will be subject to the rules described above in "Consequences of the Restructuring Transactions to U.S. Holders of Allowed First Priority Claims – Treatment of U.S. Holders of Allowed First Priority Claims if the Restructuring Transactions are structured as a Sale Transaction."

In general, no entity-level tax should be imposed on the GUC Trust with respect to earnings generated by the assets held by the GUC Trust.  Instead, each GUC Trust Beneficiary must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the GUC Trust, even if no distributions are made to the GUC Trust Beneficiaries by the GUC Trust.  Allocations of taxable income of the GUC Trust among the GUC Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the GUC Trust had distributed all its assets (valued at their tax book value) to the GUC Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust.  Similarly, taxable loss of the GUC Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining GUC Trust Assets.  The tax book value of the GUC Trust Assets shall equal their fair market value on the date of the transfer of the GUC Trust Assets to the GUC Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The GUC Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the GUC Trust Assets (*e.g.*, income, gain, loss,

deduction and credit), to the extent required by applicable law.  The GUC Trustee will annually send or make available to each GUC Trust Beneficiary of record, in accordance with applicable law, a separate statement setting forth such beneficiary's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the GUC Trust) as relevant for U.S. federal income tax purposes.  Each GUC Trust Beneficiary must report on its U.S. federal income tax return its share of all such items. The information provided by the GUC Trust will pertain to GUC Trust Beneficiaries who received their interests in the GUC Trust in connection with the Plan.

In the event of the subsequent disallowance of any Disputed Claims, it is possible that a U.S. Holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim.  Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims for which the Holders are receiving the GUC Trust Interests are Allowed or Disallowed.  Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any such additional distributions received. In addition, a portion of any distributions received may be treated as interest income under the imputed interest provisions of the IRC.  The discussion herein assumes that the installment method does not apply, either because the exchange is not eligible or because the U.S. Holder of Allowed General Unsecured Claims elects out of such treatment.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the GUC Trustee of an IRS private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee may (A) elect to treat any portion of the GUC Trust allocable to Disputed Claims (if any) as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for U.S. federal, state and local income tax purposes.

Accordingly, any Disputed Claims Reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the GUC Trust Assets in such reserve (including any gain recognized by the reserve with respect to such GUC Trust Assets if and to the extent such assets are actually or deemed distributed from the reserve, due to the treatment of such distribution as a sale or exchange), and all distributions from such reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by Holders in respect of their Allowed General Unsecured Claims as if distributed by the Debtors.  All parties (including, without limitation, the Debtors, the GUC Trustee, and the GUC Trust Beneficiaries) will be required to report for U.S. federal, state, and local income tax purposes consistently with the foregoing.  To the extent property is not distributed to U.S. Holders of applicable Allowed General Unsecured Claims on the Effective Date but instead is transferred to any such account, although not free from doubt, such U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually or deemed distributed to such U.S. Holders from the Disputed Claims Reserve.

Subject to the above discussion regarding the Disputed Claims Reserve, the U.S. federal income tax obligations of U.S. Holders with respect to their beneficial interest in the GUC Trust are not dependent on the GUC Trust distributing any Cash or other proceeds.  As described above, holders of the Allowed General Unsecured Claims will be required to report on their U.S. federal income tax returns their share of the GUC Trust's items of income, gain, loss, deduction, and credit in the year recognized by the GUC Trust.  This requirement may result in such U.S. Holders being subject to tax on their allocable share of the GUC Trust's taxable income prior to receiving any cash distributions from the GUC Trust.  In general, except with respect to distributions from the Disputed Claims Reserve, a

distribution of Cash by the GUC Trust will not be separately taxable to a holder of a beneficial interest in the GUC Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Trust).

    **5.**    **Accrued Interest.**

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but untaxed interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

    ***U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.***

    **6.**    **Market Discount.**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Allowed Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (i.e., up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange,

redemption, or other disposition of such property will be treated as ordinary income to the extent of such accrued, but not recognized, market discount.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim.*

**7.      Limitations on Capital Losses.**

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

**8.      Consequences to U.S. Holders of the Ownership and Disposition of New Common Stock.**

**a.    Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Careismatic as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock.  Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Careismatic has sufficient earnings and profits and certain holding period requirements are satisfied.

**b.    Sale, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock.  Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed First Priority Claims or recognized an ordinary loss on the exchange of its Allowed First Priority Claims for New Common Stock.

**D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed First Priority Claims, Allowed Second Lien Secured Claims, and Allowed General Unsecured Claims.  This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock or Second Lien Warrants, as applicable.

**1.    Gain Recognition by Non-U.S. Holders of Allowed Claims.**

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims.  Any gain realized by a Non-U.S. Holder of an Allowed Claim on the exchange of its Allowed Claims (other than any gain attributable to accrued but untaxed interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

With respect to the Allowed General Unsecured Claims, in addition to the consequences described in Article XIII.C.4 (*Consequences of the Restructuring Transactions to U.S. Holders of Allowed General Unsecured Claims*), the GUC Trustee will comply with all applicable governmental withholding requirements.  With respect to any GUC Trust Beneficiaries that are Non-U.S. Holders, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate and appropriate documentation or other support has been provided by such Non-U.S. Holder that establishes that such Non-U.S. Holder is eligible for such reduced rate of withholding).  Non-U.S. Holders receiving GUC Trust Interests should consult their tax advisors concerning the U.S. federal income tax consequences to them of holding GUC Trust Interests, including that such Non-U.S. Holders would be treated as owning direct interests in the GUC Trust Assets.

2.    **Accrued Interest.**

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to Allowed Claims generally will not be subject to U.S. federal income or withholding tax, provided that such Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that such Non-U.S. Holder is not a U.S. person, unless:

(a)    such Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of Debtor's stock entitled to vote;

(b)    such Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Debtor (each, within the meaning of the IRC);

(c)    such Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders - Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

3.    **Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Stock.**

a.    **Dividends.**

Any distributions made with respect to New Common Stock (other than certain distributions of stock of Reorganized Careismatic) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Careismatic, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such New Common Stock and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are

not effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that is effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If Reorganized Careismatic is considered a "U.S. real property holding corporation" (a "USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes.  In the event the New Common Stock are regularly traded on an established market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of equity interests that includes New Common Stock during a specified testing period.  Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

**b.   Sale, Redemption, or Repurchase of New Common Stock.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless:

(i)        such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)       such gain is effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)      the issuer of such New Common Stock is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with

respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of New Common Stock generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a Non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connect with such Non-U.S. Holder's conduct of a U.S. trade or business. A Non-U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) such Non-U.S. Holder's holding period for its interests in the corporation.

In general, FIRPTA will not apply upon a Non-U.S. Holder's disposition of its New Common Stock if (x) the New Common Stock is treated as "regularly traded" on an established market and continue to be regularly traded on an established market and (y) the Non-U.S. Holder did not directly or indirectly own more than 5 percent of the value of the New Common Stock during a specified testing period.

## E.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final Treasury Regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW COMMON STOCK.**

**F.        Information Reporting and Backup Withholding.**

The Debtors, the Post-Effective Date Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan.    Further, the Debtors will comply with all applicable reporting requirements of the IRC.    In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.    Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).    The current backup withholding rate is 24 percent.    Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.    THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.    ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, TERRITORIAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 4~~18~~, 2024                    Careismatic Brands, LLC
                                              on behalf of itself and all other Debtors


                                       By:    */s/ Kent Percy*
                                              Kent Percy
                                              Chief Restructuring Officer